# SBA

SOP 50 10 5(K)

---

# Lender and Development Company Loan Programs

Office of Financial Assistance

U.S. Small Business Administration



**SMALL BUSINESS ADMINISTRATION**
**STANDARD OPERATING PROCEDURE**

| SUBJECT: | S.O.P. | | REV |
|---|---|---|---|
| Lender and Development Company Loan Programs | SECTION 50 | NO. 10 | 5(K) |

**INTRODUCTION**

1. Purpose: Update SOP 50 10 5(K) Lender and Development Company Loan Programs.
2. Personnel Concerned: All SBA Employees
3. SOP Canceled: None. Previous edition of SOP 50 10 will continue to have applicability to loans that were approved during their effective time periods.
4. Updated Information: This full update of SOP 50 10 5 is necessary for the SOP to conform to recently revised regulations in 13 CFR Part 120, and to provide guidance that clarifies and streamlines policy and procedures affecting the 7(a) and 504 programs. This version, which will be SOP 50 10 5(K), includes revised guidance in the following general areas:

   a) Incorporates regulatory changes published in the May 7, 2018, Final Rule on Debt Refinancing in 504 Loan Program (83 FR 19915), effective June 6, 2018;

   b) Incorporates the availability of 504 Debentures with a maturity of 25 years, in accordance with the Federal Register Notice published April 4, 2018, available for 504 Projects approved on or after April 2, 2018;

   c) Incorporates policy changes published in SBA Policy Notice 5000-17057, effective April 3, 2018, including:

      i. Revised guidance on credit elsewhere for 7(a) and 504 loans;

      ii. Clarified the minimum equity requirements for 7(a) loans involving change of ownership transactions between existing owners;

      iii. Provided additional guidance regarding the eligibility of marijuana-related businesses and hemp-related businesses; and

      iv. Reduced the minimum monitoring requirements for Working Capital CAPLines; and

   d) Clarifies guidance for SBA Lenders (7(a) lenders and CDCs) on the delivery of 7(a) loans (including SBA Express, Export Express, Export Working Capital Program and International Trade) and 504 program loans.

5. Originator: Office of Capital Access

| AUTHORIZED BY: | | EFFECTIVE DATE |
|---|---|---|
| William M. Manger<br>Associate Administrator<br>Capital Access | | April 1, 2019 |
| | | Page 1 |

# TABLE OF CONTENTS

SUBPART A SBA LENDER AND CERTIFIED DEVELOPMENT COMPANY PARTICIPATION REQUIREMENTS ................................................................ 7
  PURPOSE OF THIS SUBPART ................................................................ 7
  **CHAPTER 1: 7(a) LENDERS** ................................................................ 8
    I.    THE 7(A) LOAN PROGRAM ................................................................ 8
    II.   BECOMING A 7(A) LENDER ................................................................ 8
    III.  HOW SBA OVERSEES 7(A) LENDERS ................................................ 17
    IV.   DELEGATED AUTHORITY IN THE 7(A) LOAN PROGRAM ............................ 22
  CHAPTER 2: SMALL BUSINESS LENDING COMPANIES ................................ 40
    I.    SMALL BUSINESS LENDING COMPANIES ("SBLC") 13 CFR §§ 120.460-120.490 ................................................................ 40
    II.   PROCESS FOR ACQUIRING AN SBLC ................................................ 41
  CHAPTER 3: CERTIFIED DEVELOPMENT COMPANIES ................................ 45
    I.    THE 504 LOAN PROGRAM ................................................................ 45
    II.   BECOMING A CDC AND OPERATIONAL REQUIREMENTS .......................... 45
    III.  THE PROCESS OF APPLYING TO BECOME A CDC .................................. 60
    IV.   SBA OVERSIGHT OF CDCs ................................................................ 63
    V.    TYPES OF CDCS ................................................................ 70
    VI.   AREA OF OPERATIONS ................................................................ 81
SUBPART B  SECTION 7(A) BUSINESS LOAN PROGRAMS ................................ 88
  PURPOSE OF THIS SUBPART ................................................................ 88
  CHAPTER 1: GENERAL DESCRIPTION OF THE 7(A) LOAN PROGRAMS .............. 89
    I.    LOAN PROCESSING DELIVERY METHODS .......................................... 89
    II.   USE OF 7(A) LOAN PROCEEDS ........................................................ 89
    III.  SPECIAL PURPOSE LOANS ................................................................ 89
    IV.   DEFINITIONS APPLICABLE TO THE 7(A) LOAN PROGRAMS .................... 90
  CHAPTER 2: ELIGIBILITY FOR 7(**A**) GUARANTY LOAN PROGRAM .................. 91
    I.    INTRODUCTION ................................................................ 91
    II.   ELIGIBILITY REQUIREMENTS FOR ALL 7(A) LOAN APPLICANTS .............. 91
    III.  INELIGIBLE TYPES OF BUSINESSES ................................................ 104

SOP 50 10 5(K)

IV.    ADDITIONAL ELIGIBILITY REQUIREMENTS FOR CERTAIN SBA 7(A) LOAN DELIVERY METHODS ................................................................ 126

V.    ELIGIBLE USES OF LOAN PROCEEDS (13 CFR §§ 120.120, 120.202, and 120.332) ................................................................................................................ 128

CHAPTER 3: LOAN TERMS AND CONDITIONS ................................................ 146

I.    MAXIMUM LOAN AMOUNTS ................................................................ 146

II.    MAXIMUM GUARANTY AMOUNTS ...................................................... 146

III.    LOAN MATURITIES (13 CFR § 120.212) ................................................ 148

IV.    INTEREST RATES ................................................................................ 152

V.    SBA GUARANTY FEES (13 CFR § 120.220) ............................................ 159

VI.    FEES LENDERS AND/OR THIRD PARTIES MAY COLLECT FROM AN APPLICANT (13 CFR § 120.221) .................................................................. 165

VII.    PROHIBITED FEES .............................................................................. 169

VIII.    DISCLOSURE OF FEES AND LENDER EXPENSES (13 CFR Part 103 and 13 CFR §120.221). ....................................................................................... 169

IX.    AGENTS ............................................................................................ 171

X.    WHO MAY CONDUCT BUSINESS WITH SBA (13 CFR § 103.2) .......................... 173

CHAPTER 4: CREDIT STANDARDS, COLLATERAL AND ENVIRONMENTAL POLICIES ................................................................................................ 177

I.    CREDITWORTHINESS/CREDIT UNDERWRITING .............................................. 177

II.    GUARANTIES AND COLLATERAL .......................................................... 191

III.    ASSIGNMENT OF LEASE AND LANDLORD'S WAIVER ................................ 200

IV.    REAL ESTATE APPRAISAL AND BUSINESS VALUATION REQUIREMENTS ................................................................................... 201

V.    ENVIRONMENTAL POLICIES AND PROCEDURES ............................................ 205

CHAPTER 5: LOAN AUTHORIZATION .............................................................. 214

I.    BASIC LOAN CONDITIONS (13 CFR § 120.160) ............................................ 214

II.    CONSTRUCTION LOAN PROVISIONS (13 CFR § 120.174) .................................. 215

III.    INSURANCE REQUIREMENTS ................................................................ 217

IV.    IRS TAX TRANSCRIPT/VERIFICATION OF FINANCIAL INFORMATION .... 217

V.    SPECIAL PROVISION FOR CAPLINES ...................................................... 220

VI.    SPECIAL PROVISION FOR FRANCHISE .................................................. 220

VII.    MODIFYING THE AUTHORIZATION ........................................................ 220

SOP 50 10 5(K)

CHAPTER 6: SUBMISSION OF APPLICATION FOR GUARANTY ................................... 221

  I.    CONTENTS OF LENDER'S APPLICATION FOR GUARANTY: ........................... 221

  II.   WHERE TO SUBMIT APPLICATION FOR GUARANTY ....................................... 226

CHAPTER 7: POST-APPROVAL MODIFICATIONS, LOAN CLOSING & DISBURSEMENT ........................................................................................................... 228

  I.    POST-APPROVAL/PRE-DISBURSEMENT REQUESTS FOR CHANGES ............. 228

  II.   TRANSFER OF GUARANTY BETWEEN PARTICIPATING LENDERS................ 231

  III.  PAYMENT OF GUARANTY FEE ........................................................................ 231

  IV.  LOAN CLOSING AND DISBURSEMENT ............................................................ 231

CHAPTER 8: POST-DISBURSEMENT CHANGES, SECONDARY MARKET, SECURITIZATION AND LENDER REPORTING (SBA FORM 1502) ................................ 255

  I.    POST-DISBURSEMENT CHANGES ..................................................................... 255

  II.   SECONDARY MARKET FOR SBA-GUARANTEED LOANS ................................. 255

  III.  SECONDARY MARKET RESOURCES ................................................................. 256

  IV.  LOAN TRANSFERS ............................................................................................ 256

  V.   LOAN PARTICIPATION SALES ........................................................................ 257

  VI.  SECURITIZATION AND OTHER CONVEYANCES ............................................ 258

  VII. LENDER LOAN REPORTING ........................................................................... 260

SUBPART C SECTION 504 CERTIFIED DEVELOPMENT COMPANY LOAN PROGRAM 262

PURPOSE OF THIS SUBPART ................................................................................... 262

CHAPTER 1: GENERAL PROVISIONS ........................................................................ 263

  I.    PURPOSE OF THE 504 CERTIFIED DEVELOPMENT COMPANY LOAN PROGRAM ......................................................................................................... 263

  II.   CREDIT STANDARDS (13 CFR § 120.150) ................................................... 263

  III.  DEFINITIONS .................................................................................................. 263

  IV.  HOW A 504 PROJECT IS FINANCED ............................................................. 265

CHAPTER 2: ELIGIBILITY ........................................................................................ 274

  I.    INTRODUCTION ............................................................................................... 274

  II.   ELIGIBILITY REQUIREMENTS FOR ALL 504 APPLICANTS............................. 274

  III.  TYPES OF INELIGIBLE BUSINESSES ............................................................... 287

  IV.  504 PROGRAM-SPECIFIC ELIGIBILITY FACTORS ......................................... 309

CHAPTER 3: COLLATERAL, APPRAISALS AND ENVIRONMENTAL POLICIES......... 324

SOP 50 10 5(K)

I.    COLLATERAL ................................................................... 324

II.    APPRAISAL REQUIREMENTS ....................................... 327

III.    ENVIRONMENTAL POLICIES AND PROCEDURES ......................... 328

CHAPTER 4: LOAN APPLICATION PROCEDURES AND CONTROLS ........................ 337

I.    CDC'S 504 APPLICATION ............................................ 337

II.    MINIMUM DEBENTURE AMOUNT .............................. 337

III.    SUBMITTING THE APPLICATION ............................... 337

CHAPTER 5: LOAN CONDITIONS/AUTHORIZATION REQUIREMENTS ..................... 340

I.    AUTHORIZATION BOILERPLATE/WIZARD .......................... 340

II.    MODIFYING THE AUTHORIZATION .......................... 347

CHAPTER 6: CLOSINGS ................................................................ 349

I.    RESPONSIBILITY FOR CLOSING THE 504 LOAN AND DEBENTURE ............. 349

II.    THE CLOSING PACKAGE ............................................. 349

III.    SPECIFIC RESPONSIBILITIES AND PROCEDURES FOR CLOSING AND POST-CLOSING ACTIVITIES ................................................. 350

CHAPTER 7: DEBENTURE PRICING & FUNDING ..................................... 355

I.    PRICING A 504 DEBENTURE (13 CFR § 120.931) .................. 355

II.    FUNDING THE DEBENTURE ..................................... 358

CHAPTER 8: ALLOWABLE FEES ..................................................... 360

I.    ALLOWABLE FEES THAT A 504 BORROWER MAY BE CHARGED ............... 360

II.    FEES FOR OTHER SERVICES ..................................... 361

III.    DISCLOSURE OF FEES AND CDC EXPENSES (13 CFR Part 103) .............. 362

IV.    AGENTS ............................................................. 363

V.    WHO MAY CONDUCT BUSINESS WITH SBA (13 CFR §103.2) .............. 364

CHAPTER 9: BORROWER'S DEPOSIT, DEBENTURE POOLS AND POST-DISBURSEMENT ISSUES ............................................................. 366

I.    RULES GOVERNING THE BORROWER'S DEPOSIT .......................... 366

II.    DEBENTURE POOLS ................................................. 366

III.    MISCELLANEOUS ................................................... 366

IV.    POST-DISBURSEMENT ISSUES ................................. 366

APPENDIX 1: RESTRICTIONS ON FOREIGN CONTROLLED ENTERPRISES .................. 368

APPENDIX 2: DEFINITIONS ........................................................... 371

SOP 50 10 5(K)

APPENDIX 3: RELIANCE LETTER ........................................................................................ 378
APPENDIX 4: NAICS CODES OF ENVIRONMENTALLY SENSITIVE INDUSTRIES ........ 381
APPENDIX 5: REQUIREMENTS PERTAINING TO GAS STATION LOANS ....................... 384
APPENDIX 6: SBA ENVIRONMENTAL INDEMNIFICATION AGREEMENT ..................... 386
APPENDIX 7: SAMPLE BORROWING BASE CERTIFICATE & REPORT TO LENDER .... 408
APPENDIX 8: REQUIREMENTS FOR ELECTRONIC SIGNATURES IN THE 7(A) AND 504
LOAN PROGRAMS ............................................................................................................ 416

# SUBPART A
## SBA LENDER AND CERTIFIED DEVELOPMENT COMPANY
## PARTICIPATION REQUIREMENTS

**PURPOSE OF THIS SUBPART**

This Subpart contains the requirements for Lenders and Certified Development Companies (CDCs) to participate in SBA lending programs. This Subpart also explains the different types of delegated authority SBA grants to Lenders and CDCs, as well as how Lenders and CDCs maintain their participating status with SBA. Finally, this Subpart provides a brief overview as to how SBA oversees its participating Lenders and CDCs.

When the policy set forth in this Subpart does not adequately address the unique circumstances regarding a particular matter, an exception to policy may be approved by the Director of the Office of Financial Assistance (D/FA). For Export Working Capital Program (EWCP) and International Trade loans (ITL), an exception to policy may be approved by the Director, International Trade Finance (D/ITF). For Export Express loans, an exception to policy may be approved by the D/ITF with the concurrence of the Director, Office of Credit Risk Management (D/OCRM). The D/FA or D/ITF may not approve an exception to policy if such exception would be inconsistent with a statute or regulation. A request for an exception to policy must be submitted to the Loan Guaranty Processing Center (LGPC) for 7(a) applications, including EWCP, ITL and Export Express loan applications, and to the Sacramento Loan Processing Center (SLPC) for 504 applications. The processing center will analyze the request and make a recommendation to the D/FA or D/ITF, as applicable, or an individual acting in that capacity, who will make the final decision (with the concurrence of the D/OCRM for Export Express loans). The decision must be documented in the appropriate Agency loan file. This procedure may only be used in situations where a minor deviation from standard policy is necessary for the specific situation. Exceptions to policy will be considered on a case-by-case basis and the decision will only apply to the specific request.

# CHAPTER 1: 7(a) LENDERS

## I.   THE 7(A) LOAN PROGRAM

A. The 7(a) Loan Program is authorized by section 7(a) of the Small Business Act and is governed by the regulations outlined in Parts 103, 105, 120, and 121 of Title 13 of the Code of Federal Regulations (CFR).

B. This multi-purpose business loan program is administered as a deferred participation program where SBA guarantees a portion of the loan made by a Lender. The Lender initiates the loan to a small business and, if the SBA agrees to guarantee the loan, the Lender funds and services the loan. In the event of default, the Lender conducts the work-out or the liquidation efforts and the Lender and SBA share in the loss, if any, in accordance with the percentage guaranteed by the SBA.

C. Definitions applicable to this subpart can be found in 13 CFR §§103.1, 105.201, 120.10, and 120.420.

## II.  BECOMING A 7(A) LENDER

A. The following lenders may apply to participate with SBA as a 7(a) Lender:

1. Federally Regulated Lenders, including those lenders regulated by Federal Financial Institution Regulators (e.g., the Federal Deposit Insurance Corporation, the Federal Reserve Board, the Office of the Comptroller of the Currency, the National Credit Union Administration, and the Farm Credit Administration); and

2. SBA Supervised Lenders:

   a. Non-Federally Regulated Lenders (NFRLs, including State-regulated lenders without Federal deposit or share insurance protection; and

   b. Small Business Lending Companies (SBLCs).

B. The following lenders may not apply to participate with SBA as a 7(a) Lender:

1. SBA-licensed Small Business Investment Companies (SBICs);

2. Certified Development Companies (see 13 CFR § 120.820(c), except with respect to the Community Advantage Pilot Program); and

3. Bank holding companies.

C. Process to Become a 7(a) Participating Lender:

1. Federally Regulated Lenders:

   a. An institution that has Federal deposit or share insurance protection and is a State or National bank, a State or federally-chartered thrift institution or a State or federally-chartered credit union must submit a request in writing to the SBA Field Office serving the geographic area where the lender's principal office is located. With the exception of State-chartered credit unions, these institutions automatically comply with the Agency's examination and supervision requirements.

   b. When a State-chartered credit union applies to become a participating Lender:

      i.   If the credit union has Federal deposit or share insurance protection, it must submit an

application to the SBA Field Office servicing the geographic area where its principal office is located.

ii.     If the credit union does not have Federal deposit or share insurance protection, it must send to the SBA Field Office the items required in paragraph II.C.2.b) below for Non-Federally Regulated Lenders.

iii.    The SBA Field Office must contact the Office of Credit Risk Management (OCRM) and ask for a written determination by OCRM regarding the State's level of regulatory supervision and examination.

iv.     The SBA District Counsel must review the application for legal sufficiency. As part of that review, District Counsel must determine that the credit union has the authority to apply for participation with SBA and, specifically, that the person who submitted the application has the authority to act on behalf of the credit union. Applications submitted on behalf of a credit union by a Credit Union Service Organization (CUSO) or Lender Service Provider (LSP) are not acceptable.

c.   A lender must be considered in good standing with its state regulator and considered to be Satisfactory by its Federal Financial Institution Regulator (FFIR) as determined by SBA. For purposes of participation in the 7(a) program, SBA considers a lender to be in good/satisfactory standing with its state/FFIR if it has satisfactory financial condition and satisfactory small business credit administration and servicing policies, procedures and practices. Accordingly, the lender's written request to participate must include a written statement that to the best of its knowledge, the lender has satisfactory: i) financial condition (e.g., capital and liquidity); ii) small business credit administration policies, procedures, and practices that it continues to adhere to in its operations; and iii) small business servicing policies, procedures, and practices that it continues to adhere to in its operations. When reviewing good standing or whether a lender is considered Satisfactory, SBA will look to see that a lender does not have significant deficiencies or weaknesses in these areas. "Significant" may be evidenced by the number or seriousness of the deficiencies, as determined by SBA in its discretion. SBA will verify any good standing/satisfactory status statement where possible with public (e.g., Cease and Desist Orders and Call Reports) and/or non-public information from the lender's primary and/or other regulators.

d.   The SBA Field Office must determine whether the lender meets the requirements of 13 CFR § 120.410 to be a 7(a) participant. If the Field Office determines that the lender meets these requirements, it may enter into a Loan Guaranty Agreement with the lender. Both parties will execute a Loan Guaranty Agreement (Deferred Participation), SBA Form 750, and/or a Loan Guaranty Agreement (Deferred Participation) for Short-Term Loans, SBA Form 750B. Once the SBA Form 750 is executed, the SBA Field Office will add the lender to the SBA Partner Information Management System (PIMS), which identifies the lender as an SBA participating Lender.

e.   If a Lender makes a major change in its structure or organization after execution of the SBA Form 750/750B, it must notify the SBA Field Office in writing. Major changes that may impact continued SBA participation include:

i.      Acquisition by another entity;

      ii.     Merger into another legal entity;

      iii.    A change of name;

      iv.    Substantial changes in management;

      v.     Substantial changes in how the Lender handles SBA loans; or

      vi.    Takeover or closure of the Lender by a regulatory agency.

2.   Non-Federally Regulated Lenders:

    a.  Non-Federally Regulated Lenders (NFRLs) are entities engaged in small business lending that are subject to the oversight and supervision by a state regulator authorized to evaluate the safety and soundness of its regulated members. These entities operate without Federal deposit or share insurance protection (such as Business and Industrial Development Companies (BIDCOs)). NFRLs are authorized by the Administrator to make loans pursuant to section 7(a) of the Small Business Act. NFRLs are subject to additional regulations specific to SBA Supervised Lenders (see 13 CFR §§ 120.460-120.465) as well as all other 7(a) regulations specific to loan processing, servicing, and liquidation. NFRLs must have internal controls that meet the requirements set forth for SBLCs in Chapter 2, Paragraph I.B.3 of this Subpart.

      To become a 7(a) participant, the lender must submit an application containing the information and documents specified below to the Office of Financial Assistance (OFA) at SBA's Headquarters in Washington, D.C. The applicant must submit two (2) complete binders of fully executed paper copies and one (1) executed electronic scanned copy (in pdf format) to OFA addressing each of the elements set forth below ("NFRL Application"). The NFRL Application must be complete and organized in tabular format. Incomplete NFRL Applications will not be processed by SBA and will be returned to the applicant. An applicant that submits an incomplete NFRL Application (as determined by SBA) must wait 30 calendar days before reapplying.

      SBA reserves the right to deny any applicant requesting to become an NFRL in its sole discretion. In addition to SBA's evaluation of the elements required in paragraph b. below, SBA may consider risk factors in its evaluation of an NFRL Application. These factors include, but are not limited to, historical performance measures (such as default, purchase and loss rate), and other performance data associated with the lender or its senior management team, along with other relevant information (such as SBA-observed gaps in small business lending not served by the existing 7(a) Lender population).

    b.  The lender's application must include:

      i.     Lender's name, address, telephone number and email address;

      ii.    A copy of the lender's organizational formation documents and bylaws filed with the appropriate authority and certified by an appropriate officer of the applicant;

      iii.   The identification of all classes of stock, partnership interest or members interests, the rights and preferences accorded to these forms of ownership, including voting rights, redemption rights, distribution rights and rights of convertibility and any conditions for the transfer, sale or assignment of such interests;

iv.    The lender's proposed geographical area of operations, as authorized by the lender's state regulator;

v.     A list of officers, directors, managing partners, managing members, Associates, and holders of 10% or more of any class of the lender's capital stock or ownership interest ("Associates" are defined in 13 CFR § 120.10);

vi.    An organizational chart showing all officers, directors, managers and key employees of the lender, including any relationships between the lender and any Associates;

vii.   An executed SBA Form 1081, "Statement of Personal History," and either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA ("electronic fingerprint submission" is defined in Subpart B, Chapter 2, Paragraph III.A.13.d.iv of this SOP), for:

    a)  Each officer, managing partner, and managing member of lender, and all holders of 10% or more of any class of stock or ownership, limited partnership or member's interest; and

    b)  Each director and key employee (an employee who manages daily operations, e.g., overseeing a department or a division, not a clerical staff position) of the lender organization. Directors and key employees must only submit either Form FD-258 (fingerprint card) or electronic fingerprint submission along with SBA Form 1081 if the individual answered affirmatively to questions 10a, 10b, 10c, 11a, and/or 11b on the SBA Form 1081.

viii.  A copy of the most recent audited financial statements of the lender;

ix.    A copy of the most recent audited financial statements on any entity, other than natural persons, holding 10% or more of any class of the lender's stock or ownership interest;

x.     An operations plan detailing the nature of the lender's proposed loan activity, the volume of activity projected over the first 3 years as a 7(a) Lender, projected balance sheets, income statements and statement of cash flows of the lender, with alternative profit and loss scenarios based on run rates equivalent to 70% and 50% of projected loan activity, the type and projected amount of financing needed to support its lending plan, along with a discussion of lender's proposed wind-down plan in the event the lender decides to leave the program;

xi.    A detailed analysis of the lender's projected secondary market activities during the first 3 years of operation, including a sensitivity analysis of the effect any changes in premium from the sale of the guaranteed portion of 7(a) loans in SBA's secondary market may have on the lender's prospective earnings. The analysis must also include a description of the lender's plans (if any) to securitize or sell participations in the unguaranteed portion of 7(a) loans;

xii.   If the lender intends to acquire any 7(a) loans, a written plan detailing the extent of this acquisition activity in its operating plan, and how the lender intends to manage the transition of the 7(a) loan portfolio;

xiii.  A copy of the lender's policies and procedures governing business loan origination, servicing, and liquidation;

xiv.   A certification that the lender will not be engaged primarily in financing the operations of an Affiliate, as defined in 13 CFR §§ 121.103 and 121.301.

xv.   A copy of the State or Federal statute or regulations governing the lender's operations, including those pertaining to audit, examination and supervision of the lender. Each lender bears the burden of demonstrating that it is subject to continuing supervision by a State or Federal regulatory authority satisfactory to SBA;

xvi.   A copy of the latest report covering the examination of the lender, and/or any regulatory orders if such reports can be released to SBA. If the report cannot be released or the lender is newly formed and has not been examined by its primary regulator include a statement to that effect;

xvii.   A copy of the license, if any, issued to the lender by a regulatory authority;

xviii.   A certified copy of a Resolution of the Board of Directors designating the person(s) authorized to submit the application on behalf of the lender;

xix.   Disclosure of any and all actions, proceedings, investigations or litigation, pending or threatened, against the lender, including complete details of any actions disclosed; and

xx.   A written legal opinion of independent counsel ("Independent Counsel" is counsel that is not an "Associate" of the lender under 13 CFR § 120.10.), satisfactory to SBA that addresses whether the lender:

   a)   Is duly formed, organized, and validly existing in good standing under the laws of the State of its organization, and is in full compliance with all Federal, State, and local laws in connection with the formation and organization of the lender;

   b)   Has the power, legal right, and authority to conduct business in the lender's proposed operating area; and

   c)   Is in full compliance with all appropriate Federal and State securities laws.

c.   Once received, the D/FA or designee, in consultation with the Director, Office of Credit Risk Management (D/OCRM), makes the final determination on the application and notifies the SBA Field Office. If the application is approved, the SBA Field Office executes an SBA Form 750 and/or SBA Form 750B, with the Lender and sends a copy of the executed agreement to the D/FA. The D/FA or designee will add the Lender to the SBA Partner Information Management System (PIMS), which identifies the Lender as an SBA participating Lender.

d.   Change of Ownership or Control: SBA's prior written consent is required for any change of ownership or control of ten percent (10%) or more of any class of an NFRL's stock or ownership interests. SBA's prior written consent is also required for any proposed transaction or event that results in control by any entity or person(s) not previously approved by SBA. Control, as defined in this paragraph, means the possession, direct or indirect, or the power to direct or cause the direction of the management or policies of an NFRL, whether through the ownership of voting securities, by contract, or otherwise.

   i.   A new application in accordance with paragraph II.C.2.b. above must be submitted for SBA's prior written consent with respect to a change of ownership or control

transaction. For change of control transactions, the Lender must reapply for any delegated authorities.

   ii.   If the proposed change of ownership is for less than a majority interest, SBA, in its sole discretion, may limit the items required by the Lender in paragraph II.C.2.b) to support a request for prior SBA consent.

3. Small Business Lending Companies ("SBLCs") (13 CFR §§ 120.460 - 120.490):

   A Small Business Lending Company (SBLC) is a non-depository lending institution that is authorized by SBA to only make loans pursuant to section 7(a) of the Small Business Act and loans to Intermediaries in SBA's Microloan program. See Chapter 2 of this Subpart for more information on becoming an SBLC.

D. Loan Guaranty Agreement – SBA Form 750 and SBA Form 750B:

1. The Loan Guaranty Agreement (SBA Form 750) provides a basic framework for the responsibilities and duties of the Lender and SBA when making, closing, and administering any individual SBA-guaranteed loan. (13 CFR § 120.400) This agreement is subject to SBA's rules and regulations, as amended from time to time.

2. SBA Form 750 governs loans with a maturity greater than 12 months. A Lender must execute this agreement prior to submitting any applications for guaranty to SBA.

3. SBA Form 750B governs loans with a maturity of 12 months or less. If the Lender intends to approve loans with a maturity of 12 months or less, it must also execute SBA Form 750B.

E. Responsibilities of 7(a) Lenders:

1. In making SBA-guaranteed loans, 7(a) Lenders must:

   a. Submit applications for guaranty with all required forms, documentation and credit analyses, to the designated SBA processing center for review;

   b. Execute the Authorization;

   c. Close the loan in accordance with the Authorization and all SBA policies and regulations;

   d. Maintain complete loan files;

   e. Service the loan in accordance with SOP 50 57 and regulations;

   f. Liquidate the loan in accordance with SOP 50 57 and regulations;

   g. Comply with SBA Loan Program Requirements (as defined in 13 CFR § 120.10) for the 7(a) program, as such requirements are revised from time to time. SBA Loan Program Requirements in effect at the time that a Lender takes an action in connection with a particular loan govern that specific action. For example, although loan closing requirements in effect when a Lender closes a loan will govern closing actions, a Lender's liquidation actions on the same loan are subject to the liquidation requirements in effect at the time that a liquidation action is taken (13 CFR § 120.180). SBA Loan Program Requirements, Center contacts, and other information can be found at https://www.sba.gov/partners/lenders/7a-loan-program;

   h. Individuals and entities suspended, debarred, revoked, or otherwise excluded under the SBA

or Government-wide debarment regulations are not permitted to conduct business with SBA, including participating in an SBA-guaranteed loan. Lenders are responsible for consulting the System for Awards Management's (SAM) Excluded Parties List System (EPLS) or any successor system to determine if an employee or an Agent has been debarred, suspended or otherwise excluded by SBA or another Federal agency (https://www.sam.gov/portal/SAM/); and

i.   SBA expects Lenders to exercise due diligence and prudent oversight of their third party vendors, including Lender Service Providers (LSPs) and other loan agents, which should include having written policies governing such relationships and monitoring performance of loans referred by an Agent or where an Agent provided assistance. SBA will review evidence of such due diligence and oversight of such relationships when conducting lender oversight activities. Federally-regulated Lenders are reminded that they must comply with the requirements of their primary Federal Financial Institution Regulator regarding third party vendors.

2.  Preferences:

a.   A Lender may not take any action in connection with an SBA-guaranteed loan that establishes a preference in favor of the Lender (13 CFR § 120.411). A Lender must be particularly careful to avoid establishing a preference when using its delegated authority (for example, reducing its existing exposure to the Borrower through the use of an SBA-guaranteed loan).

b.   A Lender must not:

i.   Take any side collateral or guaranty that would secure only its own interest in a loan;

ii.  Obtain a separate guaranty on the unguaranteed portion of the 7(a) loan without SBA's approval, such as through a co-guaranty program or arrangement;

iii. Require a Borrower to purchase certificates of deposit;

iv.  Maintain a compensating balance not under the control of the Borrower;

v.   Take a side loan which would have the effect of ensuring a risk-free or limited-risk investment on the participant's share; or

vi.  Have an SBA-guaranteed loan in a "piggyback" structure.

a)  Piggyback financing occurs when one or more lenders provide more than one loan to a single Borrower at or about the same time, financing the same or similar purpose, and where the SBA-guaranteed loan is secured with a junior lien position or no lien position on the collateral securing the non-guaranteed loan(s).

b)  SBA does not consider a scenario where both loans are for working capital and the non-SBA guaranteed loan is secured only by working capital assets to be a piggyback structure.

c)  SBA does not consider a shared lien position with the lender (pari passu) as a piggyback structure.

c.   Under the following circumstances, a Lender may make a side loan to the Borrower to

purchase stock of the participating Lender (as may be required by certain Lenders, such as Farm Credit Administration entities):

  i.    The enabling authority of the Lender requires the purchase as a condition for making the loan.

  ii.   The Lender makes a separate side loan not guaranteed by SBA for the Borrower to buy the stock or debentures. The side loan must be subordinated to the SBA loan, but the Lender may hold a first lien on any stock collateralizing the side loan.

  iii.  The interest to be charged on the side loan must not exceed the maximum rate of interest acceptable for SBA-guaranteed loans, and the maturity of the side loan must not be less than that of the SBA-guaranteed loan.

  iv.   In the event of default, either on the side loan or the SBA-guaranteed loan, the Lender may not take any action to collect or liquidate the side loan, except canceling or retiring the stock securing the side loan, until the SBA loan has been fully liquidated.

3. Ethical Requirements Placed on a Lender:

   SBA Lenders must act ethically and exhibit good character (13 CFR § 120.140). Conduct of a Lender's Associates (including Agents and Lender Service Providers) and staff will be attributed directly to the Lender. Lenders are required to notify SBA immediately upon becoming aware of any unethical behavior by its staff or its Associates. Examples of unethical behavior ae found at 13 CFR § 120.140.

   a. Conflicts of Interest:

      Neither a Lender nor its Associates may have a real or apparent conflict of interest with a small business or SBA (13 CFR § 120.140 and 13 CFR Part 105). Lenders must exercise care and judgment in determining whether a conflict of interest exists and document the file in detail. SBA will not guarantee a loan if the Lender, its Associates, partner(s) or a close relative:

      i.    Has a direct or indirect financial or other interest in the Applicant; or

      ii.   Had such interest within 6 months prior to the date of application.

      SBA reserves the right to deny liability on its guaranty in the event that the Borrower defaults if the Lender, its Associates, partner(s) or a close relative acquires such an interest at any time during the term of the loan.

   b. The Standards of Conduct Counselor for the Agency is the Designated Agency Ethics Official. (13 CFR § 105.402(a))

   c. Standards of Conduct ("Conflict of Interest") Approvals:

      i.    If an Applicant has, as an employee, owner, general partner, managing member, attorney, agent, owner of stock, officer, director, creditor or debtor, an individual who, within one (1) year prior to the loan application, was an SBA Employee (as defined by 13 CFR § 105.201(a)), the loan application must be approved by the Standards of Conduct Counselor. (13 CFR § 105.203(a))

      ii.   If an Applicant has, as its sole proprietor, general partner, managing member, officer,

director, or stockholder with a 10% or more interest, an individual who is an SBA Employee (as defined by 13 CFR § 105.201(a)) or a Household Member of an SBA Employee, the loan application must be approved by the Standards of Conduct Committee at SBA Headquarters. (13 CFR § 105.204) A "Household Member" of an SBA Employee includes:

    a) The spouse of the Employee;

    b) The minor children of the Employee; and

    c) The blood relatives of the Employee, and the blood relatives of the Employee's spouse, who reside in the same place of abode as the Employee. (13 CFR § 105.201(d))

    iii. If an Applicant has, as its sole proprietor, general partner, managing member, officer, director, or stockholder with a 10% or more interest, or a Household Member of such individual, an individual who is a Member of Congress, an appointed official of the legislative or judicial branch of the Federal Government, a member or employee of a Small Business Advisory Council, or a SCORE volunteer, the loan application must be approved by the Standards of Conduct Committee. (13 CFR §§ 105.301(c) and 105.302(a))

d. When a Standards of Conduct approval is required, the application should be processed by the appropriate processing center and, if appropriate, be conditionally approved and forwarded to the Standards of Conduct Counselor or Standards of Conduct Committee (through the Standards of Conduct Counselor). The Standards of Conduct Counselor will notify the processing center of the final Agency decision and the processing center will notify the lender accordingly.

e. Other Government Employees:

The Applicant must submit a statement of no objection from the pertinent department or military service ethics officer if its sole proprietor, general partner, managing member, officer, director, or stockholder with a 10% or more interest, or a Household Member of such individual, is an employee of another department or agency of the Federal Government (Executive Branch) in a grade of at least GS-13 (or its equivalent) or higher. Lenders must submit the statement to SNOMemos@sba.gov and receive written clearance from SBA prior to submitting the application to LGPC (non-delegated) or processing the application under their delegated authority. Non-delegated Lenders must submit a copy of SBA's written clearance with the application to the LGPC. (13 CFR § 105.301(a))

4. Forward Commitments:

A forward commitment exists when a Lender issues a commitment to a builder or developer to finance future sales of real estate. The SBA will not guarantee loans made by the Lender to small businesses to purchase such real estate. This is a potential conflict of interest for the Lender because of its predisposition to make SBA loans in order to honor their prior agreement with the builder or developer. Such loans are ineligible for SBA's guarantee regardless of whether the Lender gets a fee for issuing the commitment.

5. Advertising of Relationship with SBA (13 CFR §120.413):

a. <u>General Advertising</u>. A Lender may publicize its relationship with SBA, including identifying itself as an SBA participating Lender, by placing the appropriate SBA-approved decal on the window of the lending institution or placing identical decal icons on its website. A Lender may not use the SBA logo in any manner in any advertisement, brochure, publication or promotional piece, or state or imply that the Lender or its Borrowers will receive any preferential treatment by SBA.

b. <u>Use of Window Decals</u>. The SBA-approved Lender decal may only be used to inform the public of the Lender's relationship with SBA and may not be used to promote, or appear to promote, the Lender's non-SBA products or services. Window decals are available from SBA Field Offices.

c. <u>Use of Decal Icons on Website</u>. The SBA-approved Lender decal icon is an exact replica of the window decal and may only be used to inform the public of the Lender's relationship with SBA and may not be used to promote, or appear to promote, the Lender's non-SBA products or services.

    i. When using the SBA-approved Lender decal icon on a website, the Lender must include the following public statement: "Approved to offer SBA loan products under SBA's Preferred Lender Program" (or SBA Express Program, etc.).

    ii. The Lender decal icon may be downloaded from and must be used in accordance with SBA's Lender decal guidelines found at https://www.sba.gov/document/support-object-object-advertising-your-sba-relationship.

d. <u>Oversight</u>. A Lender's usage of the window/building decal and any identical decal icons on its website may be reviewed as part of the Agency's Lender oversight activities.

6. Record Retention:

a. Lenders must retain the <u>original</u> Note; Guaranty(ies); Security/Collateral documents such as mortgages, deeds of trust, security agreements; SBA application (SBA Form 1919, SBA Form 1920 and any SBA Forms 912); and SBA Form(s) 159. Hard-copy records of those documents requiring original signatures must be retained unless the <u>original</u> signature was made electronically in accordance with applicable standards governing electronic signatures. (See Appendix 8 for guidance on electronic signature standards.)

b. Federally-regulated Lenders must comply with the requirements of their FFIR's requirements governing how long to retain documentation.

c. SBA Supervised Lenders must comply with 13 CFR § 120.461.

## III.  HOW SBA OVERSEES 7(A) LENDERS

SBA oversees 7(a) Lenders through:

A. Loan and Lender Monitoring System (L/LMS):

1. L/LMS is an internal SBA data system that includes the use of historical data and predictive small business credit scoring. All SBA 7(a) loans with an outstanding balance are credit-scored quarterly. Data on 7(a) loans are aggregated, analyzed and evaluated to assess the credit quality of each

individual 7(a) Lender's portfolio of SBA-guaranteed loans. SBA uses this information to monitor the performance of 7(a) Lenders individually and in comparison to their peers.

2. Using SBA's L/LMS system, SBA assigns all 7(a) Lenders a composite rating. The composite rating reflects SBA's assessment of the potential risk to the government of that 7(a) Lender's SBA portfolio. The specific performance factors which comprise the composite rating are published from time to time by SBA's Office of Credit Risk Management (OCRM). In general, these factors reflect both historical 7(a) Lender performance and projected future performance. SBA performs quarterly recalculations on the common factors for each 7(a) Lender, so 7(a) Lenders' composite risk ratings are updated on a quarterly basis.

3. SBA has established peer groups to minimize the differences that could result from changes in loan performance for portfolios of different sizes. The peer groups are based upon gross outstanding SBA loan dollars. For 7(a) Lenders, they are:

    a. $350,000,000 or more

    b. $100,000,000 - $349,999,999

    c. $10,000,000 - $99,999,999

    d. $4,000,000 - $9,999,999

    e. $1,000,000 - $3,999,999

    f. $0 - $999,999B (active with at least one loan disbursed in past 12 months)

    g. $0 - $999,999A (inactive with no loans disbursed within the past 12 months)

4. SBA assigns a composite rating of "1" to "5" to each 7(a) Lender generally based upon its portfolio performance, as reported in L/LMS. A rating of "1" indicates strong portfolio performance, the least risk, and requires the lowest degree of SBA management oversight (relative to other 7(a) Lenders in its peer group). A "5" rating indicates weak portfolio performance, the highest risk, and requires the highest degree of SBA management oversight. (See 13 CFR § 120.10 (definitions related to Risk Rating); 13 CFR § 120.1015 (Risk Rating System); 75 FR 9257, March 1, 2010; 75 FR 13145, March 18, 2010; and 79 FR 24053, April 29, 2014 (Risk Rating Notices)) As set forth in the Risk Rating Notices, SBA may take into account rapid growth that may skew metrics and other factors in considering a Lender's risk.

B. Lender Portal:

1. SBA communicates Lender performance to individual 7(a) Lenders through the use of SBA's Lender Portal (Portal). The Portal allows a 7(a) Lender to view its own quarterly performance data, including, but not limited to, its current composite risk rating, peer and portfolio averages, and its PARRiS score (as discussed below). Portal data includes both summary performance and credit quality data. Summary performance data is largely derived from data that 7(a) Lenders provide to SBA through SBA Form 1502 and 172 Reports; therefore, 7(a) Lenders bear much of the responsibility for ensuring data accuracy. If a 7(a) Lender reviews its performance components and finds a discrepancy with its records, the 7(a) Lender should contact OCRM.

2. SBA 7(a) Lenders with at least 1 outstanding SBA loan may apply for the Portal access. Currently, SBA issues only one Portal user account per 7(a) Lender. Submission of initial requests for a Portal user account must be submitted to SBA's OCRM, and must include the following information:

    a.   Request must be made by a senior officer with proper authority of the 7(a) Lender (Senior Vice President or higher);

    b.   Request must be sent via regular or overnight mail to the SBA's OCRM at 409 Third Street SW, Washington DC 20416, ATTN: Director, Office of Credit Risk Management;

    c.   Request must be made using the 7(a) Lender's stationery;

    d.   Request must include the user's business card;

    e.   The stationery and business card should include the 7(a) Lender's name and address;

    f.   The request should include the following data:

        i.    SBA FIRS ID Number(s);

        ii.   Account user's name and title;

        iii.  Account user's mailing address, telephone number and email address at the 7(a) Lender;

        iv.  Requesting officer's name and title; and

        v.   Requesting officer's mailing address, telephone number and email address at the 7(a) Lender.

    g.   Once SBA receives and approves the user's request, SBA will forward the approval to SBA's Portal contractor for issuance of a user account name and password. The Portal contractor will email the user his or her user name and password within approximately 2 weeks of account approval. The user can then access its data by logging into the SBA Lender Portal web page. Before accessing the Portal, Lenders must agree to the terms of a Confidentiality Agreement, which is found on the SBA Lender Portal web page.

    h.   Lenders are responsible for complying with and maintaining the Portal user accounts and passwords as set forth in the Confidentiality Agreement on the Portal web page, and as published by SBA from time to time. Lenders are also responsible for timely informing SBA to terminate or transfer an account if the person to whom it was issued no longer holds that responsibility for the 7(a) Lender. Lenders must take full responsibility for protecting the confidentiality of the user password and the 7(a) Lender risk rating, PARRiS score, and confidential information and for ensuring the security of the data. See 13 CFR § 120.1060.

C.  Monitoring and Reviews: (13 CFR §§ 120.1025 and 120.1050 - 1060)

    L/LMS provides performance information that allows SBA to monitor and conduct reviews of all Lenders. L/LMS-related monitoring/reviews serve as the primary means of reviewing Lenders with less than $10 million in gross outstanding SBA loan dollars although SBA may determine, in its discretion, to conduct other more in-depth reviews (e.g., Analytical, Targeted, Full, or Delegated Authority Renewal) of these Lenders. ("L/LMS-related" refers to the L/LMS reviews and the SBA Lender Profile Assessment (LPA) including the PARRiS Score.) SBA will contact the Lender if the review detects performance issues or trends requiring further discussion.

1.  For Lenders with more than $10 million in gross outstanding SBA loan dollars, L/LMS details historical and projected performance data:

    a.   For use in planning and conducting more in-depth reviews or examinations;

    b.  To assist in prioritizing more in-depth reviews or examinations; and

    c.  To monitor Lenders between the more in-depth reviews or examinations.

2.  SBA's 7(a) risk-based reviews generally feature a composite risk measurement methodology and scoring guide, known as "PARRiS." PARRiS is an acronym for the specific risk areas or components that SBA reviews: **P**ortfolio Performance; **A**sset Management; **R**egulatory Compliance; **Ri**sk Management; and **S**pecial Items.

3.  Additionally, in accordance with 13 CFR § 120.1010, a Lender must allow SBA's authorized representatives, including representatives authorized by SBA's Inspector General, during normal business hours, access to its files to review, inspect and/or copy all records and documents relating to SBA-guaranteed loans or as requested for SBA oversight.

4.  SBA may request reports on a case-by-case basis.

5.  Additional information regarding reviews and examinations can be found in 13 CFR §§ 120.1050-1060, SBA Policy Notice 5000-1332: Revised Risk-Based Review Protocol for SBA Operations of Federally Regulated 7(a) Lenders (December 29, 2014), SBA Information Notice 5000-1397: Updated PARRiS Methodology for Oversight of SBA Operations of Federally Regulated 7(a) Lenders (November 15, 2016), SBA Policy Notice 5000-1940: Revised Risk-Based Review/Examination Protocol for SBA Supervised Lenders (January 18, 2017), and SBA's SOP 51 00.

6.  Lender oversight fees. Lenders are required to pay SBA fees to cover the costs of examinations and reviews and, if assessed by SBA, other Lender oversight activities. (13 CFR § 120.1070)

    a.  The fees may cover:

        i.  The cost of conducting L/LMS-related reviews/monitoring of a 7(a) Lender;

        ii.  The cost of conducting more in-depth reviews of a 7(a) Lender (e.g., Analytical, Targeted, and Full Reviews, Delegated Authority Reviews, Quarterly Condition and Certification of Capital Compliance Reviews (for SBA Supervised Lenders), Secondary Market Evaluations, and related review activities, such as corrective action assessments);

        iii.  The cost of conducting loan reviews (e.g., Secondary Market loan-by-loan reviews);

        iv.  The cost of conducting safety and soundness examinations of an SBA Supervised Lender (SBLCs and NFRLs); and

        v.  Any additional expenses that SBA incurs in carrying out Lender oversight activities (e.g., technical assistance and analytics to support the monitoring and review program, supervision and enforcement activity costs, salaries and travel expenses of SBA employees, and equipment expenses directly related to Lender oversight.

    b.  In general, where the costs that SBA incurs for a review, examination, monitoring, or other Lender oversight activity are specific to a particular 7(a) Lender, SBA will charge that Lender a fee for the actual costs of the oversight activity. For example, for most examinations or reviews conducted under a)ii and a)iv above, SBA will invoice each Lender for the amount owed following completion of the examination or review.

   c. In general, where the costs that SBA incurs for the Lender oversight activity are not sufficiently specific to a particular Lender, SBA will assess a fee based on each 7(a) Lender's portion of the total dollar amount of SBA guaranties in SBA's total portfolio or in the relevant portfolio segment being reviewed or examined, to cover the costs of such activity. For these fees, such as the L/LMS related reviews/monitoring conducted under subparagraph a)i above and other Lender oversight activity expenses incurred under a)v above, SBA will invoice each Lender on an annual basis.

      i. The invoice will state the charges, the date by which payment is due and the approved payment method(s).

      ii. The payment due date will be no less than 30 calendar days from the invoice date.

      iii. SBA may waive the fees assessed under this paragraph 5.c) for those Lenders owing less than a threshold amount if SBA determines that it is not cost effective to collect the fee.

   d. Payments that are not received by the due date shall be considered delinquent, and SBA will charge interest and other applicable charges and penalties as authorized by 31 U.S.C. 3717. A Lender's failure to pay any of the fee components described above, or to pay interest, charges and penalties that have been charged, may result in a decision to suspend or revoke a Lender's eligibility to participate in SBA's loan programs or participant's delegated authority or other remedy available under law. (13 CFR § 120.1070)

**D. Supervision and Enforcement:**

   An integral part of overseeing the 7(a) loan program is SBA's authority to supervise and take enforcement actions as necessary. For further guidance on Lender Supervision and Enforcement, see SOP 50 53(A).

**E. Suspension or Revocation:**

   1. SBA may suspend or revoke the authority of a Lender to conduct 7(a) program activities, in accordance with 13 CFR §§ 120.1400-1600.

   2. Examples of circumstances that may result in suspension or revocation under the above cited regulation include but are not limited to:

      a. Failure to comply materially with any requirement imposed by Loan Program Requirements, including but not limited to Lender eligibility requirements and prudent lending requirements (SBA will consider the severity and frequency of violations among other factors);

      b. Repeated failure to properly report on loan disbursements and status; or

      c. Less Than Acceptable examination/review assessment or repeated Less Than Acceptable Risk Rating, the latter generally in conjunction with other grounds.

   3. SBA will notify the Lender of a proposed suspension or revocation in accordance with 13 CFR § 120.1600. The Lender will be provided an opportunity to respond prior to final action.

**F. Receiverships of NFRLs:**

   1. Upon SBA's determination that grounds for an enforcement action against a NFRL exist under 13 CFR § 120.1400, SBA may, pursuant to 13 CFR § 120.1500(c)(3), apply to a Federal court for the

appointment of a receiver. Typically, SBA will use its receivership authority as a remedy of last resort. The appointment of a receiver is only one of several types of enforcement actions set forth in 13 CFR § 120.1500.

2. SBA will review the facts and circumstances of the enforcement action when deciding whether or not to seek the appointment of a receiver. SBA will also make a determination regarding the scope of the receiver's duties and powers, including whether the receivership will be limited to the NFRL's assets related to the SBA loan programs. In deciding whether to seek a receiver and in determining the scope of a receivership, SBA will consider the following:

   a. The existence of fraud or false statements;

   b. A NFRL's refusal to cooperate with SBA enforcement action instructions or orders;

   c. A NFRL's insolvency (legal or equitable);

   d. The size of the NFRL's SBA loan portfolio(s) in relation to other activities of the NFRL;

   e. The dollar amount of any claims SBA may have against the NFRL; and/or

   f. The existence of other non-SBA enforcement actions against the NFRL.

3. Under 13 CFR § 120.1400(a)(2), a NFRL that makes 7(a) guaranteed loans after October 20, 2017, has consented to SBA's right to seek a receivership in appropriate circumstances. As described in 50 10 5(J), such consent is deemed to apply only if the NFRL makes 7(a) loans on or after January 1, 2018. The NFRL's consent does not in any way preclude the NFRL from contesting whether or not SBA has established the grounds for seeking the remedy of receivership. A NFRL's consent to receivership as a remedy does not require SBA to seek the appointment of a receiver in any particular SBA enforcement action.

# IV. DELEGATED AUTHORITY IN THE 7(A) LOAN PROGRAM

A. Delegated Authority Criteria:

1. In making its decision to grant or renew a delegated authority, SBA considers whether the Lender, as determined by SBA in its discretion:

   a. Has the continuing ability to evaluate, process, close, disburse, service, liquidate and litigate SBA loans. This includes the ability to develop and analyze complete loan packages. SBA may consider the experience and capability of Lender's management and staff;

   b. Has satisfactory SBA performance (as defined in 13 CFR § 120.410(a)(2)). The Lender's Risk Rating, among other factors, will be considered in determining satisfactory SBA performance. Other factors may include, but are not limited to, review/examination assessments, historical performance measures (like default rate, purchase rate and loss rate), loan volume to the extent that it impacts performance measures, and other performance related measurements and information (such as contribution toward SBA's mission);

   c. Is in compliance with SBA Loan Program Requirements (i.e., SBA Form 1502 reporting, timely payment of all fees to SBA);

   d. Has completed, to SBA's satisfaction, all required corrective actions;

   e. Is in good standing with SBA as defined in 13 CFR § 120.420(f) (as determined by SBA in its discretion), and, as applicable, with its state regulator and is considered Satisfactory by its

FFIR (as determined by SBA and based on, for example, information in published orders/agreements and call reports) (13 CFR § 120.410(e)):

    i.    The Lender's written request to participate must include a written statement that to the best of its knowledge, the Lender has satisfactory: (a) financial condition (i.e., is deemed well-capitalized based on size of entity, has sufficient liquid assets, etc.); (b) small business credit administration policies, procedures, and practices that it continues to adhere to in its operations; and (c) small business servicing policies, procedures, and practices that it continues to adhere to in its operations. When reviewing good standing/Satisfactory status, SBA will look to see that a Lender does not have significant deficiencies or weaknesses in these areas. "Significant" may be evidenced by the number or seriousness of the deficiencies, as determined by SBA in its discretion. SBA will verify any good-standing/Satisfactory status statement where possible with public (e.g., Cease and Desist Orders and Call Reports) and/or non-public information from the Lender's primary and/or other regulators.

    ii.    In conjunction with this eligibility criteria, SBA reviews whether Lender is subject to any enforcement action, order or agreement with a regulator or the presence of other regulatory concerns as determined by SBA;

    f.    Is not subject to any SBA enforcement actions;

    g.    Has not received a major substantive objection from its lead SBA Field Office relating to the delegated authority criteria; and

    h.    Exhibits other risk/program integrity factors (i.e., has rapid growth; low SBA activity; SBA loan volume; Lender, an officer or director is under investigation or indictment, inadequate capital, inadequate governance or management).

2. Delegated authority decisions are made by the appropriate SBA official in accordance with Delegations of Authority, and are final.

3. If delegated authority is approved or renewed, Lender must execute a Supplemental Guarantee Agreement, which will specify a term not to exceed 2 years. SBA may grant shorter renewals based on risk or any of the other delegated authority criteria. Lenders with less than 3 years of SBA lending experience will be limited to a term of 1 year or less.

B. Certified Lenders Program (CLP):

As CLP authority has been eliminated from 13 CFR Part 120, no new CLP loans may be made. However, any existing CLP loans must comply with applicable Loan Program Requirements, including but not limited to those set forth in SOP 50 57.

C. Preferred Lenders Program (PLP) (13 CFR § 120.450)

The most experienced Lenders may be designated as PLP Lenders and delegated the authority to process, close, service, and liquidate most SBA guaranteed loans without prior SBA review.

1. The PLP Lender:

PLP Lenders are authorized to make SBA guaranteed loans without prior SBA review of eligibility or creditworthiness. An SBA Loan Number is assigned by SBA upon notification by the PLP Lender

of approval of the loan. In addition, they are expected to handle servicing and liquidation of all of their SBA loans with limited involvement of SBA.

2. Qualifications for Initial PLP Consideration:

The Lender must demonstrate to SBA's satisfaction that it:

   a. Has disbursed at least five (5) SBA loans within the past 24 months; and

   b. Meets the criteria for delegated authority set forth in Paragraph IV.A above.

3. Process to obtain PLP authority:

A Lender's initial request for PLP authority must be submitted electronically to D/OCRM or designee at [7aDeleAuthNomination@sba.gov](mailto:7aDeleAuthNomination@sba.gov).

A Lender requesting to reinstate or expand existing delegated authority must submit a request electronically to D/OCRM or designee at [7aRedelegationNominations@sba.gov](mailto:7aRedelegationNominations@sba.gov).

   a. The Lender's request should include:

      i. Legal name and address of Lender;

      ii. Legal name of any holding company of Lender;

      iii. Name, title, address, phone number, e-mail address and fax number for contact person at Lender;

      iv. Lender's lead SBA Field Office (the SBA Field Office serving the area in which the Lender's headquarters is located);

      v. A copy of the Lender's SBA Form 750 and SBA Form 750B, if applicable;

      vi. If Lender was previously a PLP Lender, an explanation of why the Lender left the Preferred Lenders Program;

      vii. A description of the Lender's history, organization, and management, including:

         a) When the Lender was chartered; and

         b) Any recent mergers or acquisitions;

      viii. Personnel who will be in charge of PLP loans for the Lender, have PLP loan approval authority, and their experience with the Lender, in the industry, and with SBA loans, including any training they have received.

      ix. Where and how PLP loans will be processed, closed, serviced and liquidated;

      x. A good standing/Satisfactory statement (as described in paragraph IV.A.1.e. i. above).

   b. D/OCRM or designee will consider:

      i. Any SBA Field Office concerns regarding the Lender;

      ii. The processing, servicing and liquidation Centers' written opinion of Lender's ability to process, close, service and liquidate SBA loans, as applicable; and

      iii. The Lender's commitment to SBA lending.

   c. D/OCRM or designee then informs the Lender of SBA's decision.

   d.  Upon approval, OCRM notifies the Lender and the SBA Field Office:

      i.  That the request for delegated authority is approved; and

      ii.  The term of the delegated authority (not to exceed 2 years). For Lenders with less than 3 years of SBA lending experience/data, the Agency may consider performance over the period of time that the Lender has been a participating Lender, but will limit the Lender's initial term of delegated authority to 1 year or less. Lenders that identify significant differences between the performance numbers developed by the Lender and those developed by SBA (not related to a lack of accurate SBA Form 1502 reporting) should contact OCRM.

   e.  OCRM sends the Lender a Supplemental Guaranty Agreement, Preferred Lenders Program (SBA Form 1347) signed by the appropriate SBA official. The Lender must sign and return the SBA Form 1347 to OCRM before the Lender's PLP authority is effective. (Agreements must be signed and returned to OCRM within 30 days of receipt or a new application to the program will be required.)

   f.  OCRM sends the appropriate SBA Field Office a copy of the approval letter. OCRM will enter the effective term of the Lender's PLP authority on the SBA Partner Information Management System (PIMS). This is an essential step for Lenders processing PLP loans.

   g.  Decline of PLP application:

      If the PLP application is declined, OCRM notifies the Lender and SBA Field Office with the reason(s) for decline. The Lender may re-apply for PLP authority when it has overcome the reason(s) for decline. To do so, the Lender must file a request with OCRM and must show how it has overcome the reason(s) for decline. OCRM will review the request, make a recommendation and send it to the appropriate SBA official for a final Agency decision. OCRM will notify the Lender in writing of SBA's final decision.

4.  Process for Renewal of PLP Authority:

   a.  OCRM automatically starts the renewal process just prior to the expiration of a Lender's PLP authority. OCRM asks for comments from the SBA Field Office and the SBA's processing, servicing and liquidation centers. The comments should pertain to the Lender's most recent PLP term and must include:

      i.  Whether they recommend renewal;

      ii.  If they do not recommend renewal, why not;

      iii.  Whether the Lender can process, close, service and liquidate SBA loans;

      iv.  Changes in Lender's organization or management;

      v.  Any recurring denial of liability or repair situations with the Lender;

      vi.  Reasons for any unfavorable loan volume or repurchase rate data;

      vii.  Identification of any areas of concern; and

      viii.  An explanation of any discussions with the Lender that may impact the PLP decision.

   b.  OCRM contacts the Lender to obtain a good standing/Satisfactory status statement.

    c.  OCRM gathers the information relevant to a Lender's renewal. OCRM performs an analysis, makes a decision and informs the Lender of SBA's decision.

    d.  For renewal of its PLP authority, the Lender must demonstrate to SBA's satisfaction that it meets the criteria for delegated authority set forth in Paragraph IV.A.

5.  Notification of Renewal:

OCRM notifies the Lender and SBA Field Office that:

    a.  The renewal is approved; and

    b.  The term of the renewal.

    c.  OCRM sends the Lender a new signed by OCRM on behalf of the appropriate SBA official. The Lender must sign and return the SBA Form 1347 to OCRM before the Lender's PLP renewal is effective.

6.  If Renewal is Declined:

OCRM notifies the Lender and SBA Field Office of the reason(s) for decline of the PLP renewal. The Lender may not make PLP loans after its PLP authority expires. The Lender may re-apply for PLP authority when it has overcome the reason(s) for decline. To do so, the Lender must file a request with OCRM and must show how it has overcome the reason(s) for decline. OCRM will review the request, make a recommendation and send it to the appropriate SBA official for a final Agency decision. OCRM will notify the Lender in writing of SBA's final decision.

7.  Temporary Extension of PLP Authority:

If a Lender's PLP authority is expiring and SBA has not completed the renewal process, OCRM may extend a Lender's PLP authority for a short, interim period as determined by the D/OCRM.

8.  Non-Renewal and Shortened Renewals:

    a.  If SBA determines in its discretion that a Lender does not meet delegated authority criteria or increased supervision may be necessary, SBA may either not grant or renew delegated authority or may grant a shortened renewal period. See SOP 50 53(A), Chapter 3 on Increased Supervision.

9.  Reinstatement:

If a Lender's PLP authority was revoked, declined or voluntarily terminated, the Lender may ask SBA to reinstate its PLP authority. However, the Lender must generally wait 6 months before requesting reinstatement and follow paragraph IV.C.3.) of this chapter.

10.  PLP - Export Working Capital Program (EWCP) Authority:

    a.  This program offers the opportunity for SBA 7(a) Lenders with experience making EWCP loans or who are participants in the Delegated Authority Lender Program of the Export-Import Bank to apply for PLP authority to underwrite EWCP loans. Lenders with PLP-EWCP authority are delegated the same level of authority to process, close, service, and liquidate EWCP loans as is granted to approved 7(a) Lenders with PLP authority.

    b.  Application requests include the following elements:

        i.    Legal name and address of Lender;

    ii.     Address, city and state where Lender's EWCP underwriting will be performed;

    iii.    Name, title, telephone and fax numbers and e-mail address of the lending unit's primary contact for the EWCP program;

    iv.    A copy of the Lender's SBA Form 750EX;

    v.     Identification of the USEAC offices the lending unit works through on EWCP loans;

    vi.    A description of the lending unit's experience in international trade lending, including its level of EWCP lending over the last 2 years, Export-Import Bank ("Ex-Im") lending activity over the same 2-year period, and identification of any form of delegated lender authority with Ex-Im Bank or other trade finance agencies;

    vii.   Identification of personnel in charge of EWCP lending and explanation of their experience in export trade finance for small concerns; and

    viii.  Documentation supporting the bank's delegation of authority to the contact person filing this PLP expansion request.

c.    Completed applications should be directed to the Office of International Trade ("OIT") at SBA. OIT staff will be responsible for screening and collecting information from the applicable SBA offices on the current regulatory authority of the Lender and the Lender's unit's capabilities as an EWCP participant. OIT will electronically forward its recommendation and the comments of the other offices to OCRM for a final decision. The Lender must demonstrate to SBA's satisfaction that it:

    i.     Has a satisfactory history of providing trade finance to exporters (both the Lender and the Lender's loan officers); and

    ii.    Has been an active participant in the EWCP with SBA and/or with Ex-Im Bank for at least 6 consecutive months immediately prior to the SBA Field Office's recommendation and, if not an Ex-Im Bank delegated lender, has booked no fewer than three (3) SBA EWCP loans during the 24 months prior to application; and

    iii.   Meets the criteria for delegated authority in Paragraph IV.A. above.

d.    Lenders are notified of the final decision by written letter from OCRM with a copy to OIT and the appropriate SBA Field Office. If approved, OCRM will provide the Lender with SBA Form 2310, "Supplemental Guaranty Agreement – Preferred Lender Program (PLP) for Export Working Capital Program (EWCP) Loans," which the Lender must execute and return to SBA before the Lender can submit any loan applications under its PLP-EWCP authority. (Agreements must be signed and returned within 30 days of receipt or a new application to the program will be required.)

e.    If the PLP-EWCP application is declined, OCRM notifies the Lender, OIT, and SBA Field Office with the reason(s) for decline. The Lender may re-apply for PLP-EWCP authority when it has overcome the reason(s) for decline. To do so, the Lender must file a request with OIT and must show how it has overcome the reason(s) for decline. OIT will review the request, make a recommendation and send it to OCRM for a final Agency decision. OCRM will notify the Lender in writing of SBA's final decision.

f.    All PLP-EWCP expansion approvals will be for a period not to exceed the existing term of

the Lender's PLP authority. The succeeding PLP renewal of the Lender will include a section on the Lender's EWCP lending, with comment requests from OCRM directed to the OIT.

g. Lenders that are participating in the Delegated Authority Lender Program of the Export-Import Bank of the United States (Ex-Im Bank) (or any successor Program) are eligible to participate in the PLP-EWCP program. Lenders should be aware that they must comply with 13 CFR § 120.410(d), which requires SBA Lenders to "be supervised and examined by either a Federal Financial Institution Regulator or a state banking regulator satisfactory to SBA." Ex-Im Bank Delegated Authority Lenders must comply with the PLP-EWCP application procedures described above; however, such lenders are not required to have prior experience with SBA 7(a) lending and are deemed to be an active participant with Ex-Im Bank for purposes of the application.

11. Authority and Responsibilities:

a. Eligibility Requirements:

In addition to the SBA's primary business loan eligibility standards set forth in Subpart B, Chapter 2 of this SOP, the following additional restrictions apply to PLP Loans.

i. Lenders may use PLP only for 7(a) loans. Lenders may not use PLP for any pilot program unless SBA authorizes use of PLP for the pilot.

ii. The following types of loans are not eligible under PLP processing:

    a) Disabled Assistance Loans (DAL);

    b) Qualified Employee Trusts (ESOP) (loans made to an ESOP or 401K under 13 CFR §§ 120.350 through 120.354);

    c) Cooperatives;

    d) Pollution Control program;

    e) International Trade Loans not secured by a first lien position on the assets being financed;

    f) Applications Previously Submitted to LGPC for Processing. Once submitted to LGPC, an application withdrawn by the Lender, screened-out, or declined by LGPC may not be approved by any Lender under its PLP Authority. No Lender may knowingly submit an application for the same project under its PLP authority that was previously submitted through LGPC by a different Lender. E-Tran will not permit the submission of such an application under any Lender's PLP authority for a period of 12 months from the date of the withdrawal, screen-out, or decline of the application; and

    g) Revolving credits are not eligible except under CAPLines and, if the Lender has authority from SBA to make PLP-EWCP loans, under the EWCP.

iii. The same types of businesses that are not eligible under standard 7(a) also are not eligible under PLP. See Subpart B, Chapter 2.

iv. Additional restrictions specific to PLP refinancing are found in (13 CFR § 120.452), and explained further in Subpart B, Chapter 2.

b.  PLP Lenders' Processing Responsibilities (13 CFR § 120.452(a)):

SBA's business loan eligibility requirements, credit policy, and procedures apply to PLP loans. The PLP Lender must stay informed on and must apply all of SBA's Loan Program Requirements.

i.  Lender's Eligibility Review:

a)  A PLP Lender must analyze a PLP loan Applicant's eligibility in the same way that SBA analyzes eligibility for a regular 7(a) Applicant. The PLP Lender must keep in its loan file documentation supporting its eligibility analysis. SBA will not conduct an eligibility review prior to issuing a loan number. SBA may review the Lender's documentation supporting its eligibility determination as part of any guaranty purchase request or when conducting lender oversight activities.

b)  For a PLP loan, size of the Applicant is determined as of the date of the Lender's approval of the loan. A PLP Lender may accept as true the size information provided by the Applicant, unless credible evidence to the contrary is apparent.

ii.  Credit Analysis:

SBA has authorized PLP Lenders to make the credit decision without prior SBA review. The Lender must perform a thorough and complete credit analysis of the applicant, establish that the loan is of such sound value as to reasonably assure repayment and document its analysis in the loan file. See Subpart B, Chapter 4 of this SOP for specific guidance on processing loan guaranty requests.

iii.  The Authorization:

PLP Lenders draft the Authorization without SBA review and execute it on behalf of SBA. The Lender must make sure that all collateral and other requirements documented in the Lender's credit analysis are in each Authorization. The Lender also must include all SBA-required authorization provisions. See Subpart B, Chapter 5 of this SOP.

iv.  Closing Requirements:

SBA closing requirements are the same for PLP loans as for non-delegated 7(a) loans. The same SBA forms are required. The Lender must obtain all required collateral positions and must meet all other required conditions before loan disbursement. SBA delegates to the PLP Lender responsibility for all pre-disbursement Authorization requirements in this SOP. The only actions that the Lender may not take on a PLP loan are those specifically reserved to SBA. See Subpart B, Chapter 7 of this SOP.

After closing the loan, the PLP Lender must submit electronically to SBA through E-Tran a copy of the executed Authorization. The Lender should not send SBA any other closing documentation, including disbursement information, except through the required periodic loan status reports (SBA Form 1502).

v.  Servicing and Liquidation Responsibilities:

See SOP 50 57 and 13 CFR § 120.453 and 13 CFR Part 120, Subpart E for guidance.

c.  Change of PLP Lender's Structure:

i.   To determine the effect on a Lender's delegated authority due to a change in the Lender's structure, please see the chart below.

ii.  If a PLP Lender changes its structure or organization in any of the following ways, it must inform OCRM in writing:

   a) The Lender is acquired by another lender;

   b) The Lender is merged into another legal entity;

   c) The Lender changes its name;

   d) The Lender substantially changes the management of its SBA business;

   e) The Lender substantially changes how it handles SBA loans; or

   f) A regulatory agency takes over or closes the Lender.

iii. An SBA Field Office that discovers any of the above circumstances also must immediately notify OCRM in writing.

iv.  Requests for New SBA Guaranty Agreements:

   When necessary, the Lender may obtain:

   a) A new SBA Form 750 from the SBA Field Office; and

   b) New SBA Form 1347 from OCRM.

| If a PLP Lender continues as the same legal entity that signed the SBA Form 1347 (PLP) and | Then |
|---|---|
| (1) The PLP Lender changes its name. | OCRM records the name change. The Lender's PLP authority is not changed. A new SBA Form 1347 (PLP) is not needed. |
| (2) The PLP Lender is acquired by another entity. The PLP Lender continues as a separate legal entity. | OCRM records the holding company name. The Lender's PLP authority is not changed. A new SBA Form 1347 (PLP) is not needed. |
| (3) The PLP Lender acquires another lender. The acquired lender does not continue as a separate legal entity. | The PLP Lender may continue to make PLP loans under its PLP authority unless there is a substantial change in its ability to make PLP loans. |
| (4) The PLP Lender acquires another lender. The acquired lender continues as a separate legal entity. | The acquired lender may not make PLP loans. The acquired lender may apply for PLP authority. |

| If a PLP Lender continues as the same legal entity that signed the SBA Form 1347 (PLP) and | Then |
|---|---|
| (5) The PLP Lender is closed or taken over by a regulatory authority. | The Lender's PLP authority automatically terminates and the Lender must cooperate with SBA to transfer responsibility for servicing and liquidating its SBA portfolio. OCRM notifies the Lender, SBA Field Office(s) and appropriate Centers that the Lender may not make any new loans. |
| (6) The PLPLender changes its operations so much that it cannot show that it handles SBA loans appropriately. | SBA will not renew the Lender's PLP authority or will suspend or revoke the lender's PLP authority. |
| **If a PLP Lender does not continue as the legal entity that executed the SBA Forms 1347 (PLP) and** | **Then** |
| (1) The PLP Lender is merged into a non-PLP Lender. The original PLP Lender's SBA operations are unchanged. | The original PLP Lender no longer has the authority to make PLP loans. The surviving lender may apply for PLP authority and execute a PLP agreement. |
| (2) The PLP Lender is merged into another PLP Lender. | The original PLP Lender no longer has the authority to make PLP loans under its agreements with SBA. However, PLP loans may be made under the surviving PLP Lender's agreements and the surviving PLP Lender is responsible for servicing and liquidating the acquired SBA loan portfolio. |
| (3) The PLP Lender is dissolved. It does not merge into another lender. | PLP authority terminates automatically and the Lender must cooperate with SBA to transfer responsibility for servicing and liquidating its SBA portfolio. OCRM notifies the Lender, SBA Field Office(s) and appropriate Centers that the Lender may not make any new loans. |

    c) Monitoring and reviews:

       See Paragraph III.A through C of this Chapter for further information on monitoring and reviews.

    d) Supervision and enforcement:

       See Paragraph III.D of this Chapter for further information on supervision and enforcement.

    e) Suspension and revocation:

       SBA may suspend or revoke a Lender's PLP authority in accordance with 13 CFR §§ 120.1400-1600.

D. **SBA Express Program:**

1. SBA Express was established as a permanent SBA program under P.L.108-447 and signed into law on December 8, 2004. The program reduces the number of government mandated forms and procedures, streamlines the processing and reduces the cost of smaller, less complex SBA loans. The program allows Lenders to utilize, to the maximum extent practicable, their respective loan analyses, procedures, and documentation. In return for the expanded authority and autonomy provided by the program, Lenders agree to accept a maximum SBA guaranty of 50 percent.

2. The SBA Express Lender:

   To the maximum extent practicable, SBA Express Lenders may use their own forms, internal credit memoranda, notes, collateral documents, and servicing and liquidation documentation. In using their documents and procedures, Lenders must follow their established and proven internal procedures used for their similarly sized non-SBA guaranteed commercial loans. See Subpart B, Chapter 6 for a listing of the forms SBA requires for SBA Express.

3. Qualifications for Initial SBA Express Lender Authority:

   a. An existing SBA Lender must demonstrate to SBA's satisfaction that it meets the criteria for delegated authority set forth in Paragraph IV.A. above.

   b. For SBA Lenders with less than 3 years of SBA lending experience/data, the Agency may consider performance over the period of time the Lender has been an SBA Lender, but will limit the Lender's initial term of participation to 1 year or less. Lenders that identify significant differences between the performance numbers developed by the Lender and those developed by SBA (not related to a lack of accurate SBA Form 1502 reporting) may contact OCRM.

   c. Lenders that do not currently participate with SBA:

   In addition to meeting the Agency's Lender requirements as set forth in paragraph II.C. of this chapter, a lender that does not currently participate with SBA also must demonstrate to SBA's satisfaction that it:

   i.   Is in good standing or considered Satisfactory by its state/FFIR, as applicable. The Lender's written request to participate must include a written statement that to the best of its knowledge, the Lender has satisfactory: i) financial condition (e.g., capital and liquidity); ii) small business credit administration policies, procedures, and practices

that it continues to adhere to in its operations; and iii) small business servicing policies, procedures, and practices that it continues to adhere to in its operations. When reviewing good standing/Satisfactory status, SBA will look to see that a Lender does not have significant deficiencies or weaknesses in these areas. "Significance" may be evidenced by the number or seriousness of the deficiencies, as determined by SBA in its discretion. SBA will verify any good standing/Satisfactory status statement where possible with public (e.g., Cease and Desist Orders and Call Reports) and/or non-public information from the Lender's primary and/or other regulators.

ii.   Has at least 20 commercial or business loans for $350,000 or less at its most recent fiscal year end;

iii.  Ensures its primary SBA loan personnel have received appropriate training on SBA's policies and procedures (such training could include SBA Field Office training and/or trade association training that adequately addresses SBA's regulations and Standard Operating Procedures, including SBA's loan processing, servicing, and liquidation requirements); and

iv.   Has no major substantive objections from the D/OCRM (e.g., relating to risk or program integrity).

4.  Process to become an SBA Express Lender:

a.  A Lender's initial request for delegated authority must be sent electronically to D/OCRM or designee at 7aDeleAuthNomination@sba.gov.

A Lender requesting to reinstate or expand existing delegated authority must submit a request electronically to D/OCRM or designee at 7aRedelegationNominations@sba.gov.

b.  As noted above, lenders not currently participating with the SBA must meet the Agency's Lender requirements as set forth in paragraph II.C. of this chapter and must become an approved SBA Lender before participating in SBA Express. (An application for SBA Express authority may be made simultaneously with the application for SBA Lender authority.)

c.  OCRM gathers the information relevant to a Lender's participation request. OCRM performs an analysis, makes the final determination, and notifies the Lender and SBA Field Office(s) of SBA's decision.

d.  SBA may limit a new SBA Lender to a yearly maximum of $25 million of SBA Express in its first year of participation.

5.  Supplemental Guaranty Agreement:

a.  If the Lender's request for SBA Express authority is approved, OCRM notifies the Lender of the decision and sends the Lender an SBA Express SBA Form 2424, "Supplemental Loan Guaranty Agreement SBA Express Program" Agreement to sign and return. OCRM also sends the Lender instructions for submitting SBA Express applications.

b.  The Lender must sign and return the agreement to OCRM before the Lender's SBA Express authority is effective. (Agreements must be signed and returned to the Center within 30 days of receipt or a new application to the program will be required.)

    c. If the Lender is a PLP Lender, the term of its SBA Express authority, when possible, will be tied to the Lender's remaining PLP term.

    d. Lenders not currently participating in SBA's loan programs that are approved for SBA Express will be limited to an initial SBA Express term of 1 year.

6. Decline of SBA Express Authority:

If SBA declines a request for nomination for SBA Express authority, OCRM notifies the Lender and SBA Field Office of the reason(s) for decline of the request. The Lender may re-apply for SBA Express authority when it has overcome the reason(s) for decline. To do so, the Lender must file a request with OCRM and must show how it has overcome the reason(s) for decline. OCRM will review the request, make a recommendation and send it to the appropriate SBA official for a final Agency decision. OCRM will notify the Lender in writing of SBA's final decision.

7. Renewals of SBA Express Authority:

    a. OCRM will automatically start the renewal process a few months prior to the expiration of a Lender's SBA Express authority. OCRM contacts the Lender to obtain a current statement of Satisfactory status (as described in paragraph 3 above).

    b. OCRM will also contact the Lender's SBA Field Office and the SBA's processing, servicing and liquidation Centers. The comments of those offices should pertain to the Lender's most recent SBA Express term and must include:

        i. Whether renewal is recommended;

        ii. If renewal is not recommended, why not;

        iii. Whether the Lender can effectively process, close, service and liquidate SBA loans;

        iv. Changes in Lender's organization or management;

        v. Any recurring denial of liability or repair situations with the Lender;

        vi. Reasons for any unfavorable loan volume or repurchase rate data;

        vii. Identification of any areas of concern; and

        viii. An explanation of any discussions with the Lender that may impact the SBA Express decision.

    c. OCRM gathers the information relevant to a Lender's renewal. OCRM performs an analysis, makes a recommendation and sends it to the appropriate SBA official who makes a decision and notifies OCRM. OCRM then informs the Lender of SBA's decision.

    d. Lenders that have participated in SBA Express for 2 years or more may be renewed in the program for a term up to 2 years, but SBA may renew for less than 2 years if Lender or program circumstances warrant. Lenders participating in SBA Express for less than 2 years may be renewed in SBA Express for an additional year and may be renewed for up to 2 years thereafter.

    e. For renewal of a Lender's SBA Express authority and to determine its renewal term for SBA Express, the Lender must demonstrate to SBA's satisfaction that it meets the criteria for delegated authority in Paragraph IV.A. above.

f.  OCRM notifies the Lender of SBA's decision and, if the renewal is approved, OCRM sends the Lender a new SBA Express Supplemental Guaranty Agreement to sign.

g.  The Lender must sign and return the agreement to OCRM before the Lender's SBA Express renewal is effective. (Agreements must be signed and returned to OCRM within 30 days of receipt or a new application to the program will be required.)

h.  If the renewal is declined, the Lender will be notified of the reason(s) for the decline, and it may not make SBA Express loans after its SBA Express authority expires. The Lender may re-apply when it has overcome the reason(s) for decline. To do so, the Lender must file a request with OCRM and must show how it has overcome the reason(s) for denial. OCRM will review the request, make a recommendation and send it to the appropriate SBA official for a final Agency decision. OCRM will notify the Lender in writing of SBA's final decision.

i.  If a Lender's SBA Express authority was revoked, declined or voluntarily terminated, the Lender may ask SBA to reinstate its SBA Express authority. However, the Lender must follow paragraph C.4 of this section.

8.  Authority and Responsibilities:

a.  SBA Express Lenders may make SBA Express loans in any area of the country.

b.  SBA Express Lenders must apply and comply with all of SBA's Loan Program Requirements.

c.  Eligibility Requirements: In addition to the SBA's primary business loan eligibility standards set forth in Subpart B, Chapter 2 of this SOP, the following restrictions apply to SBA Express loans.

    i.  Lenders may not use SBA Express for any pilot program unless SBA authorizes use of SBA Express for the pilot.

    ii.  The following types of loans are not eligible under SBA Express processing:

       a)  Disabled Assistance Loans (DAL);

       b)  Qualified Employee Trusts (ESOP) (loans made to an ESOP or 401k under 13 CFR §§ 120.350 through 120.354);

       c)  Cooperatives;

       d)  Pollution Control program; and

       e)  CAPLines program.

       f)  Applications Previously Submitted to LGPC for Processing. Once submitted to LGPC, an application withdrawn by the Lender, screened-out, or declined by LGPC may not be approved by any Lender under its SBA Express Authority. No Lender may knowingly submit an application for the same project under SBA Express that was previously submitted by a different Lender. E-Tran will not permit the submission of such an application under any Lender's SBA Express authority for a period of 12 months from the date of withdrawal, screen-out, or decline of the application.

       g)  An application that did not receive an acceptable credit score under 7(a) Small

Loan procedures may be withdrawn prior to submission through E-Tran or SBA One and may be processed under SBA Express. See Subpart B, Chapters 4 and 6 of this SOP.

d.  SBA Express Lender's Processing Responsibilities:

    i.  Lender's Eligibility Review:

       a)  SBA Express is a streamlined program, so complex or ambiguous eligibility issues should be processed using standard 7(a) procedures rather than through SBA Express. SBA grants SBA Express Lenders increased responsibility for screening applicants and loans for SBA eligibility. SBA Express Lenders must be fully familiar with SBA's eligibility requirements as set forth in the SBA Loan Program Requirements and must screen all SBA Express Applicants and loans to ensure they meet those requirements.

       b)  Lenders may rely, in many instances, on certifications provided by the Applicant, several of which are included in the SBA Express application documents. In the case of size, the Lender may rely on information provided by the Applicant at the date of application, unless the Lender has credible evidence to the contrary.

       c)  Certain eligibility issues require additional lender review and/or verification. Lenders must follow all standard 7(a) eligibility requirements and maintain appropriate documentation supporting their eligibility screening in the loan file.

       d)  Lenders must carefully review and screen SBA Express Applicants and loans to ensure they meet SBA's eligibility requirements before transmitting the SBA Express guaranty request and supplemental information via E-Tran.

       e)  Lenders must ensure all required forms/information are obtained, complete, and properly executed. Appropriate documentation must be maintained, including adequate information to support the eligibility of the Applicant and the loan, in the Lender's loan file.

    ii.  Credit Analysis:

       a)  SBA has authorized SBA Express Lenders to make the credit decision without prior SBA review. The credit analysis must demonstrate that there is a reasonable assurance of repayment. The Lender is required to use appropriate, prudent and generally accepted industry credit analysis processes and procedures (which may include credit scoring), and these procedures must be consistent with those used for its similarly sized non-SBA guaranteed commercial loans. Lenders that do not use credit scoring for their similarly sized non-SBA guaranteed commercial loans may not use credit scoring for SBA Express. Lenders must validate (and document) with appropriate statistical methodologies that their credit analysis procedures are predictive of loan performance, and they must provide that documentation to SBA upon request. SBLCs are required to provide credit scoring model validation to SBA on an annual basis. In addition, the credit scoring results must be documented in each loan file and available for SBA review.

b) Lenders must not make an SBA Express loan which would be inconsistent with SBA's "credit not available elsewhere" standard (see Subpart B, Chapter 2 of this SOP), i.e., Lenders must not make an SBA-guaranteed loan that would be available on reasonable terms from non-Federal, non-State, or non-local government sources, including from the Lender, without an SBA guaranty.

c) The credit decision, including how much to factor in a past bankruptcy or whether to require an equity injection, is left to the business judgment of the Lender. Also, if the Lender requires an equity injection and, as part of its standard processes for non-SBA guaranteed loans verifies the equity injection, it must do so for SBA Express loans. While the credit decision is left to the business judgment of the Lender, early loan defaults will be reviewed by SBA pursuant to SOP 50 57.

iii.    Application Documents and Authorization:

a) After the loan is closed, the Lender must continue to apprise SBA of certain critical performance data as well as changes in certain basic Borrower information, such as trade name and address. See Subpart B, Chapters 7 and 8 of this SOP.

b) The Lender completes the SBA Express Authorization without SBA review and signs it on behalf of SBA. See Subpart B, Chapter 5 of this SOP.

e. Closing, Servicing and Liquidation:

The SBA Express Lender must close, service, and liquidate its SBA Express loans using the same reasonable and prudent practices and procedures that the Lender uses for its non-SBA guaranteed commercial loans.

9. Monitoring and reviews:

SBA uses the L/LMS system to assess SBA Express Lenders quarterly through the composite risk rating. In addition, those SBA Express Lenders with outstanding SBA balances of $10 million or more are also reviewed in accordance with SOP 51 00. See Paragraph III.A through C of this Chapter for further information on monitoring and reviews.

10. Supervision and enforcement:

See Paragraph III.D of this Chapter for further information on supervision and enforcement.

11. Suspension or revocation:

See Paragraph III.E of this Chapter for further information on suspension and revocation.

E. Export Express Program:

1. The Export Express Program is designed to help SBA meet the export financing needs of small businesses too small to be effectively met by existing SBA export loan guaranty programs. It is generally subject to the same loan processing, making, closing, servicing, and liquidation requirements as well as the same maturity terms, interest rates, and applicable fees as the SBA Express Loan Program. Any differences between the Export Express requirements are set forth in the appropriate section of this SOP. (For example, certain uses of loan proceeds are allowed under Export Express that are not allowed under SBA's other lending programs. See Subpart B, Chapter 2

of this SOP.)

2.  Becoming an Export Express Lender:

   a.  Lenders must have a signed Export Express Supplemental Guaranty Agreement to make Export Express loans.

   b.  The procedures for receiving Export Express authority are different based on the Lender's existing authority:

      i.   Active SBA Express Lenders:

         Lenders that currently have SBA Express authority that would like to make Export Express loans must submit a request to SBA. The request should be submitted to the Lender's local SBA Field Office or U.S. Export Assistance Center (USEAC). These offices should submit the Lender's request to the OCRM, at 7aRedelegationNomination@sba.gov. OCRM will send the Lender the Export Express Supplemental Guaranty Agreement (Agreement), with a copy of the approval letter to OIT, and the Lender will have 30 days to execute and return the Agreement to OCRM.

      ii.  Existing 7(a) Lender that Does Not Participate in the SBA Express Program:

         An existing 7(a) Lender that would like to participate in the Export Express Program must submit a request to its local SBA Field Office or U.S. Export Assistance Center (USEAC). These offices should submit the request to OCRM at 7aDeleAuthNomination@sba.gov. OCRM will contact the local SBA USEAC for comments and process the request in accordance with the procedures and process for the SBA Express Program, as described in Paragraph IV.C.4. above. Lenders can request SBA Express and Export Express authority simultaneously, but are not required to do so. OCRM will send the Lender the Export Express Supplemental Guaranty Agreement, with a copy of the approval letter to OIT, and the Lender will have 30 days to execute and return the Agreement to OCRM.

   c.  To retain or renew Export Express authority, SBA Express Lenders must:

      i.   Effectively process, make, close, service, and liquidate Export Express loans;

      ii.  Remain in compliance with SBA Loan Program Requirements;

      iii. Have received no major substantive objections regarding renewal from the Field Office(s) covering the territory where the Lender generates significant numbers of Export Express loans; and

      iv.  Received acceptable review results on the Export Express portion of any SBA-administered Lender reviews.

   d.  SBA will generally grant Lenders Export Express loan authority for a term that coincides with the Lender's SBA Express term, unless the D/OCRM determines a shorter term is appropriate. The maximum term for all Export Express Lenders is 2 years. For 7(a) Lenders who have not participated with SBA previously, the term may be less than 2 years at the discretion of the D/OCRM.

3.  Monitoring and reviews:

SBA uses the L/LMS system to assess Export Express Lenders quarterly through the composite risk rating and other performance metrics. In addition, those Lenders with outstanding SBA balances of $10 million or more may also receive more in-depth reviews. See Paragraph III.A through C of this Chapter for further information on monitoring and reviews.

4.  Supervision and enforcement:

    See Paragraph III.D of this Chapter for further information on supervision and enforcement.

5.  Suspension or revocation:

    See Paragraph III.E of this Chapter for further information on suspension and revocation.

F.  Export Working Capital Program (EWCP):

    To participate in the Export Working Capital Program (EWCP):

    1.  An existing SBA Lender may contact the local United States Export Assistance Center (USEAC) or the local SBA Field Office to request authority to participate in the EWCP. (A complete listing of USEAC locations and personnel may be found at https://www.sba.gov/tools/local-assistance/eac.) The USEAC or Field Office staff will provide the Lender with SBA Form 750EX, "Supplemental Guarantee Agreement Export Working Capital Program," which the Lender must execute and return to the USEAC.

    2.  Non-SBA lenders must be approved by SBA to participate in the 7(a) loan guaranty program before they can participate in EWCP. Such lenders may also contact the local USEAC or local SBA Field Office to request authority to participate in SBA lending. If the lender meets the criteria set forth above for 7(a) Lenders, the USEAC or Field Office staff will provide the lender with SBA Form 750 and/or SBA Form 750B, as appropriate, and SBA Form 750EX, which the lender must execute and return to the USEAC.

    3.  The Regional Manager of SBA's Export Solutions Group located at each USEAC will consult, advise and train Lenders and small business exporters on the procedures and benefits of SBA's EWCP.

    4.  To request authority to participate in the Preferred Lender Program (PLP) for EWCP, see paragraph IV.C.10 of this Chapter.

## CHAPTER 2: SMALL BUSINESS LENDING COMPANIES

### I.  SMALL BUSINESS LENDING COMPANIES ("SBLC") 13 CFR §§ 120.460-120.490

A.  A Small Business Lending Company (SBLC) is a non-depository lending institution that is authorized by SBA to only make loans pursuant to section 7(a) of the Small Business Act and loans to Intermediaries in SBA's Microloan program. An SBLC is:

1.  Regulated, supervised and examined solely by SBA;

2.  Subject to additional SBA regulations specific to SBLCs regarding formation, capitalization, and enforcement actions;

3.  Subject to all other 7(a) regulations specific to origination, servicing and liquidation; and

4.  As required of all SBA Lenders, SBLCs must analyze each application in a commercially reasonable manner, consistent with prudent lending standards.

B.  SBLCs are required to:

1.  Submit to the D/OCRM for review their credit policy that demonstrates compliance with Title 13 of the CFR and SBA's Standard Operating Procedures (SOPs) for origination, servicing and liquidation of 7(a) loans, and which must be acceptable to SBA in its discretion.

2.  Submit to the D/OCRM for review and approval annual validation, with supporting documentation and methodologies demonstrating that any scoring model used by the SBLC is predictive of loan performance.

3.  Each SBLC's Board of directors must adopt and fully implement an internal control policy that provides adequate direction to the institution for effective control over and accountability for operations, programs, and resources. The Board-adopted internal control policy must, at a minimum, comply with 13 CFR § 120.460. For example:

    a.  The internal control policy implemented must ensure satisfactory monitoring and management of the SBA loan portfolio, including but not limited to, providing for a periodic loan review function to be performed at least annually by a person who is not directly or indirectly responsible for loan making or by outside contractors.

    b.  It must include a list of monthly reports provided by the SBLC's management for Board review to support adequate Board oversight.

    c.  It must provide for internal controls for loan making, servicing and liquidation.

    d.  It must provide for a risk rating system to risk classify SBA loan assets satisfactory to SBA.

    e.  Internal control policies and procedures must include provisions to ensure compliance with SBA's Loan Program Requirements on eligibility.

    f.  Internal control policies and procedures must include provisions to ensure the SBLC exercises due diligence and prudent oversight of its third party vendors, including Lender Service Providers (LSP) and other loan Agents. Such policies and procedures should include, but not be limited to, monitoring performance of loans referred by an Agent or where an Agent provided assistance. SBLCs must provide documentation demonstrating that the

internal control policies and procedures are fully implemented and followed.

C. In accordance with Paragraph I.B above, SBLCs must adhere to their internal policies and procedures for originating, closing, servicing, and when necessary liquidating SBA loans. When this SOP states that Lenders are to follow their own policies and procedures on their similarly-sized, non-SBA guaranteed loans, SBLCs must follow the written policies and procedures that have been reviewed by SBA.

D. An SBLC may not make a loan to an Applicant that has received assistance from an affiliated Small Business Investment Company (SBIC) (13 CFR § 120.476)

## II.  PROCESS FOR ACQUIRING AN SBLC

A. SBA regulations restrict the issuance of the SBA lending authority to operate as an SBLC to 14 entities. To become an SBLC, an entity must purchase one of the existing lending authorities from a current SBLC.

B. SBA reserves the right to deny any entity proposing to acquire an SBLC's SBA lending authority in its sole discretion. In addition to SBA's evaluation of the elements required in paragraph E. below, SBA may consider risk factors in its evaluation of an SBLC application. These factors include, but are not limited to, historical performance measures (such as default, purchase and loss rate), and other performance data associated with the acquiring concern or its senior management team, along with other relevant information (such as SBA-observed gaps in small business lending not served by the existing 7(a) Lender population).

C. SBA does not participate in facilitating the transfer of an SBLC's SBA lending authority. Private party negotiations culminate in a definitive purchase and sale agreement which includes the terms and conditions related to the transfer of the SBA lending authority. This agreement must include provisions which condition the transfer upon the prior written approval of the SBA.

D. A written request by the selling SBLC to the D/FA for approval of a transfer of ownership and control by the entity transferring the SBA lending authority becomes notice to SBA of the intent to transfer. The written request must include:

1. The name and address of the acquiring concern;

2. The primary name and contact information for the acquiring concern's contact.

E. The acquiring concern must file a request for transfer with the D/FA and submit two (2) complete binders of fully executed paper copies and one (1) executed electronic scanned copy (in pdf format) to OFA addressing each of the elements set forth below ("SBLC Application"). The SBLC Application must be complete and organized in tabular format. Incomplete SBLC Applications will not be processed by SBA and will be returned to the acquiring concern. An applicant that submits an incomplete SBLC Application (as determined by SBA) must wait 30 calendar days before reapplying.

1. The Legal name, address, telephone, facsimile and email address of the acquiring concern;

2. Identification of the form of organization of the proposed SBLC along with file-stamped copies of the concern's certificate of incorporation, certificate of formation or certificate of limited partnership (as applicable), and a copy of the concern's corporate bylaws, limited liability company operating agreement, or limited partnership agreement (as applicable);

3. Identification of the proposed SBLC's capitalization including the form of ownership, the identification of all classes of equity capital and proposed funding amounts, rights and preferences

accorded to each class of stock or members interest (including voting rights, redemption rights, and rights of convertibility) and conditions for transfer, sale, or assignment of these interests;

4. The proposed SBLC's geographic area of operation;

5. Identification of all officers, directors, managing partners, managing members, key employee(s) of lender (an employee who manages daily operations, e.g., overseeing a department or a division, not a clerical staff position), and all other individuals or entities that propose to hold an equity interest of at least 10% of the economic interest in any class of stock or ownership interest in the proposed SBLC (such identification should include a discussion of any prior SBA experience);

   a. An organization chart showing the relationship of the proposed SBLC with all related associates and affiliates within the organization;

   b. All individuals or entities identified in paragraph 5 above must submit an executed SBA Form 1081 and either a Form FD-258 (fingerprint card) or electronic fingerprint submission. "Electronic fingerprint submission" is defined in Subpart B, Chapter 2, Paragraph III.A.13.d.iv of this SOP. SBA Form 1081 and the Form FD-258 or electronic fingerprint submission must be signed and dated within 90 days of submission to SBA.

   c. A director or key employee of the lender organization is only required to submit either Form FD-258 (fingerprint card) or electronic fingerprint submission if the director or key employee answered affirmatively to questions 10a, 10b, 10c, 11a and/or 11b on the SBA Form 1081.

6. Proof of fidelity insurance coverage as detailed in 13 CFR § 120.470(e).

7. A comprehensive business plan that details:

   a. The nature of proposed operations, including the organizational units involved in sourcing, evaluating, underwriting, closing, disbursing servicing and liquidating small business loans in the organization;

   b. The identification of all sources of capital used to finance lending operations;

   c. An operations plan detailing the nature of the Lender's proposed loan activity, the volume of activity projected over the first 3 years as an SBA Lender, projected balance sheets, income statements and statement of cash flows of the Lender, with alternative profit and loss scenarios based on run rates equivalent to 70% and 50% of projected loan activity, the type and projected amount of financing needed to support its lending plan, along with a discussion of Lender's proposed wind-down plan in the event the Lender decides to leave the program;

   d. A detailed analysis of the Lender's projected secondary market activities during the first 3 years of operation, including a sensitivity analysis of the effect any changes in premium from the sale of the guaranteed portion of 7(a) loans in SBA's secondary market may have on the Lender's prospective earnings. The analysis must also include a description of the Lender's plans (if any) to securitize or sell participations in the unguaranteed portion of 7(a) loans; and

   e. If the Lender intends to acquire any 7(a) loans, a written plan detailing the extent of this acquisition activity in its operating plan, and how the Lender will manage the transition of the 7(a) loan portfolio;

8. All documents associated with any type of external financing expected to be undertaken by the

proposed SBLC;

9.   A written statement from an authorized official of the acquiring concern certifying that the SBLC will not be primarily engaged in the financing the operations of an Affiliate as defined in 13 CFR § 121.103.

10. The most recent audited financial statements of the acquiring concern if it has been in operation for more than 1 year, or the audited financial statements of the acquiring concern's parent company.

11. A certified copy of a Board, limited partners, or members resolution specifying the individual(s) or official(s) granted the authority by the organization to submit this SBLC application;

12. A certification by the acquiring concern that it is in full compliance with all Federal, State, and local laws;

13. A written legal opinion of independent counsel ("Independent Counsel" is counsel that is not an "Associate" of the lender under 13 CFR § 120.10.), satisfactory to SBA that addresses whether the proposed SBLC:

    a. Is duly formed, organized, and validly existing in good standing under the laws of the State of its organization, and is in full compliance with all Federal, State, and local laws in connection with the formation and organization of the proposed SBLC; and

    b. Has the power, legal right and authority to enter into the sale transaction.

F.  Once received, the D/FA or designee, in consultation with the Director, Office of Credit Risk Management (D/OCRM) or designee, makes the final determination on the application. If approved, the D/FA will provide written notification to the selling SBLC and the acquiring concern that SBA consents to the transfer of the lending authority. Included with this letter will be all applicable SBA Form 750 agreement(s) for execution and return to OFA. For change of control transactions, the Lender will also have to reapply for any delegated authorities.

G.  SBA's prior written consent is required for any proposed transaction or event that results in Control by any entity or person(s) not previously approved by SBA. Control as defined in this paragraph means the possession, direct or indirect, or the power to direct or cause the direction of the management or policies of an SBLC, whether through the ownership of voting securities, by contract, or otherwise.

1.  A new application in accordance with paragraph II.E above must be submitted for SBA's prior written consent with respect to any change of ownership or control transaction as specified in 13 CFR § 120.475.

2.  For change of control transactions, the Lender will also have to reapply for any delegated authorities.

H.  If the proposed change of ownership is for less than a majority interest, SBA may in its sole discretion limit the items required from the Lender in paragraph II.E of this chapter to support a request for prior SBA consent.

I.  Receiverships of SBLCs (except Other Regulated SBLCs as defined in 13 CFR § 120.10):

1.  Upon SBA's determination that grounds for an enforcement action against an SBLC (except an Other Regulated SBLC) exist under 13 CFR § 120.1400, SBA may, pursuant to 13 CFR § 120.1500(c)(3), apply to a Federal court for the appointment of a receiver. Typically, SBA will use its receivership authority as a remedy of last resort. The appointment of a receiver is only one of

several types of enforcement actions set forth in 13 CFR § 120.1500.

2. SBA will review the facts and circumstances of the enforcement action when deciding whether or not to seek the appointment of a receiver. SBA will also make a determination regarding the scope of the receiver's duties and powers. In deciding whether to seek a receiver and in determining the scope of a receivership, SBA will consider the following:

   a. The existence of fraud or false statements;

   b. An SBLC's refusal to cooperate with SBA enforcement action instructions or orders;

   c. An SBLC's insolvency (legal or equitable); and/or

   d. The dollar amount of any claims SBA may have against the SBLC.

3. Under 13 CFR § 120.1400(a)(2), an SBLC (except an Other Regulated SBLC) that makes SBA 7(a) guaranteed loans after October 20, 2017, has consented to SBA's right to seek a receivership in appropriate circumstances. As described in 50 10 5(J), such consent is deemed to apply only if the SBLC makes 7(a) loans on or after January 1, 2018. The SBLC's consent does not in any way preclude the SBLC from contesting whether or not SBA has established the grounds for seeking the remedy of a receivership. An SBLC's consent to receivership as a remedy does not require SBA to seek the appointment of a receiver in any particular SBA enforcement action.

# CHAPTER 3: CERTIFIED DEVELOPMENT COMPANIES

## I.  THE 504 LOAN PROGRAM

A.  The SBA 504 Loan Program is an economic development program offering a financing package that stimulates private sector investment in long-term fixed assets to increase productivity, create new jobs, and increase the local tax base. The stimulus is provided by making long-term, low down payment, reasonably priced fixed-rate financing to healthy and expanding businesses which have the highest probability of successfully creating new jobs and competing in the world marketplace.

B.  504 loans are issued through a partnership with Certified Development Companies (CDC) and private sector, third party lenders. CDCs are non-profit corporations certified and regulated by the Small Business Administration to package, process, close, and service 504 loans. There are a small number of for-profit CDCs that have been grandfathered into the current 504 program. Unless expressly provided otherwise in the regulations, any SBA Loan Program Requirement that applies to non-profit CDCs also applies to for-profit CDCs. (13 CFR § 120.818)

C.  Terms and definitions specific to the 504 program can be found at 13 CFR § 120.802.

## II.  BECOMING A CDC AND OPERATIONAL REQUIREMENTS

A.  A CDC must provide evidence of the following in its application (13 CFR §120.810):

1.  Non-Profit Status (13 CFR § 120.816): A CDC must be a non-profit corporation and must:

    a.  Be in good standing in the State in which the CDC is incorporated;

    b.  Be in compliance with all laws, including taxation requirements, in the State in which the CDC is incorporated and any other State in which the CDC conducts business; and

    c.  Provide a copy of its IRS tax exempt status.

2.  Area of Operations (13 CFR § 120.821): The Area of Operations is the State of the CDC's incorporation.

3.  CDC Membership: CDC membership is optional. If a CDC elects to have a membership, the membership requirements must be included in the CDC's bylaws.

4.  CDC Board of Directors Roles and Responsibilities under 13 CFR § 120.823: The CDC must have a Board of Directors. The Board shall have and exercise all corporate powers and authority and be responsible for all corporate actions and business. The Board is responsible for ensuring that the structure and operation of the CDC as set forth in the CDC's bylaws complies with SBA's Loan Program Requirements. The Board must be actively involved in encouraging economic development in the CDC's Area of Operations. The initial Board may be created by any method permitted by State law.

5.  CDC Board of Directors Composition and Requirements: CDC Boards must comply with 13 CFR § 120.823, as follows:

    a.  All CDCs must have a Board of Directors with at least nine (9) voting directors. SBA recommends limiting a CDC Board size to no more than 25 voting directors. For good cause, a CDC may request the approval of D/FA or designee to have a Board with fewer directors than nine (9). Good cause may include a CDC in a rural or isolated community than can

demonstrate difficulty in finding people to serve.

b.  At a minimum, the CDC's Board must have directors with background and expertise in commercial lending; internal controls; financial risk management; legal issues relating to commercial lending and corporate governance. A Director may meet more than one of the Board's background and expertise requirements. Directors may be either currently employed or retired. Retirees may either represent the field from which they retired or represent the community.

c.  At least two voting Directors, other than the CDC manager, must possess commercial lending experience.

d.  At least one voting Director must represent the economic, community or workforce development fields.

e.  Directors from the commercial lending field must comprise less than 50% of the representation of the Board.

f.  No person who is a member of a CDC's staff (including contractors) may be a voting Director of the Board except for the CDC manager.

g.  The Board must meet at least quarterly and shall be responsible for all corporate actions and business of the CDC, including any committee(s) established by the Board.

h.  The Board meetings require a quorum to transact business. A quorum must be present for the duration of the meeting. The number of Directors that constitute a quorum shall be set by the CDC, provided that a quorum shall not be less than 50% of the voting Directors of the CDC Board. Attendance may be through any format permitted by State law.

i.  When the Board votes on SBA loan approval or servicing actions, at least two voting members with commercial loan experience satisfactory to SBA, other than the CDC manager, must be present and vote.

j.  Directors voting on loan approval or servicing actions must live or work in the area of operations of the CDC.

k.  There must be no actual or appearance of conflict of interest with respect to any actions of the Board. The Board must establish a policy in the bylaws of the CDC prohibiting an actual conflict of interest or the appearance of same, and enforce such policy (13 CFR § 120.823(d)).

l.  No Board member may serve on the Board of another CDC (13 CFR § 120.851(b)). CDC Board members may serve on the Boards of civic, charitable, or comparable organizations.

m. A CDC must be independent and must not be affiliated with any other entity, except as authorized under 13 CFR § 120.820. Affiliation is determined in accordance with 13 CFR § 121.103 and may arise, for example, where the CDC and the other entity have common board members.

n.  Other Responsibilities of the CDC Board (13 CFR § 120.823(d)) include, but are not limited to, the following:

   i.   Approving the mission and policies of the CDC.

     ii.    Hiring, firing, supervising and annually evaluating the CDC manager.

     iii.   Setting the salary for the CDC manager and reviewing all CDC staff salaries.

     iv.   Establishing committees, at the Board's discretion.

     v.    Ensuring that the CDC's expenses are reasonable and customary.

     vi.   Hiring directly an independent auditor to provide the financial statements of the CDC in accordance with SBA Loan Program Requirements.

     vii.  Monitoring the CDC's portfolio performance on a regular basis.

     viii. Reviewing a semi-annual report on portfolio performance from the CDC manager, which includes, but is not limited to, asset quality and industry concentration.

     ix.   Ensuring that the CDC establishes and maintains adequate reserves for operations.

     x.    Ensuring that the CDC invests in economic development in each of the states in its Area of Operations in which it has a portfolio, and approving each investment. (If the investment is included in the CDC's budget, the Board's approval of the budget may be deemed approval of the investment. If the investment is not included in the CDC's budget, the Board must separately approve the investment.)

     xi.   Retaining accountability for the actions of the CDC.

     xii.  Establishing written internal control policies in accordance with 13 CFR § 120.826.

     xiii. Establishing written commercially reasonable loan approval policies, procedures and standards. The CDC must establish and set forth in detail in a policy manual its credit approval process. All 504 loan applications must have credit approval prior to submission to SBA. If a Loan Committee is not established, the CDC Board must provide credit approval of all 504 loans.

     xiv. Each member of the Board must annually certify in writing that he or she has read and understands 13 CFR § 120.823, and copies of these annual certifications must be included in the CDC's Annual Report.

     xv.  Maintaining Directors' and Officers' Liability and Errors and Omission insurance in amounts required by SBA as provided in this chapter.

     xvi. Ensuring compliance with loan servicing and liquidation requirements as set forth in SOP 50 55.

6.  Committees (13 CFR § 120.823(d)): If the CDC Board exercises its discretion to establish committee(s), any such committee must be authorized by the CDC's bylaws. Delegation of authority to committee(s) does not relieve the Board of its responsibility imposed by law or SBA Loan Program Requirements. Delegations of Authority to Executive Committee or Loan Committee, if established, must be included in the CDC's bylaws. No further delegation or re-delegation of a Board's authority is permitted.

    a.  Executive Committee – The CDC Board may establish an Executive Committee and delegate management functions to the Executive Committee if this delegation is in compliance with 13 CFR § 120.823(d)(4)(i) and is authorized by the CDC's bylaws.

    i.    The Executive Committee must:

        a) Be chosen by and from the Board of Directors; and

        b) Meet the same organizational and representational requirements as the Board of Directors, except that the Executive Committee must have a minimum of 5 voting members present to conduct business.

    ii.    Only the Board or Executive Committee, if authorized by the Board, may provide credit approval for 504 loans greater than $2,000,000.

b. Loan Committees – The Board may establish a Loan Committee (13 CFR § 120.823(d)(4)(ii)). The Loan Committee may exercise the authority of the CDC Board as set forth below.

    i.    The Loan Committee reports to the Board, and members must:

        a) Be chosen by the Board of Directors and consist of individuals with a background in financial risk management, commercial lending or legal issues relating to commercial lending who are not associated with another CDC.

        b) Have a quorum of at least five (5) Loan Committee members authorized to vote, with attendance by any method allowed by State law;

        c) Have at least two (2) Loan Committee members with commercial lending experience satisfactory to SBA;

        d) Consist of Loan Committee members who live or work in the Area of Operations of the State where the 504 Project they are voting on is located, unless the Project falls under one of the exceptions listed in 13 CFR § 120.839;

        e) Not include CDC staff or the CDC manager, and;

        f) For multi-state CDCs, there must be a separate Loan Committee for each State into which the CDC expands. (13 CFR § 120.835(c))

    ii.    The Loan Committee, if established, may be delegated the authority to:

        a) For loans up to $1,000,000 provide credit approval; and

        b) For loans of $1,000,000 to $2,000,000, provide credit approval with the ratification of the Board or Executive Committee prior to Debenture closing.

There must be no actual or appearance of a conflict of interest with respect to any actions of the Loan Committee, including for example, a Loan Committee member participating in deliberations on a 504 loan for which the Third Party Lender is the member's employer or the member is otherwise associated with the Third Party Lender. 13 CFR § 120.823(d)(4)(ii)(D).

7. CDC Staff (13 CFR § 120.824):

a. A CDC must directly employ full-time professional management, including an Executive Director (or the equivalent) to manage daily operations. A CDC may petition SBA to waive the requirement of the manager being employed directly only if:

    i.    The petitioning CDC will have full-time professional management that is employed by

a non-profit entity that has the economic development of the CDC's Area of Operations as one of its principal activities. Such full-time management may also work on and operate the other entity's economic development programs, but must be available to small businesses interested in the 504 program and to 504 loan Borrowers during regular business hours; or

ii.   The petitioning CDC is rural and has insufficient loan volume to justify having management employed directly by the CDC. The rural CDC must contract with another CDC located (i.e., incorporated) in the same general area. The "same general area" means the rural CDC's SBA Region (Regions I-X) or a State contiguous to the rural CDC's State. SBA will grant the rural CDC's petition in its sole discretion, considering factors including but not limited to the number of CDCs for which the other CDC is providing the assistance. The management contributed by the CDC may work on and operate both CDCs' economic development programs, but must be available during regular business hours to small businesses interested in the 504 program and to 504 Borrowers located in the rural CDC's Area of Operations.

b.   A CDC must have qualified full-time professional staff to market, package, process, close and service loans and, if authorized by SBA, liquidate the loan portfolio.

c.   When any of the functions referred to in 7.a) and b) above are not performed by an employee directly employed by the CDC, the CDC must use a written professional services contract.

8.   Professional services contracts: All professional services contracts for functions related to marketing, packaging, closing, servicing, liquidating, or human resources (e.g., for paying wages and taxes and providing retirement and health benefits to the CDC's staff) must be pre-approved by the D/FA prior to engaging the services of the contractor. Contracts for management services are only permitted for CDCs affiliated with state and local economic development organizations. CDCs may contract for accounting, legal services, information technology, and independent loan review services without SBA approval, except for legal services in connection with loan liquidation or litigation. (13 CFR §120.824(b)-(f)) A CDC may not obtain independent loan review services from another CDC.

For all contracts that require prior approval (except for contracts involving legal services in connection with loan liquidation or litigation) the 504 Program Branch reviews the contracts and provides its recommendation to the D/FA, or designee, who makes the final decision. The CDC will be notified in writing of OFA's final decision with a copy to the CDC's Lead SBA Office. For contracts involving legal services in connection with loan liquidation or litigation, the Fresno or Little Rock Commercial Loan Servicing Center (CLSC) will review and approve the contracts.

a.   Submission process for pre-approval of professional services contracts: At least 60 days prior to the date on which the CDC intends to engage the contractor's services, the CDC must submit electronically to the Office of Financial Assistance (OFA) at 504requests@sba.gov:

i.    A request from a responsible CDC management official to review the draft materials;

ii.   An unsigned draft of the contract; and

iii.  A justification from the CDC's Board of Directors explaining its reasoning for why the Board believes it is in the best interest of the CDC to contract for CDC functions. (13 CFR § 120.824(2)(e)).

b.  The request for SBA's approval of a contract may not be submitted with the CDC's Annual Report. (The Annual Report must include copies of all of the CDC's current contracts.)

c.  If the CDC wishes to renew a professional services contract, the CDC must re-submit the contract at least 60 days prior to the end of the approved contract term (including any approved option renewal years) for review and pre-approval.

d.  The professional services contract must:

    i.    Demonstrate that the CDC is not a shell for another entity as a result of the contract;

    ii.   Contract terms between CDCs greater than five years, including optional renewal years, are not permitted by SBA and must be limited in time (no more than five years, including renewals) and scope, and have a transition phase leading to contract termination;

    iii.  Not include any contractual services provided by the Executive Director of a CDC or evidence any actual or apparent conflict of interest or self-dealing on the part of any of the CDC's officers, management, and staff, including any members of the Board or any Loan Committee;

    iv.   Not diminish the responsibility of the Board of Directors for the operations of the CDC;

    v.    State that the CDC's Board of Directors specifically acknowledges and retains the ultimate responsibility for all loan approvals and loan servicing actions, and that such responsibility must be carried out independently of any control by the contractor, 13 CFR §120.823;

    vi.   State that no contractor or associate of the contractor may be a voting or non-voting member of the CDC's Board of Directors;

    vii.  State that all compensation paid to the contractor will be paid by the CDC and that the contractor cannot charge the Borrower for the same services;

    viii. Include a provision that allows the CDC to terminate the contract with written notice (usually a 30 to 60 day notice) without penalty at any time prior to the expiration date of the contract;

    ix.   State that the contractor is prohibited from requiring a 503/504 Applicant or Borrower to purchase other services from the contractor as a condition of the contractor's performing CDC staff or management functions; and

    x.    Include the following:

          a)  A description of services that the contractor will perform;

          b)  A description (resume or summary of work history/relevant experience) of each individual who is providing services under the contract;

          c)  SBA Form 1081, and either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA, for each individual providing services. If the contract is for legal services in connection with loan liquidation or litigation, attorneys providing such services

are not required to submit an SBA Form 1081, Form FD-258 (fingerprint card), or electronic fingerprint submission. If an attorney is providing services under any other type of contract requiring SBA pre-approval, the attorney must submit an SBA Form 1081 and either Form FD-258 (fingerprint card) or electronic fingerprint submission. "Electronic fingerprint submission" is defined in Subpart B, Chapter 2, Paragraph III.A.13.d.iv of this SOP. If the individual has been cleared by SBA within 1 year of the date of submission to SBA, the CDC may provide documentation of SBA clearance. SBA Form 1081 clearances are valid for a period of 1 year and must be renewed if the individual requests to perform services for new CDC clients after the initial clearance period lapses;

d) A breakdown of compensation by individual if more than one person is being compensated under the contract;

e) The rate of compensation for all parts of the contract except servicing stated at an hourly rate (the servicing portion may be based on a percentage not to exceed the amount authorized by the regulations 13 CFR §120.971(a)(3));

f) The basis for its determination that the fees are customary and reasonable for similar services in the area; and

g) A statement that additional compensation from CDC fee income such as multipliers or bonuses is not permitted.

xi. A Board of Directors' Resolution must accompany the contract and contain statements:

a) That the contract is in compliance with 13 CFR §§ 120.823, 120.824 and 120.825 and SBA Loan Program Requirements;

b) Of understanding that the contract is subject to pre-approval by SBA D/FA upon each new contract term; and

c) Of understanding that approved contracts are subject to yearly review by SBA through the required submission of the contract with the Annual Report.

e. If a CDC engages the services of a contractor without obtaining SBA's approval in accordance with the above process, the CDC's non-compliance will be reported to OCRM. In addition to any other appropriate action, any loan application requests sent to the Sacramento Loan Processing Center by an individual employed under the contract may be delayed for processing and approval until such time as the professional services contract is approved by the D/FA.

9. Financial Ability to Operate: (13 CFR § 120.825)

a. A CDC must be able to sustain its operations continuously, with reliable sources of funds (such as income from services rendered and contributions from government or other sponsors). Any funds generated from 504 loan activity by a CDC remaining after payment of staff and overhead expenses must be retained by the CDC as a reserve for future operations or for investment in other local economic development activity in its Area of Operations.

b. A CDC must have financial statements evidencing that it maintains adequate capital.

c. A CDC should exhibit positive net cash flow trends.

   d.  A CDC must maintain sufficient loan loss reserves, if required.

   e.  A CDC must be solvent.

       i.   A CDC must have assets in excess of liabilities.

       ii.   A CDC must be able to pay its debts when they become due.

   f.  A CDC must not have received a going concern opinion from its auditor.

   g.  Other factors as determined by SBA.

B.  Basic Operating, Reporting and Ethical Requirements for CDCs:

   1.  CDCs must comply with SBA Loan Program Requirements (as defined in 13 CFR § 120.10) for the 504 program, as such requirements are revised from time to time. SBA Loan Program Requirements in effect at the time that a CDC takes an action in connection with a particular loan govern that specific action. For example, although loan closing requirements in effect when a CDC closes a loan will govern closing actions, a CDC's liquidation actions on the same loan are subject to the liquidation requirements in effect at the time that a liquidation action is taken (13 CFR § 120.180). SBA Loan Program Requirements, Center contacts, and other information can be found at https://www.sba.gov/partners/lenders/cdc-504-loan-program;

   2.  Individuals and entities suspended, debarred, revoked, or otherwise excluded under the SBA or Government-wide debarment regulations are not permitted to conduct business with SBA, including participating in an SBA-guaranteed loan. CDCs are responsible for consulting the System for Awards Management's (SAM) Excluded Parties List System (EPLS) or any successor system to determine if an employee or an Agent has been debarred, suspended or otherwise excluded by SBA or other Federal agency (https://www.sam.gov/portal/SAM/); and

   3.  CDCs must supply to SBA current and accurate information about all certification and operational requirements, maintain all records and submit all policies, procedures and reports required by SBA. (13 CFR § 120.826 and 13 CFR § 120.830)

      a.  Internal Control Policies - Each CDC's Board of Directors must establish and fully implement an internal control policy which provides adequate direction to the institution for effective control over and accountability for operations, programs, and resources. The Board-established internal control policy must, at a minimum, comply with 13 CFR §120.826(b) and include Board oversight responsibilities under 13 CFR § 120.823(d) such as oversight for CDC operations, financial oversight, annual reports and certifications.

        i.   The internal control policy implemented must ensure satisfactory monitoring and management of the SBA loan portfolio, including but not limited to, providing for a periodic loan review function to be performed at a minimum of every 2 years by a person who is not directly or indirectly responsible for loan making or by outside contractors. OCRM, in its discretion, may require an off-cycle Independent Loan Review. Guidance for Independent Loan Reviews is available on SBA's website at https://www.sba.gov/document/support-object-object-independent-loan-review-guide.

        ii.   It must include a list of monthly reports provided by the CDC's management for Board review to support adequate Board oversight.

        iii.   It must provide for internal controls for loan making, closing, disbursing, servicing and

liquidation.

iv.   It must provide for a risk rating system to risk classify SBA loan assets satisfactory to SBA.

v.    Internal control policies and procedures must include provisions to ensure compliance with SBA's Loan Program Requirements on eligibility.

vi.   CDCs must provide documentation demonstrating that the internal control policies and procedures are fully implemented and followed.

b.  Financial Statements - This includes timely submission of complete financial statements audited in accordance with Generally Accepted Accounting Principles (GAAP) by an independent CPA for CDCs with 504 loan portfolio balances of $20 million or more; or at a minimum a review by an independent CPA or independent accountant in accordance with GAAP for CDCs with 504 loan portfolio balances of less than $20 million. The auditor's opinion must state that the financial statements are in conformity with GAAP. See 13 CFR § 120.826(d) for further guidance on auditor qualifications. The CDC must also submit a copy of the CDC's Federal tax return in the Annual Report. (13 CFR § 120.830(a))

c.  Annual Reports - Annual Reports must be submitted to the CDC's Lead SBA Office within 180 days of the CDC's fiscal year-end. CDCs are requested to submit the Annual Reports to their Lead SBA Office electronically via email with a copy to OCRM at CDCAnnualReports@sba.gov. (If the electronic file is larger than 10MB, CDCs may need to separate the electronic file into multiple attachments.) A CDC that is certified by SBA within 6 months of its fiscal year-end will not have to submit financial statements or its Annual Report for that year. Within 60 days of receipt of the CDC Annual Report, the Lead SBA Office must forward a copy to OCRM at CDCAnnualReports@sba.gov, along with the Lead SBA Office's analysis and review of the Annual Report and a CDC operational review. These Annual Reports must also include board certifications, reports on compensation and reports on investment in economic development, as outlined below and detailed on SBA Form 1253, "CDC Annual Report Guide."  If the Annual Report is incomplete, the Lead SBA Office must notify the CDC in writing and within 30 days of receipt of SBA's notice, the CDC must submit a complete Annual Report. Incomplete or unacceptable Annual Reports will not fulfill the submission requirement. If a CDC does not submit a complete, acceptable Annual Report in a timely manner, this non-compliance will be reported to OCRM for potential supervisory or enforcement actions and any request a CDC has submitted will not be processed by OFA or OCRM until such time as the complete, acceptable report is submitted. CDCs must prepare Annual Reports according to 13 CFR § 120.830 and SBA Form 1253 "Annual Report Guide," including the Exhibit to SBA Form 1253, a format template for documenting job creation. SBA Field Office staff should refer to the Operational Review Example Format for guidance on completing their assessment of the Annual Report.

d.  Certification of members of the Board - The Annual Report must include a copy of the written annual certification by each Board member that he or she has read and understands the requirements set forth in 13 CFR § 120.823.

e.  Report on compensation - The Annual Report must provide detailed information on all compensation (including salary, bonuses and expenses) paid within the CDC's most recent

tax year for:

    i.    Current and former officers, directors, and key employees (even in cases where compensation for the aforementioned individuals is less than $100,000); and

    ii.    Current and former employees and independent contractors with total compensation of more than $100,000 during that period.

This report must include details of deferred compensation packages where applicable.

f.    Report on investment in economic development - The Annual Report must include a written report on the CDC's investment in economic development in each State in which the CDC has an outstanding 504 loan, including explanation of each investment by type and amount. See SBA Form 1253, Annual Report Guide, for specific requirements.

g.    CDCs may include, along with the Annual Report, a request for renewal of their Accredited Lenders Program (ALP) status or Premier Certified Lender Program (PCLP) status. If the CDC chooses to do so, the CDC must clearly indicate in its Annual Report that a status renewal request is included. Any status renewal request submitted along with a CDC's Annual Report must meet SBA's Loan Program Requirements for the status request.

4.    A CDC must have satisfactory SBA performance as determined by SBA in its discretion. The CDC's Risk Rating, among other factors, will be considered in determining satisfactory SBA performance. Other factors may include, but are not limited to: review/examination assessments, historical performance measures (like default rate, purchase rate and loss rate), loan volume to the extent that it impacts performance measures, and other performance related measurements and information (such as contribution toward SBA's mission).

5.    Regulations regarding the ethical requirements for CDCs may be found at 13 CFR §§ 120.140 and 120.851.

a.    The Standards of Conduct Counselor for the Agency is the Designated Agency Ethics Official. (13 CFR § 105.402(a))

b.    Standards of Conduct ("Conflict of Interest") Approvals of Certain Loan Applicants:

    i.    If an Applicant has, as an employee, owner, general partner, managing member, attorney, agent, owner of stock, officer, director, creditor or debtor, an individual who, within 1 year prior to the loan application, was an SBA Employee (as defined by 13 CFR § 105.201(a)), the loan application must be approved by the Standards of Conduct Counselor. (13 CFR § 105.203(a))

    ii.    If an Applicant has, as its sole proprietor, general partner, managing member, officer, director, or stockholder with a 10% or more interest, an individual who is an SBA Employee (as defined by 13 CFR § 105.201(a)) or a Household Member of an SBA Employee, the loan application must be approved by the Standards of Conduct Committee at SBA Headquarters. (13 CFR § 105.204) A "Household Member" of an SBA Employee includes:

        a)    The spouse of the Employee;

        b)    The minor children of the Employee; and

      c)  The blood relatives of the Employee, and the blood relatives of the Employee's spouse, who reside in the same place of abode as the Employee. (13 CFR § 105.201(d))

      iii.  If an Applicant has, as its sole proprietor, general partner, managing member, officer, director, or stockholder with a 10% or more interest, or a Household Member of such individual, an individual who is a Member of Congress, an appointed official of the legislative or judicial branch of the Federal Government, a member or employee of a Small Business Advisory Council, or a SCORE volunteer, the loan application must be approved by the Standards of Conduct Committee. (13 CFR §§ 105.301(c) and 105.302(a))

   c.  When a Standards of Conduct approval is required, the application should be processed by the SLPC and, if appropriate, be conditionally approved and forwarded to the Standards of Conduct Counselor or Standards of Conduct Committee (through the Standards of Conduct Counselor). The Standards of Conduct Counselor will notify the processing center of the final Agency decision and the processing center will notify the CDC accordingly.

   d.  Other Government Employees:

An Applicant must submit a statement of no objection from the pertinent department or military service if its sole proprietor, general partner, managing member, officer, director, or stockholder with a 10% or more interest, or a Household Member of such individual, is an employee of another department or agency of the Federal Government (Executive Branch) having a grade of at least GS-13 (or its equivalent) or higher. CDCs must submit the statement to SNOMemos@sba.gov and receive written clearance from SBA prior to submitting the application to the SLPC (non-PCLP CDCs) or processing the application under their delegated authority (PCLP CDCs). Non-PCLP CDCs must submit a copy of SBA's written clearance to the SLPC with the application. (13 CFR §105.301(a))

6.  Restrictions regarding CDC affiliation may found at 13 CFR § 120.820.

   a.  A CDC must be independent and must not be affiliated (as determined in accordance with 13 CFR § 121.103) with any Person (as defined in 13 CFR § 120.10) except as discussed below.

   b.  A CDC may be affiliated with an entity (other than a 7(a) Lender or another CDC) whose function is economic development in the same Area of Operations and that is either a non-profit entity or a State or local government or political subdivision (e.g., council of governments).

   c.  A CDC must not be affiliated (as determined in accordance with 13 CFR § 121.103) with or invest, directly or indirectly, in a 7(a) Lender. A CDC that was affiliated with a 7(a) Lender as of November 6, 2003, may continue such affiliation.

   d.  A CDC must not be affiliated (as determined in accordance with 13 CFR § 121.103) with another CDC. In addition, a CDC must not directly or indirectly invest in or finance another CDC except with the prior written approval of D/FA or designee and D/OCRM or designee if they determine in their discretion that such approval is in the best interest of the 504 Loan Program.

   e.  A CDC may remain affiliated with a for-profit entity (other than a 7(a) Lender) if such

affiliation existed prior to March 21, 2014. A CDC may also be affiliated with a for-profit entity (other than a 7(a) Lender) whose function is economic development in the same Area of Operations with the prior written approval of the D/FA or designee if he or she determines in his or her discretion that such approval is in the best interest of the 504 Loan program.

   f.   A CDC must not directly or indirectly invest in a Licensee (as defined in 13 CFR § 120.820(f)) licensed by SBA under the Small Business Investment Company Program. A CDC that has an SBA-approved investment in a Licensee as of November 6, 2003, may retain such investment.

7.  The CDC's place of business:

   a.   Must be accessible and open to the public during regular business hours with an adequate staff (at least one qualified professional staff member available full-time as described in paragraph II.A.7 above) to perform normal business transactions;

   b.   May be located with a sponsoring organization if it is clearly evident to the public that the CDC is a separate entity; and

   c.   Must have a separately listed telephone number.

8.  CDC Loan files:

   a.   All loan case files and collateral documents must be either at the principal office of the CDC or maintained in a manner acceptable to SBA that permits their immediate access.

   b.   A CDC must retain a copy of SBA's character determination, if any, in the CDC loan file for the life of the loan.

   c.   After closing, the CDC must forward all original loan documents to SBA as required by SBA Form 2286 and Subpart C, Chapter 6, Para. III.A.12 of this SOP. The Trustee retains the original Debenture.

   d.   A CDC must provide, at its own expense, documents or copies when requested by SBA.

   e.   CDCs must retain the original SBA application (SBA Forms 1244, 2234 (Parts A, B, and C), and 2450 and any SBA Forms 912); SBA Form(s) 159, and SBA Form 1081 for Loan Committee Members. Hard-copy records of those documents requiring original signatures must be retained unless the original signature was made electronically in accordance with applicable standards governing electronic signatures. (See Appendix 8 for guidance on electronic signature standards.)

   f.   File Retention Guidelines:

   Unless paragraph 9.e) above specifies that the original document(s) must be retained by the CDC, CDCs may retain scanned copies.

      i.    Inquiries, partial applications, and applications withdrawn, canceled or denied by the CDC or SBA must be kept for 2 years after notification of incomplete application, withdrawal, cancelation or decline. After 2 years, the files may be destroyed.

      ii.   General correspondence must be kept for 1 year. Case-specific correspondence should be filed in the case file.

      iii.  Paid off loan files (including the original application file, servicing file and closing

file), must be kept for 9 years after the loan was paid in full.

    iv.    Files from liquidated loans (including the original application file, closing and servicing files), must be kept for 10 years after the loan was charged off.

9. CDC financial and organizational records:

    a.    The CDC must maintain its own financial records including books of account and signed minutes of all meetings of members, stockholders, directors, executive committees, and other officials. The CDC financial reports furnished to SBA must contain complete disclosure of matters relevant to the act and regulations. Records and documents which are the basis for or related to its financial statements or loans must be maintained in a manner that permits their immediate availability.

    b.    All organizational files must be accessible to SBA.

10. CDC fiscal year: CDCs choose their own fiscal year. The CDC must notify its Lead SBA Office of any change.

11. CDC insurance: The CDC must obtain and maintain Directors' and Officers' (D&O) Liability and Errors and Omissions (E&O) insurance in form and substance satisfactory to SBA with:

    a.    An endorsement covering CDC Board members, committees, staff and contractors engaged in the 504 loan approval, closing, servicing and liquidation process;

    b.    Minimum amounts of D&O and E&O insurance coverage required by SBA based on the CDC's annual revenues as reported in the CDC's Annual Report for their most recent fiscal year, and in accordance with the sliding scale as follows:

Table: Minimum D&O and E&O Insurance Requirements - 13 CFR § 120.823(e)

| Annual Revenues of CDC | D&O Minimum per occurrence and in the aggregate | E&O Minimum per occurrence and in the aggregate |
|---|---|---|
| >$8.5 million | $ 5,000,000 | $ 5,000,000 |
| >$4.5M - $8.5 M | $ 3,000,000 | $ 3,000,000 |
| >$2 M - $4.5 M | $ 2,000,000 | $ 2,000,000 |
| $2 M or less | $ 1,000,000 | $ 1,000,000 |

    c.    At SBA's discretion, higher levels of D&O and E&O insurance, but in no event in excess of $5.5 million, or reduced deductible levels may be required if the D/OCRM identifies a CDC as having potentially inadequate coverage to protect the CDC or SBA from financial risk;

    d.    A declaration that SBA will receive at least 20 days prior notice of any lapse of coverage, failure to renew, or cancellation; and

    e.    The CDC must submit to SBA annually with the CDC's Annual Report a certificate from its insurance carrier confirming this coverage.

    f.    Each CDC must assess its risk factors and may determine that higher levels of insurance

coverage and/or lower deductibles are prudent.

C.  Operational changes the CDC must report to SBA:

1.  Changes that require prior written approval by OFA:

a.  Changes in CDC legal structure. Any proposed change in the CDC legal structure (e.g., a CDC spins off its 504 operations into a separate non-profit entity) must have prior written approval and may require a new application for CDC certification.

b.  Changes in CDC Management or Staff - Any changes in the CDC manager, compensated officers, or CDC professional staff (including contracted staff) must have prior written approval. SBA Form 1081, "Statement of Personal History," and either Form FD-258 (fingerprint card) or electronic fingerprint submission, must be submitted to SBA for all new CDC managers, compensated officers, and professional staff, including contractors. SBA Form 1081 and the Form FD-258 or electronic fingerprint submission must be signed and dated within 90 days of submission to SBA.

c.  Changes to CDC Name - Requests for CDC name changes must be submitted to OFA for written approval by the D/FA prior to the CDC filing an amended Articles of Incorporation with the CDC's state of incorporation. Note: the CDC must use its legal name, not a "dba" name on all correspondence.

i.  CDC legal name changes must be submitted to the D/OFA for prior approval. CDC must submit a letter of request to the 504 Program Branch at 504Requests@sba.gov, outlining the reasons for the requested change, a Board Resolution authorizing the change, and a draft of the amended Articles of Incorporation.

ii.  504 Program Branch will review the request and, if acceptable to SBA, the CDC will be notified in writing by D/FA that their request is contingently approved. After notification of contingent approval, the CDC must file the appropriate documents with their state to complete the legal name change and send evidence of the Amendment to the Articles of Incorporation approved by the State acknowledging the legal name change to OFA.

iii.  Upon receipt of the state-approved documents, D/FA will notify the CDC in writing of final approval and send written notification of the name change to the SLPC, appropriate SBA CLSC, and to the CDC's Lead SBA Office.

iv.  The 504 Program Branch at Headquarters will update all SBA systems and notify the Central Servicing Agent (CSA) of the change.

2.  Changes the CDC must report to SBA:

a.  Changes in CDC's Uncompensated Officers or CDC's Board of Directors, or Executive Committees – Any changes in a CDC's uncompensated officers, or any director, board member, and/or executive committee member must be reported to the D/FA no later than 30 days after the change takes place. The report must be accompanied by an SBA Form 1081, "Statement of Personal History," and either Form FD-258 (fingerprint card) or electronic fingerprint submission, and supporting documentation for each new director, uncompensated officer, board member, and/or executive committee member (unless previously submitted when serving in a different capacity, e.g., a board member becoming an

executive committee member) as required in paragraph III.A of this Chapter. SBA Form 1081 and the Form FD-258 or electronic fingerprint submission must be signed and dated within 90 days of submission to SBA.

b. Changes to Loan Committees – Any changes in a CDC's Loan Committee must be reported to the D/FA no later than 30 days after the change takes place. The CDC must collect an SBA Form 1081, "Statement of Personal History," for each Loan Committee member.

If the CDC collects an SBA Form 1081 on a Loan Committee member who answers "yes" to question numbers 10a, 10b, 10c, 11a, and/or 11b, then the CDC must submit the SBA Form 1081, and either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA, and supporting documentation to SBA.

If the CDC collects an SBA Form 1081 on a Loan Committee member who answered "no" to question numbers 10a, 10b, 10c, 11a, and 11b the CDC does not submit the SBA Form 1081 to SBA, but must retain it in their file and make it available to SBA for review upon request.

If a CDC submitted an SBA Form 1081 on a Loan Committee member that does not answer "yes" to question numbers 10a, 10b, 10c, 11a, and/or 11b to SBA rather than retaining the form in its file, SBA will retain the submission but the CDC should not expect a clearance notification on those submissions.

c. Changes in CDC Governing Documents – Any changes in a CDC's bylaws, or Articles of Incorporation must be reported to the D/OCRM no later than 30 days after the change takes place. All documents are subject to SBA review and must comply with all Loan Program Requirements.

d. Changes in CDC Contact Information – Any changes in CDC address, telephone number, or other contact information must be reported to D/FA no later than 30 days after the change takes place.

e. Litigation or other Legal Proceedings – Within 10 business days of the date a CDC becomes a party to litigation or other legal proceedings, it must submit a written report, by certified or overnight mail, to its local SBA counsel, D/FA and D/OCRM. The report must describe the proceedings and identify the parties involved and the CDC's relationship(s) to the other parties. Once proceedings are terminated by settlement or final judgment, the CDC must promptly advise the same parties listed above of the terms.

3. The CDC must submit notice of all changes by email to 504Requests@sba.gov.

4. When required, SBA Form 1081 and Form FD-258 (fingerprint card) must be submitted to SBA Headquarters via overnight mail or courier at: U.S. Small Business Administration, Office of Capital Access, Attn: 1081 Processing, 409 3rd Street SW, 8th Floor, Washington, DC, 20416. Or, when electronic fingerprint submission was completed in lieu of a Form FD-258, the SBA Form 1081 may be sent electronically to OCA1081@sba.gov.

D. Other CDC Services (13 CFR § 120.827):

A CDC may provide a small business with assistance unrelated to the 504 loan program as long as the CDC does not make such assistance a condition of the application for a 504 loan. A CDC is subject to

13 CFR Part 103 when providing such assistance. See Subpart B, Chapter 3 of this SOP when providing such assistance on a 7(a) loan.

E.  Minimum Level of Activity and Restrictions on Portfolio Concentrations (13 CFR § 120.828):

A CDC must have at least four (4) different loans approved during the last 2 consecutive fiscal years, and the portfolio must be diversified as to type of business.

F.  Job Opportunity Average (13 CFR § 120.829):

1.  A CDC must maintain the required average of one Job Opportunity per an amount of 504 loan funding as specified by SBA from time to time in the Federal Register and must indicate in its annual report the Job Opportunities actually or estimated to be created or retained by each Project.

2.  A CDC is permitted 2 years from its certification date to meet this average. If a CDC does not maintain the required average, it may retain its certification if it justifies to SBA's satisfaction its failure to do so in its annual report and shows how it intends to attain the required average.

## III.  THE PROCESS OF APPLYING TO BECOME A CDC

A.  The Application (13 CFR § 120.810):

The Application for Certification as a Certified Development Company, SBA Form 1246, outlines the requirements for an application. CDCs must also comply with all of the requirements prescribed in 13 CFR §§ 120.810 – 120.830. The applicant must demonstrate that it satisfies the CDC certification and operational requirements in 13 CFR §§ 120.816 through 120.830. The applicant also must include an operating budget, approved by the applicant's Board of Directors, which demonstrates the required financial ability (as described in 13 CFR § 120.825), and a plan to meet CDC operational requirements. See CDC Certification Guide for additional guidance.

The following documents must accompany the application at a minimum (additional information may be requested by the reviewing parties at the Lead SBA Office and/or the 504 Program Branch):

1.  List of Board of Directors and any Executive Committee or Loan Committee established, organized by area of expertise.

a.  An SBA Form 1081, "Statement of Personal History," signed and dated within 90 days of submission to SBA, for each Board member or Executive Committee member or Loan Committee member.

b.  Each Board member must submit either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA, or evidence of a Federal clearance (e.g., FDIC, OCC, Federal Reserve) from the individual's current employer.

c.  Loan Committee members not serving on the CDC's Board of Directors (if a Loan Committee is established) who answer "yes" to question numbers 10a, 10b, 10c, 11a, and/or 11b on SBA Form 1081, must submit to SBA either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA, or evidence of a Federal clearance (e.g., FDIC, OCC, Federal Reserve) from the individual's current employer. For those Loan Committee members who answer "no" to question numbers 10a, 10b, 10c, 11a, and 11b, the CDC retains the signed SBA Form 1081 in the CDC's files, and no fingerprint submission is required.

2. Plan of Operation - a detailed narrative describing the applicant's ability to package, process, close, and service the loans. The plan must identify the applicant's financial and legal capacity and identify how it plans to market the 504 program, the geographic area it plans to serve, and include plans for investment in economic development in their Area of Operations;

3. Organizational Chart;

4. List of all officers and paid employees of the CDC (including all contracted staff and contractors assisting in performing 504 loan functions, including but not limited to loan packaging, processing, closing, servicing and liquidation (if applicable) for the CDC) accompanied by a completed SBA Form 1081, and either Form FD-258 (fingerprint card) or electronic fingerprint submission for each officer, paid employee, and contractor. SBA Form 1081 and the Form FD-258 or electronic fingerprint submission must be signed and dated within 90 days of submission to SBA;

5. Certificate of Incorporation;

6. Articles of Incorporation;

7. Bylaws, which must include the regulatory requirements regarding the Board of Directors and Membership (if applicable);

8. Board Resolution authorizing the CDC's creation;

9. Financial statements and detailed projections with assumptions demonstrating the CDC's financial ability to operate (see paragraph II.A.9. Financial Ability to Operate requirements), how the CDC can operate in a positive net asset position by the end of its two-year probationary period; and

10. Information regarding any affiliates.

B. Where to Apply:

1. The CDC submits an original and one copy of the application to the Lead SBA Office serving the proposed Area of Operations. If there is more than one SBA Office serving the proposed Area of Operations, the CDC submits its application to the SBA Office where the CDC will be headquartered. The Lead SBA Office will review the application and forward all original SBA Forms 1081 and any required Forms FD-258 or electronic fingerprint submissions to the Office of Financial Assistance (OFA) to OCA1081@sba.gov or by overnight mail or courier (409 3rd Street SW, 8th Floor, Washington, DC 20416), maintaining copies in the CDC application. If the application is complete and eligible, the Lead SBA Office will forward to the 504 Program Branch for further review and recommendation by D/FA.

   The application package must include:

   a. SBA Form 1246, Application to Become a CDC;

   b. Copies of required SBA Forms 1081 with attachments;

   c. A notation that the original SBA Forms 1081 and either Form FD-258 (fingerprint card) or electronic fingerprint submission have been forwarded to OCA (Note: A CDC may not be approved to begin 504 Loan Program operations until all staff has been cleared by SBA); and

   d. Lead SBA Office's assessment of the application, containing a recommendation for application approval.

2. Decline at the Lead SBA Office: If the Lead SBA Office review determines that the CDC is not

eligible for certification, it should decline the CDC application. In the case of an application decline by the Lead SBA Office, the Lead SBA Office will notify the CDC in writing outlining the reasons for decline and the CDC's rights of appeal, with a copy to the appropriate SBA official, including D/FA. The CDC applicant has 60 days to send an appeal to the Lead SBA Office for action by the next higher authority.

3. Final Decision – The final decision on CDC applications is determined by D/FA. SBA will send a letter to the CDC applicant notifying it of the decision with a copy to the appropriate Lead SBA Office's district director. If the decision is a decline by D/FA, SBA will notify the CDC applicant and Lead SBA Office in writing of the decision and the reason(s) for decline. There is no process for appeal of a final decision of decline. The CDC may submit a new application to the Lead SBA Office, following all procedures as outlined in Section II of this Chapter after a waiting period of 6 months from the date of notification of the decline by SBA.

C. Probationary Period for a New CDC (13 CFR § 120.812):

1. Newly certified CDCs will be on probation for a period of 2 years. Probationary status means that the CDC is not eligible to apply for statuses of delegated authority, request expansions to their Area of Operations, receive portfolio transfers, or merge with another entity, unless permission has been expressly provided by D/FA in writing prior to such action. The Probationary period is meant for newly certified CDCs to establish their operation and demonstrate to SBA their ability to perform in accordance with the mission of the 504 Loan Program and comply with all Loan Program Requirements. To be considered for permanent CDC status or an extension or probation, the CDC must have satisfactory SBA performance, as determined by SBA in its discretion. Ninety (90) days prior to the end of the probationary period, the CDC must either apply for permanent status or a single one-year extension.

2. The request for permanent CDC status or a single one-year extension of the CDC's probationary status should be sent to the CDC's Lead SBA Office with a copy to the 504 Branch Chief at 504Requests@sba.gov and contain:

    a. A current Board of Directors List, identifying each Director's area of expertise;

    b. A list of all members of all Board-established committees (if established);

    c. A list of all current staff, including a description of each individual's duties and an organizational chart;

    d. Current bylaws, including any amendments; and

    e. Current Articles of Incorporation, including any amendments.

3. The Lead SBA Office must obtain comments from the SBA processing and servicing centers as to the quality of the CDC's processing and servicing. The Lead SBA Office must include the centers' comments and its own comments on the CDC's closing in its recommendation and send the request/recommendation electronically to the 504 Program Branch Chief at 504Requests@sba.gov.

4. SBA will determine permanent CDC status or an extension of probation, in part, based upon the CDC's compliance with the certification and operational requirements in 13 CFR §§ 120.816 through 120.830. Also, the CDC must have satisfactory SBA performance, as determined by SBA in its discretion. The CDC's Risk Rating, among other factors, will be considered in determining satisfactory SBA performance. Other factors may include, but are not

limited to, review/examination assessments, historical performance measures (like default rate, purchase rate and loss rate), loan volume to the extent that it impacts performance measures, and other performance related measurements and information (such as contribution toward SBA mission).

5.  SBA will consider failure to apply for permanent status or a single one-year extension of probation before the end of the probationary period as a withdrawal from the 504 program. If the CDC withdraws, it must transfer all funded and/or approved loans to another CDC, SBA, or other servicer approved by SBA, including all related servicing fees.

6.  The CDC must have appropriate personnel attend industry training in credit analysis, 504 packaging, closing and servicing within 1 year of certification.

## IV. SBA OVERSIGHT OF CDCS

A.  CDCs must submit to SBA the reports listed in [13 CFR § 120.830](13 CFR § 120.830).

B.  SBA oversees CDCs through:

1.  Loan and Lender Monitoring System (L/LMS):

    a.  L/LMS is an internal SBA data system that includes use of historical data and predictive small business credit scoring. All SBA 504 loans with an outstanding balance are credit-scored quarterly. These data are aggregated, analyzed and evaluated to assess the credit quality of each individual CDC's portfolio of SBA loans. SBA uses this information to monitor the performance of CDCs individually and in comparison to their peers.

    b.  Using SBA's L/LMS system, SBA assigns all CDCs a composite rating. The composite rating reflects SBA's assessment of the potential risk to the government of that CDC's SBA portfolio. The specific performance factors which comprise the composite rating are published from time to time by SBA's Office of Credit Risk Management (OCRM). In general, these factors reflect both historical CDC performance and projected future performance. SBA performs quarterly recalculations on the common factors for each CDC, so CDCs' composite risk ratings are updated on a quarterly basis.

    c.  SBA established peer groups to minimize the differences that could result from changes in loan performance for portfolios of different sizes. The peer groups are based upon gross outstanding SBA loan dollars, and for CDCs they are:

        i.   $100,000,000 or more

        ii.  $30,000,000  -  $99,999,999

        iii. $10,000,000  -  $29,999,999

        iv.  $5,000,000 - $9,999,999

        v.   $0 - $4,999,999

    d.  SBA assigns a composite rating of "1" to "5" to each CDC generally based upon its portfolio performance, as reported in L/LMS. A rating of "1" indicates strong portfolio performance, the least risk, and requires the lowest degree of SBA management oversight (relative to other CDCs in its peer group). A "5" rating indicates weak portfolio performance, the highest risk,

and requires the highest degree of SBA management oversight.

See 13 CFR § 120.10 (definitions related to Risk Rating), 13 CFR § 120.1015 (Risk Rating System), and 75 FR 9257, March 1, 2010, 75 FR 13145, March 18, 2010, and 79 FR 24053, April 29, 2014, (Risk Rating Notices). As set forth in the Risk Rating Notices, SBA may take into account rapid growth that may skew metrics and other factors in considering a CDC's risk.

2. Lender Portal:

   a. SBA communicates CDC performance to individual CDCs through the use of SBA's Lender Portal (Portal). The Portal allows a CDC to view its own quarterly performance data, including, but not limited to, its current composite risk rating and peer and portfolio averages and its SMART score (as discussed below). Portal data includes both summary performance and credit quality data. Summary performance data is largely derived from data that is provided to SBA through the Central Servicing Agent. If a CDC reviews its performance components and finds a discrepancy with its records, the CDC should contact OCRM.

   b. CDCs with at least one (1) outstanding SBA loan may apply for access to the Portal. Currently SBA issues only one Portal user account per CDC. Submission of initial requests for a Portal user account must be submitted to SBA's OCRM, and must include the following information:

      i. Request must be made by a senior officer of the CDC with proper authority (Senior Vice President or higher);

      ii. Request must be sent via regular or overnight mail to the SBA's OCRM at 409 Third Street SW, 8th Floor, Washington DC 20416, ATTN: Director, Office of Credit Risk Management;

      iii. Request must be made using the CDC's stationery;

      iv. Request must include the user's business card;

      v. The stationery and business card should include the CDC's name and address;

      vi. The request should include the following data:

         a) SBA FIRS ID Number(s);

         b) Account user's name and title;

         c) Account user's mailing address, telephone number and email address at the CDC;

         d) Requesting officer's name and title; and

         e) Requesting officer's mailing address, telephone number and email address at the CDC.

      vii. Once SBA receives and approves the user's request, SBA will forward the approval to SBA's Portal contractor for issuance of a user account name and password. The Portal contractor will email the user his or her user name and password within approximately 2 weeks of account approval. The user can then access its data by logging into the SBA Lender Portal web page. Before accessing the Portal, lenders must agree to the terms of a Confidentiality Agreement, which is found on the SBA Lender Portal web page.

viii.   CDCs are responsible for complying with and maintaining the Portal user accounts and passwords as set forth in the Confidentiality Agreement on the Portal web page, and as published by SBA from time to time. CDCs are also responsible for submitting a timely request to SBA to terminate or transfer an account if the person to whom it was issued no longer holds that responsibility for the CDC. CDCs must take full responsibility for protecting the confidentiality of the user password and the CDC risk rating, SMART score, and confidential information and for ensuring the security of the data. See 13 CFR § 120.1060.

3. Monitoring and reviews (13 CFR §§ 120.1025 and 120.1050-1060):

L/LMS provides performance information that allows SBA to monitor and conduct reviews of all CDCs. L/LMS-related monitoring/reviews serves as the primary means of reviewing CDCs with less than $30 million in gross outstanding SBA loan dollars; however, SBA may determine at its discretion to conduct other more in-depth reviews (e.g., Analytical, Targeted, Full, or Delegated Authority Renewal reviews) of these CDCs. ("L/LMS-related" refers to the L/LMS reviews and the Lender Profile Assessment (LPA), including the SMART Score.) SBA will contact the CDC if the review detects performance issues or trends requiring further discussion.

a.   For CDCs with $30 million or more in gross outstanding SBA loan dollars L/LMS details historical and projected performance data:

i.    For use in planning and conducting more in-depth reviews;

ii.   To assist in prioritizing in-depth reviews, and

iii.  As a system to monitor CDCs between in-depth reviews.

b.   SBA's 504 program risk-based reviews generally feature a composite risk measurement methodology and scoring guide, "SMART." SMART is an acronym for the specific risk areas or components that SBA reviews: Solvency and Financial Condition; Management and Board Governance; Asset Quality and Servicing; Regulatory Compliance; and Technical Issues and Mission.

c.   Additionally, in accordance with 13 CFR §120.1010 , a CDC must allow SBA's authorized representatives access to its SBA files to review, inspect and/or copy all records and documents relating to SBA guaranteed loans or as requested for SBA oversight.

d.   SBA may request reports on a case by case basis.

e.   Additional information regarding in-depth reviews can be found in 13 CFR §120.1050-1060, SBA Policy Notice 5000-1348: Revised Risk-Based Review Protocol for Certified Development Companies (August 5, 2015), SBA Information Notice 5000-1398: Updated SMART Methodology for Oversight of CDCs (November 9, 2016), and SBA's SOP 51 00.

C. Supervision and Enforcement:

1. An integral part of overseeing the CDC program is SBA's authority to supervise and take enforcement actions as necessary. (For further guidance on Lender Supervision and Enforcement, see SOP 50 53(A).)

2. Receiverships in Enforcement Actions Against CDCs.

a. Upon SBA's determination that grounds for an enforcement action against a CDC exist under 13 CFR § 120.1400, SBA may, pursuant to 13 CFR § 120.1500(e)(3), apply to a Federal court for the appointment of a receiver. Typically, SBA will use its receivership authority as a remedy of last resort. The appointment of a receiver is only one of several types of enforcement actions set forth in 13 CFR § 120.1500.

b. SBA will limit the scope of the receivership to the CDC's assets related to the SBA loan program(s) except where the CDC's business is almost exclusively SBA-related. Further, SBA will only seek a receivership if either of the following circumstances are present:

   i. The existence of fraud or false statements, or

   ii. The CDC has refused to cooperate with SBA enforcement action instructions or orders.

c. Under 13 CFR § 120.1400(a)(1), a CDC that obtains approval for 504 loans after October 20, 2017, has consented to SBA's right to seek a receivership in appropriate circumstances. As described in 50 10 5(J), such consent will be deemed to apply only if the CDC makes 504 loans on or after January 1, 2018. The CDC's consent does not in any way preclude the CDC from contesting whether or not SBA has established the grounds for seeking the remedy of a receivership. A CDC's consent to receivership as a remedy does not require SBA to seek the appointment of a receiver in any particular SBA enforcement action.

D. Oversight and Enforcement Actions 13 CFR §§ 120.1400-1600:

1. SBA may take enforcement actions against a CDC if the CDC (for example):

   a. Fails to receive approval for at least four loans during last two consecutive fiscal years;

   b. Fails to comply materially with SBA Loan Program Requirements;

   c. Makes a material false statement or fails to disclose a material fact to SBA;

   d. Performs actions with respect to the 504 loans in a commercially imprudent or unreasonable manner;

   e. Fails to correct a deficiency after receiving notice of same from SBA; or

   f. Exercises poor behavior or takes actions undermining SBA's management of the 504 program and fails to correct its actions after notice from SBA.

2. SBA may take enforcement actions against an ALP or PCLP CDC if the CDC (for example):

   a. Does not continue to meet the requirements for eligibility;

   b. Fails to follow SBA Loan Program Requirements; or

   c. Fails to maintain a Loan Loss Reserve Fund (LLRF) as required (PCLP only).

3. SBA identifies the types of enforcement actions in 13 CFR § 120.1500. SBA, in its discretion, may undertake (for example):

   a. Immediate suspension, upon written notice, when SBA determines that one or more grounds set forth in 13 CFR § 120.1400(c)(11) exist and such action is necessary to protect program integrity;

   b. Suspension or termination of the CDC's authority to:

    i.      Participate in the 504 program or any pilot or other program within the 504 program; or

    ii.     Perform any function under the program (processing, closing, servicing, liquidation or litigation).

c.    Transfer of some or all of the CDC's portfolio to another CDC or any other entity (13 CFR § 120.1500(e)(1)), including all pending 504 loan applications and all rights associated with the foregoing, including any and all processing, closing, servicing and other fees associated with the portfolio due and payable to the CDC going forward;

d.    Instruct the Central Servicing Agent (CSA) to withhold payments to CDC; or

e.    For ALP or PCLP CDCs, suspend or terminate the CDCs authority to participate as an ALP or PCLP CDC.

f.    The term of any suspension will be determined by SBA in its discretion.

4.    Enforcement Procedures (13 CFR § 120.1600):

a.    For all formal enforcement actions, including a proposed enforcement action and an immediate suspension, SBA will issue a written notice to the CDC:

    i.      Identifying the proposed action or notifying of the immediate suspension;

    ii.     Outlining the facts and reasons for the action;

    iii.    Stating the term and scope of the proposed or immediate suspension; and

    iv.    If based on information from a third party;

        a)  Copies of the documentation received from that party; or

        b)  The name of the third party, if based on oral information; and

        c)  If there are compelling reasons not to release that information, a summary of same.

b.    A CDC proposing an objection to the action must file a written objection to the appropriate SBA official or other person identified in the notice within 30 calendar days of its receipt of the notice from SBA as provided in 13 CFR § 120.1600.

c.    Upon CDC's request, SBA, in its discretion may extend the time to object.

d.    If CDC timely files a written objection, SBA will:

    i.      Issue a written notice of decision to the CDC within 90 days of either receiving the objection or from when additional information is provided, whichever is later, unless SBA provides notice that it requires additional time; and

    ii.     For immediate suspension, the notice must be issued within 30 days of receiving the objection advising if SBA is continuing with the suspension, unless SBA provides notice that it requires additional time.

e.    SBA, in its discretion, may:

    i.      Seek additional information; or

    ii.     Consider an untimely objection.

f.    SBA may then issue a notice of final agency decision.

g.  CDC may appeal the final agency decision in accordance with SBA regulations.

5.  Mergers:

A CDC with permanent status may merge with another CDC with permanent status that has the same Area of Operations. CDCs may not merge across state lines unless the surviving entity CDC has multi-state authority to operate in both states. Multi-state authority is required for mergers across state lines to be considered in the same area of operation; LEA status is not eligible for mergers across state lines. All mergers are subject to the process and requirements outlined below.

CDCs wishing to merge must notify the SBA in writing of their desire to merge prior to any official action or legal filings. A letter signed by a responsible management official accompanied by a Board of Directors' resolution from each of the CDCs wishing to merge must be sent to the Office of Financial Assistance (OFA) at SBA's headquarters by overnight mail (409 3rd Street SW, 8th floor, Washington, DC 20416) or electronically to 504Requests@sba.gov.

a.  The request should include the following:

i.   The name of the proposed merged entity;

ii.  A listing of the proposed Board of Directors of the merged entity, identifying which entity the Directors previously served. New Directors must submit SBA Form 1081, and either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA, or evidence of a Federal clearance (e.g., FDIC, OCC, Federal Reserve) from the individual's current employer, as required by paragraph III.A of this Chapter;

iii. An organizational chart with a listing of proposed merged staff, identifying responsibilities of each staff member and which entity they previously served;

iv.  A resume for all proposed staff indicating 504 lending experience acceptable to SBA. Any staff that has not previously been cleared by SBA is required to submit SBA Form 1081, and either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA. Mergers will not be approved until all staff has been cleared by SBA. SBA reserves the right to deny merger requests if proposed staff does not represent an adequate level of 504 Loan Program experience, as determined by SBA in its sole discretion;

v.   An explanation of the purpose of the merger;

vi.  A Plan of Operations which indicates how the merged entity will provide enhanced service in its area of operations;

vii. Copies of the proposed merger documents and any proposed amendments to the Articles of Incorporation and bylaws; and

viii. A pro forma balance sheet and income statement for the merged entity.

b.  The 504 Program Branch will solicit the Lead SBA Office(s) and the 504 Loan Processing and Servicing Centers for a recommendation that should include, but not be limited to, an evaluation of the historical performance of the surviving CDC regarding the:

i.   Quality and completeness of the CDC's loan packages;

      ii.     CDC's credit analysis abilities, as well as knowledge of SBA's policies and procedures;

      iii.    CDC's capability and performance related to loan closing; and

      iv.    CDC's servicing capability and performance (include comments from the appropriate servicing center(s)).

c.   The decision process is as follows:

      i.     The 504 Program Branch Chief will forward the request with a recommendation to the D/FA for a final decision. SBA will notify the CDC and Lead SBA Office(s) of the final decision. If SBA supports the merger, CDC will be notified of approval, contingent upon the CDC taking any action required by its State to complete the legal merger and providing SBA with:

           a)  Copies of the merger documents filed with the state;

           b)  Any executed or finalized amendments to the Articles of Incorporation and bylaws (if applicable); and

           c)  Finalized list of the Members of the merged CDC (if applicable), staff, Board of Directors, and any committees (if established), along with the corresponding Minutes of the meeting(s) and Board Resolution(s) reflecting the approval of the changes.

**d.**  Upon receipt, review and acceptance of the merger documents, SBA will notify the CDC in writing of final approval (with a copy to the appropriate Lead SBA Office**(S))**, **TAKE THE STEPS NECESSARY TO MERGE THE PORTFOLIOS, AND NOTIFY THE CENTRAL SERVICING AGENT.**

6.  Voluntary Surrender of CDC Certification and Loan Portfolio Transfer:

SBA regulations at 13 CFR § 120.857 discuss the circumstances under which a CDC can voluntarily surrender its certification and withdraw from the 504 Loan Program. Upon voluntary withdrawal, SBA will direct the transfer of the surrendering CDC's loan portfolio at its discretion.

The process for voluntary withdrawal and surrendering of a CDC certification requires the following:

a.  The CDC must notify the Lead SBA Office, D/FA, and D/OCRM in writing of the intent to withdraw from the program. The letter must be signed by a responsible management official and accompanied by a Board of Directors resolution stating the intent to withdraw from the program.

b.  A responsible management official and the CDC Board Chair must execute a Voluntary Withdrawal Agreement in form satisfactory to SBA. If the Board of Directors is no longer functioning, the responsible management official alone may execute the Voluntary Withdrawal Agreement, and include a certification as to Board status.

c.  Upon submission of the executed Voluntary Withdrawal Agreement to SBA, the CDC must follow the requirements of the Voluntary Withdrawal Agreement, including preparing all active loan files and files subject to the File Retention guidelines for review and transfer.

d.   The Lead SBA Office will make a recommendation to transfer the files of the withdrawing CDC to one or more CDCs. Generally, the Lead SBA Office should consider each CDC that reports to its Office or is incorporated in the state of the withdrawing CDC and provide a detailed explanation as to the reasons why or why not, in its opinion, each CDC would/would not be recommended to receive the portfolio in part or in its entirety.

e.   A Multi-state CDC may be considered to receive a portfolio transfer outside of its primary Area of Operations if:

   i.    There are no CDCs in the withdrawing CDC's primary Area of Operations that have been determined to be capable or do not have the capacity to assume the additional servicing responsibilities;

   ii.   There are no other CDCs authorized to operate in the withdrawing CDCs primary Area of Operations.

f.   In order to make a determination that the recipient CDC(s) is/are capable and have the capacity to take on the additional responsibility of an increased portfolio, the Lead SBA Office must prepare a recommendation memo on behalf of the recipient(s) that must include, but is not limited to, an evaluation of the CDC's:

   i.    Quality and completeness of loan packages, including commentary from the Sacramento Loan Processing Center;

   ii.   Credit analysis abilities as well as knowledge of SBA's policies and procedures;

   iii.  Capability and performance related to loan closing, including commentary from the District Counsel; and

   iv.   Servicing capability and performance, including commentary from the appropriate loan servicing center(s)).

The decision regarding the transfer of a withdrawing CDC's portfolio will be made in SBA's sole discretion.

g.   The CDC's request for voluntary withdrawal and the Lead SBA Office's recommendation for transfer of the withdrawing CDC's portfolio should each be emailed to the Chief, 504 Program Branch at 504Requests@sba.gov. Upon receipt and review, Chief, 504 Program Branch, will forward the request with a recommendation to the D/FA for a final decision, with concurrence from the D/OCRM. SBA will notify the CDC of SBA's acceptance of its request to surrender its certification (including SBA's execution of the Voluntary Withdrawal Agreement) and the Lead SBA Office will be notified by the 504 Program Branch of the steps necessary to complete the transfer of the portfolio to another CDC(s).

h.   A CDC that has completed a voluntary decertification may not apply to re-certify the CDC or apply for certification as a new CDC in the future.

i.   A transfer in conjunction with increased supervision or enforcement activity will be implemented by the D/OCRM, including determining the transferee.

# V.   TYPES OF CDCS

A. Priority CDCs ([13 CFR § 120.802](#)):

    1.  A Priority CDC is a CDC with permanent status that SBA has approved to participate in an expedited 504 loan and Debenture closing process. To request this status, the CDC must use the services of a Designated Attorney.

    2.  To become a Priority CDC, a CDC must have:

        a.  At least one 504 closing attorney, designated as provided below;

        b.  Adequate experience and expertise in 504 loan closings;

        c.  A history of presenting complete and accurate closing packages;

        d.  Satisfactory SBA performance, as determined by SBA in its discretion. The CDC's Risk Rating, among other factors, will be considered in determining satisfactory SBA performance. Other factors may include, but are not limited to, review/examination assessments, historical performance measures (like default rate, purchase rate and loss rate), loan volume to the extent that it impacts performance measures, and other performance related measurements and information (such as contribution toward SBA's mission).

        e.  A qualified and knowledgeable staff;

        f.  A satisfactory working relationship with its Lead SBA Office; and

        g.  Evidence of Directors' and Officers' Liability and Errors and Omissions insurance in form and substance satisfactory to SBA as provided in Subpart A, Ch3. II.B.15.

    3.  Application Process – CDCs may obtain Priority Status either through the submission of an Application, or by Nomination from their Lead SBA Office.

        a.  Application by the CDC:

            i.  The CDC submits a written application to the 504 Program Branch electronically to [504Requests@sba.gov](mailto:504Requests@sba.gov) or by overnight mail or courier to SBA Headquarters (409 3rd Street SW, 8th Floor, Washington, DC 20416). The application must address each of the items in the previous paragraphs to ensure that the CDC remains in compliance with these requirements.

           ii.  The 504 Program Branch will solicit comments and a recommendation from the Lead SBA Office's District Director, District Counsel, SLPC, the appropriate loan servicing center, and other field offices, if applicable.

           iii.  If the application contains both a request for Designated Attorney delegation and a request for Priority Status, the CDC should send the complete package to the 504 Program Branch, who will forward the attorney information to the Office of General Counsel (OGC).

        b.  Nomination by the Lead SBA Office:

        The Lead SBA Office sends a nomination to the 504 Program Branch with a copy to the CDC. The nomination must be signed by the District Counsel and the District Director. The nomination should address all of the conditions above and include evidence of the required insurance coverage and the name of the Designated Attorney.

   c. Notification to the CDC:

      The D/FA will notify the CDC in writing of its approval with a copy to the Lead SBA Office and the attorney will receive a separate approval letter from OGC.

4. Designated Attorney is defined at 13 CFR § 120.802. To become a Designated Attorney, an attorney must submit evidence of:

   a. A degree from a recognized law school;

   b. Membership in the bar of the state in which the attorney's 504 closing practice is or will be primarily located;

   c. Professional malpractice insurance coverage:

     i. With limits of at least $1,000,000/$1,000,000; and

     ii. A deductible not to exceed $20,000 for individuals and firms with 3 or fewer attorneys, $50,000 for law firms with more than 3 attorneys or $100,000 for large law firms with more than 25 attorneys.

     iii. Applicants may request a hardship exemption from the General Counsel, or designee, with respect to the policy limits or the deductible. Policy limit reductions to $500,000/$1,000,000 will only be granted to sole practitioners and small firms of three or fewer attorneys, while deductible requirement waivers will only be granted to larger firms with a demonstrated, strong financial history. The General Counsel, or designee, will consider a number of factors when deciding whether to grant or renew a hardship waiver, including, but not limited to, the documentation provided in support of the waiver request, the number of 504 loan closings by the Designated Attorney in the prior 12 months, the total dollar amount of the 504 loans closed by the Designated Attorney in the prior 12 months, and the overall quality of the loan closing packages received from the Designated Attorney. If approved, a hardship waiver will have a duration of 1 year. If an attorney obtains designated status, renewals of hardship waivers may be sought annually for as long as the hardship exists. Approval and renewal of hardship waivers are within the discretion of the General Counsel (or designee).

     iv. Sole practitioners seeking a hardship waiver must state what their present annual premium is and what it would cost to get $1,000,000/$1,000,000 with $20,000 deductible and $500,000/$1,000,000 with $20,000 deductible. All other relevant financial information should also be provided.

   d. Attendance at an SBA-approved 504 loan closing training course. Attorneys may fulfill this requirement up to 1 year prior to designation or within 6 months after designation; and

   e. Adequate expertise in 504 loan closings.

5. Process to request Designated Attorney status:

   a. The CDC nominates the attorney by submitting an application to the Lead SBA Office in which the attorney's practice is primarily located. An application must include:

     i. A submission on the attorney's letterhead addressing each of the conditions in the previous paragraph;

      ii.    A copy of the attorney's malpractice insurance policy, or a certificate of insurance or declarations page showing the:

          a)  Amount of coverage and deductible;

          b)  Premium; and

          c)  Name of the attorney insured.

      iii.   If the attorney requests a hardship exemption with respect to the insurance policy limits or a waiver of the amount of the deductible, the attorney must include the request with the application, supported by appropriate information, including:

          a)  The amount of their policy limits or deductible; and

          b)  The current premium;

          c)  The quote obtained for the increased premium to meet SBA's minimum professional malpractice insurance requirements (absent a hardship waiver);

          d)  The size of the firm;

          e)  The firm's arrangement for covering the deductible, such as a loss reserve or escrow;

          f)  Evidence of the firm's history and financial strength; and

          g)  For sole practitioners or law firms with fewer than three attorneys, personal financial statements for each attorney seeking Designated Attorney status.

b.  Other Restrictions/Requirements:

      i.    A designated attorney cannot be:

          a)  An employee of the CDC or of an Associate of the CDC; or

          b)  On the board of the CDC, participate in its lending decisions, or otherwise be too closely associated with the CDC, as determined by SBA Counsel.

      ii.   An attorney may be a member of the CDC, but not an officer, provided SBA Counsel determines the attorney is not too closely associated with the CDC. SBA Counsel must consider the attorney's relationship with the CDC including:

          a)  The degree of control exerted by the attorney on the CDC's decision-making;

          b)  Any benefits accruing to the attorney through the attorney's association with the CDC; and

          c)  Any appearance of conflict of interest.

c.  The Lead SBA Office forwards the application to the Office of General Counsel (OGC) with the recommendations of the District Director, District Counsel and other field offices, if applicable.

d.  OGC will notify the attorney in writing that he/she has been accepted as a designated 504 closing attorney.

e.  The Lead SBA Office must allow a CDC to use a non-designated attorney for a reasonable

time to develop an additional designated attorney or to replace a designated attorney. In either event, SBA counsel will accept the closing package from a non-designated attorney and conduct a non-priority closing review.

6.  To maintain Designated Attorney status, an attorney must:

    a.  Deliver annually to the 504 Program Branch on or before the renewal of the current policy:

        i.   A certificate from its insurance carrier confirming the existence of professional malpractice insurance in the amount identified in paragraph 4 above. If seeking a hardship waiver or a renewal of an existing hardship waiver, the Designated Attorney must provide:

            a)  The current amount of their policy limits or deductible;

            b)  The current premium;

            c)  The quote obtained for the increased premium to meet SBA's minimum professional malpractice insurance requirements (absent a hardship waiver);

            d)  The size of the firm;

            e)  The firm's arrangement for covering the deductible, such as a loss reserve or escrow;

            f)  Evidence of the firm's history and financial strength; and

            g)  For sole practitioners or law firms with fewer than three attorneys, personal financial statements for each attorney seeking designated status.

        ii.  Evidence of continued membership and good standing in the bar(s) of all states in which the attorney is approved to serve as designated counsel.

    b.  Notify SBA immediately if there is a change of status (e.g., new address, new law firm or change in malpractice coverage); and

    c.  Submit evidence of attendance at an SBA-approved closing update course every 2 years. The attorney may take the course any time within the calendar year that their status would expire to maintain their status.

7.  Withdrawal of Designated Attorney status:

    The General Counsel, or designee, may withdraw an attorney's Designated status for good cause, including, but not limited to: unprofessional or unethical conduct; failure to maintain the required insurance coverage; failure to attend the required training; submission of unsatisfactory 504 closing packages (based upon reviews or other evidence); failure to maintain a good working relationship and good communication with SBA; failure to maintain membership and good standing in the bar(s) of all states in which the attorney is approved to serve as designated counsel; and/or failure to comply materially with an SBA Loan Program Requirement. See Subpart C, Chapter 6, Paragraph I of this SOP for further guidance.

8.  Termination of Priority CDC Status:

    The D/FA or designee may terminate a CDC's Priority designation for good cause, including, but not limited to: the CDC's failure to use a designated attorney; failure to maintain adequate insurance

coverage; submission of unsatisfactory closing packages; failure to maintain a good working relationship and good communications with Lead SBA Office personnel; and/or failure to comply materially with an SBA Loan Program Requirement.

B. Accredited Lenders Program (ALP):

SBA may designate a CDC as an Accredited Lender, which gives them increased authority to process, close, and service 504 loans, and provides expedited processing of loan approval and servicing actions. ALP CDCs are accountable for thorough credit and eligibility analysis on loan applications and on servicing actions. The Agency relies on the ALP CDC's credit analysis in making the decision to guarantee the debenture and complete the documentation in a reduced timeframe. Guidance is provided in the Accredited Lenders Program (ALP) Application and Renewal Guide for CDCs.

1. Application for ALP status:

   a. To be eligible for ALP status, a CDC must have permanent CDC status and meet all requirements of a Priority CDC. A CDC may apply in writing to its Lead SBA Office, providing all applicable information for SBA Review. At a minimum, the following items must be included in the application package (Note: this list may not be all-inclusive and the reviewing SBA official may request further information from the CDC in order to make a recommendation):

      i. A certified copy of the CDC's Board of Directors' resolution authorizing the application for ALP status (this is only required for new ALP CDC applications not for renewals);

      ii. Current list of CDC staff with organizational chart and description of each staff member's responsibilities and experience. If contracted staff, also provide a copy of the contract and evidence of pre-approval by D/FA;

      iii. Current list of CDC Board of Directors, identifying each Director's area of expertise;

      iv. Current list of Executive Committee and Loan Committee members (if applicable);

      v. Copy of CDC's current bylaws and Articles of Incorporation to ensure that they are in compliance with the regulations;

      vi. Copy of CDC's internal control policy in compliance with 13 CFR 120.826(b);

      vii. Copy of certificate and policy evidencing the Directors' and Officers' Liability and Errors and Omission insurance required in Chapter 3, paragraph II.B.12; and

      viii. Copy of certificate and policy evidencing Designated Attorney's malpractice insurance. If the CDC is a multi-state or has an LEA, include verification that designated attorneys are licensed to practice law in each state represented.

   b. See 13 CFR §§ 120.840, Accredited Lenders Program (ALP) and 120.841, Qualifications for the ALP.

2. Lead SBA Office Review:

   a. The Lead SBA Office must review the ALP application and make a recommendation to OFA electronically to 504Requests@sba.gov within 2 weeks of receipt of the CDC's letter. The Lead SBA Office's recommendation must include:

      i. An evaluation, in conjunction with the SLPC and the appropriate CLSC, of the:

      a) Quality of the CDC's loan packages;

      b) CDC staff's knowledge of SBA policies and procedures;

      c) CDC staff's credit analysis abilities;

      d) CDC staff's capability and performance related to loan closing; and

      e) CDC staff's servicing capability and performance.

  ii. Evidence that the CDC is in compliance with 13 CFR §§ 120.840 and 120.841;

  iii. Comments from the CDC and the Lead SBA Office on:

      a) Any loans in the "90 day or more past due" category or in the "Catch-Up" category; and

      b) Any past due Annual Reports;

  iv. Verification that the CDC's employees are either hired directly by the CDC or are under a contract that has been pre-approved by SBA D/FA;

  v. Verification that the CDC is in compliance with 13 CFR §§ 120.824, 120.825 and 120.826;

  vi. Confirmation of CDC compliance with the requirements of a Priority CDC, including D&O and E&O insurance and Designated Attorney requirements; and

  vii. Verification that the structure and composition of Board and committee(s) is/are in compliance with 13 CFR § 120.823 and that staff is qualified by training and experience.

b. The Lead SBA Office forwards the application and its recommendation electronically to the Chief, 504 Program Branch, at 504Requests@sba.gov. The 504 Program Branch will review and forward to D/FA with a recommendation for final determination.

c. Analysis by the 504 Program Branch includes, at a minimum, the following factors:

  i. Number of 504 loans approved in the most recent 3 years and current size of CDC's outstanding portfolio balance;

  ii. Satisfactory SBA performance, as determined by SBA in its discretion. The CDC's Risk Rating, among other factors, will be considered in determining satisfactory SBA performance. Other factors may include, but are not limited to, review/examination assessments, historical performance measures (such as 60 days delinquent report, 90 days or more past due, catch up reports, liquidation rate, past 12 month active purchase rate, SBPS score average, default rate, purchase rate and loss rate, loan volume to the extent that it impacts performance measures, and other performance related measurements and information (such as contribution toward SBA's mission);

  iii. Record of compliance with SBA Loan Program Requirements; and

  iv. Record of cooperation with all SBA offices, including Field Offices and SBA's loan processing and servicing centers.

3. Term of designation:

SBA will designate a CDC as an ALP CDC for up to 2 years and may renew the designation for additional periods of up to 2 years.

4. Renewal of an ALP CDC's designation:

Ninety days prior to the end of the term, the CDC should apply in writing for renewal of its designation to OCRM at CDCAnnualReports@sba.gov. The application for renewal must address all of the requirements found at 13 CFR §§ 120.840 and 120.841 and submit the required items noted in paragraphs V.B.1 and 2 above. OCRM will solicit comments and a recommendation from the Lead SBA Office's District Director, District Counsel, SLPC, the appropriate loan servicing center, and other field offices, if applicable.

5. Recognition of ALP Status Between SBA Offices

Once the CDC is approved as an ALP CDC for a particular field office, it is an ALP CDC for its entire Area of Operations.

6. Oversight and Enforcement Actions

See Section III of this Chapter above.

C. Premier Certified Lenders Program (PCLP):

Under the PCLP, SBA designates qualified CDCs as PCLP CDCs and delegates to them increased authority to process, close, service and liquidate 504 loans (13 CFR § 120.848). SBA also may give PCLP CDCs increased authority to litigate 504 loans (13 CFR § 120.845). Loans processed under PCLP are subject to the same loan terms and conditions as other 504 loans, but SBA delegates to the PCLP CDC all loan approval decisions, except eligibility.

1. Application for PCLP Status:

A CDC may apply in writing to its Lead SBA Office providing all applicable information set forth in paragraph V.B.1 and 2 above and the following:

   a. Documentation of meeting all ALP requirements to be eligible to obtain or retain PCLP status;

   b. A certified copy of the Board of Directors' resolution authorizing the application for PCLP status (this is only required for new PCLP CDC applications not for renewals);

   c. Evidence that the CDC:

      i. Has established a Loan Loss Reserve Fund (LLRF) in compliance with the requirements set forth in 13 CFR § 120.847;

      ii. Has a demonstrated ability to process, close, service and liquidate 504 and/or PCLP loans; and

      iii. Has satisfactory SBA performance as determined by SBA in its discretion. The CDC's Risk Rating, among other factors, will be considered in determining satisfactory SBA performance. Other factors may include, but are not limited to, review/examination assessments, historical performance measures (such as 60 days delinquent reports, 90 days or more past due reports, catch up reports, liquidation rates, past 12 month active purchase rates, SBPS score average, default rate, purchase rate and loss rate

    d.   Summary of experience of each of the CDC's processing, closing, servicing, and liquidation staff members with significant authority; and

    e.   Name, address, and summary of experience of the CDC's Designated Attorney.

2.  Lead SBA Office Review:

    a.   The Lead SBA Office must review the PCLP application and make a recommendation to OFA within 2 weeks of receipt of the CDC's letter. The Lead SBA Office's recommendation must address the requirements and include the information stated in the previous paragraph.

    b.   The Lead SBA Office sends the application and its recommendation to the SLPC. The SLPC reviews the materials and forwards the entire application, including all supporting documentation, with its recommendation to the Chief, 504 Program Branch, for review and final determination by D/FA.

3.  Notification of PCLP Status:

SBA will notify the CDC in writing of an approval or decline of a PCLP application with a copy to the Lead SBA Office. If the application is declined, SBA will notify the CDC and the CDC's Lead SBA Office of the reason(s) for the decline.

4.  Loan Guaranty Agreement - Premier Certified Lenders Program (PCLP):

Upon approval as a PCLP CDC, the SLPC will send the CDC a Loan Guaranty Agreement - Premier Certified Lenders Program (PCLP) (SBA Form 2006). The CDC must sign and return the agreement before it can begin processing PCLP loans.

5.  PCLP Term:

SBA will confer PCLP status for a period of up to 2 years and may renew the designation for additional periods of up to 2 years.

6.  Area of Operations:

The PCLP CDC may exercise its PCLP authority in its entire Area of Operations.

7.  Loan Loss Reserve Fund (LLRF):

    a.   A PCLP CDC must establish and maintain a LLRF for its financings under this program. The LLRF will be used to reimburse the SBA for 10 percent of any loss sustained by SBA as a result of a default in the payment of principal or interest on a PCLP debenture.[1] Each Loss Reserve must equal 1% of the original principal amount of each PCLP debenture.

---

[1] For PCLP debentures issued while a PCLP CDC elected to participate in the Alternative Loan Loss Reserve Pilot Program (ALLR) authorized under Section 508(c)(7) of the Small Business Investment Act of 1958, the PLCP CDC is required to reimburse SBA for 15 percent of any loss sustained by SBA as a result of a default in the payment of principal or interest on those PCLP debentures. The statutory authority for the ALLR lapsed on July 31, 2011.  As a result of the statutory lapse, PCLP CDCs that had elected to participate in the ALLR are now required to maintain a Loan Loss Reserve Fund in an amount sufficient to meet the Standard Loan Loss Reserve Requirement set forth in 13 C.F.R. § 120.847(b), which is one percent of the original principal amount of the PCLP Debenture for the life of the loan.

    b.  The PCLP CDC must grant SBA a first priority perfected security interest in its LLRF. The security interest in the PCLP CDC's LLRF must be granted pursuant to a security agreement between the PCLP CDC and SBA. The security interest in the PCLP CDC's LLRF must be perfected pursuant to a control agreement between the PCLP CDC, SBA and the applicable depository institution.

    c.  When establishing a LLRF, a PCLP CDC must coordinate with its Lead SBA Office to execute and deliver the required documentation. SBA created a Control Agreement (SBA Form 2230) and a Security Agreement (SBA Form 2229) that must be used in connection with the LLRF. If any changes to the agreements are required in order to meet local legal requirements, or if significant numbers of local lenders are averse to executing the agreements, SBA field counsel must work with the OGC to make appropriate changes to the agreements. A fully executed original copy of the control and security agreements, as well as any applicable financing statements, must be provided to and retained by the Lead SBA Office.

    d.  All documents must be satisfactory to SBA in both form and substance. SBA may require changes in, or supplements to, the documentation from time to time. If a depository institution will not enter into any agreement required by SBA or violates the terms of any such agreement, the PCLP CDC may not maintain an LLRF with that institution.

    e.  For further guidance on the LLRF, see the table at the end of this chapter and 13 CFR § 120.847.

8.  Renewal of a PCLP CDC's designation:

A PCLP CDC requesting renewal of its PCLP CDC designation must submit the required information and documentation to OCRM at CDCAnnualReports@sba.gov. The required information and documentation should be submitted at least 120 days prior to expiration of the CDC's PCLP status to ensure sufficient processing time. After receipt of the required information and documentation, OCRM will ask for comments from the Lead SBA Office, SBA's processing, servicing and liquidation centers. SBA's review will address all of the requirements found at 13 CFR § 120.846 and the items noted in paragraph V.C.1 above.

D.  Oversight and Enforcement Actions:

See Section IV of this Chapter for information on PCLP Oversight and Enforcement Actions.

| What Each PCLP CDC Must Do: | Deadline For Activity: |
|---|---|
| Fund LLRFs | 180 days after becoming a PCLP CDC |
| Contribute 50% of the required Loss Reserve for a PCLP Debenture | Within 5 business days after the PCLP Debenture is sold |
| Contribute an additional 25% of the required Loss Reserve for a PCLP Debenture | 1 year after PCLP CDC issues PCLP Debenture |

| **What Each PCLP CDC Must Do:** | **Deadline For Activity:** |
|---|---|
| Contribute the final 25% of the required Loss Reserve for a PCLP Debenture | 2 years after PCLP CDC issues PCLP Debenture |
| Pay SBA its Exposure on a PCLP Debenture in lieu of SBA's withdrawal of amounts from the Loss Reserves (optional) | 10 days after the PCLP CDC and SBA determine the Exposure |
| Contribute to the Loss Reserve any difference between the required amount of Loss Reserves and actual Loss Reserves resulting from transfers, fees, or any other reason | 30 days from the creation of the difference |
| Pay SBA any difference between the Exposure on a PCLP Debenture and the Loss Reserves after SBA makes withdrawals from the Loss Reserves | 45 days after demand for payment by SBA |
| Report to and reconcile with the Lead SBA Office any discrepancies between the Quarterly PCLP List of Required LLRF Deposits and its records | 45 days after the end of each quarter |
| Submit to Lead SBA Office the Quarterly PCLP Summary of LLRF Balances | 45 days after the end of each quarter |

| **What Lead SBA Office Must Do:** | **Deadline For Activity:** |
|---|---|
| Notify Sacramento Loan Processing Center when a PCLP CDC meets LLRF initial establishment requirements | 30 days after it verifies compliance |
| Process requests for interest earned on LLRF or excess funds in LLRF | 15 days after request by PCLP CDC, unless there is disagreement on entitled amount |

| What Lead SBA Office Must Do: | Deadline For Activity: |
|---|---|
| Transmit to each PCLP CDC the Quarterly PCLP List of Required LLRF Deposits | 15 days after the end of the quarter |
| Work with PCLP CDCs to reconcile any differences in quarterly Loss Reserve calculations | Within 45 days of the end of the quarter |
| Review and approve the Quarterly PCLP List of Required LLRF Deposits | Within 60 days of the end of the quarter |
| Written notice to the PCLP CDC of SBA's intent to transfer funds from the LLRF | No less than 3 days before effecting the transfer |

## VI.  AREA OF OPERATIONS

There are three (3) ways a CDC may process 504 loans outside its approved area of operation. They are:

- Case-by-case requests based on particular circumstances
- Expanding based on a Local Economic Area (LEA)
- Becoming a Multi-State CDC

A.  Case-by-case (13 CFR § 120.839):

A CDC may apply to make a 504 loan for a Project outside its Area of Operations to the Sacramento Loan Processing Center (SLPC). The CDC must demonstrate that it can adequately fulfill its 504 program responsibilities for the 504 loan, including proper servicing. The SLPC may approve the application if the CDC has satisfactory SBA performance as determined by SBA in its discretion and any of these three conditions are met:

1. The applicant CDC has previously assisted the business (including its affiliates, if any) to obtain a 504 loan; or

2. The existing CDC or CDCs serving the area agree to permit the applicant CDC to make the 504 loan; or

3. There is no CDC within the Area of Operations.

B.  Local Economic Area (LEA) Expansion (13 CFR § 120.835):

1. A CDC may apply for expansion of its territory to include a Local Economic Area (LEA). An LEA is an area, as determined by SBA, that is:

   a. In a State other than the State in which an existing CDC, or an applicant applying to become

a CDC, is incorporated; and

b. Is a part of a local trade area that is contiguous to the CDC's State of incorporation.

2. Examples of a local trade area would include a city that is bisected by a State line or a metropolitan statistical area, as defined by the Office of Management and Budget (OMB), that is bisected by a State line. If the requested county is not classified as metropolitan statistical area, the CDC must provide a justification of how the county has shared commerce with the CDC's state of incorporation in order for SBA to consider the county a local trade area.

3. A CDC that has been certified to participate permanently in the 504 program may apply to expand its Area of Operations if it meets all requirements to be an Accredited Lender Program (ALP) CDC, as outlined elsewhere in this chapter, and demonstrates that it can competently fulfill its 504 program responsibilities in the proposed area.

4. Application Process:

a. The CDC must submit the items listed below to its Lead SBA Office.

i. A list of the requested area(s) (e.g., a county, parish, incorporated city) in the contiguous state and information supporting how those area(s) meet the definition of a Local Economic Area (13 CFR § 120.802, Definitions);

ii. A certified copy of the resolution of the Board of Directors approving the proposed expansion;

iii. A copy of any changes to the Articles of Incorporation that are required (or a statement from the CDC's Attorney that no changes are necessary);

iv. A copy of any bylaw changes that are required (or a statement that no changes are necessary);

v. A listing of the CDC's Board members that meets the requirements contained in 13 CFR § 120.823;

vi. If the CDC has an Executive Committee or a Loan Committee, the CDC must submit a listing of each committee that meets the requirements contained in 13 CFR § 120.823;

vii. If the CDC has a Membership, a list of the CDC's Members must be provided if Membership has corporate powers, i.e., elects Board Members or votes on amendments to Articles of Incorporation;

viii. Evidence of proposed registration as a foreign corporation (if required) or a statement from the CDC's Attorney certifying that such registration is not required in the State of expansion;

ix. Documentation showing that the CDC currently meets the requirements of an ALP CDC (This includes those CDCs that are ALP CDCs already.) (See 13 CFR § 120.841, Qualifications for the ALP and paragraph V.B of this chapter);

x. A written statement from the CDC's Attorney certifying that the CDC is operating in compliance with its Articles of Incorporation and bylaws and is in good standing with its State of incorporation. CDC's attorney must review the CDC's corporate documents and minutes of board meetings before providing the certification;

xi.   A Certificate of Good Standing from the CDC's state of incorporation;

xii.  A summary of the qualifications and experience of any new professional staff who will be responsible for marketing, packaging, processing, closing, servicing, and if applicable, liquidating the loans in the expanded area, as well as a complete SBA Form 1081, and either Form FD-258 (fingerprint card) or electronic fingerprint submission for each new staff member. SBA Form 1081 and Form FD-258 or electronic fingerprint submission must be signed and dated within 90 days of submission to SBA. If the new employees will be provided under contract, CDCs must submit a copy of the proposed contract for their services that meets the regulations governing professional service contracts and will be subject to the pre-approval process of professional services contracts as outlined in paragraph II.A.8 prior to LEA approval or engaging the services of the contractor. (13 CFR § 120.824); and

xiii. Identification of the CDC's Designated 504 Closing Attorney who is licensed to practice in that jurisdiction, including evidence of the attorney's current professional liability insurance and 504 loan closing training. If a CDC does not have a Designated Attorney in the new jurisdiction at the time of application, then:

   a) The CDC may request a waiver for a period of up to 2 years of the requirement of a Designated 504 Closing Attorney through the Lead SBA Office in the new jurisdiction as part of the LEA expansion request.

   b) If a waiver is granted under (a) above, the LEA expansion will also be limited to the period of the waiver. If the CDC does not have a Designated 504 Closing Attorney at the end of 2 years, the CDC's LEA expansion will expire.

   c) The CDC may not close loans as a Priority CDC in the area of expansion until such time as it has a Designated 504 Closing Attorney licensed to practice in that state.

b. The Lead SBA Office must review the request for an LEA expansion and prepare an analysis, which should include but is not limited to:

   i.   Comments on whether the CDC is in compliance with SBA's regulations and policies;

   ii.  Comments on whether the Lead SBA Office agrees that the areas requested meet the definition of a Local Economic Area;

   iii. Comments on the CDC's ability to manage an increase in loan servicing activity resulting from the expansion; and

   iv.  Any other pertinent comments regarding the CDC's application or operations.

      a) The Lead SBA Office must solicit the comments of any other Field Office in which the CDC operates or proposes to operate as well as the comments of the processing and servicing centers.

      b) The Lead SBA Office must determine that the CDC is in compliance with SBA's regulations, policies, and performance benchmarks, including pre-approval and annual review by SBA of any management or staff contracts, and the timely submission of all annual reports.

      c) In making its recommendation on the application, the Lead SBA Office may

consider any information presented to it regarding the requesting CDC, the existing CDC, or CDCs that may be affected by the application, and the proposed Area of Operations.

    v.    The Lead SBA Office will submit the application, recommendation, and supporting materials within 60 days of the receipt of a complete application from the CDC to the D/FA, who will make the final decision. The application package should be sent electronically to 504Requests@sba.gov.

c.    If the Lead SBA Office determines that the CDC's LEA application is incomplete, it should inform the CDC in writing, identifying the information missing from the application. The Lead SBA Office also has full authority to decline a CDC's expansion request. A letter outlining the reasons for decline and the CDC's rights of appeal must be sent to the CDC with a copy to the D/FA. The CDC has 60 days to appeal the decline to the Lead SBA Office for action by the D/FA.

d.    SBA will consider whether the CDC has satisfactory SBA performance as determined by SBA in its discretion. The CDC's Risk Rating, among other factors, will be considered in determining satisfactory SBA performance. Other factors may include, but are not limited to, review/examination assessments, historical performance measures (like default rate, purchase rate and loss rate), loan volume to the extent that it impacts performance measures, and other performance related measurements and information (such as contribution toward SBA's mission).

e.    The D/FA may consider any information submitted or available related to the applicant and the application. SBA will notify the CDC of its decision in writing, and if the application is denied, the reason(s) for its decision with a copy to the Lead SBA Office.

C.  Multi-State Expansion (13 CFR § 120.835):

A CDC can expand by applying to be a Multi-State CDC provided the State the CDC seeks to expand into is contiguous to the State of the CDC's incorporation and the CDC has a Loan Committee meeting the requirements of 13 CFR § 120.823. For states or territories not directly connected to the 48 contiguous states, the following are deemed to be contiguous: Alaska and Washington; Hawaii, Guam, American Samoa, and the Commonwealth of the Northern Marianas Islands, and California; Puerto Rico and the U.S. Virgin Islands and Florida.

1.  Application Process:

A CDC seeking to become a Multi-State CDC must apply to the Lead SBA Office where the CDC intends to locate its principal office for the State into which it seeks to expand. The request must include:

a.    Demonstration that the State that the CDC seeks to expand into is contiguous to the state of the CDC's incorporation;

b.    If the CDC has a Membership, a list of the CDC's Members must be provided if the Membership has corporate powers, i.e., elects Board Members or votes on amendments to Articles of Incorporation;

c.    A listing of the Board members that meets the requirements contained in 13 CFR § 120.823;

d.  If the CDC has an Executive Committee, the CDC must submit a listing of the Executive Committee that meets the requirements contained in 13 CFR § 120.823;

e.  A listing of the Loan Committee in the CDC's State of incorporation, if one has been established by the CDC, and a listing of the required Loan Committee for the State into which the CDC is seeking to expand, both of which must meet the requirements contained in 13 CFR § 120.823;

The CDC must collect an SBA Form 1081, "Statement of Personal History," for each Loan Committee member. If a Loan Committee member answers "yes" to question numbers 10a, 10b, 10c, 11a and/or 11b on SBA Form 1081, the individual must submit to SBA the SBA Form 1081, and either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA, or evidence of a Federal clearance (e.g. FDIC, OCC, Federal Reserve) from the individual's current employer. For those Loan Committee members who answer "no" to question numbers 10a, 10b, 10c, 11a, and 11b, the CDC retains the signed SBA Form 1081 in the CDC's files and no fingerprint submission is required.

f.  The address where the CDC's principal office in the new state will be located and a copy of the lease if the space is to be leased (13 CFR § 120.835(c));

g.  A certified copy of the resolution of the Board of Directors approving the expansion;

h.  A certified copy of any changes to the Articles of Incorporation that are required;

i.  A certified copy of any bylaw changes that are required (or a statement from the CDC's Attorney that no changes are required).

j.  After the CDC's Attorney has had an opportunity to review corporate documents and minutes of board meetings, the CDC's Attorney is to provide a written statement certifying that the CDC is operating in compliance with its Articles of Incorporation and bylaws and is in good standing with its State of incorporation. If registration as a foreign corporation is required, provide a copy of the proposed registration or a statement from the CDC's Attorney that foreign corporation registration is not required in the State into which the CDC seeks to expand.

k.  A Certificate of Good Standing from the CDC's state of incorporation;

l.  Evidence that the CDC currently meets the requirements of an ALP CDC (This includes those CDCs that are ALP CDCs already.) (13 CFR §§ 120.840 and 120.841);

m.  A copy of the policy for Director' and Officers' and Errors and Omission insurance including a Certificate of Insurance reflecting at least the required minimum coverage of $1,000,000 Liability coverage for all CDCs, or the appropriate level of insurance coverage required in Subpart A Ch.3.II.B.15.

n.  The name of the CDC's Designated Attorney licensed to practice in the new state. Include proof that the designated status is current and provide a copy of the binder page of the attorney's current malpractice insurance or a Certificate of Insurance reflecting at least $1,000,000 Liability coverage and a deductible/retention of not more than $10,000. The certificate must either contain the name of the Designated Attorney or provide it in an attachment.

(13 CFR § 120.841(e));

o. The CDC's Annual Report submission must be current and the Annual Report must be in compliance;

p. The CDC must demonstrate that it has satisfactory SBA performance as determined by SBA in its discretion. The CDC's Risk Rating, among other factors, will be considered in determining satisfactory SBA performance. Other factors may include, but are not limited to, review/examination assessments, historical performance measures (like default rate, purchase rate and loss rate), loan volume to the extent that it impacts performance measures, and other performance and risk-related measurements and information (such as contribution toward SBA's mission);

q. Provide a summary of the qualifications and experience of those loan officers who will be responsible for marketing, packaging, processing and servicing the loans in the expanded area. If the loan officers are new employees, provide a complete SBA Form 1081, and either Form FD-258 (fingerprint card) or electronic fingerprint submission, each signed and dated within 90 days of submission to SBA, for each employee. If the new employees will be provided under contract, submit a copy of the proposed contract for their services that meets the regulations governing professional service contracts and will be subject to the pre-approval process of Professional Services Contracts as outlined in paragraph II.A.8 of this chapter prior to multi-state approval or engaging the services of the contractor. (13 CFR § 120.824);

2. Analysis by the Lead SBA Office (13 CFR § 120.837):

a. The Lead SBA Office in the State into which the CDC seeks to expand conducts a review and comments on:

   i. Any previous experience with the applicant, including comments on the CDC's ability to handle an increase in loan servicing activity including servicing of an expanded geographic area;

   ii. The CDC's compliance with SBA's regulations, policies, and performance benchmarks, including the timely submission of all annual reports;

   iii. Compliance of any new contracts with SBA regulations (13 CFR § 120.824);

   iv. Comments from other Field Offices that have dealings with the applicant, including Servicing Centers; and

   v. Any other pertinent comments regarding the CDC's operations.

b. If the Lead SBA Office's analysis determines that the CDC is in compliance with SBA's regulations and policies governing CDCs, the Lead SBA Office will, within 60 days of receipt of a complete request, forward the CDC's application along with the Lead SBA Office's analysis and recommendation to the D/FA.

c. If the Lead SBA Office's analysis determines that the CDC is not in compliance with SBA's regulations and policies governing CDCs, return the application to the CDC identifying the outstanding issues to give the CDC an opportunity to come into compliance.

3. The Decision:

a.  The D/FA may consider any information submitted or available related to the applicant and the application and will make the final decision. SBA will notify the CDC of its decision in writing, and if the application is denied, the reason(s) for its decision with a copy to the Lead SBA Office.

b.  Multi-State CDCs must maintain a separate accounting for each State of all 504 fee income and expenses and provide, upon SBA's request, evidence that the funds resulting from its Multi-State CDC operations are being invested in economic development activities in each State in which they operate. (13 CFR §§ 120.825 and 120.830)

c.  If a CDC is approved to operate as a Multi-State CDC, the CDC's ALP, PCLP, or Priority CDC authority will carry over into every additional State in which it is approved to operate as a Multi-State CDC.

## SUBPART B
## SECTION 7(A) BUSINESS LOAN PROGRAMS

**PURPOSE OF THIS SUBPART**

This Subpart contains the policies and procedures governing 7(a) business loan programs.

When the policy set forth in this Subpart does not adequately address the unique circumstances regarding a particular matter, an exception to policy may be approved by the D/FA. For Export Working Capital Program (EWCP) and International Trade (ITL) loans, an exception to policy may be approved by the Director, International Trade Finance (D/ITF). For Export Express loans, an exception to policy may be approved by the D/ITF with the concurrence of the Director, Office of Credit Risk Management (D/OCRM). The D/FA or D/ITF may not approve an exception to policy if such exception would be inconsistent with a statute or regulation. A request for an exception to policy must be submitted to the LGPC. The LGPC will analyze the request and make a recommendation to the D/FA or D/ITF, as applicable or to an individual acting in that capacity, who will make the final decision (with the concurrence of the D/OCRM for Export Express loans). The decision must be documented in the appropriate Agency loan file. This procedure may only be used in situations where a minor deviation from standard policy is necessary for the specific situation. Exceptions to policy will be considered on a case-by-case basis and the decision will only apply to the specific request.

## CHAPTER 1: GENERAL DESCRIPTION OF THE 7(A) LOAN PROGRAMS

SBA is an agency of the Federal government that is authorized through the Small Business Act to guarantee loans made by lenders to eligible small businesses. (13 CFR Part 120)

## I.   LOAN PROCESSING DELIVERY METHODS

The Agency guarantees 7(a) Program Loans through various loan processing methods including:

   A.  Non-delegated Standard 7(a) Guaranty:

       1.  "7(a) Small Loans" up to and including $350,000

       2. Loans over $350,000 to $5,000,000

   B.  Preferred Lenders (PLP - delegated):

       1.  "7(a) Small Loans" up to and including $350,000

       2. Loans over $350,000 to $5,000,000

   C.  SBA Express (delegated)

   D.  Export Express (delegated)

   E.  Export Working Capital Program (EWCP) (non-delegated and delegated)

   F.  Community Advantage Pilot Program (non-delegated and delegated)

       1.  Loans up to and including $250,000

       2.  Policy covered by a separate Community Advantage Participant Guide.

## II.   USE OF 7(A) LOAN PROCEEDS

SBA loan proceeds may be used to finance any of the eligible uses of loan proceeds provided in Chapter 2 of this subpart, including:

   A.  Permanent working capital;

   B.  Revolving working capital;

   C.  Furniture and fixtures;

   D.  Machinery and equipment;

   E.  Purchase of land as part of an eligible project;

   F.  Purchase, construction, or renovations to buildings;

   G.  Business acquisition; and

   H.  Refinancing of existing debt

## III.  SPECIAL PURPOSE LOANS

Certain Special Purpose Loan programs are authorized under separate or special funding under SBA's budget. The following Special Purpose Loan programs as of the date of this SOP are authorized but are not funded:

A.  Disabled Assistance Loan (DAL);

B.  Loan Program for Low Income Individuals;

C.  The Veterans Loan Program;

D.  The 8(a) Participant Loan Program;

E.  Community Adjustment and Investment Program (CAIP);

F.  Defense Economic Transition Loan Program; and

G.  Defense Loan and Technical Assistance (DELTA).

Check with the local SBA Field Office or the 7(a) Loan Guaranty Processing Center (LGPC) to see if funding for these programs becomes available.

## IV.  DEFINITIONS APPLICABLE TO THE 7(A) LOAN PROGRAMS

The key definitions applicable to the 7(a) loan programs are set forth in 13 CFR §§103.1, 120.10, 120.420, 120.600, and 121.301.

## CHAPTER 2: ELIGIBILITY FOR 7(A) GUARANTY LOAN PROGRAM

### I.   INTRODUCTION

Determining whether or not or an Applicant is eligible for a loan guaranteed by the Small Business Administration is one of the most critical steps in the 7(a) lending process. Program eligibility should be determined as early as possible in the application process and properly documented.

This chapter addresses the program eligibility requirements that the Applicant must meet at the time of application and throughout loan closing and disbursement. The only exception to this is the size standard; please see the applicable section of this chapter for additional information.

The SBA's lending programs qualify as "Special-Purpose Credit Programs" under the Equal Credit Opportunity Act (ECOA). This regulation stipulates that information pertaining to the Applicant's marital status, sources of personal income, alimony, child support, and spouse's financial resources can be obtained and considered in determining program eligibility. Therefore, the Lender has the right to obtain the signature of an Applicant's spouse (whether an owner of the business or not) or other person on an application or credit instrument if it is required by Federal or State law.

### II.   ELIGIBILITY REQUIREMENTS FOR ALL 7(A) LOAN APPLICANTS

Eligibility requirements for all Applicants for SBA business loans are outlined in 13 CFR § 120.100 and are discussed below.

The Applicant must:

A. Be an Operating Business (except for Eligible Passive Companies). See further guidance on Eligible Passive Companies/Operating Companies (EPC/OC) at paragraph III.D below.

B. Be Organized for Profit. All Applicants must be organized for profit. Non-profit businesses are not eligible for SBA business loan assistance. For-profit subsidiaries of non-profits may be eligible.

1. In order to determine an Applicant's for-profit status, the Lender may review the Applicant's organizational documents, for example:

    a. Articles of Incorporation/ Organization (filed with the Secretary of State or similar department in the state where the Applicant is organized);

    b. Corporate bylaws and any amendments;

    c. Partnership Agreements;

    d. Association By-Laws; and/ or

    e. Tax Returns.

2. If all other eligibility requirements are met, 13 CFR 120.110(a) allows for-profit entities that are subsidiaries of a non-profit to be eligible for SBA assistance.

    a. The Lender must include the non-profit affiliate in determining size.

    b. The loan proceeds must be used exclusively for the benefit of the for-profit business.

     c.  If the non-profit affiliate owns 20% or more of the for-profit business but cannot or will not guarantee the loan, the for-profit business is not eligible for SBA assistance.

C.  Be Located in the United States (including its territories and possessions).

   1.  The Applicant must be located in the United States (including its territories and possessions) and:

     a.  Operate primarily in the U.S., its territories, or possessions; and

     b.  Be authorized to operate in the state, territory, or possession where it seeks SBA financial assistance;

       OR

     c.  Make a significant contribution to the U.S. economy through the payment of taxes to the U.S. or the use of American products, material, and labor.

   2.  If an Applicant has international operations, the loan proceeds must be used exclusively for the benefit of the domestic operations (as a result, the business and its employees are subject to U.S. and local taxes).

   3.  Businesses involved in international trade are subject to U.S. trade restrictions.

   4.  Businesses owned by non-U.S. citizens may be eligible. See Paragraph III.C of this chapter.

   5.  The Applicant may not be owned in whole or part by undocumented (illegal) aliens.

D.  Be Small Under SBA Size Requirements (13 CFR Part 121).

   1.  The Applicant alone (without affiliates) must not exceed the small business size standard for the industry in which the Applicant is primarily engaged, and the Applicant when combined with its affiliates, must not exceed the size standard designated for either the primary industry (defined in 13 CFR § 121.107) of the Applicant alone or the primary industry of the Applicant and its affiliates, whichever is higher. SBA calculates annual receipts for both the Applicant and its affiliates based on Federal tax returns (13 CFR § 121.104). The table of size standards is found at 13 CFR § 121.201.

   2.  Affiliation exists when one individual or entity controls, or has the power to control another or a third party or parties controls or has the power to control both. SBA considers factors such as ownership, management, and franchise, license or other agreements/relationships when determining whether affiliation exists.
     See 13 CFR § 121.301(f) for how SBA determines affiliation for business loan programs.

   3.  The applicable size standards are increased by 25 percent when the Applicant agrees to use all of the financial assistance within a labor surplus area (labor surplus areas are designated by the Department of Labor). (13 CFR § 121.301(e))

   4.  The Applicant business may qualify under either the industry small business size standards or the alternative size standard. To qualify under the alternative size standard, the Applicant (including affiliates) must meet the following:

     a.  The maximum tangible net worth may not exceed $15 million; and

     b.  The average net income after Federal income taxes (excluding any carry-over losses)

for the two full fiscal years before the application date may not exceed $5.0 million.

5. When size status of an Applicant is determined (13 CFR § 121.302).

    a. The size of an Applicant for SBA financial assistance is determined as of the date the application is accepted for processing by SBA. Changes in the size of the business subsequent to the applicable date when size is determined will not disqualify an Applicant for assistance.

    b. If the Applicant is an existing business and is using the proposed loan proceeds to acquire another business, the sizes of the two businesses combined is used to determine if the application for 7(a) loan assistance meets small business size standards.

    c. For applications processed under a Lender's delegated authority (PLP, PLP-EWCP, SBA Express, and Export Express), small business size is determined as of the date of approval of the loan by the Lender.

6. Formal size determinations.

    a. By signing the application, an Applicant is deemed to have certified that it is small under the applicable small business size standard. SBA or Lender may request additional information concerning the Applicant's size based on information supplied in the application or any other source. SBA or a delegated Lender may accept as true the size information provided by an Applicant, unless credible evidence to the contrary is apparent. (13 CFR § 121.303)

    b. Prior to denial of eligibility based on size, a formal size determination may be requested by an Applicant or the SBA official with authority to take final action on the assistance requested. (13 CFR § 121.1001(b)(1))

    c. The SBA official may also request a determination of whether affiliation exists between an Applicant for financial assistance and one or more other entities to determine whether the Applicant would exceed the maximum loan amount and maximum guaranty amount set out in 13 CFR § 120.151 and Chapter 3 of this Subpart.

    d. The request for a size or affiliation determination must be made to the Government Contracting Area Director serving the area in which the headquarters of the Applicant is located, regardless of the location of the parent company or affiliates.

7. Affiliation based on Management. (13 CFR § 121.301(f)(3))

    a. Affiliation arises where the CEO or President of the Applicant business (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one of more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the Applicant business through a management agreement.

    b.  Management agreements that give the management company sole discretion over the business operations with minimal oversight of the decision-making by the Applicant business, while not passive, create affiliation between the management company and the Applicant business. (For a discussion of management agreements that do result in a passive business, see Paragraph III.A.3. of this Chapter.) SBA has determined, however, that affiliation is not created between the Applicant business and the management company if the management agreement includes meaningful oversight by the Applicant business over the management company's activities.

    c.  "Meaningful oversight" by the Applicant business means involvement in the decisions made concerning the operation of the business, which include a management agreement that provides for the Applicant business to do all of the following:

        i.  Approve the annual operating budget;

        ii.  Approve any capital expenditures or operating expenses over a significant dollar threshold;

        iii.  Have control over the bank accounts; and

        iv.  Have oversight over the employees operating the business (who must be employees of the Applicant business).

8.  Franchise, License, Dealer, Jobber, and Similar Agreements:

While a relationship established under a license, jobber, dealer or similar agreement is not generally described as a "franchise" relationship, if such relationship meets the Federal Trade Commission's definition of a franchise, it is treated by SBA as a franchise for purposes of affiliation determinations in accordance with 13 CFR § 121.301(f)(5). All such relationships are referred to in this paragraph as "franchises," the agreements are referred to as "franchise agreements," and the parties to such agreements are referred to as "franchisor" and "franchisee."

The procedures described below apply to all agreements or relationships meeting the Federal Trade Commission definition of "franchise" in 16 CFR § 436. SBA will only consider franchise or license agreements of the Applicant business and not the franchise or license agreements of any other franchisee or licensee owned or controlled by the Applicant. (13 CFR § 121.301(f)(5))

    a.  The Federal Trade Commission definition of "franchise."

The Federal Trade Commission (FTC) definition of a "franchise" in 16 CFR § 436.1(h) states as follows:

Franchise means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller [franchisor] promises or represents, orally or in writing, that:

        i.  The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's

trademark;

ii.   The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

iii.  As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

Although exempt from FTC disclosure requirements, all agreements and relationships that are covered by the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. 2801 (e.g., gas stations, dealer/jobber agreements), are included within the FTC definition of "franchise" and are, therefore, subject to the procedures described below.

SBA is no longer excluding dealer agreements with new car manufacturers from affiliation determinations. Therefore, Applicants that are or will be operating under a dealer agreement with a new car manufacturer that meets the FTC definition of a franchise are subject to the procedures described below.

b.  The SBA Franchise Directory:

SBA has created the SBA Franchise Directory (the "Directory") of all franchise and other brands reviewed by SBA that are eligible for SBA financial assistance. The Directory will only include business models that SBA determines are eligible under SBA's affiliation rules and other eligibility criteria. **If the Applicant's brand meets the FTC definition of a franchise, it must be on the Directory in order to obtain SBA financing.** (To help minimize confusion over brands that may appear to be franchises but that do not meet the FTC definition, SBA will include such brands on the Directory at their request if they are eligible in all other respects.) **Lenders will be able to rely on the Directory and will no longer need to review franchise or other brand documentation for affiliation or eligibility.**

The Directory will be maintained on SBA's website at https://www.sba.gov/document/support-object-object-sba-franchise-directory. It will contain the following information:

i.   Whether the brand meets the FTC definition of a franchise;

ii.  The SBA Franchise Identifier Code, if applicable (a code will only be issued if the agreement meets the FTC definition of a franchise);

iii. Whether an addendum is needed and, if so, whether the franchisor will use the SBA Addendum to Franchise Agreement (SBA Form 2462) or an SBA Negotiated Addendum; and

iv.  Whether there are additional issues the Lender must consider with respect to the brand (e.g., documentation that the business will be open to all, review of any third party management agreement to ensure Applicant is not a passive business or affiliated with the management company in accordance with Paragraph D.7. above.).

Franchisors may always choose to use the SBA Addendum to Franchise Agreement (SBA Form 2462), even if they have an SBA Negotiated Addendum.

c. Use of the Directory by Lenders:

 i. For applications involving a franchise or similar relationship that meets the FTC definition of a franchise, before submitting the application to SBA for non-delegated processing or requesting an SBA Loan Number for delegated processing, Lender must check the Directory to determine if it includes the Applicant's brand.

   a) If the Applicant's brand is on the Directory, Lender may proceed with submitting the application to SBA or requesting an SBA Loan Number through E-Tran or SBA One.

   b) If the Applicant's brand is not on the Directory, for non-delegated loans, Lender cannot submit the application to the LGPC, or for delegated loans, Lender cannot submit a request for a loan number. See paragraph 8.d. below for the process to add brands to the Directory.

 ii. Exception for Applicants Operating under Multiple Agreements:

   a) When an Applicant operates under multiple agreements (i.e., multiple product lines), Lenders first must check the Directory to ensure all of Applicant's agreements that meet the FTC definition of a franchise are on the Directory. **If any of the Applicant's agreements that meet the FTC definition of a franchise are not on the Directory, the application cannot proceed.** If all such agreements are on the Directory, Lenders next must determine which agreement(s) is(are) "critical" to the Applicant's business operation. As a general rule, SBA considers an agreement to be "critical" if the agreement (or the products, services or trademarks covered by it) accounts, individually or together with other agreements of the applicant, for more than 50% of the applicant's revenues. Lenders only need to follow the Directory (i.e., obtain an addendum, as applicable) for the agreements that meet the FTC definition of a franchise AND are critical to the Applicant's business operation. For example, the Applicant business is a dealership that sells 10 different brands of boats under separate agreements for each brand of boat. First, the Lender must check the Directory for all of the Applicant's agreements that meet the FTC definition of a franchise. If, for example, 7 of the 10 agreements meet the FTC definition of a franchise, all 7 must be on the Directory for the application to proceed. Next, the Lender needs to determine which of the Applicant's 10 agreements are critical to the Applicant's business operation. In this example, if 5 of the 10 agreements together represent 51% of the applicant's revenues, those 5 agreements are considered critical. If 3 of the 5 critical agreements meet the FTC definition of a franchise, the Lender need only obtain an addendum, as identified on the Directory, for those 3 agreements.

   b) If one of the Applicant's brands or agreements has been determined by

SBA to be ineligible for SBA financial assistance, the loan cannot be processed, regardless of whether the brand or agreement meets the FTC definition of a franchise or is critical to the Applicant's business operation.

iii.   Exception for Applicants Operating under a Single, Non-critical Agreement: If the Applicant is operating under a single agreement that is not considered critical to the Applicant's business operation (i.e., it represents 50% or less of the applicant's revenues), then the Lender first must check the Directory to ensure that, if the Applicant's agreement meets the FTC definition of a franchise, it is on the Directory before processing the application. If the agreement meets the FTC definition of a franchise, but is not on the Directory, the application cannot proceed. For example, the Applicant business is an auto body shop that also rents trucks and trailers under an agreement. The rental of the trucks and trailers only represents 10% of the Applicant's revenues. The Lender must check the Directory to ensure that, if the agreement meets the FTC definition of a franchise, the agreement is on the Directory, but the Lender does not need to obtain an addendum for that agreement. If the agreement is not listed on the Directory and the Lender determines that the agreement does not meet the FTC definition of a franchise, the Lender must determine the brand is eligible (e.g., does not have discriminatory hiring practices) before proceeding with the application. SBA will review this decision at time of application for non-delegated applications and at time of purchase or when conducting lender oversight activities for delegated applications. SBA will make the final determination for non-delegated applications. The delegated Lender bears the risk of an incorrect determination on a delegated application.

d.   Procedure to add brands to the SBA Franchise Directory:

i.   To add its brand to the Directory, Franchisor must submit the agreement, Franchise Disclosure Document (FDD) if applicable, and all other documents the franchisor requires the franchisee to sign to [franchise@sba.gov](mailto:franchise@sba.gov) for an affiliation and eligibility determination. If the documents are submitted to SBA by someone other than the Franchisor, contact information for the Franchisor (name and email address only) must be included in the email.

   a)   If the franchisor agrees to use SBA Form 2462, SBA will only conduct an eligibility review and will not conduct an affiliation review.

   b)   If the franchisor elects not to use SBA Form 2462, SBA will work with the franchisor to resolve any affiliation issues, including through the use of an SBA Negotiated Addendum, if necessary. Franchisors electing this option will be reviewed by SBA in the order in which their documents are received.

ii.   Upon completion of SBA's review and a determination by SBA that the brand is eligible, SBA will list the brand on the Directory, along with an indication of the type of Addendum being used, if necessary, and will assign an SBA Franchise Identifier Code. If SBA determines that the brand does not meet the

FTC definition of a franchise, SBA will list the brand on the Directory but will indicate that it is not a franchise and SBA will <u>not</u> assign an SBA Franchise Identifier Code.

e.  Annual Certification from Franchisor:

For those franchises listed on the Directory that either do not need an addendum or are using an SBA Negotiated Addendum, in order to continue using no addendum or using an SBA Negotiated Addendum, the franchisor must submit to SBA each year the "Annual Franchisor Certification" (SBA Form 2464, the "Certification"). The Franchisor must submit the Certification as soon as it issues an updated agreement, but in no event later than April 30 of each year. If the Certification is not received by SBA by April 30, the Franchisor must use the SBA Addendum to Franchise Agreement (SBA Form 2462) for all SBA-guaranteed loans. (For brands listed on the Directory as using SBA Form 2462, no certification is required to remain on the Directory.) This certification is provided by the Franchisor to SBA annually. Lenders do not need to obtain SBA Form 2464 or provide it to SBA.

The Certification requires a duly authorized representative of the Franchisor with the authority to sign the Certification to represent that:

i.  The terms of Franchisor's current agreement that relate to control by the Franchisor of its franchisees (resulting in a determination by SBA of affiliation between the Franchisor and its franchisees, as defined in 13 CFR Part 121 and SBA's Standard Operating Procedure 50 10) have not substantively changed from those appearing in the most recent franchise agreement reviewed by SBA for placement on the Directory; and

ii.  If the Franchisor is using an SBA Negotiated Addendum, no changes have been made to its SBA Negotiated Addendum.

If the Franchisor cannot certify as required or would like to change its addendum, the Franchisor will have to follow the procedures in paragraph 8.d) above to add brands to the Directory.

To ensure the effectiveness of the certification process, SBA intends to inspect, on a periodic basis, a sample of updated franchise agreements where a Certification has been submitted. Therefore, SBA may request from the Franchisor copies of the current franchise agreement and related documents.

f.  Issues that Result in Affiliation:

SBA has determined that each of the following provisions in a franchise agreement results in affiliation between a franchisor and a franchisee:

i.  Transfer or Change of Ownership;

    a)  Franchisor has the option or right of first refusal (ROFR) to purchase an interest in the franchise and become a partial owner of the Franchisee.

    b)  Franchisor's consent to the sale or transfer of any interest in the franchise (full or partial) is based on the Franchisor's "sole discretion" or the

agreement is silent on the standard for consent.

   c) Franchisee remains liable for the actions of the transferee after transfer of the franchise.

ii.   Sale of Assets;

   a) Franchisor or an appraiser selected by the Franchisor solely controls the valuation of assets when the Franchisor has the option or ROFR to purchase assets, including real estate, upon default or termination of agreement.

   b) Franchisor has the right to force the Franchisee to sell the Franchisee's real estate upon default or termination of agreement.

iii.   Covenants or Use Restrictions; and

Franchisor has recorded or has the right to record against the Franchisee's real estate any restrictive covenants, branding covenants or environmental use restrictions (e.g., restricting the use of the property upon sale).

iv.   Control of Employees.

   a) Franchisor has the authority to directly control (hire, fire or schedule) Franchisee's employees.

   b) For temporary personnel franchises, Franchisor (not the Franchisee) employs the temporary employees.

If a franchise agreement contains any of the provisions identified above, the franchisor will be required to execute either SBA Form 2462 or an SBA Negotiated Addendum approved by SBA to resolve the affiliation issues. By executing the applicable addendum, the franchisor agrees that any provision identified above that is represented in the franchise agreement, or any other document the franchisor requires the franchisee to sign, will not be enforced against the franchisee during the life of the SBA-guaranteed loan.

g.   Procedure to Submit Franchise Loan Applications:

i.   For non-delegated loans:

   a) If the Applicant's brand meets the FTC definition of a franchise, Lender must identify the name of the franchise and the SBA Franchise Identifier Code when entering the application into E-Tran or SBA One.

   b) No other franchise documentation must be submitted to the LGPC with the application.

   c) The LGPC will confirm that the brand is listed on the Directory.

   d) If the Lender determines that the Applicant's brand does not meet the FTC definition of a franchise, and it is not on the Directory, then the Lender needs to explain its determination in its credit memorandum when submitting the application to the LGPC and provide the agreement and

any additional documentation required by the brand for SBA's review and final determination.

ii.  For delegated loans:

a)  If the Applicant's brand meets the FTC definition of a franchise, Lender must document in its file that the Applicant's brand is on the Directory and identify the name of the franchise and SBA Franchise Identifier Code when entering the request for loan number into E-Tran or SBA One.

b)  Lender will need to submit the documentation showing that the Applicant's brand is on the Directory with any guaranty purchase request.

c)  *If the Applicant's brand is not on the Directory and the delegated Lender determines the brand does not meet the FTC definition and proceeds with approving the loan under its delegated authority, SBA will review this decision at time of purchase or when conducting lender oversight activities and the delegated Lender bears the risk of an incorrect determination.*

iii.  When an Applicant operates under multiple brands, the Lender must enter the SBA Franchise Identifier Code for the brand that generates the largest amount of the Applicant's revenue when entering the application or request for a loan number in E-Tran or SBA One. The Lender must identify all other brands and their SBA Franchise Identifier Codes (if applicable) in the Lender's credit memorandum, and must identify which of the Applicant's brands are critical to the Applicant's business operation, including an explanation of the basis for that determination (e.g., a breakdown of revenue by brand). (See paragraph 8.c above for further guidance on Applicants with multiple brands.)

a)  For non-delegated loans, the LGPC will confirm that all of the Applicant's brands are eligible for SBA financial assistance and those that meet the FTC definition of a franchise that are critical to the Applicant's business operation are on the Directory.

b)  For delegated loans, the delegated Lenders must document in its file that all of the Applicant's brands are eligible for SBA financial assistance and those that meet the FTC definition of a franchise that are critical to the Applicant's business operation are on the Directory. Delegated Lenders will be required to submit this supporting documentation to SBA with any guaranty purchase request and SBA will review this documentation when conducting lender oversight activities.

iv.  If the Applicant franchisee has multiple locations and each location operates under a separate franchise agreement, each location (i.e., each agreement) must have its own SBA Form 2462 or an SBA Negotiated Addendum, if applicable.

v.  If the Applicant applies for further assistance under an agreement that already has an executed addendum, Lender will not need to obtain a new addendum in connection with the subsequent application for financial assistance.

vi.   For all 7(a) loans, prior to any disbursement of loan proceeds, the Lender must obtain a copy of the executed franchise agreement, the executed SBA Form 2462 or SBA Negotiated Addendum (if applicable), and any other document the franchisor requires the franchisee to sign. The Lender must obtain the SBA Negotiated Addendum directly from the Franchisor. (While it is prudent for the Lender to review the Franchise Disclosure Document, as it contains financial information on the franchise brand, it is not necessary for the Lender to retain a copy in its file.) In order to ensure the Lender obtained the required documents and the documents were properly executed, SBA may review these documents when conducting Lender oversight activities and they must be provided with any request for SBA to honor the guaranty on a defaulted 7(a) loan.

h.   Applications involving an applicant franchisor:

If the Applicant is a franchisor, it must together with all affiliates not exceed the size standard designated for either the primary industry of the Applicant alone or the primary industry of the Applicant and its affiliates, whichever is higher. A franchisor's relationship with its franchisees under a franchise agreement must be considered when making a size determination. If affiliation is found between a franchisor and its franchisees based on the franchise agreement, the Franchisor may execute a global addendum to resolve any affiliation issue(s) with respect to all agreements with its franchisees. To request a determination of affiliation and, if necessary, obtain a franchisor global addendum for a franchisor Applicant, please contact franchise@sba.gov.

i.   Applications involving Franchise Development Agreements or Area Development Rights:

Franchise Development Agreements (also known as a "Master Franchise Agreements") provide the developer with a geographic area with which to establish additional franchise units. These additional franchise units are owned and operated by other franchisees, and the developer's income is derived from the royalty payments from each franchisee in the developer's geographic territory. Based on those features, these agreements have been determined to be passive and, therefore, an applicant franchisee that is or will be operating under a Franchise Development Agreement is not eligible for SBA financial assistance.

If an Applicant franchisee has an affiliate that operates under an ineligible Franchise Development Agreement, the Applicant franchisee may be eligible for SBA financial assistance, provided that the Applicant and its affiliates are small and no SBA loan proceeds are used for the benefit of the ineligible affiliate franchise developer.

An Applicant franchisee that is or will be operating under a franchise agreement that provides the franchisee with the right to develop additional units that the franchisee or its affiliates own and operate within its territory ("area development rights" or "Multi-Unit Franchise Agreement"), however, may be eligible provided that the applicant and its affiliate franchise units is small.

    j.  Applicants with Management Agreements:

       i.  If the applicant will be using a management agreement, for non-delegated loans, Lender must submit the management agreement to the LGPC to determine if it creates affiliation between the Applicant and the management company or results in a passive business. The SBA Franchise Team does not review management agreements and such agreements will not be included on the SBA Franchise Directory.

       ii.  If a delegated Lender is processing the loan under its delegated authority, the Lender must review the management agreement to determine if it creates affiliation between the Applicant and the management company or results in a passive business. SBA will review this decision at time of purchase or when conducting lender oversight activities and the delegated Lender bears the risk of an incorrect determination.

       iii.  If the Applicant franchisee is operating under a management agreement where the management company is, or is affiliated with, the franchisor, the Applicant is not eligible. Such a relationship does not result in the franchisee operating as an independent small business.

       iv.  See paragraph II.D.7 of this Chapter for guidance on affiliation based on management and paragraph III.A.3 of this Chapter for guidance on passive businesses.

    k.  Questions on SBA's Franchise Policy, Requests for Reconsideration and Appeals:

       i.  Questions on SBA's Franchise Policy should be directed to franchise@sba.gov.

       ii.  Franchisors that would like to appeal SBA's decision not to place them on the Directory may do so by forwarding a copy of the decision, along with an explanation of how the determination is perceived to be inconsistent with SBA Loan Program Requirements, to franchise@sba.gov. Franchise appeals will be reviewed by the SBA Franchise Committee comprised of OFA and OGC personnel.

       iii.  The Franchise Committee will refer agreements involving businesses that may be engaged in promoting religion, that may have activities of a prurient nature, or that appear to cater to one gender to the Associate General Counsel for Litigation for a final Agency decision. There is no right of appeal to the Franchise Committee.

E.  Demonstrate the Need for Desired Credit (Credit not available elsewhere). (13 CFR § 120.101)

    1.  The Lender must certify that the Applicant does not have the ability to obtain some or all of the requested loan funds on reasonable terms from non-Federal, non-State, or non-local government sources, including from the Lender, without SBA assistance. If the Applicant's cash flow and collateral, including the adequacy of any third party guaranty, would cause the Applicant's loan to meet the conventional credit standards of the Lender, an SBA

guaranty is not available for the loan. Failure of the Lender to adequately address the Applicant's need for the desired credit in the credit memorandum may result in SBA denying the application submitted under non-delegated processing or denying liability on the guaranty if the application is approved by a Lender under its delegated authority.

2. The Lender must include in its credit memorandum:

   a. A determination that some or all of the loan is not available from any of the following sources:

      i.   The liquidity of owners of 20% or more of the equity of the Applicant, their spouses and minor children, and the Applicant itself; or

      ii.  Conventional lenders or other non-Federal, non-State, or non-local government sources of credit. (Note: This includes any commitment by a third party to provide financial assistance to the Applicant business in the event of a delinquency or default on a payment (e.g., a commitment by a franchisor or licensor to provide financial assistance to the franchisee or licensee).)

   b. Substantiation that credit is not available elsewhere by discussing acceptable factors that demonstrate an identifiable weakness in the credit. Lender must include the specific reasons why the Applicant does not meet the Lender's conventional loan policy requirements. Acceptable factors that demonstrate an identifiable weakness in the credit or exceed policy limits of the Lender include, among others:

      i.   The business needs a longer maturity than the Lender's policy permits to reasonably assure the ability of the loan applicant to repay the debt from the actual or projected cash flow of the business (for example, the business needs a loan that is not on a demand basis);

      ii.  The requested loan exceeds the Lender's policy limit regarding the amount that it can lend to one customer;

      iii. The collateral does not meet the Lender's policy requirements;

      iv.  The Lender's policy normally does not allow loans to new businesses (e.g., a business that has been in operation for a period of not more than 2 years) or businesses in the Applicant's industry; and/or

      v.   Any other factors relating to the particular credit (such as business and personal credit history) that, in the Lender's opinion, cannot be overcome except for the guaranty. These other factors must be specifically documented in the loan file.

3. The Lender may not rely on the following factors as the sole basis to demonstrate that the Applicant does not have credit available elsewhere:

   a. The fact that the liquidity of the Lender depends upon the guaranteed portion of the loan being sold on the secondary market; or

   b. The guaranty will allow the Lender to exceed its legal lending limit.

4. The Lender may not rely in any manner on the following factors to demonstrate that the

Applicant does not have credit available elsewhere:

    a.  The maintenance or improvement of the Lender's rating or performance evaluation under the Community Reinvestment Act (CRA) or its implementing regulations; or

    b.  The improvement of the Lender's collateral lien position.

## III. INELIGIBLE TYPES OF BUSINESSES

  A.  The Lender must determine whether the Applicant is one of the types of businesses listed as ineligible in SBA regulations (13 CFR § 120.110). Certain business types appearing on this list may be eligible under limited circumstances, as discussed below.

    1.  Businesses organized as a non-profit are ineligible (for-profit subsidiaries may be eligible). (13 CFR § 120.110 (a))

    2.  Businesses Engaged in Lending (13 CFR § 120.110 (b)).

        a.  SBA cannot guarantee a loan that provides funds to businesses primarily engaged in lending, investments, or to an otherwise eligible business engaged in financing or factoring. This prohibits SBA loans to:

           i.  Banks;

           ii.  Life Insurance Companies (but not independent agents);

           iii.  Finance Companies;

           iv.  Factoring companies;

           v.  Investment Companies;

           vi.  Bail Bond Companies; and

           vii.  Other businesses whose stock in trade is money.

        b.  The limited circumstances under which certain businesses engaged in lending may be eligible are as follows:

           i.  A pawn shop that provides financing is eligible if more than 50% of its revenue for the previous year was from the sale of merchandise rather than from interest on loans.

           ii.  A business that provides financing in the regular course of its business (such as a business that finances credit sales) is eligible, provided less than 50% of its revenue is from financing its sales.

           iii.  A mortgage servicing company that disburses loans and sells them within 14 calendar days of loan closing is eligible. Mortgage companies primarily engaged in the business of servicing loans are eligible. Mortgage companies that make loans and hold them in their portfolio are not eligible.

           iv.  A check cashing business is eligible if it receives more than 50% of its revenue from the service of cashing checks.

           v.  A business engaged in providing the services of a financial advisor on a fee basis is eligible provided they do not use loan proceeds to invest in their own

portfolio of investments.

3. Passive Businesses (13 CFR § 120.110(c)):

    a. Passive businesses owned by developers and landlords that do not actively use or occupy the assets acquired or improved with the loan proceeds (except as Eligible Passive Companies under 13 CFR § 120.111) are not eligible.

    b. Businesses primarily engaged in subdividing real property into lots and developing it for resale on its own account are not eligible.

    c. Businesses that are primarily engaged in owning or purchasing real estate and leasing it for any purpose are not eligible. For example, shopping centers, salon suites, and similar business models that generate income by renting space to accommodate independent businesses that provide services directly to the public are not eligible.

    d. Businesses that lease land for the installation of a cell phone tower, solar panels, billboards, or wind turbine also are not eligible. However, the business operating the cell phone tower, solar panel, billboard, or wind turbine is eligible.

    e. Businesses that have entered into a management agreement with a third party that gives the management company sole discretion to manage the operations of the business, including control over the employees, the finances and the bank accounts of the business, with no involvement by the owner(s) of the Applicant business, are not eligible. (See paragraph II.D.7 of this chapter for additional guidance on management agreements.)

    f. Apartment buildings and mobile home parks are not eligible.

    g. Residential facilities that do not provide healthcare and/or medical services are not eligible.

    h. The limited circumstances under which certain businesses engaged in renting or leasing may be eligible are as follows:

        i. Hotels, motels, recreational vehicle parks, marinas, campgrounds, or similar types of businesses are eligible if more than 50% of the business's revenue for the prior year is derived from transients who stay for 30 days or less at a time and the business complies with all zoning and other legal requirements. If the Applicant is a start-up, the Applicant's projections must show that more than 50% of the business's revenue will be derived from transients who stay for 30 days or less at a time.

        ii. Businesses that are licensed as nursing homes or assisted living facilities and provide healthcare and/or medical services are eligible.

        iii. Businesses that are engaged in leasing equipment, household goods or other items are eligible. (See subparagraph A.2 above regarding the eligibility of businesses engaged in lending.)

        iv. Businesses such as barber shops, hair salons, nail salons, and similar types of personal services businesses are eligible, regardless of whether they have

employees or contract with individuals to provide the services. (See subparagraphs a) and c) above regarding ineligibility of developers and landlords.)

    i.   An ineligible passive business cannot obtain an SBA loan for any purpose, including the purchase or construction of a building for its own use.

4.   Life Insurance Companies (13 CFR § 120.110(d)):

    a.   Life insurance companies are not eligible.

    b.   A life insurance agent may qualify as an eligible independent contractor if the business meets all of the following factors:

        i.   The insurance agent is not subject to the control or direction of another agent in conjunction with the sale and servicing of life insurance;

        ii.   The insurance agent has full discretion over the means and method for rendering services;

        iii.   The insurance agent hires, supervises and pays employees needed to perform his or her services;

        iv.   The insurance agent performs services at his or her own place of business rather than at the life insurance company's place of business;

        v.   The insurance agent is paid by the job or on a commission basis, rather than by the hour, week or month;

        vi.   The insurance agent is responsible for paying his or her own business expenses;

        vii.   The insurance agent provides a significant amount of his or her own personal resources and other equipment, even if the insurance company provides some forms, manuals, or other materials;

        viii.   The insurance agent invests in facilities that are used in performing services and are not typically maintained by employees (such as the maintenance of an office rented at fair market value from an unrelated party); and

        ix.   The insurance agent can realize a profit or incur a loss as a result of his or her services.

5.   Business Located in a Foreign Country or Owned by Undocumented (Illegal) Aliens (13 CFR § 120.110 (e))

    a.   Businesses are not eligible for SBA assistance if the business is:

        i.   Located in a foreign country with no activities in the United States; or

        ii.   Owned in whole or in part by undocumented (illegal) aliens.

    b.   Businesses owned by non-U.S. citizens may be eligible. See paragraph III.C of this Chapter for details.

6.   Businesses Selling Through a Pyramid Plan (13 CFR § 120.110(f))

Pyramid or multilevel sales distribution plans are not eligible for SBA assistance.

7. Businesses Engaged in Legal Gambling Activities (13 CFR § 120.110(g))

   a. Small businesses that obtain more than one-third of their annual gross revenue for the prior year, including rental income, from legal gambling activities are not eligible.

   b. If the purpose of the business is gambling, such as a pari-mutuel betting racetrack or a gambling casino, the business is not eligible, regardless of the percentage of gross revenue derived from gambling.

   c. Circumstances exist in which businesses engaged in legal gambling activities may be eligible, including if the Applicant obtains one-third or less of their annual gross revenue, including rental income, from:

      i. Commissions from official State lottery ticket sales under a State license; or

      ii. Gambling activities licensed and supervised by a state authority in those states where the activities are legal.

8. Businesses Engaged in any Illegal Activity (13 CFR § 120.110 (h))

   a. SBA must not approve loans to Applicants that are engaged in illegal activity under federal, state, or local law. This includes Applicants that make, sell, service, or distribute products or services used in connection with illegal activity, unless such use can be shown to be completely outside of the Applicant's intended market.

   b. Marijuana-Related Businesses:

      i. Because federal law prohibits the distribution and sale of marijuana, financial transactions involving a marijuana-related business would generally involve funds derived from illegal activity. Therefore, businesses that derive revenue from marijuana-related activities or that support the end-use of marijuana may be ineligible for SBA financial assistance.

      ii. Whether a business is eligible is determined by the nature of the business's specific operations. The following businesses are ineligible:

         a) "Direct Marijuana Business" -- a business that grows, produces, processes, distributes, or sells marijuana or marijuana products, edibles, or derivatives, regardless of the amount of such activity. This applies to recreational use and medical use even if the business is legal under local or state law where the applicant business is or will be located.

         b) "Indirect Marijuana Business" -- a business that derived any of its gross revenue for the previous year (or, if a start-up, projects to derive any of its gross revenue for the next year) from sales to Direct Marijuana Businesses of products or services that could reasonably be determined to aid in the use, growth, enhancement or other development of marijuana. Examples of Indirect Marijuana Businesses include businesses that provide testing services, or sell or install grow lights, hydroponic or other

specialized equipment, to one or more Direct Marijuana Businesses; and businesses that advise or counsel Direct Marijuana Businesses on the specific legal, financial/accounting, policy, regulatory or other issues associated with establishing, promoting, or operating a Direct Marijuana Business. However, for purposes of illustration, SBA does not consider a plumber who fixes a sink for a Direct Marijuana Business or a tech support company that repairs a laptop for such a business to be aiding in the use, growth, enhancement or other development of marijuana.

Indirect Marijuana Businesses also include businesses that sell smoking devices, pipes, bongs, inhalants, or other products if the products are primarily intended or designed for marijuana use or if the business markets the products for such use.

    iii.   Consistent with the Agriculture Improvement Act of 2018 (Public Law No. 115-334), a business that grows, produces, processes, distributes or sells products made from hemp (as defined in section 297A of the Agricultural Marketing Act of 1946) is eligible.

9.   Businesses Which Restrict Patronage (13 CFR § 120.110(i) and 13 CFR § 113.3(a))

    a.   Businesses that restrict patronage for any reason other than capacity are not eligible. For example, a men's or women's only health club is not eligible, whether the business is a franchise or not.

    b.   Circumstances exist in which certain businesses, like fitness centers that market to one gender, may be eligible if they permit both men and women to join and/or use the facility. Lenders must document the file with the following:

        i.   Affidavit signed by the Applicant that the business is open to both men and women; and

        ii.   Evidence that the facility is open to both men and women, such as appropriate bath/locker rooms, or documented membership demographics.

10.  Government-Owned Entities, Excluding Native American Tribes (13 CFR § 120.110(j))

    a.   Businesses owned by municipalities and other political subdivisions are not eligible.

    b.   Special Requirements Applicable to Native American Businesses:

        i.   A Native American tribe is a Governmental entity and is not eligible.

        ii.   A small business which is owned in whole or in part by either a State or federally-recognized Native American Tribe may be eligible, provided the small business meets all other criteria set forth in SBA Loan Program Requirements and:

           a)  Establishes that it is a separate legal entity from the tribe and submits the documents authorizing its existence; and

           b)  For federally recognized tribes, the tribe waives sovereign immunity with respect to the collateral pledged for the loan, and collection of the loan

from the Applicant, OR agrees to a "sue and be sued" clause specifically naming U.S. Federal courts as "courts of competent jurisdiction."

    c)  Tribes that are recognized only by a state do not have sovereign immunity. Therefore, the requirement identified in paragraph ii.b) above is not applicable.

  c.  Lenders may seek the advice and assistance of the Bureau of Indian Affairs (BIA) personnel when dealing with loans collateralized by Indian lands held in trust.

11. Businesses Engaged in Promoting Religion ([13 CFR § 120.110 (k)](#))

  a.  If it appears an Applicant may be connected, associated or affiliated with a religious organization, or may have a religious component, the Lender must complete the Religious Eligibility Worksheet ([SBA Form 1971](#)). Any questions regarding this worksheet may be addressed to local SBA Counsel.

  b.  Prior to submitting an application to the LGPC (non-delegated) or requesting a loan number (delegated), the Lender must submit the completed worksheet and supporting documentation to the Associate General Counsel for Litigation at [Form1971Review@sba.gov](mailto:Form1971Review@sba.gov) for a final Agency decision on eligibility. Such supporting documentation includes, but is not necessarily limited to, Lender's Credit Memorandum; the Applicant's business plan; any mission statement of the Applicant; and, where applicable, a detailed statement of Applicant's curriculum. SBA may request additional documentation as needed to complete the eligibility review. Upon approval by SBA, Lender may proceed to submit the application to the LGPC (non-delegated) or process the loan under its delegated authority. For non-delegated applications, the Lender must submit a copy of SBA's approval to the LGPC with the application. The delegated Lender must retain the worksheet, supporting documentation, and evidence of SBA's approval in its loan file and must submit all of the foregoing to SBA with any request for guaranty purchase. SBA also may review the worksheet and supporting documentation when conducting Lender oversight activities.

  c.  An Applicant is not ineligible merely because it offers religious books, music, ceremonial items and other religious articles for sale.

12. Businesses Engaged in SBA Loan Packaging ([13 CFR § 120.110(m)](#))

An Applicant that receives more than one third of its gross annual revenue from packaging SBA loans, including as a Lender Service Provider, is not eligible.

13. Businesses with an Associate of Poor Character ([13 CFR § 120.110(n)](#))

The Agency requires that every proprietor, general partner, officer, director, managing member of a limited liability company (LLC), owner of 20% or more of the equity of the Applicant, Trustor (if the Applicant is owned by a trust), and any person hired by the Applicant to manage day-to-day operations ("Subject Individual") must be of good character.

A Subject Individual may not reduce his/her ownership in an Applicant business within 6 months prior to the date of the application for the purpose of avoiding compliance with this

section. The only exception to the 6-month rule is when a Subject Individual completely divests his/her interest prior to the date of application. Complete divestiture includes divestiture of all ownership interest and severance of any relationship with the Applicant (and any associated Eligible Passive Company) in any capacity, including being an employee (paid, unpaid, or contracted).

The Agency cannot provide financial assistance to businesses with Associates who are:

a.  Incarcerated, on probation, or on parole, (an individual with a deferred prosecution, conditional discharge, order of protection, or who is on a sex offender registry is treated as if the individual is on probation or parole); or

b.  Currently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction.

The character evaluation process to determine eligibility under this section begins with Subject Individuals answering the applicable questions on SBA Form 1919, "Borrower Information Form" or the EIB-SBA Joint Form 84-1 for Export Working Capital Loans.

*(NOTE: A Subject Individual must respond "Yes" even when the individual believes the record is sealed, expunged or otherwise unavailable. Lenders must keep this information private and confidential. There are no exceptions or waivers to this policy.)*

a.  If all Subject Individuals respond "No" to Questions 17, 18, and 19 on SBA Form 1919 or Questions C.2.e.1, 2, or 3 on the EIB-SBA Joint Form 84-1, the SBA 7(a) loan application may be processed and the SBA Form 912, "Statement of Personal History" is not required.

b.  If any Subject Individual responds "Yes" to Question 17 on SBA Form 1919 or indicates in response to Question C.2.e.1 on the EIB-SBA Joint Form 84-1 that the Subject Individual is currently under indictment, etc., the Applicant is not eligible for an SBA 7(a) loan.

c.  If any Subject Individual is currently on parole or probation (including probation before judgment), the Applicant is not eligible for an SBA 7(a) loan.

d.  If any Subject Individual responds "Yes" to Questions 18 or 19 on SBA Form 1919 or Question C.2.e.2 or C.2.e.3 on the EIB-SBA Joint Form 84-1, a character determination for the Subject Individual is required to establish eligibility under this section as follows:

   i.  SBA Form 912 Package:

       The Subject Individual must provide the Lender with a complete SBA Form 912 Package, which must include:

       a)  A completed SBA Form 912, signed and dated within 90 days of submission to SBA; and

       b)  A detailed written statement, which is separately signed and dated by the Subject Individual, describing the events and circumstances of any "Yes" response, which must include the following:

     i)   Date(s) of each offense;

     ii)  City or county and State where the offense(s) occurred;

     iii) The specific charge(s) and final conviction(s) (e.g. DUI, assault, forgery, etc.) and the level of each charge and conviction (either a misdemeanor or felony); and

     iv) Disposition of the charge(s) and conviction(s), including all sentencing, conditions, or requirements of the court. This includes conditions, such as registration on the Sex Offenders Registry, which provides for incarceration upon failure to comply with the conditions.

c) Court documentation evidencing that any sentencing or other conditions of the court have been met. If sentencing and other conditions of the court have not been satisfied, then the Applicant is not eligible.

     i)   Court documentation may include but is not limited to:

        (a)   Evidence of the status (paid/unpaid) of fines or restitution imposed;

        (b)   Evidence of attendance or completion of any class or workshop required by the court;

        (c)   Jail time served; or

        (d)   If applicable, the terms of probation including evidence and dates of successful conclusion of the probation.

     ii)  If court documentation is not available, the Subject Individual must submit:

        (a)   A written statement from the applicable court indicating documents are not available; and

        (b)   Verification that there are no outstanding warrants, unpaid fines, or other conditions of the court that have not been satisfied.

ii.    Character Determination by the Lender:

The Lender may process the application without review of the [SBA Form 912] Package by SBA if the Lender determines upon review of the court's disposition that the case(s) resulted in:

a) One or multiple misdemeanor convictions whose conditions were met more than 6 months prior to receipt of the application, and the convictions did not involve a crime against a minor (for example, child abuse or endangerment, possession of child pornography, etc.);

b) Reduction of the original felony charge(s) to misdemeanor(s); or

c) Dismissal of the charges.

The Lender must retain the supporting information and court documentation, including the original complete SBA Form 912 Package in the file for the life of the loan.

iii. Circumstances Requiring an FBI Fingerprint Background Check and a Character Determination by SBA:

The Lender must submit to SBA a copy of the complete SBA Form 912 Package for a background investigation by SBA and the Subject Individual must complete an FBI Fingerprint Background Check in accordance with the following paragraph if the Lender determines upon review of the court's disposition that the case(s) resulted in:

a) Felony conviction(s);

b) Misdemeanor conviction(s) within 6 months of the date of the loan Application;

c) Charge(s) filed and final disposition against the Subject Individual has been completed within 6 months of the date of the loan Application; and/or

d) Misdemeanor conviction(s) for crime(s) against a minor (for example, child abuse or endangerment, possession of child pornography, etc.).

**The Lender may not disburse the loan until it has received written clearance from SBA.**

iv. FBI Fingerprint Background Check:

SBA will conduct FBI fingerprint background checks via submission of the Form FD-258 (fingerprint card) or electronic fingerprint submission (if available) to the FBI. "Electronic fingerprint submission" means fingerprints taken and reproduced in a machine-readable format by a fingerprint capture system that complies with the FBI's Electronic Biometric Transmission Specifications. An electronic fingerprint submission must be compatible with the FBI's Automated Fingerprint Identifications System, or any successor system in place for biometric identification. The electronic fingerprint submission will generally be in paper format as produced by the fingerprint capture system, which an individual may attach to SBA Form 912 to expedite character check procedures. When using electronic fingerprint submission, check local requirements, as some localities require individuals to bring one or more Forms FD-258 to facilitate the electronic submission. Where an electronic fingerprint submission is not locally available, Form FD-258 may be used. Local law enforcement agencies will usually assist the individual with the fingerprinting. Lenders may obtain the Form FD-258 from the local SBA Field Office or order the cards from the FBI's website at: https://www.fbi.gov/services/cjis/fingerprints-and-other-biometrics/ordering-fingerprint-cards-and-training-aids.

v. Lender Submission to SBA:

Lenders submit completed SBA Form 912 Packages to SBA via overnight mail or courier to: 409 3rd Street, SW., Washington, DC 20416. SBA Form 912 Packages with electronic fingerprint submissions may be submitted via email to: oca912@sba.gov.

The Lender's submission to SBA must include a coversheet with the Lender's contact information (Lender name, point of contact, title, phone number, email, and mailing address). (NOTE: If any form is incomplete or illegible, the SBA Form 912 Package will be screened out and returned to the Lender.)

vi.   Character Determination by SBA

The Director, Office of Financial Assistance (D/FA), or designee, will make the character determination as follows:

a) Based on the information received from the FBI fingerprint check, OCA will determine either that the Subject Individual has good character, or is not eligible for SBA financial assistance; and

b) OCA will advise the Lender in writing of the Agency's character determination.

vii.   File Retention: Lenders must retain a copy of the Agency's character determination in their loan file for the life of the loan.

e.   If the Subject Individual was cleared by the D/FA or designee on a previous application submitted within 6 months of the date of the current application and the Subject Individual certifies that no other offenses have occurred since the previous application was cleared by the D/FA or designee, non-delegated Lenders may submit a copy of the prior clearance and the Subject Individual's certification with the application. A Delegated Lender processing a loan under its delegated authority must retain this documentation in the loan file and may proceed to process the application.

f.   912 Decision Appeals: A Subject Individual may request a reconsideration of an adverse character determination within 6 months of the date of SBA's decision.

i.   Any request for reconsideration must include additional information or documentation supporting the request to reconsider the adverse character determination. Factors that contribute to a favorable reconsideration include:

a) Additional information provided by the Subject Individual that satisfactorily explains the circumstances of the prior offense(s);

b) The passage of time between the date of the disclosed offense(s) and the date of the application, during which the Subject Individual has not committed additional offenses and has generally led a responsible life and made a contribution to the community; and/or

c) Any additional law enforcement and/or court documentation that supports the request.

ii.   The request for reconsideration should be submitted through the Lender to SBA, either via email to: oca912@sba.gov, or via overnight mail to: U.S.

Small Business Administration, Office of Capital Access, Attn: 912 Processing, 409 3rd Street SW, 8th Floor, Washington, DC 20416.

   iii.   The Lender's submission to SBA must include a coversheet with the Lender's contact information (Lender name, point of contact, title, phone number, email, and mailing address).

14. Equity Interest by Lender or Associates in Applicant Concern (13 CFR § 120.110(o))

   a.   A Lender or any of its Associates, may not obtain an equity interest, either directly or indirectly, in the Applicant.

   b.   The only exception is when the Associate of the Applicant is a Small Business Investment Company (SBIC), in which case the requirements of 13 CFR § 120.104 apply. See also 13 CFR § 120.140 for a list of ethical requirements that apply to Lenders.

15. Businesses Providing Prurient Sexual Material (13 CFR § 120.110 (p))

   a.   A business is not eligible for SBA assistance if:

      i.   It presents live or recorded performances of a prurient sexual nature; or

      ii.   It derives more than 5% of its gross revenue, directly or indirectly, through the sale of products, services or the presentation of any depictions or displays of a prurient sexual nature.

   b.   SBA has determined that financing lawful activities of a prurient sexual nature is not in the public interest. The Lender must consider whether the nature and extent of the sexual component causes the business activity to be prurient.

   c.   If a Lender finds that the Applicant may have a business aspect of a prurient sexual nature, prior to submitting an application to the LGPC (non-delegated) or requesting a loan number (delegated), the Lender must document and submit the analysis and supporting documentation to the Associate General Counsel for Litigation at PSMReview@sba.gov for a final Agency decision on eligibility. Upon approval by SBA, the Lender may submit the application to the LGPC or may proceed to process the loan under its delegated authority. A non-delegated Lender must submit a copy of SBA's approval with the application to the LGPC. A delegated Lender must retain its analysis, supporting documentation, and evidence of SBA's approval in its loan file and must submit the analysis and supporting documentation to SBA with any request for guaranty purchase. SBA also may review such documentation when conducting Lender oversight activities.

16. Prior Loss to the Government (13 CFR § 120.110 (q)) and Delinquent Federal Debt (31 CFR § 285.13)

   a.   Unless waived by SBA for good cause, SBA cannot provide assistance to an Applicant if there has been a Prior Loss to the Government. "Prior Loss" means the dollar amount of any deficiency on a Federal loan or federally assisted financing which has been incurred and recognized by a Federal agency after it has concluded its write-off and/or close-out procedures for the particular account including the

following:

    i.    Loss on the sale or other disposition of collateral acquired after default;

    ii.   Compromise, i.e., resolution or settlement of a loan's principal balance for less than the full amount due;

    iii.  Bankruptcy by a Borrower and/or any guarantors; and

    iv.  Any unreimbursed advance payments by a Federal agency.

b.   Unless waived by SBA for good cause, SBA cannot provide assistance to an Applicant if there is a Delinquent Federal Debt attributed to the Applicant:

    i.    A debt is considered "delinquent" when any Federal loan or federally assisted financing has not been paid within 90 days of the payment due date. A debt is considered "delinquent" even if the creditor agency has suspended or terminated collection activity with respect to such debt.

    ii.   A debt is not considered "delinquent" if:

       a)  The creditor agency has released the obligor from paying the debt;

       b)  The obligor is subject to, or has been discharged from the debt in a bankruptcy proceeding;

       c)  The obligor has entered into a satisfactory written repayment agreement and is current; or

       d)  The debt is in an administrative or judicial appeal process.

       (Note: If there was a loss associated with any of these debts, however, the loan remains subject to the rules governing a Prior Loss to the Government under subparagraph 16.a. above.)

    iii.  "Federal loan or federally-assisted financing" includes any loan made directly or guaranteed/insured by any Federal agency, any unreimbursed advance payments under 8(a) or similar programs operated by any Federal agency, and federally-backed student loans. It does not include unpaid/delinquent taxes, any loss incurred by the Federal Deposit Insurance Corporation (FDIC) when it sells a loan at a discount, or any loan purchased, held or securitized by Fannie Mae or Freddie Mac. For the purposes of Delinquent Federal Debt, "Federal loan or federally-assisted financing" does not include disaster loans, but for the purposes of Prior Loss, it includes disaster loans.

c.   These rules apply to:

    i.    The Applicant that incurred the Delinquent Federal Debt or caused the Prior Loss (either directly or as a guarantor);

    ii.   Any business owned, operated or controlled by the Applicant or an Associate of the Applicant that incurred the Delinquent Federal Debt or caused the Prior Loss (either directly or as a guarantor); and

    iii.  For Delinquent Federal Debt only, any individual or entity who will be

guaranteeing the loan for the Applicant.

d. Delegated Lenders are responsible for accessing their records in E-Tran to determine if any of the individuals or businesses identified in subparagraph c. above experienced a Prior Loss.

e. Delegated Lenders are responsible for checking the Credit Alert Verification Reporting System (CAIVRS) to determine if any of the individuals or businesses identified in paragraph c) above have outstanding Delinquent Federal Debt or Prior Loss.

   i. CAIVRS allows the Lender to enter multiple tax id numbers (either SSN or EIN) to search for an outstanding Delinquent Federal Debt in connection with a loan application.

   ii. Lenders may access CAIVRS at https://entp.hud.gov/caivrs/public/home.html.

f. Waiver Requests:

   i. When there are compelling circumstances, the Lender may send a written request for a waiver to the LGPC. The Lender must identify the Delinquent Federal Debt or Prior Loss to the Government, explain the relationship of the Applicant to the individual or business causing the delinquency or prior loss and the circumstances justifying the waiver.

   ii. For Delinquent Federal Debt, the SBA Chief Financial Officer (CFO) (who may only delegate this authority to the Deputy Chief Financial Officer) will make the final decision on the request.

   iii. For Prior Loss to the Government, the D/FA or designee will make the final decision on the request.

g. If the Delinquent Federal Debt or Prior Loss to the Government is fully satisfied, the application can be processed without a waiver from the CFO or D/FA, including under a Lender's delegated authority. The Lender must document its file as to how the debt or loss has been fully satisfied.

h. All Lenders must inform the Applicant that if the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, the names of the small business and the guarantors of the SBA-guaranteed loan will be referred for listing in the CAIVRS database, which may affect their eligibility for further financial assistance from SBA or other Federal agencies or departments.

17. Businesses primarily engaged in political or lobbying activities (13 CFR § 120.110 (r))

   An Applicant that derives over 50% of its gross annual revenue from political or lobbying activities is not eligible.

18. Speculation (13 CFR § 120.110 (s))

   a. Speculative businesses are not eligible. This prohibits loans to an Applicant for:

      i. The sole purpose of purchasing and holding an item until the market price increases; or

      ii.     Engaging in a risky business for the chance of an unusually large profit.

  b.  Speculative businesses include:

      i.     Wildcatting in oil;

      ii.     Dealing in stocks, bonds, commodity futures, and other financial instruments;

      iii.    Mining gold or silver in other than established fields;

      iv.    Research and Development; and

      v.     Building homes for future sale (except under the Builders CAPLines program).

*Note: Construction of homes for future sale with no sales contract in place (spec homes) is eligible under the Builders CAPLines program. (13 CFR § 120.391)*

  c.  Non-speculative businesses which may be eligible include:

      i.     A business, such as a grain elevator, that uses a commodity contract to lock in a price;

      ii.     A farmer who uses a commodity contract to lock in the sale price of his or her harvest;

      iii.    A business engaged in drilling for oil in established fields; and

      iv.    A business engaged in building a home under contract with an identified purchaser.

B.  Small Business Lending Company (SBLC).

An SBLC may not make a loan to an Applicant that has received financing (or a commitment for financing) from a Small Business Investment Company (SBIC) that is an Associate of the SBLC. (13 CFR § 120.476)

C.  Businesses Owned by Non-U.S. Citizens.

SBA can provide financial assistance to businesses that are at least 51% owned and controlled by persons who are not citizens of the U.S., provided the persons are lawfully in the U.S. and have an appropriate work visa. The processing procedures and the terms and conditions will vary, depending upon the status of the owners as assigned by the United States Citizenship and Immigration Services (USCIS).

SBA requires all participating Lenders, including SBLCs, to comply with the U.S. Department of the Treasury regulations for Customer Identification Programs for banks, savings associations, credit unions, and certain non-federally regulated banks found at 31 CFR § 1020.220.

1.  Businesses owned by Naturalized Citizens are eligible and the naturalized citizens are not subject to any special restrictions or requirements. If an individual's SBA Form 1919 (or EIB-SBA Joint Form 84-1 for EWCP loans) reflects he or she is a U.S. Citizen no further verification of status is required.

2.  Businesses owned by Lawful Permanent Residents (LPRs) are eligible. LPRs are persons who may live and work in the U.S. for life unless their status is revoked through an

administrative hearing.

   a. The USCIS Form I-551 (551), Lawful Permanent Resident Card, commonly referred to as the "green card," is evidence of LPR status. USCIS has two versions of the 551:

      i. Resident Alien Card (issued through 1997); and

      ii. Permanent Resident Card. (This is the most recent version and has been issued since 1997.)

      iii. Because it can take up to a year for a newly arrived immigrant to receive a 551, new immigrants are issued an immigrant visa with a Customs and Border Protection (CBP) stamp evidencing their lawful permanent residence. This visa with CBP stamp serves as evidence of LPR status, so long as the visa is not expired.

   b. Since 1997, USCIS has issued the 551 with a 10-year validity, at which time it expires and must be renewed. A 551 issued between 1979 and August 1989, however, does not have an expiration date.

   Replacing the 551 may be necessary if the 551 is lost, the individual changes his/her name, etc. Replacement of the 551 may take more than a year. The expiration of the immigrant's 551 does not affect the LPR status of the immigrant. Acceptable forms of evidence when the 551 has been submitted to USCIS for replacement or renewal upon expiration include the following:

      i. Temporary I-551 stamps. A temporary stamp, issued by USCIS to replace lost or expiring 551s, either on the immigrant's unexpired foreign passport (that reads "Upon endorsement, serves as temporary I-551 evidencing permanent residency for 1 year"), or in cases where there is no passport or it is expired, on Form I-94 with passport photo (that reads "Processed for I-551 – Temporary Evidence of Lawful Permanent Residence");

      ii. USCIS Form I-327, "Re-entry Permit," issued to LPRs in lieu of a visa, which is valid for only 2 years (the I-327 is issued for LPRs who need to be overseas for longer than 1 year); or

      iii. USCIS Form I-797, Notice of Action. Aliens with Conditional LPR status (those who married a U.S. citizen and were married for less than a year at the time of being granted LPR status) must file Form I-751 to remove conditional status within 90 days of their 551 expiration. LPRs awaiting approval of their I-751 should be issued Form I-797, which along with the expired 551, is proof of current LPR status. Please note that there are numerous types of Form I-797 (e.g., I-797A, I-797-B, I-797C, etc.). For purposes of removing conditional status, only I-797 is acceptable.

   c. SBA requires the 551 or an acceptable substitute be current at the time it is submitted with an application or it will be returned and not processed. PLP, PLP-EWCP, Export Express, SBA Express and Pilot Loan Program Lenders must have a copy of the current 551 or acceptable substitute prior to requesting a loan number.

3. Businesses owned by non-immigrant aliens residing in the U.S. may be eligible, subject to specific restrictions. Applicant businesses owned by such individuals must also meet the requirements of paragraph III.C.8 below.

Non-immigrant (documented) aliens are persons who are admitted to the U.S. for a specific purpose(s) and for a temporary period of time with a current/valid USCIS document, such as a non-immigrant visa. (An immigrant visa is issued to persons wishing to live permanently in the U.S.) While any non-immigrant alien may generally own a U.S. business as a passive investor, to control the business or be employed by it, the non-immigrant alien must have an appropriate work visa. To be eligible, the non-immigrant alien must have current/valid USCIS documentation permitting them to reside and work in the U.S. legally.

Lender must verify the documentation/status of each alien with USCIS.

Eligible non-immigrant categories. The following classes of non-immigrant aliens may be eligible for SBA financial assistance (USCIS Entrepreneur Guide non-immigrant visa categories):

   a. B-1 Business Visitor;

   b. F-1/OPT Optional Practical Training;

   c. H-1B Specialty Occupation;

   d. O-1A Extraordinary Ability and Achievement;

   e. E-2 Treaty Investor; or

   f. L-1 Intracompany Transferee.

If the Applicant has a different class of non-immigrant visa that the Lender believes may be eligible, please contact the Office of Financial Assistance for further guidance.

Lenders must consider the period of stay afforded by a non-immigrant visa category (along with possible extensions) relative to the loan term.

4. Asylees and refugees (persons who receive temporary refuge in the United States) with LPR status.

Asylees and refugees are authorized to work because of their immigration status. Acceptable forms of evidence for asylees and refugees include the following:

   a. Unexpired EAD (Employment Authorization Document, Form I-766);

   b. Form I-94/Form I-94A indicating asylee or refugee status; and

   c. Expired EAD with Form I-797C Notice of Action from USCIS for Form I-765 (if Form I-797C lists the same employment authorization category as the expired EAD).

5. Businesses owned by aliens who are subject to the Immigration Reform and Control Act of 1986 (IRCA) may be eligible under limited circumstances.

   a. IRCA vests USCIS with the authority to grant illegal aliens lawful temporary resident status. IRCA prohibits Federal financial assistance to businesses owned 20% or more by such individuals for a period of 5 years after USCIS grants lawful temporary resident status.

    b. This disqualification does not apply to Cuban or Haitian entrants or alien entrants subject to IRCA who are blind or disabled. The definition of blind or disabled is equivalent to SBA's criteria for determining eligibility for assistance to any small business owned by disabled individuals.

    c. All Applicants self-certify that they are eligible under IRCA by signing SBA Form 1919, which includes the "Statements Required by Law and Executive Orders." This includes a certification that IRCA does not apply to them or if it does apply, more than 5 years have elapsed since they were granted lawful temporary resident status pursuant to the 1986 legislation.

6. Documentation to evidence and verify an alien's status.

    a. At time of application, for any individual required to complete SBA Form 1919 (or EIB-SBA Joint Form 84-1 for EWCP loans), who is not a U.S. citizen but is located in the U.S., the following applies:

        i. The individual must provide his or her alien registration number on SBA Form 1919, "Borrower Information Form" (for EWCP loans, the individual must provide his or her alien registration number on EIB-SBA Joint Form 84-1). An "alien" (whether immigrant-alien or non-immigrant alien) is someone who resides in the U.S. but is not a U.S. citizen. If the individual is not residing or working in the U.S., then he or she is not considered an "alien" and does not have an immigration status or alien registration number that must be verified. If the individual does not have an alien registration number, he or she may provide an I-94 card/document which has a departure record number issued on the card.

        ii. Lenders must obtain a copy of the individual's USCIS documentation and maintain all documentation in the case file.

        iii. Lender must request Document Verification from the Sacramento Loan Processing Center (SLPC).

          a) In order to request Document Verification from SLPC, all Lenders must register designated personnel with the SLPC at Sacramento504Register@sba.gov.

          b) The SLPC will respond to such requests by providing instructions on how to complete registration and to use the electronic verification process.

          c) The Lender submits a USCIS Form G-845 (845), "Document Verification Request," with supporting information to the SLPC. The Lender must state on the 845 that the request is for an SBA-guaranteed loan.

          d) As required by USCIS, SBA will release information about the status of an alien to Lenders or other non-governmental entities ONLY when a signed and dated authorization from the alien is attached to and submitted with the 845 on that alien providing name, address and date of birth.

          e) As required by USCIS, SBA accepts either of the following authorization statements:

i) "I authorize the U.S. Citizenship and Immigration Services to release information regarding my immigration status to [name of Lender], because I am applying for a U.S. Small Business Administration loan."

ii) "I authorize the U.S. Citizenship and Immigration Services to release alien verification information about me to [name of Lender], because I am applying for a U.S. Small Business Administration loan."

iv. As required by USCIS, all verification requests must include an authorization with the original signature of the alien for SBA to release information to Lenders on the status of verification. The original Document Verification Request (Form G-845) and authorization for release must be maintained by the Lender in the Applicant's file for review by SBA and USCIS, if requested.

v. The information provided to SBA by the USCIS system is intended solely for the purpose of determining eligibility for SBA financial assistance. This information is governed by the Privacy Act, 5 U.S.C. 552(a)(i)(1), and any person who obtains this information under false pretenses or uses it for any purpose other than for determining eligibility may be subject to criminal penalties.

vi. The authorization statement must not be on SBA or Lender stationery.

b. Lenders must receive verification of the status of each alien required to submit USCIS documents prior to submission of the application to SBA or, for delegated processing, prior to submission of the request for loan number. The Lender must document the findings in the loan file.

c. Verification of the status of an LPR is required if 6 months has elapsed since the last verification with one exception: if the individual reported an offense on SBA Form 912, then verification would be required even if 6 months had not elapsed, as the offense may put their status at risk. For non-LPRs, verification is required with each loan application, as their status can be revoked at any time.

7. Businesses owned by Foreign Nationals or Foreign Entities may be eligible.

Businesses listed in Appendix 1 of this SOP, "Restrictions on Foreign Controlled Enterprises," that are owned and managed by Foreign Nationals, Foreign Entities or Non-Immigrant Aliens are not eligible. If a business is not listed in Appendix 1, it may be eligible.

8. Additional requirements for eligibility of businesses owned by non-citizens other than LPRs, including foreign-owned businesses:

a. The application must contain assurance that management is expected to continue in place indefinitely and have U.S. citizenship or verified LPR status.

i. Management must have operated the business for at least 1 year prior to the application date. (This requirement prevents financial assistance to "start-up" businesses owned by aliens who do not have LPR status.)

ii. Lender must require the personal guaranty from management.

    b.  The Applicant must pledge collateral within the jurisdiction of the U.S. with a liquidation value equal to no less than the approved loan amount at the time of first disbursement and, to the extent that the value of collateral declines during the life of the loan, the Lender must require the Borrower to pledge additional collateral to ensure a sufficient collateral coverage amount. If the Applicant owned by foreign nationals, foreign entities or non-immigrant aliens residing in the U.S. does not have sufficient collateral, the Applicant is not eligible for an SBA-guaranteed loan.

    c.  In order for a business not to be subject to these additional requirements, it must be at least 51% owned by individuals who are U.S. citizens and/or who have LPR Status from USCIS and control the management and daily operations of the business. This can only be waived by the D/FA or designee.

D.  Eligible Passive Company ("EPC") Rule (13 CFR § 120.111).

The Eligible Passive Company (EPC) Rule is an exception to SBA regulations that prohibit financing assets which are held for their passive income. (13 CFR § 120.130(d)) **Because the EPC rule is an exception, the EPC and the OC must comply with all of the conditions in 13 CFR § 120.111 and each condition is interpreted strictly. If all conditions are not complied with, in the event of default, SBA may deny liability on the guaranty.**

An Eligible Passive Company (EPC) must use loan proceeds only to acquire or lease, and/or improve or renovate, real or personal property (including eligible refinancing), that it leases to one or more Operating Companies (OCs) for conducting the Operating Company's business, or to finance a change of ownership between the existing owners of the EPC. With the exception of a change of ownership between existing owners of the EPC, an EPC may not use loan proceeds to acquire a business, acquire stock in a business or any intangible assets of a business, or to refinance debt that was incurred for those purposes. Further, an EPC may only use loan proceeds to finance a change of ownership between existing owners when the real estate has been held by the selling owner(s) for at least 36 months.

An EPC can take any legal form or ownership structure (e.g., corporation, partnership, LLC, sole proprietor, etc.)

A tenancy in common is a form of legal ownership and does not create a new or separate legal entity. If authorized by state law, legal entities can be a tenant in common with individuals.

1.  There may be several individuals or entities in a tenancy in common, but the tenancy in common is considered one (1) EPC.

2.  The loan documents must be signed by all of the members of the tenancy in common, with authorized individuals signing for the entity members.

Multiple OCs can be separately owned, however, multiple EPCs in one transaction are not permitted.

1.  Conditions that apply to all EPCs:

a.  The OC must be an eligible small business;

b.  The proposed use of proceeds must be an eligible use as if the OC were obtaining the financing directly;

c.  The EPC (with the exception of a trust) and the OC each must be small under the appropriate size standard of 13 CFR Part 121 (see paragraph 3 below);

d.  The EPC must lease the project property directly to the OC:

   i.   The lease must be in writing;

   ii.  The lease must be subordinate to the SBA's mortgage, trust deed lien, or security interest on the property;

   iii. The lease must have a term, including options to renew exercisable solely by the OC, at least equal to the term of the loan;

   iv.  The EPC (as landlord) must furnish as collateral for the loan an assignment of all rents paid under the lease. An assignment of the lease is only required when necessary to perfect the assignment of rents or to enable the Lender to exercise the tenant's rights upon default;

   v.   The rent or lease payments cannot exceed the amount necessary to make the loan payment to the Lender, and an additional amount to cover the EPC's direct expenses of holding the property, such as routine maintenance, insurance and property taxes.

   vi.  The OC must lease 100% of the property from the EPC, but it can sublease a portion of the property under the rules governing occupancy requirements with which all SBA Applicants must comply.

   vii. If, in acquiring the property, the EPC becomes the beneficiary or owner of the rights to an existing mineral lease on the property, the EPC must assign its interest in the lease (together with its rights to all rental, mineral, royalty, bonus, or similar lease payments that might accrue by virtue of the existing mineral (oil and gas) lease) to the OC; and any such assignment must be subordinated to all Deeds of Trust or Mortgages. In addition, the Lender must take the following actions as applicable:

      a)  If subordination is not possible, the Lender must provide documentation to that effect;

      b)  If the mineral lease has been terminated, the Lender should attempt to have it removed from the Title Policy;

      c)  If the Lender is unable to have the mineral lease removed from the Title Policy, the Lender must provide supporting documentation evidencing the proper assignment of the lease to the OC and obtain a title endorsement to protect SBA's interest in the real property (i.e., California Land Title Association (CLTA) 100.23 or 100.24).

   viii. Non-delegated Lenders must submit a copy of the lease agreement between the

EPC and OC in their request for loan guaranty to SBA. Delegated Lenders must keep a copy of the executed lease in their loan file and must submit the lease with any request to SBA to honor the guaranty.

e.   An EPC (excluding a trust) may not engage in any business activity other than leasing the property to the OC.

f.   The OC must be a guarantor or a co-Borrower on the loan. The OC must be a co-Borrower if it receives any loan proceeds as working capital and/or for the purchase of other assets, including intangible assets, for the OC's use.

   i.   Each holder of an ownership interest constituting at least 20% of either the EPC or the OC must guarantee the loan (if the holder is a trust, then the Trustee shall execute the guarantee on behalf of the trust). Each spouse with an ownership interest in the EPC or the OC must personally guarantee the loan in full when the combined ownership interest of both spouses in the EPC or OC is at least 20%. If a person has executed the Note as a Borrower in an individual capacity, that person does not also have to execute a personal guaranty.

   ii.   When deemed necessary for credit or other reasons, SBA or, for a loan processed under a Lender's delegated authority, the Lender, may require other appropriate individuals or entities to provide full or limited guaranties of the loan without regard to the percentage of their ownership interests, if any.

2.   Conditions that apply when the EPC is owned in whole or in part by a trust.

a.   The eligibility status of the Trustor will determine trust eligibility.

b.   All donors to the trust will be deemed to have Trustor status for eligibility purposes.

c.   The Trustee must warrant and certify that the trust will not be revoked or substantially amended for the term of the loan without the prior written consent of SBA.

d.   The Trustor must guarantee the loan.

   i.   If an Employee Stock Ownership Plan trust agreement prohibits it from being a guarantor or co-Borrower, then it cannot use the EPC form of borrowing.

   ii.   Beneficiaries that exercise any control over the actions of the trust also must guarantee the loan.

e.   The Trustee shall certify in writing to SBA that:

   i.   The Trustee has authority to act;

   ii.   The trust has authority to borrow funds, pledge trust assets, and lease the property to the OC;

   iii.   The Trustee has provided accurate, pertinent language from the trust agreement confirming the above; and

   iv.   The Trustee has provided and will continue to provide SBA with a true and complete list of all trustors and donors.

  f. The trust itself does not have to be small by SBA size standards.

3. Size Determinations under the EPC rule.

  a. If the EPC and the OC are affiliated, the two companies are combined for determining size.

    i. If there is only one OC, use the OC's NAICS code.

    ii. If there are multiple, unaffiliated OCs, use the NAICS code of the OC that derives the most revenue. Note: Each OC must be small based on its own NAICS code.

    iii. If the multiple OCs are affiliated, then use the rules detailed in 13 CFR §121.107 for determining the primary industry of affiliated businesses. The NAICS Code of the primary industry of the OC shall be the identifying NAICS Code.

  b. If the EPC and the OC are not affiliated, each entity must be small under the size requirement for its particular industry.

   The existence of a lease between the EPC and the OC does not, in and of itself, create an affiliation, even if the EPC and OC are co-Borrowers.

4. When sending data to SBA, use the same NAICS Code that was used to determine size for the Applicant.

5. Submission of Financial Statements by the EPC and the OC:

  a. Both the EPC and each OC must submit Financial Statements. The OC's statements are subject to tax verification.

  b. The regular requirement for an Aging of receivables and payables is waived for EPCs.

E. Special Requirements For Loans Where Collateral May Be Included In The National Register Of Historic Places (Historic Properties).

Section 106 of the National Historic Preservation Act mandates Federal agencies undergo a review process for all federally funded projects that potentially impact sites listed or eligible to be listed on the National Register of Historic Places ("NRHP"). If a loan will in any way affect such properties, the Lender (on delegated loans) and LGPC (on non-delegated loans) must consult with local SBA counsel for further guidance. Local SBA counsel will then notify the Associate General Counsel for Litigation or designee, and OFA.

If there is no potential to cause effect on historic properties, there are no further obligations under Section 106. For example, if the proceeds of the loan are to be used solely to purchase the property and no renovations or changes are anticipated, the SBA counsel may make the determination that no further Section 106 review is required.

If the local SBA counsel determines that the undertaking is the type of activity that has the potential to cause effects on historic properties, then SBA is required to consult with the relevant State Historic Preservation Officer ("SHPO") to determine if the use of the proceeds of the loan will have an adverse effect on the historic nature of the property in question.

If SBA finds no adverse effect and the SHPO agrees or does not object within 30 days, the Agency can proceed with the approval of the loan. If, however, SBA finds that there will be an adverse effect on the historic nature of the property, SBA must consult with SHPO to attempt to resolve the issue. This consultation will result in Memorandum of Agreement between Agency and SHPO regarding the resolution of the adverse effect.

Once local SBA counsel has made a no adverse effect determination or resolved any adverse effect issues with the SHPO, the decision must be signed off by the Associate General Counsel for Litigation or designee.

## IV. ADDITIONAL ELIGIBILITY REQUIREMENTS FOR CERTAIN SBA 7(A) LOAN DELIVERY METHODS

A. Export Express.

1. Eligibility for Export Express is limited to businesses that meet SBA's standard eligibility requirements discussed above and that have been in operation, although not necessarily in exporting, for at least 12 full months. However, Applicants that have been in operation for less than 12 months are eligible if both of the following conditions are met:

   a. The Applicant's key personnel have clearly demonstrated export expertise and substantial previous successful business experience; and

   b. The Lender processes the Export Express loan using conventional commercial loan underwriting procedures and does not rely solely on credit scoring or credit matrices to approve the loan. Non-bank Lenders that do not have a conventional loan portfolio must submit their underwriting procedures to the Office of Credit Risk Management for written approval prior to making an Export Express loan.

   Evidence of compliance with both of these requirements must be retained by the Lender in its file.

2. Applicants with operations, facilities or offices overseas, other than those strictly associated with the marketing and/or distribution of products/services exported from the U.S., are not eligible for Export Express, although they may be eligible for other SBA 7(a) financial assistance.

3. Lender must maintain in its loan file information provided by the Applicant as it pertains to the use of proceeds for export development activities and its projected impact on the Applicant's export sales along with an estimate of the Applicant's export sales for the 12 month period following the date of the loan application. Required documentation is itemized in Paragraph V.J.4 of this Chapter.

B. International Trade Loans.

The Applicant must demonstrate either 1 or 2, **and** 3 below in order to be eligible:

1. The loan proceeds will expand existing export markets or develop new export markets. To establish this, the Applicant must submit an export business plan, including both a projection and narrative rationale that contains enough information to reasonably support the likelihood of expanded export sales.

    a.   The plan should identify the amount of expected export sales.

    b.   Indirect exports are considered exports for purposes of determining eligibility. The term "indirect export" applies to situations where, although the Applicant's direct customer is located in the United States, that customer will be exporting the items/services it purchased from the Applicant to a foreign Buyer.

    c.   In such cases, the Applicant must provide documentation to the Lender from the Applicant's domestic customer (typically in the form of a letter, invoice, order or contract) that the goods or services are in fact being exported.

    d.   For all of the Applicant's exports (including indirect exports), the Lender must determine if U.S. companies are authorized to conduct business with the country to which the goods or services will be shipped, pursuant to the Ex-Im Bank Country Limitation Schedule. A loan may not be made to a business that directly or indirectly exports to a foreign country which is listed as a prohibited country (Note #7) on the Country Limitation Schedule; OR

2.   That the Applicant is adversely affected by import competition.

    a.   The Applicant must demonstrate injury attributable to increased competition with foreign firms in the relevant market.

    b.   A narrative explanation and financial statements showing that imported products or services which are directly competitive with those produced by the Applicant have contributed significantly to a decline in competitive position are required.

    c.   Alternatively, the Applicant can submit a finding of injury by the International Trade Commission or the Secretary of Commerce pursuant to Chapter 3 of Title II of the Trade Act of 1974 (19 U.S.C. 2341 et seq.), AND

3.   In addition to either paragraphs 1 or 2 above, the Applicant must demonstrate the loan will allow the Applicant to improve its competitive position. The Lender must include evidence in its credit memorandum to support the fact that the loan will allow the Applicant to improve its competitive position.

C.   Export Working Capital Program (EWCP).

1.   Eligibility for EWCP will be limited to businesses that meet SBA's standard eligibility requirements discussed above, and that have a history of at least 12 full months of operations prior to filing an application.

2.   The SBA Approving Official may waive the 12 month requirement, based upon demonstrated export expertise and previous business experience. The justification and recommendation for waiver must be included in the loan officer's report.

3.   Export management companies (EMC) or export trading companies (ETC) may use this program only if the EMC or ETC takes title to the goods or services being exported. EMCs or ETCs which have any bank ownership are ineligible for the EWCP loan program.

D.   Additional Eligibility Requirements for CAPLines.

1.   To be eligible for a Seasonal CAPLine, the Applicant must qualify under 7(a) eligibility

requirements and:

    a.   Have been in operation for at least 12 calendar months; and

    b.   Be able to demonstrate a definite pattern of seasonal activity.

2.  To be eligible for a Contract CAPLine, the Applicant must qualify under standard 7(a) requirements and:

    a.   Be able to demonstrate the ability to operate profitably based upon the prior completion of similar contracts;

    b.   Possess the overall ability to bid, accurately project costs, and perform the specific type of work required by the contract(s); and

    c.   Have the financial capacity and technical expertise to complete the contract on time and at a profit.

3. To be eligible for a Builders CAPLine (13 CFR §§ 120.391; 120.392; 120.393; 120.394), the Applicant must qualify under standard 7(a) requirements and:

    a.   Be construction contractors or homebuilders under NAICS codes 236220, 236115, 236116, or 236118 with demonstrated managerial and technical ability in profitable construction or renovation;

    b.   Must either perform the construction/renovation work or manage the job with at least one supervisory employee on the job site during the entire construction phase;

    c.   Renovations must be "prompt and significant." Construction must begin within a reasonable time after loan approval and the cost of renovation must equal or exceed one-third (1/3) of the purchase price of the property. The cost of renovation of buildings already owned by the Applicant must equal or exceed one-third (1/3) of the fair market value at the time of loan application;

    d.   Demonstrate a successful performance record in bidding and completing construction/renovation at a profit within the estimated construction period, and the prior successful performance must have been of comparable type and size to the proposed project. (Prior experience in single family construction is not comparable to high-rise apartment construction); and

    e.   Be able to demonstrate prior prompt payments to suppliers and subcontractors.

4. To be eligible for a Working Capital CAPLine, the Applicant must qualify under standard 7(a) requirements and generate accounts receivable (not notes receivable), and/or have inventory.

## V.   ELIGIBLE USES OF LOAN PROCEEDS (13 CFR §§ 120.120, 120.202, AND 120.332)

A.  SBA Guaranteed Loan Proceeds May Be Used For:

1.  Purchasing land as part of an eligible project;

2.  Purchasing, constructing or renovating buildings;

3.  Improving a site (e.g. Grading, streets, parking lots, landscaping), including up to five (5) percent of the loan amount for community improvements such as curbs and sidewalks;

4. Acquiring and installing fixed assets;

5. Inventory;

6. Supplies;

7. Raw Materials (including Work-in-progress);

8. Working Capital;

9. Refinancing certain outstanding business debts;

10. Energy Conservation loans; and

11. Change of Ownership/Business Acquisition.

B. Loan Proceeds May be Used to Finance a Lender's Other Real Estate Owned (OREO):

When loan proceeds will be used to finance the purchase of real estate owned by the 7(a) Lender making the loan, the application must:

1. Be submitted to the LGPC (delegated authority may not be used to process these applications);

2. Include an independent real estate appraisal that meets the requirements found in Chapter 4 of this Subpart (the appraisal requirement cannot be delayed until loan closing), and that provides the liquidation value of the real estate;

3. Include an explanation of the circumstances surrounding the Lender's acquisition of the real estate. If the acquisition of the property was triggered by a business failure at that particular location, the Lender must submit a detailed explanation of why the new Applicant will succeed at that same location; and

4. Identify the Lender's cost in the real estate. In order to get the full SBA guaranty, the sales price may not exceed the mortgage balance plus care and preservation expenses or the liquidation value, whichever is less. If the sales price is greater than the mortgage balance plus care and preservation expenses or the liquidation value (whichever is less), then the SBA guaranty will be reduced accordingly.

For example:

| OREO Sales Price | $1.2 million |
|---|---|
| Lender's costs or liquidation value (whichever is less) | $1.0 million |
| Guaranty amount: 75% of $1.0 million | $750,000 |
| Effective SBA guaranty:  $750,000/$1,200,000 | 62.5% |

C. Loan Proceeds for Farm Enterprises May be Used for:

1. The purchase of land, buildings, and land improvements (fencing, irrigation systems, construction of dikes, silos, barns, hog and dairy facilities, etc.) as part of an eligible project;

2. Construction, renovation, or improvement (including water systems) of farm buildings other than residences;

3. The purchase of farm machinery and equipment;

4. The purchase of seed and the acquisition of animals;

5. Operating expenses directly related to the farming operation, excluding personal or family living expenses; and

6. The refinancing of debt related to the farming operation, excluding personal or family debt, provided the refinancing meets SBA requirements for refinancing (see paragraph E below).

Note: The acquisition of land in excess of the farming operation's needs is not an eligible use of proceeds. In addition, Applicant must not use loan proceeds to purchase vacant or row crop land for possible future use, future construction, or to lease to third parties. For example, a concentrated animal feedlot operation (CAFO) that only requires 10 acres of land for its operation (including housing and feeding of the animals, service and access roads, and waste management facilities) may not use SBA-guaranteed loan proceeds to obtain excess farmland that is not used in the operation of the Applicant business. If excess land is being acquired at the same time as the SBA-guaranteed loan, the excess land must be financed from sources other than SBA and the source of the financing must be documented in the loan file. (See Chapter 3 of this Subpart for guidance on the appropriate maturities for loans to farm enterprises.)

D. Business Loan Proceeds Restrictions:

Loan proceeds may not be used for any of the following purposes (including the replacement of funds used or borrowed for any such purpose) (13 CFR § 120.130):

1. Payments, distributions or loans to an Associate of the Applicant (as defined in 13 CFR § 120.10), except for compensation for services actually rendered at a fair and reasonable rate;

2. A loan to an Applicant for the benefit of an ineligible affiliated business;

3. Refinancing debt owed to an SBIC or a New Markets Venture Capital Company (NMVCC);

4. Floorplan financing;

5. Investments in real or personal property acquired and held primarily for sale, lease or investment;

6. Payment of Delinquent Taxes; or

   a. Loan proceeds must not be used to pay past-due Federal, state, or local payroll taxes, sales taxes, or similar taxes that are required to be collected by the Applicant and held in trust on behalf of a Federal, state, or local government entity.

   b. Payment of delinquent business income taxes may be permitted if the Applicant has an approved payment arrangement with the IRS and the Applicant is current on the payments in the arrangement.

7. To finance the relocation of the Applicant business out of a community, if there will be a net reduction of one-third of its jobs or a substantial increase in unemployment in any area of the country. An exception may be allowed if the Lender can justify the relocation because:

    a. The relocation is for key economic reasons and crucial to the continued existence, economic wellbeing, and/or competitiveness of the Applicant; and

    b. The economic development benefits to the Applicant and the receiving community outweigh the negative impact on the community from which the Applicant is moving.

E. Policies Regarding Debt Refinancing:

  1. SBA-guaranteed loan proceeds may not be used to pay a creditor in a position to sustain a loss (13 CFR § 120.201).

  2. SBA-guaranteed loan proceeds may not be used to refinance debt originally used to finance a loan purpose that would have been ineligible for SBA financing at the time it was originally made unless the condition that would have made the loan ineligible no longer exists.

    a. Debt reflected on the Applicant's business balance sheet may be eligible if it has been reported on the Applicant's business tax returns (Schedule C for sole proprietorships) showing the interest expense associated with the debt and:

      i. If the debt to be refinanced was the first extension of credit, the Lender must document that the proceeds from that debt were used exclusively for the Applicant business and were not used for any ineligible purpose as set forth in 13 CFR § 120.130;

      ii. If the debt to be refinanced was used in whole or in part to refinance a prior debt, the debt must be reflected on the Applicant business tax returns (Schedule C for sole proprietorships) for the prior two full tax cycles, showing the interest expense associated with the debt. The Applicant must certify in accordance with 13 CFR § 120.130 that the debt to be refinanced was used exclusively for the Applicant business and was not used for any ineligible purpose; or

      iii. If the debt is in the form of an outstanding balance on a credit card issued to the small business, the Lender may refinance the credit card debt after confirming that the credit card is in the name of the business and obtaining the Applicant's certification that the credit card debt being refinanced was incurred exclusively for business related purposes. If the business credit card was also used for personal reasons, the Applicant must identify which purchases were for personal reasons and that amount must be deducted from the credit card balance. Loan proceeds must not be used to refinance any personal expenses.

    b. Debt in the personal name of the Applicant owners, such as a Home Equity Line of Credit (HELOC) or credit card debt that was used for business purposes, may be eligible for refinancing.

      i. For HELOC debt, the Applicant must certify that the amount being refinanced was used exclusively for business purposes and provide appropriate documentation. For example, a sole proprietor may demonstrate that the debt was used for business purposes by providing documentation that shows the interest deduction is reported on the Schedule "C" not the Schedule "A" of the

proprietor's tax return. If the interest deduction reported on the Schedule C includes multiple debts, then the Applicant must provide a copy of the appropriate IRS Form 1098 related to the debt being refinanced.

ii.   If the debt is in the form of an outstanding balance on a credit card issued to an individual personally, the Lender must confirm which of the credit card obligations were used for business purposes. Lenders must document the specific business purpose of the credit card debt and the Applicant must certify that the loan proceeds are being used only to refinance business expenses. Documentation required for refinancing personal credit card debt includes a copy of the credit card statements and individual receipts for any business expenses in excess of $250. In all cases, the Applicant must certify that the amount that will be refinanced was used exclusively for business expenses.

3.  SBA-guaranteed loans may be used to refinance the following types of business debt (see paragraph 6 below for additional requirements if refinancing same institution debt):

a.   Debt (short or long term) structured with a demand note or balloon payment;

b.   Debt with an interest rate that exceeds the SBA maximum interest rate based on size, term and 7(a) processing method being used;

c.   Credit card obligations used for business-related purposes;

d.   Debt that is over-collateralized based on SBA's collateral requirements;

e.   Revolving lines of credit (short term or long term) where the original Lender is unwilling to renew the line, or the Applicant is restructuring its financing in order to obtain a lower interest rate or longer term;

f.   Debt with a maturity that was not appropriate for the purpose of the financing (e.g. a 3 year term loan to finance a piece of equipment with a useful life of 15 years);

g.   Debt used to finance a change of ownership;

i.   Refinancing debt owed to a financial institution or any third party (other than the seller) within 12 months of the change of ownership may not be processed under delegated authority.

ii.   To be eligible for refinancing, any seller financed note must have been in place for 24 months following the change of ownership, and must have been current for the past 24 months. The refinancing request must meet the requirements set forth in paragraphs E.4 and E.5 below; and

h.   Debt that is not identified above but the Lender believes no longer meets the needs of the Applicant:

i.   The Lender must cite the specific reasons why the existing debt no longer meets the needs of the Applicant;

ii.   Lender may not cite "improving the lien position" as the sole reason for the refinancing; and

iii.   Applications under this subparagraph h. may only be processed through non-

delegated 7(a) procedures.

4. With the exception of debt under E.3.a., c. or e. above, when refinancing debt, the new installment amount must be at least 10 percent less than the existing installment amount(s). If other debt is being refinanced at the same time, such debt may be included in the cash flow improvement calculation. However, no debt(s) on reasonable terms may be refinanced. If the note terms include an escalating payment structure, the new installment amount must be at least 10 percent less than the expected installment amount within the next 12 months.

5. When refinancing debt, the Lender's loan file must include:

   a. A written analysis that addresses the following issues:

      i. The reason the debt was incurred;

      ii. The reason for restructuring the debt (for example, over-obligated or imprudent borrowing);

      iii. The factor(s) that support that the debt being refinanced is not currently on reasonable terms;

      iv. How the new loan will improve the financial condition of the Applicant;

      v. The reason(s) the Lender believes the debt to be refinanced no longer meets the needs of the Applicant (See paragraph E.3.h. above.); and

   b. Supporting documentation for each debt to be refinanced:

      i. Lenders are required to obtain copies of notes, security agreements, leases, or other documentation evidencing the debt. (For non-delegated loans, Lenders must submit copies of all supporting documentation for the debt to be refinanced to the LGPC with the application.)

      ii. For credit card debt, include a copy of the most recent credit card statement evidencing the holder of the account and the current balance. (See also paragraph E.2.b.ii above.)

6. Refinancing Same Institution Debt:

   a. When a Lender seeks to use SBA-guaranteed loan proceeds to refinance its own debt, it must include a transcript showing the due dates and when payments were received as part of its analysis and recommendation for the prior 36 months, or the life of the loan whichever is less. In addition, the Lender must explain in writing any late payments and late charges that have occurred during the last 36 months. (Late payments are defined as any payment made beyond 29 days of the due date.) An SBA guaranteed loan may not be used to refinance same institution debt where there is an appearance that the Lender will shift to SBA all or part of a potential loss from that same debt. (13 CFR § 120.201)

   b. Applications that include the refinancing of same institution debt may not be processed using PLP procedures unless (13 CFR § 120.452(a)(2)):

      i. The debt is an interim loan that has been made for other than real estate construction purposes and was approved by the Lender within 90 days prior to

the issuance of a PLP loan number; or

ii.     The debt is a construction loan that has not been disbursed at the time of application submission.

7.  Refinancing an SBA-Guaranteed Loan:

    a.  Refinancing an existing SBA debt is permissible provided the conditions of paragraphs E.3, E.4, and E.5 above are satisfied and the procedures of this paragraph are followed.

    b.  Procedure to refinance an SBA-guaranteed loan:

        i.     Applicant or Lender must provide evidence from the Lender holding the existing SBA-guaranteed loan that verifies the Lender has declined to approve an increase in loan amount or a second loan, and the current Lender is either unwilling or unable to modify the current payment schedule.

        ii.    Lender must retain this evidence in the loan file.

    c.  Procedure to refinance a same institution SBA-guaranteed loan:

        i.     A Lender may refinance one of its own SBA-guaranteed loans only if it is unable to modify the terms of the existing loan because a secondary market investor will not agree to modified terms, or if an increase in the amount of an existing SBA-guaranteed loan is not possible.

        ii.    These applications may not be processed under delegated authority; they must be processed in the LGPC.

8.  Using a 7(a) loan to Refinance an Existing SBA 504 loan:

    a.  A 7(a) loan may be used to refinance an existing 504 loan if it meets the requirements of paragraphs E.3, E.4, and E.5 above and either:

        i.     Both the Third Party Loan and the 504 loan are being refinanced; or

        ii.    The Third Party Loan has been paid in full and the 504 loan needs to be refinanced as part of a larger transaction to provide funding for expansion of or renovations to the Project Property. In either case, the Lender must document its loan file as to the justification to refinance the existing SBA-guaranteed 504 loan. Any applicable 504 prepayment penalties will apply.

    b.  Refinance of an existing 504 loan may not be processed under delegated authority.

9.  Refinancing under SBA Express:

    a.  A Lender may refinance an existing non-SBA guaranteed loan or Borrower debt from another lender if:

        i.     The Lender determines that the existing loan no longer meets the needs of the Applicant (for example if the current loan is a term loan and a revolver is needed); and

        ii.    The new loan meets the SBA's 10 percent improvement to debt service coverage requirement, as applicable (see Paragraph E.4 above).

b. Under SBA Express, a Lender may refinance its own non-SBA guaranteed debt to the Applicant if:

    i. Items E.9.a).i and a).ii above are met;

    ii. The debt to be refinanced is, and has been, current for at least the last 36 months. (SBA Form 1920 includes the related Lender certification.) Current means that a required payment has not remained unpaid for more than 29 days. A loan that has matured and not been paid within 29 days of the maturity date is not current and is not eligible for refinancing; and

    iii. The Lender's exposure to the Applicant will not be reduced.

c. Lenders must avoid any circumstances that could create a possible conflict of interest. Also, in refinancing debt, particularly credit card debt, Lenders must take reasonable steps to ensure Applicants are aware and certify that refinancing comprises only business related debt (SBA Form 1919, Borrower's Information Form, includes such a certification).

d. Existing SBA-guaranteed loans may not be refinanced under SBA Express. The only exceptions are:

    i. If the transaction is the purchase of an existing business that has an existing SBA loan that is not with the requesting SBA Express Lender; and

    ii. If the Applicant needs additional financing and the existing Lender is unable or unwilling to increase the existing SBA loan or make a second loan, and the new loan will meet the 10 percent improvement to debt service coverage requirement, as applicable (see Paragraph E.4 above).

An SBA Express Lender may not refinance its own existing SBA debt under SBA Express.

10. Refinancing Under Export Express:

a. A Lender may refinance debt under Export Express if it follows the guidelines set forth in paragraph E.9.a. through c. above for SBA Express.

b. A new Export Express loan is not subject to SBA's 10 percent improvement in debt service coverage requirement if the debt to be refinanced is a revolving line of credit.

c. The Lender must obtain documentation to verify that the new loan or line of credit will be used for export development activities.

d. A Lender may refinance an existing Export Express loan under Export Express only if the original Export Express Lender is unable or unwilling to increase or make a second Export Express loan. Lender must maintain evidence in its file that the original Lender is unwilling to increase the original Export Express loan amount or make a second loan. A Lender may not refinance one of its own Export Express loans with a new Export Express loan.

11. Refinancing Under CAPLines:

a. No proceeds from a Seasonal, Contract or Builder's CAPLine may be used to

refinance any existing debt.

b.  Proceeds from a Working Capital CAPLine may refinance existing short-term revolving debt as long as the conditions of paragraphs E.2, 3 and 5 above are met and:

    i.  The short-term revolving debt must be terminated after it is paid off with the CAPLine;

    ii.  The refinancing does not put SBA in a position to sustain a loss which the existing lender is presently facing;

    iii.  Depending on whether the CAPLine will be disbursed based on a Borrowing Base Certificate (BBC) or not, the Borrower has either a borrowing base or collateral sufficient to support the Working Capital CAPLine plus any other short-term debt that is not being refinanced;

    iv.  The refinancing is specifically identified in the Use of Proceeds section of the Authorization; and

    v.  If the application includes the refinancing of same institution short-term debt:

        a)  The application must be submitted to the LGPC for processing. Such applications may not be processed under delegated authority; and

        b)  If the Applicant defaults on the SBA-guaranteed CAPLine within 90 days of initial disbursement, there will be a presumption that the loan proceeds were used to pay a creditor in a position to sustain a loss causing a shift of all or part of the loss to SBA in violation of 13 CFR § 120.201 and SBA may deny liability on its guaranty of the line.

    vi.  If the application includes the refinancing of same-institution, SBA-guaranteed short-term revolving debt, in addition to the requirements of paragraphs E.11.b.i through v above, the Lender's exposure to the Applicant will not be reduced.

c.  Additional documentation required:

    i.  A copy of the note(s) and an explanation of the terms and conditions of any debt(s) being refinanced;

    ii.  A copy of the transcript of account; and

    iii.  A BBC with Aging of Receivables and List of Inventory, as necessary.

d.  If the short-term revolving debt to be refinanced was not revolving in accordance with the terms of the note, the debt is not eligible to be refinanced under CAPLines.

12.  Refinancing under Export Working Capital Program (EWCP):

Proceeds may refinance an existing EWCP loan or other export line of credit as long as the conditions of Paragraphs 2, 4 and 5 above are met and:

a.  Initial disbursement must be made in accordance with the Authorization;

b.  The loan being refinanced must be paid off with the EWCP loan and the refinanced

loan must be terminated after the pay-off; and

   c. A new EWCP loan is not subject to SBA's 10 percent improvement in debt service coverage requirement if the debt to be refinanced is a revolving line of credit.

   d. Prior to first disbursement, the Lender must ensure:

      i. Collateral for the loan being refinanced is transferred to secure the EWCP loan.

      ii. Any outstanding receivable that would have been applied to pay down the refinanced loan will be applied to pay down the EWCP loan in the same percentage.

13. Refinancing under International Trade Loan Program:

International Trade loan proceeds may be used for the refinancing of any debt that is not structured with reasonable terms and conditions, including any debt that qualifies for refinancing under Standard 7(a).

14. Refinancing as part of a change of ownership:

   a. If the change of ownership is a complete change of ownership and any existing debt of the business being acquired will be refinanced as part of the transaction, the refinancing of such debts is considered part of the purchase of the business and does not have to meet the requirements set forth in this section.

   b. If the change of ownership is between existing owners of a business and existing business debt will be refinanced as part of the transaction, the refinancing must meet the requirements set forth in this section.

   c. If the existing debt is SBA-guaranteed and with the same Lender, the application cannot be processed under delegated authority processing procedures. These applications must be processed in the LGPC. In a complete change of ownership situation, the option to assume the existing SBA debt should be offered to the buyer.

15. Other conditions that apply to debt refinancing:

   a. A 7(a) loan may not be used to refinance a debt owed to an SBIC.

   b. The third party financing for an existing 504 project cannot be refinanced with a 7(a) loan. (13 CFR § 120.920(b)).

   c. After an SBA Authorization has been issued, but prior to disbursement, a Lender or an affiliate of the Lender may make interim advances (also known as bridge loans) and SBA loan proceeds may be used to reimburse the interim advances, as long as the interim advances reasonably comply with the terms of the SBA Authorization. Such advances are made at the Lender's own risk. Lender notification to SBA of such advances is not required.

   d. The payment of trade payables is not considered to be debt repayment.

   e. The Authorization must include:

      i. An itemization of all debts being repaid by loan proceeds when the individual creditor is to be paid $10,000 or more; and/or

        ii.   The loan number and dollar amount of any existing SBA being debt refinanced.

F.  Leasing Part of a Building Acquired with Loan Proceeds (13 CFR § 120.131):

   1.  Amount of rentable property that can be leased:

      a.  For an existing building, Applicant or OC(s) must occupy 51% of the rentable property and may sublease up to 49%; and

      b.  For new construction, Applicant or OC(s) must occupy 60% of the rentable property, may permanently sublease up to 20% and temporarily sublease an additional 20% with the intention of using some of the additional 20% within 3 years and all of it within 10 years.

      c.  An EPC must lease 100% of the rentable property to an eligible OC. The OC must follow items F.1.a and b above.

      d.  Circumstances may justify allowing the Applicant a period of time after closing of the SBA loan to comply with the above occupancy requirements. For example, a pre-existing lease may have a few more months to run. In no case may the small business have more than 1 year to meet occupancy requirements.

      e.  The restrictions in F.1.a and b above apply regardless of whether the rentable property is leased to a commercial or residential tenant.

      f.  The Applicant may not use loan proceeds to improve or renovate any portion of the Rentable Property that is subleased to a third party.

      g.  During the life of the loan, a Borrower or Operating Company may not lease space to any business that the Borrower or Operating Company knows is engaged in any activity that is illegal under Federal, state or local law or any activity that can reasonably be determined to support or facilitate any activity that is illegal under Federal, state or local law (such as a marijuana dispensary). If a Borrower or Operating Company does lease space to such a business, the Lender must notify SBA Counsel as soon as the Lender becomes aware of the lease and advise of the action(s) the Lender intends to take.

   2.  "Rentable Property" is the total square footage of all buildings or facilities used for business operations (13 CFR § 120.10) excluding vertical penetrations (stairways, elevators, and mechanical areas that are designed to transfer people or services vertically between floors), and including common areas (lobbies, passageways, vestibules, and bathrooms). Rentable property may also include exterior space (except parking areas) that is actively used in Borrower's business operations. Examples of exterior space that is actively used in Borrower's business operations include: outdoor storage yards for general contractors, trucking companies, and moving and storage companies; or boat slips and docks for marinas.

   3.  Lender must document in its loan file the basis for determining that the exterior space is actively used in Borrower's business operations.

   4.  To determine the occupancy percentage allocated to the Applicant or OC, Lender may

include the square footage of all common areas.

5.  In an existing building zoned for both commercial and residential use, the business owner may either occupy or rent to a third party the space zoned for residential use. However, if the business owner occupies this space, it is not considered as occupied by the business, unless the residential portion of the property meets the requirements of paragraph V.G. below.

6.  If the projected rental income is included in the repayment analysis, it must be independently substantiated.

G.  Residential Space as Part of the Business.

If the nature of the business requires a resident owner or manager, loan proceeds may be used for the purchase of an existing building(s) or construction of a new building(s) that includes residential space essential to the business. The square footage of the residential space must be appropriate to the needs of the business, and may not exceed 49% of the total property. For example, a horse-boarding facility traditionally requires that someone be on premises at all times to care for the horses. In this case, the residential property would be considered to be occupied by the business.

H.  Change of Ownership (13 CFR § 120.202).

1.  An Applicant(s) (and any individual co-Applicant as permitted under this paragraph), may use loan proceeds for a change of ownership, whether the change of ownership is accomplished through a stock purchase (including a stock redemption) or an asset purchase, only under the circumstances described under this paragraph. An asset purchase will be deemed a change of ownership and must comply with all of the requirements of this paragraph if the Applicant(s) is purchasing all or substantially all of the assets of the Seller's business and is continuing the operations of the Seller's business.

   a.  The change of ownership will promote the sound development and/or preserve the existence of a small business;

   b.  Change of Ownership Between Existing Owners: A change of ownership between existing owners may be financed under the following circumstances:

      i.  An existing owner(s) of the small business is purchasing the ownership interest of another owner(s), resulting in 100% ownership of the business by the purchasing owner(s); or

      ii.  The small business is redeeming the ownership interest of an owner(s), resulting in 100% ownership of the small business by the remaining owner(s).

   c.  Change of Ownership Resulting in a New Owner: A change of ownership resulting in a new owner may be financed under the following circumstances:

      i.  A small business is purchasing 100% of the ownership interest in another business;

      ii.  An individual(s) who is not an existing owner is purchasing 100% of the ownership interest in a small business;

    iii.   A small business is acquiring another small business through an asset purchase;

    iv.   An Employee Stock Ownership Plan (ESOP) or equivalent trust is purchasing a controlling interest (51%) in the employer (Note: any transaction costs associated with the purchase of the controlling interest by the ESOP or equivalent trust, but not costs associated with setting up the trust, may be included in the use of proceeds) (13 CFR § 120.352(b));

    v.   A small business is obtaining a loan for the sole purpose of re-lending the funds to an ESOP or equivalent trust to acquire a controlling interest in the small business (Note: any transaction costs associated with making the loan to the ESOP or equivalent trust, but not the costs associated with setting up the trust, may be included in the use of proceeds); or

    vi.   A cooperative is purchasing a controlling interest (51%) in the employer (Note: any transaction costs associated with the purchase of the controlling interest, but not costs associated with setting up the cooperative, may be included in the use of proceeds).

2.  The seller may not remain as an officer, director, stockholder or key employee (an employee who manages daily operations, e.g. overseeing a department or a division, not a clerical staff position) of the business. (13 CFR § 120.130) If a short transitional period is needed, the small business may contract with the seller as a consultant for a period not to exceed 12 months including any extensions.

When the purchaser is an ESOP or equivalent trust or a cooperative and is acquiring a controlling interest (51 percent or more) in the employer business, the seller may stay on as an owner, officer, director, stockholder or key employee of the company; however, any seller who remains as an owner, regardless of percentage of ownership interest, must provide their guaranty in accordance with the requirements of Chapter 4, Paragraph II.A. of this Subpart.

3.  An SBA-guaranteed loan cannot be made solely to an individual. The small business must be either the Borrower or a Co-Borrower as follows:

    a.   In a change of ownership under section V.H.1.b.i. or V.H.1.c.ii. above, the small business and the individual owner(s) must be co-Borrowers. In addition, the Note must be executed, jointly and severally, by both the individual(s) who acquires the ownership interest(s) and the small business whose ownership interest is being acquired. If the small business denies liability for the debt based on an alleged failure of consideration under applicable state law, SBA may deny liability on its guaranty.

    b.   In a change of ownership under section V.H.1.b.ii. above, the small business must be the Borrower and the Lender may require the remaining owner(s) to be Guarantor(s) in accordance with the requirements for personal guaranties set forth in Chapter 4, Paragraph II of this Subpart. In a change of ownership under section V.H.1.c.i. or c.iii. above, the acquiring entity may be the Borrower or the acquiring entity and the small business being acquired may be Co-Borrowers.

4.  The Lender must comply with the requirements for IRS verification identified in Chapter 5

of this Subpart.

5. If the Borrower will be acquiring the small business's real estate in a separate transaction with a non-SBA guaranteed loan, the SBA loan must receive a shared lien position (pari passu) on the real estate with the non-SBA guaranteed loan. This provision does not apply if the business real estate is being financed as part of a 504 project.

6. The following changes of ownership are not eligible:

   a. A non-owner who is purchasing less than 100% of the ownership interests in the business, except for eligible ESOP or cooperative purchases; or

   b. An existing owner who is purchasing the ownership of another existing owner that will not result in 100% ownership of the business by the purchaser.

7. SBA considers a change of ownership to be a "new" business because it will result in new, unproven ownership/management and increased debt unrelated to business operations.

8. The Lender's loan documentation must include:

   a. A current business valuation (not to include any real estate) by the Lender or an independent third party hired by the Lender with proven experience in business valuations. (See Chapter 4 of this Subpart for SBA's business valuation requirements.)

   b. A site visit of the business being acquired. The Lender must document in its loan file the date of the site visit as well as comments.

   c. A real estate appraisal for commercial real estate that meets SBA's requirements. (See Chapter 4 of this Subpart for SBA's appraisal and valuation requirements.)

   d. An analysis as to how the change of ownership will promote the sound development and/or preserve the existence of the business. If the analysis cannot support that the change of ownership will be in the best interests of the business and its continued, successful operations, then the loan request must not be submitted to SBA for its guaranty.

   e. Business, stock, and asset purchase agreements.

   f. Evidence that all assets, including transferable licenses (i.e. liquor license) conveyed as a result of purchase are properly secured as collateral by Lender.

9. Intangible Assets: An SBA-guaranteed loan may be used to finance a change of ownership that includes intangible assets (including, but not limited to, goodwill, client/customer lists, patents, copyrights, trademarks, intellectual property, and agreements not to compete) as long as it is supported by an independent business valuation that complies with the requirements of Chapter 4 of this Subpart.

   a. The "purchase price of the business" includes all assets being acquired such as real estate, machinery and equipment, and intangible assets.

   b. The value of the intangible assets is determined by either the book value as reflected on the business's balance sheet, a separate appraisal for the particular asset, or the value of the business as identified in the business valuation minus the sum of the

working capital assets and the fixed assets being purchased.

    c.  If any of the loan proceeds will be used to finance intangible assets, the amount must be specifically identified in the Use of Proceeds section of the application and the Authorization.

I.  Eligible Use of Proceeds for SBA Express.

SBA Express loan proceeds must be used exclusively for business-related purposes subject to 13 CFR §§ 120.120 and 120.130.

J.  Eligible Use of Proceeds for Export Express.

   1.  Export Express loans must be used for an export development activity, which includes the following:

    a.  Obtaining a Standby Letter of Credit when required as a bid bond, performance bond, or advance payment guarantee;

    b.  Participation in a trade shows that takes place outside the United States;

    c.  Translation of product brochures or catalogues for use in markets outside the United States;

    d.  Obtaining a general line of credit for export purposes (as a normal course of business, the Borrower may use portions of the line of credit for domestic purposes, as long as no less than 70% of the line of credit will be used for export purposes);

    e.  Performing a service contract from buyers located outside the United States;

    f.  Obtaining transaction-specific financing associated with completing export orders;

    g.  Purchasing real estate or equipment to be used in the production of goods or services for export;

    h.  Acquiring, constructing, renovating, modernizing, improving or expanding a production facility or equipment to be used in the United States in the production of goods or services for export;

    i.  Providing term loans and other financing to enable a small business concern, including an export trading company and an export management company, to develop a market outside the United States;

    j.  Refinance debt as outlined in paragraph V.E.10 above; and

    k.  Financing indirect exports. The term "indirect export" applies to situations where, although the Borrower's direct customer is located in the United States, that customer will be exporting the items/services it purchased from the Borrower to a foreign Buyer. In such cases, the Borrower must provide documentation to the Lender from the Borrower's domestic customer (typically in the form of a letter, invoice, order or contract) that the goods or services are in fact being exported.

   2.  Loan proceeds may not be used to:

    a.  Finance overseas operations, except for the marketing and/or distribution of products/services exported from the U.S.; or

    b.  Refinance existing SBA-guaranteed loans, expect as permitted under Paragraph E.10 above.

3.  When an Export Express loan finances specific export transactions (including indirect exports) under Paragraph J.1.a, e, or f above, the Lender must determine if U.S. companies are authorized to conduct business with the Parties and the country(ies) to which the goods or services will be shipped. Lenders must check Ex-Im Bank's Country Limitation Schedule, which can be found on Ex-Im Bank's website at https://www.exim.gov/tools-for-exporters/country-limitation-schedule or is available from SBA's Office of International Trade. The Lender also must check the Department of Treasury Office of Foreign Assets Control (OFAC) sanctions lists, which can be found at https://sanctionssearch.ofac.treas.gov/.

    a.  For federally-regulated Lenders, compliance with the procedures required by the Lender's Federal Financial Institution Regulator will constitute compliance with the above referenced OFAC requirement.

    b.  For SBA Supervised Lenders, Lender must check the OFAC sanctions lists prior to first disbursement of funds on each specific export transaction. A loan may not be made to a business that directly or indirectly exports to a foreign country which is listed as a prohibited country (Note # 7 on the Country Limitation Schedule), or if the transaction would be prohibited under any of the sanctions programs administered by OFAC.

4.  Documentation required: SBA requires the Lender to obtain information from the Borrower pertaining to the use of proceeds and its projected impact on the Borrower's export sales and retain that documentation in its loan file. The specific documentation includes the following:

    a.  The Applicant must answer affirmatively on question 9 of SBA Form 1919 and provide an estimate of annual export sales; and

    b.  The Applicant must provide documentation regarding the following items (this may be in the form of a general business plan, an attachment to the loan application or on a Lender-developed questionnaire):

        i.  A brief description of the business' product or service which will be exported;

        ii.  An explanation of how the loan proceeds will enable the business to enter a new export market or expand in an existing export market;

        iii.  The countries to which the business will export; and

        iv.  An estimate of the Borrower's export sales for the 12 month period following the date of the loan application.

K.  Eligible Use of Proceeds for EWCP.

1.  EWCP loan proceeds may be used to:

    a.  Acquire inventory for export or to be used to manufacture goods for export;

    b.  Pay the manufacturing costs of goods for export;

    c.  Purchase goods or services for export;

    d.   Support Standby Letters of Credit related to export transactions;

    e.   For working capital directly related to export orders;

    f.   For foreign accounts receivable and inventory financing;

    g.   For refinancing existing short-term export lines of credit with the transfer of collateral as detailed in Paragraph E.12 above; and

    h.   Support an indirect export as detailed in paragraph V.J.1.k above.

2. Lender fees and charges, as well as any packaging fees paid, are eligible uses of proceeds.

3. EWCP loan proceeds may not be used to (13 CFR § 120.342):

    a.   Support the Borrower's domestic sales, except in the case of an indirect export;

    b.   Acquire fixed assets or capital goods for use in the Borrower's business;

    c.   Acquire, equip, or rent commercial space overseas; or

    d.   Finance professional export marketing advice or services, foreign business travel, participation in trade shows or support staff in overseas offices, except to the extent it relates directly to the transaction being financed.

L. Eligible Uses of Proceeds for International Trade (IT) Loans.

Proceeds of an IT loan may only be used for the following eligible purposes (proceeds of an IT loan may not be used for any other purpose, including a change of ownership as outlined in section H above):

1. Acquire, construct, renovate, modernize, improve or expand facilities and equipment to be used in the United States to produce goods or services involved in international trade and to develop and penetrate foreign markets;

2. Working Capital; and

3. Refinancing, as outlined in paragraph V.E.12 above.

M. Eligible Uses of Proceeds for CAPLines.

1. Seasonal CAPLines:

Borrowers must use the loan proceeds solely to finance the seasonal increases of accounts receivable and inventory (or in some cases associated increased labor costs). Funds must not be used to maintain activity during the slow periods of the business's cycle.

2. Contract CAPLines:

    a.   The contractor must use loan proceeds only to finance the costs of one or more specific contracts, including overhead or general and administrative expenses, allocable to the specific contract(s).

    b.   Contract CAPLine proceeds may not be used for permanent working capital, to acquire fixed assets, to pay delinquent taxes or similar funds held in trust (directly or indirectly), to refinance existing debt, to finance a contract in which significant performance has already begun, for change of ownership or floorplan financing.

    c.   Contract CAPLines proceeds may not be used to cover any mark-up or profit.

    d.   Advances of loan proceeds financing performance of one contract or sub-contract under a master agreement may not be used to finance the performance of another contract or sub-contract.

    e.   Progress payments or proceeds received in the performance of a contract or sub-contract financed with this line must not be applied in repayment of a different contract or sub-contract. Funding and payment applications must be accounted for in conjunction with the specific contract or sub-contract to which they relate.

3.   Builders CAPLines:

    a.   Borrowers must use the loan proceeds solely for direct expenses related to the construction and/or "substantial" renovation costs of a specific eligible project (residential or commercial buildings for resale), including labor, supplies, materials, equipment rental, direct fees (building permits, interim disbursement inspection fees, etc.), utility connections (above or below ground), construction of septic tanks, and landscaping. ("Substantial" means rehabilitation expenses of more than one-third of the purchase price or fair market value at the time of application.)

    b.   Proceeds paid to a subcontractor can include the subcontractor's profit. The cost of land is eligible if the land cost does not exceed 33 percent of the project cost. Up to 5% of the project cost can be allocated for improvements that benefit all properties in a subdivision, such as streets, curbs, sidewalks, or open spaces.

    c.   The Borrower must not use loan proceeds to purchase vacant land for possible future construction or to operate or hold rental property for future rehabilitation.

4.   Working Capital CAPLines:

Borrowers must use the loan proceeds for short term working capital/ operating needs. Proceeds must not be used to pay delinquent withholding taxes or similar funds held in trust (e.g., state or local sales taxes), or for floor planning. In the event that Working Capital CAPLine proceeds are used to acquire fixed assets, Lender must refinance the portion of the line used to acquire the fixed asset into an appropriate term facility no later than 90 days after Lender discovers that the line was used to finance a fixed asset.

# CHAPTER 3: LOAN TERMS AND CONDITIONS

## I.   MAXIMUM LOAN AMOUNTS

The maximum loan amount allowed under SBA's loan program varies by delivery method but generally cannot exceed $5 million. Loans greater than $5 million cannot be approved under the 7(a) program.

Please see the Quick Reference Chart below for more information.

### SBA QUICK REFERENCE CHART No. 1

| Loan Program/Product | Maximum Loan Amount |
|---|---|
| Standard 7(a) Loans (including PLP)<br>International Trade<br>EWCP<br>CAPLine<br>Energy Loans<br>ESOP | $5,000,000 |
| 7(a) Small Loans | $350,000 |
| SBA Express Loans<br>(including lines of credit) | $350,000 (gross) (including any outstanding SBA Express, Community Express and Patriot Express) |
| Export Express | $500,000 (gross) |

A.  Maximum Loans to Businesses with Affiliates.

Lenders must determine whether affiliation exists and document the results in their credit analysis. (See Chapter 2 of this Subpart for a discussion of affiliation.) If affiliation exists, SBA's loan maximums apply to the Applicant business, including all affiliates, as if all were a single business.

B.  Maximum Loan Amount for multiple loans approved within 90 days of each other – "90 Day Rule."

1.  If two SBA-guaranteed loans to any one business (including affiliates) are approved within 90 days of each other, the maximum gross amount of all such loans in that time frame cannot exceed $5,000,000.

2.  Two SBA-guaranteed loans approved within 90 days of each other may impact the maximum guaranty percentage available to the Borrower and its affiliates as well as the guaranty fee. (See Paragraphs II and V of this Chapter for further guidance.)

## II.  MAXIMUM GUARANTY AMOUNTS

The maximum dollar amount outstanding of SBA's guaranty to any one business (including affiliates) must not exceed $3,750,000, except when the loan is approved under a program which specifically permits higher amounts. When calculating the maximum guaranty percentage available to a Borrower

and its affiliates, the Lender must include the approved loan amount for a revolving line of credit. Please refer to the SBA Quick Reference Chart below. The SBA's guaranty is also known as the "SBA share" or "guaranteed portion."

SBA QUICK REFERENCE CHART No. 2

| Loan Program/Product | Maximum Guaranty Amount | Percentage |
|---|---|---|
| Standard 7(a) Loans (including PLP) – See Note 1 below<br><br>CAPLine<br><br>Energy Loans<br><br>ESOP | $3,750,000 | 85% for loans of $150,000 or less. 75% for loans over $150,000 |
| SBA Express Loans | $3,750,000--See Note 2 | 50% |
| Export Express | $3,750,000--See Note 2 and Note 4 | 90% for loans of $350,000 or less. 75% for loans over $350,000 up to $500,000. |
| EWCP Loans | $4,500,000 | 90% |
| International Trade Loans | $4,500,000--See Note 3 | 90% |

Note 1: The amount of any loan received by an Eligible Passive Company (EPC) applies to the loan limit of both the EPC and the Operating Company (OC).

Note 2: Multiple loans allowed up to program maximum loan amounts listed in Quick Reference Chart 1. The guaranteed amount of all SBA Express or Export Express loans counts toward the $3.75 million maximum SBA exposure that may be outstanding for all SBA loans to a Borrower and its affiliates at any one time.

Note 3: Exception for IT Loans. The amount guaranteed for working capital for the IT loan combined with any other outstanding 7(a) loan for working capital cannot exceed $4,000,000. (Small Business Act, Section 7(a)(3)(B))

Note 4: Export Express Loans: If the combined Export Express loans are approved within 90 days of each other, and the combined gross loan amount of all the Export Express loans approved in that time frame to any one Borrower (including affiliates) exceeds $350,000, then the maximum guaranty percentage on the second loan must be reduced accordingly so the combined guaranty is no more than 75% (subject to the $3,750,000 guaranty amount limit).

A.  Combination of 7(a) and 504 loans.

   1.  When an Applicant applies for any combination of 7(a) and 504 loans, the order in which the loans are approved determines the maximum loan and guaranty amount available. Because the 7(a) loan has a lower maximum guaranteed amount, the 7(a) loan should be processed and approved first.

   2.  Lenders must advise the SBA processing centers that there is a companion 504 application so the 7(a) loan is processed and approved prior to the 504 loan application being processed

and approved.

3. The 90-day rule is only for those situations where a Borrower is approved for multiple 7(a) loans within a 90-day period. It does NOT apply if the Borrower is receiving a 7(a) loan and a 504 loan.

B. Maximum Guaranty Percentage for Multiple 7(a) Loans (13 CFR § 120.210).

1. Excluding multiple 7(a) loans approved within 90 days of each other, the maximum guaranty percentage for 7(a) loans of $150,000 or less is 85 percent.

2. For loans approved within 90 days of each other, the gross dollar amounts of the loans are combined. If the combined gross amount exceeds $150,000, then the percentage of guaranty on the combined loans must not be more than 75 percent (subject to the $3,750,000 limit).

For example, if a business receives an 85 percent guaranty on a loan of $140,000, and submits a second application for $50,000 within 90 days of the first loan's approval, the percentage of guaranty on the second loan must be reduced to 47 percent so the combined guaranty is no more than $142,500, or 75 percent of the total amount of both loans ($190,000).

C. Zero Percent Guaranty Cannot be Provided For Ineligible Purposes:

A 7(a) loan cannot include proceeds for an ineligible purpose or have any portion of the loan made to an ineligible business and no part of an SBA 7(a) loan may be guaranteed at zero percent.

## III. LOAN MATURITIES (13 CFR § 120.212)

The loan term must be the shortest appropriate term based on the use of proceeds and the Borrower's ability to repay.

A. Working capital loans and the financing of intangible assets (including goodwill) must not exceed 10 years.

B. Equipment loans should not exceed 10 years (or the useful life of the equipment).

C. Real estate loans must not exceed 25 years unless a portion of the loan is used for construction or renovation of the real estate. If the use of proceeds on a real estate loan includes construction or renovation, the construction or renovation period may be added to the 25 year maximum maturity.

D. Loans for leasehold improvements may not exceed 10 years, plus an additional period reasonably necessary to complete the leasehold improvements, which may not exceed 12 months.

SBA QUICK REFERENCE CHART No. 3

| Program/Use of Proceeds | Maximum Maturity See Note 1 below | Additional Considerations |
|---|---|---|
| 7(a)--Inventory or Working Capital | Up to 10 years | Terms for a working capital or inventory loan should be appropriate to the Borrower's ability to repay up to 10 years. |

| Program/Use of Proceeds | Maximum Maturity See Note 1 below | Additional Considerations |
|---|---|---|
| 7(a)--Equipment, Fixtures, or Furniture | 10 years except when the useful life of the asset exceeds 10 years | When maturity exceeds 10 years, lender must document the loan file that the reasonable economic life of the asset(s) acquired is greater than 10 years and final maturity must not exceed the useful economic life or 25 years, whichever is less. |
| 7(a)--Real Estate— including Acquisition, rehabilitation, renovation or construction | Up to 25 years (See Note 2) | The maximum maturity for these loans is 25 years plus any additional period reasonably necessary to complete the construction or improvements. |
| 7(a)—Leasehold improvements | Generally up to 10 years | The maximum maturity for these loans is 10 years, plus an additional period necessary to complete the leasehold improvements, which may not exceed 12 months. |
| 7(a)--Mixed Purposes | May use blended maturity or the maturity up to the maximum for the asset class comprising 51% or more of the use of proceeds. | When loan proceeds are used for multiple purposes (land & building, working capital, and machinery & equipment, or the refinancing of any these purposes), the maturity may be a blended maturity or, if 51% of the use of proceeds is for real estate, the maximum maturity may be up to 25 years. |
| International Trade Loans | Same as 7(a) | |
| Export Working Capital Program | Up to 3 years | For single transactions, maturity should correspond to the length of the transaction cycle. Maturities greater than 12 months may be approved, if justification and recommendation for a longer maturity is included in the loan officer's report. For revolving lines of credit, the maturity is typically 12 months. The Lender should request re-issuance of a line (new loan & loan number) no less than 30 days prior to maturity of the existing line. |
| CAPLines | Up to 10 years (except Builder's CAPLines which cannot exceed 5 years) | Seasonal, Contract, or Builder loans which finance a single transaction should have a maturity tied to the seasonal cycle, contract completion date, or project completion date. All CAPLines must have an exit strategy. Final disbursement should occur far enough in advance of maturity so that a sufficient amount of time is available for the assets acquired with proceeds to be converted back to cash and final payment. |
| SBA Express | Term loans--same as 7(a). Lines of Credit (LOCs) up to 10 years including a term out period. | SBA Express LOCs may revolve for no more than 60 months, with a term out period of up to another 60 months, for a total term of 120 months. Under no circumstances may there be any advances after the initial 60 month period. |
| Export Express | Term loans—same as | For Export Express transactional lines of credit, the maximum term is 7 years and no disbursement can be |

| Program/Use of Proceeds | Maximum Maturity<br>See Note 1 below | Additional Considerations |
|---|---|---|
| | 7(a)<br>LOCs up to 7 years | made for an export transaction where payment by the foreign buyer will occur after the maturity date of the loan. |

Note 1: Loan maturity must not exceed the period of the guaranty. This prohibits such structures as a working capital loan with a 15-year maturity and an SBA guaranty limited to 10 years.

Note 2: The 25-year maximum maturity is not applicable for loans processed under the Builders Loan Program. (13 CFR § 120.396)

A.  Establishing the Repayment Period (13 CFR § 120.212):

When Lenders establish a repayment schedule and loan maturity, they must consider the following:

1.  The Borrower's ability to repay,

2.  Use of loan proceeds,

3.  Useful life of the assets being financed, and

4.  The appropriate maturity for mixed purpose loans. The Lender may use a blended maturity or the maturity up to the maximum for the asset class comprising 51% or more of the use of proceeds. Lenders must include the calculation used to determine the maturity in the credit memorandum.

5.  For loans to farm enterprises:

    a.  Where real estate comprises 51% or more of the use of proceeds, the maximum maturity is 20 years.

    b.  Where machinery and equipment comprise 51% or more of the use of proceeds, the maximum maturity is 15 years.

    (Note: Lender must include in its file support for maturities that exceed the standard for an asset class but in no event may the maturity exceed the stated maximums.)

    SBA has instructed the fiscal and transfer agent to stop the sale into the secondary market of a loan when the maturity exceeds the regulatory limits.

B.  Establishing the Maturity Date:

The maturity date for a 7(a) loan is set in terms of the number of months from either the date of Note or the date of initial disbursement to the date when final payment is due.

C.  Maturity When Refinancing Existing Assets or a Business Acquisition:

1.  The maximum maturity for a loan used to refinance a real estate or fixed asset loan must be the remaining useful life of the asset(s). The lender's loan analysis must document and justify that the asset(s) being refinanced has a useful life at least as long as the maturity provided.

2. The maximum maturity for a loan used to refinance a business acquisition shall be 10 years, unless 51% or more of the assets being financed consist of real estate which would permit a maturity up to 25 years.

D. SBA Express and Export Express Maximum Maturities and the use of Non-Financial Default Provisions:

1. SBA Express loans must have a stated maturity and the maturities are the same as any other 7(a) loan, except that revolving loans are limited to a maximum of 10 years. Revolving loans must be structured with a term-out period that is not less than the draw period, with no draws permitted during the term-out period. For example, the loan can have an 8 year maturity with a 2 year draw period and a term-out period of 6 years. Conversely, a loan with an 8 year maturity cannot have a draw period of 6 years and term-out period of 2 years.

2. Export Express loans must have a stated maturity and the maturities are the same as any other 7(a) loan, except that revolving loans are limited to a maximum maturity of 7 years, including any "term-out" period.

3. For Export Express transactional lines of credit, the maximum term is 7 years and no disbursement can be made for an export transaction where payment by the foreign buyer will occur after the maturity date of the loan.

4. Non-financial default provisions are allowed under SBA Express and Export Express under the following conditions:

   a. Non-financial default provisions are loan conditions that, if violated, would cause the loan to be in default even though the Borrower has made all payments as agreed.

   b. Non-financial default provisions must be substantive and must be agreed to by the Borrower in writing at loan closing;

   c. The provisions must be consistent with those used by the Lender on its similarly-sized non-SBA guaranteed commercial loans;

   d. A lender may not request purchase of the guaranty solely based on a violation of a non-financial default provision (see 13 CFR § 120.520); and

   e. A maturity date must be established in the note. For example, a line of credit could state that it is payable upon demand under certain conditions, but in no case later than a certain date.

5. Revolving loans may be established as renewable each year, provided they do not exceed the maximum maturity (10 years for SBA Express and 7 years for Export Express). Lender may not charge a renewal fee. If the original maturity was for 12 months or less, and the new maturity exceeds 12 months, an additional guaranty fee will be due. See paragraph V.G. of this Chapter.

6. The term of a loan may not exceed the period of the SBA guaranty commitment.

E. Maturity of CAPLines:

With the above noted exception for Builder's CAPLines, the maximum maturity on a CAPLine is 10 years. Any CAPLine with a maturity of less than 10 years can be renewed as long as the

total revolving repayment period does not exceed 120 months. The renewal is an extension of maturity (not a new loan). Thus, the loan number remains the same. If the original maturity was for 12 months or less, and the new maturity exceeds 12 months, an additional guaranty fee will be due. See paragraph V.G. of this Chapter.

F. Maturity of EWCP Loans:

1. General: The maximum maturity of an EWCP loan is 36 months. SBA's guaranty remains in effect for disbursements made through the maturity date, subject to the terms and conditions of the loan authorization and loan documents. With the exception of a disbursement made to fund a draw against a Standby Letter(s) of Credit that was issued under the EWCP before the maturity date, disbursements made after the maturity date are not covered under the guaranty. The maturity of the loan is:

   a. The date specified in the loan authorization. Such date will not be longer than 36 months from the Note date. If the loan is not reissued, or extended, all outstanding amounts are due and payable on that day.

   b. Standby Letters of Credit. Unless SBA provides prior written consent, Standby Letters of Credit supported by an EWCP loan must expire before the loan maturity date. If the Lender receives SBA's prior written consent and makes a disbursement after the maturity date because there has been a draw on a standby letter of credit which was issued under the EWCP prior to the maturity date, such disbursement will be covered by the guaranty.

2. Specific Types of EWCP loans:

   a. Single Transaction-Specific Loan: A non-revolving loan or revolving line of credit that supports a specifically identified, single export transaction. The LGPC or the PLP-EWCP Lender may approve a longer loan term (up to 36 months) to allow for such transaction cycles that exceed 12 months in term.

   b. Transaction Based-Revolving Line of Credit: A revolving line of credit can support either multiple export transactions or a single, specifically identified export transaction on a continuous basis during the term of the loan. While the term of a revolving line of credit typically does not exceed 12 months, LGPC or PLP-EWCP Lender may allow an initial commitment up to 36 months with annual renewals.

   c. Asset Based Loans (ABLs): ABLs are revolving lines of credit supported by a monthly BBC which reports levels of assets, normally accounts receivable and inventory, supporting the loan amount. ABLs are typically committed for 12 months and re-issued annually. Because a re-issuance of a loan is a new loan, another guaranty fee is due each time the loan is re-issued. (See the discussion of guaranty fees in Section V of this Chapter.) ABLs, however, can have up to a 36 month maturity with annual renewals. The Lender must supply to SBA updated financial statements on the Borrower annually.

## IV. INTEREST RATES

A. General Policy on Interest Rates (13 CFR §§ 120.213; 120.214; 120.215):

1. A loan may have a fixed or variable interest rate. The maximum interest rate that may be

established for any 7(a) loan is governed by SBA's regulations on interest rates, which preempts any provisions of a state's constitution or law. The Lender negotiates the interest rate with the Applicant, subject to SBA's maximum allowable rates.

2. SBA will periodically publish the maximum allowable fixed interest rate in the Federal Register. The maximum allowable fixed interest rate will be the Prime rate in effect on the first business day of the month, plus an allowable spread over Prime, as set forth in the most recent Federal Register Notice. For a listing of the current maximum allowable fixed interest rates, go to SBA's Capital Access Financial System homepage. The maximum allowable fixed rate may only be used by a Lender if such rate will be in effect for the entire term of the loan, without adjustment or reset. Otherwise, the maximum rates for variable rate loans will apply.

3. For variable interest rate loans, the base rate in effect on the first business day of the month will determine the basis for the initial interest rate for any complete loan application received by SBA during that month. The initial note rate must not exceed SBA's maximum interest rate. The basis for the SBA maximum interest rate is an acceptable base rate plus allowable spread. The spread above the base rate as identified in the Note may not be changed during the life of the loan without the written agreement of the Borrower. For further discussion of variable interest rates, see paragraph IV.C below.

4. Default interest rates are not permitted except as described below for SBA Express and Export Express.

5. For loans with a variable interest rate, the following terms must be defined:

   a. Base Rate:

      i. For standard 7(a), and PLP loans, there are three acceptable base rates:

         a) The Prime Rate;

         b) One Month London Interbank Offered Rate (LIBOR) plus 3 percentage points (LIBOR Base Rate); or

         c) The SBA Optional Peg Rate.

      ii. The Prime or LIBOR Base Rate will be that rate which is in effect on the first business day of the month, as identified in a national financial newspaper or website. This rate may be found in the newspaper on the second business day of the month. If a website is used, please ensure whether it is publishing the current day's rate or the previous day's rate as some newspaper websites publish the previous day's rate. The Optional Peg Rate is a weighted average of rates the Federal government pays for loans with maturities similar to the average 7(a) loan. SBA calculates and publishes the Optional Peg Rate quarterly in the Federal Register. Base Rates will be rounded to two decimal places with .004 being rounded down to .00 and .005 being rounded up to .01.

      iii. For SBA Express and Export Express, in addition to the above rates a lender may use the same base rate of interest it uses on its similarly sized, non-SBA guaranteed commercial loans with one exception. If the loan is sold in the secondary market, only the base rates identified in the above paragraph are permitted.

    b.  Frequency of change;

    c.  Range of fluctuation; and

    d.  Ceiling and floor (if any).

6.  After approval and prior to final disbursement, Lender must notify the LGPC of any changes to the Note terms related to the interest rate. After final disbursement, Lender must notify the appropriate Commercial Loan Servicing Center of any changes to the Note terms related to the interest rate.

7.  Reference Chart on Interest Rates

SBA QUICK REFERENCE CHART No. 4: Maximum Interest Rates Allowed

| Product | Interest Rate<br><br>The published maximum allowable fixed rate or if variable: | Limitations |
|---|---|---|
| Standard 7(a) Loans $25,000 or less<br>(Maturity less than 7 years) | Cannot exceed Prime LIBOR Base Rate, or SBA Optional Peg Rate+ 4.25% | See Paragraphs B through E below |
| Standard 7(a) Loans $25,000 or less<br><br>(Maturity 7 years or more) | Cannot exceed Prime, LIBOR Base Rate, or SBA Optional Peg Rate + 4.75% | See Paragraphs B through E below |
| Standard 7(a) Loans more than $25,000 up to $50,000<br><br>(Maturity less than 7 Years) | Cannot exceed Prime, LIBOR Base Rate, or SBA Optional Peg Rate+ 3.25% | See Paragraphs B through E below |
| Standard 7(a) Loans more than $25,000 up to $50,000<br><br>(Maturity 7 Years or more) | Cannot exceed Prime, LIBOR Base Rate, or SBA Optional Peg Rate+ 3.75% | See Paragraphs B through E below |
| Standard 7(a) Loans greater than $50,000<br><br>(Maturity less than 7 years) | Cannot exceed Prime, LIBOR Base Rate, or SBA Optional Peg Rate+ 2.25% | See Paragraphs B through E below |
| Standard 7(a) Loans greater than $50,000<br><br>(Maturity 7 years or more) | Cannot exceed Prime, LIBOR Base Rate, or SBA Optional Peg Rate+ 2.75% | See Paragraphs B through E below |
| SBA Express and Export Express Loans - $50,000 or less (All maturities) | Cannot exceed Prime + 6.5% | See Paragraph F below |
| SBA Express and Export Express - More than $50,000 (All maturities) | Cannot exceed Prime + 4.5% | See Paragraph F below |
| Export Working Capital Loans | No SBA Maximum. | SBA does not prescribe interest rates for the EWCP but does monitor the rates charged for reasonableness. |

| Product | Interest Rate<br><br>The published maximum allowable fixed rate or if variable: | Limitations |
|---------|----------------------------------------|-------------|
|         |                                        | ([13 CFR § 120.344(c)](#)) |
| CAPLines | Same as Standard 7(a) loans           |             |

B. Base Rate, Allowable Spread, and Allowable Variance for 7(a) Small Loans (up to and including $50,000) ([13 CFR § 120.214](#)):

1. A loan may have a variable interest rate. The base rate may be one of the following:

   a. The Prime Rate;

   b. The One Month LIBOR plus 3 percentage points (LIBOR Base Rate); or

   c. The SBA Optional Peg rate.

2. The allowable spread is based on the maturity of the loan. For loans with an original maturity less than 7 years, the maximum allowable rate cannot exceed 2.25 percentage points over the prime rate. For loans with an original maturity of 7 years or longer, the maximum allowable rate cannot exceed 2.75 percentage points over the prime rate. The spread as identified in the Note may not be changed during the life of the loan without the Borrower's written consent.

3. Lenders are permitted to add an additional 1 percentage point to the maximum interest rate listed above for those loans greater than $25,000 but not more than $50,000.

4. Lenders are permitted to add an additional 2 percentage points to the maximum interest rate listed above for those loans of $25,000 or less.

5. The Lender must designate on its application for guaranty the amount of the percentage spread to be added to the base rate at each adjustment date.

C. Policy on Variable Interest Rates.

1. Standard Policy:

   SBA's maximum allowable interest rate applies only to the initial Note rate on a variable rate loan. Subsequent changes in the base rate are not subject to the maximum rate at the time of loan application; however, the maximum spread over the base cannot exceed SBA's stated maximum.

2. Post-Approval Changes to the Interest Rate:

   a. Pre-Disbursement Changes: After loan approval and prior to first disbursement, the Lender may change the initial Note rate, including changing the base rate, the spread over the base rate, or changed from a fixed rate to a variable rate, or from a variable rate to a fixed rate, provided the new interest rate does not exceed the maximum allowable interest rate at the time of the loan application. The Lender must obtain the Borrower's written consent to the change in the interest rate (separate and apart from executing the loan documents) and must notify the LGPC of the change or make the change through E-Tran servicing.

For example, an SBA guaranteed loan was approved with a variable rate. Since the loan was approved, the prime rate changed. The Borrower has asked the Lender if the loan can be switched to a fixed rate. If the loan has not been disbursed and the fixed rate selected does not exceed the maximum allowable fixed rate at the time of loan application, the Lender may make this change per the Borrower's request.

b. Post-Disbursement Changes: After the loan is disbursed, on a variable rate loan, the Lender may change the base rate or the spread over the base rate as long as the new base rate or spread is based on a method permitted when the loan was approved and is consistent with the interest rate regulations at the time the loan was approved. The Lender must obtain the Borrower's written agreement and must notify the appropriate SBA CLSC of the change or make the change through E-Tran servicing. For further guidance see SOP 50 57.

3. Frequency of Interest Rate Adjustment:

a. The first adjustment may occur on the first calendar day of the month following initial disbursement, using the base rate in effect on the first business day of the month. Lenders may delay the initial adjustment period. For example, Lenders have used periods as long as 5 years in order to provide the Borrower with an interest rate that is set for the first 5 years of the loan. After that time, the interest rate will begin to fluctuate as stated in the Authorization.

b. The Lender must specify in the Note the frequency at which the interest rate adjustment will occur.

i. This adjustment period as identified in the Note may not be changed without the written consent of the Borrower.

ii. Subsequent adjustments may occur no more frequently than monthly. All subsequent adjustments will set the interest rate on the first calendar day of the adjustment period using the base rate in effect on the first business day of the adjustment period.

iii. The rate of interest will change on the first calendar day of the adjustment period even though the rate may not be known until the second business day of that period.

For example, if the first of the month is a Sunday, the base rate is the prime rate in effect on Monday. This rate will be reported in the Wall Street Journal on Tuesday, the third calendar day and second business day of the month. Many lenders use the calendar quarter as the adjustment period, especially those that sell the guaranteed portion in the Secondary Market.

c. After the interest rate begins fluctuating, the loan can be re-amortized. Typically, loans are re-amortized every time the interest rate is adjusted to ensure full amortization by the maturity date.

4. Interest Rate Requirements for an SBA Note:

a. For fixed rate loans, the Lender must state the specific interest rate in the Note.

b. For variable rate loans, the Lender must include the following information in the Note:

    i. Identification of the rate being used as the base rate;

    ii. The publication in which the designated base rate appears regularly (e.g. Wall Street Journal or the Federal Register if using the SBA Optional Peg Rate);

    iii. The permanent percentage spread to be added to the base rate;

    iv. The initial interest rate of the loan (from disbursement to first adjustment);

    v. The date or timing of the first rate adjustment; and

    vi. The frequency of rate adjustment.

5. Interest Rate Ceilings and Floors:

SBA will permit a Lender to limit the upward and downward adjustments by establishing a floor and ceiling provided that:

a. Both the floor and ceiling are stated in the Note; and

b. The difference between the stated rate in the Note and the floor is equal to or greater than the difference between the stated rate in the Note and the ceiling.

For example, if the Note rate is 10% and the ceiling is 12%, the floor must be 8% or lower.

6. Accrual Method:

SBA does not require a specific accrual method, unless the loan is sold in the Secondary Market. Loans sold on the Secondary Market must either use 30/360 or Actual/365 as the interest accrual methods. While the interest accrual method 365/360 is permitted on loans not sold on the Secondary Market, Lenders are cautioned that they cannot use this accrual method and charge the maximum allowable rate of interest because this will result in an Annual Percentage Rate that exceeds SBA's regulatory maximum.

7. Amortization:

Lender should use an amortization schedule that is appropriate for the type of loan. A fixed interest rate loan must use a payment that will fully amortize the loan by the maturity date. Typically, variable rate loans are re-amortized every time the interest rate is adjusted to ensure full amortization by the maturity date. The amortization schedule may also be adjusted to meet the cash flow needs of the business.

D. Fixed and Variable Rate Combinations:

The Lender may use a fixed rate on either the guaranteed or unguaranteed portion and a variable rate on the other portion of the loan. SBA allows such combinations as long as neither rate exceeds the SBA maximum interest rate. A Lender may use this structure to make a loan that permits it to retain a variable interest rate on the unguaranteed portion and sell a fixed rate guaranteed portion on the Secondary Market. If the Lender uses a combination, the entire loan is considered to be a variable interest rate loan. The interest rate on both the guaranteed and unguaranteed portions must be based on the variable rate.

E. Interest Rate Swap Contracts:

1. An interest rate swap is a contract between two parties where one party pays a fee in exchange for an agreement by the other party to pay any interest in excess of an established amount. The contract may last for all or part of the term of the loan. The swap contract only relates to the payment of interest.

   Example: A Borrower has a prime plus 2% interest rate on a 7(a) variable rate guaranteed loan. The Borrower could purchase an interest rate swap contract that would set the interest rate at 8%. When the Note rate is lower than the rate paid by the Borrower on the swap contract (8%), the swap seller keeps the extra amount as compensation for the risk that rates will at some point exceed 8%. When the Note rate is higher than the rate paid by the Borrower on the swap contract, the Borrower would continue to pay the fixed rate of 8% and the swap seller would pay the difference above 8% to the Lender. The ability to stabilize the amount of the loan payment each month is the benefit to the Borrower of an interest rate swap contract.

2. In order to use an interest rate swap in the 7(a) program, the interest rate swap contract must meet the following conditions:

   a. The interest rate swap contract is an agreement between the small business Borrower and the Lender or, if the swap seller is not the lender, a third party. SBA is not a party to the interest rate swap contract.

   b. The interest rate swap contract does not affect the amount of money owed by the Borrower to SBA in the event SBA purchases the guaranty. In the event of a Borrower default, interest will be calculated using the base rate and spread in the variable interest rate Note, not the swap contract.

   c. SBA will not be responsible if the swap seller defaults during the life of the contract. The Borrower will be liable for the interest as required in the Note.

   d. Loans with accompanying interest rate swap contracts may be sold on the secondary market. The Lender is still required under the secondary market contract (SBA Form 1086) to forward interest and principal pursuant to the original terms of the loan. It is the Lender's responsibility to work with the swap seller to make sure funds are available for submission to the fiscal and transfer agent according to the time schedule in the Form 1086.

   e. The full amount of the principal and interest required under the Note must be reported by the lender on the SBA Form 1502.

   f. SBA will not review swap contracts for Borrowers or provide guidance on their use. While swap contracts should not have a significant impact on the cost of the loan, SBA will not publish any guidelines on the cost of these contracts.

   g. The Borrower must sign a statement acknowledging that interest will be calculated at the Note rate if the swap contract is terminated.

   h. The following statement must be included in the swap contract that is executed by the Borrower and the swap seller: "The Small Business Administration is not a party to this contract and does not guarantee it. In the event SBA is called upon to honor

its guaranty to the Lender, the Borrower's debt will be determined by the terms of the Note, including the variable interest rate provision."

    i.   Swap contracts may be used on new or existing loans.

    j.   The swap contract does not have to last for the entire length of the loan agreement.

    k.   SBA does not have a standard form for an interest rate swap contract.

    l.   Any fees owed the swap counterparty as a result of the default by the Borrower will be subordinated to the SBA 7(a) loan.

F.   SBA Express and Export Express Interest Rate Policy.

    1.   For fixed rate SBA Express and Export Express loans, the interest rate may not exceed the maximum allowable fixed interest rate published by SBA in the Federal Register in accordance with 13 CFR § 120.213. See Paragraph IV.A.2 above.

    2.   For variable rate loans, the Lender is not required to use the base rate identified in 13 CFR § 120.214(c). It may use the same base rate of interest it uses on its similarly-sized non-SBA guaranteed commercial loans, as well as its established change intervals, payment accruals, etc. A Lender may charge up to 4.5% over the Prime rate on loans over $50,000 and up to $350,000 ($500,000 for Export Express) and up to 6.5% over the Prime rate for loans of $50,000 or less, regardless of the maturity of the loan. However, the interest rate throughout the term of the loan may not exceed the maximum allowable SBA Express or Export Express interest rate and the loan may be sold on the Secondary Market only if the base rate is one of the base rates allowed in 13 CFR § 120.214(c).

    3.   A Lender may charge a default interest rate if it does so for its similarly-sized non-SBA guaranteed commercial loans, as long as the interest rate does not exceed the amounts stated in this paragraph. (The default interest rate is a change (increase) in the interest rate charged to the Borrower as a result of a failure to meet certain conditions specified in the loan agreement.)

    4.   The amount of interest SBA will pay to a lender following default of an SBA Express loan is capped at the maximum interest rates for the standard 7(a) loan program.

## V.  SBA GUARANTY FEES (13 CFR § 120.220)

A.   General Policy on Guaranty Fees:

    1.   A Lender must pay a fee to SBA for each loan guaranteed under the 7(a) program. This fee is known as the "SBA Guaranty Fee." The total loan amount determines the percentage that is used to calculate this fee. (See the "Fees" column in Chart 5 below.) The guaranty fee is based on the guaranteed portion of the loan and not the total loan amount. The chart below describes the applicable fees.

    2.   The Agency automatically calculates the guaranty fee for each individual loan. This calculation is modified in SBA's loan accounting system and E-Tran to include changes to the fee that are necessary due to other loans approved within the past 90 days. Short term loans are not included in this calculation. For more information, see subparagraph V.I below or contact the processing center or local SBA Field Office.

Note: If there is a conflict between the fees stated in the Authorization and the statutory amount authorized at the time the loan is approved, then the statutory amount governs.

SBA QUICK REFERENCE CHART No. 5

| Gross Loan Size | FEES (See Note 1) | NOTES |
|---|---|---|
| Loans of $150,000 or less (See Note 2) | 2% of guaranteed portion<br><br>Lender is authorized to retain 25% of the fee. | Maturities that exceed 12 months. |
| SBA Express loans to qualified Veterans & Spouses up to $350,000 | Zero (When program is zero subsidy.) | |
| $150,001 to $700,000 | 3% of guaranteed portion | |
| $700,001 to $5,000,000 (See Note 3) | 3.5% of guaranteed portion up to $1,000,000 PLUS 3.75% of the guaranteed portion over $1,000,000 | |
| Short Term Loans – up to $5 million | 0.25% of the guaranteed portion | Maturities of 12 months or less |
| SBA On-Going Guaranty Fee | A percentage of the outstanding balance of the guaranteed portion. The fee is set at time of approval. | Paid by Lender and cannot be passed on to the Borrower. (See V.J below) |

Note 1: SBA specifies the amount of certain fees each fiscal year for all loans approved during that year.

Note 2: For example, the guaranty fee on a $100,000 loan with an 85% guaranty would be 2% of $85,000 or $1,700, of which the Lender may retain $425.

Note 3: For example, the guaranty fee on a $5,000,000 loan with a 75% guaranty ($3.75 million guaranteed portion) would be 3.5% of $1,000,000 ($35,000) PLUS 3.75% of $2,750,000 ($103,125), which totals $138,125.

B. When the Guaranty Fee Must be Paid (13 CFR § 120.220(b)):

1. The Lender must pay the guaranty fee to SBA as follows:

   a. On loans with maturities in excess of 12 months, the Lender must pay the guaranty fee to SBA within 90 days of the date of loan approval.

   b. For all short term loans (maturities of 12 months or less), the Lender must pay the guaranty fee electronically within 10 business days from the date the SBA Loan Number is assigned. Lenders are required to pay the fee using www.pay.gov (see paragraph C below). If the fee is not received within 10 business days after issuance of the SBA Loan Number, SBA will cancel the guaranty. For EWCP loans re-issued after 12 months, each time the loan is re-issued it is a new loan and another guaranty fee is due. The SBA earns the short term guaranty fee when the SBA loan number is issued.

   c. THE DUE DATE FOR GUARANTY FEE PAYMENT MAY NOT BE WAIVED

OR EXTENDED EVEN IF THE DISBURSEMENT PERIOD IS EXTENDED.

2.  For short term loans, the Lender may only charge the guaranty fee to the Borrower after the Lender has paid the guaranty fee. For loans with maturities in excess of 12 months, the Lender may charge the guaranty fee to the Borrower after initial disbursement. The Borrower may use loan proceeds to pay the guaranty fee, however, the first disbursement may not be made primarily for the purpose of paying the guaranty fee. If the Borrower plans to use the loan proceeds to pay the guaranty fee, the Authorization must include a Use of Proceeds category for either payment of the guaranty fee or general working capital. *Note: When an escrow closing is used, the Lender may charge the Borrower the guaranty fee only when all loan funds have been disbursed to the Borrower from the escrow account.*

C.  Method of Guaranty Fee Payment:

Lenders must pay the guaranty fee electronically either by using their existing SBA-approved bulk ACH method or through www.pay.gov. When using www.pay.gov, select "form type 1544" and select "guaranty." The loan must have been approved and an SBA Loan Number issued in order to use www.pay.gov.

D.  If the Fee Is Not Paid:

For loans with a maturity in excess of 12 months, if the guaranty fee is not paid within 90 days, the guaranty will be cancelled.

1.  Notification of Fee Due:

The Authorization is the Lender's notification that a guaranty fee is due and payable within 90 days of approval. SBA may, but is not required to, inform the Lender when the guaranty fee has not been received by SBA within the required time frame. Neither the issuance of any notice of non-payment by SBA nor the receipt of any notice of non-payment by the Lender waives the Lender's obligation to pay the fee within 90 days of approval. In addition, the obligation to pay the guaranty fee to SBA is not contingent upon the Borrower having paid the fee to the Lender.

2.  Notice of Cancellation of Guaranty:

If SBA has not received the full guaranty fee by the due date, on the 91st day after loan approval SBA may issue a "Notice of Overdue Guaranty Fee." If SBA has not received the full guaranty fee by the 120th day after loan approval, on the 121st day SBA will cancel the guaranty and issue a "Notice of Cancellation of Guaranty."

3.  When reviewing a Lender's continued participation in any of SBA's loan programs, including the initial approval or renewal of delegated authority, SBA will consider a Lender's failure to remit required guaranty fees in a timely manner.

E.  Reinstatement of Guaranty After Cancellation.

If SBA cancelled its guaranty because the Lender did not pay the guaranty fee, the Lender may request that SBA consider reinstating its guaranty. The Lender must submit a written request to either the LGPC or the appropriate SBA Commercial Loan Servicing Center in accordance with Chapter 7 of this Subpart. The request must include the following:

1.  SBA Loan Number and the SBA Loan Name;

2. The required guaranty fee must be paid electronically (see paragraph C above) within 30 days from the date of reinstatement or the guaranty will be cancelled;

3. A certification that there has been no un-remedied adverse change in the financial condition, organization, operations, or fixed assets of the Borrower or Operating Company since the date of application for guaranty;

4. If the loan has been disbursed in whole or in part, a certification that the loan is current, the lender has been reporting the loan on all SBA Form 1502 monthly reports since the loan was disbursed, and the Lender has been paying the SBA on-going guaranty fee in a timely manner on this loan; and

5. A complete written explanation as to why the Lender failed to pay the guaranty fee and what the Lender has done to correct any deficiencies in its procedures.

Note: A history of failure to pay required guaranty fees will impact a Lender's participation in SBA programs, including the initial approval or renewal of any delegated authority such as PLP or SBA Express.

F. Additional Guaranty Fee for Loan Increases.

1. When a 7(a) loan is increased, additional appropriations are committed, and an additional Guaranty fee is due. The additional fee is based on the rules in effect at the time the loan was originally approved. Therefore, the amount of the additional guaranty fee due for an increase will equal what the guaranty fee would have been if the increase was part of the original loan amount, less the amount of the original fee (if already remitted).

2. The additional guaranty fee associated with the increase must be paid electronically (see paragraph V.C above) within 30 days from the date the increase was approved or the total loan guaranty will be cancelled.

3. On loans that have been initially disbursed, the guaranty fee associated with any increase approved by SBA must be paid to SBA, whether or not the increase is subsequently cancelled.

G. Additional Guaranty Fee for Extensions of Short Term Loans.

1. When the maturity of a short term 7(a) loan is extended beyond 12 months, an additional guaranty fee is due. Lenders may contact the appropriate SBA CLSC (or the Office of International Trade for EWCP loans) for assistance. The additional fee must be paid electronically (see paragraph V.C above) within 30 days from the date the Lender agrees to the extension or the total loan guaranty will be cancelled. The Lender may charge the additional fee to the Borrower after the Lender has notified SBA that the maturity has been extended and has paid the additional guaranty fee.

2. No additional guaranty fees will be owed for loans extended beyond their original maturity date when SBA determines the extension is to effect collection and no new funds are disbursed, regardless of the original maturity.

H. Guaranty Fee Refunds (13 CFR §120.220(c)).

The guaranty fee is based on the amount that SBA has approved prior to the loan being closed and initially disbursed. Any request by the Lender to decrease the approved amount must be

approved by SBA prior to the date the loan is closed and initially disbursed by the Lender in order for the guaranty fee to be reduced. Lender must submit a request to the appropriate SBA CLSC electronically via E-Tran for an adjustment to the approved amount of the loan and guaranty fee.

1. Full refund: The guaranty fee may be refunded only when the loan has not been closed and initially disbursed and the lender submits a written request to SBA to cancel the guaranty. Once a loan has been initially disbursed, no refund is permitted.

2. Partial refund: If SBA approves the cancellation of a portion of the loan prior to the loan being closed and initially disbursed, SBA will adjust the guaranty fee payable to reflect the new loan amount and refund the excess amount if the fee has already been paid. If the loan has been closed and initially disbursed, no refund is permitted.

I. Guaranty Fee Calculation for Multiple Loans Within 90 Days.

1. If more than 1 loan (with maturities exceeding 12 months) is approved for an Applicant, including loans approved to its affiliates, within 90 days of each other, the loans are considered as 1 loan for the purpose of determining the percentage of guaranty and the guaranty fee calculation. This rule applies regardless of whether the loans were approved by the same or different Lenders.

2. When 2 or more loans are approved within 90 calendar days of each other, the applicable fee for the subsequent loans is equal to the guaranty fee that would have been charged had all the loans been combined into 1 loan. The applicable fee for the subsequent loan(s) will equal the amount of the fee that would have been charged had the loans been combined, less the amount of the fee from the first loan approved.

3. When the Applicant receives both a short and long term 7(a) loan, the percentage of guaranty is calculated as if the loans are combined, but the guaranty fee is based solely on the maturity of each loan.

4. If a short term loan that was made within 90 days of a long term loan is renewed and the maturity is extended beyond 12 months, the guaranty fee calculated at the time of renewal would equal the fee that would have been charged if both loans were originally long term. The amount owed SBA at the time of renewal would equal the recalculated guaranty fee less the amount paid at the time of original approval.

5. This rule also applies to any subsequent increases to either of the loans, even if one of the loans subsequently is paid in full.

J. Lender's Annual Service Fee ("SBA On-Going Guaranty Fee") (13 CFR § 120.220(f)).

1. Lenders are required to pay SBA an annual service fee ("on-going guaranty fee"). This fee is set at the time of loan approval and based on the outstanding principal balance of the guaranteed portion of each loan. SBA specifies the amount of the fee each fiscal year for all loans approved during that year. This fee cannot be charged to the Borrower. With the exception noted for EWCP loans in paragraph 2 below, Lenders pay this fee on a monthly basis when reporting the status of the loans on SBA Form 1502. (For further guidance on SBA Form 1502 reporting, see Chapter 8 of this Subpart.) SBA may charge the Lender a late fee if the on-going guaranty fee is not paid timely.

Note: The fee will be listed in the Authorization and, unless SBA drafts and executes the Authorization, it is the Lender's responsibility to ensure that the Authorization includes the correct fee.

2. EWCP Loans: For EWCP loans approved after September 27, 2010, the Lender may choose one of the following options for payment of the EWCP Ongoing Fee only. Either option (monthly or annually) will result in payment of the same total amount of EWCP Ongoing Fee on each EWCP loan. Regardless of which payment option is chosen, the Lender must continue to submit, on a monthly basis, the Lender's SBA Form 1502 Report on all 7(a) loans in the Lender's portfolio, including all EWCP loans.

   a. Option 1 – Monthly Payment of EWCP Ongoing Fee:
   Option 1 allows Lenders to pay the EWCP Ongoing Fee monthly along with other 7(a) loan ongoing servicing fees to Colson with the required SBA Form 1502 Report. Because EWCP loans may be a small percentage of the Lender's 7(a) portfolio, Option 1 allows Lenders to voluntarily pay the EWCP Ongoing Fee on each EWCP loan on a monthly basis along with the rest of their 7(a) portfolio.

   b. Option 2 – Annual Payment of EWCP Ongoing Fee:
   Lenders may pay the EWCP Ongoing Fee on each EWCP loan annually by selecting Option 2. Lenders selecting Option 2 will receive an annual invoice on each EWCP loan from SBA's DFC. The EWCP loan balance reported by the Lender on the monthly SBA Form 1502 Reports for the EWCP loan will allow Denver Finance Center (DFC) to compute the EWCP Ongoing Fee amount to be billed annually.

   The vast majority of EWCP loans have a maturity of 12 months or less; however, EWCP loans may have a maturity of up to 36 months. For EWCP loans with a maturity of 12 months or less, Lenders will receive one EWCP Ongoing Fee invoice after maturity. For EWCP loans with a maturity in excess of 12 months and not more than 24 months, Lenders will receive a EWCP Ongoing Fee invoice 12 months after closing and again after maturity. For EWCP loans with a maturity greater than 24 months, Lenders will receive a EWCP Ongoing Fee invoice 12 months after closing, 24 months after closing and again after maturity.

   The DFC will mail the Lender an EWCP Ongoing Fee invoice on each EWCP loan within 60 days of each 12-month interval on the EWCP loan and payment will be due within 30 days of the date of the invoice. The invoice will be for the EWCP Ongoing Fee amount owing for the previous 12 months, or shorter period for loans maturing prior to the end of the 12-month period. Lenders will be given instructions on the invoice to make payment using the Pay.gov online payment process.

   Fiscal Transfer Agent will send monthly EWCP reports to DFC and SBA's Office of International Trade (OIT). This report will track information on each EWCP loan by Lender, including but not limited to the following:

   i.   Whether the Lender is submitting SBA Form 1502 Reports on EWCP loans as required;

   ii.  When annual invoices are to be sent; and

   iii. The accrued amount to be billed for the EWCP Ongoing Fee for each EWCP

loan.

The DFC will send a monthly report to OIT and SBA's Office of Credit Risk Management reporting any Lenders that are delinquent on payments of invoiced EWCP Ongoing Fees. OIT will be responsible (through delegation to the USEAC Regional Managers) for monitoring Lenders in regards to submitting the required SBA Form 1502 Reports and the payment of the required EWCP Ongoing Fees. A Lender's failure to pay any of the fees (and any interest and penalties that are subsequently charged by SBA due to a lender's delinquent payment) may result in SBA's decision to suspend or revoke a lender's eligibility to participate in SBA's 7(a) program or to limit a lender's delegated authority.

## VI. FEES LENDERS AND/OR THIRD PARTIES MAY COLLECT FROM AN APPLICANT (13 CFR § 120.221):

In 13 CFR § 120.221, SBA provides specific guidance on the fees a Lender or its Associates may collect from an Applicant in connection with an SBA-guaranteed loan. Any fee not expressly permitted in 13 CFR § 120.221 is prohibited. Pursuant to 13 CFR § 120.222, a Lender must not share any premium received on the sale of an SBA-guaranteed loan with a service provider, packager, or other non-employee loan referral source.

SBA QUICK REFERENCE CHART No. 6

| TYPE OF FEE | AMOUNT | NOTES |
|---|---|---|
| Fees for Packaging and Other Services | Amount deemed reasonable and customary for the market area | Can be paid by Lender or Borrower and can be included in the loan amount. (See VI.A below) |
| Extraordinary Servicing Fee | Not to exceed 2% of the part requiring special servicing, except under the EWCP and Working Capital CAPLines. | Primarily for construction servicing needs, field inspections and asset-based lending costs. (See VI.B below) |
| Out-of-Pocket Expenses | All direct costs associated with collateral instrument recordation, appraisals, environmental reports or other closing costs. | Necessary expenses must be a result of a requirement of SBA policy. (See VI.C below.) |
| Late Payment Fee | Not to exceed 5% of the regular loan payment | Must be delinquent more than 10 days. (See VI.D below) |
| Subsidy Recoupment Fee | 5%, 3% or 1% of the amount of the prepayment | Fee paid to SBA on loans with a maturity of 15 years or more when the Borrower prepays 25% or more of its loan in any 1 year during the first 3 years of the loan term. (See VI.E below) |
| Assumption Fee | Not to exceed 1% of the principal balance outstanding at time of assumption | Fee may be paid by the seller or assumptor. (See VI.F below) |

A. Fees for Packaging and Other Services.

1. The Lender or a third party may charge an Applicant fees for packaging and other services.

    a. "Packaging services" provided by Lender or third party include assisting the Applicant with completing one or more applications, preparing a business plan, cash flow projections, and other documents related to the application.

    b. "Other services" provided by a third party includes consulting as to what financing is needed and what type, and broker or referral fees.

       Note: The Lender and its Associates are prohibited from charging the Applicant for "other services," as defined above.

2. The fees must be reasonable and customary for the services actually performed and must be consistent with those fees charged on the Lender's similarly-sized, non-SBA guaranteed commercial loans. Lender must document the services provided in each loan file, regardless of the amount charged.

    a. Fees for packaging and other services may be based on a percentage of the loan amount or may be charged on an hourly basis.

       i. With regard to fees for packaging and other services charged based on a percentage of the loan amount:

          a) In no event may the fee exceed 3 percent on loans of $50,000 or less;

          b) The fee may not exceed 2 percent for loans between $50,000 and the first $1,000,000 with an additional ¼ percent on amounts over $1,000,000;

          c) All fees over $2,500 must be supported, documenting the work performed and the time spent on each activity (see paragraph VIII.B for additional detail).

          d) The maximum fee that may be charged to an Applicant on a percentage basis is $30,000.

       ii. With regard to fees for packaging and other services charged on an hourly rate:

          a) Fees must be reasonable and customary for the actual services performed.

          b) There is no maximum fee for fees charged on an hourly rate. However, all fees over $2,500 must be supported, documenting the work performed and the time spent on each activity (see paragraph VIII.B for additional detail).

    b. A standard or flat fee charged to all Applicants is not acceptable.

3. Prior to the services being provided, the Lender must advise the Applicant in writing that the Applicant is not required to obtain or pay for unwanted services. If fees are charged to the Applicant, an SBA Form 159 must be completed.

4. A Lender or a third party engaged by a Lender cannot charge an Applicant for the Lender's costs associated with underwriting the loan including the completion by the Lender's Application for Guaranty for all 7(a) Loan Programs (SBA Form 1920) and/or Lender's

analysis.

5. SBA may review these fees at any time. Lenders and third parties must refund any fee considered unreasonable or impermissible by SBA.

B. Extraordinary Servicing Fee.

1. A Lender cannot charge the Borrower a servicing fee on an SBA-guaranteed loan unless the servicing fee is to cover expenses for extraordinary servicing requirements connected with the loan. Such a fee may not exceed 2% per year on the outstanding balance of the part requiring special servicing. Examples of extraordinary servicing fees include amounts to service construction loans or monitor accounts receivable and inventory collateral in asset-based lending. Under no circumstances may the fee exceed 2% of the loan amount EXCEPT under the EWCP or Working Capital CAPLine program operating under a BBC. In these programs, the fee must be reasonable and prudent based on the level of extraordinary effort required. In addition, if the Lender charges an extraordinary servicing fee on its similarly-sized, non-SBA guaranteed commercial loans, it cannot charge a higher fee on its SBA-guaranteed loans.

2. Lenders must obtain SBA's prior written approval for these fees. Lender must include the fees to be charged to administer the loan/line in its credit memorandum. Lenders submitting applications under delegated authority must enter the amount of the fee to be charged in E-Tran and certify that the fee is reasonable and prudent based on the level of extraordinary effort required. SBA's issuance of a loan number will constitute its prior written approval of the fees, subject to SBA's subsequent review of the fees for reasonableness. SBA will review such fees when conducting Lender oversight activities and at time of guaranty purchase. If SBA determines the fee is excessive, the Lender must reduce the fee to an amount SBA deems reasonable, refund any sum in excess of that amount to the Borrower, and refrain from charging or collecting from the Borrower any funds in excess of the amount SBA deems reasonable. SBA's guaranty does not extend to extraordinary servicing fees and, at time of guaranty purchase, SBA will not pay any portion of such fees.

3. The following actions do not qualify as extraordinary servicing and therefore a participating Lender is prohibited from collecting fees for these services:

    a. Changing the installment amount to avoid circumstances where the required payment amount will not be sufficient to pay the loan in full by the maturity date;

    b. Changing the installment amount after a deferment;

    c. Providing the release or exchange of collateral (standard out-of-pocket expenses such as recordation fees are permitted); or

    d. Any modification to the repayment terms of the note.

4. Past due financial statements: SBA does not permit a Lender to charge a default interest rate or a separate servicing fee for past due financial statements. Lenders should make note in their loan files as to the attempts it has made (following prudent lending standards) to obtain the required financial statements. At some point the Borrower may require a servicing action by the Lender. At that time, the Lender can require past due financial statements.

C. Out-of-Pocket Expenses.

1. Lenders may be reimbursed by the Borrower for all direct costs including UCC filings or recording fees, photocopying, delivery charges, collateral appraisals and environmental impact reports that are obtained in compliance with SBA policy, and other direct charges related to loan closing. These costs must be itemized and kept in the loan file for SBA's possible review. The costs of software or technology used in connection with preparing SBA loan documents, underwriting, or closing the SBA-guaranteed loan cannot be passed on to the Borrower.

2. Lenders may be reimbursed by the Applicant for the direct costs (including reasonable overhead) of legal services performed by Lender's in-house counsel in connection with an SBA-guaranteed loan, but in no event may the Lender be reimbursed for an amount that would exceed the cost of outside counsel. In accordance with 13 CFR § 120.221(e), charges for legal services (regardless of who provides the service) must be charged on an hourly basis. The Lender or its Associate may not pass on to the Applicant/Borrower any cost of legal services not calculated on an hourly basis for services provided in connection with the applicant/Borrower's transaction.

3. Direct costs associated with out-of-pocket expenses described in this section in connection with the loan closing do not need to be reported on [SBA Form 159](#).

D. Late Payment Fee.

Lenders may charge the Borrower a late payment fee not to exceed 5% of the regular loan payment when the Borrower is more than 10 days delinquent on its regularly scheduled payment. The fee is the property of the lender and is not shared with the investor if the loan is sold into the Secondary Market. SBA's guaranty does not extend to late fees and, at time of guaranty purchase, SBA will not pay any portion of such fees.

E. Subsidy Recoupment Fee.

For loans with a maturity of 15 years or longer, the Borrower must pay to SBA a Subsidy Recoupment Fee when the Borrower voluntarily prepays 25% or more of its loan in any 1 year during the first 3 years after first disbursement. The fee is 5% of the prepayment amount during the first year, 3% the second year, and 1% in the third year. SBA does not consider death that results in a prepayment a voluntary occurrence. No determination by SBA is required in this circumstance, and the Lender must confirm and document their file. If the Lender otherwise believes that the prepayment of the loan is not voluntary, the Lender may submit a request for a determination, with the Lender's supporting analysis, to the appropriate CLSC. The CLSC will submit the request, along with its recommendation to the Director of Financial Program Operations (OFPO) and the D/FA for a joint determination as to whether a prepayment is involuntary.

F. Assumption Fee.

1. In the case of an assumption of the loan by another entity, SBA does not require a new guaranty fee, and lien positions are often maintained eliminating the need for recording fees. As an incentive for a Lender to retain an existing loan, SBA allows a Lender to charge an assumption fee that is consistent with its assumption fee the Lender charges on its non-SBA guaranteed loans. The fee must be reasonable in relation to services provide and cannot exceed 1 percent of the principal balance outstanding at time of assumption. SBA's guaranty

does not extend to assumption fees and, at time of guaranty purchase, SBA will not pay any portion of such fees.

2. This fee may be paid by the seller or the assumptor. Lenders should review SBA's SOP 50 57, 7(a) Loan Servicing and Liquidation, for procedures to process an assumption request.

G. SBA Express and Export Express Fee Policy.

1. The SBA guaranty and on-going servicing fees are the same for SBA Express and Export Express as for standard 7(a) loans. The policy regarding packaging fees is the same as for standard 7(a) loans as set forth in paragraph VI.A.1 above. In addition, the Lender may charge the same fees for SBA Express and Export Express loans as it charges for its similarly-sized non-SBA guaranteed commercial loans as long as the fees are directly related to the service provided and are reasonable and customary for the services performed. Examples include application fees and reasonable transaction fees such as cash advance fees, late fees, returned check charges, currency conversion fees, over limit fees (assuming the Borrower did not exceed SBA's approved loan amount), and organizational change fees. If packaging or application fees are charged, they must be disclosed on SBA Form 159.

2. As with standard 7(a) loans, Lenders may not charge servicing fees unless the fees are to compensate for extraordinary servicing requirements connected with the loan; for example, monitoring the levels of accounts receivable for a line of credit. Such fees must comply with Paragraph VI.B above.

3. Renewal fees are not permitted.

4. SBA reserves the right to disallow fees that are not customary and/or which do not bear a relationship to the actual service provided. Also, if the Lender requests that SBA honor its guaranty on an SBA Express and Export Express loan, with the exception of the SBA guaranty fee, the Agency will not purchase any portion of the loan balance that consists of fees charged to the Borrower.

## VII. PROHIBITED FEES.

Lenders are prohibited from charging the Applicant any fees not expressly authorized in sections V and VI above. For example, the Lender and/or its Associate may not:

A. Require the Applicant or Borrower to pay the Lender, a Lender's Associate, or any party designated by either, any fees or charges for goods or services, including insurance, as a condition for obtaining an SBA-guaranteed loan;

B. Charge the Borrower any commitment, bonus, origination, broker, commission, referral or similar fees;

C. Charge points or add-on interest; or

D. Share any premium received from the sale of an SBA-guaranteed loan in the Secondary Market with a Service Provider, packager, or other non-employee loan-referral source.

## VIII. DISCLOSURE OF FEES AND LENDER EXPENSES (13 CFR Part 103 AND 13 CFR § 120.221).

A. Disclosure of Fees and Identification of Agents.

Section 13 of the Small Business Act (15 U.S.C. § 642) requires that an Applicant identify the names of persons engaged by or acting on behalf of the Applicant for the purpose of expediting the application and the fees paid or to be paid to any such person. SBA regulations at 13 CFR § 103.5 require any Agent to execute and provide to SBA a compensation agreement ("Agreement"). Each Agreement governs the compensation charged for services rendered or to be rendered to the Applicant or Lender in any matter involving SBA assistance. "Agent" means an authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or any other person representing an Applicant or participant by conducting business with SBA.

B.  SBA Form 159 "Fee Disclosure Form and Compensation Agreement."

1.  The Applicant or the Lender, depending on who paid or will pay the Agent, must use SBA Form 159, "Fee Disclosure Form and Compensation Agreement," to document the fees. A separate SBA Form 159 must be executed for each Agent. If the same Agent provides multiple services to the Applicant or Lender, all services provided by the same Agent may be listed on a single Form 159.

2.  Information on this form will be used to monitor fees charged by Agents and the relationship between Agents and Lenders. Lenders must make sure that all of the appropriate data fields on SBA Form 159 are completed.

3.  The following are not considered Agents for purposes of this Agreement and, therefore, are not required to complete SBA Form 159:

    a.  Applicant's accountant for the preparation of financial statements required by the Applicant in the normal course of business and not related to the loan application;

    b.  A state-certified or state-licensed appraiser employed by the Lender to appraise collateral in connection with the SBA loan;

    c.  An individual who is a qualified source, as defined in Chapter 4 of this Subpart, and employed by the Lender to conduct an independent business valuation in connection with an SBA loan;

    d.  An environmental professional employed by the Lender to conduct an environmental assessment of the collateral in connection with an SBA loan;

    e.  Any attorney in connection with the SBA loan closing; and

    f.  A real estate agent who is receiving a commission for the sale of real estate in connection with the SBA loan.

4.  The Lender must inform the Applicant in writing that the Applicant does not have to employ an Agent or representative (including the Lender) to assist the Applicant with the loan application. If an Applicant employs an Agent or representative, the fee paid must bear a reasonable relationship to the services actually performed. The SBA does not allow contingency fees (fees paid only if the loan is approved) or charges for services which are not reasonably necessary in connection with an application.

5.  If the total compensation exceeds $2,500, the compensation must be itemized. When a single provider charges an Applicant in connection with multiple applications, fees are

aggregated to establish the $2,500 threshold for itemization. Separate SBA Forms 159 must be completed for each application.

6. Lenders must submit SBA Form 159 to Fiscal Transfer Agent ("FTA") on loans that involve payment of fees, including, but not limited to, those covering any packaging fees charged by the Lender or where the Lender paid the Agent fee. This submission is required only once after there has been an initial disbursement on the loan and must be submitted in conjunction with a Lender's SBA Form 1502 report for the month and must be submitted within two SBA Form 1502 reporting cycles. The information must be submitted by electronic document imaging utilizing either the Portable Document Format (.pdf) or the Tagged Information Format (.tif). Lenders must email the pdf/tif file to Form159@colsonservices.com. Lenders are required to retain an original signature version of the form in their files for compliance review purposes.

## IX. AGENTS.

SBA expects Lenders to exercise due diligence and prudent oversight of their third party vendors, including Lender Service Providers (LSP) and other loan agents. SBA will review evidence of such due diligence and oversight of such relationships when conducting lender oversight activities. Federally-regulated Lenders are reminded that they must comply with the requirements of their primary Federal Financial Institution Regulator regarding third party vendors.

A. SBA regulations at 13 CFR Part 103 govern the activities of Agents, the disclosure of fees, and the circumstances that would result in revocation or suspension.

1. Agents (13 CFR § 103.1(a)):

   a. SBA defines an "Agent" to mean an authorized representative, including an attorney, accountant, consultant, packager, Lender Service Provider, or any other person representing an applicant or participant by conducting business with SBA.

   b. For Lender Service Provider, SBA reviews the written agreement between the Lender and the Lender Service Provider, thus SBA Form 159 is not required for the services provided by the Lender Service Provider to the Lender. (13 CFR § 103.5(c)) Fees paid by the Lender to the Lender Service Provider cannot be passed onto the Applicant.

   c. For all other Agents paid by either an Applicant or a Lender, SBA Form 159 must be completed and signed by the Applicant and the Lender. For each Agent paid by the Applicant to assist it in connection with its application, the Agent also must complete and sign the form. When an Agent is paid by the Lender, the Lender must identify the Agent on SBA Form 159 and the Lender and Applicant must sign the form.

   d. The only situation where an Agent can receive compensation from both the Lender and the Applicant is when the Agent is providing different services by providing packaging services to the Applicant and receiving a referral fee from the Lender. (13 CFR § 103.4(g))

   e. The SBA does not allow contingency fees (fees paid only if the loan is approved) or

charges for services which are not reasonably necessary in connection with an application.

2. Referral Agents (13 CFR § 103.1(f)):

"Referral Agent" means a person or entity that identifies and refers an Applicant to a Lender or a Lender to an Applicant. The referral agent may be employed and compensated by either an Applicant or a Lender. Each referral agent, including loan packagers, must disclose the name of its customer and all fees charged in connection with the SBA loan transaction on SBA Form 159.

3. Lender Service Provider (13 CFR § 103.1(d)):

   a. "Lender Service Provider" means an Agent who carries out Lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the Lender.

   b. A Lender must have a continuing ability to evaluate, process, close, service, liquidate and litigate small business loans (13 CFR § 120.410). A Lender may contract with a third party (Lender Service Provider (LSP)) to assist the Lender with one or more of these functions. However, the Lender itself, not the LSP, must be able to demonstrate that it exercises day-to-day responsibility for evaluating, processing, closing, disbursing, servicing, liquidating and litigating its SBA portfolio. SBA determines whether or not an Agent is an LSP on a loan-by-loan basis. If an Agent meets the definition of an LSP, a formal agreement between the Agent and Lender is required and must be reviewed by SBA. (See Paragraph X.D. below for further guidance on LSP agreements.)

   c. All participating Lenders must submit each LSP agreement to the LGPC for review. Lenders may submit the agreements to LSPagreements@sba.gov. If there are any changes to an LSP agreement after review by SBA, the Lender must submit the revised agreement to SBA for review.

   d. SBA will investigate any complaint by an Applicant, Lender or any other participant in an SBA program, concerning the activity, services completed, or fees charged by any LSP.

   e. SBA reserves the right to audit compliance with any SBA-reviewed LSP agreement.

4. Packager (13 CFR § 103.1(e)):

   a. "Packager" means an Agent who is employed and compensated by an Applicant or Lender to prepare the Applicant's application for financial assistance from SBA. The packager may be the Lender.

   b. For 7(a) loans, if a CDC employee performs packaging or loan referral services within the scope of their CDC employment, both the CDC and the employee are Agents. If a CDC employee acts as a Packager or Referral Agent outside the scope of his or her employment, the CDC is not considered an Agent.

B. Agents and Privacy Act Considerations.

Private information about a loan cannot be discussed with anyone who claims to be an Agent for an Applicant, Participant, or Lender without evidence of representation. Proprietary information is protected by the Right to Financial Privacy Act and the Privacy Act. Without proper authorization, SBA and participating Lenders may not discuss private information with even a spouse or other close relative of the Applicant.

C.  Reporting Data on Agents through E-Tran.

SBA is required to collect certain information regarding the involvement of Agents in applications for financial assistance from SBA. For each loan submitted through E-Tran, Lenders must identify whether an Agent was involved in any way with the transaction, and, if so, provide the name, street address, city, state, zip code and phone number of the Agent.

D.  Employment of Agent Initiated by Applicant.

Lenders and Agents must clearly inform any Applicant that the SBA does not require the use of an Agent for packaging or referring a loan application. When an Applicant employs an Agent:

1.  The Agent may bill and be paid by the Applicant for providing packaging services as long as compensation is reasonable and customary for those services; the compensation complies with paragraph VI.A.1 above; and the compensation is not contingent on the loan being approved.

2.  The Agent who works for an Applicant as a packager may also work as a Loan Referral Agent for the Applicant and receive a referral fee from the Applicant.

3.  The Agent may be a Loan Referral Agent for a Lender and a Packager for an Applicant, provided both the Applicant and the Lender are aware of both relationships, and the Agent does not receive a referral fee from the Applicant or a packaging fee from the Lender.

4.  SBA Form 159 must be completed by the Agent and the Applicant for all fees paid by the Applicant.

E.  Employment of Agent by Lender (not an LSP).

When a Lender has decided to approve a loan application and needs assistance with the preparation of the paperwork for the application to SBA, the loan closing, or preparation of the loan to sell it on the Secondary Market, the Lender may use an Agent.

1.  The compensation for these services must be reasonable and customary for the services actually provided and cannot be contingent upon the loan being approved.

2.  The Agent must bill and be paid by the Lender for all services and the Lender may not pass these charges through to the Applicant under any circumstances.

X.  **WHO MAY CONDUCT BUSINESS WITH SBA (13 CFR § 103.2)**

A.  Any person or entity applying for SBA assistance does not need an Agent to conduct business with SBA. The term "conduct business with SBA" is defined at 13 CFR § 103.1(b).

1.  Individuals and entities suspended, debarred, revoked or otherwise excluded under the SBA or Government-wide debarment regulations are not permitted to conduct business with SBA. SBA may require that an Agent supply written evidence of his or her authority to act on behalf of an Applicant or Lender as a condition of revealing any information about the

applicant's or lender's current or prior dealings with the SBA. Lenders are responsible for consulting the System for Award Management's (SAM)/Excluded Parties List System (EPLS) or any successor system to determine if an Agent has been debarred, suspended or otherwise excluded by SBA or another Federal agency. (https://www.sam.gov/portal/SAM/)

2. SBA may, for good cause, suspend or revoke the privilege of an Agent to conduct business with the government. The suspension or revocation remains in effect during any administrative proceedings under SBA regulations at 13 CFR Part 134. The meaning of "good cause" may be found at 13 CFR § 103.4.

B. Illegal Activity of an Agent Must Be Reported.

Lenders should report any illegal activity of Agents to the Office of the Inspector General, Attention: Assistant Inspector General for Investigations and the D/OCRM. Any substantiating evidence should be included when contacting the Office of the Inspector General and OCRM.

C. Review of Agent Fees.

1. Lenders must review the Agent's services and related fees to determine if the fees are necessary and reasonable when:

   a. There is an indication from a third party that an Agent's fees might be excessive; or

   b. When an Applicant complains about the fees charged by an Agent.

2. In cases where fees appear to be unreasonable, Lenders should contact the D/OCRM to report the fees.

3. If an SBA investigation determines an Agent fee is excessive, the Agent must reduce the fee to an amount SBA deems reasonable, refund any sum in excess of that amount to the Applicant, and refrain from charging or collecting from the Applicant any funds in excess of the amount SBA deems reasonable.

D. Lender Service Provider Agreements.

A Lender Service Provider (LSP) Agreement is a written contract between a Lender and an Agent who assists the Lender with 7(a) loan program loan origination and servicing duties. SBA views LSP Agreements as a means of permitting a Lender to acquire staff for those activities through a contract rather than employing those same people directly. However, the Lender itself must be able to demonstrate that it exercises day-to-day responsibility for evaluating, processing, closing, servicing, liquidating and litigating its SBA portfolio. As such, an LSP Agreement may not grant the LSP power of attorney to act on behalf of the Lender.

It is important to note that if the Lender plans to engage an LSP to handle its SBA Borrower payments, the funds must be held in an account in the Lender's name, not the name of the LSP; however the LSP may be permitted to access the account in order to process Borrower payments. For those loans where the guaranteed portion has been sold on the secondary market, the account also must be properly titled in accordance with SBA Form 1086, Secondary Participation Guaranty Agreement. In addition, the LSP may not commingle any funds from multiple lenders; there must be separate accounts for each of its lender clients. The LSP may not net its fee out of any Borrower payments or other funds collected on the Lender's behalf.

SBA does not provide a form of LSP Agreement, but expects Lenders and LSPs to negotiate the terms of the contract to meet the needs of the Lender. Each agreement must include the following:

1. Identification of both parties including full legal name, trade name or dba, address, and contact person's name, address, phone number and email address. The SBA Lender's Location ID Number also needs to be included.

2. Services: The contract must specifically identify the services that will be performed by the LSP.

3. Lender's responsibility: There must be a statement that the Lender bears full responsibility for all aspects of its 7(a) loan operation, including, but not limited to, approvals, closings, disbursements, servicing actions and due diligence. The LSP only provides assistance to the Lender. If an LSP is authorized to access SBA's Capital Access Financial System (CAFS), including E-Tran on behalf of a Lender, the Lender acknowledges it is responsible for all entries and certifications made into CAFS by the LSP.

4. Compensation: The compensation must be specifically explained as to what will be charged for each type of service and must state that the fees are for services actually performed.

    a. Fees related to assisting the Lender with packaging, processing, or underwriting cannot be contingent on whether the loan is approved or closed.

    b. The contract must state that all compensation paid to the LSP will be paid by the Lender and that the Lender and the LSP are prohibited from charging the Applicant for the same services.

    c. The Lender and the LSP cannot share in any Secondary Market premium.

    d. The billing for loan packaging or for other loan processing services must identify the Applicant's name.

5. Term: The full term of the contract including renewal options must be stated in order for SBA to determine if it is reasonable. In addition, the contract must clearly identify terms and conditions satisfactory to SBA that permit either party to terminate the contract prior to its expiration date on a reasonable basis (usually 60 days).

6. The contract also must include the following statements or disclosures:

    a. The Lender and the LSP will not engage in the sharing of any Secondary Market premium.

    b. The LSP will not assume a portion of the risk of the un-guaranteed portion of any loan.

    c. Disclosure by the LSP of any affiliations with other financial institutions, commercial lenders, CDCs, CUSOs, other LSPs, or loan brokers.

    d. Disclosures of any prior or existing relationship other than the contractual one created by the agreement, or a statement that no such relationship exists.

    e. The agreement is subject to all applicable laws, regulations, and policies including all SBA Loan Program Requirements.

    f.   In the event this Lender Service Provider Agreement conflicts with any other contract or agreement between the parties, now or in the future, this Lender Service Provider Agreement will control with respect to Lender's SBA loan portfolio.

7. The contract must not evidence any actual or apparent conflict of interest or self-dealing on the part of any of the Lender's officers, management or staff.

# CHAPTER 4: CREDIT STANDARDS, COLLATERAL AND ENVIRONMENTAL POLICIES

## I.   CREDITWORTHINESS/CREDIT UNDERWRITING

A.   Credit Standards (13 CFR § 120.150):

The policies that make up SBA's credit standards begin with the requirements outlined in 13 CFR §§ 120.101 and 120.150. This section provides procedural guidance as to what the Lender should or must consider when analyzing any request for financial assistance that will be guaranteed by SBA.

A Lender must analyze each application in a commercially reasonable manner, consistent with prudent lending standards. The cash flow of the Applicant is the primary source of repayment, not the liquidation of collateral. Thus, if the Lender's financial analysis demonstrates that the Applicant lacks reasonable assurance of repayment in a timely manner from the cash flow of the business, the loan request must be declined, regardless of the collateral available or outside sources of cash.

B.   Processing Methods and Delivery Methods:

1.   Processing Methods:

Non-delegated – When a Lender submits an SBA 7(a) loan guaranty request under the non-delegated processing method, the Lender submits the application and supporting documents to SBA. SBA will make the final determination as to the eligibility of the Applicant, use of proceeds, analysis of the credit decision, including adequacy of collateral pledged, structure of the loan and the equity contribution of the Applicant.

Delegated – When a Lender submits an SBA 7(a) loan guaranty request under the Lender's delegated authority (PLP, PLP-EWCP, SBA Express, and Export Express), the Agency does not review the Lender's determination of eligibility, analysis of the credit, or structure of the loan or line of credit prior to issuing a loan number. The Lender must analyze eligibility and credit worthiness in accordance with SBA Loan Program Requirements and properly document its file. The PLP, PLP-EWCP, SBA Express, and Export Express Lender's analysis is subject to SBA's review and determination of adequacy, when the Lender requests SBA to purchase its guaranty or when SBA is conducting lender oversight activities.

2.   Delivery Methods:

Credit underwriting requirements are separated into five categories based on the delivery method of the 7(a) loan:

a.   7(a) loans greater than $350,000 processed using either delegated or non-delegated processing and loans of $350,000 or less that do not meet SBA's minimum credit score requirements for 7(a) Small Loans;

b.   "7(a) Small Loans" consists of any loan of $350,000 or less meeting the minimum credit score requirements as set by SBA (excluding SBA Express, Export Express and CAPLine);

c.   CAPLines;

d.   SBA Express and Export Express loans; and

e.   Export Working Capital Program ("EWCP") loans.

C.   Credit Underwriting Requirements:

1.   For 7(a) loans greater than $350,000 and loans of $350,000 or less that do not meet SBA's minimum credit score requirements for 7(a) Small Loans:

a.   Lender's Credit Analysis:

Lender's credit memorandum and analysis must address the Applicant's ability and likelihood to repay the loan from the cash flow of the business and past performance by documenting the following:

i.   A description and history of the business, including:

a)   Nature of the business;

b)   Length of time in business under current management;

c)   Depth of management experience in the industry or a related industry;

d)   Brief description of the business's management team including principal's involvement in the daily onsite management of the business or how the daily operations will be managed if the principals are not there on a daily basis; and

e)   If the daily operations will be handled under a management agreement,

i)   Delegated Lenders must obtain a copy of the management agreement, review it and retain in their loan file.

ii)   Non-delegated Lenders must submit a copy of the management agreement to the LGPC with their application.

iii)   See Chapter 2, paragraph II.D.7 of this Subpart for further guidance on management agreements. ([13 CFR § 121.301(f)(3)](#))

ii.   Financial analysis of repayment ability:

a)   For existing businesses based on the three most recent years of historical financial information (tax returns or balance sheet with debt schedule and income statement) plus an interim financial statement. ([13 CFR § 120.191](#))

b)   For new businesses, detailed projections, including the supporting assumptions which reflect positive cash flow within 2 years will be required.

c)   The financial analysis for all Applicants must address the following as applicable:

i)   Historical cash flow for existing businesses, that demonstrates total

debt service coverage after the SBA loan; if the historic cash flow does not show sufficient debt service coverage, Lender must obtain from the Applicant and analyze 2 years of detailed projections including the supporting assumptions;

ii)  Calculation of operating cash flow (OCF) defined as earnings before interest, taxes, depreciation and amortization (EBITDA);

iii) Justification for additions and subtractions to cash flow such as the following:

   (a)   Unfunded capital expenditures;

   (b)   Non-recurring income;

   (c)   Expenses and distributions;

   (d)   Distributions for S-Corp taxes;

   (e)   Rent payments;

   (f)   Owner's Draw; and/or

   (g)   Global cash flow analysis that includes assessment of impact on cash flow to/from any affiliate business.

iii.   Debt Service (DS) is defined as the future required principal and interest payments on all business debt inclusive of new SBA loan proceeds. The Applicant's debt service coverage ratio (OCF/DS) must be equal to or greater than 1.15 on a historical and/or projected cash flow basis and 1:1 on a global basis. To perform a complete analysis of debt service, it is important for a Lender to obtain a current debt schedule prepared by the Applicant, including any shareholder debt.

iv.   For cash flow projections, the Lender must calculate the debt service coverage and provide the assumptions supporting the projected cash flow coverage, including as applicable:

   a)  Justification for revenue growth, i.e. new product lines, sales channels and new production facilities;

   b)  Justification for any reduction in expenses; and

   c)  A comparison to current industry trends.

v.   Spread of pro-forma Business Balance Sheet (current business balance sheet adjusted for all changes in assets and liabilities as a result of the SBA loan, other debt, any required equity injection and use of loan proceeds);

vi.   Ratio calculations (based on the pro-forma Balance Sheet and historical and projected Income Statements) for the following financial ratio benchmarks: Current Ratio, Debt/Tangible Net Worth, Debt Service Coverage, and any other ratios the Lender considers significant for the business/ industry (e.g., inventory turnover, receivables turnover, and payables turnover, etc.) including discussion of Lender's comparison to industry trends;

      vii.   Analysis of working capital adequacy, at a minimum over the next 12 months;

     viii.   Collateral adequacy assessment (using market or net book value as defined in Paragraph II. of this Chapter) to offset risk of default;

      ix.   Insurance Requirements, including:

        a)   Life Insurance - on whom and how much. If Life Insurance will not be required, provide justification.

        b)   Business hazard & liability insurances.

        c)   Other Insurances, such as specialty insurance appropriate for the type of business, e.g. malpractice insurance or product liability insurance. (See Paragraph II, "Guaranties and Collateral," below for further guidance on insurance requirements.)

       x.   Explanation of and justification for the refinancing of any debts as part of the loan request, in accordance with the written analysis required in Chapter 2, Paragraph V.E.5 of this Subpart. In addition, Lender must include a written explanation for any late payments.

      xi.   Lender's rationale for recommending approval, including a discussion and analysis of the following:

        a)   The factors demonstrating the Applicant does not have credit available elsewhere on reasonable commercial terms from non-Federal, non-State, non-local government sources (see Chapter 2, Para. II.E. of this Subpart);

        b)   Competition;

        c)   Seller financing;

        d)   Stand-by agreements;

        e)   90+ day delinquencies;

        f)   Trade disputes and/or;

        g)   Federal, State or local citations which would preclude the Applicant from normal business operations;

        h)   For a change of ownership, discussion/analysis of the business valuation used to support the purchase price (see Section IV of this chapter for business valuation requirements.);

        i)   Discussion of any liens, judgments, bankruptcy filings or pending litigation including divorce proceedings; and

        j)   Discussion of other relevant information (for example, if the application involves a franchise, Lender must review any credit information provided such as the number of failed franchisees and cash flow projections provided by the franchisor).

   b.   Equity requirements ([13 CFR § 120.150(f)](13 CFR § 120.150(f))):

i.    The Lender must determine if the equity position, any required equity injection and the pro forma debt-to-worth are acceptable based on the factors related to the type of business, experience of management and the level of competition in the market area. The Lender must include a detailed discussion of the equity position (net worth) and any required equity injection. (See Chapter 7 of this Subpart for requirements concerning documenting and verifying equity injection.)

ii.   Minimum equity injection requirements for certain Applicants or loans:

a)  Start-Up businesses – At a minimum, SBA considers an equity injection (Applicant contribution) of at least ten (10) percent of the total project costs (all costs required to become operational, regardless of the source of funds) to be necessary for a start-up business to operate on a sound financial basis. SBA considers a business to be a "start-up" for the purpose of determining equity injection requirements if it has been in operation (i.e., generating revenue from intended operations) for up to 1 year;

b)  Changes of ownership:

i)   Resulting in a new owner (complete change of ownership): At a minimum, SBA considers an equity injection of at least ten (10) percent of the total project costs (all costs required to complete the change of ownership, regardless of the source of funds) to be necessary for such transactions. Seller debt may not be considered as part of the equity injection unless it is on full standby for the life of the SBA loan and it does not exceed half of the required equity injection;

ii)  Change of ownership between existing owners ("partner buyout"): In order for a 7(a) loan to finance greater than 90% of the purchase price of a partner buyout:

(a)  The remaining owner(s) must certify that he/she has been actively participating in the business operation and held the same ownership interest in the business for at least the past 24 months (Lender must include in the credit memorandum confirmation that the Borrower has made the required certification and retain such certification in the file; and

(b)  The business balance sheets for the most recent completed fiscal year and current quarter must reflect a debt-to-worth ratio of no greater than 9:1 prior to the change in ownership.

In the event the Lender is unable to document that both (a) and (b) above are satisfied, the remaining owner(s) must contribute cash in the amount of at least 10% of the purchase price of the business, as reflected in the purchase and sale agreement.

iii.  Source of Equity Injection:

a) The following may be considered as equity injection:

    i) Cash that is not borrowed.

    ii) Cash that is borrowed through a personal loan to the business owner with repayment demonstrated to come from a source other than the cash flow of the business (the salary paid to the owner by the business does not qualify). If the personal loan is made by the participating Lender, the Lender must submit the application through non-delegated 7(a) processing.

    iii) Assets other than Cash - Lenders must carefully evaluate the value of assets other than cash that are injected by owners. An appraisal or other valuation by an independent third party is required if the valuation of the fixed assets is greater than the depreciated value (net book value). A valuation of the fixed assets provided as part of a business valuation will not meet these requirements.

    iv) Standby debt - Only debt that is on full standby (no payments of principal or interest for the term of the SBA-guaranteed loan) may be considered as equity for SBA's purposes. A copy of the note must be attached to the standby agreement.

b) The following may not be considered as Equity Injection:

    i) Value or cost of education; and

    ii) Funds that are borrowed and do not meet the exception noted in subparagraph a) ii) immediately above.

c) Standby Agreements:

    i) Lender may use SBA Form 155 or its own Standby Agreement form. A copy of the note must be attached to the standby agreement.

    ii) Standby Creditor must subordinate any lien rights in collateral securing the loan to Lender's rights in the collateral, and take no action against Borrower or any collateral securing the Standby Debt without Lender's consent.

2. 7(a) Small Loans up to and including $350,000 (excluding SBA Express, Export Express, CAPLine and EWCP):

  a. All 7(a) Small Loan applications will begin with a screening for a FICO® Small Business Scoring Service$^{SM}$ Score (SBSS Score).

    i. The SBSS Score is calculated based on a combination of consumer credit bureau data, business bureau data, Borrower financials, and application data (The SBSS Score is not to be confused with the Small Business Predictive Score (SBPS) used by SBA's Office of Credit Risk Management). The minimum credit score is based on the lower end of the risk profile of the current SBA portfolio and may be adjusted up or down from time to time. SBA will post on its website the minimum acceptable SBSS credit score for

applications at https://www.sba.gov/partners/lenders/7a-loan-program.

ii.  To screen the application for a credit score:

The Lender will enter a minimal set of fields into E-Tran Loan Origination. At this point, the Lender will not be required to complete the entire set of E-Tran screens, but the Lender may choose to submit the entire set of E-Tran loan origination data if it is easier to keep the data set intact while processing via a third-party software product. The fields required to generate a credit score are as follows (it should be noted that these data fields are part of the screens used for the E-Tran loan origination process and part of the specification for loan origination software packages, which will make it easier to move forward with the loan application if the credit score is acceptable):

a)  business_legal_name

b)  business_address

c)  business_city

d)  business_state

e)  business_zip

f)  business_phone

g)  fed_tax_id

h)  DUNs number (if available)

i)  For all owners of 20% or more equity in the Applicant small business, the following is necessary to generate the credit score:

    i)  first_name

    ii)  last_name

    iii) SSN

    iv)  city

    v)  state

    vi) zip

iii.  An acceptable SBSS credit score satisfies the requirement to consider the following:

a)  The credit history of the Applicant (and the Operating Company if applicable), its Associates, and guarantors, including historical performance as well as the potential for long term success (character and reputation will be determined through the appropriate questions on SBA Form 1919 and, if required, SBA Form 912);

b)  The strength of the business;

c)  Past earnings, projected cash flow, and future prospects; and

d) The Applicant's ability to repay the loan with earnings from the business.

iv. If the Applicant does not receive an acceptable SBSS credit score:

a) Non-delegated Lenders may submit via E-Tran or SBA One a 7(a) loan application to the LGPC following the procedures for loans over $350,000 as outlined in paragraph I.C.1. above.

b) Delegated Lenders may process the application using their delegated authority following the procedures for loans over $350,000 as outlined in paragraph I.C.1. above, or, if the Lender is an SBA Express or Export Express Lender, as an Express application.

b. Abbreviated Credit Analysis for 7(a) Small Loans:

The Lender's credit memorandum must demonstrate reasonable assurance of repayment and must include the following:

i. A brief description and history of the business;

ii. A brief description of the management team of the company. Consider the length of time in business under current management and, if applicable, the depth of management experience in this industry or a related industry. If the loan will be for a change of ownership, Lender must address the experience of the new management and potential impact on the business going forward;

iii. Owner/Guarantor analysis, including obtaining personal financial statements, consistent with Lender's policies for their similarly-sized non SBA-guaranteed commercial loans;

iv. The reason(s) why credit is not available elsewhere on reasonable commercial terms from non-Federal, non-State, or non-local government sources (see Chapter 2, Paragraph II.E of this Subpart);

v. A description of proposed collateral and estimated value, if secured.

vi. Insurance – Lender must address whether life insurance or other insurances will be required. Lender may follow the same written policies and procedures it uses for its similarly-sized non-SBA guaranteed commercial loans.

vii. Lender must address other specifics relating to the loan as applicable, including:

a) The terms of any seller financing and standby agreements;

b) Discussion of any liens, judgments, or pending litigation including divorce proceedings;

c) Franchise, dealer, or similar agreements (see Chapter 2, Paragraph II.D.8 of this Subpart for further guidance);

d) Management agreements (see paragraph 1.a) above and Chapter 2, paragraph II.D.7 of this Subpart for further guidance); and

e) Any debt refinancing, including justification and original purpose (copies

of all notes to be refinanced must be submitted with any loan submitted to LGPC).

    f)  The effect any affiliates may have on the ultimate repayment ability of the Applicant.

c.  Equity Requirements for 7(a) Small Loans.

    i.  The Lender must include in its credit analysis a detailed discussion of the required equity and its adequacy. (See Chapter 7 of this Subpart for requirements concerning documenting and verifying equity injection).

    ii.  Minimum equity injection requirements for certain Applicants and loans:

        a)  Start-Up businesses – At a minimum, SBA considers an equity injection (Applicant contribution) of at least ten (10) percent of the total project costs (all costs required to become operational, regardless of the source of funds) to be necessary for a start-up business to operate on a sound financial basis. SBA considers a business to be a "start-up" for the purpose of determining equity injection requirements if it has been in operation (i.e., generating revenue from intended operations) for up to 1 year;

        b)  Changes of ownership:

           i)  Resulting in a new owner (complete change of ownership): At a minimum, SBA considers an equity injection of at least ten (10) percent of total project costs (all costs required to complete the change of ownership, regardless of the source of funds) to be necessary for such transactions. Seller debt may not be considered as part of the equity injection unless it is on full standby for the life of the SBA loan and it does not exceed half of the required equity injection;

          ii)  Change of ownership between existing owners ("partner buyout"): In order for a 7(a) Small Loan to finance greater than 90% of the purchase price of a partner buyout:

              (a)  The remaining owner(s) must certify that he/she has been actively participating in the business operation and held the same ownership interest in the business for at least the past 24 months (Lender must include in the credit memorandum confirmation that the Borrower has made the required certification and retain such certification in the file); and

              (b)  The business balance sheets for the most recent completed fiscal year and current quarter must reflect a debt-to-worth ratio of no greater than 9:1 prior to the change in ownership.

In the event the Lender is unable to document that both (a) and (b) above are satisfied, the remaining owner(s) must contribute cash in the amount of at least 10% of the purchase price of the business, as reflected in the purchase and sale agreement.

        iii.    Source of Equity Injection: Must conform to [Paragraph I.C.1.b.iii](#) above.

3. CAPLines:

    a.   Seasonal CAPLine: The loan amount is based on the cash flow projections. The amount should correlate to the costs of the seasonal buildup of inventory and/or receivables.

    b.   Contract CAPLine:

        i.    A single Contract CAPLine may be utilized to fund a single or multiple contracts. Once the overall line amount has been approved by SBA, the lender may advance against additional contracts without SBA approval, provided that the Borrower and lender are in compliance with all terms of the Authorization. The contracting parties, as a result of a properly executed change order, may agree to increase the contract price subsequent to the approval of the Contract CAPLine. In such event, if the overall line amount needs to be increased, the Lender must comply with Chapter 7, Paragraph I.F of this Subpart to obtain SBA's approval of the increase in the line. The contracting parties, as a result of a properly executed change order, also may agree to decrease the contract price subsequent to the approval of the Contract CAPLine and/or after a progress advance was made. In such event, the lender must ensure the Borrower is aware that the next future advance or future advances, if necessary, will be at the decreased amount.

        ii.    For single contract financing with a single payment, the loan amount is equal to the sum of the costs of the contract (excluding profit), as evidenced by the project cost schedule.

        iii.    For a single contract with multiple payments, the loan amount is the amount projected by the Borrower necessary to cover 20% over the greatest cash deficit projected for the subject contract. This permits the line to revolve within the term of the contract.

        iv.    For multiple contract financing, the master note amount is equal to the sum of the costs of all contracts (excluding profit) to be financed under the CAPLine, as evidenced by the project cost schedules. For future projects not yet identified, at the time the contract is obtained all costs by line item should be identified. The amount of the sub-note for each specific contract should equal the total costs of that contract (excluding profit).

    c.   Builders CAPLine:

        i.    A single line may be utilized to fund multiple projects. Once the overall line amount has been approved by SBA, the lender may advance against additional projects without SBA approval, providing the Borrower and lender are in compliance with all terms of the loan Authorization.

        ii.    SBA may allow the finished property to be rented pending sale only in cases where the rental will enhance the ability to sell the property.

        iii.    The final sale of the property must be an arm's length transaction with legal

transfer to an unaffiliated third party.

    iv. For a non-revolving loan, the loan amount is based on the written proposal of costs (not anticipated selling price) provided by the applicant for a single project.

    v. For a revolving loan, the master note amount is based on the cash flow projection provided by the applicant for ALL work to be performed by the small business (not just a specific project). The amount of a sub-note (for each specific project) is based on the written proposal of costs (not anticipated selling price) provided by the Applicant for that particular project.

d. Working Capital CAPLine:

    i. To determine the maximum line amount, the lender must follow its established policies and procedures utilized on its similarly-sized, non-SBA guaranteed commercial lines of credit or the lender may use the following formula:

        a) Net Sales for Prior Year

        b) Divide Prior Year Net Sales by 365

        c) Multiply Daily Sales figure by number of days to finance (whatever number is the business sales cycle)

    ii. The result will be the estimated working capital needs.

4. SBA Express and Export Express.

SBA has authorized SBA Express and Export Express Lenders to make the credit decision without prior SBA review. Lenders must not make an SBA guaranteed loan that would be available on reasonable commercial terms from either the Lender itself or another source without an SBA guaranty.

a. The credit analysis must demonstrate there is a reasonable assurance of repayment.

b. The credit analysis must substantiate the reason(s) why credit is not available elsewhere on reasonable terms from non-Federal, non-State, or non-local government sources;

c. The Lender is required to use appropriate, prudent and generally accepted industry credit analysis processes and procedures (which may include credit scoring).

d. SBA Express and Export Express Lenders may use a business credit scoring model (such a model cannot rely solely on consumer credit scores) to assess character, reputation, and credit history of the applicant and/or repayment ability if they do so for their similarly-sized, non-SBA guaranteed commercial loans.

    i. If used, the business credit scoring results must be documented in each loan file and available for SBA review.

    ii. Although SBLCs do not make non-SBA guaranteed loans, SBA has determined they may use credit scoring.

    iii. Lenders must validate (and document) with appropriate and accepted statistical

methodologies their business credit scoring model is predictive of loan performance and they must provide that documentation to SBA upon request.

e. The credit decision on SBA Express and Export Express loans, including how much to factor in a past bankruptcy or whether to require an equity injection, is left to the business judgment of the Lender. Also, if the Lender requires an equity injection and, as part of its standard processes for similarly-sized, non-SBA guaranteed loans verifies the equity injection, it must do so for SBA Express and Export Express loans. While the credit decision is left to the business judgment of the Lender, early loan defaults will be reviewed by SBA pursuant to SOP 50 57.

f. Lender must also address other specifics, such as:

    i. Franchise agreements, dealer or similar agreements (see Chapter 2, Paragraph II.D.8 of this Subpart for further guidance); and

    ii. Management agreements (see Chapter 2, Paragraph II.D.7 of this Subpart for further guidance).

5. EWCP.

EWCP is limited to businesses with 12 full months or more of historical operations at the time of the loan application. (The SBA Approving Official may waive the 12 month requirement, based upon demonstrated export expertise and previous business experience. The justification and recommendation for waiver must be included in the loan officer's report.)

a. Lender must submit a credit memorandum with the application and analyze each EWCP request in a commercially reasonable manner, consistent with prudent lending standards. EWCP loans are self-liquidating loans and the conversion of the export-related trading assets to cash is the primary source of repayment. The Lender's financial analysis should pay particular attention to the Applicant's foreign payment terms and the impact on the Applicant's cash cycle. Lender must specify whether the request is for a single transaction-specific loan, a transaction-based revolving line of credit (single or multiple transactions), or an asset based loan.

b. Lender's credit analysis must include the following:

    i. An explanation of the use of proceeds and benefits of the loan guaranty, including details of the underlying transaction(s) for which the loan is needed and the country(ies) where the buyer(s) is (are) located. The Lender must identify the present financing factors that meet the credit elsewhere test;

    ii. A description of the nature of the business, length of time in business under current management and, if applicable, the depth of management experience in the industry or a related industry. Such analysis should include a brief description of the business's management team;

    iii. A discussion of the Applicant's export experience and export business plan, which may include the following:

        a) Dollar amount of revenues that are or will be generated by export sales,

and the percentage of total revenue

b) Principal or proposed export markets;

c) Proposed or established export customer relationships;

d) Largest export sales contract to date;

e) Export contract backlog discussion; and

f) Documentation of the Applicant's performance history and ability to successfully complete obligations required by standby letter(s) of credit, which serve as bid, advanced payment, performance, supplier and warranty guarantees and/or bonds.

iv.  A discussion of financing relationships to include a summary of all short and long term debt relationships, such as:

a) Domestic revolving lines of credit or other term debt credit facilities, which includes a description of the purpose of the debt, payment structure and collateral;

b) Standby debt. Address whether or not the standby debt will permit interest payments to be made and, if so, amounts and frequency, and under what conditions such payments can be halted; and

c) Identify any SBA or other government-guaranteed financing.

v.  A financial analysis of the Applicant's historical and year-to-date- financial statements. The Lender should also provide an analysis of the Applicant's financial projections. The analysis shall include:

a) Analysis of historical cash flow and total debt service for the existing business;

b) Calculation of operating cash flow (OCF) defined as earnings before interest, taxes, depreciation and amortization (EBITDA);

c) Analysis must document additions and subtractions to cash flow such as the following:

i)   Unfunded capital expenditures;

ii)  Non-recurring income;

iii) Expenses and distributions;

iv)  Distributions for S-Corp taxes;

v)   Rent payments;

vi)  Owner's Draw; and/or

vii) Global cash flow analysis that includes assessment of impact on cash flow to/from any significant affiliate businesses.

vi.  Debt service (DS) is defined as the future required principal and/or interest

payments on all business debt inclusive of new SBA loan proceeds.

vii. For projected cash flows, the Lender should provide the calculation of debt service coverage using the definitions above, and provide analysis of the assumptions supporting the projected cash flow, such as:

   a) Reason for reduced expense structure,

   b) Reason for revenue growth, i.e., new product lines, sales channels and new production facilities; and

   c) Industry analysis.

viii. A financial analysis of SBA EWCP loan repayment ability based on the Applicant's cash cycle;

ix. Ratio calculations for the following financial ratio benchmarks: Current Ratio, Debt/Tangible Net Worth, Debt Service Coverage, inventory turnover, receivables turnover, and payables turnover and any other ratios the Lender considers significant for the business/industry;

x. An analysis of the collateral that may include a discussion of:

   a) Buyer(s) and export destination market(s) risk, which may include economic, political, compliance, currency, or logistics;

   b) Anticipated "terms of sale" on the exports to be financed through the EWCP loan. Terms of sale may include:

      i)   Cash before Shipment/Cash at Shipment;

      ii)  Irrevocable Letters of Credit

      iii) Export Credit Insurance (for comprehensive commercial and political risk);

      iv)  Collections (Cash against Documents); and

      v)   Open Account;

   c) Credit insurance experience;

   d) The composition and quality of the collateral in the proposed borrowing base that may include:

      i)   Quality of the Borrower's customer base;

      ii)  The presence of concentrations risks;

      iii) Delinquency volumes and trends; and

      iv)  Dilution.

xi. A discussion of Lender's credit experience with the Applicant and a review of business and personal credit reports and why credit is not available without an EWCP guaranty.

## II.  GUARANTIES AND COLLATERAL

A.  Guaranties ([13 CFR § 120.160(a)](#)):

Each loan must be guaranteed by at least one individual or entity. If no one individual or entity owns 20% or more of the Applicant business, at least one of the owners must provide a full unconditional guaranty. In addition, if the guaranty will be provided by a trust, the requirements of the paragraph II.A.3 below must be met.

1.  Personal Guaranties:

    a.  Individuals who own 20% or more of an Applicant business must provide an unlimited full guaranty. ([SBA Form 148](#) or equivalent Lender's form). If a person has executed the Note as a Borrower in an individual capacity, that person does not also have to execute a personal guaranty.

    b.  When ownership interest of an Applicant is held by a corporation, partnership or other form of legal entity, the ownership interests of all individuals must be disclosed.

    c.  When deemed necessary for credit or other reasons, SBA or, for a loan processed on a delegated basis, the Lender, may require other appropriate individuals to provide full or limited guaranties of the loan without regard to the percentage of their ownership interests, if any. For example, an individual with a minority ownership or no ownership interest in the Applicant or OC who is critical to the operation of the business may be required to provide a personal guaranty.

    d.  If a limited guaranty is used, Lender must choose one of the payment limitation options in [SBA Form 148L](#) (Unconditional Limited Guaranty) or equivalent Lender's form and specify the option in the Authorization.

    e.  Lender must obtain a personal financial statement from all individuals guaranteeing the loan.

    f.  The guaranty may be secured or unsecured. If the loan is not fully collateralized by fixed assets, available equity in personal real estate must be pledged to secure the guaranty, up to the collateral shortfall as defined in section II.B.4.b of in this Chapter below.

2.  Guaranty of Spouse:

    a.  Each spouse owning less than 20% of an Applicant must personally guarantee the loan in full when the combined ownership interest of both spouses is 20% or more.

    b.  For a non-owner spouse, Lender must require the signature of the spouse on the appropriate collateral documents. The spouse's guaranty secured by jointly held collateral will be limited to the spouse's interest in the collateral.

3.  Corporate/Other Guaranties:

    a.  All entities that own 20% or more of an Applicant must provide an unlimited full guaranty. If the entity that owns 20% or more of the Applicant is a trust (revocable or irrevocable), the trust must guarantee the loan with the trustee executing the

guaranty on behalf of the trust and providing the certifications required in Chapter 2, Paragraph III.D.2.c) and e) of this Subpart. In addition, if the trust is revocable, the Trustor also must guarantee the loan.

b. Financial statements are necessary to determine the assets available to support the guaranty.

c. When deemed necessary for credit or other reasons, SBA or, for a loan processed on a delegated basis, the Lender, may require other appropriate entities to provide full or limited guaranties of the loan without regard to the percentage of their ownership interests, if any. This may include entities who manage the day-to-day operations of the Applicant or OC through a Management Agreement without an ownership interest in the Applicant or OC.

4. Reducing Ownership Interest:

a. Any Person subject to the guaranty requirements 6 months prior to the date of the loan application would continue to be subject to the requirements even if that Person has changed their ownership interest to less than 20%.

b. The only exception to the 6-month rule is when that Person completely divests their interest prior to the date of application. Complete divestiture includes divestiture of all ownership interest and severance of any relationship with the Applicant (and any associated Eligible Passive Company) in any capacity, including being an employee (paid or unpaid).

5. Employee Stock Ownership Plans (ESOPs) and 401(k) Accounts:

When an ESOP or 401(k) owns 20% or more of an Applicant, the Plan or Account cannot guarantee the loan. The Plan or Account must meet all applicable IRS, Treasury and Department of Labor requirements. In addition, the following loan conditions must be met:

a. The owner(s) of a 401(k) must provide his or her full unconditional personal guaranty regardless of the individual ownership interest in the Applicant concern. This guaranty must be a secured guaranty if required by SBA's existing collateral policies.

b. The members of the ESOP are not required to personally guarantee the debt; however, all owners of the Applicant who hold an ownership interest outside the ESOP are subject to SBA's personal guaranty requirements, including paragraph II.A.1.c) above.

c. The application cannot be structured as an EPC/OC. (13 CFR § 120.111(a)(6)) (SBA regulations require each 20% or more owner of the EPC and each 20% or more owner of the OC to guarantee the loan, and the regulation does not provide for an exception.)

B. General Collateral Requirements:

1. With respect to collateral, Lenders must use commercially reasonable and prudent practices to identify collateral, which conforms to procedures at least as thorough as those used for their similarly-sized non-SBA guaranteed commercial loans. Decisions regarding what

collateral must be taken to secure a loan are based on the circumstances of the individual loan, including size, and must meet the minimum requirements set forth in this section.

2. Adequacy of Collateral

   a. A loan request is not to be declined solely on the basis of inadequate collateral. In fact, one of the primary reasons Lenders use the SBA-guaranteed program is for those Applicants that demonstrate repayment ability but lack adequate collateral to repay the loan in full in the event of default. However, SBA does not permit its guaranty to be a substitute for available collateral.

   b. When assessing the adequacy of collateral, the Lender must consider the impact that covenants and other restrictions recorded against the collateral may have on its value and marketability. (See Chapter 2, Paragraph II.D.8 of this Subpart for guidance on covenants and other restrictions recorded against the collateral when the Applicant is operating under a franchise agreement.) The Lender must document this analysis in the file. Examples of items to review include:

      i. Deed restrictions, covenants, easement provisions, reversionary interests, subordinations, leases and options, and other provisions that restrict the use of the property for the benefit of a third party (note: certain deed restrictions pertaining to the use of the property, which are intended to protect the health and safety of occupants, may be acceptable, e.g., deed restrictions based upon environmental concerns including restrictions on residential use, use as a day care center for children or seniors, use as a school, or use as a hospital); and

      ii. Engineering Controls that require the Applicant or subsequent owners to install costly devices or structures such as extraction wells or subsurface barrier walls prior to constructing a building, remodeling, or otherwise improving the property.

3. Collateral Requirements for 7(a) Small Loans.

   a. For loans of $25,000 or less, the Lender is not required to take collateral. (personal guaranties must still be obtained in accordance with paragraph A above); and

   b. For loans over $25,000, up to and including $350,000, the Lender must follow the collateral policies and procedures that it has established and implemented for its similarly-sized non-SBA guaranteed commercial loans, but at a minimum:

      i. Lender must take a first lien on assets financed with loan proceeds;

      ii. Lender must take a lien on all of the Applicant's fixed assets, including real estate, up to the point that the loan is fully secured, based on the collateral valuations used in paragraph 4.a) below. Lender is not required to take a lien against Applicant's real estate when the equity is less than 25% of the fair market value. The Lender may limit the lien taken against real estate to the amount necessary to ensure the loan is fully secured; and

      iii. Lender may secure Applicant's trading assets if it does so for its similarly-sized non-SBA guaranteed commercial loans. Lender may also take personally-owned investment and/or residential real estate as collateral, and

may limit the liens on that collateral in accordance with the provisions in paragraph 4.b) below.

4. Collateral Requirements for 7(a) loans over $350,000 and 7(a) Small Loans that do not meet the minimum credit score requirements (except SBA Express, Export Express, CAPLine and EWCP):

   a. SBA considers a loan as "fully-secured" if the Lender has taken security interests in all available fixed assets of the Applicant with a combined "net book value" as adjusted below, up to the loan amount. For 7(a) loans, the term "fixed assets" means real estate, including land and structures, machinery and equipment owned by the business or an EPC. "Net book value" is defined as an asset's original price minus depreciation and amortization.

      i. New machinery and equipment (excluding furniture and fixtures) may be valued at 75% of price minus any prior liens for the calculation of "fully-secured";

      ii. Used or existing machinery and equipment (excluding furniture & fixtures) may be valued at 50% of Net Book Value or 80% with an Orderly Liquidation Appraisal minus any prior liens for the calculation of "fully-secured";

      iii. Improved real estate can be valued at 85% and unimproved real estate can be valued at 50% of the market value for the calculation of "fully-secured" and the value must be determined in accordance with the requirements set forth in Paragraph IV (Real Estate Appraisals) below; and

      iv. Furniture and Fixtures may be valued at 10% of Net Book Value or appraised value.

   b. If there is a collateral shortfall (not "fully-secured") on the SBA-guaranteed loan the Lender:

      i. Must take available equity in the personal real estate (residential and investment property) of the principals. Liens on personal real estate may be limited to the amount of the collateral shortfall. In addition, liens on personal real estate may be limited to 150% of the equity in the collateral, if there are tax implications associated with the lien amount in the particular state where the lien is filed.

      ii. May include trading assets as necessary (using 10% of current book value for the calculation).

   c. For loans that are more than $250,000 and collateralized by commercial real estate, Lenders must comply with the real estate appraisal requirements set forth in Paragraph IV below.

   d. SBA does not require a Lender to collateralize a loan with real estate (including commercial, residential and investment properties owned by the Applicant or personally by the owners) to meet the "fully secured" definition when the equity in the real estate is less than 25% of the property's fair market value. The Lender must document in their loan file the source (other than the personal financial statement)

for making the determination of less than 25% equity.

e.   When loan proceeds from any 7(a) loan will be used to purchase or improve assets, a first security interest in those assets must be obtained.

f.   Assets owned by an owner of the Applicant and Spouse:

i.   When an individual alone or together with his or her spouse owns 20% or more of the Applicant, the Lender must consider taking as collateral a lien on personal real estate (including commercial and investment properties not occupied by the Applicant business) that is owned individually by the Applicant owner, or jointly owned by the individual and his or her spouse.

ii.  Real estate transferred by the Applicant to the non-owning spouse within 6 months of the date of the application will not be exempt from consideration as available collateral.

5.   When loan proceeds from any 7(a) loan will be used to refinance existing debt, the loan must be secured with at least the same collateral and lien priority as the debt that is being refinanced. When the debt being refinanced is considered as being over collateralized based upon SBA collateral requirements and the SBA loan will remain fully secured, the Lender may approve the release of excess collateral. Substitute collateral may be offered providing it is of comparable value and useful life and is determined to be acceptable by SBA or Lender under their delegated authority.

C.  CAPLine Collateral Requirements:

The CAPLine programs listed below have specific collateral requirements as follows:

1.   For Working Capital CAPLines:

a.   If the Lender will disburse the line based on a BBC, the Lender must obtain a first lien on the Applicant's working/trading assets (i.e., accounts receivable, inventory).

b.   If the Lender will not use a BBC to disburse the line, the Lender must assume full utilization of the revolving line of credit and secure the line with sufficient collateral to ensure there is a 1:1 collateral ratio. Lender must obtain a first lien position on the working/trading assets (accounts receivable and inventory) financed with the line. If the working/trading assets are insufficient to provide a 1:1 collateral ratio, the Lender also must take additional collateral to ensure there is a 1:1 collateral ratio. If business assets do not fully secure the loan, the Lender must take available equity in personal real estate owned by the principals as collateral to ensure there is a 1:1 collateral ratio. (See Chapter 7 of this Subpart for further guidance.)

2.   For Builders CAPLines:

a.   SBA will accept no less than a second lien position on the property being constructed or renovated if the purpose of the first lien was to acquire the property.

b.   If the property is part of a subdivision where the prime Lender for the subdivision holds a first lien OR serves as partial collateral for a loan secured by more than one parcel of real estate, the first lienholder must provide a "release clause" for transfer of clear title to any eventual buyer of individual parcels upon receipt of a pre-

established payment.

    c.  Lenders must not take a second lien position if the first lienholder requires that the entire loan be paid in full before any property is released. Where Lender/SBA is in a second position, the total amount necessary to release the first and second liens may not exceed 80% of the fair market value (selling price) of the completed project.

3.  For Contract CAPLines:

    a.  Applicants must be able to provide the Lender with a first lien position on the contract(s) and the proceeds of the contract(s) financed with the line, by assignment to the participating Lender and proper UCC filing. See Chapter 7 of this Subpart for guidance on exceptions to when an assignment is required.

    b.  The Lender may take additional collateral in accordance with its policies and procedures governing its similarly-sized, non-SBA guaranteed commercial lines of credit.

    c.  All liens must be perfected and the lien position verified prior to the initial disbursement of the line. For seasonal, contract or builder lines that revolve for more than one season, contract or construction/renovation project, liens must be perfected prior to the initial disbursement for each season, contract or project.

    d.  The requirements for personal guaranties are the same as for any other 7(a) program.

D.  SBA Express and Export Express Collateral Requirements:

Lenders must use commercially reasonable and prudent practices to identify collateral items.

1.  For loans of $25,000 or less, Lenders are not required to take collateral.

2.  For loans over $25,000, the Lender must, to the maximum extent practicable, follow the written collateral policies and procedures that it has established and implemented for its similarly-sized, non-SBA guaranteed commercial loans, except for Export Express lines of credit over $25,000 used to support the issuance of a standby letter of credit. The line of credit must have collateral (cash, cash equivalent or project) that will provide coverage for at least 25% of the issued standby letter of credit amount.

E.  EWCP Collateral Requirements:

1.  EWCP loans must be secured by no less than a first security interest in all collateral associated with the transactions financed. This includes at least the export inventory and receivables, assignment of credit insurance, letters of credit proceeds, and contract proceeds as applicable. Collateral must be located in the United States, its territories or possessions. An assignment of contract proceeds for an EWCP Asset Based Line of Credit may be required at the discretion of the LGPC for non-delegated loans, or the PLP-EWCP Lender for EWCP loans processed under delegated authority.

In general, the export-related inventory produced and the foreign accounts receivables generated by the export sales financed will be considered to provide adequate collateral coverage. SBA, for non-delegated loans, or the PLP-EWCP Lender, may require additional collateral by requiring a lien on other business assets.

2.  Standby Letters of Credit: SBA requires additional collateral if EWCP loan proceeds are used to support the issuance of a standby letter of credit. In such situations, the Applicant must deposit cash into an account held by the Lender in an amount equal to 25% of the standby letter of credit being issued. This deposit must remain in the account held by the Lender for the term of the standby letter of credit. SBA, for non-delegated loans, or the PLP-EWCP Lender may allow export inventory and/or foreign accounts receivable or other acceptable collateral to replace the cash deposit requirement. However, if using an asset-based loan (ABL) facility, the Lender must determine that the borrowing base for the ABL will support at least 25% of the total of all standby letters of credit supported by the loan. In addition, EWCP Authorization Boilerplate contains specific provisions related to standby letters of credit. All Lenders must document the justification in their file.

3.  Receivables generated from sales to foreign purchasers are not considered a foreign asset and may be taken as collateral.

4.  Personal guaranties of all 20% or more owners is generally required, but may be waived by the Director, International Trade Finance (D/ITF).

F.  International Trade (IT) Loan Collateral Requirements:

1.  The Lender is required to take a first lien on the assets financed with IT loan proceeds or other assets of the Applicant. An IT loan can be secured by a second lien position on the property or equipment financed by the IT loan or on other assets of the Applicant, if the SBA determines that the second lien provides adequate assurance of repayment of the loan.

    For example, when the IT loan is to improve business real estate (such as financing an addition to an existing building) or to purchase equipment, and the collateral securing the IT loan is subject to a first lien securing an existing loan used to acquire the business real estate or equipment, the IT loan may be in a second lien position if:

    a.  The loan in the first lien position was not made at or about the same time as the IT loan ("piggyback financing"), and

    b.  The Lender's analysis identifies how the risk of a second lien position on the IT loan is offset by other factors, such as other collateral has been taken to secure the IT loan that in liquidation would pay the IT loan in full or the business has been operating profitably and repaying its existing obligations in a timely manner and the Borrower's cash flow is sufficient to repay all of the Borrower's debt, including the IT loan.

    c.  Clear justification must exist when the interest rate for the first lien loan is significantly higher than the IT loan and/or the maturity of the first lien loan is significantly shorter than the IT loan. (See discussion in Subpart A, Chapter 1, Paragraph II.E.2.b) vi of this SOP regarding "piggyback financing," which is not eligible.)

2.  IT loans may not be processed under a Lender's PLP authority when the IT loan will not have a first lien on the assets being financed.

G.  Collateral Insurance: (13 CFR § 120.160(c))

1.  Hazard Insurance – SBA requires hazard insurance on all assets pledged as collateral. The

Applicant must also maintain a separate policy if the business is located in a state that requires additional coverage such as wind, hail, earthquake, etc.

2. Real Estate:

   a. Coverage must be in the amount of the full replacement cost.

   b. If full replacement cost insurance is not available, coverage must be for the maximum insurable value.

   c. Insurance coverage must contain a MORTGAGEE CLAUSE (or substantial equivalent) in favor of the Lender. This clause must provide that any action or failure to act by the mortgagor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

3. Personal Property

   a. Coverage must be in the amount of full replacement cost.

   b. If full replacement cost insurance is not available, coverage must be for maximum insurable value.

   c. Insurance coverage must contain a LENDER'S LOSS PAYABLE CLAUSE (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

4. SBA Express and Export Express: If the Lender does not require hazard insurance (for example, if it would impose an undue burden on an Applicant given the small size of a loan), the Lender must document the reason in its loan file.

5. Marine Insurance:

   a. Coverage in the amount of the full insurable value on the vessel(s) with Lender designated as "Mortgagee" must be obtained when the vessel is the collateral on the loan.

   b. The policy must contain a Mortgagee clause providing that the interest of Lender will not be invalidated by any:

      i. Act, omission, or negligence of the mortgagor, owner, master, agent or crew of the insured vessel;

      ii. Failure to comply with any warranty or condition out of mortgagee's control; or

      iii. Change in title, ownership or management of the vessel.

   c. The policy must include Protection and Indemnity, Breach of Warranty, and Pollution coverage.

   d. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

6. Flood Insurance:

   a. SBA flood insurance requirements are based on the Standard Flood Hazard Determination ([FEMA Form 086-0-32](#)). The mandatory purchase of flood insurance, as set forth by the requirements of the National Flood Insurance Program (NFIP), applies with equal force to condominium and cooperative units. Policies for such units will consist of separate policies obtained by the individual unit owner for the particular unit and the condominium or cooperative association for the exterior of the entire building.

   b. If any portion of a building that is collateral for the loan is located in a special flood hazard area, Lender must require Applicant to obtain flood insurance for the building under the NFIP.

   c. If any equipment, fixtures or inventory that is collateral for the loan ("Personal Property Collateral") is in a building any portion of which is located in a special flood hazard area and that building is collateral for the loan, Lender must require Applicant to also obtain flood insurance for the Personal Property Collateral under the NFIP.

   d. If any Personal Property Collateral is in a building any portion of which is located in a special flood hazard area and that building is not collateral for the loan, Lender must require Applicant to obtain available flood insurance for the Personal Property Collateral. The Lender may waive this requirement when the building is not collateral for the loan if it:

      i. Uses prudent lending standards to determine that flood insurance is not economically feasible or not available; and

      ii. Includes a written justification in the loan file that fully explains why flood insurance is not economically feasible or, if flood insurance is not available, the steps taken to determine that it is not available.

   e. Insurance coverage must be at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001 et seq.), whichever is less. ("Maximum limit of coverage available" is the lesser of the maximum limit available under the NFIP for the type of structure or the insurable value of the structure.)

   f. Insurance coverage must contain a MORTGAGEE CLAUSE/LENDER'S LOSS PAYABLE CLAUSE (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

7. Life Insurance:

   a. For loans processed under standard 7(a) over $350,000 or 7(a) Small Loans that do not meet the minimum acceptable credit score, Lenders may follow their internal policy for similarly sized non-SBA guaranteed commercial loans, except:

   b. If the loan is not fully secured, life insurance is required for the principals of sole

proprietorships, single member LLCs, or for businesses otherwise dependent on one owner's active participation, consistent with the size and term of the loan. The amount and type of collateral available to repay the loan may be factored into the determination of the appropriate amount of life insurance. If Lender determines that the principal is uninsurable, Lender must obtain written documentation from a licensed insurer of the same.

c. For 7(a) Small Loans, SBA Express and Export Express loans, Lenders may follow their internal written policy for their similarly-sized, non-SBA guaranteed commercial loans.

## III.  ASSIGNMENT OF LEASE AND LANDLORD'S WAIVER

A. When a substantial portion of the loan proceeds are to be used for leasehold improvements or a substantial portion of the collateral consists of leasehold improvements, fixtures, machinery, or equipment that is attached to leased real estate, the Lender should obtain an Assignment of Lease with:

1. A term including renewal options that equals or exceeds the term of the loan; and

2. A requirement that the lessor provide a 60-day written notice of default to the Lender with option to cure the default; and

3. A Landlord's Waiver. The Landlord's Waiver gives the Lender access to the leased premises and facilitates the liquidation of the collateral on the Borrower's premises and should be obtained for all SBA loans with tangible personal property as collateral.

B. If the loan proceeds will finance existing or new improvements on a leasehold interest in land, the underlying ground lease must include, at a minimum, detailed clauses addressing the following:

1. Tenant's right to encumber leasehold estate;

2. No modification or cancellation of lease without Lender's or assignee's approval;

3. Lender's or assignee's right to:

   a. Acquire the leasehold at foreclosure sale or by assignment and right to reassign the leasehold estate (along with right to exercise any options) by Lender or successors; lessor may not unreasonably withhold, condition or delay the reassignment;

   b. Sublease;

   c. Share in hazard insurance proceeds resulting from damage to improvements;

   d. Share in condemnation proceeds; and

   e. Lender's or assignee's rights upon default of the tenant or termination.

C. For lease requirements concerning EPCs and OCs, see Chapter 2, Paragraph III.D of this Subpart.

D. For loans collateralized by Indian lands held in trust, if the owner of the land cannot get approval for a lien on the property, you may consider requiring an Assignment of Lease. The

Assignment of Lease also has to be approved by the Secretary of the Interior or his/her authorized representative.

E. If the Lender is unable to obtain the assignment of lease or landlord's waiver Lender must document its file with the attempt to obtain the assignment and the landlord's reason(s) for not providing it.

## IV. REAL ESTATE APPRAISAL AND BUSINESS VALUATION REQUIREMENTS

The regulation governing real estate appraisal is set forth at 13 CFR § 120.160(b).

A. Commercial Real Estate:

1. SBA requires a real estate appraisal if the SBA-guaranteed loan is greater than $250,000 and is collateralized by commercial real property.

2. For all loans greater than $250,000 secured by commercial real property, federally regulated Lenders must obtain an appraisal by a state licensed or certified appraiser and otherwise follow their primary regulator's FIRREA requirements for real estate appraisals. Appraisals must be in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP). Additionally, SBA requires that completed appraisals be dated within 12 months of the application for guaranty, and that federally-regulated Lenders comply with the provisions set forth in paragraphs IV.C and IV.D below with regard to other fixed assets and the additional appraisal requirements for changes of ownership. **No Exemption is granted under the Interagency Appraisal and Evaluation Guidelines dated December 2, 2010, for Transactions Insured or Guaranteed by a U.S. Government Agency**.

3. For all loans greater than $250,000, secured by commercial real property, SBA Supervised Lenders must follow the appraisal requirements provided below.

4. The SBA or the Lender may require an appraisal of real property by a State licensed or certified appraiser in connection with a loan for $250,000 or less, if such appraisal is necessary for appropriate evaluation of creditworthiness.

5. The appraiser must be:

   a. Independent and have no appearance of a conflict of interest (such as a direct or indirect financial or other interest in the property or transaction); and

   b. Either State-licensed or State-certified, with the following exception: when the commercial property's estimated value is over $1,000,000, the appraiser must be State-certified.

6. In order for the appraiser to identify the scope of work appropriately, the appraisal must identify the Lender as the client and/or an intended user of the appraisal, as those terms are defined in USPAP. The Lender may not use an appraisal prepared for the seller or the Applicant. The cost may be passed on to the Applicant.

7. The appraisal must be an "Appraisal Report" prepared in compliance with USPAP.

8. If the loan will be used to finance new construction or the substantial renovation of an existing building, the appraisal must estimate what the market value will be at completion of

construction. ("Substantial" means rehabilitation expenses of more than one-third of the purchase price or fair market value at the time of the application.) After construction is completed, Lender must obtain a statement from the appraiser, general contractor, project architect, or construction management firm that the building was built with only minor deviations (if any) from the plans and specifications upon which the original estimate of value was based. If the Lender cannot obtain such a statement, then the Lender may not close the loan without SBA's prior written permission.

9. If the SBA guaranteed loan was used to cover the construction period, the Lender must notify the appropriate SBA CLSC of any deviation(s) and work with the SBA CLSC to determine an appropriate course of action, including the securing of additional collateral. The Lender's notification to SBA must provide a sufficient understanding of the reasons for the differences in values between the estimated and actual values as well as a recommendation as to a remedy to offset the difference in values such as additional equity or additional collateral. If additional collateral is being required, the Lender must identify both the fair market and liquidation values of the additional collateral. If the Lender is unable to obtain a statement that the building was built with only minor deviations (if any) from the plans and specifications upon which the original estimate of value was based, but is able to obtain a new appraisal demonstrating that the market value meets or exceeds the original estimate of value, then no additional action on the part of the Lender is necessary.

10. If the loan will be used to acquire an existing building that does not require construction, the appraiser should estimate market value on an as-is basis. If the appraiser estimates the value other than on an as-is basis, the narrative must include an explanation of why the as-is basis was not used.

11. When valuing the collateral, the Lender must not include the contributory value of any rental income or the value of any intangible assets contained in the appraisal.

12. An appraisal may be submitted as part of the loan application to assist with the underwriting or as part of the loan closing. In no case may the Lender rely on an appraisal that was prepared more than 12 months prior to the date of the application.

13. If the Lender is going to require the appraisal at closing, the loan application must include an estimate of the value of the real estate and the estimate must be identified in the loan authorization with the requirement for an appraisal that supports the estimated value at time of closing.

14. If at time of closing the appraised value:

    a. Is 90% or more of the estimated value, the Lender may close the loan but must include a written explanation as to why the appraisal is less than the estimated value in the loan file; or

    b. Is less than 90% of estimated value, the Lender may not close the loan without SBA's prior written permission (see exception below for PLP Lenders). The Lender's justification to SBA must provide a sufficient understanding of the reasons for the differences in values between the estimated and actual values as well as a recommendation as to a remedy to offset the difference in values such as additional equity or additional collateral. If additional collateral is being required, the Lender

must identify both the fair market and liquidation values of the additional collateral.

   c. Exception for PLP Lenders: PLP Lenders are permitted to close a loan when the appraisal is less than 90% of the estimated value but the Lender must include a written justification as part of its file that may be reviewed by SBA at time of guaranty purchase or when SBA is reviewing the Lender. The justification must include a thorough analysis by the Lender of the reasons for the appraisal being low and an explanation as to what steps the Lender took to offset the risk to SBA from the low appraisal such as additional equity or additional collateral.

B. Non-commercial real estate or real estate securing a personal guaranty:

SBA has no specific appraisal requirements for non-commercial real estate (such as a residence) or real estate (commercial or non-commercial) taken as collateral to secure a personal guaranty.

C. Other Fixed Assets:

If the valuation of fixed assets is greater than their depreciated value (net book value), an independent appraisal by a qualified individual must be obtained by the Lender to support the higher valuation. A valuation of the fixed assets provided as part of a business valuation will not meet these requirements, except as part of a going concern appraisal.

D. Additional Appraisal Requirements for all Changes of Ownership:

For businesses that have been transferred within 36 months prior to the date of the loan application and the loan amount is more than $250,000, SBA requires:

   1. An appraisal of the business real estate that meets the appraisal requirements above; and

   2. Either a "review" of the appraisal by another appraiser selected directly by the Lender or a site visit by a senior member of the Lender's staff. The Lender must document the file and include the date of the visit and a description of the items reviewed on site.

E. Business Valuation Requirements – Change of Ownership:

   1. Determining the value of a business (not including real estate which is separately valued through a real estate appraisal) is the key component to the analysis of any loan application for a change of ownership. An accurate business valuation is required because the change in ownership will result in new debt unrelated to business operations and potentially the creation of intangible assets. A business valuation assists the buyer in making a determination that the seller's asking price is supported by an independent qualified source.

   2. In order for the individual performing the business valuation to identify the scope of work appropriately, the business valuation must be requested by and prepared for the Lender. The scope of work should identify whether the transaction is an asset purchase or stock purchase and be specific enough for the individual performing the business valuation to know what is included in the sale (including any assumed debt). The business valuation must include the individual's conclusion of value, the qualifications of the individual performing the appraisal and their signature certifying to the information contained in the appraisal. The Lender may not use a business valuation prepared for the Applicant or the seller. The cost of the appraisal may be passed on to the Applicant.

     a. Non-Special Purpose Properties:

i.   If the amount being financed (including any 7(a), 504, seller, or other financing) minus the appraised value of real estate and/or equipment being financed is $250,000 or less, the Lender may perform its own valuation of the business being sold, unless the Lender's internal policies and procedures require an independent business valuation from a qualified source.

ii.  If the amount being financed (including any 7(a), 504, seller, or other financing) minus the appraised value of real estate and/or equipment is greater than $250,000 or if there is a close relationship between the buyer and seller (for example, transactions between existing owners or family members), the Lender must obtain an independent business valuation from a qualified source.

iii. A "qualified source" is an individual who regularly receives compensation for business valuations and is accredited by one of the following recognized organizations:

a) Accredited Senior Appraiser (ASA) accredited through the American Society of Appraisers;

b) Certified Business Appraiser (CBA) accredited through the Institute of Business Appraisers;

c) Accredited in Business Valuation (ABV) accredited through the American Institute of Certified Public Accountants;

d) Certified Valuation Analyst (CVA) accredited through the National Association of Certified Valuation Analysts; and

e) Business Certified Appraiser (BCA) accredited through the International Society of Business Appraisers.

b.  Special Purpose Properties: (A "Special Purpose Property" is a limited-market property with a unique physical design, special construction materials, or a layout that restricts its utility to the specific use for which it was built.)

i.   If the amount being financed (including any 7(a), 504, seller, or other financing) minus the appraised value of real estate and/or equipment being financed is $250,000 or less, the Lender may perform its own valuation of the business being sold, unless the Lender's internal policies and procedures require an independent business valuation from a qualified source.

ii.  If the amount being financed (including any 7(a), 504, seller, or other financing) minus the appraised value of real estate and/or equipment being financed is over $250,000 or if there is a close relationship between the buyer and seller (for example, transactions between existing owners or family members) and the business operates from a Special Purpose Property, the Lender must obtain an independent business valuation performed by a Certified General Real Property Appraiser.

iii. The business valuation must allocate separate values to the individual components of the transaction including land, building, equipment and intangible assets.

     iv.   The Certified General Real Property Appraiser must have completed no less than four going concern appraisals of equivalent special use property as the property being appraised, within the last 36 months, as identified in the qualifications portion of the Appraisal Report.

     v.   Each business valuation assignment under this section must be undertaken with a specific instruction for the Certified General Real Property Appraiser to conduct the appraisal in compliance with current USPAP guidelines.

c.   If the application will be submitted to the LGPC, the business valuation must be submitted as part of the loan application. (See Chapter 6 of this Subpart.)

d.   If the application will be submitted under delegated authority, the business valuation may be obtained and reviewed after the issuance of an SBA Loan Number and prior to closing. If the Lender is processing the application under delegated authority and requests the business valuation after issuance of an SBA Loan Number, the credit memorandum must include an estimate of the value of the business. The credit memorandum must be updated after receipt of the business valuation to include a comparison of the loan amount and the business valuation.

e.   Any amount(s) of the loan proceeds that will be used to facilitate a change of ownership may not exceed the business valuation.

f.   Lender Verification of Business valuation Financial Data:

   Lender must obtain a copy of the financial information relied upon by the individual who performed the business valuation and verify that information against the seller's IRS transcripts to ensure the accuracy of the information.

## V.   ENVIRONMENTAL POLICIES AND PROCEDURES

SBA's environmental policies and procedures apply to all Lenders on all 7(a) loan programs, except where otherwise indicated. Failure to comply with the provisions of this paragraph may result in a denial of SBA's guaranty. Prudent lending practices may dictate additional Environmental Investigations or safeguards.

A.   Definitions:

   Terms that are capitalized in this paragraph are defined in the "Definitions" section in Appendix 2.

B.   The Risks of Environmental Contamination include:

1.   The costs of Remediation could impair the Borrower's ability to repay the loan and/or continue to operate the business;

2.   The value and marketability of the Property could be diminished. If the Borrower defaults, Lender or SBA might have to abandon the Property to avoid liability or accept a reduced price for the Property;

3.   Lender or SBA could be liable for environmental clean-up costs and third-party damage claims arising from Contamination if title to contaminated Property is taken as a result of foreclosure proceedings and/or Lender or SBA exercises operational control at the Property;

and

4. If a Governmental Entity cleans a site, it may be able to file a lien for recovery of its costs which may be superior to SBA's lien.

C. Environmental Investigations:
SBA requires an Environmental Investigation of all commercial Property upon which a security interest such as a mortgage, deed of trust, or leasehold deed of trust is offered as security for a loan or debenture. The type and depth of an Environmental Investigation to be performed varies with the risks of Contamination. This paragraph provides minimum standards. Prudent lending practices and internal bank policy may dictate additional Environmental Investigations or safeguards.

D. Submission of Environmental Investigation Reports:
Lender must submit the Environmental Investigation Report to the SBA Center processing the application, **except on PLP, 7(a) Small Loans, SBA Express, and Export Express loans.** Lenders processing PLP, 7(a) Small Loans, SBA Express and Export Express loans do not have to submit Environmental Investigation Reports to the SBA Center but they must keep a copy of any Environmental Investigation Report in the loan file. All Lenders must comply with and meet the requirements of the Environmental Policies and Procedures as set forth in this SOP. For example, all Transaction Screens, Phase I and Phase II ESAs ***must*** be performed by an Environmental Professional and be accompanied by the Reliance Letter in Appendix 3. (A Reliance Letter is required even if the Environmental Investigation Report is addressed to the Lender.) Any request for an exception to SBA's Environmental Policies and Procedures must be directed to the Environmental Committee, regardless of the method of processing used for the loan.

E. The Steps of an Environmental  Investigation:

1. NAICS Codes. For all Property _except_ a unit in a Multi-Unit Building, Lender must begin by making a Good Faith effort to determine the NAICS code(s) for the Property's *current and known prior uses* and compare the NAICS code(s) to the list of environmentally sensitive industries in Appendix 4. For a unit in a Multi-Unit Building, Lender may proceed directly to subparagraphs b.i. and ii. of this paragraph below.

   a. If there is a NAICS code match to an environmentally sensitive industry identified in Appendix 4, the Environmental Investigation must begin with a Phase I, regardless of the amount of the loan.
   If the NAICS code begins with 447 (gas stations with or without convenience stores), the Environmental Investigation must begin with a Phase I and the Lender must also refer to and, if applicable, comply with "Environmental Investigation Requirements for Gas Station Loans" in Appendix 5.

   b. If there is not a NAICS code match to an environmentally sensitive industry, or if the Property is a unit in a Multi-Unit Building, the Lender must proceed as follows:

      i. If the loan amount is **up to and including** $150,000, the Environmental Investigation may begin with an Environmental Questionnaire.

    ii.   If the loan amount is **more than** $150,000, the Environmental Investigation must, at a minimum, begin with an Environmental Questionnaire and Records Search with Risk Assessment.

2. Environmental Questionnaire Results. If the Environmental Questionnaire reveals it is unlikely that there is environmental contamination at the Property and that no further investigation is warranted, Lender must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

   If at any time an Environmental Questionnaire reveals that further investigation is warranted, Lender must obtain, at a minimum, a Records Search with Risk Assessment.

3. Environmental Questionnaire & Records Search with Risk Assessment Results:

   a. If the Environmental Questionnaire reveals that it is unlikely that there is environmental contamination at the Property and that no further investigation is warranted, and the Records Search with Risk Assessment concludes that the Property is a "low risk" for Contamination, Lender must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

   b. If the Records Search with Risk Assessment concludes that the Property is anything other than "low risk" for Contamination, Lender must obtain a Phase I ESA.

4. Transaction Screen Results:

   a. If the Environmental Professional conducting the Transaction Screen concludes that no further investigation is warranted, the Lender must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

   b. If the Environmental Professional conducting the Transaction Screen concludes that further investigation is warranted, the Lender must obtain a Phase I ESA. If an Environmental Professional recommends proceeding directly from the Transaction Screen to a Phase II (thus bypassing the Phase I), and the Lender concurs, the Lender must seek in advance an exception to policy from the SBA Environmental Committee, which may be granted on a case-by-case basis.

5. Phase I ESA Results:

   a. If the Environmental Professional conducting the Phase I ESA concludes that no further investigation is warranted, the Lender must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

   If the Environmental Professional conducting the Phase I ESA concludes that further investigation is warranted (typically a Phase II), and the Lender still wants to make the loan, the Lender must proceed as recommended by the Environmental Professional, or in the alternative submit the results of the Environmental Investigation to the SBA with recommendations and seek SBA's concurrence. In general, SBA will require compliance with all of an Environmental Professional's

recommendations (including "housekeeping measures," such as secondary containment, decommissioning monitoring wells, sealing floor drains, etc.).

b. In the rare instance where an exception to policy may be warranted, Lenders must provide the SBA Environmental Committee with justification for not wanting to follow the Environmental Professional's recommendations and obtain committee approval.

6. Phase II ESA Results:

a. If the Environmental Professional conducting the Phase II ESA concludes that no further investigation is warranted, the Lender must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

b. If the Phase II ESA reveals Contamination and the Lender still wishes to make the loan, Lender must ensure that the Environmental Professional has documented:

i. Whether the Contamination quantities exceed the reportable or actionable levels;

ii. Whether Remediation is necessary;

iii. An estimate of any Remediation costs (Environmental Professionals may use ASTM E2137-01 Standard Guide for Estimating Monetary Costs and Liabilities for Environmental Matters); and

iv. The projected completion date of any Remediation.

c. If the Environmental Investigation reveals Contamination, the Lender should determine whether disbursement is appropriate under one or more of the factors identified in subparagraph G below, "Approval and Disbursement of loans when there is Contamination or Remediation at the Property".

d. If at any stage of the Environmental Investigation SBA concurs with a Lender's recommendation that environmental risk has been sufficiently minimized and that no further investigation is required, the loan may be disbursed.

F. Legal Responsibilities of SBA Field Counsel and Center Counsel:

With respect to environmental investigations that are required to be submitted to an SBA Loan Processing Center, SBA loan processing personnel must obtain field counsel or center counsel's opinion as to the adequacy of an Environmental Investigation and whether the risk of Contamination, if any, has been sufficiently minimized.

G. Approval and Disbursement of Loans When There Is Contamination or Remediation at the Property:

Loans may not be approved or disbursed if there is known Contamination or on-going Remediation at the Property unless the risks have been minimized to the satisfaction of SBA Loan Processing Center personnel after consulting with and obtaining the concurrence of SBA field counsel or center counsel. Lenders seeking loan approval or disbursement authority despite

Contamination or on-going Remediation at the Property must submit a recommendation to SBA that includes, at a minimum, a discussion of the following:

1. Nature and Extent of the Contamination including copies of the following documents pertaining to the Property:

    a. All relevant Environmental Investigation Reports;

    b. All publicly available Governmental Entity correspondence.

2. Remediation:

    a. Recommended method of Remediation;

    b. Status of on-going Remediation, if any;

    c. Environmental Professional's estimated cost of Remediation;

    d. Environmental Professional's estimated completion date;

    e. Governmental Entity's designation of responsible Person(s);

    f. Person(s) paying for on-going Remediation;

3. Collateral Value:

    a. Proposed loan amount and proposed use of proceeds;

    b. Appraised or the estimated value of the Property;

    c. Institutional Controls and Engineering Controls, if any, and their impact on repayment ability, collateral value and marketability of the Property; and

4. Mitigating Factors:

    SBA will rely upon one or more of the following factors when deciding to disburse before completion of Remediation or monitoring.

    a. Indemnification. If any Person who possesses sufficient financial resources to cover the costs of completing Remediation executes the SBA Environmental Indemnification Agreement in Appendix 6, approval or disbursement may be considered. Lender must conduct an analysis of the proposed indemnitor to ensure that it has sufficient assets to honor an indemnification agreement. The Third Party Indemnitor cannot be the Applicant or the operating company.

    The SBA Environmental Indemnification Agreement:

    i.   Cannot be modified;

    ii.  Must be executed by the Applicant and (if applicable) Operating Company;

    iii. Must have a copy of the Environmental Investigation Report attached to it; and

    iv.  Must be properly recorded in the memorandum format in Exhibit C to Appendix 6.

    All Lenders (except when submitting requests through PLP, 7(a) Small Loans, SBA Express and Export Express) must submit the finalized SBA Environmental

Indemnification Agreement to SBA for review and approval prior to a request that SBA fund the loan.

b. **Completed Remediation.** If the Governmental Entity has affirmed in writing that active Remediation is complete but additional monitoring is required, approval or disbursement may be considered after the following occurs:

   i. Monitoring results for the first year are obtained;

   ii. An Environmental Professional concludes that the results show no unacceptable increase in Contamination since Remediation; and

   iii. An Environmental Professional concludes that the owner/operator of the Property is in compliance with any continuing obligations, including activity and use limitations, Engineering and Institutional Controls, and post-Remedial monitoring required by the Governmental Entity.

c. **No Further Action.** If a Lender obtains a "no further action letter" or "closure letter" from a Governmental Entity (or state equivalent of a "no further action letter" or "closure letter") stating that no further Remediation or monitoring of Contamination previously found is required, approval or disbursement may be considered. A state equivalent of a closure letter includes a written determination from a licensed professional in those jurisdictions that delegate authority to such professionals for site closures.

d. **Minimal Contamination with Minimal Remediation.** If the extent of Contamination and cost of Remediation are de minimis in relation to the value of the Property and/or the resources of the Person responsible for Remediation, and the Remediation is projected to be completed within 1 year, approval or disbursement may be considered. The Lender should identify the Environmental Professional that will supervise the Remediation and discuss:

   i. The nature of the Contamination;

   ii. The reliability of the Remediation estimates;

   iii. The projected completion date; and

   iv. The duration of ongoing monitoring.

e. **Clean-up Funds.** If Lender provides evidence from a Governmental Entity that the Applicant or Property has been approved by a fund to pay for or reimburse Remediation costs, and the amount allocated is sufficient to cover the costs of Remediation, approval or disbursement may be considered. Lender must also address any conditions of Remediation that might preclude payment or reimbursement and the financial capability of the fund.

f. **Escrow Account.** If an escrow account is available which (a) equals a minimum of 150 percent of the total estimated cost of required Remediation and (b) is controlled by a 7(a) Lender or first mortgage holder in a 504 loan as trustee, approval or disbursement may be considered. The Governmental Entity must concur with the Remediation's scope. The Loan Authorization and escrow agreement for the escrow

account must ensure that escrow funds will only be used for Remediation costs. The source of the escrow funds may not be SBA loan proceeds. Depending upon the circumstances, an escrow account with more than 150 percent of the estimated costs of Remediation may be appropriate. The escrowed funds may be used for Remediation. Any remaining funds in the account may not be released until the appropriate "closure letter" or "no further action letter" is received or, in the case of monitoring, when all monitoring wells related to the Property have been decommissioned.

Note: Lender's role as trustee of the escrow account is solely to release funds upon the satisfactory completion of Remediation work – the Lender must not control or manage the Property being remediated.

g.  Groundwater Contamination Originating from another Site. If groundwater Contamination on the Property is shown to have come from another property, approval or disbursement may be considered if:

i.   Another Person with sufficient resources is performing Remediation pursuant to a Remediation action plan that has been approved by the appropriate Governmental Entity; or

ii.  The state has laws or regulations that provide that an owner or operator of property will not be responsible for Contamination from another site; or

iii. The Governmental Entity provides satisfactory written assurance that it will not hold the Property owner liable for the Contamination. Lender should attempt to have Lender and SBA included by name in the letter along with the Property owner and future purchasers.

h.  Additional or Substitute Collateral. If additional or substitute collateral is being pledged, or an additional equity contribution is being made, sufficient to overcome the potential loss due to Contamination, then approval or disbursement may be considered.

i.  Other Factor(s). Lender and SBA may rely on factors other than or in addition to the eight referenced above when considering approval or disbursement. For example, the existence of adequate environmental insurance that is already in place and already paying remediation costs, bonds, agreements not to sue present and future property owners from the Governmental Entity, brownfields agreements, Engineering and Institutional Controls, etc. However, reliance solely upon "Other Factor(s)" requires clearance from the SBA Environmental Committee. This requirement extends to loans processed under PLP, 7(a) Small Loans, SBA Express and Export Express.

For loans processed under PLP, 7(a) Small Loans, SBA Express and Export Express, Lenders must follow these guidelines, but they do not have to submit documentation or obtain SBA's concurrence prior to approval or disbursement of the loan, unless they are relying solely upon the "Other Factor(s)" in subparagraph 4.i.

H.  Special Use Facilities:

1.  Child-Occupied Facilities

Prudent lending practices dictate that specific additional environmental assessments be performed for Child-Occupied Facilities. Such facilities must undergo a lead risk assessment and also testing for lead in drinking water at all taps and fountains potentially used as a drinking water source for children. All lead assessments must be conducted in conformance with U.S. Environmental Protection Agency (EPA) regulations at 40 CFR 745 and U.S. Department of Housing and Urban Development (HUD) Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing Second Edition, July 2012. The results of these assessments must be submitted to the SBA. Disbursement will not be authorized unless the risk of lead exposure to infants and small children has been sufficiently minimized.

2. Drycleaners

On-site dry cleaning facilities, which may have utilized chlorinated solvents such as tetrachloroethene (PCE) and trichloroethene (TCE) and/or petroleum-based solvents in the course of their business operations, may present significant clean-up costs if these contaminants have entered the soil, soil vapor and/or groundwater. Prudent lending practices dictate and SBA requires that for any Property with on-site dry cleaning facilities, whether currently in operation or operated historically at the site, that uses, used, or likely used chlorinated and/or petroleum-based solvents, a Phase I followed by a Phase II Environmental Assessment is required. (Any deviation from this requirement must be directed to EnvironmentalAppeals@sba.gov as a request for an exception to policy). For on-site dry cleaners, the investigation must address soil, groundwater and soil vapor. A Phase II performed in connection with an on-site dry cleaning facility must be conducted by an independent Environmental Professional *who holds a current Professional Engineer's or Professional Geologist's license and has the equivalent of three (3) years of full time relevant experience.*

3. Gasoline Stations

Gasoline stations also present significant clean-up costs if contaminated (for specific requirements pertaining to gasoline stations, please refer to Appendix 5).

I. Release of Rights to Indemnification from SBA/Lender:

If any Person has a right to indemnification from subsequent owners of the Property (e.g., SBA/Lender after acquiring Property through foreclosure or other means), then they must execute either the SBA Indemnification Agreement or another document in which they waive all known and unknown rights and release all claims and causes of action whether now or hereafter in existence against SBA and Lender related to Contamination at the Property including the right to indemnification. The document containing the waiver and release must be recorded.

J. Brownfields Sites:

SBA encourages the redevelopment of brownfields, and SBA loan guarantees are available to small businesses interested in locating on revitalized brownfields. Typically, this occurs through utilization of one or more of the 9 mitigating factors in paragraph V.G.4 above.

K. Questions on SBA's Environmental Policy and Appeals:

Questions on SBA's Environmental Policy should be directed to local SBA counsel for the area where the Property is located.

Lenders who believe that an environmental decision that has been rendered by SBA is inconsistent with this SOP may appeal the decision by forwarding a copy of the decision, along with an explanation of how the determination is perceived to be inconsistent with this SOP to EnvironmentalAppeals@sba.gov.

(NOTE: This e-mail address cannot receive submissions larger than 15MB. If the e-mail and attachments exceed this size, the appeal must be sent in more than one e-mail.)

Environmental appeals, including exceptions to SBA's environmental policy, will be reviewed by the SBA Environmental Committee comprised of OGC attorneys appointed by the Associate General Counsel for Litigation, who may consult with an environmental engineer. The Associate General Counsel for Litigation retains the authority to overrule decisions rendered by the SBA Environmental Committee.

# CHAPTER 5: LOAN AUTHORIZATION

The Authorization is the written agreement between the SBA and the Lender providing the terms and conditions under which SBA will guarantee a business loan. Specific underwriting requirements for each item are discussed in more detail in Chapter 4.

I.   **BASIC LOAN CONDITIONS (13 CFR § 120.160):**

A.   SBA establishes the wording for all 7(a) delegated and non-delegated Authorization conditions in the National Authorization Boilerplate ("the Boilerplate"). The conditions reflect the policies and procedures in effect at the time the Boilerplate is issued. The Boilerplate is incorporated by reference into this SOP. If there is any conflict between the Boilerplate and the SOP, the SOP supersedes.

1.   The Boilerplate contains the mandatory national standard language for all SBA authorizations.

2.   There are separate Boilerplates for the Export Working Capital Program (EWCP) and CAPLines.

3.   SBA Express and Export Express Lenders may use the Boilerplate or the abbreviated version created for those programs.

4.   7(a) Small Loans approved by PLP Lenders under their PLP authority may use the Boilerplate or the alternative Authorization created for what was formerly "Small Loan Advantage."

5.   The Wizard is a technical tool intended to make it easier for lenders to create Authorizations based on the Boilerplate.

B.   The latest edition of each Boilerplate can be found at https://www.sba.gov/document/support-object-object-standard-7a-authorization-file-library. The Authorization for 7(a) loans must use the pre-approved conditions that are found in the Boilerplate. If the Lender chooses to use the abbreviated Authorizations for 7(a) Small Loans (loans approved under a Lender's PLP authority only), SBA Express and Export Express, the Authorization must contain at least the paragraphs included in the form for that particular program.

C.   The party responsible for drafting the Authorization is determined by how the loan was processed.

1.   For loans processed using a Lender's delegated authority, the Lender prepares and signs the Authorization on behalf of SBA.

2.   For non-delegated loans processed through the LGPC, SBA prepares and signs the Authorization.

D.   The LGPC must review and approve any Authorization that proposes to deviate from the Boilerplate language with the following exception:

1.   Delegated lenders may develop Authorization conditions that are not pre-approved in the Boilerplates and use them without prior SBA approval, provided that the conditions are

specific to the loan and used only one time.

2. Whenever a delegated Lender develops and uses a non-standard condition, an explanation for its development must be in the loan file.

E. Content of an Authorization must include:

1. Statement of the guaranty fee (see Chapter 3 of this Subpart for calculation of fee, including multiple loans processed within 90 days of each other);

2. Ongoing Servicing Fee;

3. Repayment terms;

4. Use of Proceeds;

5. Collateral conditions;

6. Guaranties; and

7. Additional Conditions, such as:

    a. Required insurance;

    b. Standby agreements; and

    c. Lease assignment and landlord waiver.

## II.  CONSTRUCTION LOAN PROVISIONS (13 CFR § 120.174)

A. In the construction of a new building or an addition to an existing building, Lender must obtain:

1. Evidence of compliance with the "National Earthquake Hazards Reduction Program Recommended Provisions for the Development of Seismic Regulations for New Buildings" (NEHRP), or a building code that has substantially equivalent provisions.

    a. The NEHRP provisions may be found in the American Society of Civil Engineers (ASCE) Standard 7 and the International Building Code.

    b. Examples of evidence include a certificate issued by a licensed building architect, construction engineer or similar professional, or a letter from a state or local government agency stating that an occupancy permit is required and that the local building codes upon which the permit is based include the Seismic standards.

    c. The Authorization Boilerplate automatically inserts the NEHRP provision when any of the use of proceeds options selected includes construction financing, including leasehold improvements. If the leasehold improvements made with loan proceeds will become permanently affixed to any structure on the leased premises, then they must comply with the NEHRP. If the improvements are only temporary, they do not need to comply with the NEHRP. Accordingly, if the Applicant can demonstrate that the leasehold improvements will be temporary, Lender may request modification of the Authorization to remove the NEHRP provision in accordance with Chapter 7.

2. Lender may charge Borrower a one-time fee not to exceed 2% of the portion of the Loan designated for construction. The actual fee must not exceed the cost of the extra service.

B.  If the construction component of an SBA-guaranteed loan is more than $350,000:

1.  Prior to the commencement of any construction, Lender must obtain from Borrower:

a.  Evidence that the licensed contractor has furnished a l00% performance bond and labor and materials payment bond;

i.  Only a corporate surety approved by the Treasury Department using an American Institute of Architect's form or comparable coverage may issue these bonds.

ii.  Only Borrower may be named as obligee on the bonds.

b.  Evidence that contractor carries appropriate Builder's Risk and Worker's Compensation Insurance;

c.  Evidence that Borrower has injected the required funds into the project prior to disbursement of the loan, if Borrower is injecting funds into the construction project;

d.  A copy of the final plans and specifications; and

e.  A copy of a Construction Contract with:

i.  An acceptable licensed contractor at a specified price; and

ii.  An agreement that Borrower will not order or permit any material changes in the approved plans and specifications without prior written consent of Lender and the surety providing the required bonds.

2.  Lender must also:

a.  Obtain evidence of Borrower's ability to pay cost overruns or additional construction financing expenses prior to approving any contract modification. Lender and SBA are not obligated to increase the loan to cover cost overruns;

b.  Make interim and final inspections to determine that construction conforms to the plans and specifications;

c.  Obtain evidence that the building, when completed, will comply with all state and local building and zoning codes, and applicable licensing and permit requirements;

d.  Obtain a completed SBA Form 601, Applicant's Agreement of Compliance; and

e.  Obtain lien waivers or releases from all material men, contractors, and subcontractors involved in the construction.

3.  SBA has granted a blanket waiver on the Lender's requirement of a performance bond and the labor and materials payment bond when:

a.  The Lender has retained the services of a third party construction management firm. The Lender must ensure that the third party provides commercially reasonable and prudent monitoring including funds control for all disbursements; or

b.  The Lender has an existing internal construction management department that routinely manages construction for its similarly-sized, non-SBA guaranteed commercial loans. The Lender must ensure that the monitoring services provided by

its construction management department are commercially reasonable and prudent and include funds control for all disbursements.

Lender must document in the applicable loan file that the construction was completed in conformance with the plans and specifications and that all lien waivers and releases from all material men, contractors, and subcontractors involved in the construction have been obtained. If any mechanics' or other liens are filed or take priority over the Lender's lien on the collateral, the Lender may be subject to a repair or denial of the guaranty. (13 CFR § 120.200)

C. If the construction financing has an SBA guaranty and the construction costs will exceed $10,000, the Lender must obtain a completed SBA Form 601, Applicant's Agreement of Compliance.

D. "Do-it-yourself" construction and/or installation of machinery and equipment, or situations where the Borrower acts as its own contractor have proven to be generally unsatisfactory and can cause problems with lien waivers and mechanics liens, causing potential losses to the Lender and/or SBA. "Do-it-yourself" construction including renovations and/or installation of machinery and equipment, or situations where the Borrower acts as its own contractor may be permitted, if the Lender can justify and document in the loan file that:

1. The Borrower/contractor is experienced in the type of construction and has all appropriate licenses;

2. The cost is the same as, or less than, what an unaffiliated contractor would charge as evidenced by 2 bids on the work; and

3. The Borrower/contractor will not earn a profit on the construction.

## III.  INSURANCE REQUIREMENTS

A. Lender must ensure all appropriate insurance requirements are included in the Authorization. See Chapter 4, Paragraph II.G of this Subpart for requirements concerning hazard, marine, flood, and life insurance.

B. Lender must include any other insurance appropriate to the loan, including but not limited to:

1. Liability Insurance;

2. Product Liability Insurance;

3. Dram Shop/Host Liquor Liability Insurance;

4. Malpractice Insurance;

5. Disability Insurance;

6. Workers' Compensation Insurance; and

7. Any State specific insurance requirements.

## IV.  IRS TAX TRANSCRIPT/VERIFICATION OF FINANCIAL INFORMATION

A.  SBA's Tax Verification process is to determine if:

   1.  The Applicant filed business tax returns; and

   2.  The Applicant's financial statements provided as part of the application agree with the business tax returns submitted to the IRS.

B.  For a sole proprietorship, the Lender must verify the Schedule C.

C.  For a change of ownership, the Lender must verify the seller's business tax returns or a sole proprietor's Schedule C. Where there is an acquisition of a division or a segment of an existing business, other forms of verification acceptable to SBA may be used in lieu of the IRS Form 4506-T (e.g. Sales tax payment records).

D.  Prior to first disbursement of loan proceeds, Lender must obtain:

   1.  Verification of Financial Information:

      a.  Lender must submit IRS Form 4506-T to the Internal Revenue Service to obtain Federal income tax information on:

         i.  The Applicant, or the Operating Company if the Applicant is an EPC, for the last 3 years (unless Applicant or Operating Company is a start-up business).

         ii.  The Lender is required to document in its file confirmation of collection of business tax returns and verification and reconciliation of the Applicant's financial data against income tax data received in response to IRS Form 4506-T (Request for Transcript of Tax Return) **prior** to first disbursement;

         iii.  If the business has been operating for less than 3 years, Lender must obtain the information for all years in operation.

      b.  This requirement does not include tax information for the most recent fiscal year if the fiscal year-end is within 6 months of the date SBA received the application. If the Applicant has filed an extension for the most recent fiscal year, Lender must obtain a copy of the extension along with evidence of payment of estimated taxes.

      c.  Lender must compare the tax data received from the IRS with the financial data or tax returns submitted with the loan application.

      d.  Applicant must resolve any significant differences to the satisfaction of Lender and the LPGC. Failure to resolve differences may result in cancellation of the loan.

      e.  For a change of ownership, Lender must verify financial information provided by the seller of the business in the same manner as above.

      f.  If Lender processing a loan under its delegated authority does not receive a response from the IRS or the copy of the tax transcript within 10 business days, the Lender:

         i.  May proceed to close and disburse the loan;

         ii.  Must follow-up with the IRS to obtain and verify the tax data by resubmitting a copy of the IRS Form 4506-T to IRS with the notation "Second Request" in the top right hand side;

         iii.  Must document its file with a dated copy of the second submission; and

iv.   Must perform the verification and resolve any significant differences discovered as soon as the IRS response is received.

2.   The Internal Revenue Service (IRS) has implemented an expedited service through which the financial community can expeditiously confirm the income of a Borrower during the processing of a loan application: Income Verification Express Service (IVES) program. Under IVES, the IRS can electronically provide tax return transcript, W-2 transcript and 1099 transcript information generally within 2 business days to a third party with the consent of the taxpayer. The transcript information is delivered to a secure mailbox based on information received from IRS Form 4506-T. A nominal fee is imposed on each transcript requested. It is expected that this process will replace the current process, which requires the manual pick-up and delivery of transcripts from the seven IRS Return and Income Verification Services (RAIVS) units located across the country. Under IVES, transcripts will be delivered electronically using the e-Services platform via a secure mailbox. To participate in the IVES program, Lenders will need to register and identify employees to act as agents to receive electronic transcripts on the Lender's behalf. To establish access to a secure mailbox, Lenders need to register, which can be done through the following IRS website: https://www.irs.gov/individuals/income-verification-express-service

3.   If the IRS transcript reflects "Record Not Found" for the middle year of the 3 years requested, the Lender has verified the other 2 years, AND the Applicant has some record of either receiving a refund or paying the taxes for the missing year, then the Lender may reasonably assume that the Applicant filed a return for the missing year. If the Lender documents all of these steps in its loan file, the Lender has demonstrated to SBA that it has made a good faith effort to satisfy the verification requirement.

4.   If the IRS advises that it has no record on the Applicant, no record of year 1 and/or year 3, or the Lender is unable to reconcile the IRS information to the Applicant's financial information, either the loan must be cancelled or the closing must be postponed until the issue is resolved. Non-delegated Lenders must report the issue to the LGPC. If a Lender processing the loan under its delegated authority has disbursed the loan and is unable to reconcile the IRS information, the guaranty may be subject to repair or denial.

5.   If an Applicant has not filed required Federal tax returns, the applicant is not eligible for SBA financial assistance.

6.   SBA Express and Export Express Programs:

a.   If the Lender uses business financial information to determine the creditworthiness of an SBA loan, the Lender must follow the IRS tax verification process set out above.

b.   If the Lender does not use business financial information to determine creditworthiness, such as with some credit scoring models, Lender must obtain IRS tax transcripts in order to verify that the returns were filed and for the purpose of determining the Applicant's size, but reconciliation of the tax transcripts is not required.

c.   For SBA Express and Export Express, Lenders are authorized to close and disburse a loan immediately if disbursement is requested by the Borrower, however, the

Lenders must follow-up and verify the business financial data with IRS tax data and must document the loan file accordingly. If a material discrepancy appears or the IRS advises that it has no record on the Applicant, the Lender must report it immediately to the appropriate SBA CLSC and document the loan file of the action taken. The SBA will investigate the issue and may direct the Lender to secure additional information, proceed with loan processing, rescind approval of the loan (if no disbursement has occurred), suspend further disbursement, call the loan, or initiate recovery of any disbursed amounts.

## V.  SPECIAL PROVISION FOR CAPLINES

Zero Balance Period Requirements: With the exception of Seasonal CAPLines, there is no requirement that a zero balance be maintained for any specific time period on any CAPLines. A "clean up" period may be included in the Authorization at the Lender's option.

## VI.  SPECIAL PROVISION FOR FRANCHISE

The following language must be manually inserted into the Authorization Boilerplate or any streamlined or abbreviated Authorization used by a delegated Lender:

"Lender must obtain the executed Franchise Agreement, the SBA Addendum to Franchise Agreement (SBA Form 2462), or the SBA Negotiated Addendum (if applicable), and all other documents the franchisor requires the franchisee to sign prior to any disbursement of Loan proceeds and retain in the loan file. Failure to obtain the executed documents may result in a denial of liability on the guaranty."

This language will be manually inserted into the Authorization Boilerplate by the LGPC for non-delegated loans. For delegated loans, this language must be manually inserted into the Authorization Boilerplate by the Lender. The language can be manually inserted into the "prior to closing" section of the 7(a) or 504 Authorization Boilerplate by clicking "Edit" and adding the language above.

## VII. MODIFYING THE AUTHORIZATION

See Chapter 7 of this Subpart and SOP 50 57 for guidance on modifying the Authorization after SBA loan approval.

## CHAPTER 6: SUBMISSION OF APPLICATION FOR GUARANTY

There are several different ways to process an application for guaranty depending on which program the Lender chooses and is authorized to use. This chapter describes the requirements for each 7(a) delivery method:

- **Standard 7(a) Guaranty** *(non-delegated)*
  - ◦ Loans up to and including $350,000 (7(a) Small Loans)
  - ◦ Loans over $350,000 to $5,000,000
- **Preferred Lender Program (***delegated***)**
  - ◦ Loans up to and including $350,000 (7(a) Small Loans)
  - ◦ Loans over $350,000 to $5,000,000
- **SBA Express** *(delegated)*
- **Export Express** *(delegated)*
- **Export Working Capital Program (EWCP)** *(non-delegated)* **and PLP-EWCP** *(delegated)*

## I.   CONTENTS OF LENDER'S APPLICATION FOR GUARANTY:

The contents of the Lender's application for guaranty vary depending on the size of the loan and the method of processing chosen by the Lender. Based on the method of processing, the Lender may or may not be required to submit the documentation and exhibits to SBA, but in all cases must maintain those documents and any that support the guaranty request in their loan files.

Lender must disclose 100% of the Applicant's ownership on SBA Form 1919 and in the E-Tran system in order to submit a loan application. Each owner must be identified in the E-Tran system.

Information on the number of employees at the time of application and the number of jobs to be created and/or retained as a result of the loan. Jobs "created" means the number of full-time (or equivalent) employees that the small business expects to hire as a result of the loan. Jobs "retained" means the number of full-time (or equivalent) employees on the payroll of the business at the time of application that will be lost if the loan is not approved.

  A.  7(a) Non-Delegated and Delegated Processing:

   Program forms can be found at https://www.sba.gov/for-lenders.

   1. Centralized 7(a) Loan Submission Instructions and a checklist can be found at the 7(a) Loan Guaranty Processing Center ("LGPC") website along with other forms, telephone numbers and fax numbers: https://www.sba.gov/CitrusHeightsLGPC

   2. In compliance with the requirements stated in Chapter 4, all 7(a) loan files must include the forms and information the Lender requires in order to make an informed eligibility and credit decision. Any application form obtained by the Lender from the applicant must be certified by the Applicant as true and complete.

B. Delegated Lenders processing loans under their delegated authority must obtain and retain the documentation listed below in their file.

C. With the exception of 7(a) Small Loans, for all loans submitted using the non-delegated process through the LGPC (including loans from delegated Lenders using this processing method), Lender must obtain and retain in its file all documentation listed below. In addition, Lender must submit as part of the Application for guaranty those items below emphasized in **bold**.

1. Lender must complete and sign SBA Form 1920.

2. Applicants and Associates must complete and sign SBA Form 1919, "Borrower Information Form." SBA Form 1919 must be signed by the following:

    a. For a sole proprietorship, the sole proprietor;

    b. For a partnership, all general partners, and all limited partners owning 20% or more of the equity of the firm, or any partner that is involved in management of the applicant business;

    c. For a corporation, all owners of 20% or more of the corporation and each officer and director;

    d. For limited liability companies (LLCs), all members owning 20% or more of the company and each officer, director, and managing member;

    e. Any person hired by the business to manage day-to-day operations ("Key Employee"); and

    f. Any Trustor (if the Small Business Applicant is owned by a trust).

    When 20% or more ownership interest is held by a corporation, partnership or other form of legal entity in the Applicant, OC, or parent company, the ownership interests of all individuals must be disclosed.

    g. When the combined ownership interest between spouses is 20% or more, both spouses must complete SBA Form 1919.

    A separate Section I of SBA Form 1919 is required to be completed and signed for each co-applicant (e.g. Eligible Passive Company (EPC) and Operating Company (OC)).

3. **Lender's Credit Memo** must address all requirements detailed in Chapter 4, Credit and Collateral.

4. SBA Form 912:

    a. If questions 17, 18, and 19 of SBA Form 1919 are all answered "no," SBA Form 912 is not required.

    b. If question 17 is answered "yes," the loan is not eligible.

    c. If question 18 or 19 is answered "yes," the Subject Individual must complete SBA Form 912 and Lender must follow the steps as outlined in Chapter 2, Paragraph III.A.13.d of this Subpart prior to submission of the application to the LGPC for a non-delegated loan and prior to submitting the request for a loan number for a delegated loan.

5. **Personal Financial Statement** dated within 90 days of submission to SBA, for all owners of 20% or more (including the assets of the owner's spouse and any minor children), and proposed guarantors. Lenders may use SBA Form 413 or their own equivalent form.

6. **Business financial statements** and/or tax returns dated within 120 days prior to submission to SBA, consisting of:

   a. Year End Balance Sheet for the last 3 years, including detailed debt schedule;

   b. Year End Profit & Loss Statements for the last 3 years;

   c. Reconciliation of Net Worth;

   d. Interim Balance Sheet; and

   e. Interim Profit & Loss Statements;

7. **Affiliate/Subsidiary financial statement** requirements same as above;

8. Copy of Lease, if applicable;

9. Detailed listing of machinery and equipment to be purchased with loan proceeds and cost quotes, if applicable;

10. **Detailed listing of collateral** (may be included in the Lender's credit memo);

11. Provide the following if real estate is to be purchased with loan proceeds:

   a. Appraisal (see appraisal requirements in Chapter 4, Paragraph IV of this Subpart);

   b. **Copy of signed purchase agreement**;

   c. **Lender's environmental questionnaire** (if applicable – see Chapter 4, Paragraph V of this Subpart); and

   d. **Cost breakdown** where improvements to the real estate are included;

12. Provide the following if purchasing an existing business with loan proceeds:

   a. **Copy of buy-sell agreement**;

   b. Copy of business valuation that meets the requirements of Chapter 4, Paragraph IV.E. of this Subpart;

   c. Pro forma balance sheet for the business being purchased as of the date of transfer;

   d. **Copy of seller's financial statements** for the last 3 complete fiscal years or for the number of years in business if less than 3 years; and

   e. Seller's interim financial statements no older than 120 days from date of submission to SBA. If seller's financial statements are not available the seller must provide an alternate source of verifying revenues. If seller's financial statements are not available, Lender must discuss in its credit analysis:

      i. Why financial statements are not available; and

      ii. How the Lender verified business revenue.

13. Franchise:

a. For non-delegated loans:

   i.   If the Applicant's brand meets the FTC definition of a franchise, Lender must identify the name of the franchise and the SBA Franchise Identifier Code when entering the application into E-Tran or SBA One. The LGPC will confirm that the brand is listed on the SBA Franchise Directory.;

   ii.  If the Lender determines that the Applicant's brand does not meet the FTC definition of a franchise, and it is not on the Directory, Lender must explain its determination in its credit memorandum when submitting the application to the LGPC and provide the agreement and any additional documentation required by the brand for SBA's review and final determination;

   iii. If the Applicant operates under multiple brands, the Lender must enter the brand name and SBA Franchise Identifier Code for the brand that generates the largest amount of the Applicant's revenue when entering the application into E-Tran or SBA One. The Lender must identify all other brands and SBA Franchise Identifier Codes (if applicable) in the Lender's credit memorandum, and must identify which of the Applicant's brands are critical to the Applicant's business operation, including an explanation of the basis for that determination (e.g., a breakdown of revenue by brand). The LGPC will confirm that all of the Applicant's brands are eligible for SBA financial assistance and those that meet the FTC definition of a franchise that are critical to the Applicant's business operation are on the Directory. (See Ch. 2, Para. II.D.8 of this Subpart for further guidance.)

b. For delegated loans:

   i.   If the Applicant's brand meets the FTC definition of a franchise, Lender must document in its file that the Applicant's brand is on the Directory and identify the name of the franchise and SBA Franchise Identifier Code when entering the request for loan number into E-Tran or SBA One. (Lender will need to submit the documentation showing that the Applicant's brand is on the Directory with any guaranty purchase request.)

   ii.  If the Applicant's brand is not on the Directory and the delegated Lender determines the brand does not meet the FTC definition and proceeds with approving the loan under its delegated authority, the Lender must document its file and will be required to submit that documentation with any guaranty purchase request;

   iii. If the Applicant operates under multiple brands, the Lender must enter the brand name and SBA Franchise Identifier Code (if applicable) for the brand that generates the largest amount of the Applicant's revenue when entering the application into E-Tran or SBA One. The Lender must document in its file that all of the Applicant's brands are eligible for SBA financial assistance and those that meet the FTC definition of a franchise that are critical to the Applicant's business operation are on the Directory, and must document their file with the basis for their determination of which brands are critical to the Applicant's business operation (e.g., a breakdown of revenue by brand). Delegated Lenders

will be required to submit all of this supporting documentation to SBA with any guaranty purchase request. (See Ch. 2, Para. II.D.8 of this Subpart for further guidance.)

14. IRS Form 4506-T, Request for Transcript of Tax Return.

15. IRS Transcripts and complete verification.

16. **Debt Refinancing**. Lenders must maintain copies of all notes, security agreements, leases, or other documentation evidencing the debt to be refinanced in the loan file. For non-delegated loans, Lender must submit copies of all supporting documentation for the debt to be refinanced to the LGPC with the application.

17. **Documentation of USCIS status verification** - In accordance with Chapter 2 of this Subpart, Lenders must receive verification of the status of each alien required to submit USCIS documents prior to submission of the application or request for loan number to SBA. Lender may submit a copy of the verification received from USCIS or SBA-SLPC or confirm in its credit memorandum that verification has been obtained.

18. **Draft Loan Authorization** *(only required for delegated Lenders using the non-delegated processing method)*. The latest version of the Authorization Boilerplate and Wizard is available at https://www.sba.gov/document/support-object-object-standard-7a-authorization-file-library.

D. Specific 7(a) Small Loans requirements:

For loans up to and including $350,000 that meet the requirements of a 7(a) Small Loan (including the minimum acceptable SBSS credit score), the items identified in C.1 through 3 above must be submitted to the LGPC. In addition, the items identified in C.4, 5, 11, 12, 13, and 16 may also need to be submitted to the LGPC depending on the conditions of the loan.

E. Specific Standard EWCP requirements:

1. EWCP applications must be submitted on EIB-SBA Joint Form 84-1 along with the items listed on the form's application checklist.

2. For applications to reissue an existing EWCP line of credit that is maturing, the Lender must submit a new EIB-SBA Joint Form 84-1 along with the items listed on the form's application checklist.

F. PLP-EWCP:

SBA Form 1920 and all forms and items for the Standard EWCP application are required to be completed and retained in a Lender's loan file.

G. CAPLines:

1. For all CAPLines, including those processed using the non-delegated method, Lender must use SBA Forms 1919 and 1920.

2. There are four types of CAPLines. In addition to the information outlined in Paragraph C above, the Lender must obtain and provide the following as applicable for each:

   a. Working Capital CAPLine:

If the Working Capital CAPLine will be disbursed using a BBC, a sample Borrowing Base Calculation. If the Lender will not be using a BBC, Lender must provide a collateral basis calculation.

b.  Seasonal CAPLine:

   i.   Documentation of the seasonal nature of the business (i.e. month-by-month historic documentation of the needs); and

   ii.  Applicant prepared month-to-month cash flow projection for the upcoming 12 months.

c.  Contract CAPLine:

   i.   A project cost schedule depicting all direct material, labor, and overhead attributable to the contract to be financed. (Profit may not be included.) The schedule must illustrate each cost by line item;

   ii.  A current annual income statement depicting the changes (increases/decreases) in operating, investing and financing cash flows to establish affordability and to confirm adequate cash flow for repayment; and

   iii. A copy of the contract(s) being financed by the Contract CAPLine.

d.  Builders CAPLine:

   i.   Month-to-month cash flow for all work to be performed by applicant;

   ii.  A letter from:

      a)  A mortgage lender indicating that permanent mortgage money is available to qualified purchasers to buy such properties;

      b)  A real estate broker indicating that a market exists for the proposed building and that it will be compatible with its neighborhood; and

      c)  An architect, appraiser or engineer agreeing to make inspections and certifications to support interim disbursements.

   iii. A letter from a Lender who has its own real estate lending department, staffed by personnel with appraisal and engineering experience may be substituted for one or more of the letters required in b) above.


## II.   WHERE TO SUBMIT APPLICATION FOR GUARANTY

All Lenders with an executed 750 Agreement are eligible to submit applications for guaranty under non-delegated processing procedures. Regardless of the dollar amount or the processing procedure by which the Lender seeks to have the application processed, every application for guaranty must be submitted electronically using E-Tran or SBA One.

A.  Non-delegated applications - Lenders submitting applications using non-delegated procedures (including loans from delegated Lenders) must submit applications for guaranty and all attachments via E-Tran or SBA One to the LGPC. *Documents greater than 250MB must be separated into multiple documents. The system does not support uploads greater than 250MB.*

B.  Delegated applications – Lenders submitting applications using their delegated authority must submit guaranty applications via E-Tran or SBA One, retaining all required documentation in the Lender's loan file.

C.  Standard EWCP:

1.  Lender must submit applications via E-Tran (attachments too large for E-Tran may be sent electronically using Send This File), and notify the appropriate USEAC of the submission via e-mail. The contact information for each USEAC may be found at: http://www.sba.gov/content/us-export-assistance-centers.

2.  The USEAC Regional Manager will conduct a full eligibility and credit review in their Loan Officer's Report (LOR), prepare the Loan Authorization and submit a recommendation to the LGPC. The LGPC will review the LOR and EWCP application for final approval.

3.  If the LGPC concurs with the USEAC approval recommendation, a final authorization will be sent directly to the Lender.

4.  If the LGPC declines the loan, the Lender may request reconsideration within 6 months of the date of decline by submitting a request to the LGPC. LGPC will forward the request for reconsideration to the SBA/OIT for a final decision by the Director, International Trade Finance (D/ITF) or designee.

D.  Reconsideration of Declined Standard 7(a), 7(a) Small Loans (non-delegated) and CAPLines (non-delegated) Applications (13 CFR § 120.193):

1.  If the Lender believes the reason(s) for decline have been overcome, a request for reconsideration may be submitted along with a detailed written explanation of how the Applicant has overcome the reason(s) for decline. Lender must submit a request for reconsideration to the LGPC within 6 months of the date of decline. Any request submitted more than 120 days after the date of decline must include current financial statements.

2.  If a request for reconsideration is declined by the LGPC, a second appeal may be requested from the D/FA, whose decision is final. The appeal to the D/FA must be submitted to the LGPC and must include a copy of the Center's decline letter and include additional information that specifically addresses the reason(s) identified for decline and how the Applicant has overcome those reason(s). The LGPC will forward the request to the D/FA for a final decision.

E.  Delegated Lenders may not use their delegated authority to approve a loan after submitting a loan on a non-delegated basis to the LGPC where they receive a screen out or a decline.

## CHAPTER 7: POST-APPROVAL MODIFICATIONS, LOAN CLOSING & DISBURSEMENT

A thorough review of the Authorization is the first step in closing and disbursing an SBA-guaranteed loan. If any changes are necessary, the Lender must follow the steps in paragraph I below. After the Lender has determined that the loan conditions in the Authorization are appropriate for the terms of the credit, the Lender must close the loan in accordance with the provisions of the Authorization, including any SBA-approved post-approval modifications. Guidance referring to Lender Servicing and Liquidation is available in SOP 50 57 and the most current version of "Servicing and Liquidation Actions 7 (a) Lender Matrix" tool, which can be viewed at https://www.sba.gov/document/support-object-object-servicing-liquidation-actions-7a-lender-matrix.

## I.   POST-APPROVAL/PRE-DISBURSEMENT REQUESTS FOR CHANGES

The actions below are for approved loans prior to final disbursement:

    A.   Loans submitted under non-Delegated Authority:

        For SBA loans approved under non-delegated procedures that have not been fully disbursed, Lenders must submit requests for LGPC approval of the following actions:

        1.   An increase or decrease in the loan amount;

        2.   An increase or decrease in the guaranty percentage;

        3.   Any adjustments to or changes in the ownership of the Borrower, including percentage of ownership;

        4.   Changes to the Loan Authorization within program guidelines; or

        5.   Reinstatement of the guaranty.

        Lenders must request SBA approval of these actions by following the procedures set forth in paragraph I.E below.

    B.   Loans submitted under a Lender's Delegated Authority:

        For SBA loans approved under a Lender's delegated authority that have not been fully disbursed, Lenders must:

        1.   Obtain the prior written consent of the LGPC for any proposed adjustments to or changes in ownership of the Borrower, including percentage of ownership. The Lender may not unilaterally approve such adjustments or changes. The LGPC will approve the proposed modification and enter it into E-Tran after:

            a.   Verification that the proposed changes to the ownership of the Borrower comply with limitations on the aggregate amount of SBA portions of all loans to a Borrower, including affiliates; and

            b.   Verification that there has been no prior loss to the Government caused by the new owner(s) or any business owned, operated or controlled by the new owner(s).

        The LGPC review will be limited to these specific issues and the Delegated Lender remains responsible for all loan decisions regarding eligibility (including size) and creditworthiness. The Delegated Lender also is responsible for confirming that all loan closing decisions are

correct, and that it has complied with all SBA Loan Program Requirements.

2. Obtain approval for increases or decreases in the loan amount directly in E-Tran. Approval of the requested increase or decrease in E-Tran will constitute SBA's prior written consent.

3. Submit requests for an increase or decrease in guaranty percentage for approval by following the procedures set forth in paragraph D below.

C. EWCP Loans: For all EWCP loans, submit the request to the appropriate USEAC unless the change is within the Lender's delegated PLP-EWCP authority.

D. Lenders must inform SBA of certain actions by making the appropriate change using E-Tran servicing. <u>When the Lender makes the change using E-Tran servicing, a separate notification to the appropriate SBA center is not necessary</u> (SBA approval of these items is not necessary, and SBA will not respond in writing). These actions include the following:

1. Cancellation of the entire loan;

2. Partial cancellation of loan (Lenders, via E-Tran, should change the "Approval Amount" box to reflect the revised loan amount. Do not change the "Original Approval Amount.");

3. Change in the loan maturity date;

4. Change in the legal name or trade name of the business;

5. Change in the Borrower/obligor's business address;

6. Change in interest rate prior to initial disbursement (see procedures for post-approval changes to the interest rate in Chapter 3 of this Subpart.);

7. Cancel SBA Guaranty prior to initial disbursement; or

8. Cancel SBA Guaranty after initial disbursement.

E. For SBA loans that have not been closed or fully disbursed:

1. To request a post-approval modification, Lenders must submit a written request to the LGPC that includes the name of the Lender, name of the lending officer, phone number, email address, name of the Borrower, SBA Loan Number and the following information:

    a. How the loan is currently approved;

    b. The proposed change; and

    c. Why the change is being requested, along with justification for the change and any supporting documentation.

2. Post-approval modifications should be sent electronically to 7aLoanMod@sba.gov.

F. For SBA loans that have been fully disbursed:

Lenders must refer to SOP 50 57, 7(a) Loan Servicing and Liquidation to determine if notification or prior approval from SBA is required.

G. Loan Increases:

1. Increases to 7(a) loans, regardless of the disbursement status, are subject to statutory, administrative, and program maximums and must be approved by SBA. Upfront and

ongoing fees for increases in subsequent years are at the rates in effect at the time the loan was originally approved.

2. Standard 7(a) (including EWCP), PLP, PLP-EWCP, SBA Express, and Export Express term loans: If any requested increase to a 7(a) Small Loan results in a total loan(s) in excess of $350,000 (including loans made within 90 days of another), the Lender must follow the underwriting procedures for loans over $350,000 as outlined in Chapter 4, Paragraph I.C.1 of this Subpart. In addition, if the request for an increase is more than 20% of the original loan amount or is more than 18 months after the original approval date of the loan, the Lender must include with its request its analysis showing that the purpose of the increase is the same as the original purpose of the loan and that the Borrower's cash flow can support the increased payment amount. For delegated loans, the Lender must document the same analysis and retain it in Lender's loan file.

3. For revolving lines of credit, increases:

   a. May be requested:

      i. If made under SBA Express and Export Express:

         a) At any time during the life of the loan, but must be within 5 years for SBA Express and 7 years for Export Express of the date of loan approval and be in compliance with Chapter 3, Paragraph III.D. of this Subpart (maximum maturities on SBA Express and Export Express loans);

         b) Must include an analysis of appropriate credit and risk factors consistent with the procedures the Lender uses for its similarly-sized, non-SBA guaranteed commercial loans if the increase is above 33% of the original loan amount.

      ii. If made under CAPLines:

         a) At any time during the life of the loan, but must be within 10 years of the date of loan approval (except Builder's CAPLines which must be within 5 years of the date of loan approval) and be in compliance with Chapter 3, Paragraph III.E. of this Subpart (maximum maturities on CAPLines);

         b) If the request for an increase is more than 20% of the original loan amount or is more than 18 months after the original approval date of the loan, the Lender must include with its request its analysis showing that the purpose of the increase is the same as the original purpose of the loan and that the Borrower's cash flow can support the increased payment amount.

   b. May not exceed the dollar limit for the program at the time the loan was originally approved (this includes any other outstanding loans under SBA Express, Export Express, Community Express and Patriot Express); and

4. PLP, PLP-EWCP, SBA Express and Export Express Increases: Subject to paragraph 2 above, Lenders must follow their established and proven internal credit review and analysis procedures used for their similarly-sized, non-SBA guaranteed commercial loans to determine whether the increase is appropriate and must retain all supporting documentation in Lender's loan file. If any requested increase to a 7(a) Small Loan results in a total loan(s)

in excess of $350,000 (including loans made within 90 days of another), the Lender must follow the underwriting procedures for loans over $350,000 as outlined in Chapter 4, Paragraph I.C.1 of this Subpart. Approval of the requested increase in E-Tran will constitute SBA's prior written consent. SBA may review the documentation supporting the increase when conducting lender oversight activities and at time of guaranty purchase.

## II.  TRANSFER OF GUARANTY BETWEEN PARTICIPATING LENDERS

A. To transfer the guaranty between participating Lenders prior to final disbursement, Lender must submit a written explanation to the LGPC along with any supporting documentation. (Transfers after final disbursement must be sent to the appropriate CLSC in accordance with SOP 50 57.)

B. To transfer the guaranty on more than one loan prior to final disbursement, Lender must submit a written explanation to the LGPC along with any supporting documentation. The LGPC will forward the request to the D/FA for a decision. Transfers of fully disbursed loan portfolios are discussed in Chapter 8, Paragraph IV of this Subpart.

## III.  PAYMENT OF GUARANTY FEE

The guaranty fee must be paid within the time frame stated within the Authorization. For further discussion, see Chapter 3, Paragraph V of this Subpart.

## IV.  LOAN CLOSING AND DISBURSEMENT

The following instructions for loan closing and disbursement pertain to all 7(a) loans.

A. Disbursement Period:

1. The disbursement period must be stated in the loan authorization and must be tailored to meet the requirements of each individual loan. The loan must be fully disbursed within 48 months of approval or any remaining undisbursed balance will be cancelled by SBA. SBA considers a revolving line of credit as fully disbursed at the time of first disbursement.

2. Lenders may use an escrow account for not more than 5 business days to facilitate a loan closing. A Lender must not report the loan on SBA Form 1502 as "disbursed" or charge the Borrower the guaranty fee until all funds are disbursed from the escrow account. The Lender may only charge the Borrower interest on funds that have been disbursed out of escrow to the Borrower.

3. A loan is considered to be fully disbursed and then may be sold on the secondary market when the Borrower has access to all of the loan proceeds and is able to use them in accordance with the loan authorization.

B. Note Terms:

Note terms must comply with the Authorization and guidance provided in Chapter 3 of this Subpart, including:

1. All interest rate requirements,

2. The date of initial adjustment;

3. Maturity date;

4. Repayment terms:

    a. Lenders using the SBA Note are required to insert the repayment terms from the authorization into the Note without modification.

    b. Lenders using their own Note form are required to comply with SBA repayment terms but are not required to use the specific language set forth in the authorization.

    c. If there is a need for specific repayment terms that are not in the Authorization for a loan, the Lender must obtain written approval from the LGPC to add the repayment terms to the Authorization.

    d. Repayment Terms

        i. CAPLine Loans:

            a) Interest only payments for any period exceeding the Borrower's cash cycle, seasonal cycle, contract final payment date, or project completion date are not permitted.

            b) Master Notes and Sub-Notes: Each loan will have a Master Note to cover the total loan amount and general repayment period. Lenders can also utilize a system of sub-notes to establish specific repayment periods for particular seasons, contract or construction/renovation project. When the CAPLine will be used to finance the creation of more than one asset (such as the completion of two contracts) sub-notes should be used. The conditions of the sub-notes must not conflict with the conditions of the Master Note, except for variances in repayment schedules. See paragraph IV.D below for the required forms.

        ii. EWCP:

            a) Under EWCP, there are three options for repayment:

                i) All proceeds applied against the balance plus interest only payments on outstanding balances;

                ii) Principal plus interest; and

                iii) Interest-Only payments on outstanding balances.

            b) EWCP with Master Notes, Sub-Notes, and Sub-Limits: EWCP loans may be structured with a Master Note to cover the total loan amount and general repayment period. Lenders can also utilize a system of sub-notes to establish specific repayment periods for specific purchase-orders, contract(s) or transactions. The conditions of the sub-notes must not conflict with the conditions of the Master Note, except for variances in repayment schedules. EWCP Asset Based Loans may be structured as a sublimit of a Master Note provided the sublimit conforms to the requirements of this paragraph.

5. State-specific language: Lender must ensure that any necessary state-specific provisions/language is contained in the Authorization and appropriate loan documents.

6. Prepayment Terms: Every Authorization contains prepayment language that must be inserted into the Repayment Terms section of the Note.

7. Escrow Policy for Commercial Real Estate Taxes and Insurance:

   a. The Borrower and Lender may agree to establish an escrow account for the purpose of collecting and paying real estate taxes, hazard insurance, and/or flood and earthquake insurance, when applicable;

   b. The amount of money collected for an escrow account may not exceed 105% of the amount charged in the current year by the taxing authority or insurance company for the total requirement to pay the annual real estate taxes and insurance;

   c. The account must be FDIC-insured and pay the Borrower a money market rate of interest, or the rate typically paid on escrow accounts for commercial real property on non-SBA guaranteed loans, whichever is greater;

   d. Except for those items covered in subparagraphs b. and c. above, the account must be consistent with accounts required of the Lender's conventional Borrowers and the Lender must use similar procedures to administer the escrow accounts on its SBA loans as it does for its non-SBA guaranteed loans (SBLCs must be consistent with the practices followed by federally-regulated Financial Institutions);

   e. Lender must remit to the Borrower all accrued interest on the account and provide annual statements, unless otherwise required by state or Federal law; and

   f. Upon termination of the account, the remaining funds must be returned to the Borrower within 15 business days.

C. Closing Documentation:

   1. Documentation of Disbursement:

      a. Lender must disburse the loan proceeds in accordance with the Authorization. Failure to do so may be a cause for SBA to deny liability under its guaranty.

      b. All Lenders must document each disbursement on an SBA-guaranteed loan. Except under SBA Express, Export Express, and 7(a) Small Loans, Lender and Borrower must use and complete and sign SBA Form 1050 at the time of first disbursement. If there are subsequent disbursements, Lender must document each disbursement and attach the documentation to the original SBA Form 1050. The documentation must contain sufficient detail for SBA to determine:

         i. The recipient of each disbursement;

         ii. The date and amount of each disbursement; and

         iii. The purpose of each disbursement.

      c. The Lender must obtain evidence to support disbursements, such as cancelled checks or paid receipts, to ensure that the Borrower used loan proceeds for purposes stated in the Authorization. If the Authorization identifies working capital as a use of proceeds and those proceeds will be used to pay normal operating expenses (e.g., payroll, utilities, etc.), then the working capital disbursement does not need to be

documented.

    d.  The following documentation is acceptable to verify disbursement in accordance with the Authorization:

        i.  Joint payee checks;

        ii.  Copies of receipts, invoices or other supporting documentation marked paid by the seller or vendor; or

        iii.  Evidence of an electronic funds transfer to a vendor along with a copy of the invoice.

    e.  The Lender must retain in its loan file the signed SBA Form 1050 as well as all supporting documents.

2.  Documentation of Equity Injection:

    a.  With the exception of SBA Express, Export Express loans, and 7(a) Small Loans, Lenders must verify the injection prior to disbursing any loan proceeds and must maintain evidence of such verification in their loan files. Lenders are expected to use reasonable and prudent efforts to verify that equity is injected and used as intended, and failure to do so may warrant a repair or partial/full denial. Lenders must submit with each purchase request on a loan for which the loan authorization required an equity injection, documentation to show that they verified the equity injection. Verifying a cash injection requires the following documentation:

        i.  A copy of a check or wire transfer along with evidence that the check or wire was processed showing the funds were moved into the Borrower's account or escrow;

        ii.  A copy of the two most recent statements from the account where the funds are being withdrawn (showing that funds were available); and

        iii.  A statement from the Borrower's account documenting the funds were deposited or a copy of a settlement statement or HUD-1 showing the use of the cash.

    b.  A promissory note, "gift letter" or financial statement is not sufficient evidence of cash injection without corroborating evidence consistent with this subparagraph C above.

    c.  If the equity injection will come from any form of borrowed funds, such as a HELOC or seller financing in excess of the minimum Borrower injection requirements outlined above, Lender must address the proposed repayment terms as well as any Standby or Subordination terms that will be in place.

    d.  For SBA Express, Export Express, and 7(a) Small Loans, if a Lender requires an equity injection and, as part of its standard processes for similarly-sized, non-SBA guaranteed loans verifies the equity injection, it must do so for its SBA Express, Export Express, and 7(a) Small Loans.

D.  Required SBA Forms:

1. With the exception of 7(a) Small Loans, SBA Express, and Export Express, Lenders must use the SBA forms listed in Section D of the Authorization.

2. For all 7(a) loans, whether processed under non-delegated or delegated authority, Lenders have the option of using their own Note and guaranty agreements or the SBA versions (SBA Forms 147, 148 and 148L).

   a. If the Lender uses its own Note form, the Lender must ensure that the Note is legally enforceable and assignable, has a stated maturity and is not payable on demand. In addition, the Note must include the following language:

   "When SBA is the holder, this Note will be interpreted and enforced under Federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any Federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt Federal law."

   b. If the Lender uses its own guaranty form, the guaranty must include the following language:

   "When SBA is the holder, the Note and this Guarantee will be interpreted and enforced under Federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any Federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt Federal law."

3. The following language must appear in all lien instruments, including mortgages, deeds of trust, and security agreements:

   "The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

   a. When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with Federal law.

   b. Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any Federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

   c. Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument."

4. SBA loan documents and instructions can be found at https://www.sba.gov/document. The

required documents, per Section D of the Authorization, include:

    a.  Loan Authorization - After closing a loan, the Lender must maintain an executed copy of the Authorization with any amendments or modifications in the file;

    b.  Settlement Sheet, SBA Form 1050 (see Paragraph IV.C.1 above);

    c.  Fee Disclosure and Compensation Agreement, SBA Form 159 (See Chapter 3, Sections VIII and IX of this Subpart for further discussion of compensation of Agents);

    d.  Agreement of Compliance, SBA Form 601 (for construction over $10,000);

    e.  Equal Employment Opportunity Poster, SBA Form 722; and

    f.  Request for Transcript of Tax Return, IRS Form 4506-T.

E.  Collateral:

The Lender must obtain all required collateral and must meet all other required conditions before or at the time of loan disbursement, including obtaining valid and enforceable security interests in any loan collateral. These conditions include requirements identified in the credit memorandum, such as cash/equity injections, standby agreements, appraisals, and business licenses. In addition, for 7(a) Small Loans over $250,000 that are collateralized by commercial real estate, the Lender must comply with the appraisal policy set forth in Chapter 4 of this Subpart.

F.  Required Lender Action:

In accordance with the Debt Collection Improvement Act of 1996, Lenders are required to report information to the appropriate credit reporting agencies whenever they extend credit via an SBA loan. Thereafter, the Lender should continue to routinely report information concerning servicing, liquidation, and charge off activities throughout the life cycle of the loan, as specified in SOP 50 57 or a successor procedural guide.

G.  Borrower Certifications:

1.  As part of the terms and conditions of the Authorization, the Lender must obtain certain certifications and agreements from the Borrower(s) (OC and EPC) prior to disbursement of loan proceeds. Borrower and OC must certify that:

    a.  They received a copy of the Authorization;

    b.  There has been no adverse change in Borrower's (and OC's) financial condition, organization, operations or fixed assets since the date the Loan Application was signed;

    c.  No principal who holds at least 50 percent of the ownership or voting interest of the Borrower or OC is delinquent more than 60 days under the terms of any administrative order; court order; or repayment agreement requiring payment of child support;

    d.  Borrower and OC are current on all federal, state and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes and sales taxes; and

    e. Environmental - For any real estate pledged as collateral for the loan or where the Borrower or OC is conducting business operations, the Borrower or OC are in compliance with all local, state and Federal environmental laws and regulations and will continue to comply with these laws and regulations. Furthermore, they are unaware of any other actual or potential environmental hazards related to the collateral or business premises. They agree to fully indemnify Lender and SBA against all liabilities or losses arising from the contamination of the property before or during the term of the loan.

2. Prior to disbursement, Lender must require Borrower and OC to certify that:

    a. The Borrower and/or OC will reimburse lender for expenses incurred in the making and administration of the loan;

    b. The Borrower and/or OC will maintain proper books and records, allow Lender and SBA access to these records, and furnish financial statements or reports annually or whenever requested by Lender;

    c. The Borrower and/ or OC will post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public;

    d. To the extent practicable, they will purchase only American-made equipment and products with the proceeds of the loan;

    e. They will pay all federal, state and local taxes, including income, payroll, real estate and sales taxes of the business when they come due;

    f. Any credit card debt being refinanced was incurred exclusively for business purposes; and

    g. During the life of the loan, the real estate pledged as Collateral for the Loan or where the Borrower or Operating Company conducts its business operations will not be leased to or occupied by any business that Borrower or Operating Company knows is engaged in any activity that is illegal under federal, state or local law or any activity that can reasonably be determined to support or facilitate any activity that is illegal under federal, state, or local law.

3. Borrower and OC must certify that they will not, without the Lender's prior written consent:

    a. Make any distribution of company assets that will adversely affect the financial condition of the Borrower and/or OC;

    b. Change the ownership structure or interests in the business during the term of the loan; or

    c. Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of the Borrower's property or assets, except in the ordinary course of business.

4. Additional certifications from Borrower and OC. The Authorization provides for additional certifications from the Borrower and OC regarding:

    a. Limitations on acquiring additional fixed assets;

      b.  Limitations on acquiring additional business location(s);

      c.  Salary limitations; and

      d.  Occupancy requirements.

5.  Sample Borrower's Certification:

A sample Borrower's Certification is included in the Authorization as Appendix D. Lenders may use this form or create and use their own certification form.

6.  Separate Loan Agreement:

SBA does not require a separate loan agreement to be signed by the Borrower. If the Lender requires a separate loan agreement on its non-SBA guaranteed loans, it may do so on its SBA-guaranteed loans. The Lender may use its own form of loan agreement or it may use the sample Loan Agreement included in the Authorization as Appendix D.

H.  PLP Program:

1.  SBA closing requirements are the same for loans guaranteed through PLP processing as for non-delegated loans. The same forms are required.

2.  Upon final disbursement, the Lender must provide a copy of the final Authorization to SBA electronically through E-Tran and retain all other documents in the Lender's loan file.

I.  SBA Express, Export Express, and 7(a) Small Loans:

1.  For SBA Express, Export Express, and 7(a) Small Loans, a Lender must use the same written closing and disbursement procedures and documentation as it uses for its similarly sized non-SBA guaranteed commercial loans. There must be a promissory note that is legally enforceable and assignable, in the event that it would ever have to be assigned to SBA.

2.  The Lender must obtain all required collateral and must meet all other required conditions before loan disbursement, including obtaining valid and enforceable security interests in any loan collateral. These conditions include requirements identified in the loan write-up, such as standby agreements, appraisals, business licenses, and cash/equity injections. In addition, for 7(a) Small Loans over $250,000 that are collateralized by commercial real estate, the lender must comply with the appraisal policy set forth in Chapter 4 of this Subpart.

3.  Before disbursing an SBA Express, Export Express or Small Loan, the Lender must:

      a.  Use IRS tax transcripts to verify financial information used to support the loan credit analysis. For 7(a) Small Loans, the Lender is required to confirm in its credit memo, collection of business tax returns and verification and reconciliation of the applicant's financial data against income tax data (received in response to IRS Form 4506-T, Request for Transcript of Tax Return). Obtain evidence of no un-remedied adverse change since the date of the application (or since any of the preceding disbursements in the case of multiple disbursements), in the financial or any other condition of the Borrower that would warrant withholding any disbursement. For revolving line of credit disbursements, Lenders should essentially follow the same practices as they do for their non-SBA guaranteed commercial revolving lines of

credit.

b.  Obtain required hazard insurance on all assets taken as collateral, as set forth in Chapters 4 and 5 of this Subpart.

c.  Make the required flood hazard determination and require flood insurance on collateral pursuant to the flood insurance requirements in Chapters 4 and 5 of this Subpart.

d.  In the construction of a new building or an addition to a building, obtain the Borrower's agreement that the construction will conform to the "National Earthquake Hazards Reduction Program Recommended Provisions for the Development of Seismic Regulations for New Buildings" as discussed in Chapters 4 and 5 of this Subpart.

e.  Obtain the Borrower's agreement that it will, to the extent feasible, purchase only American-made equipment and products with the proceeds of the loan. This certification is included on the SBA Form 1919.

f.  For any loan involving construction of more than $10,000, as indicated on SBA Form 1920, require Borrower and contractor to execute SBA Form 601, Applicant's Agreement of Compliance.

g.  Obtain Borrower's certification that any 50 percent or more owner of the Applicant on SBA Form 1919 is not more than 60 days delinquent on any obligation to pay child support.

h.  Require appropriate environmental reviews and compliance. For loans under SBA Express, Export Express, and 7(a) Small Loans, Lenders must follow the environmental requirements in Chapter 4 of this Subpart. For loans under SBA Express, Export Express and 7(a) Small Loans, Lenders may not request a loan number for a loan that will be secured by collateral that will not meet SBA's environmental requirements or that will require use of a non-standard indemnification agreement.

4.  The Lender should not send any closing documentation to SBA after closing an SBA Express, Export Express or 7(a) Small Loan but should retain all documents in the loan file.

5.  Access to Funds: SBA Express, Export Express, and 7(a) Small Loan funds may be accessed through a variety of methods consistent with the way the Lender normally conducts business for its similarly-sized non-SBA guaranteed commercial loans. Use of a credit or debit card to access the loan funds is acceptable under SBA Express, Export Express, and 7(a) Small Loans. SBA has the right to deny a request to honor its guaranty for the misuse of credit cards involving fraud or misrepresentation or if the debtor exceeds his or her credit card limit for purchases on credit. In providing access through credit or debit cards, Lenders must ensure that these loans are documented by legally enforceable and assignable promissory notes.

J.  EWCP:

1.  On Single Transaction-Specific Loans and Transaction-Based Revolving Lines of Credit where draws are made against foreign purchase orders or contracts, the advance rate shall

not exceed 90% of the purchase order/contract or the Borrower's costs (including overhead), whichever is less. Foreign accounts receivable will be captured by the Lender through the use of a control account, and applied against the outstanding loan balance.

2. On an asset-based revolving line of credit where advances are made against a borrowing base of foreign receivables and/or export-related inventory, the maximum advance rates are 90% on eligible foreign receivables and 75% on eligible export-related inventory located within the United States. Control accounts may be required at the discretion of the LGPC for non-delegated loans, or PLP-EWCP Lender for loans processed under delegated authority. At a minimum, the Borrower must submit a Borrowing Base Certificate (BBC) to the Lender at least monthly, or as frequently as the Lender customarily requires from its Borrowers on similarly-sized, non-SBA guaranteed loans if more often than monthly, along with an aging of foreign accounts receivable and listing of export-related inventory, as appropriate. If the borrowing base shows the Borrower is over-advanced, the Lender must immediately require the Borrower to make a payment to reduce the loan balance so it is within the borrowing base formula.

3. Advance rates on foreign purchase orders/contracts or foreign accounts receivable when sold on open account (no credit insurance or letter of credit to mitigate the foreign risk) shall not exceed 80%. The LGPC may approve a maximum advance rate up to 90% when the Lender submits written justification that meets one of the following conditions:

   a. The foreign accounts receivable are from credit worthy buyers (e.g., financially sound corporations; multinational or publicly-traded companies), located in countries with acceptable commercial or political risk; or

   b. The foreign accounts receivable are from credit-worthy government entities in countries with acceptable commercial or political risk; or

   c. The exporter can provide favorable ledger experience with specific buyers over a significant period of time (at a minimum, 24 months).

If the Lender is a PLP-EWCP Lender, the Lender may advance up to 90% and must document its loan file with the above analysis and justification to allow for the higher advance rate.

4. Foreign Accounts Receivable:

   a. Terms of Sale:

      i. Payment terms must be in compliance with the loan authorization. The Ex-Im Bank Country Limitation Schedule must be reviewed for prohibited countries (such countries are identified by Note # 7 on the Ex-Im Schedule) and the Department of Treasury OFAC sanctions lists must also be reviewed at https://sanctionssearch.ofac.treas.gov/.

         a) For federally-regulated Lenders, compliance with the procedures required by the Lender's Federal Financial Institution Regulator will constitute compliance with the above referenced OFAC requirement.

         b) For SBA Supervised Lenders, Lender must check the OFAC sanctions lists prior to first disbursement of funds on each specific export transaction.

    ii.   Payment terms must be in line with prudent lending practices. Typical terms of sale include but are not limited to:

        a)  Confirmed irrevocable letter(s) of credit (SBA or the PLP-EWCP Lender may require for some or all of the Borrower's foreign accounts). Foreign accounts receivable supported by acceptable letters of credit must not exceed 364 days from the invoice date;

        b)  Irrevocable letter(s) of credit (SBA or the PLP-EWCP Lender may require for some or all of the Borrower's foreign accounts). Foreign accounts receivable supported by acceptable letters of credit must not exceed 364 days from the invoice date;

        c)  Open account insured through Ex-Im Bank or private sector export credit insurance for comprehensive commercial and political risk (SBA or the PLP-EWCP Lender may determine that export credit insurance is required to enhance the quality of foreign accounts receivable. If export credit insurance is obtained, the Lender must be named as Loss Payee on the export credit insurance policy.) Foreign accounts receivable supported by credit insurance must not exceed 180 days from the invoice date;

        d)  Cash payment received prior to shipment;

        e)  Open account uninsured, with SBA's prior written consent or documented by the PLP-EWCP Lender. Open account uninsured foreign accounts receivable must not exceed 180 days from the invoice date; and

        f)  Sight draft documents against payment, with SBA's prior written consent.

  b.  Jurisdiction and Currency of Foreign Accounts Receivable: Foreign accounts receivable held as collateral should be payable to the Borrower in the United States and in United States dollars. Foreign accounts receivable due and payable in Non-U.S. currency may be allowed on a case-by-case basis with SBA's prior written consent or authorized by the PLP-EWCP Lender. Depending on the stability of the currency in question, SBA may require that the Borrower mitigate the risk through hedging (purchasing of a forward currency contract, forward option, or similar mechanism) as a condition of such approval. When advancing against a transaction payable in a foreign currency, Lender must use an established foreign exchange rate and must retain documentation showing the exchange rate used and the Lender's calculation of the amount of the advance.

  c.  Control Accounts:

    i.   For the "single transaction-specific" and "transaction based-revolving line of credit" EWCP loans, Lenders will be required to set up a control account to capture the proceeds of foreign accounts receivable as they are paid by the foreign buyers. The proceeds are required to be applied against the loan balance, either in their entirety or as a percentage of the proceeds in a sufficient amount to pay off the initial advance for that specific transaction.

ii.   For asset-based loans, LGPC for non-delegated loans, or the PLP-EWCP
      Lender for delegated loans, will determine if a control account is required
      based on the credit analysis. Normally, Lenders must have 100% of the foreign
      accounts receivable proceeds applied against the loan balance and have the
      Borrower request additional advances as needed based on a BBC. Another
      available option is to allow for the Borrower to maintain a balance within the
      Borrowing Base limits and to retain foreign accounts receivable proceeds (not
      applied to the loan balance upon collection). At a minimum, the Borrower must
      submit a BBC to the Lender at least monthly, or as frequently as the Lender
      customarily requires from its Borrowers on similarly-sized, non-SBA
      guaranteed loans if more than monthly, along with an aging of foreign accounts
      receivable and listing of export-related inventory, as appropriate. The Lender
      will review the Borrowing Base to assure the Borrower is not over-advanced
      according to the available collateral detailed on the BBC. If the Borrower is
      over-advanced per the Borrowing Base, the Lender will require the Borrower
      to immediately make a payment to reduce the loan balance to be in
      compliance. For a small business with an asset-based loan to be allowed to
      retain the foreign accounts receivable proceeds, the small business must:

      a)  Be in business for at least 2 years (no start-ups); and

      b)  Have financial records satisfactory to SBA for non-delegated loans, or the
          PLP-EWCP Lender for delegated loans, and the ability to provide a
          current aging of foreign accounts receivable.

      In deciding whether to permit a small business to retain the foreign accounts
      receivable proceeds, the PLP-EWCP Lender must comply with its policies and
      procedures for similarly-sized, non-SBA guaranteed credit facilities.

iii.  Foreign Accounts Receivable Restrictions: Unless the Lender receives SBA's
      prior written consent, any of the following types of accounts receivable are not
      eligible for inclusion in an asset based loan borrowing base:

      a)  An account receivable that does not arise from the sale of items in the
          ordinary course of the Borrower's business;

      b)  An account receivable from a domestic (U.S.) company, unless the
          transaction has been approved by SBA as an indirect export;

      c)  An account receivable for which an invoice has not been sent;

      d)  An account receivable that is due and payable from a foreign buyer located
          in a country with which SBA is legally prohibited from doing business as
          set forth in the current Ex-Im Bank Country Limitation Schedule (such
          countries are identified by Note # 7 on the Schedule). (If the Borrower
          has knowledge that an export to a country in which SBA may do
          business, as set forth in the Ex-Im Bank Country Limitation Schedule,
          will be re-exported to a country with which SBA is legally prohibited
          from doing business, the corresponding receivables are not eligible for
          inclusion in the export-related borrowing base.);

e) A foreign account receivable that, by its original terms, is due and payable more than 180 calendar days from the date of the invoice, except those accounts receivable supported by acceptable letters of credit;

f) A foreign account receivable that is still outstanding more than 60 calendar days from its original due date;

g) A foreign account receivable that the Lender deems uncollectible or unacceptable; this category includes, but it not limited to, finance charges or late charges imposed on the foreign buyer by the Borrower as a result of the foreign buyer's past due status;

h) A foreign account receivable that does not comply with the terms of sale as set forth in the loan authorization;

i) A foreign account receivable that arises from a bill-and-hold, guarantee sale, sale-and-return, sale on approval, consignment, or any other repurchase or return basis or is evidenced by chattel paper;

j) A foreign account receivable that is subject to any offset, deduction, defense, dispute, or counterclaim, or the buyer is also a creditor or supplier of the Borrower or the account receivable is contingent in any respect or for any reason;

k) A foreign account receivable for which any of the items giving rise to such account receivable have been returned, rejected or repossessed;

l) A foreign account receivable due from an affiliated company; and

m) When 50% or more of the total foreign accounts receivable for a specific buyer are over 60 calendar days past the original due date, then the total foreign accounts receivable for that buyer are excluded.

iv. In addition, the Lender shall apply the same policies in reference to foreign accounts receivable eligible to be included in the borrowing base as the lender applies to its own similar asset based loans which are not guaranteed by SBA or any other government entity.

v. The Lender may verify that no ineligible foreign accounts receivable (as described above) are included in the borrowing base by obtaining a Borrower certification to this extent at the bottom of the BBC or on a separate certification form.

5. Export-Related Inventory:

a. General Guidelines:

i. Export-related inventory taken as collateral must be located within the United States, until shipped to the foreign buyer.

ii. Export-related inventory must be valued at the lower of actual cost or market value (including cost of work-in-process inventory) as determined in accordance with Generally Accepted Accounting Principles (GAAP).

      iii. Export-related inventory may include raw materials, work-in-process, and finished goods.

      iv. Advance rates against eligible export-related inventory may vary depending on inventory quality.

  b. Export-Related Inventory Restrictions: Unless the Lender receives SBA's prior written consent, any of the following types of export-related inventory are not eligible for inclusion in the export-related borrowing base:

      i. Export-related inventory that is not subject to a valid, perfected, and enforceable first priority lien in favor of the Lender;

      ii. Export-related inventory located at an address that has not been disclosed to the Lender in writing;

      iii. Export-related inventory that is not located in the United States, unless being shipped to the foreign buyer;

      iv. Export-related inventory that is placed by the Borrower on consignment or held by the Borrower on consignment;

      v. Export-related inventory that is demonstration inventory;

      vi. Export-related inventory that consists of proprietary software (i.e., software designed solely for the Borrower's internal use and not intended for resale);

      vii. Export-related inventory that is damaged, obsolete, returned, defective, recalled or unfit for further processing;

      viii. Export-related inventory that is to be incorporated into items destined for shipment to a country with which SBA is legally prohibited from doing business as designated in the current Ex-Im Bank Country Limitation Schedule (such countries are identified by Note # 7 on the Schedule), or that the Borrower has knowledge will be re-exported by a foreign buyer to a country in which SBA is legally prohibited from doing business; and

      ix. Export-related inventory that is to be incorporated into items whose sale would result in an account receivable that would not be an eligible foreign account receivable.

  c. In addition, Lender shall apply the same policies in reference to export-related inventory eligible to be included in the borrowing base as the Lender applies to its own similar, asset-based loans which are not guaranteed by SBA or any other government entity.

  d. The Lender may verify that no ineligible export-related inventory (as described above) is included in the borrowing base by obtaining a Borrower certification to this extent at the bottom of the BBC or on a separate certification form.

6. Certifications:

  a. The Borrower must certify that appropriate withholding tax deposits on advances for payroll have been made and that no loan proceeds will be used to pay delinquent

withholding taxes or other similar trust funds (state sales tax, etc.). The Lender may include this certification as part of its Borrowing Base Certification reporting package.

b.   The Borrower must provide a copy of valid export license(s) for each different product and each different country or a letter from the Borrower stating a valid export license(s) is not required, citing the authority for this statement. The Borrower may provide these items with a Borrowing Base Certification reporting package.

K.  CAPLines:

1.   Seasonal CAPLines:

a.   Disbursement and Repayment:

i.   Disbursements from the loan are made continually during the seasonal build-up period when the cash requirement for labor, materials, and support of accounts receivables exceeds actual cash receipts. The final disbursement of any Seasonal loan should be made in time for the funds to be utilized in the business and converted to cash which can be used to pay off the loan balance at the commencement of a 30 day clean up period or maturity.

ii.   Principal repayments on the loan must occur as soon as the cash from the seasonal sales has been received by the Borrower. Interest should be paid monthly.

b.   Borrowing Base Certificate (BBC):

Lender may use BBCs to monitor the Borrower's seasonal activity. If the Lender does so, the BBC must be submitted by the Borrower to the Lender no less frequently than monthly.

2.   Contract CAPLines:

a.   Assignment of Contract Proceeds:

i.    Subject to the exception noted in (ii) below, prior to initial disbursement on any Contract CAPLine, the entity the Borrower has entered into the contract with must be advised in writing by both the Lender and Borrower that an assignment of the contract proceeds is required. Such assignment must be in place before any disbursement for a particular contract is made and include a provision for the Lender's right to receive all payments from the third party. The Lender must receive written acknowledgement from the third party.

ii.    Exception to the Assignment of Contract Proceeds: An assignment of the contract proceeds may be foregone, if at least two of the following conditions are met:

a)  The term of the contract being financed is 12 months or less;

b)  A successful track record between the Borrower and the contracting authority exists relative to the same or reasonably similar contracts. (The definition of a "successful track record" includes but is not limited to, any

prior contractual arrangement between the subject parties, where the responsibilities of each party under the contract were met to the satisfaction of all parties to the contract.);

c) Financial analysis of historical income statements and/or tax returns and pro-forma financial statements show that the applicant has a Debt Service Coverage ratio that exceeds 1:1;

d) All contract proceeds are paid directly to the lender by the contracting authority or, in the instance where a performance bond is in place, a Funds Control (or escrow or third party servicer) procedure is implemented; or

e) There is other available and worthwhile collateral pledged to secure the line by either the Borrower or any owner/guarantor.

b. Prime and Subcontractor Contracts:
   Subject to 2.a. above, a contract between a Prime and Subcontractor is eligible to be financed with a Contract CAPLine, if at least two of the following conditions are met:

   i.    Both the Prime and the Subcontractor have favorable credit ratings based on an acceptable rating agency (e.g., Builders Industry Credit Association "BICA");

   ii.   There is a successful track record between the Prime contractor and the Subcontractor (Borrower);

   iii.  There is a successful track record between the Prime contractor and the contracting authority;

   iv.   The Contract CAPLine amount is less than $300,000;

   v.    The term of the contract is 12 months or less;

   vi.   The financial analysis of historical income statements and/or tax returns and pro-forma financial statements show that the applicant has a Debt Service Coverage ratio that exceeds 1:1; or

   vii.  There is other available and worthwhile collateral pledged by either the Borrower or any owner/guarantor.

c. Contracts with Performance Bonds:
   Subject to 2.a. above, a contract requiring a Surety's performance bond may be eligible for a Contract CAPLine provided the Lender perfects a UCC security interest in the contract proceeds.
   SBA recognizes the following conditions may be necessary to effectuate the transaction where a contract requires a Surety's performance bond:

   i.    The Lender's perfected UCC security interest in the contract proceeds will be subordinate to the cost reimbursement claim of the Surety; and

   ii.   The Surety may require that a funds control facility be executed. The funds

control facility would disburse directly to suppliers and laborers. The contracting authority will remit contract proceeds directly to the funds control facility, which will remit payment to the lender.

d. Purchase Orders under a Master Agreement:
   Purchase Orders (PO) may be substituted for a formal contract, provided the following conditions exist:

   i.    The PO is issued to the Borrower under a Master Agreement; and

   ii.   The combination of the PO and the Master Agreement constitute a binding agreement.

e. Disbursements are made, when needed, to pay for the costs on a specific contract. Disbursements will generally be made as the contract progresses, not with one lump sum disbursement to cover all costs. Only if the contract performance period was 30 days or less should only one disbursement for payroll be allowed. However, if a borrowing contractor wanted to acquire all of their materials up front to take advantage of volume discounts, and/or pay for all acquired materials within 10 days to take advantage of prompt pay discounts, the Contract CAPLine Program will accommodate such a disbursement plan.

f. With the assignment of contract proceeds and direct payment in place, the Lender receives all the payments the Borrower would normally receive if it was internally financing the contract as performance progresses. Because all performance costs (including direct overhead and allocated general/administrative expenses) were funded under the CAPLine, all such payments received by the Lender must be applied first to interest due on the CAPLine, with the remainder applied to the CAPLine balance until the balance is paid in full.

g. If deemed necessary from a credit standpoint by the Lender, the Lender may invoke additional controls over the payments, provided the Lender obtains the Borrower's prior written consent. If such additional controls include the funding of direct material and labor only, as opposed to all contract costs, then the Lender must inform the Borrower in writing of the percentage split arrangement regarding the allocation of progress payments received from the contracting authority.

3. Builders CAPLines:

   a. Prior to disbursement for each individual project, the lien must be recorded and position verified. Interim disbursements shall be made as construction progresses at stages approved by Lender, but shall be advanced only on qualified architect, appraiser or engineer's certification and personal inspection by proper Lender officer(s). Amount of disbursement shall not exceed 100% of labor, material, and other eligible costs of construction certified to be complete and shall be supported by contractor's statements and lien waivers to date.

   b. Prior to final disbursement of construction funds, final lien waivers must be obtained from Borrower/contractor and all subcontractors, material men, and any independent workers involved in the construction. No disbursement can be made after maturity of the master note.

    c.   The repayment of all funds disbursed for any individual project shall occur within 36 months after completion of each individual project or at the time of sale, whichever is less. A single principal payment is acceptable. Interest payments must be made at least semi-annually and from the applicant's own resources, not from loan proceeds.

4.  Working Capital CAPLines:

    a.   For Working Capital CAPLines, Lenders have the option of disbursing the line proceeds based on a BBC, or 1:1 collateral ratio.

        i.   If a Lender will not use a BBC to determine the availability of funds for disbursement, the Lender must:

           a)  Use a combination of factors for the underwriting and credit decision consistent with its similarly sized, non-SBA guaranteed commercial lines of credit, including at a minimum;

              i)   Cash flow analysis to determine the adequacy, duration and dependability of cash flow;

              ii)  Collateral analysis to establish an estimated value of collateral; and

              iii)  Owner/Guarantor analysis;

           b)  Assume full utilization of the revolving line of credit and secure the line with sufficient collateral to ensure there is a 1:1 collateral ratio. Lender must obtain a first lien position on the working/trading assets (accounts receivable and inventory) financed with the line. If the working/trading assets are insufficient to provide a 1:1 collateral ratio, the Lender also must take additional collateral to ensure there is a 1:1 collateral ratio. If business assets do not fully secure the line, the Lender must take available personal equity in personal real estate of the principals as collateral to ensure there is a 1:1 collateral ratio;

              i)   To determine if there is a 1:1 collateral ratio, discount the available collateral based upon the Net Book Value presented on the Borrower's financial statements. The total line amount should be supported with accounts receivable at a maximum of 80% (after discounting a percentage for any ineligible receivables identified by reviewing the accounts receivable aging) and inventory no greater than 50%. Machinery and equipment may be valued at 50% of Net Book Value or 80% with an Orderly Liquidation Value minus any prior liens. Real estate can be supported at 85% of the value and the value must be determined in accordance with the requirements set forth in Chapter 4 of this Subpart;

              ii)  If the line will be secured by fixed assets and the valuation of fixed assets is greater than their depreciated value (net book value), an independent appraisal by a qualified individual must be obtained by the lender to support the higher valuation. (See Chapter 4, Paragraph II.B.4 of this Subpart.);

c) Obtain Borrower prepared financial statements and tax returns if the CAPLine amount is $1,000,000 or less and compiled, reviewed or audited financial statements and tax returns if the CAPLine amount is over $1,000,000, consistent with lender's policies governing its similarly sized, non-SBA guaranteed commercial lines of credit;

d) Use financial covenants consistent with those used on Lender's similarly sized, non-SBA guaranteed commercial lines of credit. These balance sheet covenants such as a Current Ratio or Debt to Tangible Net Worth ratio should be tested quarterly, semi-annually or annually, consistent with Lender's policies governing its similarly sized, non-SBA guaranteed commercial lines of credit; and

e) Monitor the lines consistent with the Lender's policies and procedures for its similarly sized, non-SBA guaranteed commercial lines of credit and, at a minimum, conduct a credit review including cash flow analysis, collateral analysis to ensure there is a 1:1 collateral ratio, owner/guarantor credit review and site visit on an annual basis.

f) Proceeds from cash sales and receivable collections must pay down the line as collected consistent with Borrowers operating cash cycle.

g) Lenders must report the initial disbursement on SBA Form 1050 in accordance with paragraph D.4. above.

ii.   If the Lender will use a BBC to determine the availability of funds for disbursement the lender must adhere to the following:

a) Loan proceeds may be disbursed to the Borrower's operating account. To calculate the maximum amount available for disbursement, use the following formula:

| | | |
|---|---|---|
| i) | Eligible A/R | $_____ |
| ii) | Times advance rate | % _____ |
| iii) | Equals A/R Borrowing Base | $_____ |
| iv) | Eligible inventory | $_____ |
| v) | Times advance rate | % _____ |
| vi) | Equals inventory Borrowing Base | $_____ |
| vii) | Total (iii plus vi) | $_____ |
| viii) | Face amount of Note | $_____ |
| ix) | Borrowing base (Lesser of vii or viii) | $_____ |
| x) | Loan balance on books | $_____ |
| xi) | Amount available for disbursement (ix minus x) $_____ |

b) On a monthly basis, Lender should determine the amount of eligible assets for the borrowing base.

i)  When advancing against receivables, Lender should:

    (a)  Obtain an aging of accounts receivable and accounts payable;

    (b)  Eliminate all ineligible receivables. The following types of accounts are not eligible to be included in the borrowing base:

        (i)  Any invoice more than 90 days past due. Exceptions are permitted over the 90 day with SBA's prior written concurrence.

        (ii)  If a customer is delinquent on more than 50% of its total outstanding invoices, ALL of the accounts due from that customer are ineligible. To re-establish the customer's accounts as eligible, all delinquent accounts must be paid in full. Exceptions are permitted if the Lender obtains SBA's prior written concurrence.

        (iii)  All re-billed accounts. (Re-billing is the practice of issuing a credit to a customer and re-invoicing the obligation in the current billing cycle. If the re-billing occurs on the same day in order to correct a clerical error, the accounts do not have to be excluded.)

        (iv)  Foreign receivables not backed by documentary or standby letters of credit, factor's guarantee (of purchase), credit insurance (either commercial risk or commercial and political risk combinations), or Government enhancements such as those provided by the Export Import Bank or the World Bank.

        (v)  Offsetting receivables and payables between the Borrower and one of its creditors (contra accounts).

        (vi)  Accounts due from affiliate companies.

        (vii)  Accounts that require subordination to other parties, such as Governmental contracts where the bonding company requires assignment of the project's receivables.

        (viii)  Accounts from any one customer that constitute more than 20% of the total outstanding receivables. Accounts above 20% are ineligible, unless the lender obtains SBA's prior written concurrence.

ii)  When advancing against inventory, a Lender should:

    (a)  Obtain a description of inventory and its value; and

    (b)  Limit advances to the following types of inventory:

        (i)  Finished Goods: Eligible if readily saleable and not obsolete.

      (ii)    Work in Progress: Eligible if Lender obtains SBA's prior written concurrence.

      (iii)   Commodities or Raw Materials:  Eligible.

iii)  The dollar amount of ineligible receivables and inventory will remain unchanged for the entire month. The actual borrowing availability may increase or decrease as the balance on the line changes and the receivables and inventory are generated or converted back to cash.

iv)  A BBC is required at least monthly to determine the amount that can be disbursed. Lender may require a BBC more frequently consistent with its policy and procedures on similarly-sized non-SBA guaranteed commercial lines of credit. Lenders may use their own forms for the BBC. A sample BBC is provided in Appendix 7.

c)  Repayments will come from cash sales and receivable collections. Proceeds must pay down the line as collected with availability to re-advance as long as the Borrower is conforming to the maximum amount of the BBC.

d)  If a cash collateral account is being used and a balance remains in the cash collateral account after the loan has been paid down to zero, those funds may be credited to Borrower's operating account. There is no provision for interest only payments. Interest must be paid at least monthly either from Borrower's own resources OR from loan proceeds at the time of an advance. Principal payments should be tied to the Borrower's cash cycle.

e)  Lenders must report the initial disbursement on SBA Form 1050 in accordance with paragraph D.4. above.

f)  Advance Rate for Accounts Receivable:

i)  The maximum advance rate cannot exceed 80% of the eligible receivables. The maximum advance rate may go up to 90% of the eligible receivables if the receivable is a prime Federal contract and the Lender has obtained an assignment of the contract proceeds under the Assignment of Claims Act of 1940 (the Act), 31 USC 3727, or the Borrower is a subcontractor and the prime contractor has obtained an assignment under the Act and the contract proceeds will be disbursed by a third party funds control facility or the foreign accounts receivable are insured by the Export-Import Bank or a major private insurer. Additional exceptions may be permitted if the lender obtains SBA's prior written concurrence. The advance rate should not include any net profit. Factors that should be taken into consideration when determining the maximum advance rate are:

    (a)    Control and accounting systems of the Borrower;

    (b)    Enhancements such as credit insurance;

    (c)    Age of receivables;

        (d)     Credit quality & Borrower's credit policy;

        (e)     Turnover history;

        (f)     Industry orientation and condition; and

        (g)     Net profit margin.

  ii)  After initial disbursement, Lenders have unilateral authority to increase or decrease the advance rate for receivables by as much as 5% above or below the rate stated in the Authorization. Increases or decreases in the advance rate above 5% require SBA's prior written concurrence.

g)  Inventory Advance Rate:

  i)  The maximum advance rate cannot exceed 50% of eligible inventory. Exceptions are permitted if the lender obtains SBA's prior written concurrence. Factors to consider when determining the maximum advance rate are:

        (a)     Material and labor costs in manufacturing or invoice costs (less discounts) of resale goods in wholesale distribution;

        (b)     Nature of the product;

        (c)     Product liability;

        (d)     Manufacturer's buyback agreements; and

        (e)     Physical location of inventory (single locations are generally easier to control than multiple locations).

  ii)  After initial disbursement, Lenders have unilateral authority to increase or decrease the advance rate for inventory by as much as 5% above or below the rate stated in the Authorization. Increases or decreases in the advance rate above 5% require SBA's prior written concurrence.

h)  Examinations:

If the Working Capital CAPLine is over $1,000,000, Lender must conduct an annual field examination. The field examination may be conducted by the Lender's staff or a third party. An examination is a physical verification of the assets which compose the borrowing base. Examinations must include a sampling of the assets (receivables and inventory) included in the borrowing base. The frequency of the examinations may be determined by the Lender based upon the quality of the records, risk profile of the Borrower and seasonality of the line. At a minimum, an examination must be conducted prior to the initial disbursement and annually thereafter. The Lender must describe the level and frequency of examinations in the credit memorandum for the line.

i)  Monitoring:

The minimum monitoring requirements for Working Capital CAPLines are as follows:

i)   Monthly - BBC; Aging of accounts receivable/payable; and Inventory listing (if advanced against);

ii)  Quarterly – Borrower prepared financial statements; and

iii) Annually – Borrowers management information system; legal elements; loan agreements; NAICS review; review of cash flow and related financials: and reassess exam, monitoring and control requirements.

(a)  If the Working Capital CAPLine is $1,000,000 or less, credit review including cash flow analysis, concentration analysis, collateral analysis, owner/guarantor credit review and annual site visit. Accounts from any one customer that constitute more than 20% of the total outstanding receivables should not be included in the eligible borrowing base unless the account is a high rated public company, a Federal government account, the customer has a long-standing positive credit history with the Borrower, the customer is a prime or sub-contractor performing on a Federal government contract, or the accounts are insured through credit insurance (common for foreign accounts receivable). If the account meets one of those five conditions, the Lender does not need to obtain SBA's prior written concurrence to include the account above the 20% in the eligible borrowing base, but must include a written justification in the loan file. If, however, the account does not meet one of the five conditions, then the Lender must obtain SBA's prior written consent in order to include the account in the eligible borrowing base. Such requests must be sent to the LGPC.

(b)  If the Working Capital CAPLine is over $1,000,000, credit review including cash flow analysis, concentration analysis, collateral analysis, owner/guarantor credit review and annual field examination. Accounts from any one customer that constitute more than 20% of the total outstanding receivables should not be included in the eligible borrowing base unless the account is a high rated public company, a Federal government account, the customer has a long-standing positive credit history with the Borrower, the customer is a prime or sub-contractor performing on a Federal government contract, or the accounts are insured through credit insurance (common for foreign accounts receivable). If the account meets one of those five conditions, the Lender does not need to obtain SBA's prior written concurrence to include the account above the 20% in the eligible borrowing base, but must include a written justification in the loan file. If, however, the account does not meet one of the five conditions, then the Lender must obtain SBA's prior written consent in order to include the account in the eligible

borrowing base. Such requests must be sent to the LGPC.

   b.  Level of Funds Control:
The level of funds control for a Working Capital CAPLine, whether a BBC is used or not, is determined by the banking relationship the lender has with the Borrower.

      i.  If the Lender has the Borrower's deposit accounts, the Lender is not required to utilize cash collateral accounts or other types of controlled accounts, but must follow its established procedures for its similarly-sized, non-SBA guaranteed commercial lines of credit to monitor payments received.

      ii.  If the Lender does not have the Borrower's deposit accounts, then the Lender must utilize some form of controlled account as follows:

         a)  The customers of the Borrower can be instructed to send their remittances via joint payee checks payable to lender and Borrower to the Lender; or

         b)  Lock box (bank account under Lender control where Borrower's customers remit payments for accounts receivable).

   c.  For Working Capital CAPLines, final disbursement must occur far enough in advance of maturity so that a sufficient amount of time is available for the assets financed with the proceeds to be converted back to cash and available to make final payment at maturity. The date of final disbursement must be established in the Authorization and should be reflective of the time required to permit orderly repayment by the maturity date. Disbursements after the last cash cycle has begun, but before maturity, require SBA's prior written approval. However, if maturity coincides with the scheduled annual review of the line, including an annual review conducted by Lender coincidental with the maturity of the line, Lender may advance on the line up to maturity in conjunction with the lender's annual review in accordance with Lender's policies and procedures on its similarly-sized non-SBA guaranteed commercial lines of credit. No advances can be made after maturity. When a balance exists on a CAPLine at maturity, the lender should consider the following:

      i.  Enforce final collection;

      ii.  Renew the line without SBA's guaranty;

      iii.  Renew the line, requesting SBA's guaranty (new application required if maturity has reached 10 years);

      iv.  Term out any outstanding balance, with SBA's concurrence. SBA's guaranty would remain in place but there could be no new advances; and/or

      v.  Commence liquidation of supporting collateral.

# CHAPTER 8: POST-DISBURSEMENT CHANGES, SECONDARY MARKET, SECURITIZATION AND LENDER REPORTING (SBA FORM 1502)

## I.   POST-DISBURSEMENT CHANGES

It is important for Lenders to confer with the appropriate Commercial Loan Servicing Center (CLSC) after final disbursement of the loan to ensure that actions which require notification or prior approval of SBA are taken. Failure to notify SBA or to obtain prior SBA approval may be a cause for SBA to deny liability on its guaranty.

Note: Lenders may not unilaterally approve any adjustment to or change in the ownership of a Borrower, including a change in percentage of ownership, for 12 months after final disbursement on any loan.

Lenders may request changes on disbursed loans by contacting the appropriate CLSC. The CLSC contact information can be found at https://www.sba.gov/about-sba/sba-locations/loan-and-guaranty-centers.

Guidance on loan servicing and liquidation is also outlined in SOP 50 57.

## II.   SECONDARY MARKET FOR SBA-GUARANTEED LOANS

A.   Sale of SBA 7(a) Loans into SBA's Secondary Market:

The SBA Secondary Market was established to provide liquidity to Lenders, and thereby expand the availability of commercial credit for small business. The Lender makes the decision to participate in the Secondary Market program through the sale of each specific guaranteed loan. A Lender must use SBA Form 1086, "Secondary Participation Guaranty Agreement," to sell the guaranteed portion of an SBA 7(a) Loan. SBA Form 1086 is a legally binding document, which includes the terms and conditions that govern the sale and all subsequent servicing of the loan sold, which must be executed by the Lender, Registered Holder (or investor), Fiscal and Transfer Agent ("FTA"), and SBA.

B.   In order for a 7(a) loan to be sold, the Lender must certify, among other things, that:

1.   The Lender has underwritten, closed and serviced the loan in a prudent manner and in accordance with all SBA Loan Program Requirements;

2.   The Lender will not share any premium it has received from this sale with a lender service provider, packager or other loan referral source;

3.   The loan is fully disbursed;

4.   The loan is not a revolving loan or line of credit facility;

5.   The SBA guaranty fee has been paid by the Lender;

6.   The Lender, including its officers, directors and employees, has no knowledge of a default or likelihood of a default by Borrower; and

7.   The Lender has no authority to unilaterally repurchase the loan guaranty from the Registered Holder without SBA's written consent.

C.   The following sale documents must be presented to the FTA:

1. A fully executed SBA Form 1086;

2. A true and certified copy of the Borrower's Note, including true and certified copies of any amendments or modifications. All Notes, modifications, or amendments presented for sale must have the SBA Loan Number on the first page of each document.

D. Loan and sale information is recorded on SBA Form 1086 by the Lender and purchaser, who then presents the sale documents to the FTA for examination and processing. The FTA will identify any errors on the Note or SBA Form 1086 and notify either the Lender or the broker/dealer.

E. Secondary Market Sale Settlement:

1. Upon a confirmed settlement date, the Registered Holder (investor) will wire all sale proceeds, including all principal, interest and premium (if any), to the FTA. The FTA will wire sale proceeds to the Lender, pursuant to instructions, submitted to the FTA through a confirmation of sale document. The FTA will issue a Guaranteed Interest Certificate to the Register Holder (investor) evidencing ownership of the guaranteed portion of the loan. The guaranty to the Registered Holder or investor is unconditional.

2. All Borrower payments received by the Lender after the settlement date must be remitted to the FTA using SBA Form 1502 pursuant to the instructions contained in SBA Form 1086. This includes, but is not limited to, note payments and Borrower prepayments. All payments must be remitted by the Lender to the FTA.

## III. SECONDARY MARKET RESOURCES:

A. SBA's web page for Lenders has specific information on the Secondary Market at: https://www.sba.gov/partners/lenders/7a-loan-program/secondary-market.

B. Colson Services Corporation is the Fiscal and Transfer Agent (FTA). Find additional information on their web page: https://colsonservices.bnymellon.com.

C. SBA's SOP 50 57 provides additional information and can be accessed on SBA's web page for Lenders.

## IV. LOAN TRANSFERS:

A. SBA allows SBA 7(a) loan portfolio transfers under limited circumstances. Lenders may encounter situations that result in the ownership transfer of their entire interest in SBA 7(a) loans from one Lender to another. These situations may arise when Lenders merge, decide to leave a specific operating area, cease participation in the SBA 7(a) loan program, or as may be directed by other Federal financial regulators.

B. Pursuant to 13 CFR § 120.432(a), Lenders selling or transferring the entire interest in a SBA 7(a) loan are required to obtain SBA's **prior** written consent. All loan transfers must occur between Lenders in the 7(a) loan program. When the proposed transfer involves a single loan account, Lenders may request a transfer of participation from the appropriate SBA Commercial Loan Servicing Center (Fresno CLSC or Little Rock CLSC).

C.  When a transfer involves more than one SBA 7(a) loan, Lenders are required to obtain SBA consent to the proposed portfolio transfer. Prior to conducting a review for approval, Lenders must pay all outstanding SBA receivables that are more than 30 days in arrears. Lenders must contact DFCActionDesk@sba.gov in advance of their consent request for information on any SBA receivables outstanding. All SBA receivables must be satisfied with proof of payment to SBA in order to consider a portfolio transfer of loans.

D.  Requests for consent for transfers involving more than one SBA 7(a) loan are submitted to OFA at 7aPortfolioTransfers@sba.gov. Failure to secure SBA consent will prevent the transfer of related SBA loan guarantees accompanying the loans scheduled for transfer. The written request shall include documents describing the basis for the portfolio transfer. These documents are either in the form of an asset purchase agreement or plan of merger agreement. If the transfer takes the form of an asset purchase, SBA will also require submission of a loan list (preferably in a Microsoft Excel spreadsheet) identifying the loans to be transferred. Listed loans are to be assembled in ascending order by SBA Loan Number, and must include the name of the Borrower and the original loan amount. SBA will also require the proposed purchaser of the loan portfolio to submit a signed Lender Statement of Obligation which will identify points of contact and the purchasing Lender's responsibilities and obligations after the transfer is completed.

E.  Upon SBA approval, the Lender purchasing the 7(a) loans and/or loan portfolio must take possession of the promissory notes and the other loan documents and service the 7(a) loans. The purchasing Lender will assume all of the obligations and responsibilities of the selling Lender, including but not limited to, all obligations, responsibilities and liabilities resulting from the making, servicing, closing and liquidation of the selling Lenders' loans. The purchasing Lender purchases the 7(a) loans subject to SBA's existing rights to deny liability on its guarantee as provided in 13 CFR § 120.524.

F.  Lenders that receive SBA approval must notify the Secondary Market Division once the proposed transaction is completed. At that time, OFA will notify OPSM to transfer loan accounts into the purchasing Lender portfolio.


## V.  LOAN PARTICIPATION SALES

A.  Lenders are permitted to enter into 7(a) loan participation sales, pursuant to 13 CFR § 120.432(b), provided the purchaser is another 7(a) lender participant. Participation sales involve the sale of a portion of an SBA 7(a) loan, and are private sale transactions between Lenders.

B.  Lenders that sell loan participations are required to retain the SBA Note and service the loan on behalf of all participants. While participations may be for amounts equivalent to a loan's guarantee percentage, purchasing Lenders are not permitted to sell a participation interest into SBA's Secondary Market.

C.  Lenders are required to notify OCRM if the Lender sells a participation in any portion of an SBA 7(a) loan to another Lender. Lenders that wish to sell a participation in which the unguaranteed amount retained is below 10% of the outstanding principal balance of the loan must obtain SBA's prior written consent, which SBA may withhold in its sole discretion.

D. Requests for prior approval shall be made in writing to OFA's Secondary Market Division. The request from the selling Lender shall include a form of the participation agreement acceptable to SBA, identification of the purchasing Lender, and identification of the SBA loan(s) proposed for sale. These documents may be submitted electronically or by first class mail. OFA will coordinate its review with OCRM, and if approved, will issue conditional approval to the selling Lender. Lenders must close on the approved transaction, and notify OFA upon the closing of the transaction.

## VI. SECURITIZATION AND OTHER CONVEYANCES

A. Securitizations.

1. Lenders with an executed 750 Agreement are permitted to securitize the unguaranteed portion of their SBA-guaranteed 7(a) loans subject to SBA's prior written approval, which it may withhold in its sole discretion.

2. A securitization is a financial transaction involving the pooling and sale of the unguaranteed portion of a 7(a) loan to a trust, special purpose vehicle or other mechanism, and the issuance of securities backed by such 7(a) loans to investors.

3. Community Advantage Lenders are not permitted to securitize Community Advantage loans under the CA Pilot Program.

4. A discussion of SBA's requirements for securitizations can be found at 13 CFR §§ 120.420 through 120.428.

B. There are certain basic conditions that a Lender must meet in order to securitize. To securitize, a Lender must:

1. Be in satisfactory standing with SBA (as defined in 13 CFR §120.420(f));

2. Have satisfactory SBA performance;

3. Use a securitization structure satisfactory to SBA;

4. Use transaction documents acceptable to SBA (including the execution of a SBA Multi-Party Agreement for securitizations);

5. Obtain SBA's written consent prior to executing a commitment to securitize; and

6. Deposit the original 7(a) loan notes with SBA's Fiscal Transfer Agent.

SBA's consent to a Lender's securitization application may be withheld by SBA in its sole discretion.

C. There are certain minimum elements SBA requires for securitizations:

1. All securitizers must be considered "well capitalized" by their regulator and meet SBA's capital requirements. A discussion of SBA's capital requirements for securitizations can be found at 13 CFR § 120.425(a). If a securitizer does not maintain the level of capital required for a securitization, SBA will not approve a securitization application.

2. Each securitizer must retain a subordinated tranche of the securities issued in the securitization equal to the greater of two times the securitizer's Loss Rate (as defined in 13

CFR § 120.420(i)) or 2 percent of the principal balance outstanding at the time of securitization of the unguaranteed portion of the loans in the transaction. The securitizer's retained tranche must be subordinate to all other securities issued in the securitization (including other subordinated or junior tranches). The subordinated tranche may not be sold, pledged, transferred, assigned, participated or otherwise conveyed by the securitizer during the first 6 years after the closing date of the securitization. A discussion of SBA's requirements for the subordinated tranche can be found at 13 CFR §120.425(b). SBA expects all securitizers to be in compliance with other laws, rules or regulations related to securitizations.

3. OCRM may suspend a securitizer's PLP loan approval privileges based on the relationship between the securitizer's currency rate and the SBA 7(a) loan portfolio currency rate. See 13 CFR § 120.425(c).

4. Prefunding – Lenders may only securitize 7(a) loans that are fully disbursed within 90 days of the securitization's closing date. See 13 CFR § 120.423.

5. Once transaction documents have been drafted, Lenders shall submit key transaction documents (together with a closing checklist of all documents to be included in the transaction) in electronic form to the Chief of the Secondary Market Division within OFA. This unit will review the transaction documents and provide comments to the Lenders on unacceptable terms and conditions. Once resolved, OFA will coordinate the review of the transaction within SBA. If approved, OFA will issue a consent letter along with signature pages to the Multi-Party Agreement executed by both SBA and the FTA.

6. Secured Credit Facilities. Under 13 CFR § 120.434, Lenders are required to obtain SBA's prior written consent when pledging 7(a) loans as collateral for a secured credit facility. These credit facilities are entered into by Lenders as a source of funding for making 7(a) loans to small businesses. These credit facilities may only be used to finance the guaranteed and/or unguaranteed portions of 7(a) loans along with the cost and expenses of obtaining the credit.

7. Lenders are permitted to make financing arrangements with credit providers which culminate in the drafting of a loan and security agreement as well as other ancillary transaction documents. SBA requires each secured financing transaction to include an SBA Multi-Party Agreement ("MPA"). The form of the MPA is located at https://www.sba.gov/document/support-object-object-sba-multi-party-agreements. The MPA is a document executed by the Lender, the credit provider, SBA and the Fiscal Transfer Agent ("FTA"). The MPA identifies rights and restrictions that limit actions that may be taken by the credit provider if a Lender default on the facility occurs. As stated in the MPA, inconsistent provisions identified between the MPA and other transaction documents are decided in favor of the MPA in all cases.

8. Once transaction documents are drafted, Lenders shall submit these documents in electronic form to the Chief of the Secondary Market Division within OFA. This unit will review the transaction documents and provide comment to the Lenders on unacceptable terms and conditions. Once resolved, OFA will coordinate the review of the transaction within SBA and the FTA. If approved, OFA will issue its consent letter along with signature pages for the MPA from both SBA and the FTA. Lenders are to ensure that all conditions in the MPA

are satisfied at closing including the delivery of opinions of counsel from both the Lender and the credit provider. Lenders are to send electronic editions of the closing binders for these transactions to OFA in care of the Secondary Market Division.

## VII. LENDER LOAN REPORTING

A.  Lenders must provide a monthly report on SBA Form 1502, "Guaranty Loan Status & Lender Remittance Form," ("Form 1502") that includes loan status information for all of its SBA guaranteed loans, regardless of whether the Borrower made a payment in the current month. International trade Lenders that participate in the EWCP must ensure that this reporting function is addressed within their own operation. Lenders with EWCP loans should determine how this reporting is carried out by any domestic affiliate group(s), to the extent these affiliates participate in other SBA programs, and combine loan portfolio reporting into one source point where possible.

   Detailed instructions for Form 1502 can be found at https://www.sba.gov/document/sba-form-1502-sba-form-1502-instructions.

B.  Loan reporting in a current month reflects Borrower payments received or omitted in the prior month.

C.  The report period begins with the first calendar day of the month and continues through the last calendar day of the month.

D.  Lenders must compute and remit with the Form 1502 either the payments owed if the guaranteed portions have been sold in the secondary market or the ongoing guaranty fees due if the guaranteed portion has not been sold.

E.  The due date for transmitting loan account updates and payments to the Fiscal and Transfer Agent (FTA) is the third calendar day of each month, or the next business day thereafter if the third calendar day of the month is not a business day, plus a two business day grace period.

F.  Lender must submit the Form 1502 to SBA's FTA using one of the following delivery methods: FTA's website facilities or SFTP (Secure File Transfer Protocol). Each method is described below, followed by wire instructions:

   1.  FTA's Website:

       a.  FTA provides Lender with the option of using its website to transmit Form 1502 information. The 1502 Dashboard and the 1502 Connection are found at www.colsonservices.com.

       b.  The 1502 Dashboard's e-File Submission option allows Lender to securely upload Form 1502 file attachments in MS Excel format.

       c.  The 1502 Connection allows Lender to view its portfolio of loans and enter Form 1502 information on a Form 1502 data input screen directly on the site.

       d.  All 1502 Dashboard and 1502 Connection submissions must be accompanied with a corresponding wire transfer of funds.

       e.  Lender must call FTA Client Service at 877-245-6159, Call Option 1 for enrollment

information.

2.   SFTP:

    a.   An SFTP server site is made available through FTA. Lenders are instructed to contact Colson Services Corporation's FTA Client Service number at 877-245-6159 and select Option 1 to receive instructions on obtaining a username and password to access the secure site.

    b.   Wire Transfer instructions for Secondary Market and SBA Fee payments should be directed to the following wire address:

        Bank of New York Mellon

        ABA Routing: 021-000-018

        For credit to: Colson Services Corp.

        7(a) Collection Account # 8900606797

        Text: Bank Name & Payment Information

3.   Wire Transfer instructions for Secondary Market Payoffs and Prepayments should be directed to the following wire address:

        Bank of New York Mellon

        ABA Routing: 021-000-018

        For credit to: Colson Services Corp.

        7(a) Payoff Account # 8900606827

        Text: GP #, Bank Name and P & I

Lender is responsible for any additional funds due to the secondary market for using the incorrect wire transfer instructions.

## SUBPART C
## SECTION 504 CERTIFIED DEVELOPMENT COMPANY LOAN PROGRAM

**PURPOSE OF THIS SUBPART**

This Subpart contains the policies and procedures governing SBA's 504 Certified Development Company Loan Program. The policies and procedures governing Certified Development Companies are contained in Subpart A of this SOP.

When the policy set forth in this Subpart does not adequately address the unique circumstances regarding a particular matter, an exception to policy may be approved by the D/FA. The D/FA may not approve an exception to policy if such exception would be inconsistent with a statute or regulation. A request for an exception to policy must be submitted to the Sacramento Loan Processing Center (SLPC). The SLPC will analyze the request and make a recommendation to the D/FA or individual acting in that capacity who will make the final decision. The decision must be documented in the appropriate Agency loan file. This procedure may only be used in situations where a minor deviation from standard policy is necessary for the specific situation. Exceptions to policy will be considered on a case-by-case basis and the decision will only apply to the specific request.

# CHAPTER 1: GENERAL PROVISIONS

## I.   PURPOSE OF THE 504 CERTIFIED DEVELOPMENT COMPANY LOAN PROGRAM

The 504 loan program is an economic development program designed to finance fixed assets for small businesses on reasonable terms and to stimulate employment through a job retention/creation goal. (13 CFR § 120.800)

## II.   CREDIT STANDARDS (13 CFR § 120.150)

A.  Certified Development Companies (CDCs) must analyze each application in a commercially reasonable manner, consistent with prudent lending standards. On 504 loans, the cash flow of the Applicant is the primary source of repayment, not the liquidation of collateral. Thus, if the CDC's financial analysis demonstrates that the Applicant lacks reasonable assurance of repayment in a timely manner from the cash flow of the business, the loan request must be declined, regardless of the collateral available.

B.  The CDC's analysis must include:

1.  A financial analysis of the Applicant's pro forma balance sheet. The pro forma balance sheet must reflect the loan proceeds, use of the loan proceeds, and any other adjustments such as required equity injection or stand-by debt.

2.  A financial analysis of repayment ability based on historical income statements, tax returns (if an existing business) and a minimum of 2 years' projections, including support for the assumptions.

3.  A ratio analysis of the financial statements including comments on any trends and a comparison with industry averages.

4.  A discussion of the owners' and managers' relevant experience in the type of business, as well as their personal credit histories.

5.  An analysis of collateral adequacy, including an evaluation of the collateral and lien position offered as well as the liquidation value. (For further guidance, please see SOP 50 51, Loan Liquidation and Acquired Property.)

6.  A discussion of the Applicant's credit experience, including a review of business credit reports and any experience the CDC may have with the Applicant. In addition, business must be current on all federal, state and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes and sales taxes. Credit reports are only required for the small business concern applying for the loan and its owners and affiliates who are guarantors. Credit reports are not required on non-guarantor affiliates.

7.  Other relevant information (for example, if the application involves a franchise, the success of the franchise).

## III.   DEFINITIONS

The following terms have the same meaning wherever they are used in this subpart. Defined terms are capitalized wherever they appear. (13 CFR §§ 120.802 and 120.10)

A.  **Area of Operations** is the geographic area where SBA has approved a CDC to provide 504

program services on a permanent basis.

B. **Central Servicing Agent (CSA)** is an entity that receives and disburses funds among the various parties involved in 504 financing under a master servicing agent agreement with SBA.

C. **Certificate** is a document issued by SBA or its agent representing ownership of all or part of a Debenture Pool.

D. **Debenture** is an obligation issued by a CDC and guaranteed 100% by SBA, the proceeds of which are used to fund a 504 loan.

E. **Debenture Pool** is an aggregation of Debentures.

F. **Designated Attorney** is the CDC closing attorney that SBA has approved to close loans under an expedited closing process for a Priority CDC.

G. **Interim Financing** is any disbursement of funds (other than the Borrower's contribution) to finance eligible project costs after the loan is approved by SBA but before the debenture is sold.

H. **Investor** is an owner of a beneficial interest in a Debenture Pool.

I. **Job Opportunity** is a full time (or equivalent) permanent, or contracted, job created within 2 years of receipt of 504 funds, or retained in the community because of a 504 loan.

J. **Lead SBA Office** is the SBA District Office designated by SBA as the primary liaison between SBA and a CDC and with responsibility for managing SBA's relationship with that CDC.

K. **Limited or Special Purpose Property** - A limited-market property with a unique physical design, special construction materials, or a layout that restricts its utility to the use for which it was built.

L. **Loan Program Requirements** are requirements imposed upon CDCs by statute, SBA regulations, any agreement the CDC has executed with SBA, SBA SOPs, official SBA notices and forms applicable to the 504 loan program, debentures, and loan authorizations, as such requirements are issued and revised by SBA from time to time.

M. **Local Economic Area** is an area, as determined by SBA, that is in a State other than the State in which an existing CDC (or an applicant applying to become a CDC) is incorporated, is contiguous to the CDC's existing Area of Operations (or the applicant's proposed Area of Operations) of its State of incorporation, and is a part of a local trade area that is contiguous to the CDC's Area of Operations (or applicant's proposed Area of Operations) of its State of incorporation. Examples of a local trade area would be a city that is bisected by a State line or a metropolitan statistical area that is bisected by a State line.

N. **Multi-State CDC** is a CDC that is incorporated in one State and is authorized by SBA to operate as a CDC in a State contiguous to its State of incorporation beyond any contiguous Local Economic Areas.

O. **Net Debenture Proceeds** is the portion of Debenture proceeds that finance eligible Project costs (excluding administrative costs).

P. **New Business** is a business that has been in operations for 2 years or less at the time the loan is approved. A business that has been in operation for more than 2 years at the time the loan is approved may be considered a New Business if it is a change of ownership that will result in

new, unproven ownership/management and increased debt unrelated to business operations. If there is a change of ownership, the CDC must review the management and level of debt and make a determination whether an additional Borrower's contribution of 5% is necessary. Operations are deemed to begin when the business begins generating revenue from its intended operations.

Q. **Priority CDC** is a CDC certified to participate on a permanent basis in the 504 program (see 13 CFR § 120.812) that SBA has approved to participate in an expedited 504 loan and Debenture closing process.

R. **Project** is the purchase or lease, and/or improvement or renovation of long-term fixed assets by a small business, with 504 financing, for use in its business operations.

S. **Project Property** is one or more long-term fixed assets, such as land, buildings, machinery, and equipment, acquired or improved by a small business, with 504 financing, for use in its business operations.

T. **Special Geographic Areas** include Alaska, Hawaii, State-designated Enterprise Zones, Empowerment Zones, Enterprise Communities and Labor Surplus Areas.

U. **Third Party Lender** is usually a financial institution that provides the Third Party Loan and typically has a first lien on the project collateral. SBA does not permit the CDC to be the Third Party Lender on Projects financed by the CDC.

V. **Third Party Loan** is a loan from a commercial or private lender, investor, or Federal (non-SBA), State or local government source that is part of the Project financing.

W. **Underwriter** is an entity approved by SBA to form Debenture Pools and arrange for the sale of Certificates.

## IV. HOW A 504 PROJECT IS FINANCED

| Typical 504 Structures | | | |
|---|---|---|---|
| | Standard Financing Structure | New Business OR Limited or Special Purpose Property | Both New AND Limited or Special Purpose Property |
| Third Party Lender | 50 | 50 | 50 |
| CDC/SBA | 40 | 35 | 30 |
| Borrower | 10 | 15 | 20 |

A 504 project has three main partners and generally: a Third Party Lender provides 50% or more of the financing; a Certified Development Company (CDC) provides up to 40% of the financing through a 504 debenture (guaranteed 100% by SBA); and an applicant (Borrower) injects at least 10% of the financing (13 CFR § 120.801 and 13 CFR § 120.900). No more than 50% of eligible Project costs can be from Federal sources (13 CFR § 120.930(a)). Please see Chapter 7 of this Subpart for a discussion of the maximum debenture amount.

A.  Third Party Loan (13 CFR § 120.920):

1.  The Third Party Lender must be in place at the time of application and must be evidenced by a letter of intent/term sheet or commitment letter included in the application package outlining the terms and conditions of the Interim and/or Third Party Loan to enable SBA to evaluate the 504 application.

2.  The terms of the Third Party Loan are defined in 13 CFR § 120.921.

3.  The Third Party Loan must be at least as much as the net debenture proceeds. However, the Third Party Loan must total at least 50% of the Project costs if the Borrower (or Operating Company if the Borrower is an Eligible Passive Company) has operated for 2 years or less or the Project is for the acquisition, construction, conversion or expansion of a limited or single purpose asset.

4.  The Third Party Loan may be closed and begin amortizing prior to the debenture funding as long as the Third Party Lender obtains the Borrower's written consent.

5.  The Third Party Lender's note and loan documents must not have any cross-default, "deem-at-risk," or any other provisions which allow the Third Party Lender to make demand prior to maturity unless the loan is in default.

6.  The 504 loan is usually collateralized by a second lien on Project Property. The Third Party Lender may obtain additional collateral or other security for the Third Party Loan in addition to its lien on the Project Property ("Additional Collateral") only if in the event of liquidation and unless otherwise approved in writing by the D/OFPO:

   a.  The Third Party Lender liquidates or otherwise exhausts all reasonable avenues of collection with respect to the Additional Collateral no later than the disposition of the Project Property, and

   b.  The Third Party Lender applies any proceeds received as a result of the Additional Collateral to the balance outstanding on the Third Party Loan prior to the application of proceeds from the disposition of the Project Property to the Third Party Loan.

7.  Interest Rate Swap Contracts:

   a.  An interest rate swap is a contract between two parties where one party pays a fee in exchange for an agreement by the other party to pay any interest in excess of an established amount. The contract may last for all or part of the term of the loan. The swap contract only relates to the payment of interest.

      Example: A Borrower has a prime plus 2% interest rate on a Third Party Loan variable rate loan (presently 5.25%). The Borrower could purchase an interest rate swap contract that would set the interest rate at 7%. When the Note rate is lower than the rate paid by the Borrower on the swap contract (7%), the swap seller keeps the extra amount as compensation for the risk that rates will at some point exceed 7%. When the Note rate is higher than the rate paid by the Borrower on the swap contract, the Borrower would continue to pay the fixed rate of 7% and the swap seller would pay the difference above 7% to the lender. The ability to stabilize the amount of the loan payment each month is the benefit to the Borrower of an interest rate swap contract.

b. Third Party Loans may use swap contracts. In order to use an interest rate swap on a Third Party Loan, the interest rate swap contract must meet the following conditions:

   i. The interest rate swap contract is an agreement between the small business Borrower and the lender or, if the swap seller is not the lender, a third party. SBA is not a party to the interest rate swap contract.

   ii. SBA will not review swap contracts for Borrowers or provide guidance on their use. While swap contracts should not have a significant impact on the cost of the loan, SBA will not publish any guidelines on the cost of these contracts.

   iii. Swap contracts may be used on new or existing Third Party Loans.

   iv. The swap contract does not have to last for the entire length of the Third Party Loan.

   v. SBA does not have a standard form for an interest rate swap contract.

   vi. Any fees owed the swap counterparty as a result of the default by the Borrower will be subordinated to the SBA 504 loan.

8. CDCs must not enter into any Intercreditor agreement with the Third Party Lender other than that Third Party Lender Agreement (SBA Form 2287) without the prior written consent of SBA.

B. Interim Financing:

Loans under the 504 program provide permanent or take-out financing. An interim lender (either the Third Party Lender or another lender) provides the interim financing to cover the period between SBA approval of the project and the debenture sale. After the project is completed, the CDC will close the 504 loan. The proceeds from the Debenture sale repay the interim lender for the amount of the 504 project costs that it advanced on an interim basis.

1. Any experienced, independent source including the Third Party Lender may supply interim financing provided they meet the conditions described in 13 CFR § 120.890. A CDC may provide interim financing but only for a project financed by another CDC. As stated in the regulation, neither the Borrower nor an Associate of the Borrower may supply interim financing.

2. A construction escrow account may be used with SBA's prior approval if acquisition of machinery and equipment or other portions of a project (such as a parking lot, landscaping, etc.) represents a relatively minor portion of the total project, and it has been contracted for delivery at a specified price and date, but cannot be installed or delivered prior to acquisition or completion of the plant, the debenture may be sold, provided (see Chapter 5 of this Subpart, Construction Loan Provisions):

   a. The proceeds authorized for acquisition of such assets are held in escrow by the CSA, Title Company, CDC attorney, or bank to complete Project components;

   b. All required lien positions and collateral are obtained prior to closing;

   c. Disbursement from such account(s) must be approved by the CDC and SBA, supported by invoices, and be made payable jointly to the small business and the

designated contractor; and

    d.  Funds not disbursed after 1 year will be applied to pay down the Third Party Lender's loan.

The interim financing must be fully disbursed and the project completed prior to the sale of the Debenture with one exception. A portion of the debenture proceeds may be put into an escrow account to complete a minor portion of the total project (see 13 CFR § 120.961).

3.  If the Third Party Lender provides the interim loan, it may do so using:

    a.  An interim note which will be paid in full with the net debenture proceeds and a permanent note; or

    b.  A single note, which includes both the interim and permanent financing that will be reduced by the net debenture proceeds.

| Example of Interim Financing of Eligible Project Costs | | |
|---|---|---|
| Expenses Incurred Prior to the 504 Application: | | |
| Purchase of Land (Principal portion of short-term financing) | | $180,000 |
| Equity in Land | | 20,000 |
| Purchase of M & E | | 100,000 |
| Cost estimates submitted at time of application: | | |
| Construction of Building | | 600,000 |
| **Total Project Costs** | | **900,000** |
| Permanent Financing Structure: | | |
| First Mortgage Lender 50% | | 450,000 |
| 504 Net Proceeds | 40% | 360,000 |
| Borrower Equity | 10% | 90,000 |
| **Total Financing** | **100%** | **$900,000** |

In this example the interim loan would be $810,000. The Borrower cannot be reimbursed directly from the net debenture proceeds but the lender can refinance these with an interim loan at any time prior to the loan closing.

4.  The Interim Lender must make a number of certifications at the time of the debenture closing. The certifications are stated in 13 CFR §§ 120.891 and 120.892. If the Interim Lender cannot certify as required, then the debenture cannot be funded.

C.  Escrow Closing (No Interim Financing):[1]

When a Project is to acquire an existing facility that the Borrower will immediately occupy, SBA may allow an Escrow Closing instead of requiring Interim Financing. The requirements for an Escrow Closing are as follows:

1.  Escrow Account:

   a.  SBA counsel must approve the Escrow Agreement, which will be signed by the CDC, SBA, the Borrower and the Escrow Agent. The Escrow Agent must be approved by the CDC and SBA counsel, and the Escrow Agent must follow the escrow instructions provided by the CDC and SBA counsel. The CDC counsel, Title Company or other party approved by SBA counsel may act as the Escrow Agent and hold the Escrow Account.

   b.  The Borrower must deposit an additional 10% of the Total Project Costs into the Escrow Account.  This deposit must be in cash or an irrevocable Letter of Credit. The CDC must provide SBA counsel with evidence of the Borrower's deposit at the time of closing of the 504 Loan.

   c.  The net Debenture sale proceeds must be wired directly into the Escrow Account.

   d.  The funds in the Escrow Account may not be distributed and the Escrow Account may not be dissolved until the CDC and CDC counsel provide a certification to SBA that:

      i.   A post-Debenture funding updated title commitment has been issued and reviewed showing the title and lien positions required by the Authorization for Debenture Guarantee (SBA 504 Loan);

      ii.  As a result of the review, the CDC and CDC counsel have determined that upon release of the funds in the Escrow Account at the scheduled Project Property real estate closing and subsequent recordation, title to the Project Property will transfer to the Borrower, all collateral documents will be properly filed, and all lien positions will be properly perfected;

      iii. CDC counsel will ensure that all title and lien positions required by the Authorization are properly recorded and that a final title policy is issued; and

      iv.  The CDC has determined that since the date of the CDC Certification submitted to SBA at the 504 Loan closing, there has been no unremedied substantial adverse change in the financial condition of the Borrower or Operating Company.

   After receipt of the foregoing certification, SBA counsel will determine if all of the requirements for dissolution of the Escrow Account have been met, and if so, will

---

[1] This subparagraph IV.C. will not be available for use until SBA has announced that the necessary forms have been created and/or revised, as appropriate.

provide the Escrow Agent and the CDC with written approval for the distribution of the funds in the Escrow Account.

e. All of the requirements for dissolution of the Escrow Account must be met to SBA counsel's satisfaction no later than 5 months from the date of the Debenture sale. If not, SBA counsel will direct the Escrow Agent and the CDC to use the funds in the Escrow Account to pre-pay the Debenture in full. Any leftover funds in the Escrow Account after the Debenture is pre-paid in full will be returned to the Borrower.

f. CDC counsel must provide SBA with a post-Project Property real estate closing legal opinion stating that:

   i.   All title and lien positions required by the Authorization have been properly recorded; and

   ii.  A final title policy reflecting the same has been delivered to SBA.

2. Borrower must agree in the Escrow Agreement that:

   a. The required Borrower's deposit will be used to make up the difference between the amount of the net Debenture sale proceeds and the amount required to pre-pay the Debenture in full. This difference includes the following:

      i.   Debenture sale costs paid from the gross Debenture sale proceeds such as the CDC processing fee, CSA fee, CDC attorney's fees/closing costs, SBA Guarantee Fee, Funding Fee and Underwriter's Fee; and

      ii.  The costs of pre-paying the Debenture including the prepayment premium and 6 months' worth of interest on the original Debenture amount.

   b. If all of the requirements for dissolution of the Escrow Account are not met to SBA counsel's satisfaction within 5 months of the date of the Debenture sale, the Debenture shall be pre-paid using the funds in the Escrow Account.

   c. The Borrower must make all regularly scheduled 504 Loan payments after the Debenture sale.

D. Borrower's Contribution (13 CFR §§ 120.910 – 120.913):

1. The Borrower must contribute to the Project cash (or property acceptable to SBA obtained with the cash) or land (that is part of the Project Property), in an amount equal to the following, excluding administrative costs:

   a. All Borrowers must contribute at least 10%;

   b. New businesses must contribute at least 15%.

   c. Businesses with a Limited or Special Purpose Property must contribute at least 15%. For any business (including affiliates) that has an outstanding debenture for a Project involving a Limited or Special Purpose Property, for each subsequent Project involving a Limited or Special Purpose Property, the Borrower must contribute at least 20%. (See Chapter 7 of this Subpart for gross debenture limits (13 CFR § 120.151).) Below is a list that contains examples of properties that SBA considers to be a Limited or Special Purpose Property. This list is not intended to be all-inclusive

and SBA may determine that other properties meet the Limited or Special Purpose Property definition set forth in paragraph III of this Chapter. C**DCs must address whether the Project Property is Limited or Special Purpose in their credit memorandum and include their conclusion and explanation**.

    i.     Amusement parks;

    ii.    Bowling alleys;

    iii.   Car wash businesses;

    iv.   Cemeteries;

    v.    Cold storage facilities where more than 50% of total square footage is equipped for refrigeration;

    vi.   Dormitories;

    vii.   Farms, including livestock and dairy facilities;

    viii.  Funeral homes with crematoriums;

    ix.   Gas stations;

    x.    Golf courses;

    xi.   Hospitals, surgery centers, urgent care centers, and other health or medical facilities;

    xii.   Hotels, motels and other lodging facilities;

    xiii.  Marinas;

    xiv.  Mines;

    xv.   Nursing homes, including assisted living facilities;

    xvi.  Oil wells;

    xvii.  Quarries, including gravel pits;

    xviii. Railroads;

    xix.  Sanitary landfills;

    xx.   Service centers (e.g., oil and lube, brake or transmission centers) with pits and in-ground lifts;

    xxi.  Sports arenas;

    xxii.  Swimming pools;

    xxiii. Tennis clubs;

    xxiv. Theaters; and

    xxv.  Wineries.

d.  If a Project will finance both a New Business and a Limited or Special Purpose Property, the Applicant is required to contribute at least 20% of the Project cost.

Regardless of whether a business (including its affiliates) has an outstanding debenture(s) for a Project involving a Limited or Special Purpose Property, the minimum required equity injection will not exceed 20%.

2. The additional Borrower's contribution will reduce the SBA's portion of the financing.

3. The Borrower's equity in land previously acquired may be counted toward the Borrower's contribution. The Borrower also may count toward its contribution, equity in land and buildings that will be part of the Project if they are adding a new building to the same property.

4. If the Borrower's contribution is borrowed:

    a. Any lien position on the Project Property must be subordinate to the 504 loan;

    b. Only in situations where the borrowed equity contribution is collateralized by the Project Property, Borrower may not pay the loan for its equity contribution at a faster rate than the 504 loan (13 CFR § 120.912) unless it is approved in writing by the D/FA or designee; and

    c. If the borrowed contribution is collateralized by assets other than the Project Property, the Borrower must demonstrate repayment of the loan for its contribution from the cash flow of the business or other sources.

E. Financing Involving Industrial Development Bonds or Industrial Revenue Bonds:
SBA may participate in Projects financed in part, directly or indirectly, by obligations exempt from state or local taxes (for example, real estate tax exemptions). However, in accordance with OMB Circular A-129, "Policies for Federal Credit Programs and Non-Tax Receivables" (January 2013), *SBA may not participate in projects financed in part, directly or indirectly, by Federal tax-exempt obligations.* For Projects that do not involve Federal tax-exempt obligations, industrial development bonds or industrial revenue bonds (IDBs/IRBs) may be a source of funding for Projects under the following conditions:

1. When the bond proceeds are used to fund the Third Party Loan:

    a. If the bond issuer requires that it hold title to the Project Property, the TPL's and SBA's respective liens must be properly recorded before any transfer of the title to the Project Property to the bond issuer;

    b. If the bond issuer takes title to the Project Property and leases the Project Property to the Borrower, the bond issuer must assign the lease to the Third Party Lender and all payments under the lease must be paid to the Third Party Lender and serve as the payments under the loan;

    c. If 1.a. and b. are met, then the Third Party Loan may remain in a senior lien position.

    d. If the bond issuer does not require that it hold title to the Project Property but takes a lien on the Project Property, the Third Party Lender may still be in a senior lien position, but SBA's lien position must not be subordinate to the bond issuer's lien.

2. When the bond proceeds are used to fund the Borrower's Contribution:

    a.  If the bond issuer requires that it hold title to the Project Property, the TPL's and SBA's respective liens must be properly recorded before any transfer of the title to the Project Property to the bond issuer;

    b.  SBA's lien position must not be subordinate to the bond issuer's lien; and

    c.  The Borrower may not pay the loan made from the proceeds of the tax-exempt obligation at a faster rate than the 504 loan unless it is approved by the D/FA or designee;

3. In no case may a default in payment of the tax-exempt obligation result in a tax lien on the property; and

4. In transactions where the bond issuer takes collateral other than the Project Property, SBA may, in its discretion, agree to take a subordinate lien position on that collateral.

The structure of these transactions may vary from state to state and other conditions may apply. CDCs and the SLPC should consult with District Counsel and OGC for additional guidance.

F. Financing Involving Historic Rehabilitation Tax Credits:

Under IRS regulations (IRC § 50), the owner of property eligible for historic rehabilitation tax credits may lease the property, and transfer the historic rehabilitation tax credits, to another party (the "Tax Credit Investor"). SBA may participate in Projects involving such tax credits under the following conditions:

1. In such situations where the Borrower is the owner of the property eligible for the historic rehabilitation tax credits, the Project Property may be leased by the Borrower to the Tax Credit Investor and then must be simultaneously subleased back from the Tax Credit Investor to the Borrower. The term of the sublease must be equal to the term of the lease.

2. The transfer of the rehabilitation tax credits from the Borrower to the Tax Credit Investor must comply with all applicable IRS requirements.

3. Copies of the lease and the sublease that will be executed by the Borrower and the Tax Credit Investor must be submitted with the 504 application. The executed copies of both leases must be submitted for review (including legal review by District Counsel) prior to closing. This review will be limited to ensuring that the terms of the two leases are equal.

SBA's lien on the Project Property must not be subordinate to the lease between the Borrower and the Tax Credit Investor.

4. The loan may not be structured as an EPC/OC loan.

5. The structure of these transactions may vary case-by-case, and CDCs and the SLPC should consult with District Counsel and OCA for additional guidance. SBA may also participate in projects where the Borrower transfers State rehabilitation tax credits if such projects satisfy all applicable State requirements and the other requirements set forth above.

# CHAPTER 2: ELIGIBILITY

## I.   INTRODUCTION

Determining whether or not an Applicant is eligible for a 504 loan is one of the most critical steps in the 504 lending process.

Eligibility should be determined as early in the application process as possible and properly documented.

This chapter addresses the eligibility requirements that the Applicant must meet at the time of application and all of those requirements must continue to be met through loan closing and disbursement. The only exception is the size standard. Please see the applicable section of this chapter for additional guidance.

The SBA's lending programs qualify as "Special-Purpose Credit Programs" under the Equal Credit Opportunity Act (ECOA). This regulation stipulates that information pertaining to the applicant's marital status, sources of personal income, alimony, child support, and spouse's financial resources can be obtained and considered in determining program eligibility. Therefore, the CDC has the right to obtain the signature of an Applicant's spouse (whether an owner of the business or not) or other person on an application or credit instrument if it is required by Federal or State Law.

## II.   ELIGIBILITY REQUIREMENTS FOR ALL 504 APPLICANTS

Eligibility requirements for all Applicants for SBA business loans are outlined in 13 CFR § 120.100 and are discussed below.

The Applicant must:

   A.   Be an Operating Business (except for Eligible Passive Companies). See further guidance on Eligible Passive Companies/Operating Companies at III.C below.

   B.   Be Organized for Profit. All Applicants must be organized for profit. Non-profit businesses are not eligible for SBA business loan assistance. For-profit subsidiaries of non-profits may be eligible.

      1.   In order to determine an Applicant's for-profit status, the Lender may review its organizational documents, for example:

         a.   Articles of Incorporation/ Organization (filed with the Secretary of State or similar department in the state where the Applicant is organized);

         b.   Corporate bylaws and any amendments;

         c.   Partnership Agreements;

         d.   Association By-Laws; and/ or

         e.   Tax Returns.

      2.   If all other eligibility requirements are met, 13 CFR § 120.110(a) allows for-profit entities that are subsidiaries of a non-profit to be eligible for SBA assistance.

         a.   The CDC must include the non-profit affiliate in determining size.

    b. The loan proceeds must be used exclusively for the benefit of the for-profit business.

    c. If the non-profit affiliate owns 20% or more of the for-profit business but cannot or will not guarantee the loan, the for-profit business is not eligible for SBA assistance.

C. Be Located in the United States (includes its territories and possessions).

    1. The Applicant must be located in the United States (including its territories and possessions) and:

        a. Operate primarily in the U.S., its territories, or possessions, and

        b. Be authorized to operate in the state, territory, or possession where it seeks SBA financial assistance;

        OR

        c. Make a significant contribution to the U.S. economy through the payment of taxes to the U.S. or the use of American products, material, and labor.

    2. If an Applicant has international operations, the loan proceeds must be used exclusively for the benefit of the domestic operations (as a result, the business and its employees are subject to U.S. and local taxes).

    3. Businesses involved in international trade are subject to U.S. trade restrictions.

    4. Businesses owned by non-U.S. citizens may be eligible. See Paragraph III.B of this chapter.

    5. The Applicant may not be owned in whole or part by undocumented (illegal) aliens.

D. Be Small Under SBA Size Requirements (13 CFR Part 121).

    1. The Applicant alone (without affiliates) must not exceed the size standard for the industry in which the Applicant is primarily engaged and the Applicant combined with its affiliates must not exceed the size standard designated for either the primary industry (defined in 13 CFR § 121.107) of the Applicant alone or the primary industry of the Applicant and its affiliates, whichever is higher. SBA calculates annual receipts for both the Applicant and its affiliates based on Federal tax returns (13 CFR § 121.104). The table of size standards is found at 13 CFR § 121.201.

    2. Affiliation exists when one individual or entity controls or has the power to control another or a third party or parties controls or has the power to control both. SBA considers factors such as ownership, management, franchise license or other agreements/relationships when determining whether affiliation exists. See 13 CFR § 121.103 for how SBA determines affiliation for business loan programs.

    3. The applicable size standards are increased by 25 percent when the Applicant agrees to use all of the financial assistance within a labor surplus area (labor surplus areas are designated by the Department of Labor) (13 CFR § 121.301(e)).

    4. The Applicant business may qualify under either the industry size standards or the alternative size standard. To qualify under the alternative size standard, the Applicant (including affiliates) must meet the following:

        a. The maximum tangible net worth may not exceed $15 million; and

b.  The Applicant's and affiliate's average net income after Federal income taxes (excluding any carry-over losses) for the two full fiscal years before the application date may not exceed $5.0 million.

5.  When size status of an Applicant is determined (13 CFR § 121.302):

a.  The size of an Applicant for SBA financial assistance is determined as of the date the application is accepted for processing by SBA. Changes in the size of the business subsequent to the applicable date when size is determined will not disqualify an Applicant for assistance.

b.  If the Applicant is an existing business and is using the proposed loan proceeds to finance the acquisition of assets in conjunction with a change of ownership, the sizes of the two businesses are combined to determine if the application is size eligible.

6.  Formal size determinations:

a.  By signing the application, an Applicant is deemed to have certified that it is small under the applicable size standard. SBA or CDC may request additional information concerning the Applicant's size based on information supplied in the application or any other source. SBA or a PCLP and SLPC may accept as true the size information provided by an Applicant, unless credible evidence to the contrary is apparent. (13 CFR § 121.303)

b.  Prior to denial of eligibility based on size, a formal size determination may be requested by an Applicant or the SBA official with authority to take final action on the assistance requested. (13 CFR § 121.1001(b)(1))

c.  That SBA official may also request a determination of whether affiliation exists between an Applicant for financial assistance and one or more other entities for purposes of determining whether the applicant would exceed the maximum loan amount and maximum guaranty amount set out in 13 CFR § 120.151 and Chapter 3 of this Subpart.

d.  The request for a size or affiliation determination must be made to the Government Contracting Area Director serving the area in which the headquarters of the Applicant is located, regardless of the location of the parent company or affiliates.

7.  Affiliation Based on Management (13 CFR § 121.301(f)(3))

a.  Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one of more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the Applicant business through a management agreement.

b.  Management agreements that give the management company sole discretion over the business operations with minimal oversight of the decision-making by the Applicant business, while not passive, create affiliation between the management company and

the Applicant business. (For a discussion of management agreements that do result in a passive business, see Paragraph III.A.3. of this Chapter.) SBA has determined, however, that affiliation is not created between the Applicant business and the management company if the management agreement includes meaningful oversight by the Applicant business over the management company's activities.

c. "Meaningful oversight" by the Applicant business means involvement in the decisions made concerning the operation of the business, which include a management agreement that provides for the Applicant business to do all of the following:

   i.   Approve the annual operating budget;

   ii.  Approve any capital expenditures or operating expenses over a significant dollar threshold;

   iii. Have control over the bank accounts; and

   iv.  Have oversight over the employees operating the business (who must be employees of the Applicant business).

8. **Franchise, License, Dealer, Jobber, and Similar Agreements:**

While a relationship established under a license, jobber, dealer or similar agreement is not generally described as a "franchise" relationship, if such relationship meets the Federal Trade Commission's definition of a franchise, it is treated by SBA as a franchise for purposes of affiliation determinations in accordance with 13 CFR § 121.301(f)(5). *All such relationships are referred to in this paragraph as "franchises," the agreements are referred to as "franchise agreements," and the parties to such agreements are referred to as "franchisor" and "franchisee."*

The procedures described below apply to all agreements or relationships meeting the Federal Trade Commission definition of "franchise" in 16 CFR § 436. SBA will only consider franchise or license agreements of the Applicant business and not the franchise or license agreements of any other franchisee or licensee owned or controlled by the Applicant. (13 CFR § 121.301(f)(5))

   a. The Federal Trade Commission definition of "franchise."

   The Federal Trade Commission ("FTC") definition of "franchise" in 16 CFR § 436.1(h) states as follows:

   Franchise means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller [franchisor] promises or represents, orally or in writing, that:

   i.   The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

   ii.  The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant

assistance in the franchisee's method of operation; and

iii.   As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

Although exempt from FTC disclosure requirements, all agreements and relationships that are covered by the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. 2801 (e.g., gas stations, dealer/jobber agreements), are included within the FTC definition of "franchise" and are, therefore, subject to the procedures described below.

SBA is no longer excluding dealer agreements with new car manufacturers from affiliation determinations. Therefore, Applicants that are or will be operating under a dealer agreement with a new car manufacturer that meets the FTC definition of a franchise are subject to the procedures described below.

b.   *The SBA Franchise Directory*:

SBA has created the SBA Franchise Directory (the "Directory") of all franchise and other brands reviewed by SBA that are eligible for SBA financial assistance. The Directory will only include business models that SBA determines are eligible under SBA's affiliation rules and other eligibility criteria. If the Applicant's brand meets the FTC definition of a franchise, it must be on the Directory in order to obtain SBA financing. (To help minimize confusion over brands that may appear to be franchises but that do not meet the FTC definition, SBA will include such brands on the Directory at their request if they are eligible in all other respects.) CDCs will be able to rely on the Directory and will no longer need to review franchise or other brand documentation for affiliation or eligibility.

The Directory will be maintained on SBA's website at https://www.sba.gov/document/support-object-object-sba-franchise-directory. It will contain the following information:

i.   Whether the brand meets the FTC definition of a franchise;

ii.   The SBA Franchise Identifier Code, if applicable (a code will only be issued if the agreement meets the FTC definition of a franchise);

iii.   Whether an addendum is needed and, if so, whether the franchisor will use the SBA Addendum to Franchise Agreement (SBA Form 2462) or an SBA Negotiated Addendum; and

iv.   Whether there are additional issues the CDC must consider with respect to the brand (e.g., documentation that the business will be open to all, review of any third party management agreement to ensure Applicant is not a passive business or affiliated with the management company in accordance with Paragraph D.7 above.).

Franchisors may always choose to use the SBA Addendum to Franchise Agreement (SBA Form 2462), even if they have an SBA Negotiated Addendum.

c.  *Use of the Directory by CDCs*:

  i.  For applications involving a franchise or similar relationship that meets the FTC definition of a franchise, before submitting the application to the SLPC for non-PCLP processing or approving the loan under the PCLP CDC's delegated authority, CDC must check the Directory to determine if it includes the Applicant's brand.

    a)  If the Applicant's brand is on the Directory, CDC may proceed with submitting the application to the SLPC or approving the loan under its PCLP authority.

    b)  If the Applicant's brand is not on the Directory, CDC cannot process the application or approve the loan under its PCLP authority. See paragraph 8.d) below for the process to add brands to the Directory.

  ii.  Exception for Applicants Operating under Multiple Agreements:

    a)  When an Applicant operates under multiple agreements (i.e., multiple product lines), CDCs first must check the Directory to ensure that all of the Applicant's agreements that meet the FTC definition of a franchise are on the Directory. **If any of the Applicant's agreements that meet the FTC definition of a franchise are not on the Directory, the application cannot proceed.** If all such agreements are on the Directory, CDCs next must determine which agreement(s) is(are) "critical" to the Applicant's business operation. As a general rule, SBA considers an agreement to be "critical" if the agreement (or the products, services or trademarks covered by it) accounts, individually or together with other agreements of the Applicant, for more than 50% of the applicant's revenues. CDCs only need to follow the Directory (i.e., obtain an addendum, as applicable) for the agreements that meet the FTC definition of a franchise AND are critical to the Applicant's business operation. For example, the Applicant business is a dealership that sells 10 different brands of boats under separate agreements for each brand of boat. First, the CDC must check the Directory for all of the Applicant's agreements that meet the FTC definition of a franchise. If, for example, 7 of the 10 agreements meet the FTC definition of a franchise, all 7 must be on the Directory for the application to proceed. Next, the CDC needs to determine which of the Applicant's 10 agreements are critical to the Applicant's business operation. In this example, if 5 of the 10 agreements together represent 51% of the Applicant's revenues, those 5 agreements are considered critical. If 3 of the 5 critical agreements meet the FTC definition of a franchise, the CDC need only obtain an addendum, as identified on the Directory, for those 3 agreements.

    b)  If one of the Applicant's brands or agreements has been determined by SBA to be ineligible for SBA financial assistance, the loan cannot be processed, regardless of whether the brand or agreement meets the FTC definition of a franchise or is critical to the Applicant's business

operation.

iii.   Exception for Applicants Operating under a Single, Non-Critical Agreement: If the Applicant is operating under a single agreement that is not considered critical to the Applicant's business operation (i.e., it represents 50% or less of the Applicant's revenues), then the CDC must first check the Directory to ensure that, if the agreement meets the FTC definition of a franchise, it is on the Directory before processing the application. If the agreement meets the FTC definition of a franchise, but is not on the Directory, the application cannot proceed. For example, the Applicant business is an auto body shop that also rents trucks and trailers under an agreement. The rental of the trucks and trailers only represents 10% of the Applicant's revenues. The CDC must check the Directory to ensure that, if the agreement meets the FTC definition of a franchise, it is on the Directory, but the CDC does not need to obtain an addendum for that agreement. If the agreement is not listed on the Directory and the CDC determines that the agreement does not meet the FTC definition of a franchise, the CDC must determine the brand is eligible (e.g., does not have discriminatory hiring practices) before proceeding with the application. SBA will review this decision at time of application for non-PCLP applications and prior to closing for PCLP applications. SBA will make the final determination for non-PCLP applications. The PCLP CDC bears the risk of an incorrect determination and the loan not being able to close on a PCLP application.

d.   Procedure to add brands to the SBA Franchise Directory:

i.   To add its brand to the Directory, Franchisor must submit the agreement, Franchise Disclosure Document (FDD) if applicable, and all other documents the franchisor requires the franchisee to sign to [franchise@sba.gov](mailto:franchise@sba.gov) for an affiliation and eligibility determination. If the documents are submitted to SBA by someone other than the Franchisor, contact information for the Franchisor (name and email address only) must be included in the email.

a)   If the franchisor agrees to use SBA Form 2462, "Addendum to Franchise Agreement," SBA will only conduct an eligibility review and will not conduct an affiliation review.

b)   If the franchisor elects not to use SBA Form 2462, SBA will work with the franchisor to resolve any affiliation issues, including through the use of an SBA Negotiated Addendum, if necessary. Franchisors electing this option will be reviewed by SBA in the order in which their documents are received.

ii.   Upon completion of SBA's review and a determination by SBA that the brand is eligible, SBA will list the brand on the Directory, along with an indication of the type of Addendum being used, if necessary, and will assign an SBA Franchise Identifier Code. If SBA determines that the brand does not meet the FTC definition of a franchise, SBA will list the brand on the Directory but will indicate that it is not a franchise and SBA will not assign an SBA Franchise

Identifier Code.

e. *Annual Certification from Franchisor*:

For those franchises listed on the Directory that either do not need an addendum or are using an SBA Negotiated Addendum, in order to continue using no addendum or using an SBA Negotiated Addendum, the franchisor must submit to SBA each year the "Annual Franchisor Certification" (SBA Form 2464, the "Certification"). The Franchisor must submit the Certification as soon as it issues an updated agreement, but in no event later than April 30 of each year. If the Certification is not received by SBA by April 30, the Franchisor must use the SBA Addendum to Franchise Agreement (SBA Form 2462) for all SBA-guaranteed loans. (For brands listed on the Directory as using SBA Form 2462, no certification is required to remain on the Directory.) This certification is provided by the Franchisor to SBA annually. CDCs do not need to obtain SBA Form 2464 or provide it to SBA.

The Certification requires a duly authorized representative of the Franchisor with the authority to sign the Certification to represent that:

i. The terms of Franchisor's current agreement that relate to control by the Franchisor of its franchisees (resulting in a determination by SBA of affiliation between the Franchisor and its franchisees, as defined in 13 CFR part 121 and SBA's Standard Operating Procedure 50 10) have not substantively changed from those appearing in the most recent franchise agreement reviewed by SBA for placement on the Directory; and

ii. If the Franchisor is using an SBA Negotiated Addendum, no changes have been made to its SBA Negotiated Addendum.

If the Franchisor cannot certify as required or would like to change its addendum, the Franchisor will have to follow the procedures in paragraph 8.d) above to add brands to the Directory.

To ensure the effectiveness of the certification process, SBA intends to inspect, on a periodic basis, a sample of updated franchise agreements where a Certification has been submitted. Therefore, SBA may request from the Franchisor copies of the current franchise agreement and related documents.

f. *Issues that Result in Affiliation*:

SBA has determined that each of the following provisions in a franchise agreement results in affiliation between a franchisor and a franchisee:

i. Transfer or Change of Ownership;

    a) Franchisor has the option or right of first refusal (ROFR) to purchase an interest in the franchise and become a partial owner of the Franchisee.

    b) Franchisor's consent to the sale or transfer of any interest in the franchise (full or partial) is based on the Franchisor's "sole discretion" or the agreement is silent on the standard for consent.

    c) Franchisee remains liable for the actions of the transferee after transfer of

the franchise.

ii. Sale of Assets;

  a) Franchisor or an appraiser selected by the Franchisor solely controls the valuation of assets when the Franchisor has the option or ROFR to purchase assets, including real estate, upon default or termination of agreement.

  b) Franchisor has the right to force the Franchisee to sell the Franchisee's real estate upon default or termination of agreement.

iii. Covenants or Use Restrictions; and

Franchisor has recorded or has the right to record against the Franchisee's real estate any restrictive covenants, branding covenants or environmental use restrictions (e.g., restricting the use of the property upon sale).

iv. Control of Employees.

  a) Franchisor has the authority to directly control (hire, fire or schedule) Franchisee's employees.

  b) For temporary personnel franchises, Franchisor (not the Franchisee) employs the temporary employees.

If a franchise agreement contains any of the provisions identified above, the franchisor will be required to execute either SBA Form 2462 or an SBA Negotiated Addendum approved by SBA to resolve the affiliation issues. By executing the applicable addendum, the franchisor agrees that any provision identified above that is represented in the franchise agreement, or any other document the franchisor requires the franchisee to sign, will not be enforced against the franchisee during the life of the SBA-guaranteed loan.

g. *Procedure to Submit Franchise Applications*:

i. For non-PCLP loans:

  a) If the Applicant's brand meets the FTC definition of a franchise, CDC must identify the name of the franchise and the SBA Franchise Identifier Code when entering the application into E-Tran.

  b) No other franchise documentation must be submitted to the SLPC with the application.

  c) The SLPC will confirm that the brand is listed on the Directory.

  d) If the CDC determines that the Applicant's brand does not meet the FTC definition of a franchise and it is not on the Directory, then the CDC needs to explain its determination in its credit memorandum when submitting the application to the SLPC and provide the agreement and any additional documentation required by the brand for SBA's review and final determination.

ii. For PCLP loans:

a) If the Applicant's brand meets the FTC definition of a franchise, CDC must document in its file that the Applicant's brand is on the Directory and identify the name of the franchise and SBA Franchise Identifier Code when entering the application into E-Tran.

b) The PCLP CDC will need to submit the documentation showing that the Applicant's brand is on the Directory to SBA Counsel for approval prior to submitting the closing documents to SBA Counsel.

c) If the Applicant's brand is not on the Directory and the PCLP CDC determines the brand does not meet the FTC definition, the PCLP CDC must submit the documents to *franchise@sba.gov* for a final determination by SBA. After receiving SBA's final determination, the PCLP CDC may proceed with approving the loan under its PCLP authority.

iii. When an Applicant operates under multiple brands, the CDC must enter the name of the franchise and the SBA Franchise Identifier Code for the brand that generates the largest amount of the Applicant's revenue in E-Tran. The CDC must identify all other brands and their SBA Franchise Identifier Codes (if applicable) in the CDC's credit memorandum, and must identify which of the Applicant's brands are critical to the Applicant's business operation, including an explanation of the basis for that determination (e.g., a breakdown of revenue by brand). (See paragraph 8.c above for further guidance on Applicants with multiple brands.)

a) For non-PCLP loans, the SLPC will confirm that all of the Applicant's brands are eligible for SBA financial assistance and those that meet the FTC definition of a franchise that are critical to the Applicant's business operation are on the Directory.

b) PCLP CDCs must document in their file that all of the Applicant's brands are eligible for SBA financial assistance and those that meet the FTC definition of a franchise that are critical to the Applicant's business operation are on the Directory. PCLP CDCs will be required to submit this supporting documentation to SBA Counsel for approval prior to submitting the closing documents to SBA Counsel.

iv. If the Applicant franchisee has multiple locations and each location operates under a separate franchise agreement, each location (i.e., each agreement) must have its own SBA Form 2462 or an SBA Negotiated Addendum, if applicable.

v. If the Applicant applies for further assistance under an agreement that already has an executed addendum, CDC will not need to obtain a new addendum in connection with the subsequent application for financial assistance.

vi. For all 504 loans, prior to closing, the CDC must obtain a copy of the executed franchise agreement, the executed SBA Form 2462 or SBA Negotiated Addendum (if applicable), and any other document the franchisor requires the franchisee to sign. The CDC must obtain the SBA Negotiated Addendum

directly from the Franchisor. (While it is prudent for the CDC to review the Franchise Disclosure Document, as it contains financial information on the franchise brand, it is not necessary for the CDC to retain a copy in its file.)

   a) For non-PCLP loans, the CDC must provide these documents to and receive approval from the SLPC prior to submitting the closing package for debenture funding on a 504 loan.

   b) PCLP CDCs must submit these documents to and receive approval from SBA Counsel prior to submitting the closing package for debenture funding on a 504 loan.

h. *Applications involving an applicant franchisor*:

If the applicant is a franchisor, it must together with all affiliates not exceed the size standard designated for either the primary industry of the applicant alone or the primary industry of the applicant and its affiliates, whichever is higher. A franchisor's relationship with its franchisees under a franchise agreement must be considered when making a size determination. If affiliation is found between a franchisor and its franchisees based on the franchise agreement, the Franchisor may execute a global addendum to resolve any affiliation issue(s) with respect to all agreements with its franchisees. To request a determination of affiliation and, if necessary, obtain a franchisor global addendum for a franchisor Applicant, please contact franchise@sba.gov.

i. *Applications involving Franchise Development Agreements or Area Development Rights*:

Franchise Development Agreements (also known as a "Master Franchise Agreements") provide the developer with a geographic area with which to establish additional franchise units. These additional franchise units are owned and operated by other franchisees, and the developer's income is derived from the royalty payments from each franchisee in the developer's geographic territory. Based on those features, these agreements have been determined to be passive and, therefore, an applicant franchisee that is or will be operating under a Franchise Development Agreement is not eligible for SBA financial assistance.

If an applicant franchisee has an affiliate that operates under an ineligible Franchise Development Agreement, the applicant franchisee may be eligible for SBA financial assistance, provided that the applicant and its affiliates are small and no SBA loan proceeds are used for the benefit of the ineligible affiliate franchise developer.

An applicant franchisee that is or will be operating under a franchise agreement that provides the franchisee with the right to develop additional units that the franchisee or its affiliates own and operate within its territory ("area development rights" or "Multi-Unit Franchise Agreement"), however, may be eligible provided that the applicant and its affiliate franchise units is small.

j. *Applicants with Management Agreements*:

   i. If the Applicant will be using a management agreement, CDC must submit the

management agreement to SLPC to determine if it creates affiliation between the Applicant and the management company or results in a passive business. The SBA Franchise Team does not review management agreements and such agreements will not be included on the SBA Franchise Directory.

ii.   If a PCLP CDC is processing the loan under its delegated authority, PCLP CDC must review the management agreement to determine if it creates affiliation between the Applicant and the management company or results in a passive business and retain it in its file. The PCLP CDC bears the risk of its incorrect determination.

iii.  If the applicant franchisee is operating under a management agreement where the management company is, or is affiliated with, the franchisor, the Applicant is not eligible. SBA determined that such a relationship does not result in the franchisee operating as an independent small business.

iv.   See paragraph II.D.7 of this Chapter for guidance on affiliation based on management and paragraph III.A.3 for guidance on passive businesses.

k.   *Questions on SBA's Franchise Policy and Appeals*:

i.   Questions on SBA's Franchise Policy should be directed to franchise@sba.gov.

ii.  Franchisors that would like to appeal SBA's decision not to place them on the Directory may do so by forwarding a copy of the decision, along with an explanation of how the determination is perceived to be inconsistent with SBA Loan Program Requirements, to franchise@sba.gov. Franchise appeals will be reviewed by the SBA Franchise Committee comprised of OFA and OGC personnel.

iii. The Franchise Committee will refer agreements involving businesses that may be engaged in promoting religion, that may have activities of a prurient nature, or that appear to cater to one gender to the Associate General Counsel for Litigation for a final Agency decision. There is no right of appeal to the Franchise Committee.

E.  Demonstrate the Need for Desired Credit (Credit not Available Elsewhere). (13 CFR § 120.101)

1.  The CDC must certify that the Applicant does not have the ability to obtain some or all of the requested loan funds on reasonable terms from non-Federal, non-State, or non-local government sources, including from the Third Party Lender, without SBA assistance. If the Applicant's cash flow and collateral, including the adequacy of any third party guaranty, would cause the Applicant's 504 loan request to meet the conventional credit standards of the Third Party Lender, the Project is not eligible for a 504 loan. Failure of the CDC to adequately address in the credit memorandum the Applicant's need for the desired credit may result in SBA declining the loan application.

2.  The CDC must include in its credit memorandum:

    a.  A determination that some or all of the loan is not available from any of the following sources:

        i.   The liquidity of owners of 20% or more of the equity of the Applicant, their spouses and minor children, and the Applicant itself; or

        ii.  Conventional lenders or other non-Federal, non-State, or non-local government sources of credit. (Note: This includes any commitment by a third party to provide financial assistance to the Applicant business in the event of a delinquency or default on a payment (e.g., a commitment by a franchisor or licensor to provide financial assistance to the franchisee or license).)

    b.  Substantiation that credit is not available elsewhere by discussing acceptable factors that demonstrate an identifiable weakness in the credit. CDC must include the specific reasons why Applicant does not meet the Third Party Lender's conventional loan policy requirements. Acceptable factors that demonstrate weakness in the credit or exceed policy limits of the Third Party Lender include, among others:

        i.   The business needs a longer maturity than the Third Party Lender's policy permits to reasonably assure the ability of the loan applicant to repay the debt from the actual or projected cash flow of the business (for example, the business needs a loan that is not on a demand basis);

        ii.  The requested loan exceeds the Third Party Lender's policy limit regarding the amount that it can lend to one customer;

        iii. The collateral does not meet the Third Party Lender's policy requirements;

        iv.  The Third Party Lender's policy normally does not allow loans to new businesses (e.g., a business that has been in operation for a period of not more than 2 years) or businesses in the Applicant's industry; and/or

        v.   Any other factors relating to the particular credit (such as business and personal credit history) that, in the Third Party Lender's opinion, cannot be overcome except for the guaranty. These other factors must be specifically documented in the loan file.

3.  The CDC may not rely on the fact that the SBA debenture will allow the Third Party Lender to exceed its legal lending limit as the sole basis of demonstrating that the Applicant does not have credit available elsewhere.

4.  The CDC may not rely in any manner on the following factors to demonstrate that the Applicant does not have credit available elsewhere:

    a.  The maintenance or improvement of the Third Party Lender's rating or performance evaluation under the Community Reinvestment Act (CRA) or its implementing regulations; or

    b.  The SBA debenture will allow the Third Party Lender to improve its collateral lien position.

## III.  TYPES OF INELIGIBLE BUSINESSES

A. The CDC must determine whether the Applicant is one of the types of businesses listed as ineligible in SBA regulations (13 CFR § 120.110). Some business types on this list may be eligible only under certain circumstances, as discussed below.

1. Businesses organized as a non-profit businesses are ineligible (for profit subsidiaries may be eligible) (13 CFR § 120.110(a));

2. Businesses Engaged in Lending (13 CFR § 120.110 (b));

   a. SBA cannot guarantee a loan that provides funds to businesses primarily engaged in lending or investment, or to an otherwise eligible business for the purposes of financing investment not related or essential to the business. This prohibits loans to:

      i. Banks;

      ii. Life Insurance Companies (but not independent agents);

      iii. Finance Companies;

      iv. Factors;

      v. Investment Companies;

      vi. Bail Bond Companies; and

      vii. Other businesses whose stock in trade is money and which are engaged in financing.

   b. The limited circumstances in which certain businesses engaged in lending may be eligible are as follows:

      i. A pawn shop that provides financing is eligible if more than 50% of its revenue for the previous year was from the sale of merchandise rather than from interest on loans.

      ii. A business that provides financing in the regular course of its business (such as a business that finances credit sales) is eligible provided less than 50% of its revenue is from financing its sales.

      iii. A mortgage servicing company that disburses loans and sells them within 14 calendar days of loan closing is eligible. Mortgage companies primarily engaged in the business of servicing loans are eligible. Mortgage companies that make loans and hold them in their portfolio are not eligible.

      iv. A check cashing business is eligible if it receives more than 50% of its revenue from the service of cashing checks.

      v. A business engaged in providing the services of a financial advisor on a fee basis is eligible provided they do not use funds to invest in their own portfolio of investments.

3. Passive Businesses (13 CFR § 120.110 (c));

a.  Passive businesses owned by developers and landlords that do not actively use or occupy the assets acquired or improved with the loan proceeds (except Eligible Passive Companies under 13 CFR § 120.111) are not eligible.

b.  Businesses primarily engaged in subdividing real property into lots and developing it for resale on its own account are not eligible.

c.  Businesses that are primarily engaged in owning or purchasing real estate and leasing it for any purpose are not eligible. For example, shopping centers, salon suites, and similar business models that generate income by renting space to accommodate independent businesses that provide services directly to the public are not eligible.

d.  Businesses that lease land for the installation of a cell phone tower, solar panels, billboards, or wind turbines also are not eligible. However, the business operating the cell phone tower, solar panels, billboards, or wind turbine is eligible.

e.  Businesses that have entered into a management agreement with a third party that gives the management company sole discretion to manage the operations of the business, including control over the employees, the finances and the bank accounts of the business, with no involvement by the owner(s) of the Applicant business, are not eligible. (See paragraph II.D.7 of this chapter for additional guidance on management agreements.)

f.  Apartment buildings and mobile home parks are not eligible.

g.  Residential facilities that do not provide healthcare and/or medical services are not eligible.

h.  The limited circumstances in which certain businesses engaged in renting or leasing may be eligible are as follows:

   i.   Hotels, motels, recreational vehicle parks, marinas, campgrounds, or similar types of businesses are eligible if more than 50% of the business's revenue for the prior year is derived from transients who stay for 30 days or less at a time. If the Applicant is a start-up, the Applicant's projections must show that more than 50% of the businesses' revenue will be derived from transients who stay for 30 days or less at a time.

   ii.  Businesses that are licensed as nursing homes or assisted living facilities and provide healthcare and/or medical services are eligible.

   iii. Businesses that are engaged in leasing equipment, household goods or other items are eligible. (See paragraph III.A.2 above regarding the eligibility of businesses engaged in lending.)

   iv.  Businesses such as barber shops, hair salons, nail salons, and similar types of businesses are eligible, regardless of whether they have employees or contract with individuals to provide the services. (See subparagraphs III.A.3.a) and III.A.3.c above regarding ineligibility of developers and landlords.)

i.  An ineligible passive business cannot obtain an SBA loan for any purpose, including the purchase or construction of a building for its own use.

4. Life Insurance Companies (13 CFR § 120.110(d));

    a. Life insurance companies are not eligible.

    b. A life insurance agent may qualify as an eligible independent contractor if the business meets all of the following factors:

        i. The insurance agent is not subject to the control or direction of another agent in conjunction with the sale and servicing of life insurance, with full discretion over the means and method for rendering services;

        ii. The insurance agent hires, supervises and pays employees he or she needs to help perform his or her services;

        iii. The insurance agent performs his or her services at his or her own place of business rather than at the company's place of business;

        iv. The insurance agent is paid by the job or on a commission basis, rather than by the hour, week or month;

        v. The insurance agent is responsible for paying his or her own business expenses;

        vi. The insurance agent provides a significant amount of his or her tools, materials, and other equipment, even if the insurance company provides some forms, manuals, or other materials;

        vii. The insurance agent invests in facilities that are used by him or her in performing services and are not typically maintained by employees (such as the maintenance of an office rented at fair market value from an unrelated party); and

        viii. The insurance agent can realize a profit or incur a loss as a result of his or her services.

5. Businesses Located in a Foreign Country or Owned by Undocumented (Illegal) Aliens (13 CFR § 120.110(e));

    a. Businesses are not eligible if the business is:

        i. Located in a foreign country with no activities in the United States; or

        ii. Owned in whole or in part by undocumented (illegal) aliens.

    b. Businesses owned by non-U.S. citizens may be eligible. See III.B of this Chapter.

6. Businesses Selling Through a Pyramid Plan (13 CFR § 120.110(f));

Pyramid or multilevel sales distribution plans are not eligible for SBA assistance under any circumstances.

7. Businesses Engaged in Legal Gambling Activities (13 CFR § 120.110(g))

    a. Small businesses that obtain more than one-third of their annual gross revenue for the prior year, including rental income, from legal gambling activities are not eligible.

b.  If the purpose of the business is gambling, such as pari-mutual betting racetrack or a gambling casino, it is not eligible, regardless of the percentage of gross revenue derived from gambling.

c.  Circumstances exist in which businesses engaged in legal gambling activities may be eligible, including if the Applicant obtains one-third or less of their annual gross revenue, including rental income from:

    i.  Commissions from official State lottery ticket sales under a State license; or

    ii.  Gambling activities licensed and supervised by state authority in those states where the activities are legal.

8.  Businesses Engaged in any Illegal Activity (13 CFR § 120.110(h));

a.  SBA must not approve loans to Applicants that are engaged in illegal activity under federal, state or local law. This includes Applicants who make, sell, service, or distribute products or services used in connection with illegal activity, unless such use can be shown to be completely outside of the Applicant's intended market.

b.  Marijuana-Related Businesses:

    i.  Because federal law prohibits the distribution and sale of marijuana, financial transactions involving a marijuana-related business would generally involve funds derived from illegal activity. Therefore, businesses that derive revenue from marijuana-related activities or that support the end-use of marijuana may be ineligible for SBA financial assistance.

    ii.  Whether a business is eligible is determined by the nature of the business's specific operations. The following businesses are ineligible:

        a)  "Direct Marijuana Business" -- a business that grows, produces, processes, distributes, or sells marijuana or marijuana products, edibles, or derivatives, regardless of the amount of such activity. This applies to recreational use and medical use even if the business is legal under local or state law where the applicant business is or will be located.

        b)  "Indirect Marijuana Business" -- a business that derived any of its gross revenue for the previous year (or, if a start-up, projects to derive any of its gross revenue for the next year) from sales to Direct Marijuana Businesses of products or services that could reasonably be determined to aid in the use, growth, enhancement or other development of marijuana. Examples of Indirect Marijuana Businesses include businesses that provide testing services, or sell or install grow lights, hydroponic or other specialized equipment, to one or more Direct Marijuana Businesses; and businesses that advise or counsel Direct Marijuana Businesses on the specific legal, financial/accounting, policy, regulatory or other issues associated with establishing, promoting, or operating a Direct Marijuana Business. However, for purposes of illustration, SBA does not consider a plumber who fixes a sink for a Direct Marijuana Business or a tech support company that repairs a laptop for such a business to be aiding in

the use, growth, enhancement or other development of marijuana.

Indirect Marijuana Businesses also include businesses that sell smoking devices, pipes, bongs, inhalants, or other products if the products are primarily intended or designed for marijuana use or if the business markets the products for such use.

iii. Consistent with the Agriculture Improvement Act of 2018 (Public Law No. 115-334), a business that grows, produces, processes, distributes or sells products made from hemp (as defined in section 297A of the Agricultural Marketing Act of 1946) is eligible.

9. Businesses Which Restrict Patronage (13 CFR § 120.110(i));

   a. Businesses that restrict patronage for any reason other than capacity are not eligible. For example, a men's or women's only health club is not eligible, whether the business is a franchise or not.

   b. Circumstances exist in which certain businesses, like fitness centers that market to one gender may be eligible if they permit both men and women to join and/or use the facility. CDCs must document the file with the following:

      i. Affidavit signed by the Applicant that the business is open to both men and women; and

      ii. Evidence that the facility is open to both men and women, such as appropriate bath/locker rooms, or membership demographics.

10. Government-Owned Entities, Excluding Native American Tribes (13 CFR § 120.110(j));

   a. Businesses owned by municipalities and other political subdivisions are not eligible.

   b. Special Requirements Applicable to Native American Businesses:

      i. A Native American tribe is a Governmental entity and is not eligible.

      ii. A small business which is owned in whole or in part by a State or federally-recognized Native American Tribe may be eligible, provided the small business meets all other criteria set forth in SBA Loan Program requirements and:

         a) It establishes that it is a separate legal entity from the tribe and submits the documents authorizing its existence; and

         b) For federally-recognized tribes, the tribe waives sovereign immunity with respect to the collateral for the loan and collection of the loan from the Applicant, OR agrees to a "sue and be sued" clause specifically naming U.S. Federal courts as "courts of competent jurisdiction."

         a) Tribes that are recognized only by a state do not have sovereign immunity, therefore, the requirement identified in ii.(b) above is not necessary if the tribe is only recognized by a state.

   c. CDCs may seek the advice and assistance of the Bureau of Indian Affairs (BIA) personnel when dealing with loans collateralized by Indian lands held in trust.

11. Businesses Engaged in Promoting Religions (13 CFR § 120.110(k))

    a.  In evaluating the eligibility of an Applicant, if it appears that the Applicant may be connected, associated or affiliated with a religious organization or may have a religious component, the CDC must complete the Religious Eligibility Worksheet (SBA Form 1971). Any questions regarding this worksheet may be addressed to local SBA Counsel.

    b.  Prior to submitting an application to the SLPC (non-PCLP CDCs) or approving the loan under delegated authority (PCLP CDCs), the CDC must submit the completed worksheet and any supporting documentation to the Associate General Counsel for Litigation at Form1971Review@sba.gov for a final Agency decision on eligibility. Such supporting documentation includes, but is not necessarily limited to, CDC's Credit Memorandum; the Applicant's business plan; any mission statement of the Applicant; and, where applicable, a detailed statement of Applicant's curriculum. SBA may request additional documentation as needed to complete the eligibility review. Upon approval by SBA, the non-PCLP CDC may submit the application to the SLPC or the PCLP CDC may proceed to process the loan under its delegated authority. The non-PCLP CDC must submit a copy of SBA's approval to the SLPC with the application. The PCLP CDC must retain the worksheet, supporting documentation, and evidence of SBA's approval in the loan file. SBA may review the worksheet and supporting documentation when conducting CDC oversight activities.

    c.  An Applicant is not ineligible merely because it offers religious books, music, ceremonial items and other religious articles for sale.

12. Businesses Engaged in Loan Packaging (13 CFR § 120.110(m))

An Applicant that receives more than 1/3 of its gross annual revenue from packaging SBA loans, including as a Lender Service Provider, is not eligible.

13. Businesses with an Associate of Poor Character (13 CFR § 120.110(n))

The Agency requires that every proprietor, general partner, officer, director, managing member of a limited liability company (LLC), owner of 20% or more of the equity of the Applicant, Trustor (if the Applicant is owned by a trust), and any person hired by the Applicant to manage day-to-day operations ("Subject Individual") must be of good character.

A Subject Individual may not reduce his/her ownership in an Applicant business within 6 months prior to the date of the application for the purpose of avoiding compliance with this section. The only exception to the 6-month rule is when a Subject Individual completely divests his/her interest prior to the date of application. Complete divestiture includes divestiture of all ownership interest and severance of any relationship with the Applicant (and any associated Eligible Passive Company) in any capacity, including being an employee (paid, unpaid, or contracted).

The Agency cannot provide financial assistance to businesses with Associates who are:

1.    Incarcerated, on probation, or on parole (an individual with a deferred prosecution, conditional discharge, order of protection, or who is on a sex offender registry is treated as if the individual is on probation or parole); or

2.    Currently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction.

The character evaluation process to determine eligibility under this section begins with Subject Individuals answering the applicable questions on SBA Form 1244, Section XIX, "Application for Section 504 Loan." *(NOTE: A Subject Individual must respond "Yes" even when the individual believes the record is sealed, expunged or otherwise unavailable. CDCs must keep this information private and confidential. There are no exceptions or waivers to this policy.)*

a.   If all Subject Individuals respond "No" to Questions 1, 2, and 3 in Section XIX of SBA Form 1244, the SBA 504 loan application may be processed and the SBA Form 912, "Statement of Personal History" is not required.

b.   If a Subject Individual responds "Yes" to Question 1 in Section XIX of SBA Form 1244, the Applicant is not eligible for an SBA 504 loan.

c.   If any Subject Individual is currently on parole or probation (including probation before judgment), the Applicant is not eligible for an SBA 504 loan.

d.   If any Subject Individual responds "Yes" to Questions 2 or 3 in Section XIX of SBA Form 1244, a character determination for the Subject Individual is required to establish eligibility under this section as follows:

   i.   SBA Form 912 Package: The Subject Individual must provide the CDC with a complete SBA Form 912 Package, which must include:

      a)  A completed SBA Form 912, signed and dated within 90 days of submission to SBA; and

      b)  A detailed written statement, which is separately signed and dated by the Subject Individual, describing the events and circumstances of any "Yes" response, which must include the following:

         i)   Date(s) of each offense;

         ii)  City or county and State where the offense(s) occurred;

         iii) The specific charge(s) and final conviction(s) (e.g. DUI, assault, forgery, etc.) and the level of each charge and conviction (either a misdemeanor or felony); and

         iv)  Disposition of the charge(s) and conviction(s), including all sentencing, conditions, or requirements of the court. This includes conditions such as registration on the Sex Offenders Registry, which provides for incarceration upon failure to comply with the conditions.

      c)  Court documentation evidencing that any sentencing or other conditions of the court have been met. If sentencing and other conditions of the court

have not been satisfied, then the Applicant is not eligible.

    i)  Court documentation may include but is not limited to:

        (a)  Evidence of the status (paid/unpaid) of fines or restitution imposed;

        (b)  Evidence of attendance or completion of any class or workshop required by the court;

        (c)  Jail time served; or

        (d)  If applicable, the terms of probation including evidence and dates of successful conclusion of the probation.

    ii)  If court documentation is not available, the Subject Individual must submit:

        (a)  A written statement from the applicable court indicating documents are not available; and

        (b)  Verification that there are no outstanding warrants, unpaid fines, or other conditions of the court that have not been satisfied.

ii.  Character Determination by the CDC: The CDC may process the application without review of the SBA Form 912 Package by SBA if the CDC determines upon review of the court's disposition that the case(s) resulted in:

    a)  One or multiple misdemeanor convictions whose conditions were met more than 6 months prior to receipt of the application, and the convictions did not involve a crime against a minor (for example, child abuse or endangerment, possession of child pornography, etc.);

    b)  Reduction of the original felony charge(s) to misdemeanor(s); or

    c)  Dismissal of the charges.

The CDC must retain the supporting information and court documentation, including the original complete SBA Form 912 Package in the file for the life of the loan.

iii.  Circumstances Requiring an FBI Fingerprint Background Check and a Character Determination by SBA: The CDC must submit to SBA a copy of the complete SBA Form 912 Package for a background investigation by SBA and the Subject Individual must complete an FBI fingerprint background check in accordance with the following paragraph if the CDC determines upon review of the court's disposition that the case(s) resulted in:

    a)  Felony conviction(s);

    b)  Misdemeanor conviction(s) within 6 months of the date of the loan Application;

    c)  Charge(s) filed and final disposition against the Subject Individual has

been completed within 6 months of the date of the loan Application; and/or

d) Misdemeanor conviction(s) for crime(s) against a minor (for example, child abuse or endangerment, possession of child pornography, etc.).

**The SLPC will not approve the loan until written clearance is received from OFA.**

iv. FBI Fingerprint Background Check: SBA will conduct FBI fingerprint background checks via submission of the Form FD-258 (fingerprint card) or electronic fingerprint submission (if available) to the FBI. "Electronic fingerprint submission" means fingerprints taken and reproduced in a machine-readable format by a fingerprint capture system that complies with the FBI's Electronic Biometric Transmission Specifications. An electronic fingerprint submission must be compatible with the FBI's Automated Fingerprint Identifications System, or any successor system in place for biometric identification. The electronic fingerprint submission will generally be in paper format as produced by the fingerprint capture system, which an individual may attach to SBA Form 912 to expedite character check procedures. When using electronic fingerprint submission, check local requirements, as some localities require individuals to bring one or more Forms FD-258 to facilitate the electronic submission. Where an electronic fingerprint submission is not locally available, Form FD-258 may be used. Local law enforcement agencies will usually assist the individual with the fingerprinting. CDCs may obtain the Form FD-258 from the local SBA Field Office or order the cards from the FBI's website at: https://www.fbi.gov/services/cjis/fingerprints-and-other-biometrics/ordering-fingerprint-cards-and-training-aids.

v. CDC Submission to SBA: CDCs submit completed SBA Form 912 Packages to SBA via overnight mail or courier to: 409 3rd Street, SW., Washington, DC 20416. SBA Form 912 Packages with electronic fingerprint submissions may be submitted via email to: oca912@sba.gov.

The CDC's submission to SBA must include a coversheet with the CDC's contact information (CDC name, point of contact, title, phone number, email, and mailing address). (NOTE: If any form is incomplete or illegible, the SBA Form 912 Package will be screened out and returned to the CDC.)

vi. Character Determination by SBA: The Director, Office of Financial Assistance (D/FA), or designee, will make the character determination as follows:

a) Based on the information received from the FBI fingerprint check, OCA will determine either that the Subject Individual has good character, or is not eligible for SBA financial assistance; and

b) OCA will advise the CDC in writing (copy to SLPC) of the Agency's character determination.

vii. File Retention: CDCs must retain a copy of the Agency's character

determination in their loan file for the life of the loan.

e.  If the Subject Individual was cleared by the D/FA or designee on a previous application submitted within 6 months of the date of the current application and the Subject Individual certifies that no other offenses have occurred since the previous application was cleared by the D/FA or designee, CDCs may submit a copy of the prior clearance and the Subject Individual's certification with the application.

f.  912 Decision Appeals: A Subject Individual may request a reconsideration of an adverse character determination within 6 months of the date of SBA's decision.

   i.  Any request for reconsideration must include additional information or documentation supporting the request to reconsider the adverse character determination. Factors that contribute to a favorable reconsideration include:

      a) Additional information provided by the Subject Individual that satisfactorily explains the circumstances of the prior offense(s);

      b) The passage of time between the date of the disclosed offense(s) and the date of the application, during which the Subject Individual has not committed additional offenses and has generally led a responsible life and made a contribution to the community; and/or

      c) Any additional law enforcement and/or court documentation that supports the request.

   ii.  The request for reconsideration should be submitted through the CDC to SBA, either via email to: oca912@sba.gov, or via overnight mail to: U.S. Small Business Administration, Office of Capital Access, Attn: 912 Processing, 409 3rd Street SW, 8th Floor, Washington, DC 20416.

   iii.  The CDC's submission to SBA must include a coversheet with the CDC's contact information (CDC name, point of contact, title, phone number, email, and mailing address).

14. Equity Interest by CDC or Associates in Applicant Concern (13 CFR § 120.110(o))

a.  A CDC or any of its associates may not obtain an equity position, either directly or indirectly, in the Applicant.

b.  The only exception is when the associate of the CDC is a Small Business Investment Company (SBIC), in which case the requirements of 13 CFR § 120.104 apply. See 13 CFR § 120.140 for a list of ethical requirements that apply to CDCs.

15. Businesses Providing Prurient Sexual Material (13 CFR § 120.110(p))

A business is not eligible for SBA assistance if:

a.  It presents live or recorded performances of a prurient sexual nature; or

b.  It derives more than five percent (5%) of its gross revenue, directly or indirectly, through the sale of products, services or the presentation of any depictions or displays of a prurient sexual nature.

   i.  SBA has determined that financing lawful activities of a prurient sexual nature

is not in the public interest. The CDC must consider whether the nature and extent of the sexual component causes the business activity to be prurient.

ii.  If a CDC finds that the Applicant may have a business aspect of a prurient sexual nature, prior to submitting the application to the SLPC (non-PCLP CDCs) or approving the loan under delegated authority (PCLP CDCs), the CDC must document its analysis and submit that analysis and supporting documentation to the Associate General Counsel for Litigation at PSMReview@sba.gov for a final Agency decision on eligibility. Upon approval by SBA, the CDC may submit the application to the SLPC or may proceed to process the loan under its delegated authority. A non-PCLP CDC must submit a copy of SBA's approval to the SLPC with the application. A PCLP CDC must retain its analysis, supporting documentation, and evidence of SBA's approval in its loan file and SBA may review such documentation when conducting CDC oversight activities.

16. Prior Loss to the Government (13 CFR § 120.110(q)) and Delinquent Federal Debt (31 CFR § 285.13)

  a.  Unless waived by SBA for good cause, SBA cannot provide assistance to an Applicant if there has been a Prior Loss to the Government. "Prior Loss" means the dollar amount of any deficiency on a Federal loan or federally assisted financing which has been incurred and recognized by a Federal agency after it has concluded its write-off and/or close-out procedures for the particular account including the following:

    i.    Loss on the sale or other disposition of collateral acquired after default;

    ii.   Compromise, i.e., resolution or settlement of a loan balance for less than the full amount due;

    iii.  Bankruptcy by a Borrower and/or any guarantors; and

    iv.   Any unreimbursed advance payments by a Federal agency.

  b.  Unless waived by SBA for good cause, SBA cannot provide assistance to an Applicant if there is a Delinquent Federal Debt:

    i.    A debt is considered "delinquent" when any Federal loan or federally assisted financing has not been paid within 90 days of the payment due date. A debt is considered "delinquent" even if the creditor agency has suspended or terminated collection activity with respect to such debt.

    ii.   A debt is not considered "delinquent" if:

      a)  The creditor agency has released the obligor from paying the debt;

      b)  The obligor is subject to, or has been discharged in, a bankruptcy proceeding;

      c)  The obligor has entered into a satisfactory written repayment agreement and is current; or

d)   The debt is in an administrative or judicial appeal process.

(Note: If there was a loss associated with any of these debts, however, the loan remains subject to the rules governing a Prior Loss to the Government under paragraph III.A.16.a) above.)

iii.   "Federal loan or federally-assisted financing" includes any loan made directly or guaranteed/insured by any Federal agency, any unreimbursed advance payments under 8(a) or similar programs operated by any Federal agency, and federally-backed student loans. It does not include unpaid/delinquent taxes, any loss incurred by the Federal Deposit Insurance Corporation (FDIC) when it sells a loan at a discount, or any loan purchased, held or securitized by Fannie Mae or Freddie Mac. For the purposes of Delinquent Federal Debt, "Federal loan or federally-assisted financing" does not include disaster loans, but for the purposes of Prior Loss, it includes disaster loans.

c.   These rules apply to:

i.   The Applicant that incurred the Delinquent Federal Debt or caused the Prior Loss (either directly or as a guarantor);

ii.   Any business owned, operated or controlled by the Applicant or by an Associate of the Applicant that incurred the Delinquent Federal Debt or caused the Prior Loss (either directly or as a guarantor); and

iii.   For Delinquent Federal Debt only, any individual or entity who will be guaranteeing the loan for the Applicant.

d.   CDCs are responsible for checking the Credit Alert Verification Reporting System (CAIVRS) to determine if any of the individuals or businesses identified in paragraph c) immediately above has a Delinquent Federal Debt or Prior Loss.

i.   CAIVRS allows the CDC to enter multiple Tax ID numbers (either SSN or EIN) to search for an outstanding Delinquent Federal Debt in connection with a loan application.

ii.   CDCs may access CAIVRS at https://entp.hud.gov/caivrs/public/home.html

e.   Waiver Requests:

i.   When there are compelling circumstances, the CDC may send a written request for a waiver to the SLPC. CDCs may submit these requests at pre-application for an eligibility determination. The CDC must identify the Delinquent Federal Debt or Prior Loss to the Government, explain the relationship of the Small Business Applicant to the individual or business causing the delinquency or prior loss and the circumstances justifying the waiver.

ii.   For Delinquent Federal Debt, the Chief Financial Officer (CFO) (who may only delegate this authority to the Deputy Chief Financial Officer) will make the final decision on the request.

iii.   For Prior Loss to the Government, the D/FA or designee will make the final decision on the request.

      f.   If the Delinquent Federal Debt or Prior Loss to the Government is fully satisfied, the application can be processed without a waiver from the CFO or D/FA, including under a CDC's delegated authority. The CDC must document its file as to how the debt or loss has been fully satisfied.

      g.  All CDCs must inform the Applicant that if the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, the names of the small business and the guarantors of the SBA-guaranteed loan will be referred for listing in the CAIVRS database, which may affect their eligibility for further financial assistance from SBA or other Federal agencies or departments.

17. Businesses Primarily Engaged in Political or Lobbying Activities (13 CFR § 120.110(r))

An Applicant that derives over 50% of its gross annual revenue from political or lobbying activities is not eligible.

18. Speculation (13 CFR § 120.110(s))

      a.  Speculative businesses are not eligible. This prohibits loans to an Applicant for:

         i.  The sole purpose of purchasing and holding an item until the market price increases; or

         ii.  Engaging in a risky business for the chance of an unusually large profit.

      b.  Speculative businesses include:

         i.  Wildcatting in oil;

         ii.  Dealing in stocks, bonds, commodity futures, and other financial instruments;

         iii.  Mining gold or silver in other than established fields; and

         iv.  Building homes for future sale.

           Note: Construction of homes for future sale with no sales contract in place (spec homes) is eligible under the Builder's CAPLine program. *13 CFR § 120.391*.

      c.  Non-speculative businesses which may be eligible include:

         i.  A business, such as a grain elevator, that uses a commodity contract to lock in a price;

         ii.  A farmer who uses a commodity contract to lock in the sale price of his or her harvest;

         iii.  A business engaged in drilling for oil in established fields; and

         iv.  A business engaged in building a home under contract with an identified purchase.

B. Businesses Owned by Non-U.S. Citizens:

SBA can provide financial assistance to businesses that are at least 51% owned and controlled by persons who are not citizens of the U.S. provided the persons are lawfully in the U.S. and have an appropriate work visa. The processing procedures and the terms and conditions will

vary, depending upon the status of the owners assigned by the United States Citizenship and Immigration Services (USCIS).

SBA requires all CDCs to comply with the U.S. Department of the Treasury regulations for Customer Identification Programs for banks, savings associations, credit unions, and certain non-federally regulated banks found at 31 CFR § 1020.220. SBA does not expect CDCs to duplicate the procedures of the Third Party Lender if the Third Party Lender is regulated by a Federal functional regulator (as defined in 31 CFR § 1010.100) and submits annual certifications to the CDC that it (the Third Party Lender or its agent) will comply with the CIP requirements of 31 CFR § 1020.220 with respect to all third-party financings of 504 loans. Under these circumstances, it is acceptable to SBA if a CDC's CIP states that the CDC will rely on the Third Party Lender to verify the identity of the SBA customer. The CDC has the option of performing its own verification of the identity of the SBA customer even if a Third Party Lender has already complied with 31 CFR § 1020.220.

1. Businesses owned by Naturalized Citizens are eligible and the naturalized citizens are not subject to any special restrictions or requirements. If an individual's SBA Form 912 reflects that he or she is a citizen, no further verification is required.

2. Businesses owned by Lawful Permanent Residents (LPRs) are eligible. LPRs are persons who may live and work in the U.S. for life unless their status is revoked through an administrative hearing.

    a. The USCIS Form I-551 (551), Lawful Permanent Resident Card, commonly referred to as the "green card," and which is evidence of LPR status. USCIS has two versions of the 551:

        i. Resident Alien Card (issued through 1997); and

        ii. Permanent Resident Card. (This is the most recent version and has been issued since 1997.)

        iii. Because it can take up to a year for a newly arrived immigrant to receive a 551, new immigrants are issued an immigrant visa with a Customs and Border Protection (CBP) stamp evidencing their lawful permanent residence for a full year from the date of their first entry to the U.S. This visa with CBP stamp serves as evidence of LPR status, so long as the visa is not expired.

    b. Since 1997, USCIS has issued the 551 with a 10-year validity, at which time it expires and must be renewed. A 551 issued between 1979 and August 1989, however, does not have an expiration date.

    c. Replacing the 551 may also be necessary if the 551 is lost, the individual changes name, etc. Replacement of the 551 may take more than a year. It is important to note that expiration of the immigrant's 551 does not affect the lawful permanent resident status of the immigrant.

        Acceptable forms of evidence when the 551 has been submitted to USCIS for replacement or renewal upon expiration include the following:

        i. Temporary I-551 stamps. A temporary stamp, issued by USCIS to replace lost or expiring 551s, either on the immigrant's unexpired foreign passport (that

reads "Upon endorsement, serves as temporary I-551 evidencing permanent residency for 1 year"), or in cases where there is no passport or it is expired, on Form I-94 with passport photo (that reads "Processed for I- 551 – Temporary Evidence of Lawful Permanent Residence");

ii.   USCIS Form I-327, "Re-entry Permit," issued to LPRs in lieu of a visa, which is valid for only 2 years (the I-327 is issued for LPRs who need to be overseas for longer than 1 year); or

iii.  USCIS Form I-797, Notice of Action. Aliens with Conditional LPR status (those who married a U.S. Citizen and were married for less than a year at the time of being granted LPR status) must file Form I-751 to remove conditional status within 90 days of their 551 expiration. LPRs awaiting approval of their I-751 should be issued Form I-797, which along with the expired 551, is proof of current LPR status. Please note that there are numerous types of Form I-797 (e.g., I-797A, I-797B, I-797C, etc.). For purposes of removing conditional status, only I-797 is acceptable.

iv.   SBA requires that the 551 or an acceptable substitute must be current at the time it is submitted with an application or it will be returned and not processed.

3.  Businesses owned by non-immigrant aliens residing in the U.S. may be eligible, subject to certain restrictions. Applicant businesses owned by such individuals must also meet the requirements of paragraph III.B.8 below.

Non-immigrant (documented) aliens are persons who are admitted to the U.S. for a specific purpose(s) and for a temporary period of time with a current/valid USCIS document, such as a non-immigrant visa (an immigrant visa is issued to persons wishing to live permanently in the U.S.). While any non-immigrant alien may generally own a U.S. business as a passive investor, to control the business or be employed by it, the non-immigrant alien must have an appropriate work visa. To be eligible, the non-immigrant alien must have current/valid USCIS documentation permitting them to reside and work in the U.S. legally.

CDC must verify the documentation/status of each alien with USCIS.

Eligible non-immigrant categories. The following classes of non-immigrant aliens may be eligible for SBA financial assistance (USCIS Entrepreneur Guide non-immigrant visa categories):

a.  B-1 Business Visitor;

b.  F-1/OPT Optional Practical Training;

c.  H-1B Specialty Occupation;

d.  O-1A Extraordinary Ability and Achievement;

e.  E-2 Treaty Investor; or

f.  L-1 Intracompany Transferee.

If the Applicant has a different class of non-immigrant visa that CDC believes may be eligible, please contact the Office of Financial Assistance for further guidance.

CDCs must consider the period of stay afforded by each non-immigrant visa category (along with possible extensions) relative to the loan term.

4. Asylees and refugees (persons who receive temporary refuge in the United States) with LPR status.

   Asylees and refugees are authorized to work because of their immigration status. Acceptable forms of evidence for asylees and refugees include the following:

   a. Unexpired EAD (Employment Authorization Document, Form I-766);

   b. Form I-94/Form I-94A indicating asylee or refugee status; and

   c. Expired EAD with Form I-797C Notice of Action from USCIS for Form I-765 (if Form I-797C lists the same employment authorization category as the expired EAD).

5. Businesses owned by aliens who are subject to the Immigration Reform and Control Act of 1986 (IRCA) might be eligible under limited circumstances.

   a. IRCA vests USCIS with the authority to grant illegal aliens lawful temporary resident status. IRCA prohibits financial assistance to businesses owned 20% or more by such individuals for a period of 5 years after USCIS grants lawful temporary resident status.

   b. This disqualification does not apply to Cuban or Haitian entrants or alien entrants subject to IRCA who are blind or disabled. The definition of blind or disabled is equivalent to SBA's criteria for determining eligibility for assistance to any small business owned by disabled individuals.

   c. All Applicants self-certify that they are eligible under IRCA by signing SBA Form 1244, which includes the "Statements Required by Law and Executive Orders." This includes a certification that IRCA does not apply to them or if it does apply, more than 5 years have elapsed since they were granted lawful temporary resident status pursuant to the 1986 legislation.

6. Documentation to evidence and verify an alien's status.

   a. At time of application, for any individual required to complete SBA Form 912, who is not a U.S. citizen, but is located in the U.S., the following applies:

      i. The individual must provide his or her alien registration number on SBA Form 912, "Statement of Personal History." An "alien" (whether immigrant-alien or non-immigrant alien) is someone who resides in the U.S. but is not a U.S. citizen. If the individual is not residing or working in the U.S., then he or she is not considered an "alien" and does not have an immigration status or alien registration number that must be verified. If the individual does not have an alien registration number, he or she may provide an I-94 card/document which has a departure record number issued on the card.

      ii. CDCs must obtain a copy of the individual's USCIS documentation and maintain all documentation in the loan file.

      iii. CDCs must request Document Verification from the Sacramento Loan

Processing Center (SLPC):

    a) In order to request Document Verification from SLPC, all CDCs must register designated personnel with the SLPC at Sacramento504Register@sba.gov.

    b) The SLPC will respond to such requests by providing instructions on how to complete registration and to use the electronic verification process.

    c) The CDC submits a USCIS Form G-845 (845), "Document Verification Request," with supporting information to the SLPC. The CDC must state on the 845 that the request is for an SBA loan.

iv. As required by USCIS, SBA will release information about the status of an alien to CDCs or other non-governmental entities ONLY when a signed and dated authorization from the alien is attached to and submitted with the 845 on that alien providing name, address and date of birth.

    a) As required by USCIS, SBA accepts either of the following authorization statements:

        i) "I authorize the U.S. Citizenship and Immigration Services to release information regarding my immigration status to [name of CDC] because I am applying for a U.S. Small Business Administration loan."

        ii) "I authorize the U.S. Citizenship and Immigration Services to release alien verification information about me to [name of CDC] because I am applying for a U.S. Small Business Administration loan."

    b) As required by USCIS, all verification requests must include an authorization with the original signature of the alien for SBA to release information to the CDC on the status of a verification. The original Document Verification Request (Form G-845) and authorization for release must be maintained by the CDC in the Borrower's file for review by SBA and USCIS, if requested.

    c) The information provided to SBA by the USCIS system is intended solely for the purpose of determining eligibility for SBA financial assistance. This information is governed by the Privacy Act, 5 U.S.C. 552(a)(i)(1), and any person who obtains this information under false pretenses or uses it for any purpose other than for determining eligibility may be subject to criminal penalties.

    d) The authorization statement must not be on SBA or CDC stationery.

b. CDCs must receive verification of the status of each alien required to submit USCIS documents prior to submission of the application to SBA. The notification received from the SLPC must be submitted to SBA with the application. PCLP CDCs must retain the notification from the SLPC in the Borrower's loan file.

c. Verification of the status of an LPR is required if 6 months has elapsed since the last verification with one exception: if the individual reported an offense on SBA Form

912, then verification would be required even if 6 months had not elapsed, as the offense may put their status at risk. For non-LPRs, verification is required with each loan application, as their status can be revoked at any time.

7. Businesses owned by Foreign Nationals or Foreign Entities may be eligible.

Businesses listed in Appendix 1 of this SOP "Restrictions on Foreign Controlled Enterprises," that are owned and managed by Foreign Nationals, Foreign Entities or Non-Immigrant Aliens are not eligible. If a business is not listed in Appendix 1 it may be eligible.

8. Additional requirements for eligibility of businesses owned by non-citizens other than LPRs, including foreign-owned businesses:

   a. The application must contain assurance that management is expected to continue in place indefinitely and have U.S. citizenship or verified LPR status.

      i. Management must have operated the business for at least 1 year prior to the application date. (This requirement prevents financial assistance to "start-up" businesses owned by aliens who do not have LPR status.)

      ii. The CDC must require the personal guaranty of management as a loan condition of the loan.

   b. The Applicant must pledge collateral within the jurisdiction of the U.S. with a liquidation value equal to no less than the approved loan amount at the time of first disbursement and, to the extent that the value of collateral declines during the life of the loan, require the Borrower to pledge additional collateral to ensure a sufficient collateral coverage amount CDCs will determine liquidation value in compliance with SOP 50 55 and in coordination with the appropriate commercial loan servicing center. If the Applicant owned by foreign nationals, foreign entities or non-immigrant aliens residing in the US does not have sufficient collateral, the Applicant is not eligible for a guaranteed loan.

   c. In order for a business not to be subject to these additional requirements, it must be at least 51% owned by individuals who are U.S. citizens and/or who have LPR Status from USCIS and control the management and daily operations of the business. This can only be waived by the D/FA or designee.

C. Eligible Passive Company ("EPC" Rule) (13 CFR § 120.111):

The Eligible Passive Company (EPC) Rule is an exception to SBA regulations that prohibit financing assets which are held for their passive income. (13 CFR § 120.130(d)) **Because the EPC rule is an exception, the EPC and the OC must comply with all of the conditions in 13 CFR § 120.111 and each condition is interpreted strictly.**

1. An Eligible Passive Company (EPC) must use loan proceeds only to acquire or lease, and/or improve or renovate real or personal property (including eligible refinancing) that it leases to one or more Operating Companies (OC) for conducting the OC's business, or to finance a change of ownership between the existing owners of the EPC. With the exception of a change of ownership between existing owners of the EPC, an EPC may not use loan proceeds to acquire a business, acquire stock in a business or any intangible assets of a

business or to refinance debt that was incurred for those purposes. An EPC may only use loan proceeds to finance a change of ownership between existing owners when the real estate has been held by that entity for at least 36 months.

In addition, loan proceeds may be used to finance a change of ownership in the EPC when the asset(s) of the EPC are limited to real estate and/or other eligible long-term fixed assets that the EPC leases to one or more Operating Companies ("OC") for conducting the OC's business. SBA recognizes that an EPC's balance sheet may include limited assets in addition to the real estate or other eligible long-term fixed assets, such as capital replacement reserves or escrow accounts for taxes and/or insurance (such assets are ineligible assets). In such case, 504 loan proceeds may be used to finance a change of ownership between existing owners of the EPC as long as:

    a. The ineligible assets are directly related to the real estate or other eligible long-term fixed assets;

    b. The amount attributable to such ineligible assets is de minimis; and

    c. The ineligible assets are excluded from the Project financing.

2. An EPC can take any legal form or ownership structure (e.g., corporation, partnership, LLC, sole proprietor, etc.)

3. A tenancy in common is a form of legal ownership and does not create a new or separate legal entity. If authorized by state law, legal entities can be a tenant in common with individuals

    a. There may be several individuals or entities in a tenancy in common, but the tenancy in common is considered one (1) EPC.

    b. The loan documents must be signed by all of the members of the tenancy in common, with authorized individuals signing for the entity members.

4. Multiple OCs can be separately owned. However, multiple EPCs in one transaction are not permitted.

5. Conditions that apply to all EPCs:

    a. The OC must be an eligible small business;

    b. The proposed use of proceeds must be an eligible use as if the OC were obtaining the financing directly;

    c. The EPC (with the exception of a trust) and the OC each must be small under the appropriate size standard of 13 CFR Part 121 (See paragraph III.C.6 below).

    d. The EPC must lease the project property directly to the OC and:

        i. The lease must be in writing;

        ii. The lease must be subordinated to the SBA's mortgage, trust deed lien, or security interest on the property;

        iii. The lease must have a term, including options to renew exercisable solely by the OC, at least equal to the term of the loan;

   iv.   The EPC (as landlord) must furnish as collateral for the loan an assignment of all rents paid under the lease. An assignment of the lease is only required when necessary to perfect the assignment of rents or to enable CDC to exercise the tenant's rights upon default;

   v.   The rent or lease payments cannot exceed:

      a) The loan payment(s) to the SBA;

      b) The loan payment(s) to the Third Party Lender,

      c) Any payment(s) to a lender authorized by SBA to provide the Borrower's equity injection; and

      d) An additional payment(s) to cover the EPC's direct expenses of holding the property, such as routine maintenance, insurance and property taxes.

      Lease payments may not include amounts for accelerated payments on the Third Party Lender loan.

   vi.   The OC must lease 100% of the property from the EPC, but it can sublease a portion of the property under the rules governing occupancy requirements with which all SBA Borrowers must comply.

   vii.   If in acquiring the Project Property, the EPC becomes the beneficiary or owner of the rights to an existing mineral lease on the property, the EPC must assign its interest in the lease (together with its rights to all rental, mineral, royalty, bonus, or similar lease payments that might accrue by virtue of the existing mineral (oil and gas) lease) to the OC; and any such assignment must be subordinated to all Deeds of Trust or Mortgages. In addition, the CDC must take the following actions if applicable:

      a) If subordination is not possible, the CDC Closing Counsel must opine to that effect.

      b) If the mineral lease has been terminated, the CDC should attempt to have it removed from the Title Policy.

      c) If the CDC is unable to have the lease removed from the Title Policy, the CDC Closing Counsel must include language in the Opinion of Counsel indicating that they have examined and relied upon the accuracy of the assignment document and obtain a title endorsement to protect SBA's interest in the real property (i.e., California Land Title Association (CLTA) 100.23 or 100.24).

e.   An EPC (excluding a trust) may not engage in any business activity other than leasing the property to the OC.

f.   The OC must be a guarantor or a co-Borrower on the loan. The OC must be a co-Borrower if any of the Project funds are used to purchase fixed assets to be owned by the OC.

   i.   Each holder of an ownership interest constituting at least 20% of either the

EPC or the OC must guarantee the loan (if the holder is a trust, then the Trustee shall execute the guarantee on behalf of any trust). Each spouse with an ownership interest in the EPC or the OC must personally guarantee the loan in full when the combined ownership interest of both spouses in the EPC or the OC is 20% or more. If a person has executed the Note as a Borrower in an individual capacity, that person does not also have to execute a personal guaranty.

   ii.   When deemed necessary for credit or other reasons, SBA, or, for a loan processed under a CDC's PCLP authority, the CDC, may require other appropriate individuals or entities to provide full or limited guaranties of the loan without regard to the percentage of their ownership interests, if any.

6.  Conditions that apply when the EPC is owned in whole or in part by a trust:

   a.   The eligibility status of the Trustor will determine trust eligibility.

   b.   All donors to the trust will be deemed to have Trustor status for eligibility purposes.

   c.   The Trustee must warrant and certify that the trust will not be revoked or substantially amended for the term of the loan without the prior written consent of SBA.

   d.   The Trustor must guarantee the loan.

      i.   If an Employee Stock Ownership Plan trust agreement prohibits it from being a guarantor or co-Borrower, then it cannot use the EPC form of borrowing.

      ii.   Beneficiaries that exercise any control over the actions of the trust must also guarantee the loan.

   e.   The Trustee shall certify in writing to SBA that:

      i.   The Trustee has authority to act;

      ii.   The trust has authority to borrow funds, pledge trust assets, and lease the property to the OC;

      iii.   The Trustee has provided accurate, pertinent language from the trust agreement confirming the above; and

      iv.   The Trustee has provided and will continue to provide SBA with a true and complete list of all trustors and donors.

   f.   The trust itself does not have to be small by SBA size standards.

7.  Size Determinations under the EPC rule:

   a.   If the EPC and the OC are affiliated, the two companies are combined for determining size.

      i.   If there is only one OC, use the OC's NAICS code.

      ii.   If there are multiple, unaffiliated OCs, use the NAICS code of the OC that derives the most revenue.

iii.   Note: Each OC must be small based on its own NAICS Code.

iv.   If the multiple OCs are affiliated, then use the rules detailed in 13 CFR § 121.107 for determining the primary industry of affiliated businesses. The NAICS code of the primary industry of the OCs shall be the identifying NAICS code.

   b.   If the EPC and the OC are not affiliated, each entity must be small under the size requirement for its particular industry.

   c.   The existence of a lease between the EPC and the OC does not, in and of itself, create an affiliation, even if the EPC and OC are co-Borrowers.

8.   When sending data to SBA, use the same NAICS Code that was used to determine size for the Applicant.

9.   Submission of Financial Statements by the EPC and the OC:

   a.   Both the EPC and each OC must submit Financial Statements. The OC's statements are subject to tax verification.

   b.   The regular requirement for an Aging of receivables and payables is waived for EPCs.

D.   Special Requirements for Loans Where Collateral May Be Included in the National Register of Historic Places (Historic Properties):

Section 106 of the National Historic Preservation Act mandates Federal agencies undergo a review process for all federally funded projects that potentially impact sites listed or eligible to be listed on the National Register of Historic Places ("NRHP"). If a loan will in any way affect such properties, the CDC must consult with local SBA counsel for further guidance. Local SBA counsel will then notify the Associate General Counsel for Litigation or designee, and OFA.

If there is no potential to cause effect on historic properties, there are no further obligations under Section 106. For example, if the proceeds of the loan are to be used solely to purchase the property and no renovations or changes are anticipated, the local SBA counsel may make the determination that no further Section 106 review is required.

If the local SBA counsel determines that the undertaking is the type of activity that has the potential to cause effects on historic properties, then SBA is required to consult with the relevant State Historic Preservation Officer ("SHPO") to determine if the use of the proceeds of the loan will have an adverse effect on the historic nature of the property in question.

If SBA finds no adverse effect and the SHPO agrees or does not object within 30 days, the Agency can proceed with the approval of the loan. If, however, SBA finds that there will be an adverse effect on the historic nature of the property, SBA must consult with SHPO to attempt to resolve the issue. This consultation will result in Memorandum of Agreement between Agency and SHPO regarding the resolution of the adverse effect.

Once local SBA counsel has made a no adverse effect determination or resolved any adverse effect issues with the SHPO, the decision must be signed off by the Associate General Counsel for Litigation or designee.

## IV.  504 PROGRAM-SPECIFIC ELIGIBILITY FACTORS

A.  A 504 Project must achieve at least one of the Economic Development Objectives set forth in either Paragraphs 1 or 2 below: (13 CFR §§ 120.860, 120.861, and 120.862)

1.  Job Creation or Retention

   At least 1 Job Opportunity must be created or retained per every $75,000 of project debenture ($120,000 for Small Manufacturers).

   a.  Job Opportunity is defined in Chapter 1 of this Subpart.

   b.  A Job Opportunity does not have to be at the project facility, but 75% of the jobs must be in the community where the project is located.

   c.  Job Retention may only be used if the CDC can reasonably show that jobs would be lost to the community if the project was not done.

   d.  CDCs must list estimated jobs created or retained at the time of application and in its Annual Report. At the 2 year anniversary of each loan's disbursement, the CDC must list the actual jobs created and/or retained for that loan (whether the initial approval was based on job creation/retention or some other 504 goal).

2.  One of the 15 community development or public policy goals listed in 13 CFR § 120.862 or one of the Energy Public Policy goals authorized by paragraphs (I), (J) or (K) of § 501(d)(3) of the Small Business Investment Act (15 USC § 695(d)(3)) and listed in a. through c. below. If the Project to be funded satisfies one of these goals, the Project is eligible even if the Project does not meet the job creation or job retention requirements, provided the CDC's portfolio satisfies the overall Job Opportunity average requirements described in paragraph f. below.

   a.  Reduction of existing energy consumption by at least 10% (see Chapter 7 of this Subpart for additional guidance);

   b.  Increased use of sustainable designs, including designs that reduce the use of greenhouse gas emitting fossil fuels or low-impact design to produce buildings that reduce the use of non-renewable resources and minimize environmental impact; or

   c.  Plant, equipment and process upgrades of renewable energy sources such as the small-scale production of energy for individual buildings or communities' consumption, commonly known as micropower, or renewable fuel producers including biodiesel and ethanol producers (see Chapter 7 of this Subpart for additional guidance).

   Note: The terms in subparagraphs b. and c. above have the meanings given those terms under the Leadership in Energy and Environmental Design (LEED) standards for green building certifications. For additional information on LEED Certification, see https://new.usgbc.org/leed.

   d.  Additional guidance for the Public Policy Goal to assist small businesses adversely affected by base closings: (13 CFR § 120.862(b)(9))

      i.     To qualify for this Public Policy Goal, the Project must be located in:

          a)  A community that has been adversely affected by a base closing; and

          b)  The community must continue to be adversely affected.

      ii.    Continuing adverse effect is presumed if the base closing was within 10 years of the date the application was submitted.

      iii.   For applications submitted more than 10 years after a base closing, the CDC must provide supporting documentation with the application and retain a copy of its finding of adverse effect in the loan file.

    e.  A CDC's portfolio must maintain a job opportunity average of one Job Opportunity created or retained for every:

      i.     $75,000 guaranteed by SBA; or

      ii.    $85,000 guaranteed by SBA for Projects located in Special Geographic Areas (Alaska, Hawaii, State- designated enterprise zones, empowerment zones, enterprise communities, Opportunity Zones[3], and labor surplus areas) A CDC may choose to separate these loans from the remainder of its portfolio for the purpose of calculating the averages.

      iii.   Loans to Small Manufacturers (See Chapter 7 - Debenture Pricing & Funding for definition) are excluded from this average.

    f.  If the 504 Project cannot satisfy any of these Economic Development Objective and guidelines described above, then the amount of the debenture must be reduced to meet the job creation or retention requirement. (See Chapter 7 of this Subpart – Debenture Pricing & Funding.)

B.  Basic Eligibility Requirements for 504:

To be an eligible Borrower for a 504 loan 13 CFR § 120.880:

1.  The Applicant must use the Project Property (except that an EPC may lease to an OC); and

2.  Meet the size requirements set out in paragraph II.D of this Chapter.

C.  Ineligible 504 Projects (13 CFR § 120.881):

1.  Relocation out of a Community – A Project cannot be approved under the 504 program if the Project involves the relocation of a business out of a community and will either have a net reduction of one-third of its jobs or cause a substantial increase in unemployment in any area of the country. An exception may be allowed if the CDC can justify the relocation as outlined in 13 CFR §§ 120.881(a)(1) and (2); and

---

[3] An "Opportunity Zone" is an economically distressed community that has been nominated by the State and certified by the Secretary of the U.S. Treasury as a community in which new investments, under certain conditions, may be eligible for preferential tax treatment. More information and a list of Opportunity Zones for all States are available at

https://www.cdfifund.gov/Pages/Opportunity-Zones.aspx.

   2.  Projects in foreign countries.

D.  Eligible Project Costs: ([13 CFR § 120.882](#))

   1.  Land and Necessary Land Improvements - (For example, grading, new streets including curbs and gutters, parking lots, utilities and landscaping.) No matter how long the land has been owned, the value of the land:

      a.  Will be based on cost only if it was purchased less than 2 years prior to the date of the application; and

      b.  Will be based on the fair market value of the land as determined by an independent real estate appraisal that meets the requirements found in Chapter 3 of this Subpart if the land has been held for 2 years or more;

      c.  May including the costs of building and building improvements such as facade expenditures, heating, electrical, plumbing and roofing costs. The value of the land also may include the costs of solar panels and associated equipment and installation costs unless:

         i.  The primary purpose of the solar panels is to produce electricity for sale (i.e., solar farms), in which case the panels are treated as machinery and equipment; or

         ii. The solar panels are part of a system that is leased to the Borrower and owned by a third party, and ownership of these assets will not transfer to the Borrower at the end of the lease.

   2.  Machinery and Equipment:

      a.  All costs associated with the purchase, transportation, dismantling or installation of machinery and equipment;

      b.  The machinery and equipment has to have a useful life of at least 10 years;

      c.  If the Borrower owns equipment that is heavy or highly calibrated (such as a large printing press) that must be moved as an essential part of the Project, then any special moving costs (including dismantling and installation) may be included in the project costs;

   3.  Furniture and Fixtures - If essential to and a minor part of the Project which will not affect the weighted average maturity ([13 CFR § 120.884(d)(1)](#));

   4.  Professional Fees – Directly attributable and essential to the Project with the exception of attorney's fees incurred in closing the Interim and Third Party Loans. Examples of project-related costs that may be included in this section are: title insurance, title searches and abstract costs, surveys and zoning matters;

   5.  Expenditures for any of the costs listed in subparagraphs 1 through 4 above incurred by the Applicant (with its own funds or from a Short Term Debt) prior to the date of application that are directly attributable to the Project, provided such expenditures (net of Applicant's contribution) are reimbursed by the Interim Lender;

   6.  Short Term Debt ("Bridge Financing") the purpose of which was to provide financing until

longer term financing could be obtained for any of the costs listed in subparagraphs 1 through 5 above that are directly attributable to the Project, provided that the financing is for a term of 3 years or less;

7.  Interim financing – Repayment of interim financing including points, fees and interest;

8.  Contingency Fund - May not exceed 10% of the Project construction costs:

    a.  If the residual contingency amount does not exceed 2% of the debenture just prior to closing, it may be refunded to the small business at the time the debenture is funded.

    b.  If the contingency residual is in excess of 2%, the debenture has to be reduced by the excess amount.

9.  "Do-it-yourself" construction, including renovations, and/or installation of machinery and equipment, or situations where the Applicant acts as its own contractor have proven to be generally unsatisfactory and can cause problems with lien waivers and mechanics liens, causing potential losses to lenders and/or SBA.

    "Do-it-yourself" construction, including renovations, (e.g. installation of carpeting or painting) and/or installation of machinery and equipment may be permitted, if the CDC can justify and document in the loan file that:

    a.  The Borrower/contractor is experienced in the type of construction and has all appropriate licenses;

    b.  The cost is the same as, or less than, what an unaffiliated contractor would charge as evidenced by two bids on the work; and

    c.  The Borrower/contractor will not earn a profit on the construction.

E.  Permissible Debt Refinance without Expansion (13 CFR § 120.882(g)):

SBA may approve a Refinancing Project of a Qualified Debt that does not involve an expansion as follows:

1.  A Refinancing Project that does not involve an expansion may be financed only in a fiscal year in which the subsidy cost to the Federal government on making guarantees under the 504 Debt Refinancing Program and under the 504 Loan Program is zero.

2.  Each CDC's new financings under this paragraph IV.E during any fiscal year cannot exceed 50% of the dollars the CDC loaned under the 504 Loan Program during the previous fiscal year. SBA may waive this limitation for good cause. SBA will consider the following factors in determining whether there is good cause for the Borrower to obtain the refinancing through the CDC that exceeds the 50% requirement:

    a.  Whether the Borrower has access to other sources of financing, including other CDCs that have not exceeded their 50% cap; and

    b.  Whether the CDC has an existing 504 loan with the Borrower that is in current status.

3.  Eligibility and Other Requirements:

    a.  The Applicant must have been in operation for all of the 2-year period ending on the

date of application, as evidenced by the financial statements submitted at the time of application. If the ownership of the Applicant has changed during this 2-year period, the CDC must follow the New Business guidance found in Subpart C, Chapter 1 of this SOP, to determine whether the Applicant is considered a New Business and document the justification for its determination in its credit memorandum.

b.  The Refinancing Project must include Qualified Debt, as defined below. In addition, the Refinancing Project may include Eligible Business Expenses, as defined below. In addition, the amount of the Refinancing Project is subject to the Loan-to-Value Limitations described below.

c.  "Qualified Debt" means a commercial loan that:

i.  Substantially all (85% or more) of the proceeds were used to acquire an Eligible Fixed Asset (as defined in 13 CFR § 120.882(g)(15)). If the Eligible Fixed Asset was originally financed through a commercial loan that would have satisfied the "substantially all" standard (the "original loan") and that was subsequently refinanced one or more times, the current commercial loan will be deemed to satisfy this requirement;

ii.  Was incurred not less than 2 years prior to the date of application. A commercial loan that was refinanced within the two years prior to the date of application (the most recent loan) may be deemed eligible if its purpose was to extend the maturity date without advancing any additional proceeds (except to cover closing costs) and the collateral is the same as for the original eligible loan. The CDC must submit to SLPC the loan documents and lien instruments for both the most recent loan and the loan it refinanced;

iii.  Was for the benefit of the small business seeking the refinancing;

iv.  Has been secured by the Eligible Fixed Asset for at least 2 years;

v.  Has been "current on all payments due" for not less than 1 year preceding the date of application. "Current on all payments due" means that no payment was more than 30 days past due from either the original or the most recent loan. (Such modification (or refinancing) must have been agreed to in writing by the Borrower and the Lender of the existing debt no less than one year preceding the date of application. Modifications to extend the maturity will be considered current; however, there may not have been any deferments of any payments, and no additional proceeds may have been advanced except to cover closing costs.;

vi.  Is not subject to a guarantee by a Federal agency or department (Note: this is a statutory requirement that cannot be waived);

vii.  Is not a Third Party Loan which is part of an existing 504 Project; and

viii.  May consist of a combination of two or more loans, provided that each of the loans satisfies the Qualified Debt requirements.

d.  "Eligible Fixed Assets" are one or more long-term fixed assets, such as land, buildings, machinery, and equipment, acquired, constructed or improved by a small

business for use in its business operations.

e.  "Refinancing Project" means the fair market value of the Eligible Fixed Asset(s) securing the Qualified Debt and any other fixed assets acceptable to SBA. (Additional fixed assets may be added only when needed to comply with the 90% Loan-to-Value Limitation described in paragraph E.4 below).

f.  When the Refinancing Project involves a Limited or Special Purpose Property, the Borrower must comply with the contribution requirements set forth in Chapter 1, Paragraph IV.C. of this Subpart.

g.  "Eligible Business Expenses (EBE)":

   i.   Are limited to the operating expenses of the business that were incurred but not paid prior to the date of application or that will become due for payment within 18 months after the date of application. This includes accrued expenses such as salaries, rent, utilities, inventory, and other expenses of the business that are not capital expenditures.

   ii.  May not include any other debt of the business, except that business lines of credit and business credit card debt may be included so long as:

       a)  Loan proceeds are not used to cover any personal expenses;

       b)  If the line of credit and/or credit card was used for personal expenses, the Applicant must identify which purchases were for personal expenses and deduct that amount from the amount to be refinanced as an EBE;

       c)  The line of credit and/or credit card are in the name of the small business; and

       d)  The Applicant and the CDC certify in the loan application that the debt being refinanced was incurred exclusively for EBE.

   iii. If the Borrower is requesting that the refinancing include EBE, the application must include a specific description and an itemization of the amount of each expense.

   iv.  EBE documentation requirements:

       a)  EBE must be itemized (a gross figure is not acceptable).

       b)  The CDC's credit memorandum must:

           i)   Document the nature of the EBE;

           ii)  Provide the itemization of EBE; and

           iii) Include the CDC's certification that the EBE are eligible.

       The CDC must retain the EBE documentation in its file.

4.  Loan-to-Value Limitations.

   a.  For projects that refinance only Qualified Debt, the maximum loan to value of the Refinancing Project allowed is 90%.

    b. For projects when the amount of Qualified Debt being refinanced is more than 90 percent of the value of the Eligible Fixed Asset(s) securing the Qualified Debt, the Borrower must provide additional cash or other fixed asset collateral acceptable to SBA so as not to exceed a 90% loan to value of the Refinancing Project.

    c. For any projects that include the financing of Eligible Business Expenses, a maximum 85% loan to value of the Refinancing Project will apply and the Eligible Business Expenses portion of the Project may not exceed 20% of the value of the Eligible Fixed Asset(s) securing the Qualified Debt. The value of the Refinancing Project may not be increased by adding additional collateral.

5. Fees.

    a. In addition to the annual guarantee fee assessed under 13 CFR § 120.971(d)(2), Borrower must pay SBA a supplemental annual guarantee fee to cover any additional cost attributable to the refinancing in an amount established by SBA each fiscal year. The CDC should follow the instructions on the Authorization for Debenture Guaranty to ensure the fee is correct.

    b. SBA will review the fee annually to determine whether it needs to be changed and, if so, will issue a notice of any change.

6. Other Implementation Guidelines.

    a. Borrower must meet all current 504 Loan Program occupancy requirements at time of application.

    b. Loan applications for assistance under this paragraph IV.E must be processed by SBA and may not be approved by CDCs under PCLP authority.

    c. The 504 loans approved under this paragraph IV.E. must be disbursed within 9 months after loan approval. The Director, Office of Financial Assistance, or designee, may approve a request for extension of the disbursement period for an additional 6 months for good cause.

7. Documentation Requirements.

    a. **Credit memorandum**. The CDC must provide an analysis in its credit memorandum that the proposed debt refinancing satisfies each of the requirements of this debt refinancing program.

    b. **Form 1244**. At application, the Borrower and CDC must certify that the debt is eligible (Exhibit 2 of SBA Form 1244) and the Third Party Lender must certify in its commitment letter that it has no reason to believe that the debt is not eligible (Exhibit 17 of SBA Form 1244), as instructed in SBA Form 1244 Part D.

    c. **Transcripts**. The CDC must submit a transcript of the previous 12-month payment history on the Qualified Debt being refinanced which confirms that the Borrower is "current on all payments due" for not less than 1 year preceding the date of application (Exhibit 21 of SBA Form 1244).

    d. **Appraisal**. Appraisals are not required at time of application. Appraisals dated within 12 months of the date the application was approved are required prior to

closing, and appraisals must otherwise comply with the requirements for appraisals set forth in this SOP.

e. **Documentation to Verify Lien(s) at Application**. In considering the Borrower's application, the CDC must obtain evidence that lien(s) are securing the Qualified Debt with Eligible Fixed Asset(s), and state in its credit memorandum that it has verified that the lien(s) has been in place for at least 2 years prior to the date of application. The CDC must retain the evidence of the liens in its records (e.g., Preliminary Title Report, Mortgage Deed of Trust, or UCC-1 filing).

f. **Interim Lender Documentation**. The Interim Lender must execute SBA Form 2288R, Interim Lender Certification for Refinancing Program, similar to what is required in all 504 closings.

8. Same Institution Debt.

a. When the loan being refinanced is Same Institution Debt (as defined in 13 CFR § 120.882(g)(15)), the Third Party Lender may modify its existing loan documents (Note, Deed of Trust/Mortgage, etc.) instead of requiring the Borrower to execute and record new loan documents for the Third Party Loan.

b. All modified loan documents must meet SBA's regulatory requirements for a Third Party Loan (see 13 CFR §§ 120.920 and 120.921).

c. When the loan being refinanced is Same Institution Debt, either an Interim Loan or an escrow account may be used, and:

   i. The Third Party Lender (who, in this case, is also the Lender of the debt being refinanced) must execute SBA Form 2416, Lender Certification for Refinanced Loan.

   ii. The CDC may create an escrow account ("account") at the time of closing of the 504 loan for the purpose of holding the Borrower's cash contribution, if any, and the net debenture proceeds.

   iii. The account will be established in accordance with an Escrow Agreement, which must be executed by the Borrower, the Third Party Lender, the Escrow Agent and the CDC. The account may be held by the CDC attorney, Title Company or other party approved by SBA District Counsel.

   iv. The Borrower's cash contribution, if any, must be deposited into the account at the time of closing of the 504 loan.

   v. A copy of the Escrow Agreement must be provided to the SBA's District Counsel with evidence of funding by Borrower's cash contribution, if any, at the time of closing of the 504 loan.

   vi. The net debenture proceeds must be wired to the account, and all funds may be released only upon written approval by the CDC and SBA, provided that CDC/SBA have the required lien positions on the collateral as set forth in the Authorization and Debenture Guaranty.

   vii. The debt to be refinanced will be satisfied by payment of the escrowed funds to

the Third Party Lender.

F. Permissible Debt Refinancing with Expansion (13 CFR § 120.882(e)):

504 Projects may include a limited amount of debt refinancing with expansion, as follows:

1. If the Project involves expansion of an Applicant, any amount of existing indebtedness that does not exceed 50% of the cost of the expansion may be refinanced. The debt being refinanced will be added to the expansion cost to establish the total project costs, if all the conditions discussed below are met. "Expansion" includes any Project that involves the acquisition, construction or improvement of land, building or equipment for use by the Applicant.

   In its loan analysis submitted to SBA for non-PCLP loans, the CDC must include a conclusion that the proposed debt refinancing meets all the conditions listed below with supporting analysis and documentation. For PCLP loans, the PCLP CDC will transmit the Eligibility Information Required for PCLP Submission (SBA Form 2234, Part C), in which the PCLP CDC is required to address these conditions, and must maintain the analysis and documentation in its file:

   a. Substantially all (85% or more) of the proceeds of the indebtedness were used to acquire land, including a building situated thereon, to construct a building thereon, or to purchase equipment. The assets acquired must be eligible for financing under the 504 loan program. If the acquisition, construction or purchase of the assets was originally financed through a commercial loan that would have satisfied the "substantially all" requirement and that was subsequently refinanced one or more times, with the current commercial loan being the most recent refinancing, the current commercial loan will be deemed to satisfy this paragraph IV.F.;

   b. Whether the new project is within the CDC's area of operation is based on the assets newly acquired for the business not the assets securing the debt being refinanced. If the assets refinanced or any collateral securing the loan are outside the CDC's Area of Operations, it is the CDC's responsibility to establish that the CDC is capable of closing and servicing the loan and monitoring the collateral. Evidence must be approved by SBA with the exception of PCLP CDCs which must document the file with evidence regarding the CDC's capability to close and service the loan and monitor the collateral.

   c. Instruments resulting in transfer of ownership of the property to the Applicant may be eligible for refinancing, including, but not limited to, land sales contracts, contracts for deed or capital leases.

   d. The purchase of property under an operating lease is eligible for 504 financing, but the operating lease itself is not eligible for debt refinancing.

   e. In order to be eligible for debt refinancing, a copy of the corresponding debt and lien instruments must be submitted with the application.

   f. The existing indebtedness is collateralized by fixed assets.

   The 504 eligible fixed assets collateralizing any debt to be refinanced, or relating to the portion of debt being refinanced in the case of a partial refinance, must also

collateralize the 504 Loan unless SBA (SLPC) approves a waiver due to extraordinary circumstances. PCLP CDCs may not use their delegated authority to approve a loan requiring this waiver. The lender of the existing indebtedness must release, subordinate (if the total existing indebtedness is not being refinanced) or assign its lien on the 504 eligible fixed assets to the lien of SBA and/or the Third Party Lender so that the Third Party Lender and/or SBA will maintain the same lien position on the collateral that was held by the lender whose debt is being refinanced.

g. The existing indebtedness was incurred for the benefit of the small business concern.

   i. The small business for which debt is refinanced must be the same small business for which any new Project costs are incurred. The debts being refinanced may be owed by an Operating Company, an Eligible Passive Company or both.

   ii. An existing 504 loan may be refinanced if it meets the conditions of this paragraph and either: (i) both the Third Party Loan and the 504 loan are being refinanced; or (ii) the Third Party Loan has been paid in full and the 504 loan needs to be refinanced as part of a larger transaction to provide funding for expansion or renovations to the Project Property. In either case, the CDC and Third Party Lender must document its loan file as to the justification to refinance the existing SBA-guaranteed 504 loan. Any applicable 504 prepayment penalties will apply. A Third Party Loan may not be refinanced with an SBA guaranteed loan. (13 CFR § 120.920(b))

   iii. Applications to refinance 504 loans with 7(a) loans may not be processed under delegated authority but must be processed through the LGPC.

   iv. An existing 7(a) loan may be refinanced in whole or in part only if the CDC has provided verification that the present lender is either unwilling or unable to modify the current payment schedule. In the case of Same Institution Debt, if the Third Party Lender or the CDC affiliate as authorized under 13 CFR § 120.820 is the 7(a) lender, the loan will be eligible for 504 refinancing only if the lender is unable to modify the terms of the existing loan because a secondary market investor will not agree to modified terms.

h. The financing will be used only for refinancing existing indebtedness or costs relating to the Project financed.

   i. Debt being refinanced does not need to be for assets at the same location or for the same type of property as the Project being financed as long as the operation at the other location has the same NAICS code as the operation at the Project location.

   ii. Costs essential to the refinancing, such as prepayment penalties, financing fees or other refinancing costs, required by the original terms of the debt instrument, may be included in the debt refinance portion of a Project.

   iii. The total debt being refinanced may consist of one or more loans.

i. The financing will provide a substantial benefit to the Borrower when prepayment

penalties, financing fees, and other financing costs are accounted for.

"Substantial Benefit" means that the portion of the new installment amounts attributable to the debt being refinanced must be at least 10% less than the existing installment amount(s). The total installment amount is determined by adding the two installment amounts attributable to the refinancing using the interest rate of the most recent debenture funding on the 504 loan and the committed interest rate of the Third Party Lender loan. The total amount must be 10% less than the existing installment amount(s).

i. Prepayment penalties, financing fees, and other financing costs must also be added to the amount being refinanced in calculating the percentage reduction in the new installment payment.

ii. Loans with seasonal payments would meet the Substantial Benefit test if there was a 10% improvement in the installment when calculated by averaging all payments over the most recent twelve month period from date of application and comparing that to the new installment amount attributable to the debt being refinanced.

iii. Loans with balloon payments meet the Substantial Benefit test.

iv. Exceptions to the 10% reduction requirement may be approved by the D/FA or designee for good cause. PCLP CDCs may not use their delegated authority to approve a loan requiring this exception.

j. The Borrower has been current on all payments due on the existing debt for not less than 1 year preceding the date of refinancing.

k. "Date of refinancing" refers to the date the 504 loan is approved by SBA. The CDC must submit a transcript of account, or similar documentation containing detailed payment history from the lender whose debt is being refinanced reflecting that the loan has been current (not to exceed 30 days in arrears) for 1 year (or for the time the debt has been open if less than 1 year). Any unremedied delinquency after approval must be reported to SBA as an adverse change.

l. The financing under section 504 will provide better terms or rate of interest than the existing indebtedness on the date of refinancing.

"Better terms or rate of interest" may include longer maturity (but always commensurate with the assets' useful life), a lower interest rate committed on the Third Party Lender Loan or projected on the 504 Loan, improved collateral conditions, or less restrictive loan covenants.

2. A 504 Project cannot be approved to refinance debt owed:

a. To an Associate, which is prohibited by 13 CFR § 120.130(a);

b. To an SBIC, which is prohibited by or a New Markets Venture Capital Company (NMVCC) 13 CFR § 120.130(b) Venture Capital; or

c. To any creditor in a position to sustain a loss causing a shift to SBA of all or a part of a potential loss from an existing debt. 13 CFR § 120.884(b)

3. PCLP authority must not be used to refinance Same Institution Debt.

"Same Institution Debt" is defined as any debt of the CDC or the Third Party Lender financing the new project, or of affiliates of either. 13 CFR § 120.882(e)(8)

(Note: Equity in land and/or building that is being refinanced may be included as Borrower's equity as set forth under present policy.)

G. Eligible Administrative Costs (13 CFR §120.883):

The administrative costs set out in 13 CFR §120.883 are not part of the Project costs but are added to the Net Debenture to calculate the Gross Debenture amount. Examples of Borrower's out-of-pocket costs include:

1. Settlement agent's fees;

2. Overnight delivery, postage and messenger services;

3. Certifications required by SBA (such as earthquake, flood, IRS, Certificate of Occupancy, and certificate of completion); and

4. Copying costs attributable to the above.

H. Ineligible Costs for 504 Loans:

Any costs not directly attributable to or necessary for the Project may not be paid with proceeds of the 504 loan. Examples can be found in 13 CFR § 120.884.

I. Pre-Existing Debt on the Project Property (13 CFR § 120.922):

The Third Party Loan may include consolidation of existing debt on the Project Property so long as it does not improve the Third Party Lender's lien position on the existing debt, unless the debt is a previous Third Party Loan.

J. Leasing:

1. Leasing policies specific to 504 loans:

a. The Borrower may use 504 loan proceeds to acquire or build a building or install machinery or equipment on leased land. There are specific requirements which must be followed in this case and they may be found at 13 CFR § 120.870.

b. The Borrower may not use 504 loan proceeds for interior tenant improvements and such improvements may not secure the Third Party Loan. 13 CFR § 120.871(a)

2. Leasing Part of a Building Acquired with Loan Proceeds (13 CFR § 120.131):

a. Amount of rentable property that can be leased:

i. For an existing building, a small business must occupy 51% of the rentable property and may lease up to 49%; and

ii. For new construction, a small business must occupy 60% of the rentable property, may permanently lease up to 20% and temporarily lease an additional 20% with the intention of using some of the additional 20% within 3 years and all of it within 10 years. (13 CFR § 120.870(b))

      iii.    An EPC must lease 100% of the rentable property to an OC(s). The OC(s) must follow IV.J.2.a.i. and ii. above.

      iv.    Closing and funding of the 504 loan must not take place until the Borrower is occupying the required amount of the Project property and the Borrower is operating at the Project property. Circumstances may justify allowing the Applicant a period of time after closing of the SBA loan to comply with the above occupancy requirements. For example, a pre-existing lease may have a few more months to run. In no case may the small business have more than 1 year to meet occupancy requirements.

      v.    The restrictions in IV.J.2.a.i. and ii. above apply regardless of whether the rentable property is leased to a commercial or residential tenant.

      vi.    The Applicant may not use loan proceeds to improve or renovate any of the Rentable Property that is leased to a third party.

      vii.    During the life of the loan, a Borrower or Operating Company may not lease space to any business that the Borrower or Operating Company knows is engaged in any activity that is illegal under Federal, state or local law or any activity that can reasonably be determined to support or facilitate any activity that is illegal under Federal, state, or local law (such as a marijuana dispensary). If a Borrower or Operating Company does lease space to such a business, the CDC must notify SBA Counsel as soon as it becomes aware of the lease to determine what action should be taken.

b.    "Rentable Property" is the total square footage of all buildings or facilities used for business operations (13 CFR § 120.10) excluding vertical penetrations (stairways, elevators, and mechanical areas that are designed to transfer people or services vertically between floors), and including common areas (lobbies, passageways, vestibules, and bathrooms). Rentable property may also include exterior space (except parking areas) that is actively used in Borrower's business operations. Examples of exterior space that is actively used in Borrower's business operations include: outdoor storage yards for general contractors, trucking companies, and moving and storage companies; or boat slips and docks for marinas.

c.    CDC must document in its loan file the basis for determining that the exterior space is actively used in Borrower's business operations.

d.    In an existing building zoned for both commercial and residential use, the business owner may either occupy or rent to a third party the space zoned for residential use. However, if the business owner occupies this space, it is not considered as occupied by the business, unless the residential portion of the property meets the requirements of Paragraph IV.J.2.d. below.

e.    If the projected rental income is included in the repayment analysis, it must be independently substantiated.

f.    Residential Space as Part of Business:

If the nature of the business requires a resident owner or manager, loan proceeds may be used for the purchase of an existing building(s) or construction of a new building(s) that includes residential space essential to the business. The square footage of the residential space must be appropriate to the needs of the business, not to exceed 49% of the total property. For example, a horse-boarding facility traditionally requires that someone be on premises at all times to care for the horses. In this case, the residential property would be considered to be occupied by the business.

K. Change of Ownership:

1. Projects that result in a change of ownership are eligible under the following circumstances:

   a. The 504 Project finances only the costs associated with eligible long-term fixed assets; the acquisition of any other assets such as receivables or goodwill is not an eligible use of 504 loan proceeds or Third Party Loan proceeds and must be financed by other means, which may include a 7(a) loan;

   b. The application documents that jobs will be created or retained because of the change of ownership. The application must demonstrate that there is a reasonable basis upon which to conclude that the retained jobs would be lost without the change of ownership. This can be in the form of a statement from the seller to that effect with supporting facts or other certification acceptable to the SLPC.

2. The 504 loan proceeds must not be used to purchase stock or any other ownership interest in a business unless, by purchasing the stock or other ownership interest, the Applicant is purchasing the real estate where the Applicant business is located and/or other eligible long-term fixed assets used in the Applicant's business operation. To the extent the value of the stock or other ownership interest exceeds the value of the real estate and/or other eligible long-term fixed assets ("excess value"):

   a. The excess value cannot be financed by the Project financing; it must be financed separately; and

   b. The excess value must be *de minimis* compared to the value of the real estate and/or other eligible long-term fixed asset(s).

3. The change of ownership must result in the Applicant owning 100% of the business.

4. The seller may not remain as an officer, director, stockholder or key employee (an employee who manages daily operations, e.g. overseeing a department of a division, not a clerical staff position) of the business.

5. All other 504 Loan Program Requirements must be met.

L. Loan Proceeds to Finance a Third Party Lender's Other Real Estate Owned (OREO) (13 CFR § 120.923):

Where loan proceeds will be used to finance a Third Party Lender's own OREO property, the application must:

1. Be submitted to the SLPC (delegated authority may not be used to process these applications);

2.   Include an independent real estate appraisal that meets the requirements found in Chapter 3 of this Subpart (the appraisal requirement cannot be delayed until loan closing); and

3.   Include an explanation of the circumstances surrounding the Third Party Lender's acquisition of the real estate. If the acquisition of the property was triggered by a business failure at that particular location, the Third Party Lender must submit a detailed explanation of why the new small business Borrower will succeed at that same location.

## CHAPTER 3: COLLATERAL, APPRAISALS AND ENVIRONMENTAL POLICIES

### I.   COLLATERAL

A.   SBA's 504 Collateral Policy ([13 CFR §120.934](13 CFR §120.934)):

When assessing the adequacy of collateral the CDC must consider the impact that covenants and other restrictions recorded against the collateral may have on its value and marketability. (See Chapter 2, Para. II.D.8 of this Subpart for guidance on covenants and other restrictions recorded against the collateral when the Applicant is operating under a franchise agreement.) The CDC must document this analysis in the file. Examples of items to review include:

1.   Deed restrictions, covenants, easement provisions, reversionary interests, subordinations, leases and options and other provisions that restrict the use of the property for the benefit of a third party (note: certain deed restrictions pertaining to the use of the property, which are intended to protect the health and safety of occupants, may be acceptable, e.g., deed restrictions based upon environmental concerns including restrictions on residential use, use as a day care center for children or seniors, use as a school, or use as a hospital); and

2.   Engineering Controls that require the small business concern or subsequent owners to install costly devices or structures such as extraction wells or subsurface barrier walls prior to constructing a building, remodeling, or otherwise improving the property.

SBA usually takes a second lien position on Project Property, but may have a shared lien (pari-passu) with the Third Party Lender.

B.   Adequacy of Collateral:

1.   SBA's second lien position will generally be considered adequate. Factors that SBA may consider in determining the adequacy of SBA's collateral may include but not limited to the following:

   a.   Strong, consistent cash flow that is sufficient to cover the debt;

   b.   Demonstrated, proven management;

   c.   The applicant business has been in operation for more than 2 years; and

   d.   The proposed Project is a logical extension of the applicant's current operations.

2.   Because leasehold improvements provide minimal collateral value, the CDC must consider requiring additional collateral.

3.   Caution: Do not encumber assets or require additional contributions that the Borrower needs to sustain ongoing operations. Taking additional collateral with minimal liquidation value only serves to limit the Borrower's ability to obtain additional short-term financing while offering little or no additional protection to SBA.

4.   Lien position on real estate is generally evidenced by a title insurance policy. If the title insurance policy contains a clause requiring arbitration or a clause allowing either party to demand arbitration in the case of a dispute, an endorsement to the policy must be obtained deleting that condition. If the policy requires that both parties agree to arbitration, no endorsement is necessary.

C.  Third Party Loan:

1.  The Third Party Lender usually has a 1st lien on the Project Property, and SBA cannot guarantee these loans. (13 CFR § 120.920)

2.  When the Third Party Lender is the property seller, the Third Party Loan must be subordinate to the 504 loan except under the following circumstances (13 CFR § 120.923):

    a.  The Borrower assumes an existing note as part of the total financing;

    b.  The FDIC has carry-back financing; or

    c.  The property is classified as "Other Real Estate Owned" (OREO), by a national bank, a State-chartered, or other federally regulated lender and the property is of sufficient value to support the 504 loan.

3.  SBA's lien position must not be subordinate to loans made from the proceeds of a tax-exempt obligation. (See Chapter 1, Paragraph IV.D. of this Subpart for additional guidance.)

D.  Mixed Use Collateral:

When one 504 debenture finances both real estate and significant shorter term assets, such as machinery and equipment and furniture and fixtures, the CDC should consider the following:

1.  Taking, along with the Third Party Lender, lien positions based upon proportional shares in the financing of the Project;

2.  Taking a 1st lien position on the shorter term assets. SBA requires at least a 2nd lien position unless there is a lien from an existing 504 loan on the assets;

3.  Requiring additional equity or collateral; or

4.  Removing the shorter term assets from the Project and have them financed by another source.

E.  Guaranties:

1.  Personal Guaranties: Individuals who own 20% or more of an Applicant must provide an unlimited full personal guaranty. If a person has executed the Note as a Borrower in an individual capacity, that person does not also have to execute a personal guaranty. When deemed necessary for credit or other reasons, SBA or, for a loan processed on a delegated basis, the PCLP CDC may require other appropriate individuals or entities to provide full or unlimited guarantees of the loan without regard to the percentage of their ownership interests, if any. For example, an individual with a minority ownership or no ownership interest in the Applicant or OC who is critical to the operation of the business may be required to provide a personal guaranty (13 CFR § 120.160(a)). Each 504 loan must be guaranteed by at least one individual or entity. If a limited guarantee is used, CDC must choose one of the payment limitation options in SBA Form 148L (Unconditional Limited Guarantee) and specify the option in the Authorization.

    a.  CDC must obtain a personal financial statement from all individuals guaranteeing the loan.

    b.  Guaranty may be secured or unsecured but must meet SBA's collateral requirements. If the loan is not fully collateralized by business assets, available personal assets

must be pledged to secure the guaranty.

c. Guaranty of Spouse:

    i. Each spouse owning 5% or more of an Applicant must personally guarantee the loan in full when the combined ownership interest of both spouses is 20% or more.

    ii. For a non-owner spouse, CDC must require the signature of the spouse on the appropriate collateral documents. The spouse's guaranty secured by jointly held collateral will be limited to the spouse's interest in the collateral.

2. Corporate/Other Guaranties: All entities that own 20% or more of an Applicant must provide an unlimited full guaranty. SBA/CDC may require other entities to guarantee the loan as well. If the entity that owns 20% or more of the Applicant is a trust (revocable or irrevocable), the trust must guarantee the loan with the trustee executing the guaranty on behalf of the trust and providing the certifications required in Chapter 2 of this Subpart. In addition, if the trust is revocable, the Trustor also must guarantee the loan. Financial statements are necessary to determine the assets available to support the guaranty.

3. Reducing Ownership Interest:

a. Any person subject to the personal guaranty requirements 6 months prior to the date of the loan application would continue to be subject to the requirements even if that person has changed his or her ownership interest to less than 20%.

b. The only exception to the 6-month rule is when that person completely divests his or her interest prior to the date of application. Complete divestiture includes divestiture of all ownership interest and severance of any relationship with the Applicant (and any associated Eligible Passive Concern) in any capacity, including being an employee (paid or unpaid).

4. Employee Stock Ownership Plans (ESOPs) and 401(k) Accounts:

When an ESOP or 401(k) owns 20% or more of an Applicant, the Plan or Account cannot guarantee the loan. CDCs must ensure that the Plan or Account meets all applicable IRS, Treasury and Department of Labor eligibility requirements. In addition, the following loan conditions must be met:

a. The owner(s) of the 401(k) must provide his or her full unconditional personal guaranty regardless of the individual ownership interest in the applicant concern. This guaranty must be a secured guaranty if required by SBA's existing collateral policies.

b. The members of the ESOP are not required to personally guarantee the debt, but all owners of the Small Business Applicant who hold an ownership interest outside the ESOP are subject to SBA's personal guaranty requirements, including paragraph I.E.1 above.

c. The application cannot be structured as an EPC/OC (13 CFR § 120.111(a)(6)). SBA regulations require that each 20% or more owner of the EPC and each 20% or more owner of the OC guarantee the loan, and the regulation does not provide for an

exception.

## II.   APPRAISAL REQUIREMENTS

The regulations governing appraisal requirements are set forth at 13 CFR § 120.160(b).

A.  Commercial Real Estate:

1.  SBA requires a real estate appraisal if the estimated value of the Project Property is:

    a.  Greater than $250,000; or

    b.  $250,000 or less, if such appraisal is necessary for appropriate evaluation of creditworthiness.

2.  The appraiser must be:

    a.  Independent and have no appearance of a conflict of interest (such as a direct or indirect financial or other interest in the property or transaction); and

    b.  Either State-licensed or State-certified with the following exception: when the Project Property's estimated value is over $1,000,000, the appraiser must be State-certified.

3.  The "Appraisal Report" must be prepared in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP) and dated no more than twelve months prior to the date of application.

4.  In order for the appraiser to identify the scope of work appropriately, the appraisal must identify SBA as the client or an intended user of the appraisal, as those terms are defined in the Uniform Standards of Professional Appraisal Practice (USPAP). The CDC may also be identified as the client or an intended user. It is acceptable to SBA if the appraisal identifies the Third Party Lender as the client and SBA as intended user. The CDC may not use an appraisal prepared for the applicant. The cost may be passed on to the Borrower.

5.  If the loan will be used to finance new construction or the substantial renovation of an existing building, the appraisal must estimate what the market value will be at completion of construction. ("Substantial" means rehabilitation expenses of more than one-third of the purchase price or fair market value at the time of the application.) After construction is completed, CDC must obtain a statement from the appraiser, general contractor, project architect, or construction management firm that the building was built with only minor deviations (if any) from the plans and specifications upon which the original estimate of value was based. If the CDC cannot obtain such a statement, then the CDC cannot close the loan without the Sacramento Loan Processing Center's (SLPC) prior written permission.

6.  If the loan will be used to acquire an existing building that does not require construction, the appraiser should estimate market value on an as-is basis. If the appraiser estimates the value other than on an as-is basis, the narrative must include an explanation of why the as-is basis was not used.

7.  If the appraisal engagement letter asks the appraiser for a business enterprise or going concern value, the appraiser must allocate separate values to the individual components of the transaction including land, building, equipment and business (including intangible

assets).

8. When the collateral is a Special Purpose Property, the appraiser must be experienced in the particular industry.

9. An appraisal must be submitted and approved by the SLPC (except on Delegated loans) prior to closing. If the appraisal comes in at less than 95% the estimated value, the debenture must be reduced or, if available, the CDC must secure additional collateral or additional investment from the Borrower and/or guarantors that will be added to the required Borrower's Contribution and will be sufficient to address the gap in value. If additional collateral or additional investment is not available, but the applicant demonstrates strong, consistent cash flow sufficient to support the debt, then the SLPC can approve the appraisal and the CDC may close the loan.

10. An appraisal must be submitted to the SLPC with the application under the following circumstances:

   a. Equity in land owned for 2 years or more is being contributed as part of Borrower's contribution;

   b. The real estate is Third Party Lender's OREO; or

   c. The Project is not an arms-length transaction (e.g., family members).

   d. The seller of the property is carrying back a loan that is part of the Borrower's contribution.

B. Equipment Appraisal:

SBA requires that an equipment appraisal be obtained when used equipment is part of the Project and is either being purchased from someone other than an equipment dealer, or being refinanced. The equipment appraisal needs to be a written document from a person that is qualified to provide a valuation, is independent of the transaction, and has performed an on-site inspection of the equipment. The appraisal must be dated no more than twelve months prior to the date of the application.

C. Non-commercial real estate or real estate securing a personal guaranty:

SBA has no specific appraisal requirements for non-commercial real estate (such as a residence) or real estate (commercial or non-commercial) taken as collateral to secure a personal guaranty.

## III. ENVIRONMENTAL POLICIES AND PROCEDURES

These environmental policies and procedures apply to all 504 loans. Prudent lending practices may dictate additional Environmental Investigations or safeguards.

A. Definitions:

Terms that are capitalized in this paragraph are defined in the "Definitions" section in Appendix 2.

B. The Risks of Environmental Contamination include:

1. The costs of Remediation could impair the Borrower's ability to repay the loan and/or

continue to operate the business;

2.  The value and marketability of the Property could be diminished. If the Borrower defaults, CDC or SBA might have to abandon the Property to avoid liability or accept a reduced price for the Property;

3.  CDC or SBA could be liable for environmental clean-up costs and third-party damage claims arising from Contamination if title to contaminated Property is taken as a result of foreclosure proceedings and/or CDC or SBA exercises operational control at the Property; and

4.  If a Governmental Entity cleans a site, it may be able to file a lien for recovery of its costs which may be superior to SBA's lien.

C.  Environmental Investigations:

SBA requires an Environmental Investigation of all commercial Property upon which a security interest such as a mortgage, deed of trust, or leasehold deed of trust is offered as security for a loan or debenture. The type and depth of an Environmental Investigation to be performed varies with the risks of Contamination. This paragraph provides minimum standards. Prudent lending and internal CDC policy may dictate additional Environmental Investigations or safeguards.

D.  Submission of Environmental Investigation Reports:

The CDC must submit the Environmental Investigation Report to the SBA Center processing the application except on PCLP loans. CDCs processing PCLP loans do not have to submit Environmental Investigation Reports to the SBA Center but they must keep a copy of any Environmental Investigation Report in the loan file. All CDCs must comply with and meet the requirements of the Environmental Policies and Procedures set forth in this SOP. For example, all Transaction Screens, Phase I and Phase II ESAs *must* be performed by an Environmental Professional and be accompanied by the Reliance Letter in Appendix 3. (A Reliance Letter is required even if the Environmental Investigation Report is addressed to the CDC.) Any request for an exception to SBA's Environmental Policies and Procedures must be directed to the Environmental Committee (see paragraph K), no matter how the underlying loan is being processed.

E.  The Steps of an Environmental Investigation:

1.  NAICS Codes. For all Property *except* a unit in a Multi-Unit Building, CDC must begin by making a Good Faith effort to determine the NAICS code(s) for the Property's *current and known prior uses* and compare the NAICS code(s) to the list of environmentally sensitive industries in Appendix 4. For a unit in a Multi-Unit Building, Lender may proceed directly to subparagraphs b)i. and ii. below.

    a.  If there is a NAICS code match to an environmentally sensitive industry identified in Appendix 4, the Environmental Investigation must begin with a Phase I, regardless of the amount of the loan.

        If the NAICS code begins with 447 (gas stations with or without convenience stores), the Environmental Investigation must begin with a Phase I and the CDC must also refer to and, if applicable, comply with "Environmental Investigation Requirements for Gas Station Loans" in Appendix 5.

    b. If there is not a NAICS code match to an environmentally sensitive industry, or if the Property is a unit in a Multi-Unit Building, the CDC must proceed as follows:

        i. If the loan amount is **up to and including** $150,000, the Environmental Investigation may begin with an Environmental Questionnaire.

        ii. If the loan amount is **more than** $150,000, the Environmental Investigation must, at a minimum, begin with an Environmental Questionnaire and Records Search with Risk Assessment.

2. Environmental Questionnaire Results. If the Environmental Questionnaire reveals it is unlikely that there is environmental contamination at the Property and that no further investigation is warranted, CDC must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

   If at any time an Environmental Questionnaire reveals that further investigation is warranted, CDC must obtain, at a minimum, a Records Search with Risk Assessment.

3. Environmental Questionnaire & Records Search with Risk Assessment Results

    a. If the Environmental Questionnaire reveals it is unlikely that there is environmental contamination at the Property and that no further investigation is warranted, and the Records Search with Risk Assessment concludes that the Property is a "low risk" for Contamination, CDC must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

    b. If the Records Search with Risk Assessment concludes that the Property is anything other than "low risk" for Contamination, CDC must obtain a Phase I ESA.

4. Transaction Screen Results

    a. If the Environmental Professional conducting the Transaction Screen concludes that no further investigation is warranted, the CDC must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

    b. If the Environmental Professional conducting the Transaction Screen concludes that further investigation is warranted, the CDC must obtain a Phase I ESA. If an Environmental Professional recommends proceeding directly from the Transaction Screen to a Phase II (thus bypassing the Phase I), and the CDC concurs, the CDC must seek in advance an exception to policy from the SBA Environmental Committee, which may be granted on a case-by-case basis.

5. Phase I ESA Results

    a. If the Environmental Professional conducting the Phase I ESA concludes that no further investigation is warranted, the CDC must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

    b. If the Environmental Professional conducting the Phase I ESA concludes that further investigation is warranted (typically a Phase II), and the CDC still wants to make the loan, the CDC must proceed as recommended by the Environmental Professional, or

in the alternative submit the results of the Environmental Investigation to the SBA with recommendations and seek SBA's concurrence. In general, SBA will require compliance with all of an Environmental Professional's recommendations (including "housekeeping measures," such as secondary containment, decommissioning monitoring wells, sealing floor drains, etc.). In the rare instance where an exception may be warranted, CDCs must provide the SBA Environmental Committee with justification for not wanting to follow the Environmental Professional's recommendations and obtain committee approval.

6. Phase II ESA Results

    a. If the Environmental Professional conducting the Phase II ESA concludes that no further investigation is warranted, the CDC must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

    b. If the Phase II ESA reveals Contamination and the CDC still wishes to make the loan, CDC must ensure that the Environmental Professional has documented:

        i. Whether the Contamination quantities exceed the reportable or actionable levels;

        ii. Whether Remediation is necessary;

        iii. An estimate of any Remediation costs (Environmental Professionals may use ASTM E2137-01 Standard Guide for Estimating Monetary Costs and Liabilities for Environmental Matters); and

        iv. The projected completion date of any Remediation.

    c. If the Environmental Investigation reveals Contamination, the CDC should determine whether disbursement is appropriate under one or more of the factors identified in subparagraph G below, "Approval and Disbursement of loans when there is Contamination or Remediation at the Property."

7. If at any stage of the Environmental Investigation SBA concurs with a CDC's recommendation that environmental risk has been sufficiently minimized and that no further investigation is required, the loan may be disbursed.

F. Legal Responsibilities of SBA Field Counsel and Center Counsel:

With respect to environmental investigations that are required to be submitted to an SBA Loan Processing Center, SBA loan processing personnel must obtain field or center counsel's opinion as to the adequacy of an Environmental Investigation and whether the risk of Contamination, if any, has been sufficiently minimized.

G. Approval and Disbursement of loans when there is Contamination or Remediation at the Property:

Loans may not be approved or disbursed if there is known Contamination or on-going Remediation at the Property unless the risks have been minimized to the satisfaction of SBA Loan Processing Center personnel after consulting with and obtaining the concurrence of SBA field counsel or center counsel. CDCs seeking loan approval or disbursement authority despite

Contamination or on-going Remediation at the Property must submit a recommendation to SBA that includes, at a minimum, a discussion of the following:

1. Nature and Extent of the Contamination including copies of the following documents pertaining to the Property:

    a. All relevant Environmental Investigation Reports;

    b. All publicly available Governmental Entity correspondence;

2. Remediation

    a. Recommended method of Remediation;

    b. Status of on-going Remediation, if any;

    c. Environmental Professional's estimated cost of Remediation;

    d. Environmental Professional's estimated completion date;

    e. Governmental Entity's designation of responsible Person(s);

    f. Person(s) paying for on-going Remediation;

3. Collateral Value

    a. Proposed loan amount and proposed use of proceeds;

    b. Appraised or the estimated value of the Property;

    c. Institutional Controls and Engineering Controls, if any, and their impact on repayment ability, collateral value and marketability of the Property; and

4. Mitigating Factors

    SBA will rely upon one or more of the following factors when deciding to disburse before completion of Remediation or monitoring:

    a. Indemnification. If any Person who possesses sufficient financial resources to cover the costs of completing Remediation executes the SBA Environmental Indemnification Agreement in Appendix 6, approval or disbursement may be considered. CDC must conduct an analysis of the proposed indemnitor to ensure that it has sufficient assets to honor an indemnification agreement. The Third Party Indemnitor cannot be the Borrower or operating company.

    The SBA Environmental Indemnification Agreement:

    i.   Cannot be modified;

    ii.  Must be executed by the Borrower and (if applicable) Operating Company;

    iii. Must have a copy of the Environmental Investigation Report attached to it; and

    iv.  Must be properly recorded in the memorandum format in Exhibit C to Appendix 6.

    All CDCs must submit the finalized SBA Environmental Indemnification Agreement to SBA for review and approval no less than 2 weeks in advance of submission of the loan closing package to the CDC's Lead SBA Office.

b.  Completed Remediation. If the Governmental Entity has affirmed in writing that active Remediation is complete but additional monitoring is required, approval or disbursement may be considered after the following occurs: (a) monitoring results for the first year are obtained; (b) an Environmental Professional concludes that the results show no unacceptable increase in Contamination since Remediation; and (c) Environmental Professional concludes that the owner/operator of the Property is in compliance with any continuing obligations, including activity and use limitations, Engineering and Institutional Controls, and post-Remedial monitoring required by the Governmental Entity.

c.  No Further Action. If a CDC obtains a "no further action letter" or "closure letter" from a Governmental Entity (or state equivalent of a "no further action letter" or "closure letter) stating that no further Remediation or monitoring of Contamination previously found is required, approval or disbursement may be considered. A state equivalent of a closure letter includes a written determination from a licensed professional in those jurisdictions that delegate authority to such professionals for site closures.

d.  Minimal Contamination with Minimal Remediation. If the extent of Contamination and cost of Remediation are de minimis in relation to the value of the Property and/or the resources of the Person responsible for Remediation, and the Remediation is projected to be completed within 1 year, approval or disbursement may be considered. The CDC should identify the Environmental Professional that will supervise the Remediation and discuss: (a) the nature of the Contamination; (b) the reliability of the Remediation estimates; (c) the projected completion date; and (d) the duration of ongoing monitoring.

e.  Clean-up Funds. If CDC provides evidence from a Governmental Entity that the Borrower or Property has been approved by a fund to pay for or reimburse Remediation costs, and the amount allocated is sufficient to cover the costs of Remediation, approval or disbursement may be considered. CDC must also address any conditions of Remediation that might preclude payment or reimbursement and the financial capability of the fund.

f.  Escrow Account. If an escrow account is available which (a) equals a minimum of 150 percent of the total estimated cost of required Remediation and (b) is controlled by a 7(a) Lender or first mortgage holder in a 504 loan as trustee, approval or disbursement may be considered. The Governmental Entity must concur with the Remediation's scope. The Loan Authorization and escrow agreement for the escrow account must ensure that escrow funds will only be used for Remediation costs. The source of the escrow funds may not be SBA loan proceeds. Depending upon the circumstances, an escrow account with more than 150 percent of the estimated costs of Remediation may be appropriate. The escrowed funds may be used for Remediation. Any remaining funds in the account may not be released until the appropriate "closure letter" or "no further action letter" is received or, in the case of monitoring, when all monitoring wells related to the Property have been decommissioned.

Note: Third Party Lender's role as trustee of the escrow account is solely to release funds upon the satisfactory completion of Remediation work -- the Third Party Lender must not control or manage the Property being Remediated.

g. Groundwater Contamination Originating from Another Site. If groundwater Contamination on the Property is shown to have come from another property, approval or disbursement may be considered if:

   i.   Another Person with sufficient resources is performing Remediation pursuant to a Remediation action plan that has been approved by the appropriate Governmental Entity; or

   ii.  The state has laws or regulations that provide that an owner or operator of property will not be responsible for Contamination from another site; or

   iii. The Governmental Entity provides satisfactory written assurance that it will not hold the Property owner liable for the Contamination. CDC should attempt to have CDC and SBA included by name in the letter along with the Property owner and future purchasers.

h. Additional or Substitute Collateral. If additional or substitute collateral is being pledged, or an additional equity contribution is being made, sufficient to overcome the potential loss due to Contamination, then approval or disbursement may be considered.

i. Other Factor(s). CDC and SBA may rely on factors other than or in addition to the eight referenced above when considering approval or disbursement. For example, the existence of adequate environmental insurance that is already in place and already paying remediation costs, bonds, agreements not to sue present and future property owners from the Governmental Entity, brownsfields agreements, Engineering and Institutional Controls, etc. However, reliance solely upon "Other Factor(s)" requires clearance from the SBA Environmental Committee. This requirement extends to PCLP CDCs.

PCLP CDCs must follow these guidelines, but they do not have to submit documentation or obtain SBA's concurrence prior to approval or disbursement of the loan unless they are relying solely upon the "Other Factor(s)" in subparagraph 4.i) above. However, all CDCs, including PCLP CDCs, must forward each finalized SBA Environmental Indemnification Agreement (located in Appendix 6) to the Lead SBA Office for review and approval no less than 2 weeks in advance of submission of the loan closing package to the Lead SBA Office if they want the loan to be considered in that closing cycle.

H. Special Use Facilities:

1. Child-Occupied Facilities

Prudent lending practices dictate that specific additional environmental assessments be performed for Child-Occupied Facilities. Such facilities must undergo a lead risk assessment and also testing for lead in drinking water at all taps and fountains potentially used as a drinking water source for children. All lead assessments must be conducted in conformance

with U.S. Environmental Protection Agency (EPA) regulations at 40 CFR 745 and U.S. Department of Housing and Urban Development (HUD) Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing Second Edition, July 2012. The results of these assessments must be submitted to the SBA. Disbursement will not be authorized unless the risk of lead exposure to infants and small children has been sufficiently minimized.

2. Drycleaners

On-site dry cleaning facilities, which may have utilized chlorinated solvents such as tetrachloroethene (PCE) and trichloroethene (TCE) and/or petroleum-based solvents in the course of their business operations, may present significant clean-up costs if these contaminants have entered the soil, soil vapor and/or groundwater. Prudent lending practices dictate and SBA requires that for any Property with on-site dry cleaning facilities, whether currently in operation or operated historically at the site, that uses, used, or likely used chlorinated and/or petroleum-based solvents, a Phase I followed by a Phase II Environmental Assessment is required. (Any deviation from this requirement must be directed to EnvironmentalAppeals@sba.gov as a request for an exception to policy). For on-site dry cleaners, the investigation must address soil, groundwater and soil vapor. A Phase II performed in connection with an on-site dry cleaning facility must be conducted by an independent Environmental Professional *who holds a current Professional Engineer's or Professional Geologist's license and has the equivalent of three (3) years of full time relevant experience*.

3. Gasoline Stations

Gasoline stations also present significant clean-up costs if contaminated (for specific requirements pertaining to gasoline stations, please refer to Appendix 5).

I.  Release of Rights to Indemnification from SBA/CDC:

If any Person has a right to indemnification from subsequent owners of the Property (e.g., SBA/CDC after acquiring Property through foreclosure or other means), then they must execute either the SBA Indemnification Agreement or another document in which they waive all known and unknown rights and release all claims and causes of action whether now or hereafter in existence against SBA and CDC related to Contamination at the Property including the right to indemnification. CDCs must submit all waiver and release documents to the SBA center processing the loan for review and approval by SBA counsel, along with a copy of the title report, the document providing for indemnification, and the purchase and sale documents, if any. PCLP CDCs must also submit the waiver and release to the SBA for review and approval prior to a request that SBA fund the loan. The document containing the waiver and release must be recorded.

J.  Brownfields Sites:

SBA encourages the redevelopment of brownfields, and SBA loan guarantees are available to small businesses interested in locating on revitalized brownfields. Typically, this occurs through utilization of one or more of the nine factors in subparagraph G.4 above.

K.  Questions on SBA's Environmental Policy and Appeals:

Questions on SBA's Environmental Policy should be directed to local field counsel for the area where the Property is located.

CDCs who believe that an environmental decision that has been rendered by SBA is inconsistent with this SOP may appeal the decision by forwarding a copy of the decision, along with an explanation of how the determination is perceived to be inconsistent with this SOP to EnvironmentalAppeals@sba.gov. (NOTE: this e-mail address cannot receive submissions larger than 15MB. If the e-mail and attachments exceed this size, the appeal must be sent in more than one e-mail.) Environmental appeals, including exceptions to Agency environmental policy, will be reviewed by the SBA Environmental Committee comprised of OGC attorneys appointed by the Associate General Counsel for Litigation, who may consult with an environmental engineer. The Associate General Counsel for Litigation retains the authority to overrule decisions rendered by the SBA Environmental Committee.

## CHAPTER 4: LOAN APPLICATION PROCEDURES AND CONTROLS

## I.   CDC'S 504 APPLICATION

The CDC and Applicant must complete in full the SBA Form 1244, "Application for Section 504 Loans," and all certifications therein. The CDC must disclose 100% of the Applicant's ownership on SBA Form 1244 and in the E-Tran system in order to submit a loan application. Each owner must be identified in the E-Tran system.

## II.   MINIMUM DEBENTURE AMOUNT

The minimum dollar amount for a debenture is $25,000. (**13 CFR § 120.930(B)**)

## III.   SUBMITTING THE APPLICATION

A.   Regular 504 Loans:

  1.   All 504 loans are processed in the SLPC.

  2.   The CDC completes the following documents which can be found at https://www.sba.gov/document:

    a.   SBA Form 1244, Application for Section 504 Loan; and

    b.   SBA Form 2450, Eligibility Information Required for 504 Submission.

  3.   Certified Development Companies use the 504 E-Tran system to submit all 504 loan applications. CDCs may choose to either use a vendor solution that integrates with the Capital Access Financial System (CAFS) loan platform or manually use the E-Tran web screens to submit all 504 loan applications and all attachments electronically via E-Tran to the SLPC. Documents greater than 250MB must be separated into multiple documents. The system does not support uploads greater than 250MB. Detailed guidance on the E-Tran submission process can be found in the 504 E-TRAN User Guide for Submitting Loan Applications, posted on SBA's website.

B.   Premier Certified Lenders Program (PCLP) Loans:

  1.   The PCLP CDC completes the following documents which can be found at https://www.sba.gov/document.

    a.   PCLP Guarantee Request (SBA Form 2234 (Part A))

    b.   Copy of pages 2 and 11 of SBA Form 1244;

    c.   Copy of "Supplemental Information for PCLP Processing" (SBA Form 2234 Part B); and

    d.   Copy of "Eligibility Information Required for PCLP Submission" (SBA Form 2234 Part C).

  2.   Send the completed items through the 504 E-TRAN system.

C. Abridged Submission Method (ASM):

SBA has established a streamlined loan application processing procedure known as the Abridged Submission Method (ASM). Under this process, the CDC is required to collect and retain all exhibits to SBA Form 1244, but is only required to submit the documents not marked with an asterisk on the instructions. See SBA Form 1244. The application includes:

1. Credit memorandum,

2. Draft loan authorization,

3. SBA Form 1244.

4. Only the following exhibits to the 1244:

   a. Eligibility checklist (Exhibit 2);

   b. SBA Forms 912 (Exhibit 3), if required;

   c. Management Agreement, if any (Exhibit 5);

   d. Franchise documentation (Exhibit 13);

   e. Key costs documents (Exhibit 14);

   f. Collateral appraisals (Exhibit 15);

   g. Environmental documentation (Exhibit 16);

   h. Participating Lender Letter (Exhibit 17);

   i. USCIS Verification (Exhibit 18); and

   j. Copies of debt and lien instruments and a transcript of account or equivalent (Exhibit 21).

5. Due to the certification on Form 1244, wet signatures from the Applicant are not required on the following Exhibits:

   a. Exhibit 4: "Personal Financial Statement;"

   b. Exhibit 6: "A balance and income statement as well as Federal income tax returns for the previous 2 years for SBC (or 3 years, if the alternative 7(a) size standard is used);

   c. Exhibit 7: "A balance sheet and income statement dated 120 days of the application together with an aging of the accounts receivable and accounts payable listed;" and

   d. Exhibit 12: "The names of affiliated (through ownership or management control) or subsidiary businesses as well as the last three fiscal year-end financial statements and/or Federal income tax returns for the last 3 years (or 2 years, if the alternative 7(a) size standard is being used.)

   The signature on the Certification will serve as the signature for Exhibits 4, 6, 7 and 12.

6. The CDC files including the Exhibits must be available for review by SBA at any time.

7. All CDCs are required to provide a copy of the full or partially executed purchase/sale agreements with 504 applications.

**D.** Criteria for ASM**:**

1. SLPC selects CDCs to participate in ASM. To be selected, CDCs must submit complete, quality loan applications.

2. To submit loans using ASM, a CDC must:

    a. Have Accredited Lender Program (ALP) status;

    b. Have Premier Certified Lenders Program (PCLP) status; or

    c. Have submitted at least 10 loans in the last 12 months, and have passed benchmark measures using the most recent loans processed; and

    d. Earn an average "loan package score" (LPS) numeric equivalent rating of no more than "2.0" among the most recent 25 loans submitted as determined by the SLPC upon the review of the comprehensiveness and quality of the loan application package.

3. For projects involving change of ownership and transactions between close family members, the application cannot be processed under ASM and as a non-arm's length transaction the appraisal must be submitted with the application.

4. Monitoring. SBA will monitor CDC's continued eligibility to use ASM by reviewing 1 loan out of 10 loan applications based upon the following:

    a. Each CDC will have at least 1 loan reviewed during a 12 month period.

    b. No CDC will have more than 12 loans reviewed during a 12 month period.

    c. SLPC will send CDC a written notice for review, and CDC will have 3 business days to submit the entire file to the SLPC.

5. The CDC will lose its ASM status if:

    a. The average "loan package score" (LPS) for the most recent 25 applications (or all applications since inception as ASM, if fewer than 25) submitted to the SLPC exceeds 2.0, the CDC will lose its ASM status until the average LPS returns to 2.0 or less.

    b. The average LPS of the ASM loans reviewed in the CDC's annual review of ASM applications by SLPC exceeds 2.0, the CDC will lose its ASM status for a period of not less than 90 days.

    c. A CDC fails to meet the required portfolio performance standards or any other criteria for ASM.

    d. SBA will rely more heavily on the analysis of the CDCs therefore, continued quality performance of the CDCs portfolio is essential.

    e. The SLPC Center Director or designee may approve or remove ASM status at any time for good cause including, but not limited to, misrepresentation, quality of post-approval actions and findings of internal or external audits of the CDC.

    f. CDCs submitting applications using the ASM may upload documents using E-Tran.

## CHAPTER 5: LOAN CONDITIONS/AUTHORIZATION REQUIREMENTS

## I.   AUTHORIZATION BOILERPLATE/WIZARD

The Authorization is SBA's written agreement between the SBA and the CDC providing the terms and conditions under which SBA will guarantee a business loan.

A.  Loan Conditions (13 CFR § 120.160):

   1.  SBA establishes the wording for the standard 504 Authorization conditions in the National Authorization Boilerplate ("the Boilerplate"). These conditions reflect the policies and procedures in effect at the time the Boilerplate is issued. The Boilerplate is incorporated by reference into this SOP. If there is any conflict between the Boilerplate and the SOP, the SOP supersedes the Boilerplate.

      a.  The **Boilerplate** contains the mandatory national standard language for all SBA authorizations.

      b.  The **Wizard** is a technical tool intended to make it easier for CDCs to create Authorizations based on the Boilerplate.

   2.  The **Authorization** for 504 loans must use the pre-approved conditions that are found in the Boilerplate. Prior to closing, the CDC must electronically submit to SBA through E-Tran a copy of the executed Authorization.

   3.  The party responsible for drafting the SBA Authorization is determined by the program the loan is processed under.

| LOAN PROGRAM | RESPONSIBLE PARTY |
|---|---|
| REGULAR/ALP | CDC DRAFTS AND SBA FINALIZES AND EXECUTES |
| PCLP | CDC DRAFTS AND EXECUTES ON SBA'S BEHALF |

   4.  SBA Counsel must review and approve any Authorization that proposes to deviate from the Boilerplate language with the following exception. When processing a loan under PCLP lending authority, PCLP CDCs may develop Authorization conditions that are not pre-approved in the Boilerplates and use them without prior SBA approval, provided they are only used one time. Whenever a PCLP CDC develops and uses a non-standard condition, an explanation for its development must be in the loan file.

B.  Disbursement Period, Interest Rates and Loan Maturity:

   1.  Disbursement Period: The loan must be disbursed within 48 months from the date of approval. SBA will automatically cancel undisbursed dollars. For Debt Refinance without Expansion, the loan must be disbursed within 9 months from the date of approval. The Denver Finance Center (DFC) will make a reasonable effort to mail an initial message to the CDC approximately 3 months prior to taking action on undisbursed funds. The message will inform the CDC of the undisbursed dollar amount and will provide a date on which the dollars will be automatically cancelled. After the 3-month message has expired, DFC will

make a reasonable effort to mail a second message on the day the automatic cancellation is processed.

2. Interest Rate: The interest rate for 10, 20, and 25 year 504 debentures is based on market conditions for long-term government debt at the time of sale. 13 CFR § 120.932

3. Maturity is 10, 20, or 25 years based upon the remaining useful life of the property being financed as follows:

   a. A maximum of 25 years for real estate;

   b. A minimum of 10 years for machinery and equipment; and

   c. When the Project includes both real estate and machinery and equipment, the maturity will be based on the asset category that constitutes the majority of loan proceeds.

C. Interim and Third Party Lender Requirements:

CDC must insert the names of the Interim and Third Party Lenders and the amounts of the loans into the Authorization.

D. Insurance Requirements: CDCs must ensure all appropriate insurance requirements are included in the Authorization.

1. Hazard Insurance (13 CFR § 120.160(c)).

   a. SBA requires hazard insurance on all assets pledged as collateral. If the business is located in a state that requires additional coverage such as wind, hail, earthquake or other, on the hazard insurance or in a separate policy, Borrower must provide.

   b. Real Estate:

      i. Coverage must be in the amount of the full replacement cost.

      ii. If full replacement cost insurance is not available, coverage must be for the maximum insurable value.

      iii. Insurance coverage must contain a MORTGAGEE CLAUSE (or substantial equivalent) in favor of the CDC/SBA. This clause must provide that any action or failure to act by the mortgagor or owner of the insured property will not invalidate the interest of CDC/SBA. The policy or endorsements must provide for at least 10 days prior written notice to CDC/SBA of policy cancellation.

   c. Personal Property:

      i. Coverage must be in the amount of full replacement cost.

      ii. If full replacement cost insurance is not available, coverage must be for maximum insurable value.

      iii. Insurance coverage must contain a LENDER'S LOSS PAYABLE CLAUSE (or substantial equivalent) in favor of CDC/SBA. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of CDC/SBA. The policy or endorsements must provide for at least 10 days prior written notice to CDC/SBA of policy

cancellation.

2. Marine Insurance.

    a. Coverage in the amount of the full insurable value on the vessel(s) with CDC/SBA designated as "Mortgagee" must be obtained when the vessel is the collateral on the loan.

    b. The policy must contain a Mortgagee clause providing that the interest of CDC/SBA will not be invalidated by any:

        i. Act, omission, or negligence of the mortgagor, owner, master, agent or crew of the insured vessel;

        ii. Failure to comply with any warranty or condition out of mortgagee's control; or

        iii. Change in title, ownership or management of the vessel.

    c. The policy must include Protection and Indemnity, Breach of Warranty, and Pollution coverage.

    d. The policy or endorsements must provide for at least 10 days prior written notice to CDC/SBA of policy cancellation.

3. Flood Insurance.

    a. SBA flood insurance requirements are based on the Standard Flood Hazard Determination ([FEMA Form 086-0-32](#)). CDCs must obtain a FEMA Form 086-0-32 or a copy of the form obtained by the Interim or Third Party Lender. The mandatory purchase of flood insurance requirements set forth by the National Flood Insurance Program (NFIP) apply with equal force to condominium and cooperative units. Policies for such units will consist of separate policies obtained by the individual unit owner for the particular unit and the condominium or cooperative association for the exterior of the entire building.

    b. If any portion of a building that is collateral for the loan is located in a special flood hazard area, CDC must require Applicant to obtain flood insurance for the building under the NFIP.

    c. If any equipment, fixtures or inventory that is collateral for the loan ("Personal Property Collateral") is in a building of which any portion is located in a special flood hazard area and that building is collateral for the loan, CDC must require Applicant to also obtain flood insurance for the Personal Property Collateral under the NFIP.

    d. If any Personal Property Collateral is in a building of which any portion is located in a special flood hazard area and that building is not collateral for the loan, CDC must require Applicant to obtain flood insurance for the Personal Property Collateral. The CDC may request a waiver of this requirement from the SLPC. The CDC must submit with its request a written justification that fully explains why flood insurance is not economically feasible or, if flood insurance is not available, the steps taken to determine that it is not available. PCLP CDCs may waive this requirement when the

building is not collateral for the loan if it:

    i.    Uses prudent lending standards to determine that flood insurance is not economically feasible or not available; and

    ii.   Includes written justification in the loan file that fully explains why flood insurance is not economically feasible or, if flood insurance is not available, the steps taken to determine that it is not available.

  e.  Insurance coverage must be at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the National Flood Insurance Act of 1968, as amended, (42 U.S.C. 4001 et seq.), whichever is less. ("Maximum limit of coverage available" is the lesser of the maximum limit available under the NFIP for the type of structure or the insurable value of the structure.)

  f.  Insurance coverage must contain a MORTGAGEE CLAUSE/LENDER'S LOSS PAYABLE CLAUSE (or substantial equivalent) in favor of CDC/SBA. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of CDC/SBA. The policy or endorsements must provide for at least 10 days prior written notice to CDC/SBA of policy cancellation.

4.  Life Insurance.

  a.  A CDC must assess whether the viability of the business is tied to an individual or individuals. Life insurance is required for the principals of sole proprietorships, single member LLCs, or for businesses otherwise dependent on one owner's active participation, consistent with the size and term of the loan. The amount and type of collateral available to repay the loan may be factored into the determination of the appropriate amount of life insurance. If CDC determines that the principal is uninsurable, CDC must obtain written documentation from a licensed insurer of the same.

  b.  Life insurance required must be consistent with the size and term of the loan. The amount and type of collateral available to repay the loan in the event of the death of the Applicant may be factored into the determination of the appropriate amount of life insurance.

  c.  For each policy required under this paragraph, CDC must obtain a collateral assignment, identifying the CDC/SBA as assignee that is acknowledged by the Home Office of the Insurer. The CDC must assure that the Applicant pays the premiums on the policy (13 CFR § 120.970(c)).

  d.  The CDC may accept the pledge of an existing life insurance policy. When a new policy is required, a decreasing term policy is most appropriate. Credit life insurance or whole life insurance should not be required.

5.  Any insurance required by State law must be included in the Authorization, including but not limited to liability insurance, workers' compensation insurance, and malpractice insurance.

6.  Other Insurance. CDC must include any other insurance appropriate to the loan, including

but not limited to:

    a.  Product liability insurance;

    b.  Dram shop/host liquor liability insurance; and

    c.  Disability insurance.

E.  IRS Tax Transcript/Verification of Financial Information:

  1.  SBA's Tax Verification process is to determine if:

    a.  The Applicant filed business tax returns; and

    b.  The Applicant's financial statements provided as part of the application agree with the business tax returns submitted to the IRS.

  2.  For a sole proprietorship, the CDC must verify the Schedule C.

  3.  For a change of ownership, the CDC must verify the seller's business tax returns or a sole proprietor's Schedule C. Where there is an acquisition of a division or a segment of an existing business, other forms of verification acceptable to SBA may be used in lieu of the Form 4506-T (e.g., Sales tax payment records).

  4.  Prior to submitting the closing documents to SBA Counsel, the CDC must obtain:

    a.  Verification of Financial Information:

      i.  Within 10 days of receipt of the Authorization, the CDC must submit IRS Form 4506-T to the Internal Revenue Service to obtain Federal income tax information on Applicant, or the Operating Company if the Applicant is an EPC, for the last 2 years unless the 7(a) size standard is used which requires 3 years.

      ii.  If the business has been operating between zero and 2 years, the CDC must obtain the information for all years in operation.

      iii.  This requirement does not include tax information for the most recent fiscal year if the fiscal year-end is within 6 months of the date SBA received the application. If the Applicant has filed an extension for the most recent fiscal year, the CDC must obtain a copy of the extension along with evidence of payment of estimated taxes.

      iv.  The CDC must compare the tax data received from the IRS with the financial data or tax returns submitted with the loan application.

      v.  Applicant must resolve any significant differences to the satisfaction of the CDC and the SLPC. Failure to resolve differences may result in cancellation of the loan.

      vi.  For a change of ownership, the CDC must verify financial information provided by the seller of the business in the same manner as above.

    b.  The Internal Revenue Service provides expedited service to obtain tax returns for a fee through its Income Verification Express Service (IVES) program for approved participants. Additional information is available at www.irs.gov/individuals/ives-

enrollment-procedures.

   c. If the IRS transcript reflects "Record Not Found" for the middle year of the 3 years requested, the CDC has verified the other 2 years, AND the Applicant has some record of either receiving a refund or paying the taxes for the missing year, then the CDC may reasonably assume that the Applicant filed a return for the missing year. If the CDC documents all of these steps in its loan file, the CDC has demonstrated to SBA that it has made a good faith effort to satisfy the verification requirement.

   d. If the IRS advises that it has no record on the Applicant, no record of year 1 and/or year 3, or the CDC is unable to reconcile the IRS information to the Applicant's financial information, the CDC must report the issue to the appropriate SBA CLSC. Either the loan must be cancelled or the closing must be postponed until the issue is resolved.

   e. If an Applicant has not filed required Federal tax returns, the Applicant is not eligible for SBA financial assistance.

F. Standby Agreements:

  1. SBA Form 155, "Standby Agreement." CDC may use SBA Form 155 or its own Standby Agreement Form. A copy of the note must be attached to the standby agreement.

  2. Standby Creditor must subordinate any lien rights in collateral securing the Loan to CDC's rights in the collateral, and take no action against Applicant or any collateral securing the Standby Debt without CDC's consent.

G. Assignment of Lease and Landlord's Waiver:

  1. An assignment of lease and Landlord's Waiver must be obtained either when a substantial portion of the loan proceeds are to be used for leasehold improvements or a substantial portion of the collateral consists of leasehold improvements, fixtures, machinery, or equipment that is attached to leased land or premises, the CDC must obtain an Assignment of Lease with:

   a. A term including renewal options, exercisable only by the lessee, that equals or exceeds the term of the loan; and

   b. A requirement that the lessor provide a 60-day written notice of default to the CDC with option to cure the default; and

  2. A Landlord's Waiver. The Landlord's Waiver must:

   a. Waive the lessor's right to the collateral;

   b. Provide for written notice of default and a reasonable opportunity to cure; and

   c. Grant the CDC reasonable access to the leased premises to facilitate the liquidation of the collateral.

  3. If the loan proceeds will finance improvements on a leasehold interest in land, the 504 loan must be secured by a recorded lien against the leasehold estate and other collateral as necessary. In addition, the underlying ground lease must include, at a minimum, detailed clauses addressing the following:

    a.   Tenant's right to encumber leasehold estate;

    b.   No modification or cancellation of lease without CDC's or assignee's approval;

    c.   CDC's or assignee's right, upon default of the tenant or termination, to:

        i.   Acquire the leasehold at foreclosure sale or by assignment and right to reassign the leasehold estate (along with right to exercise any options) by CDC or successors; lessor may not unreasonably withhold, condition or delay the reassignment;

        ii.   Sublease;

        iii.   Share in hazard insurance proceeds resulting from damage to improvements; and

        iv.   Share in condemnation proceeds.

4. For lease requirements concerning EPCs and OCs, see Chapter 2 of this Subpart.

5. For loans collateralized by Indian lands held in trust, if the owner of the land cannot get approval for a lien on the property, you may consider requiring an Assignment of Lease. The Assignment of Lease also has to be approved by the Secretary of the Interior or his/her authorized representative.

H. Construction Loan Provisions:

1. In the construction of a new building or an addition to an existing building, the CDC must obtain:

    a.   Evidence of compliance with the "National Earthquake Hazards Reduction Program Recommended Provisions for the Development of Seismic Regulations for New Buildings" (NEHRP), or a building code that has substantially equivalent provisions. (13 CFR § 120.174)

        i.   The NEHRP provisions may be found in the American Society of Civil Engineers (ASCE) Standard 7 and the International Building Code.

        ii.   Examples of evidence include a certificate issued by a licensed building architect, construction engineer or similar professional, or a letter from a state or local government agency stating that an occupancy permit is required and that the local building codes upon which the permit is based include the Seismic standards.

    b.   The authorization boilerplate automatically inserts the NEHRP provision when any of the use of proceeds options selected includes construction financing, including leasehold improvements. If the leasehold improvements made with loan proceeds will become permanently affixed to any structure on the leased premises, then they must comply with the NEHRP. If the improvements are only temporary, they do not need to comply with the NEHRP. Accordingly, if the Applicant can demonstrate that the leasehold improvements will be temporary, CDC may request modification of the authorization to remove the NEHRP provision in accordance with Paragraph II of this Chapter. The CDC must certify that the Project was completed in accordance

with the final plans and specifications unless a minor portion of the project has been escrowed for a valid reason. ([13 CFR § 120.891](#))

2. If the interim financing comes from a CDC, the following additional conditions must be required in the Authorization:

   a. Mortgages must be recorded prior to beginning construction.

   b. Inspections must be made by a qualified engineer, appraiser, or other party satisfactory to SBA prior to all progress disbursements.

   c. The Applicant must furnish a firm construction contract to the CDC from an acceptable contractor at a specified price, including a provision that no material changes are to be made without the prior written consent of the CDC;

   d. The contractor must furnish builder's risk and workers' compensation insurance;

   e. One complete set of plans and specifications of the proposed construction must be submitted to the CDC;

   f. Where the CDC or the Applicant is to inject funds into the construction project, these funds must be used prior to the disbursement of the interim financing;

   g. The CDC must make and document periodic inspections of construction; and

   h. When loan funds will be used to improve buildings on leased land, assignment of the lease must be obtained.

I. Special Provisions for Franchises:

   The following language must be manually inserted into the Authorization Boilerplate:

   "**Franchise** – CDC must obtain the executed Franchise Agreement, the SBA Addendum to Franchise Agreement (SBA Form 2462), or the SBA Negotiated Addendum, and all other documents the franchisor requires the franchisee to sign."

   This language will be manually inserted into the Authorization by the SLPC for non-PCLP loans. For PCLP loans, this language must be manually inserted into the Authorization Boilerplate by the PCLP CDC. The language can be manually inserted into the "prior to closing" section of the 504 Authorization Boilerplate by clicking "Edit" and adding the language above.

J. Certifications of the CDC:

   The certifications required of the CDC are listed on [SBA Form 2101](#).

K. Certifications of the Borrower:

   The certifications required of the Borrower are listed on [SBA Form 2289](#).

L. Certifications of the Interim Lender:

   The certifications required of the Interim Lender are listed on [SBA Form 2288](#).

# II.   MODIFYING THE AUTHORIZATION

A. The CDC must request in writing modifications to the terms and conditions of the Authorization

at any time after approval but before funding:

1. For an increase or decrease in the amount of an approved loan, the 327 action must clearly support the need for the change in the amount and address the effects on repayment ability, collateral and jobs created or retained. The 327 action must also provide the revised breakdown of the private sector lender, debenture, and Applicant's injection, including a revised use of funds.

2. Any adjustments to or changes in ownership of the Borrower, including percentage of ownership. CDCs may not unilaterally approve such adjustments or changes.

B. CDCs may use their unilateral authority to submit the following 327 actions using the 504 E-TRAN system:

1. 504 Loan Cancellation (prior to initial disbursement);

2. Borrower, EPC or OC mailing address. Note: CDCs must not exercise unilateral authority to change the address of the Project Property;

3. Borrower, EPC or OC phone numbers and email addresses;

4. Principal or Guarantor mailing address; and

5. Principal or guarantor phone number and email address.

C. PCLP CDCs may modify and extend the loan authorization unilaterally and must notify SLPC of any change in loan amount. However, PCLP CDCs must obtain prior written consent from the SLPC for any adjustments to or changes in ownership of the Borrower, including percentage of ownership. PCLP CDCs may not unilaterally approve such adjustments or changes. The SLPC will approve the proposed modification and enter it into E-Tran after:

1. Verification that the proposed changes to the ownership of the Borrower comply with limitations on the aggregate amount of SBA portions of all loans to a Borrower, including affiliates; and

2. Verification that there has been no prior loss to the Government caused by the new owner(s) or any business owned, operated or controlled by the new owner(s).

D. Post-approval modifications (327 actions) must be submitted to the SLPC through the 504 E-TRAN system. Detailed guidance on the 504 E-TRAN submission process is available on the SBA website in the 504 E-TRAN User Guide for Submitting Loan Applications.

E. Neither the amount nor the maturity of a loan can be modified after the debenture closing has been completed.

# CHAPTER 6: CLOSINGS

## I.   RESPONSIBILITY FOR CLOSING THE 504 LOAN AND DEBENTURE

A. The CDC is responsible for the 504 loan closing, including compliance with all SBA Loan Program Requirements. Each CDC has its own division of labor and dictates the CDC Counsel's role. Although SBA Counsel is available for advice and assistance, the CDC and its attorney are ultimately responsible for the 504 Loan closing. (13 CFR §§ 120.960 and 120.10)

B. The debenture closing is the joint responsibility of the CDC and SBA. CDC must prepare the documents necessary for closing the debenture. SBA Counsel reviews the loan closing package for legal sufficiency and opines whether SBA may guarantee the debenture. (13 CFR § 120.960)

C. All CDC Counsel (including Designated Attorneys and those without Designated status) who submit 504 Loan closing packages to SBA must use the form Opinion of CDC Counsel (Appendix D to the 504 Authorization Boilerplate). The Opinion of CDC Counsel requires the CDC Counsel to acknowledge that SBA will rely upon the Opinion in guaranteeing the Debenture. Additionally, the Opinion requires the CDC Counsel to certify that the CDC Counsel is a licensed, active member, in good standing, of the Bar of the applicable state. If closing deficiencies that cause a loss on the 504 loan occur, SBA may pursue a claim against the CDC Counsel for the closing deficiencies. SBA will also expect the CDC to timely pursue any claims the CDC may have against the CDC Counsel as a result of closing deficiencies. Additionally, all CDC Counsel are considered to be Agents who conduct business with SBA under 13 CFR 103.1(a). The regulation at 13 CFR 103.4 provides that SBA may suspend or revoke an Agent's privilege to conduct business with SBA for good cause, including violations of ethical guidelines which govern the profession or business of the Agent or which are published at any time by SBA. Finally, as set forth in Subpart A, Chapter 3, Para. V.A.7., good cause for withdrawal of Designated Attorney status includes, among other things, submission of unsatisfactory 504 closing packages.

## II.   THE CLOSING PACKAGE

A. Types of Loan Closing Packages:

1. Regular closing package submitted by either non-Priority CDCs or Priority CDCs who are not using a Designated Attorney; and

2. Expedited closing package submitted by a Priority CDC using a Designated Attorney under the expedited closing process.

B. The Closing Package:

1. SBA has adopted a 504 Debenture Closing Checklist (Checklist) (SBA Form 2286). CDCs and SBA must use this Checklist for all 504 debenture closings. The Checklist lists the documents SBA requires to determine whether the debenture can be sold to fund the loan. It is not intended to include all the items the CDC will need to properly close the loan.

2. SBA requires that the CDC submit to SBA Counsel for review a completed SBA Form 2286

along with either:

    a.  For regular closings, the 13 items on the Checklist; or

    b.  For expedited closing packages, the first 8 items on the Checklist.

With either type of loan closing package, in rare circumstances if an additional document is necessary, the CDC may submit it along with an explanation of the significance.

3.  Mandatory Forms:

    a.  Documents on the Checklist that have an SBA form number

    b.  Opinion of CDC Counsel (Appendix D to the 504 Authorization Boilerplate); and

    c.  The SBA-approved environmental indemnification agreement.

CDCs may use their own forms for the lien instruments on Project Property and secondary collateral. Those forms must be either state bar-approved forms or approved by SBA Counsel prior to submission. The lien instruments on real estate must contain a due-on-sale clause. Please note: The SBA Forms 928 and 930 are expired and must not be used.

## III. SPECIFIC RESPONSIBILITIES AND PROCEDURES FOR CLOSING AND POST-CLOSING ACTIVITIES

A.  CDC's Responsibilities:

The CDC must:

1.  Certify that the Project costs were paid in full and that the Project proceeds were used in accordance with the requirements of the Authorization, and that each party to the Project contributed the required amount to the costs. To support this certification, the CDC must have evidence of the use of proceeds and the contributions by each party (Third Party Lender, Interim Lender, and Borrower). Sufficient evidence is:

    a.  For the purchase of land and or building, a Settlement Statement, or its equivalent, showing the amounts paid and whether paid by the Borrower or from the Third Party Lender or Interim Lender's loan proceeds.

    b.  For construction or renovations,

        i.  Copy of construction contract and all change orders;

        ii.  Evidence of each progress payment and final payment of project reflecting cumulative costs and source of payment (Third Party Lender, Interim Lender, or Borrower);

        iii.  If a construction escrow account is used as set forth in this SOP, copies of paid invoices and a copy of the cancelled check made payable to the Borrower and the designated contractor; and

        iv.  Copy of Mechanic's Lien Releases, if applicable.

    c.  For debt refinancing, a copy of the transcript of account and settlement statement.

    d.  For all other costs, a settlement statement or copies of the paid invoices and cancelled checks or evidence of wire transfers.

    e.  No funds should be paid directly to the Borrower unless the CDC obtains evidence of the Borrower's payments (cancelled checks and paid invoices).

2. Notify SBA Counsel in writing of planned debenture closings at least 30 days before the Lead SBA Office deadline for CDCs to submit closing packages. This notification is for SBA Counsel's planning purposes only and the CDC may ultimately submit more, fewer or different closing packages.

3. Request from the SLPC all necessary modifications to the Authorization before submitting closing packages as far in advance of submitting the loan closing package as possible. The CDC must obtain SBA approval of all such issues before submitting the closing package to the Lead SBA Office.

4. Each CDC must issue a written opinion based upon financial statements current within 120 calendar days from the date of loan closing that to the best of its knowledge there has been no unremedied substantial adverse change in the Applicant's (or Operating Company's) ability to repay the 504 loan since its submission of the loan application to SBA. This CDC opinion must be made within 14 business days prior to its submission of its opinion to SLPC and supported by financial statements that are dated no earlier than 120 calendar days from the date of closing. The date of loan closing is the date by which the closing package for a loan must be submitted to SBA Counsel in order for the loan to be scheduled for the next debenture sale. This date is established by SBA Counsel.

5. For all 504 loans except ALP and PCLP, CDCs must provide its finding to the SLPC along with copies of the financial statements. The SLPC either will notify the CDC of its approval or, if SBA disagrees with the CDC's determination of no unremedied substantial adverse change, the debenture will not close until SBA has been satisfied that any adverse change has been remedied. ALP and PCLP CDCs must submit the closing package to SBA Counsel and retain the finding and copies of the financial statements on which they relied in their files.

6. If the debenture closing is not consummated in the month following the CDC's opinion of no unremedied substantial adverse change, the CDC must prepare a new opinion and follow the same process described above if the financial statement supporting the opinion will be more than 120 days old when the CDC requests the file from the SLPC for closing. For example, if a CDC's opinion of no unremedied substantial adverse change is made and approved in April, the debenture may be funded in May or June if the financial statements supporting the opinion remain no more than 120 days old at the time the request for the file is made. Otherwise, the CDC must submit a new opinion to the SLPC in the same manner noted above.

7. Request that access to each Authorization and all modifications be granted by the SLPC to the SBA Counsel for closing in time to meet the Lead SBA Office's deadline for submission of loan closing packages. CDCs must not request access to the Authorization and modifications unless the debenture is ready for closing and sale during the month following the request. If access has not been granted to SBA Counsel by its loan closing package submission deadline, SBA Counsel may hold over the package for the next month's

debenture sale.

8. Electronically submit closing packages by the deadline established by SBA Counsel. SBA Counsel may hold late packages over for the next month's debenture sale.

9. Use only the 504 Debenture Closing Checklist and submit documents in the order appearing on the Checklist. In the column labeled "CDC" on the Checklist, the CDC must check off each document the CDC has included in the closing package or for documents not applicable to a particular transaction, write "NA" in the block. CDC must submit only a copy of each document, and must retain the original until SBA Counsel completes his or her review. After the debenture sale, the CDC must retain a copy of the closing package in its files and make it available to SBA upon request.

10. Hold all original loan documents until SBA gives the CDC written notification that SBA has completed its review of the closing package and approved the debenture sale. If SBA Counsel determines that the loan is ready for funding, SBA Counsel must notify the CDC and CSA that the debenture is ready for sale. If the SBA Counsel determines that changes are needed in the closing documents, SBA must notify the CDC of such changes before the cut-off-date by which the CSA must receive documents from the CDC for the debenture sale. After the CDC makes the necessary changes and SBA has approved the changes, SBA must notify the CDC and CSA that the debenture is ready for sale.

11. Send by overnight mail to the CSA the necessary debenture closing documents for the debenture sale. After SBA sends the CDC notice of which debentures SBA has approved for sale, the CDC must send to the CSA by overnight mail the following debenture closing documents for each debenture to be sold:

    a. Servicing Agent Agreement (SBA Form 1506) (original);

    b. Development Company 504 Debenture (SBA Form 1504) (original);

    c. Note (CDC/504 Loans) (SBA Form 1505) (copy);

    d. Authorization Agreement for Preauthorized Payment (Debit) and voided check (original);

    e. Request for Taxpayer ID Number and Certification (IRS Form W-9) (original); and

    f. Third Party Lender participation fee check (if not being deducted from the CDC processing fee) (original).

12. Forward the original of all documents listed on the 504 Debenture Closing Checklist (which serves as the original collateral listing) to the appropriate CLSC within 30 days after the debenture sale.

    a. The CDC must forward the collateral file containing all the original documents listed on the Checklist to the CLSC. The CDC must use the Checklist as the collateral listing. The CDC must maintain the collateral file in a manner acceptable to SBA.

    b. If the CDC has not yet received all original documents by 30 days after the debenture sale date, the CDC must send the documents it does have and must send additional documents along with a collateral listing upon receipt.

13. Ensure that all recorded interim lender documents are canceled of record (officially canceled at the place of recordation, as required by law) within 90 days after funding.

14. If a 504 loan is canceled after closing but before funding. Ensure that all recorded documents are canceled of record.

B. SBA Counsel's Responsibilities:

SBA Counsel Must:

1. Issue an annual 504 debenture closing schedule with Lead SBA Office deadlines for receiving closing packages. SBA Counsel responsible for debenture closing in each Lead SBA Office must make available an annual schedule of the deadlines for receipt of both regular and expedited closing packages for each monthly debenture sale to the public and to CDCs who regularly submit closing packages to the district.

2. Review closing packages. SBA Counsel must use the standard Checklist to review the 8 documents submitted for an expedited closing and 13 documents submitted for a regular closing. If SBA Counsel has concerns that SBA may be at material risk if the debenture is sold, then SBA Counsel must contact the CDC and identify what information is reasonably necessary to address that concern. If the CDC is unable to provide the information or otherwise alleviate the concern, then the debenture will not be submitted for sale. In addition, SBA Counsel must verify that the information the CDC entered onto the Debenture, Note, and Servicing Agent Agreement forms is accurate and complete.

3. Notify CDCs of deficiencies. SBA Counsel may reject late packages or packages that do not meet the standards for debenture sale. If the SBA Counsel determines that changes are needed in the closing documents of packages approved for sale, SBA Counsel must notify the CDC of such changes before the deadline upon which the CDC must mail the documents to CSA for the debenture sale. If SBA Counsel rejects a package, SBA Counsel must notify the CDC that SBA will not include the package in the scheduled sale and advise the CDC in writing of what the CDC needs to correct for the package to meet the standards for sale. The CDC may resubmit the package for a future sale with the required changes.

4. If SBA Counsel discovers an issue in reviewing the closing package that impacts eligibility or closing of the loan, SBA Counsel will advise the CDC and CDC Counsel. If the issue cannot be resolved, then SBA Counsel will notify the Area Counsel of the issue, who will make a recommendation to OGC and OCA for a final decision.

5. Issue an SBA Counsel closing opinion. Once SBA Counsel is satisfied with the loan closing package (including that the CDC has made all necessary changes to the closing documents as identified by SBA Counsel), SBA Counsel must issue an opinion pursuant to 13 CFR § 120.960(c) stating that the debenture may be closed, SBA may execute its guarantee, and the debenture may be sold. The SBA Counsel's Opinions should be sent to the SLPC.

6. Notify the CDC and the CSA which loans SBA has approved for debenture funding. SBA Counsel must notify the CDC and the CSA in writing as to which debentures the Lead SBA Office approves for funding in that month's sale.

C. Complete File Reviews (CFRs):

SBA Counsel must conduct a CFR of a random selection of all loan closings, whether those closing packages were submitted by Priority CDCs or non- Priority CDCs, to ensure program integrity. A Complete File Review consists of a review of the items listed on the Checklist for Complete File Review, SBA Form 2303. The number and frequency of CFRs are at the discretion of SBA Counsel, but no less than one package per 10 closing packages submitted by each CDC will be reviewed.

SBA Counsel will notify the CDC when a loan has been selected for a CFR, and the CDC must promptly submit to SBA Counsel the applicable items on SBA Form 2303 for that loan. SBA Counsel will prepare a written report documenting the CFR and its results, and send a copy of that report to:

1. The CDC;

2. The CDC's 504 closing attorney that closed the loan;

3. The SBA Counsel that reviewed and opined upon the loan closing package; and

4. The CLSC loan file.

If the CFR reveals closing deficiencies that could result in a loss to SBA, the CDC and/or its closing attorney must promptly correct the deficiencies, if possible. SBA may take other action, including an action against the CDC closing attorney as described in Para. I. above. In the event of a loss, SBA may pursue an action against the CDC under 13 CFR 120.938(b).

D. Central Servicing Agent's (CSA) Responsibilities:

The CSA must:

1. Review debenture closing documents, package and price debenture for sale, and conduct debenture sale. The CSA notifies the CDC of any changes that need to be made or additional information to be provided before the debenture sale can occur.

2. Complete the Servicing Agent Agreement and Note: The CSA fills in the remaining blanks on the Note and Servicing Agent Agreement, generating conformed pages, and executes the Servicing Agent Agreement.

3. Distribute post-closing documents. The CSA will provide the following documents on line:

   a. The first page of the Note;

   b. The Note amortization and prepayment schedules; and

   c. Pages 3 and 4 of the Servicing Agent Agreement.

E. The Trustee's responsibilities:

The Trustee will provide copies of the Debenture and the Debenture amortization and prepayment schedules to the CDC, CSA, or SBA, as directed.

## CHAPTER 7: DEBENTURE PRICING & FUNDING

I.   **PRICING A 504 DEBENTURE (13 CFR § 120.931)**

A.   Terms:

1.   Net Debenture Proceeds is defined in Chapter 1 of this Subpart.

2.   Gross Debenture: The net debenture proceeds plus the administrative costs. See Chapter 2 in this Subpart for eligible administrative costs.

The Gross Debenture is subject to the following dollar limits and conditions:

a.   $5,000,000 in the aggregate for each small business concern, including its affiliates. This limit applies to all 504 Projects except for the Projects identified in b) below. In addition, in calculating this limit, SBA loan guaranties, committed or outstanding, that the Applicant and its affiliates have received through the 7(a) (including Community Advantage) or 504 loan programs must be included.

b.   $5,500,000 for:

i.   Each Project for Small Manufacturers (defined as a business with its primary NAICS Code in Sectors 31, 32, and 33, and all of its production facilities are located in the United States) that satisfies one of the economic development objectives described in Chapter 2, Paragraph IV of this Subpart;

ii.   Each Project that reduces the Borrower's energy consumption by at least 10% (Eligible Energy Public Policy Project). This category may not be used for Projects involving new businesses. In addition, if this project involves:

a)   The construction or acquisition of a facility (the "new facility"), the new facility must replace an existing facility. The energy consumption at the existing facility must be compared with the new facility to determine if the Project satisfies the 10% energy reduction goal. The new facility must be located in the same local area (e.g. the same city, town, county, zip code, metropolitan statistical area or as otherwise deemed appropriate by SBA), and the Applicant must be able to demonstrate that the new facility will use 10% less energy than the existing facility. In addition, the energy consumption between the two facilities must be compared for energy consumption on a square footage basis.

b)   The retrofit of an Applicant's existing facility, the retrofit must reduce the energy consumption of that facility by at least 10%, regardless of the energy usage of any other facilities that the Applicant may operate;

OR

iii.   Each Project for plant, equipment and process upgrades of renewable energy sources such as the small-scale production of energy for individual buildings or communities' consumption, commonly known as micropower, or renewable fuel producers including biodiesel and ethanol producers (Eligible Energy

Public Policy Project). This Project must generate more than 15% of the energy used by the Applicant at the Project facility. In addition, all improvements or equipment required to generate the renewable energy or renewable fuels must be included in the 504 Project costs.

c.   With respect to paragraphs b.ii and b.iii above, the Applicant must document the Eligible Energy Public Policy Project's compliance through either an energy audit, engineering report, or other professional evaluation, as deemed appropriate by SBA, that is based on the annual energy usage at the facility or facilities (measured in actual energy usage, e.g. kilowatt hours, therms, or gallons, as applicable, not in dollar costs), and that, at a minimum, includes the following:

   i.    A description of the facility or facilities;

   ii.   The current energy usage;

   iii.  The projected energy usage, which must be based on all modifications and retrofits to building(s), and all installations of, and replacements and retrofits to, equipment; and

   iv.   The qualifications of the party performing the energy audit, engineering report, or other professional evaluation, each of which must be performed by an independent third party (by an entity other than the applicant, the interim lender, the Third Party Lender, or any of their respective affiliates).

   There can be more than one Project funded under paragraph 2.b (for small manufacturers and Eligible Energy Public Policy Projects) for the same Applicant or for its affiliates provided that SBA determines that each Project meets prudent lending standards. For Eligible Energy Public Policy Projects, the outstanding Gross Debentures issued for a small business concern, including its affiliates, must not exceed $16,500,000 in the aggregate.

   Note: The $5,500,000 amount for each Project described in paragraph 2.b above is not reduced by any other outstanding SBA loan guaranties that the Borrower and its affiliates have received through other SBA loan programs. In addition, 504 loans made for the Projects described in paragraph 2.b) above do not reduce the $5,000,000 limit for each small business concern for other 504 Projects.

B.  Determining SBA's Share of the Project Costs:

To price a debenture, you must determine SBA's share of a project's total cost. The following hypothetical project will identify the amount of funds required to fund both the eligible project costs (Net Debenture) plus the administrative costs totals the Gross Debenture amount.

To illustrate, assume that total project costs (land, building and machinery and equipment and eligible soft costs) are $1,000,000. Assuming SBA will finance 35% of the project costs for 20 or 25 years, participation in project financing would be as follows:

| %   | Participation     | Amount   |
|-----|-------------------|----------|
| 50% | Third-Party Lender | $500,000 |

| 35% | 504 Net Debenture | $350,000 |
| 15% | Small Business | $150,000 |
| 100% | Total Project Costs | $1,000,000 |

C.  Steps to Calculate the Gross Debenture:

Use the following step by step pricing model procedures to determine the administrative costs and the Gross Debenture amount. Except for the underwriting fee and closing costs, each administrative cost is based on the amount of the Net Debenture.

| 1 | Net Debenture | Determine the Net Debenture: | $350,000.00 |
| 2 | SBA Guaranty Fee (0%) | multiply $350,000 by 0.000 = | $0.00 |
| 3 | Funding Fee (.25%) | multiply $350,000 by .0025 = | $875.00 |
| 4 | CDC Processing Fee (1.5%) | multiply $350,000 by .015  = | $5,250.00 |
| 5 | Eligible Closing Costs* | = | $2,500.00 |
| 6 | Gross Debenture Amount | To calculate the Gross Debenture, add items 1 through 5 above and divide the total by 0.996 for 20 or 25-year debentures (for 10-year debentures, this number would be 0.99625). This step adds the Underwriter's Fee to the total debenture. Round this number up to the next even thousand. | |
| | | Net Debenture Proceeds | $350,000.00 |
| | | SBA Guaranty Fee | $0.00 |
| | | Funding Fee | $875.00 |
| | | CDC Processing Fee | $5,250.00 |
| | | Closing Costs | $2,500.00 |
| | | Total | $358,625.00 |
| | | Divide by 0.99600 (0.99625 for 10-Year Debenture) | $360,065.20 |
| | | Round up to the next even thousand | $361,000.00 |
| | The Gross Debenture in this example is $ 361,000.00. | | |
| | Note: The Gross Debenture is calculated first because the Underwriter's Fee is based on the Gross Debenture, not the Net Debenture. | | |
| 7 | Underwriter's Fee | To determine the exact amount of the underwriter's fee, multiply the 20 or 25-year Gross Debenture by .004 (for 10-year debentures, this number would be .00375). | |
| | | Multiply $361,000.00 by .004 = | $1,444.00 |

| 8 | Balance to Borrower.<br>The difference between the Gross Debenture amount ($361,000.00) and the sum of Net Debenture proceeds ($350,000.00), processing and closing fees ($8,625.00), and Underwriter's fee ($1,444.00) goes to the Borrower. |
| | In this example, the Balance to Borrower is:<br>$361,000.00 – ($350,000.00 + $8,625.00 + $1,444.00) = $931.00. |

*For Eligible Project Costs and fees, see Chapter 2 of this Subpart.

D.  Separate Payment of the Debenture Fees:

1.  The CDC's Processing Fee and the closing costs are the only fees that can be paid upfront and deleted from the Gross Debenture calculations.

2.  If the Borrower chooses to pay the CDC's Processing Fee upfront, the Borrower may be reimbursed for the CDC's Processing Fee from the debenture proceeds.

    a.  If the Borrower is reimbursed, the CDC's Processing Fee will be included in calculating the Gross Debenture. The CDC will receive the fee as usual. The CDC then must reimburse the Borrower.

    b.  If the Borrower does not want to be reimbursed for the CDC's Processing Fee from the debenture proceeds, the Gross Debenture calculation must include the CDC's Processing Fee in order to determine the correct Underwriter's Fee. Once the Underwriter's Fee is calculated, a zero is then entered on the CDC's Processing Fee line in the SBA Form 1506, and the dollar amounts are re-totaled and rounded to the next higher thousand for the new Gross Debenture amount.

E.  When the Debenture is Priced:

1.  A Debenture is priced at time of application. If there are any changes in the 504 portion of the project costs between loan approval and project completion, the Debenture must be re-priced.

2.  If the Borrower does not use the full amount of any contingency fund, then the Debenture may be re-priced as follows:

    a.  If the amount of the unused contingency fund is 2% or less of the approved Gross Debenture amount, the difference must be refunded to the Borrower from the Gross Debenture proceeds by the CSA. No change is needed in the Debenture amount, and this does not require a loan modification request.

    b.  If the amount of the unused contingency fund is greater than 2% of the approved Gross Debenture amount, the CDC must request a loan modification from the SLPC prior to closing to reduce the Net Debenture proceeds by the amount of the unused contingency fund, and the Debenture amount is recalculated. (13 CFR § 120.930(c))

II.  **FUNDING THE DEBENTURE**

The 504 Debentures are normally sold and proceeds disbursed on the Wednesday after the second Sunday of each month. The Fiscal Agent normally negotiates the final rate and fees with underwriters on the Tuesday after the first Sunday of each month.

A. Disbursement of Debenture Proceeds:

On the scheduled sale date, the Gross Debenture proceeds, less the Underwriter's Fee, will be wired to the CSA. Upon receipt of the proceeds, the CSA must:

1. Deduct an amount sufficient to cover the following:

   a. Its initiation fee as computed and identified by SBA in the Servicing Agent Agreement, if applicable (not presently applicable); and

   b. A guaranty fee payable to SBA, as in effect at the time of loan approval.

2. Disburse the balance of the proceeds within 48 hours of receipt of funds as follows:

   a. Payoff the interim lender of the Net Debenture amount;

   b. CDC's Processing Fee; and

   c. Balance to Borrower based on the CSA's computations under the pricing model.

B. Community Adjustment and Investment Program (CAIP):

CAIP was established in 1993 to assist U.S. companies doing business in areas of the country that have been negatively affected by the North American Free Trade Agreement (NAFTA). CAIP loans allow for the reimbursement of the guaranty fee on eligible 504 loans. CAIP is a Special Purpose Loan Program that is authorized under separate or special funding under SBA's budget. The program is currently authorized but is not funded.

Check with the Lead SBA Office or the Sacramento Loan Processing Center (SLPC) to see if funding for these programs becomes available.

# CHAPTER 8: ALLOWABLE FEES

## I.   ALLOWABLE FEES THAT A 504 BORROWER MAY BE CHARGED

The fees that a 504 Borrower may be charged can be found at: 13 CFR §§ 120.971, 120.972, 120.883(e) and 120.882(g)(4) and are described in the table below.

| 504 Fees | | |
|---|---|---|
| **CDC Fees** | | |
| (1) Processing fee (Packaging fee) | Up to1.5% of the Net Debenture | Paid by Borrower to CDC. |
| (2) Closing Fee | Maximum of $2,500 may be financed from the debenture proceeds. | CDC may charge a reasonable closing fee --sufficient to reimburse it for the expenses of its in-house or outside legal counsel, and other miscellaneous closing costs. Paid by Borrower. |
| (3) Servicing fee (monthly) | Minimum of 0.625%/year. Maximum of 2%/year Note: Maximum 1.5% for rural areas and 1% for everywhere else without prior SBA approval. | Based on the unpaid principal balance of the loan – paid by Borrower to CDC |
| (4) Late fees | Loan payments received after the 15th of each month may be subject to a late payment fee of 5% of the late payment or $100, whichever is greater. | Collected by CSA (Central Servicing Agent) on behalf of the CDC. |
| (5) Assumption fee | Not to exceed 1% of the outstanding principal balance of the loan being assumed. | Upon SBA's written approval– paid by Borrower to CDC. |
| **CSA Fees** | | |
| Initiation fee | In accordance with the contract between the CSA and SBA. | |
| On-going fee | In accordance with the contract between the CSA and SBA. | |
| **Other Agent Fees** | | |
| Underwriter's fee for 20 and 25-year Debenture | Upfront fee of 0.4% | Paid by Borrower to Underwriter. |

| 504 Fees | | |
|---|---|---|
| Underwriter's fee for 10 year Debenture | Upfront fee of 0.375% | Paid by Borrower to underwriter. |
| **SBA Fees** | | |
| (1) SBA Guaranty Fee - (up-front fee) | | One-time fee |
| (2) Annual Fee -- (Ongoing fee) | | Fee is adjusted annually by cohort year (based on date the individual loan was approved) and is charged on the unpaid principal balance of the loan. |
| (3) Participation Fee -- Senior Lienholder | 0.50 % of the senior mortgage loan -- One -time fee | A one-time fee from the Third Party Lender if in a senior lien position to SBA in the project. The fee may be paid by the Third Party Lender, CDC or Borrower. |
| (4) CDC Fee | On-going fee to SBA of 0.125% of the outstanding principal balance of the debenture -- Annual Fee | The fee must be paid from the servicing fees collected by the CDC and cannot be paid from any additional fees imposed on the Borrowers (loans approved by SBA after 9/30/1996). |
| (5) Debt Refinancing Without Expansion Supplemental fee | Set each FY by SBA notice | Paid by Borrower. |
| **Funding fee** | 0.25% of the net Debenture Proceeds | Changed to cover the costs incurred by the trustee, fiscal agent and transfer agent. |

## II.   FEES FOR OTHER SERVICES

A.   The CDC may be compensated for other services provided to a small business such as packaging and servicing a 7(a) loan or providing management assistance. Such fees are to be charged pursuant to a formal agreement between the CDC and the 7(a) Lender setting forth the roles and relationships of the parties as well as terms and conditions and must be in compliance with SBA regulations.

B.   CDC referral fees for locating third party financing (13 CFR § 120.926):

The CDC may earn a fee for this service provided it is:

1. Based upon a contractual agreement between the Third Party Lender paying the referral fee and the CDC; and

2. Not paid by the Borrower or funded from the debenture proceeds.


## III. DISCLOSURE OF FEES AND CDC EXPENSES (13 CFR PART 103)

A. Disclosure of Fees and Identification of Agents:

Section 13 of the Small Business Act (15 U.S.C. §642) requires that an Applicant identify the names of persons engaged by or on behalf of the Applicant for the purpose of expediting the application and the fees paid or to be paid to any such person. SBA regulations at 13 CFR § 103.5 require any agent to execute and provide to SBA a compensation agreement ("Agreement"). Each Agreement governs the compensation charged for services rendered or to be rendered to the Applicant or CDC in any matter involving SBA assistance. "Agent" means an authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or any other person representing an applicant, or participant by conducting business with SBA.

B. SBA Form 159 "Fee Disclosure Form and Compensation Agreement":

1. The Applicant or the CDC, depending on who paid or will pay the Agent, must use SBA Form 159, "Fee Disclosure Form and Compensation Agreement," to document the fees. A separate SBA Form 159 must be executed for each Agent. If the same Agent provides multiple services to the Applicant or CDC, all services provided by the same Agent may be listed on a single SBA Form 159.

2. Information on this form will be used to monitor fees charged by Agents and the relationship between Agents and CDCs. CDCs must make sure that all of the appropriate data fields on SBA Form 159 are completed.

3. The following are not considered Agents for purposes of this Agreement and, therefore, are not required to complete SBA Form 159:

   a. Applicant's accountant for the preparation of financial statements required by the applicant in the normal course of business and not related to the loan application;

   b. A state-certified or state-licensed appraiser employed by the CDC to appraise collateral in connection with the SBA loan;

   c. An environmental professional employed by the CDC to conduct an environmental assessment of the collateral in connection with an SBA loan;

   d. An individual who is a qualified source as defined in Subpart B, Chapter 4, of this SOP and employed by the CDC to conduct an independent business valuation in connection with an SBA loan;

   e. Any attorney in connection with the SBA loan closing; and

   f. A real estate agent who is receiving a commission for the sale of real estate in connection with the SBA loan.

4.  The CDC must inform the Applicant in writing that the Applicant does not have to employ an Agent or representative (including the CDC) to assist the Applicant with the loan application. If an Applicant employs an Agent or representative, the fee paid must bear a reasonable relationship to the services actually performed. The SBA does not allow contingency fees (fees paid only if the loan is approved) or charges for services which are not reasonably necessary in connection with an application.

5.  If the total compensation exceeds $2,500, the compensation must be itemized. When a single provider charges an Applicant in connection with multiple applications, fees are aggregated to establish the $2,500 threshold for itemization. Separate SBA Forms 159 must be completed for each application.

6.  CDCs must upload SBA Form(s) 159 into E-Tran within 30 days of the initial disbursement on the loan for loans involving payment of fees, including, but not limited to, those covering any packaging fees charged to the Applicant by the CDC or where the CDC paid the Agent fee (e.g., a referral fee). For those loans that were funded prior to the effective date of this SOP, the CDC may upload Forms 159 to E-Tran or submit with the CDC's Annual Report. CDCs are required to retain an original signature version of the form in their files for compliance review purposes.

## IV.  AGENTS

SBA expects CDCs to exercise due diligence and prudent oversight of their third party vendors, including professional service contractors and other loan agents, which should include having written policies governing such relationships and monitoring performance of loans referred by an Agent or where an Agent provided assistance. SBA will review evidence of such due diligence and oversight of such relationships when conducting CDC oversight activities.

A.  SBA regulations at 13 CFR Part 103 govern the activities of Agents, the disclosure of fees, and the circumstances that would result in revocation or suspension.

1. Agent – (13 CFR § 103.1(a))

a.  SBA defines an "Agent" to mean an authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or any other person representing an applicant, or participant by conducting business with SBA.

b.  For individuals or entities operating under a professional services contract, SBA approves the written agreement or contract with the CDC and the SBA Form 159 is not required. (13 CFR §§ 103.5(c) and 120.824) (Professional Services Contracts are used under the 504 Program rather than Lender Service Provider Agreements. See Subpart A, Chapter 3 for guidance on professional service contracts.) Fees paid by the CDC in accordance with the professional services contract cannot be passed onto the Applicant.

c.  For all other Agents, paid by either an Applicant or a CDC, an SBA Form 159 must be completed and signed by the Applicant and the CDC. For each Agent paid by the Applicant to assist it in connection with its application, the Agent also must complete and sign the form. When an Agent is paid by the CDC, the CDC must identify the Agent on SBA Form 159 and the CDC and Applicant must sign the

form.

    d.  The only situation where an Agent can receive compensation from both the CDC and the Applicant is when the Agent is providing different services by providing packaging services to the Applicant and receiving a referral fee from the CDC. (13 CFR § 103.4(g))

    e.  The SBA does not allow contingency fees (fees paid only if the loan is approved) or charges for services which are not reasonably necessary in connection with an application.

2. Referral Agents – (13 CFR § 103.1(f))

"Referral Agent" means a person or entity that identifies and refers an Applicant to a CDC or a CDC to an Applicant. The referral agent may be employed and compensated by either an Applicant or a CDC. Each referral agent, including loan packagers, must disclose the name of its customer and all fees charged in connection with the SBA loan transaction on SBA Form 159.

B.  Agents and Privacy Act Considerations:

Private information about a loan cannot be discussed with anyone who claims to be an Agent for an Applicant or CDC without evidence of representation. Proprietary information is protected by the Right to Financial Privacy Act and the Privacy Act. Without proper authorization, SBA and CDCs may not discuss private information with even a spouse or other close relative of the Applicant.

C.  Employment of Agent Initiated by Applicant:

CDCs and Agents must clearly inform any Applicant that the SBA does not require the use of an Agent for packaging or referring a loan application. When an Applicant employs an Agent:

1.  The Agent may bill and be paid by the Applicant for providing packaging services as long as compensation is reasonable and customary for those services; the compensation complies with Subpart B, Chapter 3 of this SOP; and the compensation is not contingent on the loan being approved.

2.  The Agent who works for an Applicant as a packager may also work as a loan referral agent for the Applicant and receive a referral fee from the Applicant.

3.  The Agent may be a loan referral agent for a CDC and a packager for an Applicant, provided both the Applicant and the CDC are aware of both relationships, and the Agent does not receive a referral fee from the Applicant or a packaging fee from the CDC.

4.  SBA Form 159 must be completed by the Agent and the Applicant for all fees paid by the Applicant.


## V.   WHO MAY CONDUCT BUSINESS WITH SBA (13 CFR §103.2)

A.  Any person or entity applying for SBA assistance does not need an Agent to conduct business with SBA. The term "conduct business with SBA" is defined at 13 CFR § 103.1(b).

1.  Individuals and entities suspended, debarred, revoked or otherwise excluded under the SBA

or Government-wide debarment regulations are not permitted to conduct business with SBA. SBA may require that an Agent supply written evidence of his or her authority to act on behalf of an applicant or CDC as a condition of revealing any information about the applicant's or CDC's current or prior dealings with the SBA. CDCs are responsible for consulting the System for Awards Management's (SAM)/Excluded Parties List System (EPLS) or any successor system to determine if an Agent has been debarred, suspended or otherwise excluded by SBA or another Federal agency. (https://www.sam.gov)

2. SBA may, for good cause, suspend or revoke the privilege of an Agent to conduct business with the government. The suspension or revocation remains in effect during any administrative proceedings under SBA regulations at 13 CFR Part 134. The meaning of "good cause" may be found at 13 CFR § 103.4.

B. Illegal Activity of an Agent Must Be Reported.

CDCs should report any illegal activity of Agents to the Office of the Inspector General, Attention: Assistant Inspector General for Investigations and D/OCRM. Any substantiating evidence should be included when contacting the Office of the Inspector General and OCRM.

C. Review of Agent Fees:

1. CDCs must review the Agent's services and related fees to determine if the fees are necessary and reasonable when:

   a) There is an indication from a third party that an Agent's fees might be excessive; or

   b) When an Applicant complains about the fees charged by an Agent.

2. In cases where fees appear to be unreasonable, CDCs should contact the D/OCRM to report the fees.

3. If an SBA investigation determines an Agent fee is excessive, the Agent must reduce the fee to an amount SBA deems reasonable, refund any sum in excess of that amount to the Applicant, and refrain from charging or collecting from the Applicant any funds in excess of the amount SBA deems reasonable.

## CHAPTER 9: BORROWER'S DEPOSIT, DEBENTURE POOLS AND POST-DISBURSEMENT ISSUES

### I.  RULES GOVERNING THE BORROWER'S DEPOSIT

A. At the time of application, the CDC may require a deposit from the Borrower of $2,500 or 1% of the Net Debenture Proceeds, whichever is less. For additional information relating to this fee, see 13 CFR § 120.935.

B. Agreements Regarding the Deposit:

A written agreement between the CDC and the Applicant should include the following:

1. If the CDC or SBA declines the application, the deposit will be refunded in full within 10 business days after decline, including any period for reconsideration;

2. If SBA approves the loan, the deposit may be applied toward the CDC processing fee described in 13 CFR § 120.883; and

3. If the Applicant withdraws its loan application at any time before SBA issues the Authorization, the CDC may deduct its reasonable and necessary costs incurred in packaging and processing the loan application. Such costs must be documented and cannot be a percentage of the loan. Any remaining deposit balance must be remitted to the Applicant within ten business days of the withdrawal.

C. A copy of the agreement must be placed in the CDC's file.

### II.  DEBENTURE POOLS

Neither a Borrower nor an Associate of the Borrower may purchase an interest in a Debenture Pool in which the Debenture that funded its 504 loan has been placed. (13 CFR § 120.939)

### III.  MISCELLANEOUS

See 13 CFR §§ 120.990 and 120.991 on the impact of current rules on older loans and the effect of other laws.

### IV.  POST-DISBURSEMENT ISSUES

A. A CDC may request changes on disbursed 504 loans by contacting the appropriate SBA Commercial Loan Servicing Center (CLSC).

1. Guidance on loan servicing is outlined in SOP 50 55 - 504 Loan Servicing and Liquidation. CDCs may not unilaterally approve any adjustment to or change in the ownership of a Borrower, including a change in percentage of ownership, for 12 months after final disbursement on any loan.

    2.    13 CFR § 120 Subpart E outlines requirements under SBA loan servicing, liquidation and debt collection litigation.

B.  Prepayment:

The Borrower may prepay its 504 loan. The repurchase price of the Debenture shall be an amount equal to the outstanding principal balance of the Debenture, plus interest accrued and unpaid thereon to the repurchase date, plus a prepayment fee, known as a repurchase premium ("RP"). More information may be found at:

    1.    13 CFR § 120.940 addresses prepayment of the 504 loan or debenture.

    2.    SBA's SOP 50 55, Chapter 15 - contains information on prepayment or purchase of a development company loan or debenture.

    3.    SBA Form 1504, "Development Company 504 Debenture," outlines the calculation of the prepayment fee.

    4.    PricewaterhouseCoopers Public Sector LLP is the current Central Servicing Agent (CSA) for closed SBA 504 loans.

## APPENDIX 1: RESTRICTIONS ON FOREIGN CONTROLLED ENTERPRISES

Various Federal laws prohibit foreign controlled U.S. enterprises from certain types of activities. These activities are listed below for your guidance. Exercise special care in processing loans involving these types of enterprises.

## I.      GENERAL RESTRICTIONS FOR FOREIGN CONTROLLED ENTERPRISES:

Foreign controlled enterprises operating in the United States, whether in branch or subsidiary form, may not do the following:[1]

   A.  Engage in operations involving the utilization or production of atomic energy (42 U.S.C. 2133(d)).

   B.  Own vessels which transport merchandise or passengers between U.S. ports or tow U.S. vessels carrying such merchandise or passengers between U.S. ports (46 U.S.C. 50501, 55102). There are exceptions to this general rule, one of which permits a foreign controlled U.S. manufacturing or mining company to engage in shipping activities related to its principal business (46 U.S.C. Appx. 833-1).

   C.  Acquire rights of way for oil pipelines or leases or interests therein for mining coal, oil, or certain other minerals on Federal lands other than the outer continental shelf if the foreign investor's home country does not permit such mineral leasing to U. S. controlled enterprises (30 U.S.C. 181, 185).

   D.  Engage in radio or television broadcasting unless the Federal Communications Commission (FCC) finds the grant of a license to be in the public interest (47 U.S.C. 301). The FCC has granted licenses for broadcasting activities ancillary to another business of a foreign controlled enterprise.

   E.  Acquire control of a company engaged in any phase of aeronautics (49 U.S.C. 40102, 41101, 41309).

   F.  Be issued permits for intra-United States air commerce or navigation. There are exceptions to this when certain requirements are met (49 U.S.C. 41302, 41703).

   G.  Obtain a fishery loan from the Secretary of Interior for the financing or refinancing or the cost of purchasing, constructing, or operating commercial fishing vessels or gear (16 U.S.C. 742c(b)(7)).

   H.  Receive a preferred ship mortgage (46 U.S.C. 31322, 12103).

   I.  Obtain special Government emergency loans from the USDA for agricultural purposes after a natural disaster (7 U.S.C. 1961) or USDA loans to individual farmers or ranchers to purchase and operate family farms (7 U.S.C. 1922, 1941).

---

[1]In certain cases foreign enterprises can acquire a minority interest in corporations engaging in the activities noted but certain management requirements may have to be met.

J.   Establish an Edge Act corporation to engage in international or foreign banking (12 U.S.C. 619).[2]

K.   Purchase Overseas Private Investment Corporation (OPIC) insurance or guarantees (22 U.S.C. 2198(c)).

L.   Obtain construction-differential or operating-differential subsidies for vessel construction or operation (46 U.S.C. 50501, 53101).

M.   During war or a national emergency, acquire or charter U.S. flag vessels, vessels owned by a U.S. citizen or shipyard facilities or acquire controlling interest in corporations owning the vessels or facilities described above without the approval of the Secretary of Commerce (46 U.S.C. 56102).

## II.    MANAGEMENT-RELATED RESTRICTIONS ON FOREIGN ENTERPRISES:

In certain cases, a foreign controlled enterprise operating in the United States must meet certain requirements relating to management in order to engage in particular activities. The foreign investor, however, can continue to own all the equity in the enterprise because the laws in question do not contain limitations relating to stock ownership. Unless these management requirements are met, foreign controlled enterprises may not do the following:

A.   Organize a national bank (all directors must be United States citizens) (12 U.S.C. 72).

B.   Engage in dredging or salvaging operations in U.S. waters (To register a vessel to engage in these activities, the president or chief executive officer of a domestic corporation and the chairman of its board must be U.S. citizens. The foreign citizens serving as directors cannot be more than a minority of the number necessary to constitute a quorum.) (46 U.S.C. 55109, 55111).

C.   Fish in the territorial water of the United States, land fish caught on the high seas and, except for corporations of countries with traditional fishing rights, fish in the United States fishing zone.(16 U.S.C. 1801, 1821)[3]

D.   Transport certain commodities procured by or financed for export by the United States Government or an instrumentality thereof. There are certain statutory exceptions to this rule (46 U.S.C. 55305, 55314).

E.   Obtain certain types of vessel insurance. (46 U.S.C. 53903)

F.   Obtain licenses to operate as customs-house brokers (19 U.S.C. 1641). (At least one of the officers must be U.S. citizens.)

## III.    RESTRICTIONS APPLICABLE TO FOREIGN BRANCHES OR INDIVIDUALS:

---

[2] In addition to its limitations on stock ownership by foreign enterprises, the Edge Act requires that all the directors of the corporation be United States citizens.

[3] To the extent that these activities involve the coast wise trade, certain limitations on stock ownership would have to be met (Cf. Sec. 1).

A.  In certain cases the form of business organization chosen by a foreign controlled enterprise will determine whether it will be treated differently from an enterprise controlled by United States citizens. If a foreign controlled enterprise chooses to operate through a sole proprietorship or a branch office rather than a corporation organized under the laws of one of the states, it may not:

1.  Obtain licenses to construct dams, reservoirs, houses, and transmission lines (16 U.S.C. 797(e));

2.  Obtain licenses to develop and utilize geothermal steam and associated resources on Federal lands (30 U.S.C. 1015); or

3.  Obtain certain rights of way, mining rights, leases or other rights on Federal lands. (*See, generally*, 43 CFR 2000-4000, *ex.* 43 CFR 3472, *also* 30 U.S.C. 22.)

These restrictions would not apply if the foreign controlled enterprises operated through a domestic subsidiary.

B.  In addition to restrictions previously noted, foreign citizens may not:

1.  Act as officers and serve in certain other positions on certain vessels (Cf. 46 U.S.C. 8103); or

2.  Function as operators in radio or television stations (47 U.S.C. 303(1) and 310).

.

# APPENDIX 2: DEFINITIONS

For purposes of the environmental portions of this SOP, the following definitions apply. Terms that are not defined below but are defined in CERCLA, 13 CFR §or 40 CFR shall have the meaning provided in CERCLA, 13 CFR §or 40 CFR.

**"Acquisition"** or **"Acquisition Date"** means the date on which a Person acquires title to the Property.

**"Adjoining Properties"** means any real property or properties the border of which is (are) shared in part or in whole with that of the Property, or that would be shared in part or in whole with that of the Property but for a street, road, or other public thoroughfare separating the properties (See 40 CFR § 312.20).

**"All Appropriate Inquiries" (AAI)** means the standards and practices set forth in 40 CFR § 312.20.

**"ASTM"** refers to ASTM International. www.astm.org

**"At"**, whether capitalized or not, when used with respect to the Property or Adjoining Properties, means "at, on, in, into, under, above, from or about."

**"CERCLA"** means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.

**"Child-Occupied Facility"** means a building, or portion of a building, constructed prior to 1978, visited regularly by the same child, under 6 years of age, on at least two different days within any week (Sunday through Saturday period), provided that each day's visit lasts at least 3 hours and the combined weekly visits last at least 6 hours, and the combined annual visits last at least 60 hours. Child-occupied facilities may include, but are not limited to, day care centers, preschools, and kindergarten classrooms. Child-occupied facilities may be located in target housing or in public or commercial buildings. With respect to common areas in public or commercial buildings that contain child-occupied facilities, the child-occupied facility encompasses only those common areas that are routinely used by children under age 6, such as restrooms and cafeterias. Common areas that children under age 6 only pass through, such as hallways, stairways, and garages are not included. In addition, with respect to exteriors of public or commercial buildings that contain child-occupied facilities, the child-occupied facility encompasses only the exterior sides of the building that are immediately adjacent to the child-occupied facility or the common areas routinely used by children under age 6. See 40 CFR § 745.83

**"Contamination"** means the presence of any Hazardous Substance at or affecting the Property, including any Hazardous Substances that have migrated to or from the Property, in such quantities or under such conditions as to render the Property or the operations conducted thereon subject to, or potentially subject to, a directive or order from a Governmental Entity.

**"Engineering Control"** means a device or structure constructed at the Property to prevent people from coming into contact with Contamination or to prevent mobile Contamination such as groundwater Contamination from moving off site. Examples include asphalt or concrete caps, fences, extraction wells, trenches and subsurface barrier walls.

**"Environmental Investigation"** refers to the process of assessing the environmental conditions at a Property. For example, an Environmental Investigation may include one or more of the following: an Environmental Questionnaire, Records Search with Risk Assessment, Transaction Screen Analysis, Phase I Environmental Site Assessment (Phase I ESA) or Phase II Environmental Site Assessment (Phase II ESA).

**"Environmental Investigation Report"** (or the **"Report"**) means the written account of the Environmental Investigation of the Property prepared by the Person who conducted the Environmental Investigation.

**"Environmental Laws"** means any and all applicable federal, state, tribal and local statutes, laws, rules, regulations, ordinances, codes, judicial or administrative orders, consent decrees, judgments, or other binding determinations of any judicial or regulatory authority, now or hereafter in effect, imposing liability, establishing standards or otherwise relating to protection of the environment, health and safety.

**"Environmental Professional"** means a person who meets the requirements set forth in 40 CFR § 312.10(b). The All Appropriate Inquiries standards defines an Environmental Professional as "a person who possesses sufficient specific education, training, and experience necessary to exercise professional judgment to develop opinions and conclusions regarding conditions indicative of releases or threatened releases…on, at, in, or to a property, sufficient to meet the objectives and performance factors [of the rule]." 40 CFR 312.10(b). An Environmental Professional must:

1. Hold a current Professional Engineer's or Professional Geologist's license or registration from a state, tribe, or U.S. territory (or the Commonwealth of Puerto Rico) and have the equivalent of 3 years of full-time relevant experience; or

2. Be licensed or certified by the Federal government, a state, tribe, or U.S. territory (or the Commonwealth of Puerto Rico) to perform environmental inquiries as defined in § 312.21 and have the equivalent of 3 years of full-time relevant experience; or

3. Have a Baccalaureate or higher degree from an accredited institution of higher education in a

discipline of engineering or science and the equivalent of 5 years of full-time relevant experience; or

4. Have the equivalent of 10 years of full-time relevant experience.

Further, SBA requires that an Environmental Professional be impartial and maintain a minimum coverage of one million dollars per claim (or occurrence) in errors and omissions insurance.

**"Environmental Questionnaire"** means the questionnaire used by a Lender to determine the likelihood that Contamination may be present at Property offered to secure an SBA guaranteed loan. Environmental Questionnaires must be completed or reviewed by a Lender that has made at least one site visit to the Property and a good faith effort to conduct an interview with the current owner or operator of the Property. An Environmental Professional may, but is not required to, assist with the responses to the questionnaire. An Environmental Questionnaire may be considered if it was completed up to 1 year prior to submission. The current owner or operator of the Property must sign the Environmental Questionnaire. If the current owner or operator of the Property will not sign the Environmental Questionnaire it cannot be used and lender must then, at a minimum, obtain a Transaction Screen.

Prudent lending practices dictate that an Environmental Questionnaire must include the address of the property and, at a minimum, inquire into the following areas:

- Past and present uses of the Property and Adjoining Properties, with particular attention paid to those uses by environmentally sensitive industries;

- Past and present identification of any Hazardous Substances at the Property and Adjoining Properties;

- Storage, generation, treatment, emission or disposal of Hazardous Substances at the Property and Adjoining Properties;

- Possession of permits to use, store, generate, treat, emit or dispose of Hazardous Substances by businesses operating at the Property and Adjoining Properties;

- Evidence of Contamination at the Property and Adjoining Properties;

- Potential sources of Contamination[1] at the Property and Adjoining Properties;

---

[1] Sources of Contamination may include, but are not limited to, the following: (1) damaged or discarded automotive or industrial batteries; (2) pesticides, paints or other chemicals stored in individual containers greater than 5 gallons in volume or 50 gallons in the aggregate; (3) chemicals in industrial drums or sacks; (4) pits, ponds or lagoons used for waste disposal or storage; (5) fill dirt from a contaminated or unknown source; (6); underground or above-ground storage tanks; (7) vent

- Knowledge on the part of the Borrower, seller or Lender of any past evidence of Contamination or sources of Contamination at the Property and Adjoining Properties;

- Knowledge on the part of the Borrower, seller or Lender of any past, threatened or pending lawsuits or administrative proceedings concerning a Release or threatened Release at the Property and Adjoining Properties;

- Existence of any regulatory actions by any Governmental Entity for environmental conditions at the Property and Adjoining Properties;

- Identification of any previously performed environmental risk studies environmental documents pertaining to the Property (attach copies); and

- Presence of lead paint, asbestos, or Polychlorinated Biphenyls ("PCBs") at the Property.

As an alternative, SBA will accept the ASTM questionnaire utilized for Transaction Screens (currently ASTM E1528-14) for all purposes that an EQ is required by this SOP. (ASTM licenses the use of these forms, which can be obtained through www.astm.org.)

**"Good Faith"** means the absence of any intention to seek unfair advantage or to defraud another party; and honest and sincere intention to fulfill one's obligations in the conduct or transaction concerned.

**"Governmental Entity"** means any federal, state, commonwealth, tribal or local government branch, authority, district, agency, court, tribunal, department, officer, official, board, commission or other instrumentality that exercises any form of jurisdiction or authority under any Environmental Law.

**"Hazardous Substance"** means and includes any substance, material or waste regulated by CERCLA or any other Environmental Law, and specifically includes petroleum products.

**"Institutional Control"** means a legal or administrative action or requirement imposed on the Property to minimize the potential for human exposure to Contamination or to protect the integrity of Remediation. Examples include deed notices, deed restrictions, and long-term site monitoring or site security requirements.

**"Lender"** refers to banks, non-bank lenders, credit unions, certified development companies, and any other entities that participate as a lender in SBA programs. The term Lender does not include the Third Party Lender on a 504 loan.

---

pipes, fill pipes or access ways indicating a fill pipe protruding from the ground; (8) flooring drains or walls within a facility that are stained by substances other than water and/or are emitting noxious odors; (9) clarifiers, pits or sumps; (10) dry wells

**"Multi-Unit Building"** means any non-industrial, multi-unit building that is comprised of four or more individual units.

**"Person"** means an individual, firm, corporation, limited liability company, limited liability partnership, association, partnership, consortium, joint venture, commercial entity, tribe or trust, public, governmental or interstate body, agency or instrumentality.

**"Phase I Environmental Site Assessment" (Phase I ESA)** means an AAI compliant Phase I ESA conducted by an Environmental Professional in accordance with the most recently adopted standard for a Phase I ESA established by ASTM International, currently ASTM E1527-13. (See also 40 CFR § 312.20.)

A person who does not qualify as an Environmental Professional may assist in the conduct of All Appropriate Inquiries if such person is under the supervision or responsible charge of a person meeting the definition of an Environmental Professional when conducting such activities, provided an Environmental Professional reviews and signs the Phase I ESA.

A Phase I ESA must contain an opinion by the Environmental Professional as to whether the inquiry has identified conditions indicative of Recognized Environmental Conditions (RECs), Controlled Recognized Environmental Conditions (CRECs), Historical Recognized Environmental Conditions (HRECs) and/or Environmental Issues at the Property. Additionally, SBA requires that all Phase I ESAs contain a conclusion by the Environmental Professional that performs the assessment that either: (1) the risk of Contamination at the Property is so minimal that no further investigation is warranted; or (2) there is risk sufficient to warrant additional investigation. Alternatively, the Environmental Professional may include a similar statement to this effect. If further investigation is warranted, the Environmental Professional should provide a detailed description of the recommendation.

The Environmental Protection Agency (EPA) sets forth time frames for the viability of Phase I ESAs (See 40 CFR § 312.20.) For SBA's purposes, and notwithstanding the EPA's regulations on updating Phase I ESAs after 180 days, SBA will accept for review an otherwise AAI compliant Phase I ESA if it was completed within 1 year of the date upon which it was submitted to an SBA loan processing center as part of an Environmental Investigation. Lenders or CDCs using their delegated authority may accept for review an otherwise AAI compliant Phase I ESA if it was performed within 1 year of the date of approval of its Environmental Investigation. ***Parties may still wish to strictly comply with EPA's regulatory timeframes to avoid jeopardizing legal and regulatory protections.***

Note: The immediately preceding paragraph does not apply to liquidation situations under SOP 50 55 or SOP 50 57.

**"Phase II Environmental Site Assessment" (Phase II ESA)** means an Environmental Investigation, which at a minimum, is conducted by an Environmental Professional in accordance with the most recently adopted standard for a Phase II ESA process established by ASTM International, currently ASTM E1903-97 (2002). SBA will recognize a Phase II ESA conducted in accordance with generally-accepted industry standards of practice and consisting of a scope of work that would be considered reasonable and sufficient to identify the presence, nature and extent of a Release.

**"Property"** means any interest in commercial real estate upon which a security interest such as a mortgage, deed of trust, or leasehold deed of trust is required as collateral for a loan or debenture.

**"Records Search with Risk Assessment"** means and includes (1) a search of the government databases identified in 40 CFR § 312.26 for an AAI compliant Phase I as well as a search of historical use sources (for example, aerial photography, city directories, reverse directories and/or fire insurance maps) pertaining to the Property and Adjoining Properties; and (2) a risk assessment by an Environmental Professional based on the results of the records search as to whether the Property is either "low risk" or "elevated risk" or "high risk" for Contamination. While the choice of standard historical sources to be reviewed on any particular site is at the discretion of the Environmental Professional in his or her professional judgment, the historical sources should identify property uses back to the property's first developed use, or back to 1940, whichever is earlier. The Environmental Professional need only review as many of the standard historical sources as are necessary, reasonably ascertainable, and likely to be useful. The Environmental Professional should comment upon any data failure or data gap encountered. The report must identify by name the Environmental Professional who performed the risk assessment and must include all of the database reports and historical sources relied upon. (Note that this report need not be addressed to the SBA and need not be accompanied by a Reliance Letter.) A Records Search with Risk Assessment may be considered if it was completed up to one year prior to submission.

 **"Release"** means the presence of or any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Substance into the environment including the abandonment or discarding of barrels, drums, tanks, and similar receptacles and containers, containing Hazardous Substances.

**"Reliance Letter"** means SBA's standard reliance letter pertaining to Environmental Investigation Reports, a copy of which is located in Appendix 3. The language in SBA's standard reliance letter may not be modified. Additionally, Lenders and CDCs should not enter into any agreement that alters the terms of SBA's standard reliance letter.

**"Remediation"** or **"Remedial Action"** and their derivatives (such as **"Remediate"**) means and includes any clean-up, corrective action or monitoring required to comply with applicable Environmental Laws including all actions within the definition of "removal" and "remedial" actions as those terms are defined in applicable Environmental Laws.

**"SBA Environmental Indemnification Agreement"** or **"SBA Indemnification Agreement"** means SBA's standard environmental indemnification agreement, a copy of which is located in Appendix 6. The language in SBA's standard environmental indemnification agreement may not be modified.

**"Transaction Screen"** means an Environmental Investigation pursuant to the most recently adopted standard practice for limited environmental due diligence established by ASTM International, currently ASTM E1528-14. The basic elements of a Transaction Screen include: (1) an interview with the owner or operator of the Property; (2) a visit to the Property; (3) completion of an environmental questionnaire, and (4) a review of government records and historical sources. Additionally, SBA requires that an Environmental Professional supervise the site reconnaissance and conclude either (a) the risk of contamination at the site is so minimal that no further investigation is warranted; or (b) there is risk sufficient to warrant additional investigation. Alternatively, the Environmental Professional may include a similar statement to this effect. If further investigation is warranted, the Environmental Professional should provide a detailed description of the recommendation. A Transaction Screen may be considered if it was completed up to 1 year prior to submission.

## APPENDIX 3: RELIANCE LETTER

**[Letterhead of Environmental Professional or Environmental Professional's Firm]**

# <u>RELIANCE LETTER</u>

[Date]

To:    [For 7(a) loans, insert name and address of participating Lender here] ("Lender")

       or

       [For 504 loans, insert name and address of CDC here] ("Lender")

       and

       U.S. Small Business Administration ("SBA")

Re:    Borrower Name:

       Project Address ("Property"):

       Environmental Investigation Report Number(s):

Dear Lender and SBA:

[Name of Environmental Professional] ("Environmental Professional") meets the definition of an Environmental Professional as defined by 40 C.F.R. § 312.10(b) and has performed or supervised the performance of the following "Environmental Investigation(s)" (check all that apply):

    \_\_\_\_A Transaction Screen of the Property dated _____, 20\_\_\_\_, and any addendum(s) thereto, conducted in accordance with ASTM International's most recent standard (currently ASTM E1528-14);

    \_\_\_\_A Phase I (or an Updated Phase I) Environmental Site Assessment of the Property dated _____, 20\_\_\_\_, and any addendum(s) thereto, conducted in accordance with ASTM

International's most recent standard (currently ASTM E1527-13). In addition, the Environmental Professional has addressed the performance of the "additional inquiries" set forth at 40 C.F.R. § 312.22;

_____A Phase II Environmental Site Assessment of the Property dated_____, 20_____, and any addendum(s) thereto, conducted in accordance with generally-accepted industry standards of practice and consisting of a scope of work that would be considered reasonable and sufficient to identify the presence, nature and extent of a Release as it impacts the Property.

Reliance by SBA and Lender. Environmental Professional (and Environmental Professional's firm, where applicable) understand(s) that the Property may serve as collateral for an SBA guaranteed loan, a condition for which is an Environmental Investigation of the Property by an Environmental Professional. Environmental Professional (and Environmental Professional's firm, where applicable) authorize(s) Lender and SBA to use and rely upon the Environmental Investigation. Further, Environmental Professional (and Environmental Professional's firm, where applicable) authorize(s) Lender and SBA to release a copy of the Environmental Investigation to the Borrower for information purposes only. This letter is not an update or modification to the Environmental Investigation. Environmental Professional (and Environmental Professional's firm, where applicable) makes no representation or warranty, express or implied, that the condition of the Property on the date of this letter is the same or similar to the condition of the Property described in the Environmental Investigation.

Insurance Coverage. Environmental Professional (and/or Environmental Professional's firm, where applicable) certifies that he or she or the firm was covered as of the date of the Environmental Investigation by errors and omissions liability insurance with a minimum coverage of $1,000,000 per claim (or occurrence) and that evidence of this insurance is attached. As to the Lender and SBA, Environmental Professional (and Environmental Professional's firm, where applicable) specifically waive(s) any dollar amount limitations on liability up to $1,000,000 as well as any time limitations on liability, other than state or Federal statutes of limitation.

Waiver of Right to Indemnification. Environmental Professional and Environmental Professional's firm waive any right to indemnification from the Lender and SBA.

Impartiality. Environmental Professional certifies that (1) to the best of his or her knowledge, Environmental Professional is independent of and not a representative, nor an employee or affiliate of seller, Borrower, operating company, or any person in which seller has an ownership interest; and (2) the Environmental Professional has not been unduly influenced by any person with regard to the preparation of the Environmental Investigation or the contents thereof.

Acknowledgment. The undersigned acknowledge(s) and agree(s) that intentionally falsifying or concealing any material fact with regard to the subject matter of this letter or the Environmental

Investigations may, in addition to other penalties, result in prosecution under applicable laws including 18 U.S.C. § 1001.

_____

Environmental Professional

Printed Name:

**(Note: The Environmental Professional must <u>always</u> sign this letter above. If the Environmental Professional is employed or retained by an Environmental Firm, then an authorized representative of the firm must also sign below).**

_____

Signature of representative of firm who is authorized to sign this letter

Printed Name & Title:

Name of Environmental Firm:

Enclosure: Evidence of Insurance

### APPENDIX 4: NAICS CODES OF ENVIRONMENTALLY SENSITIVE INDUSTRIES

## NAICS CODES OF ENVIRONMENTALLY SENSITIVE INDUSTRIES*

**How to determine if an industry is included on this list:**

**A 3 digit NAICS code includes all industries beginning with those 3 digits.**

**A 4 digit NAICS code includes all industries beginning with those 4 digits.**

**A 5 digit NAICS code includes all industries beginning with those 5 digits.**

**A 6 digit NAICS code includes only that industry under that industrial code.**

**211**     **OIL & GAS EXTRACTION**

**212**     **MINING (EXCEPT OIL & GAS)**

**213**     **SUPPORT ACTIVITIES FOR MINING**

**237**     **HEAVY & CIVIL ENGINEERING CONSTRUCTION**

**311**     **FOOD MANUFACTURING (*if underground fuel tanks present*)**

**312**     **BEVERAGE & TOBACCO PRODUCT MANUFACTURING (*except breweries, 31212*)**

**313**     **TEXTILE MILLS (*not required if sewing, weaving, or hemming only*)**

**314**     **TEXTILE PRODUCT MILLS (*not required if sewing, weaving, or hemming only*)**

**316**     **LEATHER & ALLIED PRODUCT MANUFACTURING (*not required if assembly only*)**

**321**     **WOOD PRODUCT MANUFACTURING (*if finishing occurs on site*)**

**322**     **PAPER MANUFACTURING**

**323**     **PRINTING & RELATED SUPPORT ACTIVITIES**

**324**     **PETROLEUM & COAL PRODUCTS MANUFACTURING**

**325**     **CHEMICAL MANUFACTURING**

**326**     **PLASTICS & RUBBER PRODUCTS MANUFACTURING (*not required if assembly only*)**

**327**     **NONMETALLIC MINERAL PRODUCTS MANUFACTURING**

**331**     **PRIMARY METAL MANUFACTURING**

**332**     **FABRICATED METAL PRODUCT MANUFACTURING (*not required if assembly only*)**

**333**     **MACHINERY MANUFACTURING (*not required if assembly only*)**

**334**     **COMPUTER & ELECTRONIC PRODUCT MANUFACTURING (*not required if assembly***

*only)*

**335**     **ELECTRICAL EQUIPMENT, APPLIANCE & COMPONENT MANUFACTURING** *(not required if assembly only)*

**336**     **TRANSPORTATION EQUIPMENT MANUFACTURING**

**337**     **FURNITURE & RELATED MANUFACTURING (*if* finishing occurs on site)**

**339**     **MISCELLANEOUS MANUFACTURING** *(only required if hazardous materials are involved)*

**42311**   **AUTOMOBILE & OTHER MOTOR VEHICLE MERCHANT WHOLESALERS (*if* service bays present)**

**42314**   **MOTOR VEHICLE PARTS (USED) MERCHANT WHOLESALERS**

**4235**    **METAL & MINERAL MERCHANT WHOLESALER**

**42393**   **RECYCLABLE MATERIAL MERCHANT WHOLESALER**

**4246**    **CHEMICAL & ALLIED PRODUCTS MERCHANT WHOLESALERS**

**4247**    **PETROLEUM & PETROLEUM PRODUCTS MERCHANT WHOLESALERS**

**441**     **MOTOR VEHICLE AND PARTS DEALERS (*if* service bays present)**

**447**     **GASOLINE STATIONS**

**45431**   **FUEL DEALERS** *(not required for propane or firewood dealers)*

**481**     **AIR TRANSPORTATION**

**482**     **RAIL TRANSPORTATION**

**484**     **TRUCKING** *(if service bays, truck washing, or fuel tanks present)*

**486**     **PIPELINE TRANSPORTATION**

**488**     Support Activities for Transportation (*if* fuel tanks are present or if repairs or maintenance is performed on site)

**53212**   TRUCK, UTILITY TRAILER, AND RV (RECREATIONAL VEHICLE) RENTAL & LEASING *(if repairs, maintenance or vehicle washing are performed onsite)*

**53241**   CONSTRUCTION, TRANSPORTATION, MINING & FORESTRY MACHINERY & EQUIPMENT RENTAL & LEASING *(if repairs, maintenance or vehicle washing are performed onsite)*

**53249**   OTHER COMMERCIAL & INDUSTRIAL MACHINERY & EQUIPMENT RENTAL & LEASING *(if repairs, maintenance or vehicle washing are performed onsite)*

**54138**   **TESTING LABORATORIES**

**56171**   **EXTERMINATING & PEST CONTROL SERVICES**

**562**     **WASTE MANAGEMENT & REMEDIATION SERVICES**

**6221**    **GENERAL MEDICAL & SURGICAL HOSPITALS (*if* fuel tanks are present)**

**713990**  **OTHER RECREATIONAL INDUSTRIES** *(indoor and outdoor shooting ranges only)*

**71391**   **GOLF COURSES & COUNTRY CLUBS**

**71392    SKIING FACILITIES**

**71393    MARINAS**

**7212    RV (RECREATIONAL VEHICLES) PARKS & RECREATIONAL CAMPS *(if fuel tanks are present or if vehicle repairs or maintenance is performed onsite)***

**8111    AUTOMOTIVE REPAIR & MAINTENANCE (*except for "car wash only" facilities, for which a Transaction Screen is an acceptable starting point*)**

**8112    ELECTRONIC & PRECISION EQUIPMENT REPAIR & MAINTENANCE *(not required if assembly only)***

**8113    COMMERCIAL & INDUSTRIAL MACHINERY & EQUIPMENT REPAIR & MAINTENANCE**

**8122    DEATH CARE SERVICES *(unless no embalming or cremation at the Property)***

**8123    LAUNDRY & DRY CLEANING SERVICES (*if dry cleaning operations have ever existed on site*)**

**812921    PHOTOFINISHING LABORATORIES *(except one hour)***


**\*A Phase I should always be obtained if the business sells, supplies or dispenses fuel, gasoline, heating oil, even if the NAICS code for the business is not identified on this list of environmentally sensitive industries.**


**A complete list of industries and corresponding NAICS codes is available online at**

**http://www.census.gov/eos/www/naics/.**

## APPENDIX 5: REQUIREMENTS PERTAINING TO GAS STATION LOANS

### ENVIRONMENTAL INVESTIGATION REQUIREMENTS
### FOR GAS STATION LOANS

**NOTE:** **Lenders are reminded that documentation associated with gas station loans can be voluminous and complex. Apart from environmental concerns there are affiliation and credit issues that Lenders must analyze in order to make the initial loan eligibility determination.**

The Environmental Investigation requirements set forth below apply to all loans secured by a lien or security interest on real property (a fee simple or leasehold mortgage, deed of trust, etc.*) or* personal property (gas station fixtures or equipment such as tanks, pumps, lines, etc.) currently used to operate a gas station or commercial fueling facility ("Gas Station Loans"). These requirements would not apply when the applicant operates a business, such as a convenience store associated with a gas station, in which the applicant only leases the real or personal property and neither the real nor personal property is used as collateral for the loan. Nor do these requirements apply to situations where the only collateral for the loan is something other than gas station equipment (for example, food inventory, shelving, etc.).

A. Environmental Site Assessment. The Environmental Investigation for all Gas Station Loans (including those secured by gas station equipment only) must: (1) begin with a Phase I ESA with the additional requirement that it be conducted by an independent Environmental Professional; (2) include an analysis of all relevant environmental records concerning the Property and Adjoining Properties, including any records provided by the seller if the loan is to purchase the Property; (3) include documentation supporting the Environmental Professional's determination of compliance with all regulatory requirements, if any, pertaining to tank and equipment testing (see paragraph B. below) (even if the loan is secured by real property); (4) include the results of any further investigation, which may include a Phase II, recommended by the Environmental Professional (Any Phase II performed in connection with a Gas Station Loan must be conducted by an independent Environmental Professional *who holds a current Professional Engineer's or Professional Geologist's license and has the equivalent of 3 years of full time relevant experience*.); and (5) if the Property is Contaminated, include a detailed description of and cost estimate for the recommended Remediation.

B. The Environmental Investigation performed by the Environmental Professional must include a determination whether or not the gas station is in compliance with all regulatory requirements, if any, pertaining to tank and equipment testing. A loan may not be disbursed until full compliance is achieved. Further, any leaking or otherwise defective equipment, systems, containment devices, etc., must be replaced or repaired prior to disbursement.

C. Results of Environmental Investigation.

  1. Property is not Contaminated. If the Environmental Professional concludes that the Property is not Contaminated, the Lender (except on PLP, SBA Express, Export Express, and PCLP loans) must submit the results of the Environmental Investigation to SBA with recommendations and seek SBA's concurrence.

  2. Property is Contaminated. If the Environmental Professional concludes that the Property is

Contaminated, Lender can either: (1) decline the loan; or (2) follow the requirements set forth in paragraph G. of the Environmental Policies and Procedures sections of this SOP entitled, "Approval and Disbursement of loans when there is Contamination or Remediation at the Property," *provided that at a minimum, in change of ownership situations, the SBA Indemnification Agreement as described in paragraph G.4.a) must always be obtained and signed by the seller.* (There may be situations where it is not practical to require the seller to sign the indemnification agreement; for example, the property is being sold from a probate estate or through a trustee in bankruptcy. Waivers may be sought from the SBA Environmental Committee at environmentalappeals@sba.gov on a case-by-case basis. A mere unwillingness on the part of a seller to execute the indemnification agreement is not a sufficient basis for a waiver. PLP, SBA Express, and Export Express Lenders and PCLP CDCs do not have the authority to grant a waiver and are also required to follow this procedure.) In addition, prudent lending practices may require a Lender to utilize some of the other listed mitigating factors such as requiring additional collateral.

D.  When Waiver and Release of Right to Indemnification from SBA/Lender Required. If any oil company or other Person has a right to indemnification from subsequent owners of the Property (e.g., SBA/Lender after acquiring Property through foreclosure or other means), then they must execute either the SBA Indemnification Agreement or another document in which they waive all known and unknown rights and release all claims and causes of action whether now or hereafter in existence against SBA and Lender related to Contamination at the Property including the right to indemnification. The document containing the waiver and release must be recorded. Lenders and CDCs, except when submitting requests through PLP, SBA Express and Export Express, must submit all waiver and releases to the SBA center processing the loan for review and approval by SBA counsel, along with a copy of the title report, the document providing for indemnification, and the purchase and sale documents, if any. PCLP CDCs must also submit the waiver and release to the SBA for review and approval prior to a request that SBA fund the loan.

### APPENDIX 6: SBA ENVIRONMENTAL INDEMNIFICATION AGREEMENT

SBA Loan No: _____

This SBA Environmental Indemnification Agreement ("Agreement") effective_____, is executed by_____("Borrower"),_____[insert name(s) of indemnitor(s) not obligated on the Loan)] ("Third Party Indemnitor"), (Borrower and Third Party Indemnitor collectively referred to as "Indemnitors"),_____[Insert name of Certified Development Company or 7(a) Lender] ("Lender") and the U.S. Small Business Administration ("SBA").

The parties to this Agreement mutually agree as follows:

## I.  RECITALS

Borrower has applied for an SBA loan from Lender in the principal amount of $_____[insert full loan amount] (the "Loan") to be evidenced by a promissory note (the "Note") and secured by a "Mortgage" encumbering certain real and personal property (collectively, the "Property") described in the "Loan Documents" including the land  located at _____ [insert address] and described in Exhibit "A" attached hereto.

SBA and Lender are not willing to make the Loan without the execution and delivery of this Agreement.

## II. DEFINITIONS

For purposes of this Agreement: (1) whenever the singular form of a word is used it includes the plural, and whenever the plural form of a word is used it includes the singular; (2) the word "or" has the inclusive meaning represented by the phrase "and/or"; (3) terms used in this Agreement that are not defined below but are defined in either 13 CFR, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9875 ("CERCLA") or 40 CFR, shall have the meaning provided in 13 CFR, CERCLA or 40 CFR; and (4) unless the context otherwise clearly requires, the following definitions apply:

**A.** "**Adjoining Properties**" means any real property or properties the border of which is (are) shared in part or in whole with that of the Property, or that would be shared in part or in whole with that of the Property but for a street, road, or other public thoroughfare separating the properties.

**B.** "**At**," whether capitalized or not, when used with respect to the Property or Adjoining Properties, means "at, on, in, into, under, above, from or about."

**C.** "**Borrower**" means the Person(s) identified as the Borrower in the Loan Documents and the first paragraph of this Agreement and includes any successor in interest by virtue of assumption, merger, acquisition, transfer, assignment or otherwise.

**D.** "**Contamination**" means the presence of any Hazardous Substance at or affecting the Property, including any Hazardous Substances that have migrated to or from the Property, provided such Hazardous Substances are present in such concentrations or under such conditions as to create a violation, liability or duty to conduct a response under any Environmental Law.

**E.** "**Engineering Control**" means a device or structure constructed at the Property to prevent people from coming into contact with Contamination or to prevent mobile Contamination such as groundwater Contamination from moving off site. Examples include asphalt or concrete caps, fences, extraction wells, trenches and subsurface barrier walls.

**F.** "**Environmental Activity**" means any use, storage, holding, existence, Release, emission, discharge, generation, processing, abatement, removal, disposition, handling or transportation of any Hazardous Substance.

**G.** "**Environmental Claim**" means any written complaint, summons, action, citation, notice of violation, directive, order, claim, litigation, investigation, judicial or administrative proceeding or action, judgment, lien, demand, letter or communication from any Person alleging non-compliance with any Environmental Law, Institutional Control or Engineering Control, relating to any actual or threatened Release, or arising from an Environmental Activity.

**H.** **Environmental Investigation**" means an investigation of the Property that: (1) is conducted by an independent Environmental Professional; (2) begins with a Phase I Site Assessment in accordance with ASTM E1527-13 that includes a review of all relevant and material environmental records concerning the Property and Adjoining Properties in the actual or constructive possession, custody or control of the Borrower including, if any, those provided by the seller; and (3) includes any other investigation recommended by the Environmental Professional conducting the Phase I to determine and document the nature and extent of any Contamination and the cost to remediate it such as record reviews, soil and water testing, or underground storage tank inspections.

**I.** "**Environmental Investigation Report**" (or the "Report") means the written account of the Environmental Investigation of the Property attached as Exhibit "B", which: (1) is signed by the Environmental Professional who conducted the Environmental

Investigation; (2) includes a reliance letter that specifically grants SBA and Lender the right to rely on the Report; and (3) includes a detailed list of all relevant and material environmental records utilized by the Environmental Professional to establish the nature and extent of Contamination including those pertaining to past or on-going Remediation at the Property or Adjoining Properties.

**J.  "Environmental Laws"** means any and all applicable federal, state tribal and local statutes, laws, rules, regulations, ordinances, codes, principles of common law, judicial orders, administrative orders, consent decrees, judgments, permits, licenses or other binding determinations of any judicial or regulatory authority, now or hereafter in effect, imposing liability, establishing standards of conduct or otherwise relating to protection of the environment (including natural resources, surface water, groundwater, soils, and indoor and ambient air), health and safety, land use matters or the presence, use, generation, treatment, storage, disposal, Release or threatened Release, transport or handling of Hazardous Substances.

**K.  "Environmental Professional"** means a person who meets the requirements set forth in 40 CFR Section 312.10(a).

**L.  "Governmental Entity"** means any federal, state, commonwealth, tribal or local government branch, authority, district, agency, court, tribunal, department, officer, official, board, commission or other instrumentality that exercises any form of jurisdiction or authority under any Environmental Law.

**M. "Hazardous Substance"** means and includes any substance, material or waste regulated by CERCLA or any other Environmental Law, and specifically includes petroleum products, radioactive materials, asbestos, polychlorinated biphenyls, and radon gas.

**N.  "Including",** and its derivatives such as "include" and "includes", whether or not capitalized, means including without limitation.

**O.  "Indemnified Parties"** means and includes SBA and Lender.

**P.  "Institutional Control"** means a legal or administrative action or requirement imposed on the Property to minimize the potential for human exposure to Contamination or to protect the integrity of a Remedy. Examples include deed notices, deed restrictions, and long-term site monitoring or site security requirements.

**Q.  "Lender"** means the Person identified as the Lender in the first paragraph of this Agreement and any successor in interest by virtue of merger, acquisition, transfer, assignment or otherwise including any Person acquiring the Property or the Loan from Lender or SBA.

**R.  "Loan Documents"** means and includes the Note, the Mortgage and any other document regarding the Loan. This Agreement is one of the Loan Documents, but it is not secured by the Mortgage.

**S.  "Mortgage"** means the Mortgage identified in the Recitals section of this Agreement and includes all liens that secure the Loan regardless of their method of creation including those created by recording a mortgage, deed of trust, assignment of rents, collateral assignment of purchaser's interest in land sale contract or a Uniform Commercial Code financing statement. The Mortgage secures the Loan and all extensions, modifications, replacements, renewals, substitutions or consolidations thereof, including increases to the principal balance of the Note resulting from payment of expenses incurred to enforce the terms of the Note or other Loan Documents, or to preserve or dispose of the collateral securing the Loan, such as payments for property taxes, prior liens, insurance, appraisals, and attorney's fees and costs.

**T.  "Mortgage Release Date"** means the earlier of the following two-dates: (1) the date on which the indebtedness and obligations secured by the Mortgage have been fully paid and performed and the Mortgage has been released of record; or (2) the date on which the Mortgage is foreclosed, or a conveyance by a deed in lieu of foreclosure is effective, and possession of the Property has been given to and accepted by a Person other than Lender or SBA free of occupancy, redemption rights or any other claim by Borrower or guarantors of the Loan.

**U.  "Person"** means an individual, firm, corporation, limited liability company, limited liability partnership, association, partnership, joint venture, commercial entity, tribe, trust, or Government Entity.

**V.  "Property"** means all or any portion of the real and personal property identified in the Recitals section of this Agreement, including all improvements, fixtures and equipment, soil, ground water, surface water, air, waterways, and water bodies associated with the real property.

**W. "Purchase and Sale Documents"** means and includes every document memorializing each agreement related to Borrower's acquisition of the Property including the purchase and sale agreement and amendments thereto, and all related documents such as supply agreements, deeds, environmental declarations, rights of first refusal, options, etc.

**X.  "Release",** when used with respect to the Property or Adjoining Properties, means the presence of or any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Substance into the environment including the abandonment or discarding of barrels, drums, tanks, and similar receptacles and containers, containing Hazardous Substances.

**Y.  "Remediation"** or **"Remedial Action"** and their derivatives (such as "Remediate") means and includes any investigation, clean-up, corrective action or monitoring required to comply with applicable Environmental Laws including all actions within the definition of "removal" and "remedial" actions as those terms are defined in applicable Environmental Laws.

**Z.  "Third Party Indemnitor"** means, individually and collectively, the Person(s) identified as the Third Party Indemnitor in the first paragraph of this Agreement and includes any successor in interest by virtue of merger, acquisition, transfer, assignment or otherwise.

## III. REPRESENTATIONS AND WARRANTIES

**A.     Full Disclosure of Property Purchase and Sale Agreement.** If the Loan is to enable Borrower to acquire the Property, Borrower represents and warrants that all of the relevant and material terms and conditions of the purchase and sale of the Property have been disclosed to Lender and that Borrower has provided Lender with an accurate and complete copy of the Purchase and Sale Documents.

**B.     Control of Property.** If the Loan is to enable Borrower to acquire the Property from Third Party Indemnitor, Third Party Indemnitor represents and warrants that the Property is free from all encumbrances that could enable Third Party Indemnitor or its affiliates to control the use or ownership of the Property e.g., options to purchase or repurchase the Property; deed restrictions; or restrictive covenants such as those that limit the brand of fuel that can be sold on the Property.

**C.     Condition of Equipment**. If the loan is to enable the Borrower to acquire the Property associated with the operation of a gas station, Indemnitors warrant that all fuel dispensing equipment located on the Property has been tested by an independent contractor within the preceding twelve months and that all leaking or otherwise defective equipment, systems, containment devices, etc., have been or will be replaced or repaired prior to closing.

**D.**     Disclosure of Environmental Information.

1.     Full Disclosure by Third Party Indemnitor. Third Party Indemnitor represents and warrants that Third Party Indemnitor has provided Borrower with an accurate and complete copy of each record pertaining to the Property, (regardless of origin or method by which it was produced, recorded or preserved), in Third Party Indemnitor's actual or constructive possession, custody or control that pertain to the Property including those that materially relates to: (1) Contamination; (2) Hazardous Substances at the Adjoining Properties; or (3) compliance with any Environmental Law, Institutional Control or Engineering Control concerning the Property.

2.     Full Disclosure by Borrower. Borrower represents and warrants that Borrower provided the Environmental Professional who signed the Report with an accurate and complete copy of each record, (regardless of origin or method by which it was produced, recorded or preserved and including all records provided to Borrower by Third Party Indemnitor), in Borrower's actual or constructive possession, custody or control that materially relates to: (1) Contamination; (2) Hazardous Substances at the Adjoining Properties; (3) compliance with any Environmental Law, Institutional Control or Engineering Control concerning the Property; or (4) any other matter addressed by this Agreement.

**E.**     Environmental Investigation of Property.

1.     Conducted by Independent Environmental Professional. Lender and Borrower represent and warrant to SBA that an independent Environmental Professional has conducted an

Environmental Investigation of the Property and that a complete and accurate copy of the Environmental Investigation Report is attached hereto as Exhibit "B".

       a.    <u>Lender's Warranty</u>. Lender represents and warrants to SBA that: (1) the Environmental Professional who prepared the Report is not a representative, employee, associate or affiliate of, Lender or any Person in which Lender has an ownership interest; and (2) no influence has been exerted over the Environmental Professional with regard to the preparation of the Report or the contents thereof by Lender or by any of Lender's attorneys, agents, employees, associates or affiliates.

       b.    <u>Indemnitors' Warranty</u>. Each Indemnitor independently represents and warrants to SBA that to the best of Indemnitor's knowledge: (1) the Environmental Professional who prepared the Report is not a representative, employee, associate or affiliate of, Indemnitor or any Person in which Indemnitor has an ownership interest; and (2) no influence has been exerted over the Environmental Professional with regard to the preparation of the Report or the contents thereof by Indemnitor or by any of Indemnitor's attorneys, agents, employees, associates or affiliates.

       2.    <u>Report Establishes Environmental Baseline of Property</u>. Lender and each Indemnitor independently represent and warrant to SBA that they have no knowledge of any facts or circumstances that could result in the Report containing incomplete or inaccurate information.

       **F.**    **Execution and Performance of Agreement.** Each Indemnitor  independently represents and warrants to SBA and Lender that:

       1.    <u>Authority and Financial Capability</u>. Indemnitor is either an individual or a duly organized, validly existing business entity in good standing and duly qualified to do business in each jurisdiction where the conduct of its business requires such qualification; and Indemnitor has and will maintain full power, financial capability and authority to enter into this Agreement, and to perform Indemnitor's obligations hereunder.

       2.    <u>Validity of Agreement</u>. This Agreement is a legal, valid, and binding obligation of Indemnitor enforceable according to its terms.

       3.    <u>Authority to Sign</u>. Indemnitor has proper authority to execute this Agreement as evidenced by, and has, if required, provided Lender with a complete and accurate copy of a valid, certified resolution or other evidence confirming such authority.

## IV. COVENANTS

In addition to their obligations and liabilities under applicable law, Indemnitors covenant and agree as follows:

**A.**     Borrower Covenants

1.     <u>Notice to Lender</u>. Borrower shall immediately notify Lender upon becoming aware of any of the following: (1) Any Release on the Property that must be reported to any Governmental Entity under applicable Environmental Laws; (2) Any Contamination, or imminent threat of Contamination, or any violation of Environmental Laws in connection with the Property or operations conducted thereon; (3) Any order, notice of violation, fine or penalty or similar action by any Governmental Entity relating to Hazardous Substances or Environmental Laws and the Property or the operations conducted thereon; (4) Any expiration or revocation of any required environmental permit, registration or authorization with regard to the Property or the operations conducted thereon; (5) Any Environmental Claim relating to the Property or the operations conducted thereon; or (6) Any matters relating to Hazardous Substances or Environmental Laws that would give a reasonably prudent lender cause to be concerned that the value of their security interest in the Property may be reduced or threatened or that may impair or threaten to impair Borrower's ability to perform any of Borrower's obligations under this Agreement when such performance is due.

2.     <u>Use of Property</u>. Borrower shall not allow Hazardous Substances or the occurrence of any Environmental Activity at the Property except as necessary to operate the type of business specified in the Loan Documents.

3.     <u>Compliance with Environmental Laws</u>. Borrower shall not cause, commit, permit or allow non-compliance with any Environmental Law, Institutional Control or Engineering Control with respect to the Property and shall obtain, keep in effect and comply with all permits, registrations and authorizations required by Environmental Laws with respect to the Property and operations conducted thereon.

4.     <u>Environmental Insurance</u>. Borrower shall include Lender as a loss payee on all environmental insurance policies held by Borrower relating to the Property.

5.     <u>UST Reimbursement Funds</u>. If the Property securing the Loan is associated with the operation of a gas station, Borrower shall register for all participate in any available federal, state or local petroleum storage tank fund programs that Borrower is eligible to participate in, which permitting full or partial reimbursement of costs incurred for the assessment or Remediation of Contamination, even if such program is voluntary.

**B.**     Borrower and Third Party Indemnitor Covenants

1.     <u>Record Retention</u>. Until the Mortgage Release Date, Indemnitors shall retain and make available to SBA and Lender upon request an accurate and complete copy of each record, (regardless of origin or method by which it was produced, recorded or preserved), in Indemnitor's actual or constructive possession, custody or control that materially relates to: (1) Contamination; (2) Hazardous Substances at the Adjoining Properties; (3) compliance with any Environmental Law, Institutional Control or Engineering Control concerning the Property; or (4) any other matter addressed by this Agreement.

2.    <u>Control of Property</u>. Prior to the Mortgage Release Date, Indemnitors shall not record or cause to be recorded any document containing a provision that could enable any Person to control the use or ownership of the Property, such as a purchase option; repurchase option; or restrictive covenant such as one that limits the brand of fuel that can be sold on the Property.

## V. REMEDIATION

**A.    Corrective, Preventive and Remedial Action.** Indemnitors shall, at their own cost and expense, in a manner that is in compliance with all applicable laws, and at times that will not unreasonably interfere with Borrower's use of the Property, promptly undertake, continuously and diligently pursue and complete any and all Remedial Action that is necessary to: (1) Remediate any Contamination; (2) correct non-compliance with any Environmental Law, Institutional Control or Engineering Control concerning the Property; or (3) respond to any threatened or pending Environmental Claim regarding the Property.

**B.    Limitation on Third Party Indemnitor's Duty to Remediate.** If Third Party Indemnitor is the seller or prior owner of the Property, Third Party Indemnitor's duty under this section of the Agreement shall be limited to Remedial Action: (1) necessitated by acts, omissions, events or conditions existing or occurring in connection with the condition, use or occupancy of the Property on or before the date title to the Property is transferred to Borrower under the Purchase and Sale Documents as disclosed in the Environmental Investigation Report; or (2) created or caused by Third Party Indemnitor, (including Third Party Indemnitor's employees, representatives, agents, contractors, or consultants), at any time after the date title to the Property is transferred to Borrower. As set forth in Paragraph VII herein, provided that neither SBA nor Lender has acquired title to the Property, Third Party Indemnitor may also limit its duty to Remediate under this Agreement by paying the entire balance due under the Loan Documents including any applicable pre-payment penalty.

**C.    Remediation Standards**. Remediation required under this Agreement shall, at a minimum, meet the applicable, relevant and appropriate requirements and standards in the Environmental Laws ("ARARs") that must be met before the responsible Government Entity will issue a No Further Action letter or the written equivalent thereof.

**D.    Duration of Responsibility to Remediate.** Indemnitors' responsibility for Remediation under this Agreement shall continue until the earlier of: (1) the Mortgage Release Date; or (2) the responsible Governmental Entity issues a No Further Action Letter or equivalent written assurance that the applicable, relevant and appropriate requirements and standards in the Environmental Laws ARARs have been met. Provided, however, that Indemnitors' responsibility for Remediation shall resume if the responsible Governmental Entity thereafter determines that additional Remedial Action is necessary with respect to any Contamination covered by this Agreement.

## VI. INDEMNIFICATION

**A.    SBA and Lender's Right to Indemnification.** Except as provided below, upon demand by an Indemnified Party, Indemnitors agree to indemnify and defend (by counsel selected by Indemnitors and reasonably acceptable to SBA and Lender)  Indemnified Parties from  and against any and all

"Environmental Risks." For purposes of this Agreement, "Environmental Risks" means and includes any and all actual or threatened losses, (including loss of use and diminution in value of the Loan or the Property), all direct and indirect costs associated with Remedial Action (including the repair, replacement or restoration of improvements and equipment; and monitoring and other closure requirements imposed by any Governmental Entity), liabilities, demands, claims and causes of action (including those asserted by third parties for personal injury, illness, death, and damage to real and personal property), damages (including natural resource damages, consequential damages and punitive damages), expenses (including experts' and consultants' fees and disbursements), reasonable attorneys' fees and disbursements for in-house and outside counsel (including those incurred at trial, on appeal, or in enforcing this Agreement, and regardless of the outcome), fines, assessments, penalties, forfeitures, judgments, settlements, orders, equitable relief of any kind, suffered, paid, incurred by, or sought from an Indemnified Party by any Person in connection with, in whole or in part, or arising or allegedly arising, directly or indirectly out of: (1) the inaccuracy or breach of any representation, warranty or covenant contained in this Agreement; (2) the presence, suspected presence, or threat of Contamination; (3) non-compliance with any Environmental Law, Institutional Control or Engineering Control; (4) any Environmental Claim; or (5) the filing or imposition of any environmental lien against the Property.

1.    Limitation on Third Party Indemnitor's Duty to Indemnify. If Third Party Indemnitor is the seller or a prior owner of the Property, Third Party Indemnitor's duty to indemnify and defend Indemnified Parties shall be limited to Environmental Risks arising from acts, omissions, events or conditions existing or occurring in connection with the condition, use or occupancy of the Property: (1) on or before the date title to the Property is transferred to Borrower; or (2) created or caused by Third Party Indemnitor, (including Third Party Indemnitor's employees, representatives, agents, contractors, or consultants), at any time after the date title to the Property is transferred to Borrower. As set forth in Paragraph VII herein, provided that neither SBA nor Lender has acquired title to the Property, Third Party Indemnitor may also limit its duty to indemnify under this Agreement by paying the entire balance due under the Loan Documents including any applicable pre-payment penalty.

2.    Duration of Indemnitors' Duty to Indemnify. Indemnitors' duty to indemnify and defend Indemnified Parties shall continue until the earlier of the following dates: (1) the Mortgage Release Date or (2) the date after which all pending and potential causes of action that could be asserted against any or all of the Indemnified Parties arising from Contamination or other matters addressed by this Agreement are finally resolved and satisfied in full, dismissed with prejudice and all appeal rights exhausted, or otherwise barred by the applicable statute of limitation.

**B.**    Demand for Indemnification or Tender of Defense.

1.    Procedure. In connection with any demand for indemnification or defense made pursuant to this Agreement, the Indemnified Party servicing the Loan shall notify the responsible Indemnitor(s) in writing as soon as reasonably practical and shall specify, to the best of Indemnified Parties' knowledge, the facts giving rise to the demand for indemnification or the need for legal defense.

2.      <u>Amounts Payable</u>. Any amount to be paid to Indemnified Parties by Indemnitors under this Agreement shall be a demand obligation, immediately due and payable, which Indemnitors hereby promise to pay, and shall bear interest at the monetary default interest rate provided for in the Note. Payments under this Agreement shall not reduce Borrower's obligations and liabilities under the Note or other Loan Documents.

3.      <u>Subrogation.</u> In the event Indemnitors pay Indemnified Parties any amount under this Agreement, Indemnitors shall be subrogated to any rights of Indemnified Parties relating thereto, provided, however, that such subrogation shall not be in derogation of any rights of Indemnified Parties under this Agreement, and shall not be construed to limit the obligations of Indemnitors hereunder.

## VII. THIRD PARTY INDEMNITOR'S ELECTION TO PAY LOAN BALANCE

In the event that either SBA or Lender makes a written demand on Third Party Indemnitor pursuant to this Agreement, and provided that neither SBA nor Lender has acquired title to the Property, Third Party Indemnitor may elect to pay the entire balance due under the Loan Documents, including any applicable pre-payment penalty, in exchange for (1) a release from all liability under this Agreement; and (2) an assignment of SBA and Lender's interest in the Loan Documents to Third Party Indemnitor.

## VIII. RELEASE AND WAIVER

**A.      Liability Related to Contamination.** Each Indemnitor waives all known and unknown rights and releases all claims and causes of action whether now or hereafter in existence that Indemnitor may have against SBA and Lender related to Contamination at the Property including the right, if any, to indemnification in the event SBA or Lender acquires title to the Property.

**B.      Alteration of SBA or Lender's Legal Rights.** If any document has been recorded that could alter SBA or Lender's legal rights, remedies or responsibilities such as provisions requiring lien subordination, special notice of default, or forbearance from initiating liquidation activities; or provisions requiring subsequent Property owners to waive legal rights and remedies, release claims or indemnify another Person, Indemnitors waive the right to enforce such provisions against SBA and Lender.

**C.      Buyout of Duty to Remediate.** If any document gives Third Party Indemnitor the option to pay a lump sum or provide other consideration to Borrower, whether directly or indirectly, in lieu of Remediating the Property, Third Party Indemnitor waives the right to enforce such provision without the prior written consent of SBA and Lender, and Borrower waives the right to receive such consideration without the prior written consent of SBA and Lender.

## IX. SUBORDINATION

**A.      Priority of Mortgage.** As set forth in greater detail in Exhibit "C", any lien to secure the

performance of any of Borrower's monetary or non-monetary obligations to Third Party Indemnitor shall be unconditionally subordinate to the Mortgage.

**B.     Indemnitor's Consent to Subordination.** Each Indemnitor independently represents and warrants that: (1) Lender has provided Indemnitor with the opportunity to examine the terms of the Mortgage and Loan Documents; and (2) Indemnitor understands that Lender has no obligation to Third Party Indemnitor to advance any funds under its Mortgage or see to the application of the Mortgage funds, and that any application or use of such funds for purposes other than those provided for in the Loan Documents shall not defeat, in whole or in part, the subordination of Third Party Indemnitor's rights and interests in the Property.

## X. LOAN DEFAULT

In the event of default on the Loan, SBA and Lender's obligation to Third Party Indemnitor shall not extend beyond complying with applicable law regardless of conflicting provisions, if any, in the Purchase and Sale Documents such as those requiring notice of Loan default, notice of Mortgage foreclosure, or forbearance prior to initiating liquidation activities on the Loan.

## XI. GENERAL PROVISIONS

**A.     Consideration.** Indemnitors acknowledge that: (1) they will receive direct and indirect benefits from the Loan; (2) that SBA and Lender have relied and will rely on the representations, warranties, covenants and agreements herein in closing and funding the Loan; and (3) that the execution and delivery of this Agreement is an essential condition but for which SBA and Lender would not make the Loan.

**B.     Primary and Unconditional Nature of Obligations.** Indemnitors' liability under this Agreement is direct and primary and not that of a guarantor or surety. Unless otherwise specified, the representations, warranties, covenants, agreements and other obligations set forth in this Agreement: (1) are not conditioned on fault or on any other event, occurrence, matter or circumstance; (2) are in addition to, and not in substitution for, any provisions regarding related matters in the Loan Documents; (3) shall not terminate on the Mortgage Release Date or be discharged or satisfied by payment or satisfaction of the Loan or foreclosure of the Mortgage; (4) shall continue in effect after any sale or transfer of the Loan or Property, including transfers pursuant to foreclosure proceedings or in lieu thereof; (5) shall apply regardless of whether or not a Governmental Entity issues an order requiring Remediation, indemnification or any other obligation of Indemnitors under this Agreement; and (6) shall not be affected or impaired by: (a) the voluntary or involuntary liquidation of all or substantially all of any Indemnitor's assets, including liquidation through a receivership, bankruptcy, reorganization or other similar proceedings; (b) SBA or Lender's failure to give any Indemnitor notice of any event or matter under this Agreement, the Loan Documents, or otherwise; (c) any finding or allegation that Lender or SBA is or was an "owner" or "operator" of the Property; (d) any extension of time for performance under any Loan Document; (e) any exculpatory provision in the Note, Mortgage or other Loan Documents limiting SBA or Lender's recourse to the Property or other security, or limiting SBA or Lender's right to a deficiency judgment; (f) the release of Borrower or any other Person from performance or observance of any agreement, covenant, term or condition in the Note, Mortgage, other Loan Documents or this Agreement; (g) the release or substitution in

whole or in part of any collateral for the Loan; (h) the determination by a Governmental Entity that a third party is responsible for the Contamination or its Remediation; or (i) any other act or omission of SBA or Lender other than those specially found by a court of law to have arisen out of gross negligence or willful misconduct.

  **C. Exhibits Incorporated by Reference.** All Exhibits hereto are deemed a part of this Agreement, incorporated and made a part of this Agreement, including: (1) Exhibit "A" – Legal Description of Real Property Securing Loan; (2) Exhibit "B" – Environmental Investigation Report; and (3) Exhibit "C" – Memorandum of SBA Environmental Indemnification Agreement.

  **D. Disclaimer**. This Agreement constitutes neither a finding by SBA or Lender, nor knowledge on their part, as to the risks to human health or the environment posed by any Contamination; nor does it constitute a representation by SBA or Lender that the Property is fit for any particular purpose.

  **E. Headings and Font Style.** The headings and font style (including bold lettering) used in this Agreement are for convenience of reference only and shall not be used to define the meaning of any provision.

  **F. Rights Not Exclusive.** SBA and Lender's rights and remedies under this Agreement are in addition to any explicit or implied rights and remedies SBA and Lender may have against Indemnitors or any other Person under the Loan Documents, at law, or in equity.

  **G. No Waiver; Rights Cumulative.** The rights and remedies available to SBA and Lender may be exercised separately or together, and as many times, and in any order that SBA or Lender choose. SBA and Lender may delay or forgo enforcing any of their rights without giving any up. Any waiver, consent or approval under this Agreement must be in writing and signed by all of the parties to be effective.

  **H. Assignment.** Indemnitors shall not assign, transfer or delegate this Agreement or any obligation of Indemnitors hereunder without the prior written consent of SBA and Lender which shall not be unreasonably withheld. Any attempted assignment, transfer or delegation without SBA and Lender's prior written consent shall be null and void. SBA and Lender may assign or transfer, in whole or in part, conditionally or otherwise, any interest in this Agreement without impairing the indemnification granted to SBA and Lender, which shall continue to exist for the benefit of SBA and Lender notwithstanding any such assignment or transfer.

  **I. Notice.** All notices, demands, consents and other communications required or that any party desires to give under this Agreement shall be in writing and delivered by fax, hand, courier, or by registered or certified United States mail, postage pre-paid, return receipt requested, to the appropriate address or, if applicable, facsimile number, specified at the end of this Agreement or to such other address or facsimile number as Indemnitors, SBA or Lender may designate in a written notice given to all parties to this Agreement. Notices that are delivered by facsimile, hand or courier shall be deemed received upon delivery or transmission. Notices that are deposited in the United States mail shall be deemed received 3 days after the date mailed. Notwithstanding the foregoing, a copy of any notice sent by facsimile shall also be delivered to the addressee by hand, overnight courier or United States mail, and any notice of change of address shall not be effective until actual receipt.

  **J. Consent to Jurisdiction.** Indemnitors consent to the jurisdiction of the United States

District Court for the Federal District in which the Property is located for all purposes in connection with any action or proceeding that arises out of or relates to this Agreement.

**K.     Construction.** This Agreement shall be governed by and its provisions construed in accordance with Federal law, and to the extent not inconsistent therewith, the laws of the state where the Property is located without regard to its choice of law principles. In the event a court of law or equity finds any provision of this Agreement, or the application thereof to any party or circumstance, to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to parties or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and enforced to the fullest extent permitted by law or equity.

**L.     Modification or Termination.** No amendment, modification, termination or cancellation of this Agreement shall be effective unless it is in writing signed by an authorized representative of each party.

**M.     Integration and Entire Agreement.** This Agreement sets forth the entire understanding of the parties and supersedes and merges all other written and oral negotiations, commitments, understandings and agreements relating to the subject matter hereof among the parties including contradictory provisions that would otherwise apply to Indemnified Parties, if any, contained in the Purchase and Sale Documents.

**N.     Counterparts.** The parties may sign this Agreement in identical counterparts. The signature pages from the separately signed counterparts may be attached to one copy of this Agreement to form a single document.

**O.     Memorandum of Agreement.** Concurrently with the execution of this Agreement, the parties shall execute a Memorandum of SBA Environmental Indemnification Agreement (the "Memorandum"), in the form attached hereto as Exhibit "C." The executed Memorandum shall be immediately recorded in the official records of the appropriate county or other government office in the state where the Property is located. In the event of a conflict between the terms of the Memorandum and this Agreement, the terms of this Agreement shall control.

**P.     Intentional Omission or False Statement.** Each party signing this Agreement acknowledges that intentionally falsifying or concealing any material fact with regard to the subject matter of this Agreement may result in prosecution under applicable laws including 18 U.S.C. 1344, which provides for fines up to $1,000,000 and imprisonment for up to 30 years.


[Add additional signature blocks as necessary including a signature block for the Operating Company, if any, identified in the Loan Documents.]

Borrower:

_____ [Insert name of Borrower]

By: _____

Name and Title: _____

Address:_____

Telephone Number: _____

Facsimile Number: _____


[Add notary acknowledgement]


Third Party Indemnitor:


_____ [Insert name of Third Party Indemnitor]


By:_____

Name and title: _____

Address:_____

Telephone Number: _____

Facsimile Number: _____


[Add notary acknowledgement]


Lender:


_____ [Insert name of CDC or lending institution]


By: _____

Name and Title: _____

Address:_____

Telephone Number: _____

Facsimile Number: _____

[Add notary acknowledgement]


U. S. Small Business Administration

By: _____

Name and Title: _____

Address:_____

Phone Number: _____

Fax Number: _____


[Add notary acknowledgement]


A copy of each notice, demand and other correspondence with regard to this Agreement must include the SBA Loan Number and be sent to:


Associate General Counsel for Litigation

Office of General Counsel

U.S. Small Business Administration

409 3rd Street S.W.

Washington, DC 20416

And to:

Legal Counsel for_____[Insert name of SBA District Office]

Name:_____

Address:_____

Phone Number: _____

Fax Number: _____

Exhibit "A"

Legal Description of Real Property Securing Loan
[To be inserted]

Exhibit "B"

Environmental Investigation Report

[To be inserted]

Exhibit "C"

Memorandum of SBA Environmental Indemnification Agreement

## Sample Recording Information

Return Address:

Please print or type information

Document title(s) (or transactions contained therein): Memorandum of SBA Environmental Indemnification Agreement

Grantor(s):

[Insert names of Borrower(s) and Third Party Indemnitor(s). For individuals, type last name first, then first name and middle initial. Add additional lines as necessary.]
1.
2.
3.

Grantee(s):
1. [Insert name of Lender.]
2. U.S. Small Business Administration, an Agency of the United States Government

Legal Description:

[Insert legal description or abbreviated legal description of Property: i.e., lot, block, plat or section, township, range.]

Assessor's Property Tax Parcel or Account Number at the time of recording:

[Insert Property tax ID number.]

Reference Number(s) of subordinated document(s):

[Insert recording number(s) of Third Party Indemnitor's document(s) to be subordinated to Mortgage securing SBA Loan and other lien instruments.]

Reference Number(s) of Document subordinated to:

[Insert recording number(s) of Mortgage securing SBA Loan and other lien instruments]

# EXHIBIT "C"

## MEMORANDUM OF SBA ENVIRONMENTAL INDEMNIFICATION AGREEMENT

SBA Loan No._____

This Memorandum of SBA Environmental Indemnification Agreement ("Memorandum") dated _____ [insert date of SBA Environmental Indemnification Agreement] is executed by _____ (whether one or more, "Borrower"),_____[insert name of indemnitor(s) not obligated on the SBA Loan] (whether one or more, "Third Party Indemnitor"), _____ [Insert name of Certified Development Company or Lending Institution] ("Lender"), and the U.S. Small Business Administration ("SBA").

## PURPOSE OF MEMORANDUM

The purpose of this Memorandum is to provide constructive notice of the un-recorded SBA Environmental Indemnification Agreement of even date with this Memorandum entered into by Borrower, Third Party Indemnitor, SBA and Lender (the "Agreement") pertaining to the real and personal property described therein including the land located at_____[Insert address] and legally described in Exhibit "A" attached hereto (collectively, the "Property"). The Agreement contains, but is not limited to, the following provisions, which are addressed in greater detail therein:

**A.**     Indemnification and Remediation. Borrower and Third Party Indemnitor agree to indemnify SBA and Lender against certain losses, liabilities, damages, etc., including attorney fees and costs, related to environmental contamination associated with the Property and other matters addressed and more fully set forth in the Agreement.

**B.**     Indemnitor's Election to Pay Loan Balance. Third Party Indemnitor may, under certain conditions, limit its duty to remediate and indemnify under the Agreement by paying the entire balance due under the Loan Documents including any applicable pre-payment penalty.

**C.**     Release and Waiver. Borrower and Third Party Indemnitor release and waive all rights, claims and causes of action against SBA and Lender with regard to environmental contamination at the Property and other matters addressed in the Agreement including the right to enforce any provision recorded in the chain of title to the Property that alters SBA or Lender's legal rights, remedies or responsibilities.

**D.**     <u>Warranties and Covenants</u>. Indemnitors warrant, among other things, that there are no documents recorded against the Property that would enable Third Party Indemnitor or its affiliates to control the use or ownership of the Property, such as a right of first refusal, purchase option, repurchase option, restrictive covenant, deed restriction, etc.; and covenant, among other things, not to record or cause to be recorded any such document before Borrower's SBA Loan has been paid in full.

**E.**     <u>Subordination.</u> Third Party Indemnitor unconditionally subordinates to SBA and Lender's Mortgage recorded in volume _____ of _____, page _____, under auditor's file number_____, records of _____ County, State of_____any right, title or interest Third Party Indemnitor has with respect to the Property, whether of record or not, including the following:

Third Party Indemnitor's_____[Insert description of lien, e.g., deed of trust, mortgage, UCC Financing Statement, etc.] dated_____, recorded in volume_____of_____, page_____under auditor's file number_____, records of_____County, State of_____.

[Add additional blocks as necessary.]

## II.      CONFLICTING TERMS OR PROVISIONS

Terms used in this Memorandum that are not defined herein, but are defined in the Agreement, shall have the meaning provided in the Agreement. To the extent any term or provision of this Memorandum conflicts with any term or provision of the Agreement, the terms and provisions of the Agreement shall control.

## III.  COUNTERPARTS

The parties may sign this Memorandum in identical counterparts. The signature pages from the separately signed counterparts may be attached to one copy of this Memorandum to form a single document.

[Add additional signature blocks as necessary including a signature block for the Operating Company, if any, identified in the Loan Documents.]

Borrower:

_____ [Insert name of Borrower]

By: _____

Name and Title: _____

Address:_____

Telephone Number: _____

Facsimile Number: _____

[Add notary acknowledgement]

Third Party Indemnitor:

_____ [Insert name of Third Party Indemnitor]

By:_____

Name and title: _____

Address:_____

Telephone Number: _____

Facsimile Number: _____

[Add notary acknowledgement]

Lender:

_____ [Insert name of CDC or lending institution]

By: _____

Name and Title: _____

Address: _____

Telephone Number: _____

Facsimile Number: _____


[Add notary acknowledgement]


U. S. Small Business Administration

By:


_____

Name and Title: _____

Address:_____

Phone Number:_____

Fax Number: _____


[Add notary acknowledgement]


A copy of each notice, demand and other correspondence with regard to this Agreement must include the SBA Loan Number and be sent to:


Associate General Counsel for Litigation

Office of General Counsel

U.S. Small Business Administration

409 3rd Street S.W.

Washington, DC 20416

And to:

Legal Counsel for_____[Insert name of SBA District Office]

Name: _____

Address: _____

Phone Number: _____

Fax Number: _____


ATTACHMENTS:

        Exhibit "A" - Legal Description of Real Property Securing Loan

## APPENDIX 7: SAMPLE BORROWING BASE CERTIFICATE & REPORT TO LENDER

FOR THE PERIOD ENDING_____, 20                    EFFECTIVE DATE OF LAST REPORT:

TO BE COMPLETED BY ALL ASSET BASED BORROWERS TO REPORT AND RECONCILE THEIR ACCOUNTS RECEIVABLE AND INVENTORY. THE VALUES HEREIN DO NOT PREVENT THE LENDER FROM MAKING THEIR OWN DETERMINATION OF APPROPRIATE VALUES.

<u>ACCOUNTS RECEIVABLE</u> (As of This Period)

| | | |
|---|---|---|
| 1. | Accounts Receivable From Previous Report | $ |
| 2. | (+) New Total Sales From Last Report | $ |
| 3. | (-) Less Cash Sales From Last Report | $ |
| 4. | (=) Total Credit Sales Since Last Report | $ |
| 5. | (-) Account Receivable Collection Since Last Report | $ |
| 6. | (+/-) Adjustments | |
| | (-) Non-Trade Receivables | $ |
| | (-) Affiliated Company Receivables | $ |
| | () Other:_____ | $ |
| 7. | (=) Net Accounts Receivable (As Of Period End) | $ |
| 8. | (-) Accounts Receivable Over 90 Days | $ |
| 9. | (=) Eligible Accounts Receivable (As Of Period End) | $ |
| 10. | (X) __ % of Eligible Accounts Receivable | $ |

<u>INVENTORY</u> (As of This Period)

| | | |
|---|---|---|
| 11 | **RAW MATERIAL INVENTORY** | $ |
| 12. | (+/-) Adjustments | |
| | ()_____ | $ |
| | ()_____ | $ |
| 13. | (=)     Total Eligible Raw Material Inventory: | $ |
| 14. | (X) __ % of Raw Material Inventory | $ |
| 15. | **WORK IN PROGRESS INVENTORY** | $ |
| 16. | (+/-) Adjustments | |
| | ()_____ | $ |
| | ()_____ | $ |

SOP 50 10 5(K)                                                                      Appendix 7

| | | | |
|---|---|---|---|
| 17. | (=) | Total Eligible Work In Progress Inventory: | $ |
| 18. | (X) | __ % of Work In Progress Inventory | $ |
| | | | |
| 19. | | **FINISHED GOODS INVENTORY** | $ |
| 20. | (+/-) Adjustments | | |
| | | ()_____ | $ |
| | | ()_____ | $ |
| 21. | (=) | Total Eligible Finished Goods Inventory: | $ |
| 22. | (X) | __ % of Eligible Finished Goods | $ |

<u>RECONCILIATION</u>

| | | |
|---|---|---|
| 23. | Total Lines 10, 14, 18, & 22 | $ |
| 24. | Face Amount of Note: | $ |
| 25. | Borrowing Base (Lesser of Line 23 or 24) | $ |
| 26. | Loan Balance form Previous Report | $ |
| 27. | (+) Plus Total Advances Since Last Report | $ |
| 28. | (-) Less Total Payments Since Last Report | $ |
| 29. | (=) Loan Balance Per Borrowers Books (Line 26 + 27 - 28) | $ |
| 30. | Approximate Amount Available To Borrower (Line 25 - 29) | $ |

The Above Is Certified To Be In Accordance With The Revolving Line Of Credit Authorization (<u>SBA Form 529B</u>)

Borrower:_____Loan Number:_____ _

Authorized Signature:_____Date:_____

\*          A Current Listing And Aging Of Accounts Receivable And Accounts Payable Are Attached

\*\*          Description Of Inventory And Certification Of Values Are Attached.

SOP 50 10 5(K)                                                                           Appendix 7

## SAMPLE BORROWING BASE CERTIFICATE & REPORT TO LENDER

**FOR THE PERIOD ENDING:**                                    _____, 20

**DATE OF LAST REPORT:**                                      _____, 20

**COMPLETED BY ALL CAPLINES ASSET BASED SUB-PROGRAMS BORROWERS TO REPORT AND RECONCILE THEIR ACCOUNTS RECEIVABLE AND INVENTORY. THE VALUES HEREIN DO NOT PREVENT THE LENDER FROM MAKING THEIR OWN DETERMINATION OF APPROPRIATE VALUES.**

Pursuant to the Loan Authorization and the Note between undersigned (Borrower) and (Lender) dated (          ), the Borrower hereby requests an additional loan as follows:

| | | |
|---|---|---|
| 1. | **Loan Balance on Previous Report** | $ |
| 2. | **Advances Since Last Report** | $ |
| 3. | **Total Payments Since Last Report** | $ |
| | (agrees w/#4 on reverse as long as loan balance exceeds collections) | |
| 4. | **Loan Balance on Books** | $ |
| 5. | **Amount Available to Borrow** | $ |
| | (from Collateral Reconciliation) | |
| 6. | **Amount Requested**     (If #5 above is positive) | $ |
| 7. | **Check attached for balance (If #5 above id Negative)** | $ |

**BORROWING BASE**

| | | |
|---|---|---|
| a. | **Total Accounts Receivable** | $ |
| b. | **Ineligible Accounts Receivable** | $ |
| c. | **Eligible Accounts Receivable** | $ |
| d. | **Accounts Receivable Advance Rate Percentage** | $ |
| e. | **Borrowing Level For Accounts Receivable** | $ |
| f. | **Total Inventory** | $ |
| g. | **Ineligible Inventory** | $ |
| h. | **Eligible Inventory** | $ |

SOP 50 10 5(K)                                                    Appendix 7

| | | |
|---|---|---|
| i. | **Inventory Advance Rate Percentage** | $ |
| j. | **Borrowing Level For Inventory** | $ |
| k. | **Borrowing Base (e + i)** | $ |

**The Above Is Certified To Be In Accordance With The Revolving Line Of Credit Authorization (SBA Form 529B)**

**Borrower:**

**Loan Number:**

**Authorized Signature:** _____**Date:**

\* **A Current Listing and Aging of Accounts Receivable and Accounts Payable are Attached**

\*\* **Description Of Inventory And Certification Of Values Are Attached.**

**SAMPLE BORROWING BASE CERTIFICATE & REPORT TO LENDER**


**COLLATERAL RECONCILIATION**


**ACCOUNTS RECEIVABLE**

| | | |
|---|---|---|
| 1. | Accounts Receivable Last Report | $ |
| 2. | Credit Sales Since Last Report | $ |
| 3. | Total | $ |
| 4. | Collections Since Last Report | $ |
| 5. | Accounts Receivable Per Books | $ |
| 6. | Ineligible Accounts Receivable | $ |
| 7. | Eligible Accounts Receivable | $ |

**INVENTORY**

| | | |
|---|---|---|
| 8. | Inventory Per Books | $ |
| 9. | Ineligible Inventory | $ |
| 10. | Eligible Inventory | $ |

**RECONCILIATION**

| | | |
|---|---|---|
| 11. | Accounts Receivable Borrowing Base | $ |

(_____percent of 7 above)

12.       **Inventory Borrowing Base**                                                     $

(_____percent of 10 above)

13.       **Total**                                                                        $

14.       **Face Amount of Note**                                                          $

15.       **Borrowing Base**                                                               $

16.       **Loan Balance on Books**                                                        $

17.       **Amount Available to Borrow**                                                   $
          **(#15 minus 16)**

## SAMPLE BORROWING BASE CERTIFICATE & REPORT TO LENDER

### LISTING OF INELIGIBLE ACCOUNTS RECEIVABLE AND INVENTORY

**ACCOUNTS RECEIVABLE**

| | | |
|---|---|---|
| A. | Accounts Receivable over 90 days | $ |
| B. | Contra Accounts | $ |
| C. | Foreign Accounts | $ |
| D. | Affiliate Accounts | $ |
| E. | Retention, Dated Sales, Consigned Sales | $ |
| F. | Credit Memo/Balances | $ |
| G. | Bonded Jobs | $ |
| H. | Pre-Billed Accounts | $ |
| I. | Total Ineligible Accounts Receivables | $ |

**INVENTORY**

| | | |
|---|---|---|
| J. | Work in Progress | $ |
| K. | Other Ineligibles | $ |

**(specify)**


**L.**     **Total Ineligible Inventory**                                            **$**


. . . . . . . . . . . . . . . . . . . . . . . .

# APPENDIX 8: REQUIREMENTS FOR ELECTRONIC SIGNATURES IN THE 7(A) AND 504 LOAN PROGRAMS

SBA Lenders may utilize electronic signatures in connection with 7(a) and 504 loans provided they comply with the performance standards outlined in this Appendix on SBA Forms and other documents requiring signatures.

The Electronic Signatures in Global and National Commerce (ESIGN)[1] Act, in conjunction with the Government Paperwork Elimination Act (GPEA), encourages agency acceptance of electronic signatures. Pub. L. 106-229, § 1 (June 30, 2000), 114 Stat. 464, codified at 15 U.S.C. §§ 7001-7006; and Pub. L. 105-277 (October 21, 1998). The ESIGN Act also grants agencies the ability to specify performance standards to ensure accuracy, integrity, and accessibility of records that are required to be retained.

The ESIGN Act defines electronic signature as "any electronic sound, symbol, or process attached to or logically associated with a contract or record and executed or adopted by a person with the intent to sign the record."[2] Signatories should follow this definition of electronic signature *with the exception that SBA will not accept an electronic signature that is solely voice or audio.* Electronic signatures include digital signatures.

SBA's policy is consistent with and requires SBA Lenders to comply with NIST Special Publication 800-63-2, and OMB Memorandum M-04-04 ("E-Authentication Guidance for Federal Agencies[3] and Guidance Document, Use of Electronic Signatures in Federal Organization Transactions", Version 2.0, January 25, 2013 (Specifically section D: "Requirements for Legally Binding Electronic Signatures")[4]). For electronic signatures to be legal and binding the requirements for electronic form of signature, intent to sign, association of signature to record, identification and authentication of signer, and integrity of the signed record must comply with OMB Memorandum M-04-04.

This Appendix specifies key requirements that SBA Lenders must comply with, in addition to those noted above, when implementing an electronic signature technology for SBA forms and documents. Electronic signatures meeting the requirements of this Appendix will be treated as equivalent to handwritten signatures. Nothing in this Appendix affects existing SBA requirements as to who is required to sign any specific document or which documents the SBA Lender is required to retain in the loan file.

   A. Electronic Form of Signature:

---

[1] ESIGN § 104(a)(3)

[2] ESIGN § 106(5)

[3] E-Authentication Guidance for Federal Agencies: https://georgewbush-whitehouse.archives.gov/omb/memoranda/fy04/m04-04.pdf

[4] https://s3.amazonaws.com/sitesusa/wp-content/uploads/sites/1151/2016/10/Use_of_ESignatures_in_Federal_Agency_Transactions_v1-0_20130125.pdf

For the SBA-approved forms of signature, the vendor must comply with "Use of Electronic Signatures in Federal Organization Transactions, Version 2.0, and January 25, 2013"; section D: "Requirements for Legally Binding Electronic Signatures."

The SBA will accept the following forms of signature.

1.  Symbols such as:

    a.  A typed name (e.g., typed at the end of an email message by the sender, or typed into a signature block on a website form by a party);

    b.  A digitized image of a handwritten signature that is attached to an electronic record;

    c.  A shared secret (e.g., a secret code, password, or PIN) used by a person to sign the electronic record;

    d.  A unique biometrics based identifier, such as a fingerprint, voice print, or a retinal scan; or

    e.  A digital signature.

2.  Processes such as

    a.  Using a private key and applicable software to apply a "digital signature;" or

    b.  Scanning and applying a fingerprint.

B.  Intent to Sign:

The signing ceremony must (1) clearly identify the reason for signing (e.g., agreement to the contract terms; acknowledgement of receipt, etc.), and (2) clearly specify the conduct that will indicate an intent to sign for the purpose of agreeing to that reason.

SBA Lenders are reminded that electronic signatures are only valid under the ESIGN Act if they are "executed or adopted by a person with the intent to sign the record." Therefore, SBA Lenders must establish that the signer intended to sign the record.

1.  Establishing intent includes:

    a.  Identifying the purpose for the Applicant/Borrower or other party signing the electronic record;

    b.  Being reasonably certain that the Applicant/Borrower or other party knows which electronic record is being signed; and

    c.  Providing notice to the Applicant/Borrower or other party that his or her electronic signature will be applied to, or associated with, the electronic record.

2.  SBA Lenders may establish the signatory's intent to use an electronic signature using any of the following or other similar methods:

    a.  An online dialog box or alert advising the Borrower or other party that continuing the process will result in an electronic signature;

    b.  An online dialog box or alert indicating that an electronic signature has just been created and giving the Applicant/Borrower or other party an opportunity to confirm or

   cancel the signature; or

  c. A click-through agreement advising the Applicant/Borrower or other party that continuing the process will result in an electronic signature.

C. Association of Signature to Documents:

 1. The signing process must:

  a. Ensure the document is presented to the signer before an electronic signature is obtained; and

  b. Be attached to, or logically associated with, the document that has been electronically signed for the life of the document.

 2. In addition, SBA will require electronic signatures to have a record/certificate that tracks:

  a. Certificate of Completion Status;

  b. Identity of the signer or a link to the source of identifying information, such as a validated UserID, a digital certificate, a biometric database, etc.;

  c. Date and time of the signature;

  d. Method used to sign the record; and

  e. An indication of the reason for signing and/or events associated with signature.

D. Identification and Authentication of Signer:

 1. Initial Establishment/Verification:

  The first time a signer requests the credentials to sign a document SBA requires proofing to be performed consistent with the standards in the current NIST 800-63 for Level 3 assurance. This notice tales the level 3 standard is noted below which was taken from page 34 of http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-63-2.pdf

| Level 3 | In Person | Remote |
|---------|-----------|--------|
| Basis for issuing credentials | Possession of verified current primary Government Picture ID that contains Applicant's picture and either address of record or nationality of record (e.g., driver's license or passport) | Possession of a valid Government ID (e.g., a driver's license or Passport) number and a financial or utility account number (e.g., checking account, savings account, utility account, loan or credit card) confirmed via records of both numbers. Note that confirmation of the financial or utility account may require supplemental information from the Applicant. |

| Registering Agent (RA)/Credential Service Provider (CSP) actions | **RA** inspects photo-ID and verifies via the issuing government agency or through credit bureaus or similar databases. Confirms that: name, DoB, address and other personal information in record are consistent with the application. Compares picture to Applicant and records ID number. If ID is valid and photo matches Applicant, then:<br><br>a) If personal information in records includes a telephone number, the **CSP** issues credentials in a manner that confirms the ability of the Applicant to receive telephone communications at a number associated with the Applicant in records, while recording the Applicant's voice or using alternative means that establish an equivalent level of non-repudiation; or<br><br>b) If ID confirms address of record, **RA** authorizes or **CSP** issues credentials. Notice is sent to address of record, or;<br><br>c) If ID does not confirm address of record, **CSP** issues credentials in a manner that confirms the claimed address. | **RA** verifies information provided by Applicant including ID number AND account number through record checks either with the applicable agency or institution or through credit bureaus or similar databases, and confirms that: name, DoB, address and other personal information in records are consistent with the application and sufficient to identify a unique individual. At a minimum, the records check for both the ID number AND the account number should confirm the name and address of the Applicant. For utility account numbers, confirmation shall be performed by verifying knowledge of recent account activity. (This technique may also be applied to some financial accounts.)<br><br>· Address confirmation:<br><br>*a)* **CSP** issues credentials in a manner that confirms the ability of the applicant to receive mail at a physical address associated with the Applicant in records;<br><br>or<br><br>*b)* If personal information in records includes both an electronic address and a physical address that are linked together with the Applicant's name, and are consistent with the information provided by the applicant, then the **CSP** may |

|  |  | issue credentials in a manner that confirms ability of the Applicant to receive messages (SMS, voice or e-mail) sent to the electronic address. Any secret sent over an unprotected session shall be reset upon first use and shall be valid for a maximum lifetime of 7 days. |
|--|--|--|

NIST Special Publication 800-63-2, and OMB Memorandum M-04-04, E-Authentication Guidance for Federal Agencies detail guidance for CSPs and RAs. Page 27 NIST Special Publication 800-63-2of states the requirements to becoming a Registering Agent as noted below.

> *"In the registration process, an Applicant undergoes identity proofing by a trusted RA. If the RA is able to verify the Applicant's identity, the CSP registers or gives the Applicant a token and issues a credential as needed to bind that token to the identity or some related attribute. The Applicant is now a Subscriber of the CSP and may use the token as a Claimant in an authentication protocol. This section describes the requirements for registration and for token and credential issuance.*

> *The RA can be a part of the CSP, or the RA can be a separate and independent entity; however, a trusted relationship always exists between the RA and CSP. Where the RA and CSP are separate entities, the trust relationship is often contractual, but the trust relationship may also be based on laws and regulations, such as when a notary performs the RA function. The RA or CSP maintain records of the registration. The RA and CSP can provide services on behalf of an organization or may provide services to the public. The processes and mechanisms available to the RA for identity proofing may differ as a result. Where the RA operates on behalf of an organization, the identity proofing process may be able to leverage a pre-existing relationship (e.g., the Applicant is an employee or student). Where the RA provides services to the public, the identity proofing process is generally limited to confirming publicly available information and previously issued credentials."*

2. Separate Action for Each Signature/Initial:

SBA Lenders must require a separate action by the signer, evidencing intent to sign, in each location where a signature or initials are to be applied.

3. Attribution:

Attribution is the process of associating the identity of an individual with his or her signature. Attribution will be performed at a Level 3 as defined in the identification section above. SBA Lenders must maintain evidence sufficient to establish that the electronic signature may be attributed to the individual purported to have signed.

The following methods are acceptable means of establishing attribution:

   a.  Selection by or assignment to the individual of a PIN, password, or other shared secret, that the individual uses as part of the signature process;

   b.  Delivery of a credential to the individual by a trusted third party, used either to sign electronically or to prevent undetected alteration after the electronic signature using another method;

   c.  "Out of band/wallet" information;

   d.  Measurement of some unique biometric attribute of the individual and creation of a computer file that represents the measurement, together with procedures;

4.  Authentication:

   Authentication refers to the process used to confirm an individual's identity as a party in a transaction. SBA requires the implementation of the NIST Special Publication 800- 63-2 Level 3 assurance level. Level 3 asserts the validity of the identity of the user with a high level of confidence. Level 3 provides multifactor remote network authentication.

   a.  For the first factor, the following are approved authentication mechanisms:

       i.    One time passwords sent to a user's email, SMS, or voice;

       ii.   In-person authentication;

       iii.  Electronic Notary;

       iv.   Hard token;

       v.    Public key;

       vi.   Biometrics.

   b.  The second factor will be using Knowledge Based Authentication (KBA). At this level, identity proofing procedures require verification of identifying materials and information.

       i.   SBA-approved independent sources include, but are not limited to:

            a)  National commercial credit bureaus;

            b)  Commercially available data sources or services;

            c)  State motor vehicle agencies; or

            d)  Government databases.

       ii.  KBA requirements are listed below.

            a)  SBA requires that the system use static (date of birth) information at a minimum.

            b)  The SBA Lender must verify an individual's name and date of birth, and either the Social Security number or driver's license number.

            c)  SBA prefers that the system utilize static and dynamic (verification of

account balances).

    d) The system must use multiple versions of the same question to protect against scripts and hacking.

    e) The system must randomly order the questions to protect against scripts and hacking.

    f) Failed attempts must be documented and reported to the SBA Lender.

    g) The system should lockout the user after 3 failed attempts.

    h) The system should delete accounts after 90 days of inactivity.

5. Credential Loss Management:

If an SBA Lender uses a PIN, password or other shared secret or delivery of a credential as the method of establishing attribution, the SBA Lender must have a system in place to ensure the security of all issued codes or credentials. One or more of the following acceptable loss management controls must be used:

    a. Maintaining the uniqueness of each combined identification code and password, such that no two individuals have the same combination of identification code and password;

    b. Ensuring that identification code and password issuances are periodically checked, recalled, or revised;

    c. Following loss management procedures to electronically de-authorize lost, stolen, missing, or otherwise compromised identification code or password information, and to issue temporary or permanent replacements using suitable, rigorous controls;

    d. Use of transaction safeguards to prevent unauthorized use of passwords or identification codes; or

    e. Detection and reporting of any attempts at unauthorized use of the password of identification code to the system security unit.

E. Integrity of Signed Record:

SBA Lenders must ensure that documents signed electronically cannot be altered without authorization and documented in an "audit trail." The documents must be tamper sealed to ensure their validity. Industry standard encryption must be used to protect the individual's signature and the integrity of the documents to which they are affixed.

If authorized changes to the document are made, the electronic process must be designed to provide an audit trail showing all alterations, the date and time they were made, and identify who made them.

The SBA Lender's system must be designed so that the signed document is designated as the "Authoritative Copy."

F. Electronic Signature Eligible Documents:

1. Unless otherwise prohibited by law, 7(a) Lenders and 504 CDCs may utilize electronic

signatures on the documents referenced below (collectively referred to as "Eligible Documents"), provided that the signatories comply with the standards outlined in this Notice. Electronic signatures cannot be used on any document identified below if the recording office requires wet signatures.

a. <u>Application Documents:</u> Electronic signatures may be accepted on all documents requiring signatures.

b. <u>Loan Closing Documents:</u> Electronic signatures may be accepted on all documents requiring signatures.

c. <u>Secondary Market Sale Documents:</u> With the exception of the Form of Detached Assignment for U.S. Small Business Administration Loan Pool or Guaranteed Interest Certificate (SBA Form 1088), electronic signatures may be accepted on all documents requiring signatures.

d. <u>Servicing Action – Pre-Disbursement Documents:</u> Electronic signatures may be accepted on all documents requiring signatures, including but not limited to change requests and supporting documentation.

e. <u>Servicing Action – Post-Disbursement Documents:</u> Electronic signatures may be accepted on all documents requiring signatures.

f. <u>Liquidation Documents:</u> Electronic signatures may be accepted on all documents requiring signatures.

g. <u>Litigation Documents:</u> Electronic signatures may be accepted on all documents requiring signatures, unless otherwise specified by a court order.

h. <u>Post Default Action Documents:</u> Electronic signatures may be accepted on all documents requiring signatures.

i. <u>Lender On-Boarding Documents:</u> Electronic signatures may be accepted on all documents requiring signatures, including but not limited to lender participation applications and agreements.

j. <u>Delegated Authority Documentation:</u> Electronic Signatures may be accepted on all documents requiring signatures, including but not limited to supplemental guaranty agreements.

k. <u>Targeted and Full SBA Lender Review Documentation:</u> Electronic Signatures may be accepted on all documents requiring signatures.

2. At this time, the use of electronic signatures is voluntary; however, SBA Lenders who choose to use electronic signatures must fully comply with the standards outlined in this Appendix and may be held liable for failure to adhere to these standards. This Appendix is not valid for transactions that require filing of security or other documents with a jurisdiction that does not have electronic filing capabilities. The E-Sign Act provides that section 101 of the Act (15 U.S.C. § 7001) "shall not apply to a contract or other record to the extent it is governed by … the Uniform Commercial Code, as in effect in any State, other than sections 1–107 and 1–206 and Articles 2 and 2A." 15 U.S.C. § 7003. Therefore, SBA Lenders need to comply with Uniform Commercial Code (UCC) Article 9-105 which outlines the requirements for

electronic chattel paper and article 3 of the UCC which outlines the electronic equivalent of a paper promissory note, known as a "Transferrable Record".

3. The concept of "Authoritative Copy" comes from UCC Art. 9-105. This revision to Article 9 was intended to address the problem of electronic chattel paper. Anticipating that there may someday be a technological means for identifying or controlling an electronic "original," the drafters of 9-105 came up with the parameters, including these requirements:

   a. A single authoritative copy of the transferable record exists which is unique, identifiable, and, except as otherwise provided in paragraphs d), e), and f) below, unalterable;

   b. The authoritative copy identifies the person asserting control as-

      i. The person to which the transferable record was issued; or

      ii. If the authoritative copy indicates that the transferable record has been transferred, the person to which the transferable record was most recently transferred;

   c. The authoritative copy is communicated to and maintained by the person asserting control or its designated custodian;

   d. Copies or revisions that add or change an identified assignee of the authoritative copy can be made only with the consent of the person asserting control;

   e. Each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy; and

   f. Any revision of the authoritative copy is readily identifiable as authorized or unauthorized.

4. ESIGN (Title II) and UETA (Section 16) create a parallel structure for the electronic equivalent of a paper promissory note, known as a "transferable record." Since the UCC Article 3 provisions for promissory notes were not designed for use with electronic records, both laws set forth special rules for the management and retention of Transferable Records, stating that an electronic record can be treated as the equivalent of a negotiable promissory note in certain respects if:

   a. The electronic record contains only the same terms and conditions that are permitted in a promissory note governed by Article 3 of the UCC;

   b. The electronic record is signed;

   c. The issuer of the record has agreed that it should be treated as a transferable record under the UETA; and

   d. The method used to record, register, or evidence a transfer of interests in the transferable record reliably establishes the identity of the person entitled to "control" (meaning control the transfer of) the electronic record.

5. The "safe harbor" for establishing control of the Transferable Record is taken directly from UCC 9-105 above.

G.  Vendor/Technology Selection Requirements:

An SBA Lender must ensure that any electronic signature technology vendor it uses:

1.  Complies with Section 101 of the ESIGN Act (http://www.gpo.gov/fdsys/pkg/PLAW-106publ229/pdf/PLAW-106publ229.pdf);

2.  Has the experience, capabilities, and expected longevity to meet all SBA electronic signature requirements;

3.  Includes vendor agreements that contain express provisions that vendors will comply with all applicable SBA requirements pertaining to this procedural notice;

4.  Includes vendor agreements language that would ensure that vendor representatives will be available to provide testimony to support the United States government in litigation regarding electronic signature data that will be introduced in court;

5.  Meets disaster recovery and archiving requirements; and

6.  Has adequate quality control processes.

H.  Lender Liability for Failure to Adhere to Prescribed Standards:

The Office of Credit Risk Management (OCRM) will review compliance with the ESIGN Act as well as standards outlined in this Appendix as components of lender/CDC oversight.

As with all Loan Program Requirements, SBA Lenders may be held accountable for not complying with the electronic signature standards and requirements set forth in this Appendix.

I.  Quality Control:

SBA Lenders must ensure their electronic signature policies and procedures meet all requirements including their own oversight of the electronic signature process.

J.  Record Retention:

SBA's record retention requirements are the same for both wet ink and electronic signatures. The audit trail as well as any computer systems (including hardware and software), controls, and documentation must be readily available for, and subject to, SBA inspection for the same periods as records signed in wet ink.

Federally-regulated Lenders also must adhere to the applicable record retention requirements established by their respective FFIR regulators.

SBA-supervised Lenders, i.e., Small Business Lending Companies, must follow the record retention requirements set out in 13 CFR 120.461, SOP 50 10, and SOP 50 57.

CDCs must follow the record retention requirements set out in SOP 50 10 and SOP 50 55.

An SBA Lender's system must be able to reproduce electronic records as accurately as if they were paper when printed or viewed. These records must be made available to SBA on request.

The table below highlights SBA's retention requirements for several documents.

| Loan Status | Retention Requirement |
|---|---|
| Inquiries, partial applications, and applications withdrawn, canceled or denied by the SBA. | Must be retained for 2 years after notification of incomplete application, withdrawal, cancelation or decline. After 2 years, the files may be destroyed using practices aligned with SOP 90 47 03. |
| General correspondence | Must be kept for 1 year. |
| Case-specific correspondence should be filed in the case file. | Must be retained for 10 years. |
| Paid off loan files (including the original application file, servicing file, and closing file). | Must be retained for 9 years after the loan is paid in full. |
| Files from liquidated loans (including the original application file, closing and servicing files). | Must be kept for 10 years after the loan was charged off. |